ACCEPTED
03-14-00726-CV
4089429
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/10/2015 12:09:14 PM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00726-CV

## IN THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/10/2015 12:09:14 PM
JEFFREY D. KYLE
Clerk

## TEXAS SAN MARCOS TREATMENT CENTER, L.P. d/b/a SAN MARCOS TREATMENT CENTER
*Appellant*

**v.**

## VERONICA PAYTON
*Appellee*

## On Appeal from Hays County, Texas, 428th Judicial District Court
## Trial Court Case Number: 13-2658

## BRIEF FOR APPELLEE

Adam S. Ward
Texas Bar No. 00788615
Keely Allison Ward
Texas Bar No. 00790220
Allison & Ward
2001 North Lamar Blvd.
Austin, Texas 78705
Telephone: (512) 474-8153
Facsimile:  (512) 474-9703
Email: allison-ward@sbcglobal.net

**Attorneys for Appellee,
Veronica Payton**

## ORAL ARGUMENT RESPECTFULLY REQUESTED

# I. IDENTITY OF PARTIES AND COUNSEL

In accordance with Rule 38.1(a) of the Texas Rules of Appellate Procedure, Appellee provides the following complete list of all parties and counsel to the trial court's order that forms the basis of this appeal.

**Trial and Appellate Counsel for Appellee Veronica Payton:**

Adam S. Ward
Texas Bar No. 00788615
Keely Allison Ward
Texas Bar No. 00790220
Aaron Allison
Texas Bar No. 24055098
Allison & Ward
2001 North Lamar Blvd.
Austin, Texas 78705-4907
Telephone: (512) 474-8153
Facsimile: (512) 474-9703
Email: allison-ward@sbcglobal.net
Email: keely@allisonwardllp.com
Email: aaron@allisonwardllp.com


Trial and Appellate Counsel for Appellate Counsel for Appellant Texas San Marcos Treatment Center, L.P. d/b/a San Marcos Treatment Center:

Ryan L. Clement
Texas Bar No. 24036371
SERPE JONES ANDREWS
CALLENDER & BELL, PLLC
2929 Allen Parkway, Suite 1600
Houston, Texas 77019
Telephone: (713) 452-4400
Facsimile: (713) 452-4499
Emails: rclement@serpejones.com

## II.     TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL…………………………………………..ii

TABLE OF CONTENTS………………………………………………………………iii

TABLE OF AUTHORITIES……………………………………………………………iv

STATEMENT OF THE CASE……………………………………………………….2

ISSUES PRESENTED……………………………………………………………..3

STATEMENT OF FACTS……………………………………………………………4

SUMMARY OF THE ARGUMENT…………………………………………………..11

ARGUMENT & AUTHORITY………………………………………………………..12

      A.     STANDARD OF REVIEW…………………………………………12

      B.     The Trial Court Did Not Abuse Its Discretion When Finding
            Dr. Reid's Report Satisfied the Requirements of Chapter 74
            And Denying Appellant's Motion to Dismiss……………………14

            1.     Section 74.351 Requires Only a "Good Faith"
                   "Fair Summary" of an Expert's Opinions……………..14

            2.     Dr. Reid's Report Provides A "Good Faith"
                   "Fair Summary" of Ms. Payton's Claims Against
                   San Marcos Treatment Center………………….....17

      C.     Dr. Reid's Expert Report Satisfies the Legislative Purpose of
            Chapter 74's Expert Report Requirement…………………………38

Conclusion & Prayer…………………………………………………………...39

Certificate of Compliance………………………………………………………..41

Certificate of Service……………………………………………………………..42

Appendix
A.     Expert report and curriculum vitae of Dr. William H. Reid, M.D. M.P.H.
B.     Cases

## III.  TABLE OF AUTHORITIES

**Cases**

Am. Transitional Care Ctrs. Of Tex. Inc. v. Palacios,
46 S.W. 3d 873 (Tex. 2001)…………………………………………………passim

Apodaca v. Russo,
228 S.W.3d 252 (Tex. App. – Austin 2007, no pet)………………………………16

Baylor All Saints Medical Center v. Martin,
340 S.W.3d 529 (Tex. App. – Fort Worth 2011, no pet)………….………..20, 21

Certified EMS, Inc. v. Potts,
392 S.W.3d 625 (Tex. 2013)……………………………………………………passim

Chadha, M.D. v. Rothert,
No. 03-13-00153-CV, 2014 WL 538815
(Tex. App. – Austin Feb. 5, 2014, no pet.)…………………………………….38

Christian Care Center, Inc. v. Golenko,
328 S.W.3d 637 (Tex. App. – Dallas 2011, pet denied)…………………………36

Christus Spohn Health Sys. Corp. v. Sanchez,
299 S.W. 3d 868, 877-78 (Tex. App. – Corpus Christi 2009, pet. denied)…..37, 38

Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238 (Tex. 1985)………………………………………………....12

Flores v. Fourth Court of Appeals,
777 S.W.2d 38 (Tex. 1989)…………………………………………………….12

Herbert v. Hopkins,
395 S.W.3d 884 (Tex. App. – Austin 2013, no pet.)…………………………...13

Jelenek v. Casas,
328 S.W.3d 526 (Tex. 2010)…………………………………………………...35

Kingwood Pines Hospital, LLC. V. Gomez,
362 S.W.3d 740 (Tex. App. – Houston [14th Dist.] 2011, no pet.)…………....20, 21

*Kloeris v. Stockdale*,
No. 01-09-00711-CV, 2010 WL 1241305
(Tex. App. -  Houston [1st Dist.] 2010, no pet.)……………………………….25, 26

*Kocurek v. Colby*,
No. 03-13-00057, 2014 WL 4179454
(Tex. App. – Austin Aug. 22, 2014, no pet.)………………………….…………..35

*Methodist Hosp. v. Shepherd-Sherman*,
296 S.W.3d 193 (Tex. App. Houston [14th Dist] 2009, no pet.)…………………..25

*Nexion Health at Garland, Inc. v. Treybig*,
No. 05-14-00498-CV, 2014 WL 7499373
(Tex. App. – Dallas, Dec. 31, 2014, no pet.)……………………………………19, 37

*Presbyterian Cmty. Hosp. of Denton v. Smith,*
314 S.W.3d 508 (Tex. App. – Fort Worth 2010, no pet.)…………………………19

*Shenoy v. Jean*,
No. 01-10-01116-CV, 2011 WL 6938538
(Tex. App. – Houston [1st Dist.] Dec. 29, 2011, no pet.)………………….23, 25, 32

*Smith v. Wilson*,
368 S.W.3d 574 (Tex. App. – Austin 2012, no pet.)……………………………...35

*Texarkana Nursing & Healthcare Center, LLC v. Lyle*,
388 S.W.3d 314 (Tex. App. – Texarkana 2012, no pet.)…………….………..20, 36

*Texas West Oaks Hosp. L.P. v. Williams*,
371 S.W.3d 171 (Tex. 2012)…………………………………………………………2

*TTHR Ltd. P'ship v. Moreno*,
401 S.W. 3d 41 (Tex. 2013)………………………………………….12, 15, 23

*UHS of Timberlawn, Inc. v. S.B.*,
281 S.W.3d 207, (Tex. App. – Dallas 2009, pet. denied)…………………………34

*Wissa v. Voosen*,
243 S.W.3d 165 (Tex. App. – San Antonio 2007, no pet.)………………...…25, 26

**Statutes**

Tex. Civ. Prac. Rem. Code §74.351………….………………………………passim

Tex. Civ. Prac. Rem. Code §74.351(a)………………………………………14

Tex. Civ. Prac. Rem. Code §74.351(b)……………………………………passim

Tex. Civ. Prac. Rem. Code §74.351(c).......................................…...3, 41

Tex. Civ. Prac. Rem. Code §74.351(l)………………………………………14

Tex. Civ. Prac. Rem. Code §74.351(r)(6)……………………………….12, 14

Tex. Civ. Prac. Rem. Code §74.351(s)………………………………………16

NO. 03-14-00726-CV

IN THE COURT OF APPEALS FOR THE
THIRD DISTRICT OF TEXAS

TEXAS SAN MARCOS TREATMENT CENTER, L.P. d/b/a
SAN MARCOS TREATMENT CENTER
*Appellant*

v.

VERONICA PAYTON
*Appellee*

On Appeal from Hays County, Texas,
428th Judicial District Court
Trial Court Case Number: 13-2658

BRIEF FOR APPELLEE

TO THE HONORABLE JUSTICES OF THE THIRD COURT OF APPEALS:

Appellee Veronica Payton ("Veronica Payton", "Ms. Payton" or "Appellee") files this brief in response to Appellant's, Texas San Marcos Treatment Center, L.P. d/b/a San Marcos Treatment Center ("San Marcos Treatment Center", "SMTC" or "Appellant") appeal from an order denying Appellant's motion to dismiss pursuant to section 74.351(b) of the Texas Civil Practices and Remedies Code in Trial Court Case Number 13-2658; *Veronica Payton v. Texas San Marcos*

*Treatment Center, L.P. d/b/a/ San Marcos Treatment Center*, in the 428th Judicial District Court of Hays County, Texas, before the Honorable R. Bruce Boyer.

## IV.    STATEMENT OF THE CASE

**Nature of the Case**:

This is a negligence case brought by Ms. Veronica Payton against her employer, San Marcos Treatment Center L.P. d/b/a San Marcos Treatment Center. San Marcos Treatment Center L.P. d/b/a San Marcos Treatment Center ("SMTC") is a nonsubscriber to the Texas Workers' Compensation Act. SMTC is a health care provider and pursuant to *Texas West Oaks Hosp. L.P. v. Williams*, 371 S.W.3d 171 (Tex. 2012), this is a health care liability claim. (CR 4-14).

**Trial Court Proceeding and Disposition**:

This case was originally filed on December 18, 2013. (CR 4).  On January 27, 2014, Ms. Payton timely served the 120-day expert report and Curriculum Vitae of Mr. William H. Reid, M.D., M.P.H. ("Dr. Reid") pursuant to Tex. Civ. Prac. Rem. Code § 74.351. (CR 22). Appellant filed objections to the report on February 18, 2014 (CR 22).  Appellant also objected to discovery based on its objections to the report. (RR 10, 18, 20). Appellant filed its motion to dismiss pursuant to 74.351(b) on July 9, 2014. (CR 22).  Ms. Payton filed her response to Appellant's motion to dismiss and filed a motion for sanctions against Appellant

2

on July 29, 2014. (CR 92-107). A hearing on Appellant's objections and Ms. Payton's motion for sanctions was held on September 22, 2014, before the Honorable Judge R. Bruce Boyer. (CR 127; RR 1-26). Judge Boyer overruled Appellant's objections and denied its Motion to Dismiss and denied Ms. Payton's motion for sanctions in an order dated October 30, 2014. (CR 118). Appellant's Notice of Appeal was filed on November 19, 2014. (CR 119-121).

**Requested Disposition from this Court:**

Ms. Veronica Payton requests that Judge R. Bruce Boyer's order dated October 30, 2014, be affirmed. In the alternative, should this Court find that the trial court abused its discretion by holding that Ms. Payton's expert report was sufficient, Ms. Payton requests that this Court remand the case to the trial court concerning Ms. Payton's request for a 30-day extension to cure pursuant to Tex. Civ. Prac. & Rem. Code 74.351(c). Ms. Payton requested such relief from the trial court below, but the trial court did not address the request because it found that Ms. Payton's expert report was sufficient. (RR 21).

## V. ISSUE PRESENTED

Did the trial court abuse its discretion by holding that Ms. Payton's expert report was sufficient, overruling Appellant's objections to the report, and denying Appellant's Motion to Dismiss?

3

## VI.    STATEMENT OF FACTS

This is an interlocutory appeal arising from an expert report challenge in a health care liability case.  San Marcos Treatment Center ("SMTC") is a facility licensed by the State of Texas to provide behavioral health care and treatment to adolescent patients. (CR 5).  San Marcos Treatment Center is divided into units, providing care and services to patients based upon, among other things, gender and treatment needs. (CR 5).  At all relevant times Veronica Payton was an employee of San Marcos Treatment Center working as an aide on a boys unit. (CR 5, 36). On December 7, 2011, a patient, Mr. Leroy Simon, was admitted to SMTC. (CR 5).  Mr. Simon was a 17 year old, "stocky", male patient with a long history of assaultive behavior, sex offenses, fights, borderline intellectual function or mild retardation, and chronic symptoms of intermittent explosive disorder, lack of impulse control, oppositional defiant disorder, and other mental and behavioral problems. (CR 36).  Mr. Simon also had an extensive criminal history, including out of state theft and assault charges and drug abuse. (CR 6).  On December 12, 2011 and December 13, 2011, Mr. Simon was evaluated at SMTC by, among others, T. Walter Harrell, PH.D. acting on behalf of SMTC. (CR 6).  The evaluation occurred in conjunction with a treatment plan for Mr. Simon's potential admission to SMTC (CR 6).  Mr. Simon was admitted to SMTC with the diagnoses of severe impulsivity or explosive expression of anger; severe defiant, disruptive or

4

destructive behavior; dangerous self-injurious or unsafe behaviors; severe deterioration of function in family, school, and or community; cognitive/processing disturbance interfering with social adaption and learning; sexual reactive or offending behavior; and sexual behavior problems (CR 6). Mr. Simon was housed on the boys unit to which Ms. Payton was assigned. (CR 36). On January 2, 2012, Ms. Payton and another female employee were responsible for 17 patients on the unit. (CR 6, 36). Many, perhaps all, the patients, other than Mr. Simon were younger than Mr. Simon, aged 11 years and up, and smaller than Mr. Simon. (CR 34, 35, 36). On January 2, 2012, Mr. Simon asked to do his laundry in preparation for classes the following day. (CR 6). The laundry facility was located off the boys unit in an unoccupied section of SMTC, because the laundry equipment located on the boys unit had been broken for some time. (CR 7, 36). Ms. Payton escorted Mr. Simon to the functioning laundry. (CR 36). Mr. Simon was not under any particular monitoring or containment order or special supervision. (CR 34). Ms. Payton was not notified or otherwise advised that Mr. Simon was potentially assaultive or otherwise dangerous, or that escorting him off the unit to the laundry alone was unsafe. (CR 33). If Ms. Payton had been aware that Mr. Simon was potentially assaultive or otherwise dangerous, she would not have escorted him to the laundry alone. (CR 35). If there had been one more capable staff person on the unit, Ms. Payton would not have believed it necessary to accompany Mr. Simon to

5

the laundry alone. (CR 35). If there had been one more staff member who was male on the boys unit, Ms. Payton would not have been a sole female alone with Mr. Simon in the laundry. (CR 35). Ms. Payton received no training from SMTC regarding her safety in the workplace, and particularly none related to recognizing potentially dangerous patients, recognizing potentially assaultive patients or protecting herself from patient assault and no training regarding the dangers of escorting patients such as Mr. Simon off-unit alone. (CR 33, 35). If Ms. Payton had received adequate training regarding the dangers of escorting patients such as Mr. Simon off-unit alone, she would not have escorted him alone to the laundry room. (CR35). While returning to the boys unit, Mr. Simon attacked Ms. Payton. (CR 7). Mr. Simon suddenly and violently assaulted Ms. Payton, quickly overpowering her, choking her, knocking or otherwise forcing her to the ground, hitting and kicking her, and forcing her head into a wall. (CR 36). Ms. Payton could not call for help because she could not breathe. (CR 7). Mr. Simon threw Ms. Payton to the ground while maintaining the choke hold on her. (CR 7). Ms. Payton realized she was not going to get away from Mr. Simon so she "played dead". (CR 7). When Ms. Payton "played dead" Mr. Simon loosened his hold on her. (CR 7). Ms. Payton grabbed her writing pen and began trying to stab Mr. Simon by thrusting her arm next to her head in an attempt to strike Mr. Simon in the face and make him release his strangle hold. (CR 7). Mr. Simon tightened his

hold on Ms. Payton's neck and she lost consciousness. (CR 7, 36). Once Ms. Payton was unconscious, Mr. Simon released the choke hold. (CR 7). Ms. Payton regained consciousness to find Mr. Simon was still there. (CR 7). Ms. Payton then struck out at Mr. Simon and he began hitting and kicking her. (CR 7, 36). Then, Mr. Simon ripped Ms. Payton's keys, which she wore on a necklace, off her neck and ran out of the area. (CR 7, 36). As Mr. Simon ran away, Ms. Payton was able to yell for help and other staff members came to her aide. (CR 7, 36). The assault was recorded on an unmonitored video camera. (CR 7). SMTC staff called 911. (CR 36). Mr. Simon used Ms. Payton's keys to flee SMTC's facility. (CR 7). Mr. Simon ran to a residence a few blocks away from SMTC and told the resident that he (Mr. Simon) had been assaulted by a group home employee and needed help. (CR 7-8, 36). San Marcos Police Department apprehended Mr. Simon and after determining that Mr. Simon's story was false, arrested him. (CR 8, 36). Mr. Simon was indicted for aggravated assault with a deadly weapon (his fists and arms). (CR 8, 36). Ms. Payton was transported by ambulance to Central Texas Medical Center ("CTMC") from SMTC. (CR 7, 36). Ms. Payton received medical follow-up from her primary care physician, Dr. Chris Larson. (CR 36). Dr. Larson quickly recognized symptoms of acute and chronic stress disorder due to the assault. (CR 36). Ms. Payton was evaluated by psychiatrist Andrew Brylowski and psychologist Dr. Edward Kotin. (CR 36). Dr. Brylowski found very significant

7

anxiety and depression and diagnosed "acute stress reaction" and major depressive disorder. (CR 36). Video of the assault, emergency room records, and outpatient general medical records all indicate injuries, including neck and back injuries and concussion as well as both acute and chronic post-traumatic mental symptoms, including post traumatic stress disorder. (CR 34).

In order to contradict or correct the "facts" in Appellant's brief regarding Ms. Payton's allegations against SMTC, Appellee states the following allegations from her original petition lettered A-E in this statement of facts. On December 18, 2013 Ms. Payton filed suit against San Marcos Treatment Center alleging negligence on the part of SMTC for SMTC's failure to meet five standards of care. (CR 9-11). A) SMTC failed to meet the duty/standard for adequate staffing when it failed to provide adequate staffing to meet foreseeable needs for patient care and staff and patient safety. (CR 9). Staffing was inadequate on Ms. Payton's unit on January 2, 2012, and was lower than that required by plans of correction and/or other agreements with the Texas Department of Family and Protective Services ("DFPS"). (CR 10). The unit in question was supposed to have had at least three staff on the shift during which the assault occurred (but instead only had two) and that at least one of the staff was supposed to be male (not the case on the January 2, 2012, evening shift). (CR 10-11). B) SMTC failed to meet the relevant duty/standard regarding training when it failed to provide Ms. Payton with

8

adequate training regarding safety in a workplace which contained foreseeable threats to staff safety. (CR10). Ms. Payton never received any SMTC training regarding her safety in the workplace related to recognizing potentially dangerous patients, recognizing potentially assaultive patients, or protecting herself from patient assault. (CR 10). C) SMTC failed to meet the relevant duty/standard regarding adequate notification when it failed to provide Ms. Payton with information or notification that Mr. Simon was likely to be assaultive or otherwise dangerous to staff and/or patients. (CR 10). SMTC knew that Mr. Simon had a pre-admission history of, among other things, "severe impulsivity or explosive expression of anger", yet Ms. Payton was not notified or otherwise advised that he was potentially assaultive or otherwise dangerous, or that her escorting him alone was unsafe. (CR 10). D) SMTC failed to meet the relevant duty/standard regarding Mr. Simon's admission when it admitted, allowed to be admitted, and/or allowed housing on the children's unit without adequate containment and/or supervision, Mr. Simon was a 17 year old "stocky" male sex offender with a substantial history of aggression, fights with staff and peers, criminal assault, severe problems with physical and sexual conduct, conduct disorder, poor impulse control and/or frequent inability to resist aggressive an sexual impulses, which had manifested themselves both in and outside of residential treatment settings. (CR 10-11). SMTC knew that Mr. Simon had a pre-admission history of, among other things,

9

"severe impulsivity or explosive expression of anger" and other dangerous behaviors and symptoms. (CR 11). SMTC was well aware, or should have been aware, that Mr. Simon was inappropriate for admission to SMTC and/or was not suited, in terms of staff and patient safety, for housing on the unit on which he was housed, without special supervision or containment. (CR 11). E) SMTC failed to meet the relevant duty/standard regarding amelioration or elimination of risks when it failed to adequately contain, supervise, and/or monitor Mr. Simon to ameliorate his danger to others and protect staff and patients on and before January 2, 2012. (CR 11). Mr. Simon was not under any particular monitoring or containment order, special supervision, or the like, which should have been commensurate with his known history and behavioral/mental conditions. (CR 11). SMTC knew or reasonable should have known that Mr. Simon was dangerous or assaultive and should have been physically contained and/or supervised by more than one female staff person. (CR 11). SMTC did nothing physically or clinically to ameliorate the danger from Mr. Simon to staff and other patients. (CR 11). Appellee also made other allegations in its original petition not addressed by Appellant in its statement of facts. (CR 4-14).

Also in response to Appellant's statement of the "facts", Dr. Reid's report contains relevant facts concerning the staffing on January 2, 2012; the education and training or lack thereof provided to Ms. Payton, the information or lack thereof

10

shared with health care staff concerning the patient's condition and propensities, factual information concerning the admission of Mr. Simon and placement on unit, supervision and monitoring provided, and efforts to reduce the risk of danger and protect patients and/or staff. (CR 32-39).

On October 30, 2014, the trial court overruled Appellant's motion to dismiss pursuant to 74.351(b). (CR 118). Appellant filed its notice of appeal on November 19, 2014 and this interlocutory appeal ensued. (CR 119).

## VII. SUMMARY OF THE ARGUMENT

The expert report by Dr. Reid very clearly and specifically sets forth five standards of care as they apply to San Marcos Treatment Center and specifically details how those standards of care were breached. Dr. Reid's report informs San Marcos Treatment Center of the specific conduct called into question, notifying it as to what it should have done differently. Dr. Reid's report also describes how the breaches in the standard of care led to Ms. Payton's assault and subsequent injuries. Appellant is asking this Court to hold Dr. Reid's expert report to a much higher standard than the "fair summary" standard mandated by Chapter 74. Appellant wants the report to marshal all the evidence in detail without the benefit of discovery of Appellant's records and without any depositions. The law is clear that Dr. Reid's report must only provide a "good faith" "fair summary" of his

11

opinions. Tex. Civ. Prac. Rem. Code §74.351(r)(6); *Am. Transitional Care Ctrs. Of Tex. Inc. v. Palacios*, 46 S.W. 3d 873 (Tex. 2001); *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625 (Tex. 2013). Dr. Reid's report provides a "good faith" "fair summary" of his opinions and satisfies the Legislative goal of Chapter 74 to "deter baseless claims, not to block earnest ones". *Id.* The trial court did not abuse its discretion by finding Dr. Reid's report sufficient and overruling Appellant's motion to dismiss pursuant to 74.351(b).

## IIX. ARGUMENT & AUTHORITY

### A. Standard of Review

This Court reviews a trial court's ruling on a §74.351 motion to dismiss under an abuse of discretion standard of review. *Am. Transitional Care Ctrs. of Tex. Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *TTHR Ltd. P'ship v. Moreno*, 401 S.W. 3d 41, 44 (Tex. 2013). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for the trial court's judgment. *Flores v. Fourth Court of Appeals*, 777 S.W.2d 38, 41 (Tex. 1989). This Court described the abuse of discretion standard as it applied to a trial court's ruling on a

12

§74.351 motion to dismiss in *Herbert v. Hopkins*, 395 S.W.3d 884, 891 (Tex. App.

– Austin 2013, no pet.).  This Court stated,

> We do not, in other words, examine the contents of Dr. White's reports and make our own de novo determination as to whether he has provided sufficient information, with respect to his opinions regarding standard of care, breach, and causation, to (1) inform appellees of the specific conduct the Heberts have called into question; and (2) provide a basis for the district court to conclude that the claims have merit. *See Jelinek*, 328 S.W.3d at 538-40 & n. 9; *Wright*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878-79.  Instead we determine only whether the district court acted arbitrarily, unreasonably, and without reference to guiding rules and principles in determining that the reports failed to provide that information. *See Wright*, 79 S.W.3d at 52; *see also Jelinek*, 328 S.W.3d at 542 (Jefferson, C.J., dissenting) ("The dividing line between a sufficient and an inadequate report is impossible to draw precisely.  We have said, therefore, that the determination must be made in the first instance by the trial court, and review of that decision asks not how an appellate court would have resolved that issue, but instead whether the trial court abused its discretion.")(citing *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006); *Walker v. Gutierrez*, 111 S.W.3d 56, 63 (Tex. 2003)).

The trial court did not abuse its discretion in finding that Dr. Reid's report satisfied

the requirement of Chapter 74 and in denying Appellant's Motion to Dismiss,

because Dr. Reid's report provides a "good faith" "fair summary" of Ms. Payton's

claims against Appellant.

13

**B.** **The Trial Court Did Not Abuse Its Discretion When Finding Dr. Reid's Report Satisfied the Requirements of Chapter 74 and Denying Appellant's Motion to Dismiss**

**1.** **Section 74.351 Requires Only a "Good Faith" "Fair Summary" of an Expert's Opinions**

Section 74.351 requires a plaintiff asserting a health care liability claim to submit an expert report, along with the expert's curriculum vitae no later than the 120th day after filing suit. Tex. Civ. Prac. & Rem. Code Ann. §74.351(a). The Act describes an expert report as a written report providing "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. §74.351(r)(6).

If the report filed constitutes a good faith effort to provide a fair summary of the expert's opinions regarding the plaintiff's claims, a §74.351(b) motion to dismiss must be denied. Tex. Civ. Prac. & Rem. Code Ann. §74.351(l). A "good-faith" effort only requires that the report discuss the elements of the plaintiff's claims with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. *Am. Transitional Care Ctrs. of Tex. Inc. v.*

*Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). The plaintiff is not required to marshal all its evidence. *Palacios* at 879. The plaintiff is not required to present evidence in the report as if it were actually litigating the merits. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013) *citing Palacios* at 879. Rather, the report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. *Id.*

A report that satisfies the elements as to only one theory of liability, entitles the claimant to proceed with a suit against the physician or health care provider. *Potts* at 630. For a particular liability theory the report must sufficiently describe the defendant's alleged conduct. *Id*. Such a report both informs a defendant of the behavior in question and allows the trial court to determine if the allegations have merit. *Id*. If the trial court decides that a liability theory is supported, then the claim is not frivolous, and the suit may proceed. *Id*.; *TTHR Limited P'ship v. Moreno*, 401 S.W.3d 41 (Tex. 2013).

The Texas Supreme Court described its reasoning in *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, at 632 by stating, "The expert report requirement is a threshold mechanism to dispose of claims lacking merit. . . while a full development of all liability theories may be required for pretrial motions or to convince a judge or jury during trial, there is no such requirement at the expert

15

report stage." An expert report is not required to prove defendant's liability, but rather to provide notice of what conduct forms the basis for the plaintiff's complaints. *Apodaca v. Russo*, 228 S.W.3d 252, 255 (Tex. App. – Austin 2007, no pet.). The Act requires the expert report to summarize the expert's opinions as of the date of the report recognizing that those opinions are subject to further refinement *Potts*, 392 S.W.3d at 632.

Applying a less stringent standard at the Chapter 74 report stage versus at summary judgment or trial makes sense when one considers the timing of Chapter 74 reports. Section 74.351(s) provides that until a plaintiff has served its expert report(s) and curriculum vitae of its expert all discovery is stayed except for the acquisition by the plaintiff of information related to the plaintiff's health care through written discovery, depositions on written questions, and discovery from non-parties. Tex. Civ. Prac. & Rem. Code §74.351(s). Thus, expert reports are generally produced before the defendant has been deposed, and even before any oral depositions have been taken in the case. Requiring an expert to know all the facts of the case exactly as they happened at this early stage of the lawsuit would place an impossible burden upon plaintiff's expert that could never be met. *See Potts*, 392 S.W.3d at 632. This is why the statute requires only a "fair summary" of the plaintiff's claims. Dr. Reid's report is a "fair summary" of his opinions as of the date of the report regarding the applicable standard of care, the manner in

which the care rendered by San Marcos Treatment Center failed to meet the standard and the causal relationship between the failure and the injury, harm or damages claimed.

**2.    Dr. Reid's Report Provides A "Good Faith" "Fair Summary" of Ms. Payton's Claims Against San Marcos Treatment Center**

Dr. Reid's report specifically states five separate standards of care, specifically states how Appellant breached each of the standards of care and how the breach of the standard of care caused harm to Ms. Payton. Dr. Reid's report satisfies the requirements of informing the defendant of the conduct the plaintiff has called into question providing a basis for the trial court to conclude that the claims have merit. *See  Am. Transitional Care Ctrs. of Tex. Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). Appellant's arguments that Dr. Reid's report failed to identify any of the standards of care, failed to advise Appellant as to what it should have done, and failed to link the breaches to the harm suffered by Mr. Payton because Dr. Reid failed to link any facts to his opinions and therefore his opinions are conclusory are incorrect.

Dr. Reid states five standards of care that were breached by Appellant and links facts to his conclusions for each standard of care and breach. For the first

17

standard Dr. Reid states in relevant part,

> That employer (SMTC) by itself and through its various parts or assigns, had duties to its unit employee Ms. Payton which included… adequate staffing and staff support in her work environment sufficient to meet reasonable levels of staff safety, as well as patient safety and care.

(CR 32). Dr. Reid also states that SMTC failed to meet this standard when it "failed to provide adequate staffing to meet the foreseeable needs for patient care and staff and patient safety". (CR 33). Dr. Reid continues his opinion with details as to how SMTC breached the standard stating,

> [The] evening shift staffing was inadequate on Ms. Payton's unit on January 2, 2012, and was lower than that required by plans of corrections and/or other agreements with the Texas Department of Family and Protective Services (DFPS). Specific staffing data from SMTC is not yet available to me; materials from DFPS, however, indicate a number of recent (to 1/02/2012) agency findings of inadequate staffing on the clinical units, as well as agreed upon DFPS specifications for correcting unit staffing deficiencies. It is my understanding (and this opinion is predicated on the accuracy of that understanding) that the unit in question was supposed to have had at least 3 staff persons on the shift on which the assault occurred (but instead only had 2) and that at least one of the staff was supposed to be male (not the case in the 1/02/2012, evening shift).

(CR 33). In discussing causation Dr. Reid states,

> SMTC's failures to meet the applicable standards…foreseeably led to (i.e., were a significant cause of) damages to Ms. Payton…But for one or more of the breaches by SMTC…it is more likely than not that the January 2, 2012, assault would not have occurred, and thus …damages to Ms. Payton, would not have occurred. Specifically, if staffing had been adequate (that

18

is, at least one more capable staff person on the 17-patient unit), Ms. Payton would not have believed it necessary to accompany Leroy Simon to the laundry alone… if there had been adequate male staffing on the boy's unit, Ms. Payton would not have been in the position of being a sole female vulnerable to attack by a physically stronger, younger male.

(CR 34-35). These statements by Dr. Reid regarding adequate staffing are not conclusory but provide specific facts upon which his opinions are based and tell the Appellant specifically what it should have done but failed to do and without which the assault and injuries suffered by Ms. Payton would not have occurred.

Dr. Reid explains the basis of his statements and links his conclusions to the facts. Appellant mischaracterizes Dr. Reid's report by simply citing the first page of the report without including all the statements regarding the five standards, breach, and causal nexus contained in the rest of the report as evidence that his opinions are conclusory concerning the applicable standard of care. *See Appellant's Brief* at 16. The whole report, not just a few statements, determine if the report is a "fair summary" of the expert's opinions. *Nexion Health at Garland, Inc. v. Treybig*, No. 05-14-00498-CV, 2014 WL 7499373, (Tex. App. – Dallas, Dec. 31, 2014, no pet.); *Presbyterian Cmty. Hosp. of Denton v. Smith*, 314 S.W.3d 508, 514 (Tex. App. – Fort Worth 2010, no pet.)(in defining expert report rejected a hospital's argument that "several individual statements in [the expert's] report [were] insufficient" because the "report as a whole, provide[d] a 'fair summary' of [the expert's] opinions"). Dr. Reid's report as a whole is a "good faith" "fair

19

summary" his of opinions on each standard of care, breach and the causal nexus between the breach and the harm, injuries or damages suffered by Ms. Payton.

Appellant claims Dr. Reid's statements concerning the standards of care "mirror" those found in other assault cases wherein the expert's report was found to be deficient citing *Texarkana Nursing & Healthcare Center, LLC v. Lyle*, 388 S.W.3d 314 (Tex. App. – Texarkana 2012, no pet.); *Baylor All Saints Medical Center v. Martin*, 340 S.W.3d 529 (Tex. App. – Forth Worth 2011, no pet.); and *Kingwood Pines Hospital, LLC. V. Gomez*, 362 S.W.3d 740 (Tex. App. – Houston [14th Dist.] 2011, no pet.). *See Appellant's Brief* at 17. The report in *Texarkana* was found to be deficient because the expert report only stated, "Texarkana Nursing failed to provide 'a safe and secure environment for its residents, allowing the documented assault of Ms. Vest by one of its own employees'." *Texarkana* at 319. The Texarkana Court of Appeals found this single statement by itself and without any additional statements to inform the defendant as to what it should have done differently did not advise the defendant of what should have been done in order to prevent its employee from assaulting a patient. *Texarkana* at 320-21. In contrast, Dr. Reid's report goes well beyond a single statement like the one in *Texarkana* and details exactly what SMTC should have done to prevent Ms. Payton from being assaulted. For example, Dr. Reid's statements regarding adequate staffing do not "mirror" those found *Texarkana*. Dr. Reid makes clear

20

what SMTC should have done regarding staffing: SMTC should have had one more capable staff person on the 17 patient unit because they should have had 3 staff members but only had 2 and at least one of the staff members should have been male, which was not the case.

Appellant's reliance on *Baylor All Saints Medical Center v. Martin, 340 S.W. 3d 529 (Tex. App.- Fort Worth 2011, no pet.)* is also misplaced. In *Baylor*, the court found the report to be insufficient because the report stated there must be policies in place to safeguard patients from assault including employing a sufficient number of security personnel. *Baylor* at 534. The court found the expert report failed to indicate what specific policies and safeguards should have been in place and the number of security personnel needed was not described. *Id.* Clearly Dr. Reid's report is more specific than the report in *Baylor* and does not "mirror" the language of the expert report in *Baylor*. For example, regarding adequate staffing Dr. Reid specifically states the number of staff members Appellant should have had on the unit in which Ms. Payton was working when she was assaulted.

The *Kingwood* case cited by Appellant is likewise distinguishable. In *Kingwood,* the expert stated a failure "to ensure that there were appropriately trained and adequate staffing and milieu structure such that a young girl … would not be sexually molested" the report stated the standard of care was breached when the physician failed to insure her patient's safety using "any number of measures

available", by failing to "provided additional supervision" and not affording the patient "the most basic supervision". *Kingwood* at 748. The court found that the report did not provide information about how the *physician* was to insure that the *hospital* was adequately staffed and that staff members were appropriately trained or what measures were available to insure the patient's safety. *Id.* The expert's report in *Kingwood* did not indicate what kind of supervision by the hospital was sufficient to provide a secure environment for the patient. *Kingwood* at 750. Dr. Reid's report clearly informs SMTC as to what it should have done but did not. For example, regarding staffing, Dr. Reid does state specifically how many staff members SMTC should have had on the unit at the time of the assault but did not. (CR 33-36). Clearly Dr. Reid's report is more specific than the one the court considered in *Kingwood* and does not "mirror" the statements of the expert report in *Kingwood*.

Appellant argues that Dr. Reid's opinions regarding adequate staffing are conclusory because Dr. Reid states that "specific staffing data from SMTC is not yet available to me". *See Appellant's Brief* at 26. The fact that Dr. Reid has not yet seen staffing data from Appellant does not make his statements conclusory. The Texas Supreme Court stated in *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013), "The Act requires the expert report to summarize the expert's opinions as of the date of the report recognizing that those opinions are subject to

further refinement". Additional facts may give rise to additional theories of liability and change theories of liability which are allowed. *Id.* Requiring an expert to know all the facts of the case exactly as they happened at this early stage of the lawsuit would place an impossible burden upon plaintiff's expert that could never be met. *Id.* The court accepts the factual statement for purpose of sufficiency of expert report inquiry. *Shenoy v. Jean*, No. 01-10-01116-CV, 2011 WL 6938538 (Tex. App. – Houston [1st Dist.] Dec. 29, 2011, no pet.). Dr. Reid's opinions are based upon the facts known at the time of the report which he links to his opinions regarding the standard of care, breach and causation and his opinions are neither speculative nor conclusory.

It is necessary to address the additional four standards of care, breach and causal nexus beyond adequate staffing that Dr. Reid discusses in his report because if any of the five standards and their breach and causal nexus described in Dr. Reid's report represents a "good faith" "fair summary" of Dr. Reid's opinions, then the trial court did not abuse its discretion and the case proceeds on all theories of liability against Appellant. See *Potts* at 630; *TTHR Limited P'ship v. Moreno*, 401 S.W.3d 41 (Tex. 2013).

The second standard of care breached by SMTC relates to adequate training.

Dr. Reid states in relevant part,

> SMTC… had duties to its unit employee Ms. Payton which included...adequate training with regard to recognizing, and managing situations that might arise in which her safety could be compromised…SMTC failed to meet the relevant duty/standard-per 1(b), above-when it failed to provide Ms. Payton with adequate training regarding safety in a workplace which contained foreseeable threats to staff safety. Review of Ms. Payton's SMTC personnel file and relevant portions of the SMTC Employee Handbook reveals no indication that Ms. Payton received any SMTC training regarding her safety in the workplace, and particularly none related to recognizing potentially dangerous patients, recognizing potentially assaultive patients, or protecting herself from patient assault…SMTC's failures to meet the applicable standards, individually and collectively, …foreseeably let to (i.e., were a significant cause of) damages to Ms. Payton …But for one or more of the breaches by SMTC, …it is more likely than not that the January 2, 2012, assault would not have occurred, and thus the …damages to Ms. Payton, would not have occurred. Specifically, if Ms. Payton had received adequate training regarding the dangers of escorting patients such as Leroy Simon off-unit alone, she would not have escorted him alone to the laundry room.

(CR 32-35). These statements in Dr. Reid's report clearly identify the standard of care, detail what an reasonably prudent healthcare provider would have done and states what the Appellant needed to do and how the breach gave rise to Ms. Payton's harm, injuries, or damages. Dr. Reid states the specific type of training required, training related to recognizing potentially dangerous patients, recognizing potentially assaultive patients, or protecting herself from patient assault and

24

training regarding the dangers of escorting patients such as Leroy Simon off-unit alone. (CR 33-35).

Appellant was clearly put on notice as to what it should have done but did not do, because Appellant responded to the allegation of inadequate training in its brief with facts to argue against that allegation. *See Appellant's Brief* at 21. This Court should not consider these facts because they are not part of the trial court's record and because this Court is limited in its determination of whether the trial court abused its discretion in finding Dr. Reid's report was a "good faith" "fair summary" of his opinions to the "four corners" of the expert report. *Am. Transitional Care Ctrs. of Tex. Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). The facts within the expert report are taken as true in a Chapter 74 review of the expert's report. *Jean v. Shenoy*, No. 01-10-01116-CV, 2011 WL 6938538 (Tex. App. – Houston [1st Dist.] Dec. 29, 2011, no pet.).

The report of an expert under Chapter 74 is not reviewed like the evidence in a summary judgment proceeding. *Kloeris v. Stockdale*, No. 01-09-00711-CV, 2010 WL 1241305 (Tex. App. - Houston [1st Dist.] 2010, no pet.); *Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 199 n. 2 (Tex. App. Houston [14th Dist] 2009, no pet.); *Wissa v. Voosen*, 243 S.W.3d 165, 169 (Tex. App. – San Antonio 2007, no pet.). Whether an expert's opinions are correct is an issue for summary judgment, not a Chapter 74 motion to dismiss. *Kloeris* at 7. "A Motion to dismiss

seeks to demonstrate that plaintiff has not satisfied the *procedural* requirements of Chapter 74, while a motion for summary judgment seeks to demonstrate that the *substance* of the claim lacks merit". *Wissa at* 169. Dr. Reid's expert report provided a "good faith" "fair summary" of the standard of care applicable to SMTC, how SMTC breached that standard and how the breach led to Ms. Payton's assault and injuries which is the focus of the Court in a Chapter 74 review, not whether Dr. Reid is ultimately correct in his opinions. *See Kloeris* at 7. Dr. Reid's report is a "good faith" "fair summary" of his opinions related to adequate training at the time his report was written.

Dr. Reid's expert report is also a "good faith" "fair summary" of his opinions relating to the third standard, adequate notification, its breach and the causal nexus. Dr. Reid states in his report,

> SMTC…had duties to its unit employee Ms. Payton, which included…adequate notification of work situations or persons in her work environment that could reasonably present a danger to her or others…SMTC failed to meet the relevant duty/standard.. when it failed to provide Ms. Payton with information or notification that patient Leroy Simon was likely to be assaultive or otherwise dangerous to staff and/or patients. SMTC knew that Mr. Simon had a pre-admission history of, among other things, "severe impulsivity or explosive expression of anger" (See Dr. Harrell's December, 2011, evaluation). Nevertheless, review of materials associated with the January 2, 2012, assault upon Ms. Payton reveals no indication that Ms. Payton or other unit staff had been notified or otherwise advised that Mr. Simon was potentially assaultive or otherwise dangerous, or that her escorting him off the unit to the laundry alone was

26

unsafe…SMTC's failures to meet the applicable standards, individually and collectively,…foreseeably led to (i.e., were a significant cause of) damages to Ms. Payton…But for one or more of the breaches by SMTC …it is more likely than not that the January 2, 2012, assault would not have occurred, and thus the … damages to Ms. Payton, would not have occurred. Specifically, if Ms. Payton had been adequately informed by SMTC of Mr. Simon's past history of such things as violence, impulsive and assaultive behavior, other behaviors noted above, and his pre-admission history of "sever impulsivity or explosive expression of anger" (cf. Dr. Harrell's pre-incident evaluation, December 12-13, 2011), she would not have escorted him to the laundry room alone.

(CR 32-35). These statements regarding adequate notification detail the standard of care, breach and causal nexus with facts underlying the breach and causal nexus that inform Appellant of what it should have done but did not do, and allow the court to determine the claims are not frivolous.

Appellant complains that Dr. Reid's opinions regarding notification are conclusory because they do not state what SMTC's methods of informing staff about patient behaviors were or should have been. *See Appellant's Brief* at 22. The *type* of notification was not at issue because Ms. Payton received *no* notification, it was the subject matter of the notification that mattered, because if Ms. Payton had been adequately informed of the subject matter of the notification, she would not have escorted Leroy Simon off the unit alone. Dr. Reid's explanation of the standard and breach are based upon Appellant's complete failure to notify Ms. Payton and specifically state the subject matter of what Ms. Payton should have

27

been informed of regarding the patient who assaulted her. These opinions are not conclusory and provide a "good faith" "fair summary" of Dr. Reid's opinions. Appellant's argument again fails because the expert's opinions for purposes of a Chapter 74 review are based upon the facts known to the expert at the time of the report. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013). Dr. Reid's report provides a "good faith" "fair summary" of his opinions regarding the standard of adequate notification of work situations, or persons in Ms. Payton's work environment, that could reasonably present a danger to her or others. Dr. Reid's opinion regarding adequate notification clearly identifies the standard of care, states what Appellant should have done but did not and how the breach led to Ms. Payton's harm and ties those opinions to the facts known to Dr. Reid at the time of the report.

The fourth standard regarding admission of Mr. Simon to SMTC also provides a "good faith" "fair summary" of Dr. Reid's opinions. Dr. Reid states in relevant part,

> SMTC by itself and through its various parts or assigns, had duties to its unit employee Ms. Payton which included… adequate care in *avoiding or declining admission of patients/clients who are inappropriate* for the unit on which she worked… SMTC failed to meet the relevant duty/standard… when it admitted, allowed to be admitted, and/or allowed housing on the children's unit without adequate containment and/or supervision, Leroy Simon, a 17 year-old, "stocky" (per 911 call) male sex offender with a substantial history of

28

aggression, fights with staff (Dr. Coons, 3/14/2012, p. 2) and peers, criminal assault (cf. 1/2/2012 Hays County criminal complaint), severe problems with physical and sexual conduct, conduct disorder, poor impulse control and/or frequent inability to resist aggressive and sexual impulses, which had manifested themselves both in and outside residential treatment settings. SMTC knew that Mr. Simon had a pre-admission history of, among other things, "sever impulsivity or explosive expression of anger" (See Dr. Harrell's December, 2011, evaluation), as well as other behaviors and symptoms enumerated above and below. Review of Mr. Simon's pre and post-incident evaluation (with notes about his history prior to his assault on Ms. Payton) by Dr. Richard Coons and Dr. Walter Harrell (one performed white he was at SMTC, 18 days before the assault) indicates that SMTC was well aware, or should have been aware, that Simon was inappropriate for admission to SMTC and/or was not suited—in terms of staff and patient safety—for housing on the boys' unit on which he was housed on January 2, 2012, (the date of the assault), without special supervision or containment. SMTC's failures to meet the applicable standards, individually and collectively,…foreseeably let to (i.e., were a significant cause of) damages to Ms. Payton…But for one or more of the breaches by SMTC,…it is more likely than not that the January 2, 2012, assault would not have occurred, and thus the … damages to Ms. Payton, would not have occurred. Specifically, If Mr. Simon had not been admitted to SMTC and housed on Ms. Payton's boys' unit (to the extent that he was negligently admitted and housed; see above) Ms. Payton would not have been assaulted and injured by him on January 2, 2012.

(CR 32-35). Dr. Reid identifies the standard of care, states how Appellant breached that duty, states what Appellant should have done and states how the breach led to the assault and damages to Ms. Payton.

Dr. Reid discusses the supervision or containment of the patient further in

29

his fifth standard of care where he states in relevant part,

> SMTC, by itself and through its various parts or assigns, had duties to its unit employee Ms. Payton which included, but may not have been limited to elimination or amelioration of reasonably known risks to Ms. Payton and other staff or patients created by patients/clients who are admitted to and housed on the unit on which she worked…SMTC failed to meet the relevant duty/standard…when it failed to adequately contain, supervise, and/or monitor Leroy Simon to ameliorate his danger to others and protect staff and patients on and before January 2, 2012. Review of materials associated with the January 2, 2012, assault upon Ms. Payton reveal no indication that Mr. Simon was under any particular monitoring or containment order, special supervision, or the like, which should have been commensurate with his known history and behavioral/mental condition (see above and below). SMTC knew or reasonably should have known that Leroy Simon was dangerous or assaultive, and should have been physically contained and/or supervised by more than one, female, staff person. There is no indication in the records available to me that SMTC did anything, physically or clinically, to ameliorate the danger from Leroy Simon to staff and other patients. (Many, perhaps all, other patients on the boys' unit were apparently much younger and smaller than Mr. Simon)…SMTC's failures to meet the applicable standards, individually and collectively,…foreseeably let to (i.e., were a significant cause of) damages to Ms. Payton…But for one or more of the breaches by SMTC…it is more likely than not that the January 2, 2012, assault would not have occurred, and thus the above damages to Ms. Payton, would not have occurred. Specifically… If Mr. Simon had been placed on adequate safety precautions, such as with the containment and/or supervision reasonably required given his past history, Ms. Payton would not have escorted him to the laundry room alone.

30

(CR 32, 33-34). Dr. Reid's opinions regarding adequate containment/supervision clearly identifies the standard of care, the breach and causation. Dr. Reid informs Appellant about the specific conduct about which Appellee complains.

Appellant argues that Dr. Reid's statements regarding supervision by more than one female staff person are conclusory because Dr. Reid stated in his report that specific staffing data from Appellant was not yet available to him. *See Appellants Brief* at 22. This is not the case because the facts reviewed by Dr. Reid clearly reflect Ms. Payton was the only one supervising the assaultive patient at the time she was assaulted. This argument by Appellant also fails for the same reasons its argument fails regarding the standard of adequate staffing. The court is limited in its review of whether the expert report makes a "good faith" effort to "fairly summarize" the experts opinions by looking only at the "four corners" of the report. *Palacios*, at 878.

The fact that Dr. Reid has not yet seen staffing data from Appellant does not make his statements conclusory. The Texas Supreme Court has stated, "The Act requires the expert report to summarize the expert's opinions as of the date of the report recognizing that those opinions are subject to further refinement". *Potts*, 392 S.W.3d at 632. Additional facts may give rise to additional theories of liability and change theories of liability which are allowed. *Id*. Requiring an expert to know all the facts of the case exactly as they happened at this early stage of the

31

lawsuit would place an impossible burden upon plaintiff's expert that could never be met. *Id.* The court accepts the factual statement for purpose of sufficient of an expert report inquiry. *Jean v. Shenoy*, No. 01-10-01116-CV, 2011 WL 6938538 (Tex. App. – Houston [1st Dist.] Dec. 29, 2011, no pet.). Dr. Reid's opinions are based upon the facts known at the time of the report which he links to his opinions regarding the standard of care, breach and causation are not speculative or conclusory.

Dr. Reid's report provides a "good faith" "fair summary" of the standard to use adequate care in avoiding or declining admission of patients/clients who are inappropriate for the unit on which Mr. Payton worked. Dr. Reid provides factual details of the patient who assaulted Ms. Payton, "Leroy Simon, a 17 year-old, "stocky" (per 911 call) male sex offender with a substantial history of aggression, fights with staff (Dr. Coons, 3/14/2012, p. 2) and peers, criminal assault (cf. 1/2/2012 Hays County criminal complaint), severe problems with physical and sexual conduct, conduct disorder, poor impulse control and/or frequent inability to resist aggressive and sexual impulses, which had manifested themselves both in and outside residential treatment settings. (CR 33-34). Dr. Reid details how or why SMTC knew that Mr. Simon had a pre-admission history of, among other things, "severe impulsivity or explosive expression of anger" (See Dr. Harrell's December, 2011, evaluation), as well as other behaviors and symptoms. (CR 32-

35). Dr. Reid bases his opinion in part on the preadmission history taken by Appellant 18 days before the assault and states it indicates that, "SMTC was well aware, or should have been aware, that Simon was inappropriate for admission to SMTC and/or was not suited—in terms of staff and patient safety—for housing on the boys' unit on which he was housed on January 2, 2012, without special supervision or containment". (CR 34). Dr. Reid then states what Appellant failed to do, "Review of materials associated with the January 2, 2012, assault upon Ms. Payton reveal no indication that Mr. Simon was under any particular monitoring or containment order, special supervision, or the like, which should have been commensurate with his known history and behavioral/mental condition (see above and below). (CR 34). Appellant knew or reasonably should have known that Leroy Simon was dangerous or assaultive, and should have been physically contained and/or supervised by more than one, female, staff person. (CR 34). There is no indication in the records available to me that SMTC did anything, physically or clinically, to ameliorate the danger from Leroy Simon to staff and other patients. (Many, perhaps all, other patients on the boys' unit were apparently much younger and smaller than Mr. Simon)". (CR 34). These statements reflect a "good faith" "fair summary" of Dr. Reid's opinions. Appellant's complaints regarding these standards is another example of Appellant arguing the facts of the case, which clearly shows it has notice of what the expert is saying it should have done but

33

failed to do. Simply because SMTC does not like the facts does not make the opinions of the expert conclusory.

Dr. Reid's report specifically states the standards of care required, details how those standards were breached and informs Appellant what is should have done but failed to do and allows the trial court to determine the case is not frivolous for all five theories of negligence in Dr. Reid's report. Dr. Reid's report provides a "good faith" "fair summary" of his opinions on the elements required by Chapter 74.

Appellant also criticizes Dr. Reid's report on the element of causation. *See Appellant's Brief* at 27-28. Dr. Reid's report provides a "good faith" "fair summary" of his opinions on the element of causation. Assault is not a medical condition. *UHS of Timberlawn, Inc. v. S.B.*, 281 S.W.3d 207, (Tex. App. – Dallas 2009, pet. denied). Assault cases are different from those cases in which the injury, harm, or damages claimed flow from the existence of a medical condition that itself resulted from the breach and require not only explanation as to how standard was breached but also how the breach gave rise to the medical condition. Assault cases are also different from healthcare liability claims alleging that breaches of a standard of care caused an exacerbation of a preexisting medical condition, or hindered or prevented effective treatment of such a condition. *Id.* Identifying the causal relationship in those cases may well require an expert to

34

opine as to the existence, extent, and prognosis of a pre-existing medical condition as well as how the breach aggravated, impeded, or prohibited treatment and otherwise affected patient's prognosis. *Id.*

Several cases cited by Appellant in his brief on the causation element are not assault cases but rather those types of healthcare liability claims differentiated from assault cases by the court in *Timberlawn*. *See Jelenek v. Casas*, 328 S.W.3d 526 (Tex. 2010)(discussing causation required for prescription lapse to cause infection causing additional pain and suffering beyond what plaintiff would have otherwise experienced when other causes of infection are equally possible); *Smith v. Wilson*, 368 S.W.3d 574 (Tex. App. – Austin 2012, no pet.) (discussing statement that a correlation exists between fluoxetine and suicide in adolescents as not supplying a causal link between drug and suicide when plaintiff was not an adolescent); *Kocurek v. Colby*, No. 03-13-00057, 2014 WL 4179454 (Tex. App. – Austin Aug. 22, 2014, no pet.) (discussing the insufficiency of the expert's report on the element of causation when plaintiff was claiming worsening of pain and numbness because failed to specify how any injury would have been prevented or lessened had plaintiff received "appropriate care" sooner and statement that referral to specialist "might have made a difference").

In assault cases the expert report should link the defendant's negligence with

the alleged harm, the assault. *Christian Care Centers, Inc., v. Golenko*, 328 S.W. 3d 637, 648 (Tex. App. – Dallas 2011, pet. denied) *citing Timberlawn.* In the case of *Texarkana Nursing & Healthcare Center, LLC v. Lyle* 338 S.W.3d 314, 323 (Tex. App. – Texarkana 2012, no pet.), the court held that *if* the expert report is insufficient on the standard of care and breach and does not advise the defendant of what it should have done differently *then* causation should be described in terms of the specific shortcomings that created a situation in which assault could occur. Dr. Reid's report is sufficient on the standard of care and breach because it advises the defendant of what it should have done differently and causation is also described in terms of the specific shortcomings that created the situation in which the assault occurred. Dr. Reid's report links all the breaches of the standard of care to the circumstances allowing assault. Dr. Reid's report describes the damages Ms. Payton suffered as a result of the assault and the facts leading to his opinion that the assault caused those damages. (CR 34-35). He also describes the standards and breaches in further detail and gives his opinion that but for one or more breaches it is more likely than not that the January 2, 2012 assault would not have occurred, and thus the damages to Ms. Payton described in his report would not have occurred. (CR 35).

Dr. Reid's expert report is at least as specific regarding the standard of care,

breach and causation as the report found sufficient on those elements in *Nexion v. Treybig,* No. 05-14-00498-CV, 2014 WL 7499373 (Tex. App. – Dallas, Dec. 31, 2014, no pet.) where the court found the standard of care articulated as,

> the facility must provide a safe environment for its patients such as securing qualified personnel, adequately supervising therapy sessions, providing proper equipment and facilities for all treatments necessary to meet the patient's needs, and following up with the patient to verify the success of all procedures and treatments. . . The standard is not met when nursing home fails to properly investigate, treat and document the patient's pain complaints over the course of time. The instance of Defendant's failure to investigate and treat the patient's back pain was during the therapy session when the therapists ignored Mr. Treybig's cries of pain and requests to stop the session, continuing to push and pull using their combined bodyweight…reasonable investigation, documentation and treatment would have signified the danger in forceful hamstring stretches on a double below the knee amputee, and prevent fracture.

Dr. Reid's report is also more specific than the assault case of *Christus Spohn Health Sys. Corp. v. Sanchez*, 299 S.W. 3d 868, 877-78 (Tex. App. – Corpus Christi 2009, pet. denied) in which the court concluded the expert reports sufficiently linked the patient's assault to the hospital's failure to protect her from the assaultive conduct of its employees, the report stated the hospital had a duty to provide a safe recovery environment, described the alleged conduct of the employees, and concluded that the fact that the patient was vulnerable, unable to protect herself, and felt as if her person was violated has caused her to now have symptoms of Major Depression and Post Traumatic Stress Disorder. All five of

37

the standards, breaches and causal nexus articulated in Dr. Reid's report are more specific than the report in *Spohn*. Dr. Reid's report is also as specific as the one this Court found sufficient in *Chadha, M.D. v. Rothert*, No. 03-13-00153-CV, 2014 WL 538815 (Tex. App. – Austin Feb. 5, 2014, no pet.) In *Chadha*, the expert report stated the standard of care, "required that Dr. Chadha follow-up with the patient regarding the elevated sedimentation rate in 2010". The expert report then detailed the breach, "should have called [Sharon] and had her return for a follow-up". The expert then gave facts as to support his opinion on the breach, and connected the breach to the harm, vision loss by the patient. Dr. Reid's report likewise provides the standard of care, the breach, and the causal nexus with facts to support his opinions. Dr. Reid's entire expert report is a "good faith" "fair summary" of his opinions regarding the standard of care, breach of the standard of care and causation and is not conclusory. Therefore, the trial court did not abuse its discretion in denying Appellants motion to dismiss.

## C. Dr. Reid's Expert Report Satisfies the Purpose of Chapter 74's Expert Report Requirement

Appellants argue that the purpose of the Texas Legislature in enacting Chapter 74 would be thwarted unless this Court finds the trial court abused its discretion in finding Dr. Reid's report to be a "good faith" "fair summary" of his opinions. This argument is simply incorrect. The Texas Supreme Court recently

discussed the purpose of the Legislature in enacting Chapter 74 in *Certified Ems, Inc. V. Potts*, 392 S.W.3d 625, 631-32 (Tex. 2013). There, the Texas Supreme Court stated, "In amending the Act, the Legislature sought to reduce 'the excessive frequency and severity of …claims', but to 'do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis' (citing the act)…In accordance with this goal…we have also stated that the purpose of evaluating expert reports is to 'deter frivolous claims, not to dispose of claims regardless of their merits' *Scoresby v. Sullivan*, 346 S.W.3d 546, 554 (Tex. 2011)." The Texas Supreme Court continued stating, "If a healthcare liability claim contains at least one viable liability theory, as evidenced by an expert report meeting the statutory requirements, the claim cannot be frivolous. The Legislature's goal was to deter baseless claims, not to block earnest ones." *Id*. Dr. Reid's expert report meets the statutory requirements as to all five of the negligence theories Ms. Payton claims. So Ms. Payton's claims cannot be frivolous. The Legislative goal of Chapter 74 to "deter baseless claims, not to block earnest ones" is satisfied with Dr. Reid's report.

## CONCLUSION & PRAYER

In conclusion, the expert report by Dr. Reid very clearly and specifically sets forth five standards of care as they apply to San Marcos Treatment Center and specifically details how those standards of care were breached. Dr. Reid's report

informs San Marcos Treatment Center of the specific conduct called into question, notifying it as to what it should have done differently. Dr. Reid's report also describes how the breaches in the standards of care led to Ms. Payton's assault and subsequent injuries. Appellant is asking this Court to hold Dr. Reid's expert report to a much higher standard than the "fair summary" standard mandated by Chapter 74. Appellant wants the report to marshal all the evidence in detail without the benefit of discovery of Appellant's records and without any depositions. The law is clear that Dr. Reid's report must only provide a "good faith" "fair summary" of his opinions. Tex. Civ. Prac. Rem. Code §74.351(r)(6); *Am. Transitional Care Ctrs. of Tex. Inc. v. Palacios*, 46 S.W. 3d 873 (Tex. 2001); *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625 (Tex. 2013). Dr. Reid's report provides just such a "good faith" "fair summary" of his opinions and satisfies the Legislative goal of Chapter 74 to "deter baseless claims, not to block earnest ones". *Id.* The trial court did not abuse its discretion by finding Dr. Reid's report sufficient and overruling Appellant's motion to dismiss pursuant to 74.351(b).

Ms. Veronica Payton respectfully requests this Court affirm the trial court's order overruling San Marcos Treatment Centers' motion to dismiss pursuant to 74.351(b). In the alternative, should this Court find the trial court abused its discretion by finding Dr. Reid's report sufficient, Ms. Payton prays this Court remand the case to the trial court for a determination of whether to grant Ms.

40

Payton a 30-day extension to cure under Tex. Civ. Prac. & Rem. Code §74.351(c).

Appellee also requests reasonable attorney's fees and costs and all other relief to which she may be entitled.

Respectfully submitted,

Allison & Ward

By: */s/ Adam S. Ward*
    Adam S. Ward
    Texas Bar No. 00788615
    allison-ward@sbcglobal.net
2001 North Lamar Blvd.
Austin, Texas 78705
Telephone: (512) 474-8153
Facsimile: (512) 474-9703

**Attorneys for Appellee,**
**Veronica Payton**

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief for Appellee is computer generated, has been prepared in a conventional typeface no smaller than 14-point text and 12-point for footnotes, contains 9762 words according to word count function of the computer program used to prepare this Brief, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1), and otherwise complies with Texas Rule of Appellate Procedure 9.4.

*/s/ Adam S. Ward*
Adam S. Ward

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to all known counsel of record in accordance with the Texas Rules of Appellate Procedure on this the 10th day of February, 2015.

Ryan L. Clement
Serpe Jones Andrews
Callender & Bell, PLLC
2929 Allen Parkway, Suite 1600
Houston, Texas 77019
Telephone:  (713) 452-4400
Facsimile:   (713) 452-4499
Email: rclement@serpejones.com

/s/ Adam S. Ward
Adam S. Ward

**APPENDIX A**

EXPERT REPORT AND CURRICULUM VITAE OF
DR. WILLIAM H. REID, M.D. M.P.H.

A

# WILLIAM H. REID, M.D., M.P.H.

### FAPA   FACP   FRCP
## CLINICAL AND FORENSIC PSYCHIATRY

CERTIFIED: *

CLINICAL PSYCHIATRY

FORENSIC PSYCHIATRY

ADMINISTRATIVE PSYCHIATRY

P.O. BOX 4015
HORSESHOE BAY, TEXAS 78657

TELEPHONE (800) 256-6627
(830) 596-0062
FACSIMILE (830) 596-9047

REIDW@REIDPSYCHIATRY.COM

December 16, 2013

Adam S. Ward, Attorney
Allison & Ward
2001 North Lamar Boulevard
Austin, TX 78705

**FAX TO:** (512) 474-9703 (Original to follow by mail)

RE: **Preliminary Report: Matter of Veronica Payton**

Dear Mr. Ward:

You have asked for a report of my preliminary opinions regarding Ms. Payton's assault and its sequelae. I am able to supply the opinions and comments below, based upon the materials you have provided and my training, background and experience. The methods used in my review and report are those routinely relied upon by forensic professionals in matters such as this.

Note that not all of the expected records have been available for review, and I have not yet examined Ms. Payton. This report is intended to address CPRC Chapter 74 concerns of the Court. Additional information could change or add to these opinions; should that become the case, I will communicate with you promptly.

## FINDINGS AND OPINIONS

The following opinions are offered to a reasonable medical probability given the information available to me at this time.

## DUTIES, STANDARDS AND BREACHES THEREOF

1.      Ms. Payton was an employee of San Marcos Treatment Center (hereafter "SMTC") at the time of the incident that gave rise to her alleged damages (January 2, 2012; see below). That employer (SMTC), by itself and through its various parts or assigns, had duties to its unit employee Ms. Payton which included, but may not have been limited to, **(a)** adequate *staffing* and staff support in her work environment (sufficient to meet reasonable levels of staff safety, as well as patient safety and care), **(b)** adequate *training* with regard to recognizing and managing situations that might arise in which her safety could be compromised, **(c)** adequate *notification* of work situations or persons in her work environment that could reasonably present a danger to her or others, **(d)** adequate care in *avoiding or declining admission of patients/clients who are inappropriate* for the unit on which she worked, and **(e)** *elimination or amelioration of*

*Certification in general and forensic psychiatry by the American Board of Psychiatry & Neurolo[g]
Certification in psychiatric administration & management by the American Psychiatric Association (TSBM[]



**EXHIBIT**

**A**

000032

*reasonably known risks* to her and other staff or patients created by patients/clients who are admitted to and housed on the unit on which she worked.

2.       **SMTC failed to meet the relevant duty/standard – per 1(a), above – when it failed to provide adequate staffing to meet foreseeable needs for patient care and staff and patient safety.**
        The information available to me indicates that evening shift staffing was inadequate on Ms. Payton's unit on January 2, 2012, and was lower than that required by plans of correction and/or other agreements with the Texas Department of Family and Protective Services (DFPS). Specific staffing data from SMTC is not yet available to me; materials from DFPS, however, indicate a number of recent (to January 2, 2012) agency findings of inadequate staffing on the clinical units, as well as agreed-upon DFPS specifications for correcting unit staffing deficiencies. It is my understanding (and this opinion is predicated on the accuracy of that understanding) that the unit in question was supposed to have had *at least three* staff persons on the shift on which the assault occurred (but instead had only two) and that *at least one of the staff was supposed to be male* (not the case on the January 2, 2012, evening shift).

3.       **SMTC failed to meet the relevant duty/standard – per 1(b), above – when it failed to provide Ms. Payton with adequate training regarding safety in a workplace which contained foreseeable threats to staff safety.**
        Review of Ms. Payton's SMTC personnel file and relevant portions of the SMTC Employee Handbook reveals no indication that Ms. Payton received any SMTC training regarding her safety in the workplace, and particularly none related to recognizing potentially dangerous patients, recognizing potentially assaultive patients, or protecting herself from patient assault.

4.       **SMTC failed to meet the relevant duty/standard – per 1(c), above – when it failed to provide Ms. Payton with information or notification that patient Leroy Simon was likely to be assaultive or otherwise dangerous to staff and/or patients.**
        SMTC knew that Mr. Simon had a pre-admission history of, among other things, "severe impulsivity or explosive expression of anger" (see Dr. Harrell's December, 2011, evaluation). Nevertheless, review of materials associated with the January 2, 2012, assault upon Ms. Payton reveals no indication that Ms. Payton or other unit staff had been notified or otherwise advised that Mr. Simon was potentially assaultive or otherwise dangerous, or that her escorting him off the unit to the laundry alone was unsafe.

5.       **SMTC failed to meet the relevant duty/standard – per 1(d), above – when it admitted, allowed to be admitted, and/or allowed housing on the children's unit without adequate containment and/or supervision, Leroy Simon, a 17 year-old, "stocky" (per 911 call) male sex offender with a substantial history of aggression, fights with staff (Dr. Coons, 3/14/12, p.2) and peers, criminal assault (cf. 1/2/12 Hays County criminal complaint), severe problems with physical and sexual conduct, conduct disorder, poor impulse control and/or**

frequent inability to resist aggressive and sexual impulses, which had manifested themselves both in and outside residential treatment settings.

SMTC knew that Mr. Simon had a pre-admission history of, among other things, "severe impulsivity or explosive expression of anger" (see Dr. Harrell's December, 2011, evaluation), as well as other behaviors and symptoms enumerated above and below.  Review of Mr. Simon's pre- and post-incident evaluations (with notes about his history prior to his assault on Ms. Payton) by Dr. Richard Coons and Dr. Walter Harrell (one performed while he was at SMTC, 18 days before the assault) indicates that SMTC was well aware, or should have been aware, that Simon was inappropriate for admission to SMTC and/or was not suited – in terms of staff and patient safety – for housing on the boys' unit on which he was housed on January 2, 2012 (the date of the assault), without special supervision or containment.

**6.      SMTC failed to meet the relevant duty/standard – per 1(e), above – when it failed to adequately contain, supervise, and/or monitor Leroy Simon to ameliorate his danger to others and protect staff and patients on and before January 2, 2012.**

Review of materials associated with the January 2, 2012, assault upon Ms. Payton reveal no indication that Mr. Simon was under any particular monitoring or containment order, special supervision, or the like, which should have been commensurate with his known history and behavioral/mental condition (see above and below).  SMTC knew or reasonably should have known that Leroy Simon was dangerous or assaultive, and should have been physically contained and/or supervised by more than one, female, staff person.  There is no indication in the records available to me that SMTC did anything, physically or clinically, to ameliorate the danger from Leroy Simon to staff and other patients.  (Many, perhaps all, other patients on the boys' unit were apparently much younger and smaller than Mr. Simon.)

**DAMAGE AND CAUSATION**

SMTC's failures to meet the applicable standards, individually and collectively, described above, foreseeably led to (i.e., were a significant cause of) damages to Ms. Payton.

**7.      Ms. Payton suffered immediate physical and mental trauma as a result of the assault,** based on police, medical, and counseling records, and implied in the videos of the assault.

**8.      Ms. Payton's physical trauma continued well after the assault, in both the near term and for months (perhaps more) afterward.**

Video of the assault, emergency room records, and outpatient general medical records all indicate injuries, including neck and back injuries and concussion.  My psychiatric specialty and the fact that I have not examined Ms. Payton to date preclude detailed opinions about the extent of physical damages, but the record is clear that significant damage existed, and may still exist.

**9.      Ms. Payton's mental trauma began with the beginning of the assault and continued well after, in both the near term and for months (perhaps more) afterward.**
    Post-assault emergency room records, general medical records, and a summary of counseling visits all document both acute and chronic post-traumatic mental symptoms, including post-traumatic stress disorder (PTSD). The police reports and videos of the assault are consistent with acute emotional trauma. One police report relates that in addition to being in acute fear for life and limb, she "lost control of her bowels and urinated on herself" during the assault.

**10.      But for one or more of the breaches by SMTC, summarized in items 2-6 above, it is more likely than not that the January 2, 2012, assault would not have occurred, and thus the above damages to Ms. Payton, would not have occurred.** Specifically,

> (a) If staffing had been adequate (that is, at least one more capable staff person on the 17-patient unit), Ms. Payton would not have believed it necessary to accompany Leroy Simon to the laundry alone. (See her statement.)

> (b) If there had been adequate *male* staffing on the boys' unit, Ms. Payton would not have been in the position of being a sole female vulnerable to attack by a physically stronger, younger male. (See her statement.)

> (c) If Ms. Payton had received adequate training regarding the dangers of escorting patients such as Leroy Simon off-unit alone, she would not have escorted him alone to the laundry room.

> (d) If Ms. Payton had been adequately informed by SMTC of Mr. Simon's past history of such things as violence, impulsive and assaultive behavior, other behaviors noted above, and his pre-admission history of "severe impulsivity or explosive expression of anger" (cf. Dr. Harrell's pre-incident evaluation, December 12-13, 2011), she would not have escorted him to the laundry room alone.

> (e) If Mr. Simon had not been admitted to SMTC and housed on Ms. Payton's boys' unit (to the extent that he was negligently admitted and housed; see above). Ms. Payton would not have been assaulted and injured by him on January 2, 2012.

> (f) If Mr. Simon had been placed on adequate safety precautions, such as with the containment and/or supervision reasonably required given his past history, Ms. Payton would not have escorted him to the laundry room alone.

000035

## BRIEF NARRATIVE

At the time of the assault, Veronica Payton (victim) was an aide on a boys' unit (patients apparently about 11 years old and up) of San Marcos Treatment Center (SMTC).  Leroy Simon (assailant) was a 17 year-old, "stocky" male patient with a long history of assaultive behavior, sex offenses, fights, borderline intellectual function or mild mental retardation, and chronic symptoms of intermittent explosive disorder, lack of impulse control, oppositional defiant disorder, and other mental and behavioral problems, most or all of which were known to SMTC prior to January 2, 2012.  Mr. Simon was housed on the boys' unit to which Ms. Payton was assigned.

During the evening of January 2, 2012, Mr. Simon asked to be escorted off the unit to do his laundry.  There were two staff, both female, assigned to the boys' unit at the time, including Ms. Payton.  Ms. Payton agreed to accompany him to the functioning laundry, and did so.

At some point during the laundry trip, Mr. Simon suddenly and violently assaulted Ms. Payton, quickly overpowering her, choking her, knocking or otherwise forcing her to the ground, hitting and kicking her, and forcing her head into a wall.  Ms. Payton attempted to defend herself but was utterly unable to do so, being choked, incapacitated, and sometimes unconscious.  After 3-1/2 to four minutes of assault, Mr. Simon took her keys and ran out of the area, exiting the building through an apparently unmonitored door. (Much of the assault, with time data, was captured by video cameras.)

As Mr. Simon ran away, Ms. Payton was able to scream or yell for help, which arrived almost immediately.  SMTC staff called 911 a few minutes after 8:00 PM.

Police apprehended Mr. Simon within a short time, having received an additional call from the home of a facility neighbor.  Mr. Simon had attempted to convince the neighbor that he was the one assaulted, in an apparent attempt at subterfuge.

Ms. Payton was treated at a hospital emergency room for her injuries, and received medical follow up from primary care physician Dr. Chris Larson and other clinicians over several months.  Dr. Larson quickly recognized symptoms of acute and chronic stress disorder due to the assault, and referred Ms. Simon for psychiatric/psychological evaluation and treatment.

A few weeks after the assault, Ms. Payton was evaluated by psychiatrist Andrew Brylowski, M.D. (2/14/12), and psychologist Dr. Edward Kotin (3/1/12 and later).  Dr. Brylowski found very significant anxiety and depression apparently caused by the assault and diagnosed "acute stress reaction" and "major depressive disorder, moderate."  He assessed her overall functioning ("GAF") on 2/14/12 as much worse than her best functioning in the previous year ("60" ["moderate symptoms . . ."] *vs.* a pre-assault estimate of "90" ["absent or minimal symptoms . . . good functioning in all areas"]) (quotes from the *Diagnostic and Statistical Manual of Mental Disiorders, Fourth Edition, Text Revision – DSM-IV-TR*, p.32).  Tests for malingering were negative.

Ms. Payton received psychotherapy from Dr. Kotin for at least several weeks (complete records not yet available) for "severe trauma"-related mental symptoms, including "many symptoms of PTSD" (post-traumatic stress disorder). Dr. Kotin's treatment included cognitive-behavioral therapy (CBT) and eye movement desensitization and reprocessing (EMDR). She also received medication for those symptoms.

Mr. Simon was arrested and indicted for aggravated assault with a deadly weapon (his fists and arms).


## SOURCES REVIEWED AND/OR RELIED UPON

- Written materials, represented as everything relevant and available from your office (material contains some duplicates):

  DVD – videos of the 1/2/12 assault, several views
  CD – TX Department of Family and Protective Services documents regarding San Marcos Treatment Center (SMTC) complaints, investigations, infractions, plans of correction, and follow-up (3900+ pages; about 1000 pages reviewed or skimmed)
  Employee Handbook, San Marcos Treatment Center
  SMTC Personnel file, Veronica Payton
  Medical/psychological records:
  > Emergency Room, Central Texas Medical Center – Dr. Henry W. David, 1/2/2012
  > Texas MedClinic – Southpark (Dr. Larson, Dr. Peters-Do), 1/5/12 – 8/16/12
  > Edward H. Kotin, PhD (psychologist), 3/28/2012 1-page interim summary of several visits
  > Chris Larson, DO/Texas MedClinic, 1/5/2012 examination and Texas Workers' Compensation Work Status Report
  > Central Texas Medical Center
  "911" telephone recordings (3), 1/2/12
  Statement of Veronica Payton re: conversation with coworker (no date)
  Statement of Veronica Payton re: escorting patient (12/13/13)
  San Marcos Police Department – Incident Report (1/2/2012); Interview details and narrative, Officer Reeder; Interview details and narrative, Officer Ames
  San Marco Police Department – Arrest Report (1/2/2012)
  Register of Actions (Case No. CR-12-0068)
  Report: 2/14/12 Independent Medical Examination of Veronica Payton, Andrew Brylowski, M.D. (psychiatrist), with psychological testing results
  Report: 1/26/2012 Letter to Judge Ramsay from Richard Coons, M.D.
  Report: Letter to Judge Ramsay from T. Walter Harrell, Ph.D., ABPP, enclosing Dr. Harrell's 12/12/11 & 12/13/2011 neuropsychological evaluation for SMTC

000037

Report:  3/14/2012 Richard Coons, M.D. re: 3/14/12 trial competency evaluation of Leroy
Simon (competency to stand trial, presence of mental illness diagnosis)

Report:  3/14/2012 Richard Coons, M.D. re: 3/14/12 evaluation of Leroy Simon to
determine whether defendant is a person with mental illness and meets criteria for
court-ordered inpatient mental health services; and whether the defendant is a
person with mental retardation and meets the criteria for commitment to a
residential care locality

Report:  3/14/2012 Richard Coons, M.D. re: 3/14/12 evaluation of Leroy Simon to
determine defendant's sanity at the time of the alleged offense

Report:  1/26/12 (date uncertain) Richard Coons, M.D. letter to Judge Ramsay altering
and supplementing Dr. Coons's opinions about Mr. Simon's present competency
to stand trial as expressed in his 3/4/12 report (date uncertain)

Report:  11/6/12 T. Walter Harrell, Ph.D. letter to Judge Ramsay re: results of 8/1/12
intelligence test of Mr. Simon

Complaint and Affidavit of Probable Cause for Arrest

Magistrate's Warning, 1/3/2012

Grand Jury Indictment

Motion to Examine the Defendant Regarding Competency and Sanity, 2/16/2012

Order to Examine Defendant Regarding Competency and Sanity, 2/16/2012

Order Appointing Disinterested Expert to Examine Defendant, 3/13/2012

Arrest Report

Motion to Dismiss & Order, 5/30/2013

Order to Pay – Court Appointed Attorney

Motion for Payment of Itemized Time and Services for Court Appointed Attorney

Defendant's Second Motion for Continuance (filed 7/25/2012)

Application for Subpoena (witness: T. Walter Harrell, Ph.D.)

Defendant's Fourth Motion for Continuance (filed 4/30/2013)

Newspaper article, "Patient jailed in assault case," 1/4/12, *San Marcos Daily Record*

- My background, training, and experience in medicine, psychiatry, forensic psychiatry, and
mental health administration.


**QUALIFICATIONS**

I am a clinical and forensic psychiatrist with training and experience in general and forensic
psychiatry and mental health administration and management.  I have been licensed to practice
medicine in Texas since 1986.  I have been in the continuous practice of psychiatry since
completing training, including three years as medical director of a freestanding psychiatric
facility and seven years as State medical director of the Texas Department of Mental Health and
Mental Retardation (which operated, among other things, 13 mental health inpatient facilities and

oversaw 35 community mental health systems.

I am certified in general and forensic psychiatry by the American Board of Psychiatry and Neurology, and in administrative psychiatry by the American Psychiatric Association.

My qualifications are further outlined in the *curriculum vitae* recently supplied to your office.

\*   \*   \*

Thank you for the opportunity to comment.

William H. Reid, M.D., M.P.H.

Clinical Professor of Psychiatry
Texas Tech University Health Science Center

Adjunct Professor of Psychiatry
University of Texas Health Science Center, San Antonio
        and
Texas A&M College of Medicine

WHR/br

C:\Users\aaa\Documents\WPWHOLD0306\FOR\REPORTS\TX\TX Payton Ward Prelim Rept 121613.doc

000039

# CURRICULUM VITAE

William Howard Reid, MD, MPH, FACPsych, FRCP Edin.    Telephone (830) 596-0062
P.O. Box 4015                                        Fax (830) 596-9047
Horseshoe Bay, TX  78657                             e-mail reidw@reidpsychiatry.com
D.O.B.  April 10, 1945              Date this document prepared:  September, 2013

## EDUCATION AND TRAINING

B.A. (Psychology), University of Minnesota, Minneapolis, Minnesota, 1966

M.D., University of Minnesota Medical School, Minneapolis, 1970

Psychiatry Internship and Residency, University of California, Davis, California, 1970-71, 1973-75  (interrupted for military service)

M.P.H. (Health Care Management & Planning), University of California, Berkeley, School of Public Health, 1975

Postgraduate Program in Administrative Psychiatry, Wright State University, Dayton, Ohio, 1984

Governor's Executive Development Program, University of Texas LBJ School of Public Affairs and Graduate School of Business, 1990-91 (Group President)

## PRIMARY CURRENT POSITIONS AND EXPERIENCE

Clinical and Forensic Psychiatry Practice, Mental Health & Agency Consultation, 1996-present

Clinical Professor of Psychiatry, Texas Tech University School of Medicine, 2010-present (Adjunct Professor 1995-2010)

Adjunct Professor of Psychiatry, University of Texas Health Science Center, San Antonio, 2011-present (Clinical Professor 1996-2011)

Adjunct Professor of Psychiatry, Texas A&M College of Medicine, 1991-present

Clinical Faculty, Austin Psychiatry Residency Program (University of Texas Southwestern Medical School), 1991-present



EXHIBIT

B

000040

### Other Current Professional Activities

Hospital medical staff appointments
   Seton Health Care System (Consulting) (Seton Medical Center, University Medical Center/Brackenridge, Shoal Creek, Highland Lakes, Edgar B. Davis, Northwest, Southwest), Austin, Burnet, and Luling, TX
   Scott & White Hospital – Llano, Llano, TX (Honorary)
   University of Texas Health System (Honorary, as faculty), San Antonio
   Austin State Hospital, Austin, TX (Honorary)

Clinical teaching of diagnosis, patient care & treatment, clinical risk, clinical interviewing, forensic psychiatry, mental health administration & management;  and supervisor in areas of "boundary violations" and therapist-patient relationships

External Review Physician Roster (Managed Health Care Bureau), New Mexico Public Regulation Commission (2007-present)

## PAST POSITIONS & ACTIVITIES

Clinical and Forensic Consultant, suicide & violence assessment review, Kerrville State Hospital, Kerrville, TX, 2004-2010

Expert Physician Panel (evaluator and consultant regarding physician practice, clinical standards, clinician impairment), Texas Medical Board, ~1997-2010.

Medical Director, TX Dept. of Mental Health & Mental Retardation, 1989-1996

Special Assistant for Mental Health & Mental Retardation, Office of the Executive Vice Chancellor for Medical Center Affairs, The University of Texas System, 1989-1996

Chair, National Council of State Medical Directors, 1994-1996

Professor of Psychiatry, UT Health Science Center, San Antonio, 1989-1996

Evaluator and consultant in matters of alleged sexually violent predators, Texas Department of Criminal Justice, ~1996-2007

Chair, National Clozapine Task Force, National Association of State Mental Health Program Directors (NASMHPD), 1991-1996
Chair, Texas Public-Academic Consortium, 1991-1996

000041

Chair, Texas Health Care Forum, 1990-1996

Advisory Board, Texas Mental Sciences Institute, U.T. Health Science Center., Houston, 1989-1996

Advisory Board, Harris Co. Psychiatric Center, U.T. Health Science Center, Houston, 1989-1996

Institutional Advisory Board, University of Texas-UTHSCSA Area Health Education Center (AHEC) and HETCAT Council, ~1990-1996

Governing Boards, eight Texas state mental hospitals and five state MHMR centers, ~1993-1996

U.T. System Border Health Task Force (Texas-Mexico), ~1991-1996

Diagnostic vignette development for clinical licensing examination, College of Psychologists of Ontario, Canada

Surveyor/evaluator of medical school forensic psychiatry fellowship programs, Accreditation Council for Graduate Medical Education, 1998~2004

Program sponsor/preceptor, International Medical Scholars Program, ~1997-2000

Pharmaceutical advisory committees (unpaid, various manufacturers), 1989-97

National planning committee for clozapine cost-effectiveness studies (NIMH), 1990-1992

Joint Commission on the Accreditation of Healthcare Organizations (JCAHO) Hospital Administration PTAC (NASMHPD Alternate), 1993-94

University of Texas Health Science Center, San Antonio, 1986-89
Clinical Professor of Psychiatry

Colonial Hills Hospital, San Antonio, Texas, 1986-1989
Medical Director

Clinical Inpatient & Outpatient Psychiatry Practice, 1986-1989

000042

University of Nebraska Medical Center, Omaha, Nebraska, 1977-1986
    College of Medicine, Department of Psychiatry & Nebr. Psychiatric Institute
        Clinical Inpatient & Outpatient Practice, 1977-1986
        Clinical Research Coordinator, 1978-83
        Director, Psychiatry Education and Training, 1983-85
        Director, Psychiatry Residency Training, 1983-86
        Assistant Professor, 1977-80
        Associate Professor, 1980-86 (approved for Professor, 1986)
    College of Medicine, Department of Medical Jurisprudence & Humanities
        Adjunct Associate Professor, 1980-86
    Graduate College
        Member & Fellow of the Graduate Faculty, 1978-86

Training Psychoanalysis (Chicago Institute for Psychoanalysis), 1977-1981

Additional, part-time, positions while commuting to Chicago Institute of
    Psychoanalysis from University of Nebraska Medical Center (1978-81):
        Northwestern University Medical School, Chicago
            Lecturer in Psychiatry, 1978-81
        VA Medical Center, Lakeside Hospital, Chicago
            Attending Psychiatrist, 1978-81
        Rush Medical College, Chicago
            Visiting Associate Professor & Forensic Consultant, 1979-81

Private Clinical Psychiatry Practice; Santa Fe, New Mexico, 1975-77
    Counseling and Resource Center; Santa Fe, New Mexico --
        Clinical and Program Consultant, 1975-77
University of New Mexico Medical School, Albuquerque
    Clinical Associate, Department of Psychiatry, 1975-77

New Mexico Department of Hospitals and Institutions
    Forensic Consultant, 1975-77

Various New Mexico and California Agencies --
    Program Consultant, 1974-77

U.S. Army, Fort Polk, Louisiana --
    Clinical psychiatrist and Chief, Mental Hygiene, 1971-73
    Chief, Neuropsychiatric Service, 1973
    Interim Director, Human Resources, 1973
    Current Classification: 4AM (obligation completed)

### Clinical Research Grants (since 1995)

Reid, W.H. (Principal Investigator), Mason, M.:  Suicide in chronic psychotic illness.  Sandoz (Novartis) Pharma, Basel, 1996-97.

Reid, W.H. (Principal Investigator), Mason, M.: Clozapine treatment of schizophrenia and schizoaffective disorder.  Sandoz (Novartis) Pharma, Basel, 1995-96.

Reid, W.H. (Principal Investigator):  Treatment of chronic psychosis in the public sector.  Sandoz (Novartis) Pharma, Basel, 1997.

## CERTIFICATION & LICENSURE

### Certifications:

American Board of Psychiatry and Neurology
(General Psychiatry) Certificate #15959, 1977
American Board of Psychiatry and Neurology
(Added Qualifications in Forensic Psychiatry)
Certificate #445, 1996-2006, Renewed 2007-present
American Board of Forensic Psychiatry
Certificate #106, 1981
American Psychiatric Association Certification in Administrative Psychiatry
Certificate #859, 1985

### Licensed to practice Medicine:

Minnesota, 019742-1, July 2, 1971--present
California, C-34185, 1972--present
Louisiana, 3152 R, 1972--present
New Mexico, 74-80, 1974--present
Nebraska, 13804, 1977--present
Illinois, 036-058708, 1979--present
Texas, H0100, 1986--present

### Controlled Drug Registration:

U.S. (DEA) and Texas (DPS)

## NATIONAL/INTERNATIONAL JOURNAL EDITORSHIPS, EXAMINATION BOARDS

*JOURNAL OF PSYCHIATRIC PRACTICE*
    (formerly *J. PRACTICAL PSYCHIATRY AND BEHAVIORAL HEALTH*)
    Contributing Editor, 1997-present
*CONTEMPORARY PSYCHOLOGY SERIES*
    Praeger Press (Greenwood), Editorial Review Board, 2002-present
*CURRENT PSYCHIATRIC RESEARCH & OPINION*
    Editorial Board, 2000-present
Psychiatrists In Practice Examination (PIPE)
    American College of Psychiatrists, Editorial Board, 2002~2006
*JOURNAL OF PSYCHIATRIC ADMINISTRATION*
    Editorial Board, 2000-present (formerly *Psychiatric Administrator*)
*PSYCHIATRIC UPDATE SERIES (American College of Psychiatrists)*
    Editor-in-Chief, 1995-1998
*JOURNAL OF THE AMERICAN ACADEMY OF PSYCHIATRY & THE LAW*
    Associate Editor, 1982-2002;  Book Review Editor, 1982-89
*BEHAVIORAL SCIENCES AND THE LAW*
    Editorial Board, Consulting Editor, 1982-1999
*BEHAVIOR ONLINE*
    Consulting Editor, 1999-present;  Forum Editor, Law, Ethics, & Psychotherapy
*JOURNAL OF BORDER HEALTH* Editorial Board, 1997~2006
*VIOLENCE, AGGRESSION & TERRORISM:  AN INTERNATIONAL FORUM*
    Editorial Board, 1984~2004
*PSYCHIATRY ONLINE:  The International Journal of Psychiatry*
    Contributing Editor & Referee, 1996~2006
    U.S. Forensic Psychiatry Section Editor, 2000~2006
*PSYCHIATRIC MEDICINE* Editorial Board, 1983-1991
*THE BEHAVIORAL AND BRAIN SCIENCES*
    Board of Editorial Commentators, 1977-84
*DYNAMIC PSYCHOTHERAPY* Editorial Board, 1983~1992
*EMOTIONAL FIRST AID:  A JOURNAL OF CRISIS INTERVENTION*
    Editorial Board, 1983~1991

Current or past manuscript reviewer for professional journals and textbook publishers, including *Acta Psychiatrica Scandinavica, Arch. Gen. Psychiatry, Clin. Drug Investig., Psychiatric Services, J. Clin. Psychiatry, J. Nerv. Ment. Dis., Psychiatry, Expert Review of Neurotherapeutics (London), Schizophrenia Res., Bulletin of the Menninger Clinic, J. Amer. Acad. Psychiat. & the Law, Beh. Sci. & the Law, Acad. Psychiat., Amer. J. Psychotherapy, Amer. J. Orthopsychiatry.*

## OTHER NATIONAL OR REGIONAL OFFICES, BOARDS AND COMMITTEES

**American Academy of Psychiatry and the Law**
President, 1988-89
Executive Council, 1983-90
Peer Review of Psychiatric Testimony Committee
Various other committee memberships and chairs, 1980-present

**American Psychiatric Association**
Council on Psychiatry and Law, 2002-2007
Committee on Judicial Action (consultant 2007-2008, corres. mem. 2008-2009)
Task Force on Seclusion and Restraint, 2003-2007
Committee on Psychiatric Administration & Management, 1992-2002
    Chair and Director of the certifying examinations, 1996-2002
Council on Medical Education and Career Development (*ex officio*), 1996-2002
Isaac Ray Award Committee, 2000-2002; corresponding member 2003
Manfred S. Guttmacher Award Board, 1987-90 (Chair, 1988-90)
Panel on Treatment of Disorders of Impulse Control, 1984-88
Task Force on the Psychiatric Aspects of Terrorism and its Victims
    (Council on National Affairs), 1978-85
Panel on Personality Disorders, T.F.: Treatments of Psychiatric Disorders, 1989
Consultant, Task Force on the Treatments of Psychiatric Disorders
Consultant, Task Force on Treatment Guidelines for Bipolar Disorder
Consultant, Committee on Managed Care, Clinical Standards Work Group
Advisor, DSM-IV Section on Personality Disorders
Assembly Representative, 1995-1997

**Texas Society of Psychiatric Physicians** (District Branch of APA)
President (2007-2008) (President-elect, 2006-2007)
Councilor:  Council on Service (2008-2011)
Committee on Constitution & Bylaws, 2000-2003 (Chair, 2002- 2003);
Physicians' Advocacy Committee, 2005-present;  Forensic Psychiatry
Committee, 1998-2006, Chair, 2009-present;  Committee on Public
Psychiatry, ~1989-98;  Task Force on Criminal Forensic Psychiatry (Chair),
1991-93;  other committees

**American Association of Psychiatric Administrators**, 1993-present
Texas Society of Psychiatric Administrators, President, 1991-92

**Texas Depression and Bipolar Support Alliance**
Medical Advisor & Scientific Advisory Board (Chair), 1999-present
Board of directors, 2007-present

**American Board of Psychiatry & Neurology**, Examiner (Psychiatry, primary,
associate, & senior), ~1979-2006

**American Board of Forensic Psychiatry**, Examiner, 1983-93

**Texas Federation of Psychiatry**, Board of Directors (ex officio, 2007-2008)

**Director**, American Psychiatric Association Administrative Psychiatry certification
   examinations and Chair, Administrative Psychiatry Committee, 1996-2002
   Section Chief for Law & Ethics, 1992-96
   Examiner, 1986-2002
**Editorial Consultant**, American College of Psychiatrists Psychiatry Residents-In-
   Training Examination (PRITE), 1981-86
**National Association of State Mental Health Research Institutes**
   Vice President, 1981-84
**National Association of State Mental Health Program Directors (Affiliate)**
   Chair, National Council of State Medical Directors, 1994-1996
   Chair, Clozapine Task Force, 1990-1996
**Academy of Psychosomatic Medicine**
   Nominating Committee, 1984-85
**Grant reviewer for various foundations and funding agencies** (Ontario Mental
   Health Foundation, U.S. Veterans Administration, others), 1980-present
**NIMH Consumer-Provider Panel**:  Mental Health Services & Telecommunications
   in Rural Areas.  National Institute of Mental Health, Rockville, MD., 1994.
**HealthMed Expert**, Millennium Medical Communications' webhealth*search* (online
   medical information gateway and evaluator), 2000-present


## BIOGRAPHICAL LISTINGS

**Marquis Who's Who in the World**, 1984-present
**Who's Who in Medicine and Healthcare**, 1997-present
**Best Doctors in America**, 1998-present (2013)
**Heritage Foundation Guide to Public Policy Experts**, 1981-present
   Recently addressing (as they relate to mental health and health care):
      Medicine and public health policy
      Domestic public policy
      Crime and security
      Civil & criminal legal issues
      Terrorism and international crime
and others.

## HONORS, HONORARY APPOINTMENTS, etc. (not already mentioned above)

*Texas Monthly* magazine "Best Physicians" peer survey (2009 - present)

Distinguished Life Fellow, American Psychiatric Association (2006-present)

Austin's Best Doctors, *Austin* (Texas) *Monthly* peer survey (2003-present)

Recognition for AOutstanding Contributions and Leadership in the Field of Administrative Psychiatry,@ American Association of Psychiatric Administrators, May, 2003

Distinguished Fellow, American Psychiatric Association (2003-2006)

Manfred Guttmacher Award, Honorable Mention, for Ashford, Sales, Reid (Eds.): *Treating Adult and Juvenile Offenders with Special Needs* (2002)

Honored Speaker Award, Association for Convulsive Therapy (2002)

National Depressive & Manic Depressive Association (DMDA) Scientific Advisory Board Service Award, 2000

*Journal of ECT* Investigator's Award, 2000

Texas Depressive & Manic Depressive Association Ardis Cline Martin Award, 1998

Fellow, American College of Psychiatrists, 1998-present

25th Anniversary Distinguished Alumnus, Department of Psychiatry, University of California Medical Center, Sacramento/Davis, CA, 1997

Consultant, Slovakian Ministry of Health (community integration of mentally ill and mentally retarded persons), 1996-97

Certificates of appreciation, various Texas hospitals & groups, 1996

Fellow, Royal College of Physicians (Edin.), 1995-present

Visiting Professor of Psychiatry, Hunan Medical Univ., Changsha, P.R. China, 1994

Exemplary Psychiatrist Award, National Alliance for the Mentally Ill, 1992

Faculty Teaching Award, Austin Psychiatry Residency Programs, 1989-90, 1994-95

U.S. Observer, Board of Presidents of Socialist Countries' Psychiatric Associations, Sofia, Bulgaria (November, 1988)

Fellow, College of Physicians of Philadelphia, 1987-present

Mid-America States University Association (MASUA), Honor Lecturer, 1984-85

Dean, Hervey M. Cleckley Memorial Conference, Highland Hospital Foundation and Duke University, 1984

U. S. Representative, Ver Heyden de Lancey Conference on Psychiatry, Law, and Public Policy. Trinity College, Cambridge University, England, Sept., 1983

Distinguished Visiting Professor of Psychiatry, Institute of Living, Hartford, CT, 1982

Chair, Research Section, International Conference on Psychiatric Aspects of Terrorism (APA/LEAA), 1979

Outstanding Faculty Member, Department of Psychiatry, Univ. of Nebraska, 1979

000048

## PROFESSIONAL AND SCIENTIFIC ASSOCIATIONS

Academy of Psychosomatic Medicine, 1982
American Academy of Psychiatry and the Law, 1976-present (see above)
American Association for the Advancement of Science, 1977-86
American Association of Directors of Psychiatric Residency Training, 1982-86
American Association of Psychiatric Administrators, 1987-present (see above)
    Texas Society of Psychiatric Administrators, 1989-present (see above)
American College of Psychiatrists, 1990-present
    Elevated to Fellow, 1998; Continuing Education Committee, 2009-present
American Medical Association, 1975-2008
Texas Medical Association, 1986-present
    Bexar County Medical Society, 1986-89
    Travis County Medical Society, 1989-1997
    Llano County Medical Society, 1997-200present
American Psychiatric Association, 1971-present (see above for appointments)
    Distinguished Life Fellow, 2006
    Elevated to Distinguished Fellow, 2003
    Elevated to Fellow, 1985
    Nebraska District Branch, 1977-86
        Executive Council, Program Chair 1980-83
    Texas Society of Psychiatric Physicians, 1986-present
        President, 2007-2008
        Bylaws Committee, 2000-2008
        Committee on Public Psychiatry, 1989-2000
        Legislative Affairs Committee, 1987-88
        Ad hoc Committee on Forensic Psychiatry (Chair), 1988-89
        Legislative Committee (consultant), 1990-1999
        Medical Review Committee, Utilization Review Complaint Service
        Forensic Psychiatry Committee
    Travis County Psychiatric Society, 1989-present (inactive)
    Bexar County Psychiatric Society, 1986-89
        Legislative Committee, 1986-89 (chair, 1987-89)
American Public Health Association, 1975-1982, 1990-95
American Society of Law and Medicine, 1982-84
Association for the Advancement of Psychotherapy, 1975-86
International Platform Association, 1982-90
National Alliance for the Mentally Ill (NAMI) (Professional Associate)
National Ass'n of State Mental Health Program Directors (affiliate), 1990-1996
National Ass'n of State Mental Health Research Institutes, 1978-84 (see above)
Phi Delta Epsilon, 1968-present
Texas Medical Foundation

000049

## VOLUNTEER & CIVIC ACTIVITIES

Board of Trustees, Schreiner University, 2006 – present (Executive Committee; Chair, Education Committee)

Various regional and national mental health advocacy groups (DMDA/DBSA, etc.)

Free patient consultations (various hospitals, clinics, medical centers)

Volunteer clinical teaching, various medical schools and hospitals

Board of Directors, Applehead Property Owners Association, 2013 – present

Consultant, Capacity for Justice (non-profit grant-funded organization to increase defendant access to adequate forensic evaluation and testimony), ~1998-2000

Marble Falls Community Tennis Association (2008-2010)

Board Vice-president, Applehead Island Property Owners' Association, 2001-2002

000050

**PUBLICATIONS** (R=refereed; I=invited; A=paper presented/abstracted in "scientific proceedings")

## Books

1. Reid WH (Ed.): *THE PSYCHOPATH: A COMPREHENSIVE STUDY OF ANTISOCIAL DISORDERS AND BEHAVIORS.* New York: Brunner/Mazel, 1978.

2. Reid WH: *PSYCHIATRY FOR THE HOUSE OFFICER.* NY: Brunner/Mazel, 1979.

3. Reid WH: *BASIC INTENSIVE PSYCHOTHERAPY.* NY: Brunner/Mazel, 1980.

4. Reid WH (Ed.): *THE TREATMENT OF ANTISOCIAL SYNDROMES.* New York: Van Nostrand Reinhold, 1981.

5. Eichelman B, Soskis DA, Reid WH (Eds.): *TERRORISM: INTERDISCIPLINARY PERSPECTIVES.* Washington DC: American Psychiatric Press, 1983.

6. Reid WH: *TREATMENT OF THE DSM-III PSYCHIATRIC DISORDERS.* New York: Brunner/Mazel, 1983.

7. Lion JR, Reid WH (Eds.): *ASSAULTS WITHIN PSYCHIATRIC FACILITIES.* New York: Grune & Stratton, 1983.

8. Reid WH, Dorr D, Walker J, Bonner J (Eds.): *UNMASKING THE PSYCHOPATH.* New York: W.W. Norton, 1986.

9. Reid WH, Wise MG: *DSM-III-R TRAINING GUIDE.* NY: Brunner/Mazel, 1989.

10. Reid WH: *THE TREATMENT OF PSYCHIATRIC DISORDERS* (Revised for the DSM-III-R). New York: Brunner/Mazel, 1989.

11. Reid WH, Wise MG: *DSM-IV TRAINING GUIDE.* New York: Brunner/Mazel, 1995.

12. Reid WH, Balis GU: *THE TREATMENT OF PSYCHIATRIC DISORDERS* (3rd Edition, Revised) New York: Brunner/Mazel (Washington, DC: Taylor & Francis), 1997.

13. Reid WH: *A CLINICIAN'S GUIDE TO LEGAL ISSUES IN PSYCHOTHERAPY.* Phoenix, AZ: Zeig, Tucker, 1999.

000051

14. Ashford J, Sales BD, Reid WH (Eds.): *TREATING ADULT AND JUVENILE OFFENDERS WITH SPECIAL NEEDS* (on treatment of offenders and violent persons). Washington, DC:  American Psychological Association Books, 2001.

15. Reid WH, Silver SB (Eds.): *HANDBOOK OF MENTAL HEALTH ADMINISTRATION AND MANAGEMENT* (on administration and leadership of mental health facilities and systems).  New York:  Brunner-Routledge (Taylor & Francis), 2003.

16. Reid WH:  *DEVELOPING A FORENSIC PRACTICE: Operations and Ethics for Experts* (on forensic practice).  New York & London: Routledge (Taylor & Francis Group), 2013.

000052

## Monographs, Journal Volumes, Video Publications

1.  Reid WH, Ruedrich S:  Understanding and helping the female violent patient. **Upjohn Monograph Series**, 1983.

2.  Reid WH (Guest Ed.):  Special Issue on psychiatry, law, and terrorism. **Behavioral Sciences and the Law**, 1983, **1**(2).

3.  Reid WH (Guest Ed.):  Special Issue on medicine and forensic psychiatry. **Psychiatric Medicine**, 1985, **2**(3).

4.  Reid WH, Ruedrich SL (Guest Eds.):  Special Issue on Psychiatric Education. **Psychiatric Annals**, 1986.

5.  Reid WH:  **Treating Patients in Psychiatric Hospitals. Workbook for Continuing Education Workshops**, 1987.

6.  Reid WH:  **Diagnosis and Management of the Violent Patient**. Continuing Education Videotape, 1985.

7.  Reid WH:  **Psychiatric Issues in Substance Abuse Counseling**. Continuing Education Videotape, 1986.

8.  Reid WH:  **Treating Patients in Psychiatric Hospitals**. Continuing Education Videotape, 1987.

9.  Reid WH:  **DSM-III-R Training Program** (videotape, 140-slide program, acetates, guidebook). New York:  Brunner/Mazel, 1989.

10. Reid WH, Wise MG:  **DSM-IV Training Program** (videotapes, Clinical Vignettes, slide program, guidebook). New York:  Brunner/Mazel, 1995.  (Reissued on DVD, 2011)

11. Reid WH:  **Suicide Risk:  Awareness, Assessment, Management and Documentation** (video, monograph, lectures).  Commissioned by Kerrville State Hospital for use in facilities of the Texas Department of State Health Services and other clinical settings, 2006, later versions.

12. Reid WH, Wise MG:  **DSM-IV-TR Training Program DVD** (Clinical vignettes, guidebook).  New York:  Routledge Mental Health (Taylor & Francis), 2011.

## Book Chapters

1.  Reid WH:  Diagnosis of antisocial syndromes.  In Reid WH (Ed.), *The Psychopath: A Comprehensive Study of Antisocial Disorders and Behaviors*.  New York: Brunner/Mazel, 1978, 3-6.

2.  Reid WH:  The sadness of the psychopath.  In Reid WH (Ed.), *The Psychopath: A Comprehensive Study of Antisocial Disorders and Behaviors*.  New York: Brunner/Mazel, 1978, 7-21.

3.  Reid WH:  Genetic correlates of antisocial syndromes.  In Reid WH (Ed.), *The Psychopath: A Comprehensive Study of Antisocial Disorders and Behaviors*.  New York:  Brunner/Mazel, 1978, 244-257.

4.  Reid WH:  The antisocial personality and related symptoms.  In Lion JR (Ed.), *Personality Disorders: Diagnosis and Management* (2nd ed.).  Baltimore: Williams & Wilkins, 1981, 133-162.  (I)

5.  Reid WH, Gutnik BD:  Diagnosis and treatment of sleepwalking.  In Golden C, Alcaparras S, Strider F, Graber B (Eds.), *Applied Techniques in Behavioral Medicine*.  New York:  Grune & Stratton, 1981, 49-58.  (I)

6.  Matthews WM, Reid WH:  A wilderness experience treatment program for offenders.  In Reid WH (Ed.), *The Treatment of Antisocial Syndromes*.  New York:  Van Nostrand Reinhold, 1981, 247-258.

7.  Stürup GK, Reid WH:  Herstedvester:  An historical overview of institutional treatment.  In Reid WH (Ed.), *The Treatment of Antisocial Syndromes*.  New York:  Van Nostrand Reinhold, 1981, 41-63.

8.  Reid WH, Solomon GF:  Community-based offender programs.  In Reid WH (Ed), *The Treatment of Antisocial Syndromes*.  New York:  Van Nostrand Reinhold, 1981, 76-94.

9.  Moore SL, Reid WH, Gutnik BD:  Treatment of flat affect associated with chronic schizophrenia in a partial hospitalization setting.  In Maxey T, Lefkovitz P. (Eds.), *Proceedings of the 1981 Annual Conference on Partial Hospitalization*. Boston: The American Association for Partial Hospitalization, 1982, 46-48.  (R)

10. Reid WH:  Research in terrorism.  In Eichelman B, Soskis DA, Reid WH (Eds.), *Terrorism: Interdisciplinary Perspectives*.  Washington, DC:  American Psychiatric Press, 1983, 149-152.

11. Reid WH, Morrison HL: Risk factors in children of depressed parents. In Morrison HL (Ed.), *Children of Depressed Parents*. New York: Grune & Stratton, 1983, 33-46. (I)

12. Edwards G, Reid WH: Violence in psychiatric facilities in Europe and the U.S. In Lion JR, Reid WH (Eds.), *Assaults Within Psychiatric Facilities*. New York: Grune & Stratton, 1983, 131-142. (I)

13. Haffke EA, Reid WH: Violence against mental health personnel in Nebraska. In Lion JR, Reid WH (Eds.), *Assaults Within Psychiatric Facilities*. New York: Grune & Stratton, 1983, 91-102. (I)

14. Reid WH: Antisocial personality. In Cavenar JO, Michels R (Eds.), *Psychiatry*. Philadelphia: Lippincott, 1986. (I)

15. Reid WH: Psychopathy and dangerousness. In Roth M, Bluglass R (Eds.), *Psychiatry, Human Rights and the Law*. Cambridge, England: Cambridge University Press, 1985. (I)

16. Reid WH, Halpern AL: The impact of psychiatric classification on the justice system: Description versus principle. In Freedman AM, Brotman R, Silverman I, Hutson D (Eds.), *Issues in Psychiatric Classification: Science, Practice and Social Policy*. New York: Human Sciences Press, 1986. (I)

17. Reid WH, Balis G: Evaluation of the violent patient. In *Psychiatry Update, Vol. 6*. Washington, DC: American Psychiatric Press, 1987. (I,R)

18. Reid WH: Treatment of violent patients: Concerns for the psychiatrist. In Tasman A, Hales RE, Frances AJ (Eds.), *Review of Psychiatry, Vol. 8* Washington, DC: American Psychiatric Press, 1989. (I,R)

19. Reid WH, Burke W: Treatment of antisocial personality. In Karasu TB (Ed.), *Treatments of Psychiatric Disorders*. A Task Force Report of the American Psychiatric Association, Washington DC: American Psychiatric Press, 1989. (I,R)

20. Reid WH: Psychiatry and fear of cancer. In *ASBESTOS MEDICINE*, Defense Research Institute, 1990. (I)

21. Reid WH: Antisocial personality. In Rosner R (Ed.), *Principles and Practice of Forensic Psychiatry*. New York: New York: Chapman & Hall (ITP), 1994. (I)

000055

22. Reid WH:  Terrorism and forensic psychiatry.  In Rosner R (Ed.), *Principles and Practice of Forensic Psychiatry*.  New York:  Chapman & Hall (ITP), 1994.  (I)

23. Reid WH:  Impulsivity and aggression in antisocial personality. In Hollander E, Stein D (Eds.), *Impulsivity and Aggression*.  New York:  John Wiley & Sons, 1995.  (I)

24. Reid WH:  Clinical Guidelines in Mental Health Care.  In Boruch F (Ed.), *Behavioral Health Services and Delivery:  Models and Methods.* Tampa, FL:  American College of Physician Executives, 1998.  (I)

25. Reid WH:  Antisocial character and behavior:  Threats and Solutions.  In Millon T, Simonsen E, Birket-Smith M, Davis RD (Eds.), *Psychopathy:  Antisocial, Criminal, and Violent Behaviors (Selected  Papers from the Stockholm International Symposium on Psychopathy)*, New York:  Guilford Press, 1998.  (I)

26. Reid WH:  Evaluation of violent patients.  In Tardiff K (Ed.), *Medical Management of the Violent Patient:  Clinical Assessment and Therapy.* (pp. 173-199) New York:  Marcel Dekker Medical Psychiatry Series, 1999.  (I)

27. Reid WH, Reid, DJ:  Management and the Management Environment.  in WH Reid, SB Silver (eds), *Handbook of Mental Health Administration and Management.* New York:  Brunner-Routledge (Taylor & Francis), 2003.

28. Reid DJ, Reid, WH:  Negotiation.  in WH Reid, SB Silver (eds), *Handbook of Mental Health Administration and Management.* New York:  Brunner-Routledge (Taylor & Francis), 2003.

29. Reid WH, Reid, DJ:  Leadership.  in WH Reid, SB Silver (eds), *Handbook of Mental Health Administration and Management.* New York:  Brunner-Routledge (Taylor & Francis), 2003.

30. Hirsch TW, Reid WH:  Principles of Human Resource Management.  in WH Reid, SB Silver (eds), *Handbook of Mental Health Administration and Management.* New York:  Brunner-Routledge (Taylor & Francis), 2003.

31. Mahalik AM, Stout CE, Reid WH:  Medical Information Technology Glossary.  in WH Reid, SB Silver (eds), *Handbook of Mental Health Administration and Management.* New York:  Brunner-Routledge (Taylor & Francis), 2003.

32. Reid WH:  Controlling Political Terrorism:  Practicality, not Psychology.  in C.E. Stout (ed.), *The Psychology of Terrorism.* Westport, CT:  Greenwood (GPG), 2002.  (I,R)

33. Reid WH: Bioterrorism: Separating Fact, Fiction, and Hysteria. in C.E. Stout (ed.), *The Psychology of Terrorism.* Westport, CT: Greenwood (GPG), 2002. (I,R)

34. Reid WH, Ruiz-Sweeney MS: Antisocial personality, psychopathy, and forensic psychiatry. In Rosner R (Ed.): *Principles and Practice of Forensic Psychiatry, 2nd ed.* London: Arnold, 2003. (I)

35. Reid WH, Stout CE: Terrorism and forensic psychiatry. In Rosner R (Ed.), *Principles & Practice of Forensic Psychiatry, 2nd ed.* London: Arnold, 2003. (I)

36. Reid WH: Sanity Evaluations and Criminal Responsibility. in Conroy MA, Lyons PM, Kwartzner P (eds.), *Forensic Evaluations Under Texas Law: Selected Criminal Issues.* Austin, TX: Capacity for Justice, 2006. (I) [Electronic version: Reid, WH (2006). Sanity Evaluations and Criminal Responsibility. *Applied Psychology in Criminal Justice*, 2(3), 114-146, at www.apcj.org]

37. Reid WH, Thorne SA: Residential and Experiential Treatment of Antisocial Syndromes. in Felthous AR & Sass H (eds.), *International Handbook on Psychopathic Disorders and the Law.* New York: John Wiley & Sons, 2008. (Winner of the Guttmacher Award) (I)

38. Reid WH, Thorne SA: Personality Disorders (violence & violence potential). in Simon RI & Tardiff K (eds.), *Textbook of Violence Assessment and Management.* Washington, DC: American Psychiatric Press (APPI), 2008. (I)

39. Reid WH: Professional Barriers to Offering or Providing Electroconvulsive Therapy (ECT). in C. Swartz (ed.), *Electroconvulsive Therapy and Neuromodulation.* Boston: Cambridge University Press, 2009. (I)

40. Brodsky SB, Reid WH: Developing and Operating a Forensic Practice. in E.Y. Drogin, F.M. Dattilio, R.L. Sadoff, T.G. Gutheil (eds.), *Handbook of Forensic Assessment.* Hoboken, NJ: Wiley, 2011. (I)

41. Reid WH, Kirwin S: Risk and risk management in psychodermatology (tentative title). in A. Bewley, R. Taylor, J. Reichenberg, M. Magid (eds.), *Practical Psychodermatology.* London: Wiley-Blackwell, in press, 2013. (I)

## Journal Articles

1. Reid WH: Sleepwalking. In, Important Advances in Clinical Medicine: Epitomes of Progress – Psychiatry. *Western Journal of Medicine*, 122(5), 417-418, 1975. (I)

2. Reid WH: Treatment of somnambulism in military trainees. *American Journal of Psychotherapy*, 29(1), 101-106, 1975. (R)

3. Reid WH, Blouin P: Outpatient psychiatric medications and glaucoma. *Psychosomatics*, 17(2), 83-85, 1976. (R)

4. Reid WH, Blouin P, and Schermer, M.: A review of psychotropic medications and the glaucomas. *International Pharmacopsychiatry*, 11(3), 163-174, 1976. (R)

5. Reid WH: The sadness of the psychopath. *American Journal of Psychotherapy*, 32(4), 496-509, 1978. (R)

6. Reid WH, Bottlinger J: Genetic aspects of antisocial disorders. *Hillside Journal of Clinical Psychiatry,* 1:87-95, 1979. (R)

7. Reid WH, Gutnik BD: A case report: Treatment of intractable sleepwalking. *The Psychiatric Journal of the University of Ottawa/ Rev. de psychiatrie de l'Univ. d'Ottawa*, 5(2), 86-88, 1980. (R)

8. Reid WH, Matthews WM: A wilderness experience treatment program for antisocial offenders. *International Journal of Offender Therapy and Comparative Criminology*, 24(2), 171-178, 1980. (R)

9. Reid WH, Arkfeld D: Psychotropic medications and glaucoma. *Hillside Journal of Clinical Psychiatry*, 2(2), 217-221, 1980. (R)

10. Reid WH, Ahmed I., Levie CA: Treatment of sleepwalking: A controlled study. *American Journal of Psychotherapy*, 35(1), 27-37, 1981. (R)

11. Soskis DA, Apter NS, Eichelman BS, Lion JR, Reid WH, Symonds M: Ethical dimensions of psychiatric intervention in terrorism and hostage situations. *American Journal of Psychiatry*, 139(11), 1529-1530, 1982. (I,R)

12. Gutnik BD, Reid WH: Adult somnambulism: Two treatment approaches. *Nebraska Medical Journal*, 67:309-312, 1982. (R)

000058

13. Reid WH, Moore SL, Zimmer M: Assessment of affect in schizophrenia: Reliability data. *Journal of Nervous & Mental Disease*, 170(5), 266-269, 1982. (R)

14. Reid WH, Gutnik BD: Organic treatment of chronically violent patients. *Psychiatric Annals*, 12(5), 526-532, 1982. (I)

15. Rakes S, Reid WH: Psychologic management of loss of vision. *Canadian Journal of Ophthalmology*, 17(4), 178-180, 1982. (R)

16. Moore SL, Zimmer M, Reid WH: Affect development group. *International Journal of Partial Hospitalization*, 1(3), 237-240, 1982. (R)

17. Shilling K, Reid WH: Prescribing principles for psychotropic medications. *Nebraska Medical Journal*, 68(3), 56-69, 1983. (R)

18. Reid WH, Rakes S: Intraocular pressure in patients receiving psychotropic medications. *Psychosomatics*, 24(7), 665-667, 1983. (R)

19. Moore SL, Reid WH, Zimmer M: Group treatment to improve affect in chronic schizophrenia. *The Psychiatric Hospital*, 14(2), 119-121, 1983. (R)

20. Reid WH, Swanson DA: Mental health boards in Nebraska. *Nebraska Medical Journal*, 69(6), 189-191, 1984. (R)

21. Reid WH, Haffke EA, Chu C-C: Diazepam in intractable sleepwalking: A pilot study. *Hillside Journal of Clinical Psychiatry*, 6(1), 49-55, 1984. (R)

22. Reid WH, Bollinger MF, Edwards G: Assaults by inpatients: Frequency and liability. *Psychiatric Medicine*, 2(3), 1985. (R)

23. Reid WH, Bollinger MF, Edwards G.: Assaults in hospitals. *Bulletin of the American Academy of Psychiatry and the Law*, 13(1), 1-4, 1985. (R)

24. Ruedrich SL, Reid WH: Financial incentives for teaching: A faculty response. *Journal of Medical Education*, 60(1), 68-69, 1985 (R)

25. Reid WH: The antisocial personality: a review. *Hospital & Community Psychiatry*, 36(8), 831-837, 1985. (I,R)

26. Ruedrich SL, Reid WH, Chu C-C: Rewarding teaching excellence with cash. *Psychiatric Annals*, 16:370-373, 1986. (I,R)

27. Reid WH, Kang J: Serious assaults by outpatients. *American Journal of Psychotherapy*, 40(4), 594-600, 1986. (R)

28. Reid WH: Clinical evaluation of the violent patient. *Psychiatric Clinics of North America*, 11(4), 527-537, 1988. (I,R)

29. Edwards JG, Jones D, Reid WH, Chu C-C: Physical assaults in a psychiatric unit of a general hospital. *American Journal of Psychiatry*, 145(12), 1568-1571, 1988. (R)

30. Reid WH, Edwards JG, Bollinger M: Serious assaults by inpatients. *Psychosomatics*, 30(1), 54-56, 1989. (R)

31. Reid WH: Terrorism and the Social Sciences: The psychiatrist's role. *Violence, Aggression and Terrorism* (Israel), 3(2):101-117, 1989. (I,R)

32. Reid WH: Thoughts For the Next 20 Years: Presidential Address. *Bulletin of the American Academy of Psychiatry and the Law*, 18(4):343-347, 1990. (I,R)

33. Reid WH: Access to Care: Clozapine in the Public Sector. *Hospital and Community Psychiatry*, 41(8):870-874, 1990. (I,R)

34. Rago W, Reid WH: Total quality management (TQM) strategies in mental health systems. *Journal of Mental Health Administration*, 18(3):253-263, 1991. (R)

35. Reid WH, Wise M, Sutton B: The Use and reliability of psychiatric diagnosis in forensic settings. *Psychiatric Clinics of North America*, 15(3):529-537, 1992. (I,R)

36. Reid WH: The role of electroconvulsive therapy in modern psychiatric treatment. *Texas Medicine*, May, 1993. (R)

37. Reid WH, Pham V, Rago W: Clozapine use by state programs: Public mental health systems respond to a new medication. *Hospital and Community Psychiatry*, 44(8):739-743, 1993. (R)

38. Jurek GH, Reid WH: Oral health of state hospital patients. *Hospital and Community Psychiatry*, 44(9):889-891, 1993. (R)

39. Jurek GH, Reid WH: Oral health of institutionalized individuals with mental retardation. *American Journal on Mental Retardation*, 98(5):656-660, 1994. (R)

40. Reid WH, Mason M, Toprac M: Savings in hospital bed-days related to treatment with clozapine. *Hospital and Community Psychiatry*, 45(3):261-264, 1994. (R)

41. Reid WH: The Treatment of psychosis: Resetting the drug cost "thermostat." *Journal of Clinical Psychiatry*, 55(9)Suppl.B:166-168, 1994. (R)

42. Reid WH: Schizophrenia, modern treatment, and the economics of care. *Reviews in Contemporary Pharmacotherapy*, 6:209-215, 1995. (I,R)

43. Reid WH (guest editor): Central Nervous System Roundtable on medications in forensic and violent populations. Princeton, N.J.: *Excerpta Medica*, 1996. (I)

44. Reid WH, Keller S, Leatherman M, Mason M: Electroconvulsive therapy (ECT) in Texas: 19 months of mandatory reporting. *Journal of Clinical Psychiatry*, 59(1):8-13, 1998. (R)

45. Reid WH, Mason M: Psychiatric hospital utilization in patients treated with clozapine for up to 4.5 years in a state mental health care system. *Journal of Clinical Psychiatry*, 59(4):189-194, 1998. (R)

46. Reid WH, Mason M, Hogan T: Suicide in schizophrenia & schizoaffective disorder. *Psychiatric Services*, 49:1029-1033, 1998. (R)

47. Reid WH: New vs. old antipsychotics: The Texas experience. *Journal of Clinical Psychiatry*, Supplement 1, 1999. (I,R)

48. Reid WH: Electroconvulsive therapy (ECT) in psychiatrists and their families. **The** *Journal of ECT*, 15(3):207-212, 1999. (R)

49. Reid WH, Gacono CB: Treatment of antisocial personality, psychopathy, and other characterologic antisocial syndromes. *Behavioral Sciences and the Law*, 18:647-662, 2000. (I,R)

50. Reid WH: Licensure requirements for out-of-state forensic examinations. *Journal of the American Academy of Psychiatry and the Law*, 28(4):433-437, 2000. (R)

51. Shiwach RS, Reid WH, Carmody TJ: An analysis of reported deaths following electroconvulsive therapy in Texas, 1993-1998. *Psychiatric Services*, 52(8):1095-1097, 2001. (R)

52. Reid WH: Recognizing and dealing with impaired clinicians, Part I: Recognition and Reporting. *Journal of Medical Practice Management*, 17(2):97-99, 2001. (I,R)

000061

53. Reid WH:  Recognizing and dealing with impaired clinicians, Part II:  Treatment Options. *Journal of Medical Practice Management*, 17(3):145-148, 2001.  (I,R)

54. Reid WH, Reid DJ:  A Primer on Management and the Management Environment for psychiatrists. *The Psychiatrist Administrator*, 2(1):14-19, 2002.  (I,R)

55. Reid WH, Reid DJ:  A Primer on Leadership for psychiatrists. *The Psychiatrist Administrator*, 2(2):34-44, 2002.  (I,R)

56. Reid WH:  Forensic medicine:  Opportunity, with strings attached. *Journal of Medical Practice Management* 18(5):262-265, 2002.  (I,R)

57. Shuman DW, Connell MA, Reid WH, Cunningham MD:  Interstate Forensic Psychology Consultations:  A Call for Reform and Proposal of a Model Rule. *Professional Psychology:  Research & Practice*, 34(3):233-239, 2003.  (R)

58. Reid DJ, Reid WH:  Negotiation in Mental Health Systems. *The Psychiatrist Administrator*, 3(2) 38-46, 2003.  (I,R)

59. Reid DJ, Reid WH:  Terrorism-related Risk Management for Health Care Facilities. *Behavioral Sciences and the Law,* 23:591-601, 2005.  (I,R)

60. Norris DM, Price M, Gutheil T, Reid WH:  Firearm Laws, Patients, and the Roles of Psychiatrists. *American Journal of Psychiatry*, 163(8): 1392-1396, 2006.  (R)

61. Metzner JL, Tardiff K, Lion J, Reid WH, Recupero PR, Schetky DH, Edenfield BM, Matson M, Janofsky JS:  Resource Document on the Use of Restraint and Seclusion in Correctional Mental Health Care. *Journal of the American Academy of Psychiatry and the Law*, 35:417-425, 2007.  (R)

62. Magid M, Trevino K, Reid WH, Jalalat S, Husein M:  Emergency ECT in an Incapacitated, Medically Compromised Patient with Huntington's Disease. *Journal of Psychiatric Practice*, in press.  (R)

**Briefer Articles, Editorials, Research Reports**

1.  Reid WH: The end of residency? *Journal of Medical Education*, 1976, **51**(2), 158-159.

2.  Reid WH, Riedler J: Psychiatric and computers: An uneasy synthesis. *The Behavioral and Brain Sciences*, 1981, **4**(4), 547. (I)

3.  Reid WH: The insanity defense: A dispassionate discussion. Syndicated Editorial, *Public Research, Syndicated*, 1982, August. (I)

4.  Reid WH: Treatment of antisocial personality: An editorial view. *Newsletter* of the American Academy of Psychiatry and the Law, 1983, Spring. (I)

5.  Reid WH: Dreams of violence. *Consultant*, 1983, **23**(3), 109. (I)

6.  Reid WH: Is there treatment for antisocial personality? *Harvard Mental Health Letter*, March, 1986. (I,R)

7.  Reid WH: Treatment of sex offenders. *Harvard Mental Health Letter*, April, 1987. (I,R)

8.  Reid WH: The risk of violence in "psychotics": Comment. *Integrative Psychiatry*, 1986, **4**, 16-18. (I)

9.  Reid WH: Optimism and pessimism in the treatment of sex offenders. *Psychiatric Times*, 1988, **5**(4), 8,10-11. (I)

10. Reid WH: Access to Care: The Rest of the Clozaril Story. National Mental Health Association *FOCUS*, Summer, 1990. (I)

11. Reid WH: *Stewart v. Sullivan:* Comment on Implications for medical practice. *Policy Review*, Fall, 1993. (I)

12. Reid WH, Metelitsa YL, Kazakevich E, Goldberg S: Intellectual computer systems as tools of learning, using, and creating standard descriptions (classification systems) in medicine. (abstracted in Witten M [Ed.], ***Computational Medicine, Public Health and Biotechnology: Building a Man in the Machine***, River Edge, NJ: World Scientific Publishing, 1996 [Proc First World Congress on Computers and Medicine, 1994]). (R)

13. Reid WH: Roles and characteristics of state medical directors. *Journal of the American Association of Psychiatric Administrators*, Fall, 1995. (I)

14. Reid WH: Electroconvulsive therapy. *Issues of the Mind* (public television series), August, 1996.

15. Reid WH: Commentary: *Fogg v. Paoli Memorial Hospital* (on suicide/wrongful death). *Forensic Psychiatry Echo*, pp. 18-19, May, 1997.

16. Reid WH: Commentary: *Beaver v. Alaska* and *Colorado v. Elsbach* (on sex offenders/self-incrimination). *Forensic Psychiatry Echo*, July, 1997.

17. Reid WH: Commentary: *Matter of LeBovici, as Guardian* (on competence to contract). *Forensic Psychiatry Echo*, July, 1997.

18. Reid WH: Commentary: *In Re: Marriage of Liljedahl* (on mental disability). *Forensic Psychiatry Echo*, September, 1997.

19. Reid WH: Commentary: *Commonwealth v. Hooper* and *Commonwealth v. Sheriff* (on competence to plead or stand trial). *Forensic Psychiatry Echo*, September, 1997.

20. Reid WH: Treating clinicians and expert testimony. *Journal of Practical Psychiatry and Behavioral Health* 4(2):121-123, March, 1998. (I,R)

21. Reid WH: Standard of care and patient need. *Journal of Practical Psychiatry and Behavioral Health* 4(3):172-174, May, 1998. (I,R)

22. Reid WH: Violent sexual predators. *Journal of Practical Psychiatry and Behavioral Health* 4(4):246-248, July, 1998. (I,R)

23. Reid WH: Don't rely on patients' no-suicide/no-violence Acontracts. *Journal of Practical Psychiatry and Behavioral Health* 4(5):316-318, September, 1998. (I,R)

24. Reid WH: Evaluating criminal defendants: Responsibility and competence to stand trial. *Journal of Practical Psychiatry and Behavioral Health* 4(6):373-376, November, 1998. (I,R)

25. Reid WH: Accidents, Suicide and Insurance. *Journal of Practical Psychiatry and Behavioral Health* 5(2):115-116, March, 1999. (I,R)

000064

26. Reid WH: Boundary Issues and Violations. *Journal of Practical Psychiatry and Behavioral Health* 5(3):173-176, May, 1999. (I,R)

27. Reid WH: Top 19 Things to Remember When Working With Lawyers and Courts. *Journal of Practical Psychiatry and Behavioral Health* 5(4):234-237, July, 1999. (I,R)

28. Reid WH: Impaired Colleagues. *Journal of Practical Psychiatry and Behavioral Health* 5(5):291-293, September, 1999. (I,R)

29. Reid WH: Being Sued. *Journal of Practical Psychiatry and Behavioral Health* 5(6):357-360, November, 1999. (I,R)

30. Reid WH: Whom Do You Trust? Patient Care and Professional Relationships. *Journal of Psychiatric Practice* 6(1):45-48, January, 2000. (I,R)

31. Reid WH: Staying Ethical Under Pressure. *Journal of Psychiatric Practice* 6(2):105-108, March, 2000. (I,R)

32. Reid WH: The Insanity Defense: Bad or Mad, or Both? *Journal of Psychiatric Practice* 6(3):169-172, May, 2000. (I,R)

33. Reid WH: Malingering. *Journal of Psychiatric Practice* 6(4):226-228, July, 2000. (I,R)

34. Reid WH: Treating Offenders With Special Needs. *Journal of Psychiatric Practice* 6(5):280-283, September, 2000. (I,R)

35. Reid WH: Antisocial Personality, Psychopathy, and Forensic Psychiatry. *Journal of Psychiatric Practice* 7(1):55-58, January, 2001. (I,R)

36. Reid WH: Pregnant Patients Refusing Medical Care. *Journal of Psychiatric Practice* 7(2):141-144, March, 2001. (I,R)

37. Reid WH: Psychiatry and the Death Penalty. *Journal of Psychiatric Practice* 7(3):216-219, May, 2001. (I,R)

38. Reid WH: Competence to Consent. *Journal of Psychiatric Practice* 7(4):276-278, July, 2001. (I,R)

39. Reid WH: Psychological Aspects of Terrorism. *Journal of Psychiatric Practice* 7(6):422-425, November, 2001. (I,R)

40. Reid WH:  Evaluations in Jails, Prisons, and Forensic Facilities.  *Journal of Psychiatric Practice* 8(1):54-56, January, 2002.  (I,R)

41. Reid WH:  Forensic Work and Nonforensic Clinicians  -- Part I.  *Journal of Psychiatric Practice* 8(2):  119-122,  2002.  (I,R)

42. Reid WH:  Forensic Work and Nonforensic Clinicians  -- Part II:  Reports and depositions.  *Journal of Psychiatric Practice* 8(3):181-185, 2002.  (I,R)

43. Reid WH:  Forensic Work and Nonforensic Clinicians  -- Part III:  Testifying in court.  *Journal of Psychiatric Practice* 8(4):246-249, 2002.  (I,R)

44. Reid WH:  Sexual Predator Evaluations and Commitments.  *Journal of Psychiatric Practice* 8(5):320-324, 2002.  (I,R)

45. Reid WH:  Ethics and forensic work.  *Journal of Psychiatric Practice* 8(6):380-385, 2002.  (I,R)

46. Reid WH:  Risk Assessment, Prediction, and Foreseeability.  *Journal of Psychiatric Practice* 9(1):  82-86, 2003.  (I,R)

47. Reid WH:  Why Clinicians Should Decline Forensic Referrals.  *Journal of Psychiatric Practice* 9(2):162-166, 2003.  (I,R)

48. Reid WH:  Terrorism and Forensic Psychiatry.  *Journal of the American Academy of Psychiatry and the Law*, 31(3):285-288, 2003.  (I,R)

49. Reid WH:  Back To Basics:  Law and Mental Health.  *Journal of Psychiatric Practice* 9(3):240-244, 2003.  (I,R)

50. Reid WH:  Expert Evaluation, Controversial Cases, and the Media.  *Journal of Psychiatric Practice* 9(5):388-390, 2003.  (I,R)

51. Reid WH:  Killing Family Members: Mental Illness, Victim Risk, and Culpability.  *Journal of Psychiatric Practice* 10(1):68-71, 2004.  (I,R)

52. Reid WH, Durgam SK:  International Medical Graduates as Forensic Experts.  *Journal of Psychiatric Practice* 10(2):130-133, 2004.  (I,R)

53. Reid WH:  Organization liability:  Beyond *respondeat superior*.  *Journal of Psychiatric Practice* 10(4):258-262, 2004.  (I,R)

000066

54. Reid WH:  Two cases from the forensic files.  *Journal of Psychiatric Practice* 10(6):389-392, 2004.  (I,R)

55. Reid WH:  Contracting for safety *redux*.  *Journal of Psychiatric Practice* 11(1):54-57, 2005.  (I,R)

56. Reid WH:  Delusional disorder and the Law.  *Journal of Psychiatric Practice* 11(2):126-130, 2005.  (I,R)

57. Reid WH:  Forensic practice:  A day in the Life.  *Journal of Psychiatric Practice* 12(1), 2006.  (I,R)

58. Reid WH:  Useful books on forensic psychiatry.  *Journal of Psychiatric Practice* 12(2):116-118, 2006.  (I,R)

59. Reid WH:  When clinicians must testify in court.  *Journal of Psychiatric Practice* 12(3):176-179, 2006.  (I,R)

60. Reid WH, Thorne SA:  Treating antisocial personality.  *Journal of Psychiatric Practice* 12(5):320-323, 2006.  (I,R)

61. Reid WH:  Evaluating and treating disabled and impaired colleagues.  *Journal of Psychiatric Practice* 13(1):44-48, 2007. (I,R)

62. Reid WH, Durgam S:  Jury bias and psychiatric experts: Judges= impressions of international medical graduates as expert witnesses.  *Journal of Psychiatric Practice* 13(3):190-194, 2007.  (I,R)

63. Reid WH, Thorne SA:  Personality disorders and violence potential.  *Journal of Psychiatric Practice* 13(4):261-268, 2007. (I,R)

64. Reid WH:  Practice well:  Suicide risk and suicide prevention.  *Journal of Psychiatric Practice* 13(6):402-404, 2007. (I,R)

65. Reid WH:  A few new books.  *Journal of Psychiatric Practice* 14(1):58-61, 2008 (I,R)

66. Reid WH:  Recognizing and dealing with impaired colleagues.  *Texas Psychiatrist* Feb.-March, 2008:1,7. (I)

67. Reid WH:  The treatment-forensic interface.  *Journal of Psychiatric Practice* 14(2):122-125, 2008. (I,R)

68. Reid WH: Assaults against psychiatrists and other mental health professionals. *Journal of Psychiatric Practice* 14(3):179-181, 2008. (I,R)

69. Reid WH: Prognosis after suicide attempt. *Journal of Psychiatric Practice* 15(2):141-144, 2009. (I,R)

70. Reid WH: Borderline personality disorder and related traits in forensic psychiatry. *Journal of Psychiatric Practice* 15(3):216-220, 2009. (I,R)

71. Reid WH: Important new books in forensic psychiatry. *Journal of Psychiatric Practice* 16(1):54-57, 2010. (I,R)

72. Reid WH: Preventing suicide. *Journal of Psychiatric Practice* 16(2):120-124, 2010 (I,R)

73. Reid WH: When lawyers call clinicians. *Journal of Psychiatric Practice* 16(4):253-257, 2010 (I,R)

74. Reid WH: Book Review: *The American Psychiatric Publishing Textbook of Forensic Psychiatry* (and *Study Guide*). *Journal of Psychiatric Practice* 16(5):344-349, 2010 (I,R)

75. Gao B, Reid WH, Li S: Forensic psychiatry in the People's Republic of China. *Journal of Psychiatric Practice* 17(2):129-132, 2011 (I,R)

76. Reid WH: So they want you to be their medical director. *Journal of Psychiatric Practice* 17(3):208-211, 2011 (I,R)

77. Reid WH: Writing reports for lawyers and courts. *Journal of Psychiatric Practice*, 17(5):355-359, 2011 (I,R)

78. Burrows M, Reid WH: Psychiatric aspects of criminal responsibility: Insanity and mitigation. *Journal of Psychiatric Practice*, 17(6):429-431, 2011 (I,R)

79. Reid WH: Doing forensic work I: Starting the case. *Journal of Psychiatric Practice*, 18(2):122-125, 2012 (I,R)

80. Reid WH: Doing forensic work II: Fees, billing, and collections. *Journal of Psychiatric Practice*, 18(3):208-212, 2012 (I,R)

81. Reid WH: Doing forensic work III: Marketing your practice. *Journal of Psychiatric Practice*, 18(4):291-295, 2012 (I,R)

82.  Reid WH, Simpson S:  How lawyers view psychiatric experts.  *Journal of Psychiatric Practice*, 18(5): 444-447, 2012 (I,R)

83.  Reid WH:  Avoiding (or fixing) problems with lawyers and courts.  *Journal of Psychiatric Practice*, 19(2): 152-156, 2013 (I,R)

000069

## Audiotapes

1. Reid WH:  The psychopath.  On **The Search for Mental Health**.  Educational Recording, Forest Hospital Foundation, Des Plaines, IL, 1977.  (I)

2. Reid WH:  Sleepwalking.  On **The Search for Mental Health**.  Educational Recording, Forest Hospital Foundation, Des Plaines, IL, 1978.  (I)

3. Reid WH:  Psychiatric aspects of terrorism.  On **The Search for Mental Health**.  Educational Recording, Forest Hospital Foundation, Des Plaines, IL, 1980.  (I)

4. Reid WH, Swanson D:  Violence in psychiatric facilities.  On **Medical Portfolio**.  Educational Recording, 1982.  (I)

5. McHugh J, Frances A, Reid WH:  **DSM-III-R in the 90s**.  American College of Psychiatrists *Update* Series, 1990.  (I)

6. Reid WH (Chair), Lion JR, Meloy JR:  **Psychopathy and Antisocial Syndromes**.  American College of Psychiatrists *Update* Series, 1993.  (I)

7. Reid WH:  Clozapine:  First Choice or Last Resort?  **Audio Digest Psychiatry** 23(10), May, 1994.  (I)

8. Reid WH:  **Developing a Forensic Practice:  Principles, Operations & Ethics**.  Audiotape workshop & syllabus on practice quality and ethics, 1998, 2011.

000070

## Other (non-Internet)

Reid WH, Edwards JG: Reid/Edwards Survey Instrument for Assessing Violence in Medical Facilities, 1983.

Reid WH (Chair), Currier S, Durish SS, Fitzgerald PH, Giffen C, Heald W, Rosenbusch W, Wilson WC: Operating State Agencies Under Court Order. Governor's Executive Development Program Task Force Report (Texas), 1991 (pp. 87-106).

Content Advisor, Meloy JR: Violence Risk Assessment. Menninger Video Productions, The Menninger Clinic & Foundation, 1994.

Written diagnostic vignettes (24) for the Ontario licensing examination, College of Psychologists of Ontario, Canada, 1998.

Reid WH, Durgam S: Reid/Durgam survey instrument for assessing juror bias regarding IMG expert witnesses, 2003.

Reid WH: Preventing Suicide. White paper for the Sixth Annual Capitol Hill Press Event on suicide prevention, Cannon House Caucus Room, Washington, DC. (Kristin Brooks Hope Center and others), April, 2010.

## Online and Web-Based Publications/Activities

Reid WH: Psychiatry and Law Updates. Website at *www.psychandlaw.org*, 1998-present.

Forum host: Law, Ethics, and Psychotherapy. Behavior.Net forums at *www.behavior.net*, 1998-present.

Continuing medical education content for Psychiatry On-Line, an international online journal based in the United Kingdom at *www.priory.com*, ~1999-2004.

Reid WH: Should the treating clinician be an expert witness? *www.ExpertPages.com*, January, 2001.

Reid WH: What qualifications are important when lawyers or judges choose a forensic psychiatrist? *www.ExpertPages.com*, January, 2001.

Reid WH: "Hired Guns" and Expert Witnesses. *www.ExpertPages.com*, January, 2001. (reprinted on *www.ewitness.com*)

Reid WH: Forensic Psychiatry, Controversial Cases, and the Media. *www.houstonpsychiatry.org*, June, 2003. (I)

## Book Reviews

50-60 reviews of psychiatric books in various professional journals.

000072

## SELECTED REGIONAL, NATIONAL AND INTERNATIONAL PRESENTATIONS

Reid WH:  Clinical use of biocybernetic techniques in short-term outpatient treatment.  Various presentations, 1974-75.

Reid WH:  Survivor's guilt in the new city.  Annual Meeting, School of Public Health, University of California, Berkeley, 1975.

Ziskind E, Reid WH, Spitzer RL, Jenkins RL, Strömgren E:  The diagnostic dilemma in sociopathy.  Symposium, VI World Congress of Psychiatry, Honolulu, 1977.  (I)

Reid WH:  Sociopathic disorders:  Update and clarification.  VI World Congress of Psychiatry, Honolulu, 1977.  (R,A)

Reid WH, Blouin P, Schermer M:  Glaucoma and psychiatric medications.  VI World Congress of Psychiatry, Honolulu, 1977. (R,A)

Reid WH, Tupin JP, Kellner R, Morrison HL, Leaff LA:  Sociopathy: Discussion & update. Panel, Annual Meeting, Amer. Psychiatric Association, Toronto, 1977. (R,A)

Reid WH, Ahmed I, Levie CA:  Successful treatment of uncomplicated sleepwalking: A controlled study.  Annual Meeting, Academy of Psychosomatic Medicine, Atlanta, 1978.  (R,A)

Reid WH, Bottlinger JL:  Genetic aspects of human antisocial syndromes.  Nebraska Academy of Sciences, Lincoln, NE, 1978.  (R,A)

Morrison HL, Cohler B, Reid WH, Grunebaum H, Bemisderfer S:  Children of depressed parents.  Course, Annual Meeting, American Psychiatric Association, Atlanta, 1978.  (I,A)

Reid WH, Lion JR, Morrison HL, Carney F, and Nelson S: Treatment of antisocial syndromes.  Panel, Annual Meeting, American Psychiatric Association, Atlanta, 1978.  (R,A)

Reid WH (Chairman, Research Section):  International Conference on the Psychiatric Aspects of Terrorism (APA/LEAA), Cross Keys MD, 1979.  (I,A)

Reid WH:  Medical approaches to the treatment of antisocial disorders.  Annual Meeting, American Academy of Psychiatry and the Law, Baltimore, 1979.  (R,A)

Reid, WH: International terrorism: Research & present status. American Psychiatric Association International Symposium on Terrorism, Baltimore, 1979. (I,A)

Benedek E, Lion JR, Eichelman B, Symonds M, Reid W, Soskis DA:  Psychiatric aspects of terrorism.  Panel, Annual Meeting, American Psychiatric Association, Chicago, 1979.  (R,A)

Reid WH:  Treatment of antisocial syndromes in other major illness.  Annual Meeting, American Psychiatric Association, Chicago, 1979.  (R,A)

Reid WH (Chairman), Kellner R, Fawcett J, Tupin JP, Rada RT:  Treatment of antisocial syndromes.  I.  Organically based approaches.  Special Session, Annual Meeting, American Psychiatric Association, Chicago, 1979.  (R,A)

Reid WH (Chairman), Carney F, Morrison HL, Lion JR, Benedek EP, Matthews WM: Treatment of antisocial syndromes.  II.  Systems and psychotherapy.  Special Session, Annual Meetings, American Psychiatric Association, Chicago, 1979.  (R,A)

Reid WH (with the American Psychiatric Association Task Force): Research issues regarding the psychiatric aspects of terrorism.  Annual Meeting, American Psychiatric Association, Chicago, 1979.  (I)

Reid WH:  Report of the American Psychiatric Association Task Force on Terrorism.  University of Chicago Conference on Psychopathology and Political Violence, 1979.  (I,A)

Reid WH (with the American Psychiatric Association Task Force): Research in Terrorism.  Annual Meeting, American Psychiatric Association, 1980.  (I)

Reid WH (Chairman), with seven presenters:  The violent offender: Clinical and legal issues.  Annual Meeting, American Academy of Psychiatry and the Law, Chicago, 1980.  (I,A)

Zawodny JK, Reid WH:  Psychopolitical aspects of terrorism.  Conference, Nebraska Psychiatric Institute Symposium Series, Omaha, NE, 1980.  (I)

Reid WH (Chairman), Zawodny JK, Bassiouni MC, Eichelman B, Hassel C: Multidisciplinary symposium on international terrorism.  American Academy of Psychiatry and the Law,  Chicago, 1980.  (I)

Reid WH:  Antisocial syndromes:  Treatment update.  Annual Meeting, American Psychiatric Association, New Orleans, 1981.  (R,A)

Haffke EA, Reid WH, Hackett T, Penna M:  Patient violence:  Psychiatric occupational hazard?  Panel, Annual Meeting, American Psychiatric Association, New Orleans, 1981.  (R)

Reid WH, Kentsmith D, Apter N:  Psychiatric aspects of terrorism.  Task Force Workshop, Annual Meeting, American Psychiatric Association, New Orleans, 1981.  (I)

Reid WH, Cavanaugh J, Rogers R, Rada RT:  Ethical research and the violent patient.  Issue Workshop, Annual Meeting, American Psychiatric Association, New Orleans, 1981.  (R)

Reid WH (Chairman), Bursten B, Halpern AL, Portnow SL, Rachlin S, Solomon GF:  The antisocial personality and forensic psychiatry.  Panel, Annual Meeting, American Academy of Psychiatry and the Law, 1981.  (I,A)

Reid WH (Chairman), Barry DJ, Ciccone JR, Dietz PE, Halpern AL, Mills MJ:  *DSM-III* in forensic psychiatry.  Special Course, Annual Meeting, American Academy of Psychiatry and the Law, 1981.  (I,A)

Karrer K, Reid WH, Haffke E:  Violence in mental health settings:  Can the environment be made safe for staff?  Annual Meeting, American Public Health Association, Los Angeles, 1981.  (R)

Gutnik B, Reid WH:  The treatment of sleepwalking.  Annual Meeting, Academy of Psychosomatic Medicine, 1981.  (R,A)

Reid WH, Haffke EA:  Assaults in community mental health centers.  Annual Meeting, American Psychiatric Association, 1982.  (R,A)

Reid WH:  Research in correctional settings.  Address, Symposium of Federal Correctional Psychiatrists and Researchers, Butner, NC, 1982.  (I)

Reid WH (Chairman), Freedman A, Visotsky H, Thomas H, Veliz J:  International issues in psychiatric treatment.  Symposium, Annual Meeting, American Academy of Psychiatry and the Law, 1982.  (I,A)

000075

Reid WH:  Assaults in psychiatric facilities in the U.S. and Britain.  Annual Meeting, American Academy of Psychiatry and the Law, 1982.  (I,A)

Reid WH:  Assaults in hospitals.  Upstate Medical Center, Syracuse, NY, March 1983.  (I)

Reid WH:  Assaults in hospitals.  Louisiana State University, New Orleans, Mar., 1983.  (I)

Reid WH:  Psychopathy and dangerousness.  Plenary Address, International Conference on Public Policy in Medicine and Law, Trinity College, Cambridge University, England, September, 1983.  (I,A)

Reid WH:  Treatment of antisocial offenders.  Municipal Hospital (Kommunehospitalet), Copenhagen, Denmark, September, 1983.  (I)

Reid WH:  Psychiatrists and terrorism.  Rigshospitalet, Copenhagen, Denmark, September, 1983.  (I)

Reid WH:  Offender treatment in the United States.  Central Mental Hospital and Saint Vincent's Hospital, Dublin University, Ireland, September, 1983.  (I)

Reid WH:  Assaults in hospitals.  University of Missouri, Department of Psychiatry, Columbia, October, 1983.  (I)

Reid WH, Assaults in medical facilities.  University of Texas, San Antonio, December 1983. (I)

Reid WH:  The treatment of antisocial personality.  Detroit Psychiatric Institute, Detroit, January, 1984.  (I)

Reid WH:  Assaults within psychiatric facilities.  Detroit Psychiatric Institute, Detroit, January, 1984.  (I)

Reid WH:  Understanding and helping the female violent patient.  Lafayette Clinic, Detroit, January, 1984.  (I)

Reid WH, Halpern AL:  The impact of psychiatric classification on the justice system.  International Conference on Critical Issues in Psychiatric Classification, New York, February, 1984.  (I,A)

000076

Reid WH:  Cost-Effective approaches to community and wilderness offender treatment programs.  Annual Meeting, American Academy of Forensic Sciences, Los Angeles, February, 1984.  (I,A)

Reid WH (Dean), McCord WM, Brown GL, Kegan RG, Reid WH, Robinowitz CB, Person ES, Menninger W:  Conference:  Unmasking the psychopath, Highland Hospital and Duke University Medical Center, Asheville NC, August, 1984.  (I,A)

Reid WH:  Assaults within psychiatric facilities.  Conference Panel (Schneider J, Cavanaugh JL Jr., Reid WH, Brelje TB, Brown N:  Violence in the mental health setting), Illinois State Psychiatric Institute, Chicago, Sept. 21-22, 1984.  (I)

Reid WH:  Psychiatry as creative medicine.  Annual Meeting, Louisiana Psychiatric Society, New Orleans, September 23, 1984.  (I)

Reid WH:  Treatment of Depression.  Workshop, Department of Public Institutions, Lincoln Regional Center, Lincoln, NE, November 3, 1983.  (I)

Reid WH: Cost-effective offender treatment. Annual Conference, National Assoc. of State Mental Health Program Directors, Boston, Nov. 14-16, 1984.  (I)

Reid WH:  The antisocial personality in 1985.  MASUA Honors Lecture, Iowa State University, December 10, 1984. (I)

Reid WH:  The antisocial personality in 1985.  MASUA Honors Lecture, University of Oklahoma, January 16, 1985.  (I)

Reid WH:  Wilderness treatment programs.  Visiting Professor Presentation, Department of the Navy, Naval Hospital, Portsmouth, VA, March 22, 1985.  (I)

Reid WH:  Psychotherapy with violent and antisocial patients.  Conference, The Violent Patient, The Institute for the Advancement of Human Behavior (Portola Valley, CA), Chicago, IL, April 26-28, 1985.  (I)

Reid WH:  Treatment & management of the violent patient.  Missouri Institute of Psychiatry & the Burrell Center (St. Louis), Springfield, June, 1985.  (I)

Reid WH:  Series on antisocial syndromes, State of Ohio, 1986.  (I)

Eichelman B, Lion JR, Maier G, Reid WH:  Course on management of violent patients.  APA Annual Meeting, 1986.  (I,A)

Tardiff K, Appelbaum PS, Lion JR, Madden DJ, Penna MW, Reid WH: Course on acute management of violent patients. APA Annual Meeting, 1987. (I,A)

Eichelman B, Maier GJ, Mills M, Reid WH, Tupin J, Van Rybrock G: Management of the aggressive patient (course). APA Annual Meeting, 1987. (I,A)

Bradford JM, Abel GG, Reid WH: Course on the assessment and treatment of the child molester. APA Annual Meeting, Chicago, IL, 1987. (I,A)

Reid WH, Balis GU: Evaluation of the violent patient. APA Annual Meeting, Chicago, IL, 1987. (I,A)

Reid WH: Medical Conditions Presenting as Emotional Disorders. Texas Psychological Association Annual Convention, San Antonio, TX, 1987. (I)

Reid WH, Kennedy M, Pyle CH, Inkster W: Terrorism: Psychosocial perspectives. Symposium on Terrorism and Social Science, Ottawa, Ontario, Canada, October, 1987. (I,R,A)

Reid WH: Institutional treatment of antisocial disorders. National Institute of Justice symposium, Baltimore, MD., April, 1988. (I)

Reid WH: Chair, Conference on Forensic Psychiatry. CME, Inc., Scottsdale, AZ. (presentations on forensic practice and treatment of paraphilias). Feb., 1989. (I)

Reid WH: The mentally retarded felon. Thomas More Society Lecture, St. Mary=s University Law School, San Antonio, TX. Mar., 1989. (I)

Reid WH, Balis GU: Evaluation of the violent patient. American Psychiatric Association Annual Meeting, San Francisco, May, 1989. (I,R,A)

Co-Chair (with A. Beigel), Psychiatric aspects of terrorism, lecture by F. Ferracuti. American Psychiatric Association Annual Meeting, San Francisco, May, 1989. (I)

Reid WH: Presidential Address, American Academy of Psychiatry and the Law, Washington, DC, October, 1989. (I,A)

Reid WH and other presenters: Forum on Clozapine for the American Psychiatric Association. APA Annual Meeting, New York, May, 1990. (I)

Appelbaum P, Hughes A, Reid WH, Beck J.: Barring the Door to Overcrowding in State Hospitals. APA Annual Meeting, 1990. (I,R,A)

000078

Keill S, Leon R, Reid WH:  Incentives for Psychiatric Administration.  APA Annual Meeting, New York, May, 1990.  (I,R,A)

Reid WH:  Forensic mental health in the 1990s.  Keynote address, National Assoc. State Forensic Program Directors, Annual Meeting, Sept., 1990.  (I)

Michels R (Chair), Flynn L, Honigfeld G, Reid WH, *et al.*:  American Psychiatric Association Forum on Clozapine.  APA Annual Meeting, New Orleans, 1991.  (I,R)

Reid WH:  Which hat?  Administrator, manager, leader, executive.  Plenary address, Texas Society of Psychiatric Administrators.  June, 1991.  (I)

Reid WH:  Psychiatrist as executive.  Texas Society of Psychiatric Physicians Annual Meeting, November, 1991.

Katz S, Honigfeld G, Kane J, Meltzer H, Reid W, Winters D:  American Psychiatric Association Forum on Clozapine.  APA Annual Meeting, Washington, DC, 1992.  (I)

Reid WH:  Partnership among mental health advocacy groups, clinical professionals, and health care systems.  Plenary lecture for the annual conference of the Texas Alliance for the Mentally Ill, Dallas, May, 1992.  (I)

Reid WH (symposium chair & speaker):  Integrating Patient Care, Organization Goals and Professional Ethics.  TXAAPA Annual Symposium, June, 1992.  (I)

Gartlan JV, Reid WH, Fox TS:  State Government Responses to Clozaril. Conference panel, "Clozaril:  A National Dialogue," Arlington, VA, July, 1992.  (I,A)

Reid WH (Chair):  Research Issues (Panel).  Clozaril:  A National Dialogue, Arlington, VA, July, 1992.  (I)

Stage TB, Reid WH, Leadbetter R, Panduramgi AK:  Medical Issues in Clozaril Implementation (Panel). Clozaril: A National Dialogue, Arlington, VA, July, 1992. (I)

Reid WH:  The Future of Hospital Psychiatry in the Public Sector.  Plenary address, Hospital Psychiatry 2000, Houston, Texas, December, 1992.  (I)

Reid WH:  A comparison of psychiatry and mental health in Eastern Europe, the republics of the former USSR, and the West.  W.H.O/World Psychiatric Association Conference, Banff, Alberta, Canada, January, 1993.  (I,A)

000079

Reid WH (Chair):  Symposium on clozapine use in the U.S. and Canada.  World Health Org. & World Psychiatric Association Conference, Banff, Alberta, Canada, Jan., 1993.  (I,A)

Reid WH:  Mental health public policy.  WHO/World Psychiatric Association Conference, Banff, Alberta Canada, January, 1993.  (I,A)

Reid WH, Dontschev P (Co-Chairs, with ten contributors):  Symposium on psychiatry and mental health conditions in Eastern Europe and the former Soviet Union.  WHO/World Psychiatric Association Conference (above), January, 1993.

Reid WH:  The impact of recent legislation on medical practice.  The Titus Harris Society Annual Meeting, Austin, February, 1993.  (I)

Reid WH:  Forensic issues in substance abuse diagnosis and treatment.  17th Annual Conference on Alcoholism and Drug Abuse, San Antonio, Feb., 1993.  (I)

Reid WH:  Antisocial personality:  Recent advances.  Akron General Hospital, Akron, OH, March, 1993.  (I)

Reid WH:  Medical Leadership.  Harvard/NASMHPD Medical Directors' Leadership Symposium, Chicago, April, 1993.  (I)

Katz B (Chair), Honigfeld G, Kane J, Meltzer H, Reid W:  Clozapine Update, American Psychiatric Association Annual Meeting, San Francisco, May, 1993.  (R)

Reid WH:  Medical leadership in mental health systems.  North Carolina Department of Mental Health,  September, 1993.  (I)

Matthews D, Halleck S, Reid WH, Fitch WL:  *DSM-IV:*  Forensic implications. American Academy of Psychiatry and the Law Annual Meeting, October, 1993.  (I)

Reid WH:  Physicians in the management of large mental health systems.  South Carolina Department of Mental Health,  November, 1993.  (I)

Reid WH:  Practicing outside one's specialty.  The Tower Conference of St. Luke's Medical Center, Houston, December, 1993.  (I)

Reid WH:  Clozapine:  First choice or last resort?  FL Mental Health Institute, March, 1994.

Reid WH: The Treatment of Psychosis. International conference on clozapine therapy, Albert Einstein Medical College/Long Island Jewish Medical Center, February, 1994.

Reid WH, Metelitsa YL, Kazakevich E, Goldberg S: Intellectual Computer Systems as Tools of Learning, Using, and Creating Standard Descriptions (Classification Systems) in Medicine. First International Conference on Computers and Medicine. April, 1994.

Reid WH: The best and worst of public sector psychiatry. Texas Medical Association Annual Meeting, May, 1994.

Reid WH (Chair), Bonner JW, Meyer CA, Russakoff LM: Career advancement in psychiatric administration. Component Workshop, Committee on Administrative Psychiatry, Amer. Psychiatric Association Annual Meeting, Phila., May, 1994. (R)

Reid WH: Treating Schizophrenia: The payer's perspective of quality and cost. In Treating Schizophrenia: The Quality/Cost Dilemma. Industry-sponsored symposium (Glazer WM [Chair], Arons BS, Lehman AF, Reid WH, Sharfstein SS, Weiden PJ) American Psychiatric Association Annual Meeting, Philadelphia, May, 1994. (I,A)

Katz S (Chair), Honigfeld G, Kane J, Meltzer H, Reid W: Clozapine Annual Update. American Psychiatric Association Annual Meeting, May, 1994. (I,R)

Reid WH: Administrative issues in clozapine treatment. Issues workshop with McCarthy R and Terkelson K, American Psychiatric Association Ann. Meeting, Phila., May, 1994. (I,R)

Reid WH: Clinical, legal & ethical issues in the treatment of schizophrenia. Consensus Conference on the Treatment of Schizophrenia: The Quality/Cost Balance (Glazer WM [Chair], Goldman H, Reid W, *et al.,* Philadelphia, May 25, 1994. (I)

Reid WH (Chair), Arfa KS, Chiles JA, Miller AL, Felthous AR, Nati C, Raleigh F, Stone M, Thompson JW Jr: Janssen CNS Roundtable: Risperidone in forensic and correctional patients. San Antonio, Sept. 1, 1995. (I)

Hansen A, Reid WH, *et al.:* Public sector psychiatry. Issues workshop, Psychiatric Services Institute, Boston, Oct., 1995. (I)

000081

Reid WH: New medications in the treatment of chronic psychosis: Safety, efficacy and prescribing protocols. Various presentations in Texas, Louisiana, Arizona, Alabama, Tennessee, Colorado, 1996-1997. (I)

Reid WH (co-chair), Weiner R, Sobin P, Thompson R: ECT in the USA: Practice and access. Symposium, American Psychiatric Association Annual Meeting, May, 1996. (R)

Moy C, Reid WH (Co-chair): Issues in mental health utilization review. Paper session, Amer. Psychiatric Association Annual Meeting, New York, May, 1996. (I)

Reid WH, Keller S: Electroconvulsive therapy: Access and demographics. American Psychiatric Association Annual Meeting, New York, May, 1996. (R)

Reid WH: Modern treatment of schizophrenia and schizoaffective disorders (Keynote Address). Advanced Outpatient Treatment Forum in Managed Care, Mental Health Association of Colorado, Denver, August, 1996. (I)

Reid WH: Clozapine treatment in schizophrenia and schizoaffective illness. Ft. Logan Mental Health Institute, Denver, CO., August, 1996. (I)

Reid WH (Chair), Foley CA, Menninger WW, Veenhuis PE, Whittington HG: Certification in Administrative Psychiatry. Component session, American Psychiatric Association Annual Meeting, San Diego, May, 1997. (R)

Reid WH (Chair), Menninger WW, Davis DM: Litigation and Risk Management in Psychiatric Administration. Workshop, American Psychiatric Association Annual Meeting, San Diego, May, 1997. (R)

Reid WH: Old and New Antipsychotics: The Texas Experience. National Consensus Conference on the Pharmacoeconomics of Treatment Resistant Schizophrenia. Dallas, October, 1997. (I)

Hall RCW, Reid WH, Feinsilver D: Medicolegal Aspects of Mental Health Managed Care. Course, Amer. Academy of Psychiatry & the Law, Ann. Mtg., Denver, CO, Oct., 1997. (R)

Reid WH, Hall RCW: Standard of Care and Liability in Managed Care. 10th Annual New York Mental Health Research Conference, Albany, NY, December, 1997. (I)

Reid WH: New Developments in Forensic Psychiatry. Texas Department of Mental Health and Mental Retardation CME program, January, 1998. (I)

000082

Reid WH, Menninger WW:  Forum on Physician-Assisted Suicide.  Plenary presentation, Annual Meeting, Louisiana Psychiatric Society, March, 1998.  (I)

Reid WH:  Assisted Suicide.  Texas A&M College of Medicine, March, 1998.  (I)

Reid WH:  Violent Sexual Predators: Policy and Treatment Issues.  Louisiana Department of Mental Health, 1998.  (I)

Menninger WW, Reid WH, Veenhuis P:  Problems in Psychiatric Administration.  Workshop for the American Psychiatric Association Annual Meeting, Toronto, June, 1998.  (I)
Reid WH, *et al.:*  Certification in Psychiatric Administration & Management.  Workshop for the American Psychiatric Association Annual Meeting, Toronto, June, 1998.  (I)

Hall RCW, Reid WH, Searing D:  Spousal abuse:  Clinical and legal issues.  Workshop for the American Academy of Psychiatry & the Law, New Orleans, October, 1998.  (I)

Reid WH:  Assessing Criminal Responsibility.  "Capacity for Justice" seminars for Texas attorneys & judges, Austin, April, 1999.  (I)

Veenhuis P, Menninger WW, Reid WH, Silver SB, Davis D:  Psychiatrists in Executive Roles.  Workshop for American Psychiatric Association Annual Meeting, May, 1999.  (I)

Reid WH:  Legal Issues for Psychotherapists.  One-week course, Cape Cod Institute, Albert Einstein College of Medicine, July, 1999.  (I)

Reid WH:  Standard of Care and Clinical Professional Ethics.  Annual Meeting of the Texas Society of Psychiatric Physicians, November, 1999.  (I)

Reid WH (Chair), Veenhuis P, Davis D:  Certification in Psychiatric Administration and Management. Workshop for the American Psychiatric Association Annual Meeting, Chicago, May, 2000.  (I)

Reid WH:  Forensic examinations and state licensure.  American Academy of Psychiatry & the Law, Vancouver, BC, October, 2000. (*in absentia*)  (R)

Reid WH:  Forensic psychiatry:  Working with attorneys.  Texas Medical Association Annual Meeting, Dallas, TX, April, 2002.  (I)

000083

Reid WH: Electroconvulsive therapy: Medicine's most noncontroversial "controversy." ACT Honored Speaker Presentation in conjunction with the American Psychiatric Association, Philadelphia, May, 2002. (I)

Reid WH: Ethics in psychiatric practice. Annual ethics lecture, Austin, TX, Dec., 2002. (I)

Reid WH: Psychiatry, ethics, and responsibility. University of Texas Health Sciences Center annual ethics Grand Rounds, San Antonio, Jan., 2003. (I)

Reid WH: Psychotic Disorders in Criminal Forensic Settings. Presentation for the American Academy of Forensic Sciences, Annual Meeting, Chicago, February, 2003. (I,R)

Grant B, Gutheil TG, Reid WH, Resnick P, Brodie JD: Panel on the Trial of Vincent Gigante, American Academy of Psychiatry and the Law, Annual Meeting, San Antonio, October, 2003. (I,R)

Reid WH: Organizational Liability for Clinical Staff Negligence: Beyond *Respondeat Superior.* Plenary lecture, American Association of Psychiatric Administrators, New York, May, 2004. (I)

Reid, WH: Denying Patients Treatments That Work (part of a symposium on clinical controversies) American Psychiatric Association Annual Meeting, New York, May, 2004. (I,R)

Turpin S, Reid WH: Clinical standards and patient risk. APA Caucus of State Hospital Psychiatrists symposium: *Suicide prevention in state hospital psychiatry.* Institute for Psychiatric Services (APA), Atlanta, October, 2004. (I,R)

Reid WH: Psychiatric and Psychological Aspects of Terrorism. in AR Felthous, R Weinstock panel, Terrorism: A Forensic Sampler, Psychiatry & Behavioral Sciences section of the American Academy of Forensic Sciences. American Academy of Psychiatry and the Law Annual Meeting, Scottsdale, AZ, October, 2004. (I,R)

Dietz PE (Chair), Kent CS, Reid WH, Resnick P: Plenary discussion of *State v. Deanna Laney* (delusional disorders and criminal responsibility). American Academy of Psychiatry and the Law Annual Meeting, Scottsdale, AZ, October, 2004. (I,R)

000084

Reid WH (chair), Durgam S, Ruiz-Sweeney M:  Workshop on forensic roles for international medical graduate psychiatrists.  American Academy of Psychiatry and the Law Annual Meeting, Scottsdale, AZ, October, 2004.  (R)

Reid WH:  Delusional Disorder:  Clinical issues, risk, and a little court stuff.  in Felthous, Stanislaus, Wolfson, Reid:  Pure persecutory delusiona and the law. Proc. American Academy of Forensic Sciences, New Orleans, 2005.  (I,R)

Reid WH:  Mental Health in Court.  Plenary lecture, Texas Center for the Judiciary, Houston, TX, March, 2005.  (I)

Reid WH:  Delusional Disorder.  Hugh Pennal Memorial Lecture, Panhandle Mental Health Center and Texas Tech School of Medicine, Amarillo, TX, April 21, 2005.  (I)

Reid WH:  Plenary lecture on psychiatry and psychology for judges.  Texas Center for the Judiciary, Austin, TX  May, 2005.  (I)

Reid WH:  Suicide Risk:  Awareness, Assessment, Management, and Documentation (for clinicians and direct care staff).  Various presentations, including Texas Department of State Health Services video.  2005-2006.  (I)

Reid WH:  Lectures on psychiatric diagnosis and interpreting reports.  Texas Center for the Judiciary, Austin, TX  March, 2006.  (I)

Reid WH *et al.* (American Psychiatric Association Committee on Psychiatric Administration):  Basic Concepts in Administrative Psychiatry II:  Care Management, Law, and Ethics.  American Psychiatric Association Annual Meeting, Toronto, May, 2006. (course number C028).  (I,R)

Norris DM (Chair), Gutheil TG, Price M, Reid WH (APA Council on Psychiatry and Law):  What Do You Do With a Patient Who Has Access to a Gun?  (Reid portion: Clinical management of patients in the outpatient setting.)  APA Annual Meeting, Toronto, May, 2006. (I,R)

Rosmarin D, Resnick P, Mills MJ, Wettstein R, Reid WH:  Peer Review Presentation:  Two Views of Insanity:  The Ohio Interstate Shooter Case. Scheduled for the Annual Meeting of the American Academy of Psychiatry and the Law, October, 2006. (I)

Reid WH:  Lectures on psychiatric symptoms and diagnosis in court proceedings. Texas Center for the Judiciary, Austin, TX  April, 2007.  (I)

000085

Reid WH (chair), Fawcett J, Simpson S: Symposium on assessment of suicide (risk assessment, risk management, prevention, potential malpractice issues). Texas Medical Association Annual Meeting, Dallas, May, 2007 (scheduled). (I)

American Psychiatric Association Committee on Psychiatric Administration: Basic Concepts in Administrative Psychiatry II: Course: Care Management, Law, & Ethics. American Psychiatric Association Annual Meeting, San Diego, May, 2007. (I,R)

Voskanian PH, Berger SH, Crowley B, Granacher RP, Reid WH, Rodgers C: Establishing a forensic practice: Advanced course. American Academy of Psychiatry and the Law Annual Meeting, Miami Beach, FL, October, 2007. (R)

Reid WH: Ethics in forensic psychiatry. Texas Department of State Health Services, Kerrville, TX, April, 2008.

Reid WH: The sexually attractive patient: Boundary and ethical issues. Baylor Medical Center & Menninger Foundation lectureship series, Houston, April, 2008.

Dunn M, Taylor R, Reid WH (discussant): Ethics in state and forensic hospitals. Texas Department of State Health Services, Kerrville, TX, April, 2009.

American Psychiatric Association Committee on Psychiatric Administration: Course section on Care Management, Law, & Ethics. American Psychiatric Association Annual Meeting, San Francisco, May, 2009. (I,R)

Reid WH: Practicing well: Staying ethical and avoiding malpractice in psychiatry. Grand Rounds, University of Texas Health Science Center, San Antonio, February, 2010. (I)

Reid WH: Practicing well: Staying ethical and avoiding malpractice in psychiatry. Plenary lecture, Alabama Psychiatric Society Annual Meeting, Montgomery, AL, April, 2010. (I)

Reid WH: Ethical assessment of decisionmaking capacity in patient-centered care. Plenary/Ethics lecture, Texas Society of Psychiatric Physicians Annual Meeting, November, 2012. (I)

Over 120 other medical school Grand Rounds and other local or regional lectures, and several hundred medical school and training program lectures and presentations, on clinical, ethics, forensic, and social science topics, 1975 - present.

## CURRENT PROJECTS AND SUBMISSIONS

Suicide (clinical risk assessment, clinical risk management, national suicide prevention policy)

Reid WH: Practicing well: Suicide risk and prevention for clinicians. (various presentations)

Reid WH: Developing a forensic practice (tentative title), in R. Rosner, C. Scott (Eds.), *Principles and Practice of Forensic Psychiatry, 3rd Ed.* London: Chapman & Hall.

Reid DJ, Reid WH: Terrorism and forensic psychiatry, in R. Rosner, C. Scott (Eds.), *Principles and Practice of Forensic Psychiatry, 3rd Ed.* London: Chapman & Hall.

Reid WH: Practicing well: Staying ethical & avoiding malpractice. (various)

Reid WH: Ethics in psychiatric practice (various presentations & workshops)

Reid WH: Ethical assessment of decisionmaking capacity (CME presentations)

Reid WH: Residency training materials: Forensic psychiatry

Reid WH: Residency training materials, Administrative psychiatry and mental health care management

## PERSONAL AND PROFESSIONAL INTERESTS

### Professional

Clinical psychiatry, including suicide, inpatient and outpatient consultation, chronic and severe mental illness, psychotherapy, psychopharmacology, violence, antisocial syndromes, and professional ethics.

Professional teaching and writing, including clinical teaching; supervising clinical, forensic, and administrative trainees; national practice competency examinations; continuing education; books, journal articles, and journal editorial activities, and educational websites.

Forensic psychiatry, including civil and criminal matters, often involving duty and standard of care, professional standards, response to trauma, emotional damage, workplace-related allegations, threats in the workplace, civil and criminal capacities and competencies, criminal responsibility, offender treatment, clinician competence and impairment, and ethics.

Health care administration, including management of mental health care systems; providing care in outpatient and inpatient settings; training, supervision, and certification of psychiatrists and others engaged in health care administration, human resource issues, and risk management.

Advocacy for patients, families, and quality patient care.

### Personal

Music, tennis, writing, fly fishing.

000088

# APPENDIX B

## CASES



46 S.W.3d 873, 44 Tex. Sup. Ct. J. 720
**(Cite as: 46 S.W.3d 873)**

▷

Supreme Court of Texas.
AMERICAN TRANSITIONAL CARE CENTERS
OF TEXAS, INC. d/b/a American Transitional
Hospital, Petitioner,
v.
Teofilo PALACIOS and Maria Palacios, individu-
ally and a/n/f of Gloria Janeth Palacios and Rocio
Daniela Palacios, minors, Maria Angelica Palacios,
and Sentry Insurance, a mutual company, Respond-
ents.

No. 99–1311.
Argued Dec. 6, 2000.
Decided May 10, 2001.
Rehearing Overruled June 28, 2001.

Medical malpractice action was brought against hospital to recover for injuries patient allegedly suffered in fall at hospital. The 280th District Court, Harris County, Tony Lindsay, J., dismissed case for failure to file expert report, as required by Medical Liability and Insurance Improvement Act. Patient appealed. The Houston Court of Appeals, First District, reversed and remanded, 4 S.W.3d 857. On petition for review, the Supreme Court, Hankinson, J., held that: (1) trial court's determination about adequacy of expert report under Act is reviewed under abuse-of-discretion standard, and (2) expert's report did not provide fair summary of standard of care and how it was breached.

Court of Appeals' judgment reversed.

West Headnotes

**[1] Health 198H ⬦821(1)**

198H Health
 198HV Malpractice, Negligence, or Breach of Duty
  198HV(G) Actions and Proceedings
   198Hk815 Evidence
    198Hk821 Necessity of Expert Testi-

mony
     198Hk821(1) k. In general. Most Cited Cases
(Formerly 299k18.80(6.1) Physicians and Sur-geons)
Expert testimony is necessary in medical-malpractice cases. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(d).

**[2] Appeal and Error 30 ⬦960(1)**

30 Appeal and Error
 30XVI Review
  30XVI(H) Discretion of Lower Court
   30k960 Rulings on Motions Relating to Pleadings
    30k960(1) k. In general. Most Cited Cases
(Formerly 198Hk809, 299k18.130 Physicians and Surgeons)
A trial court's determination about the ad-equacy of an expert report under the Medical Liab-ility and Insurance Improvement Act is reviewed under an abuse-of-discretion standard. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

**[3] Appeal and Error 30 ⬦984(1)**

30 Appeal and Error
 30XVI Review
  30XVI(H) Discretion of Lower Court
   30k984 Costs and Allowances
    30k984(1) k. In general. Most Cited Cases
Sanctions are generally reviewed under an ab-use-of-discretion standard.

**[4] Health 198H ⬦804**

198H Health
 198HV Malpractice, Negligence, or Breach of Duty
  198HV(G) Actions and Proceedings
   198Hk804 k. Affidavits of merit or merit-orious defense; expert affidavits. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

46 S.W.3d 873, 44 Tex. Sup. Ct. J. 720
**(Cite as: 46 S.W.3d 873)**

(Formerly 299k18.20 Physicians and Surgeons)

In determining the adequacy of an expert report under the Medical Liability and Insurance Improvement Act, the trial court should look no further than the report. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*).

**[5] Health 198H ☞804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
        198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
(Formerly 299k18.20 Physicians and Surgeons)

For an expert's report to satisfy the requirements of the Medical Liability and Insurance Improvement Act, the report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*).

**[6] Health 198H ☞804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
        198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
(Formerly 299k18.20 Physicians and Surgeons)

For an expert's report to constitute a good-faith effort under the Medical Liability and Insurance Improvement Act, the report must provide enough information to fulfill two purposes: first, the report must inform the defendant of the specific conduct the plaintiff has called into question; second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

**[7] Health 198H ☞804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
        198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
(Formerly 299k18.20 Physicians and Surgeons)

A report that merely states the expert's conclusions about the standard of care, breach, and causation does not constitute a good-faith effort under the Medical Liability and Insurance Improvement Act. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

**[8] Health 198H ☞804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
        198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
(Formerly 299k18.20 Physicians and Surgeons)

An expert's report that omits any of the statutory requirements does not constitute a good-faith effort under the Medical Liability and Insurance Improvement Act. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

**[9] Health 198H ☞804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
        198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
(Formerly 299k18.20 Physicians and Surgeons)

To avoid dismissal due to inadequacy of an expert's report under the Medical Liability and Insurance Improvement Act, a plaintiff need not present evidence in the report as if it were actually litigating the merits. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

**[10] Health 198H ☞804**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
(Formerly 299k18.20 Physicians and Surgeons)

The expert's report in a medical malpractice action can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

**[11] Health 198H ⚷804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
(Formerly 198Hk961, 204k8 Hospitals)

Conclusory statement in expert's report that defendant hospital did not use precautions to prevent patient's fall was not good-faith effort to provide fair summary of standard of care and how it was breached, and thus, dismissal of medical malpractice action was warranted under Medical Liability and Insurance Improvement Act; it could not be determined from that statement if expert believed that standard of care required hospital to have monitored patient more closely, restrained him more securely, or done something else entirely. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

**[12] Health 198H ⚷804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
(Formerly 299k18.20 Physicians and Surgeons)

An expert's report does not constitute a good-faith effort under the Medical Liability and Insurance Improvement Act if it simply states that he or she knows the standard of care and that it was or was not met. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

**\*875** Matthew T. McCracken, John C. Marshall, James C. Marrow, Dee L. Dawson, Marshall & McCraken, Houston, for Petitioner.

D. John Leger, Leger & Coplen, Levon G. Hovnatanian, Martin Disiere & Jefferson, Houston, Mickey C. Shyrock, Law Office of Mickey C. Shyrock, Athens, for Respondents.

Justice HANKINSON delivered the opinion of the Court.

In this medical-malpractice case we determine the standards for reviewing an expert report under section 13.01 of the Medical Liability and Insurance Improvement Act. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01. The trial court dismissed the Palacioses' medical-malpractice claims against American Transitional Care Centers, Inc., d/b/a American Transitional Hospital, because it determined that the Palacioses' expert report did not show a good-faith effort to provide a fair summary of the expert's opinions about the standard of care, breach, and causation, as required by section 13.01. *See id.* § 13.01(d), (e), (*l*), (r)(6). The court of appeals, after evaluating the trial court's decision as it would a summary-judgment decision, reversed, holding that the report did meet the statutory requirements. 4 S.W.3d 857, 860.

We hold that a trial court's decision to dismiss a case under section 13.01(e) is reviewed for abuse of discretion. We further hold that to constitute a good-faith effort to provide a fair summary of an expert's opinions under section 13.01(*l* ), an expert report must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. In this

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

case, the trial court did not abuse its discretion in concluding that the challenged report does not meet the statutory requirements and in dismissing with prejudice the claims against American Transitional. Accordingly, we reverse the court of appeals' judgment and dismiss with prejudice the Palacioses' claims.

Teofilo Palacios suffered brain damage and other severe injuries following a two-story fall at work. After almost a year in an intensive rehabilitation program, he was transferred to American Transitional Hospital for further rehabilitation. Although Palacios at that time was able to **\*876** communicate with others and respond to simple commands, he required assistance with most daily tasks. In addition, due to the severity of his brain damage, Palacios' physicians prescribed bed restraints for him. Nevertheless, while a patient at American Transitional, Palacios fell from his bed and required additional medical care for his injuries. His family claims that this fall caused him to sustain further brain injury, which impaired his ability to communicate with others and to assist them in his care.

Palacios and his family sued American Transitional and the treating doctors, respectively, for negligently failing to prevent the fall and negligently treating him after the fall. After ninety days passed from the date the Palacioses filed suit, American Transitional, along with the other defendants, moved to require the Palacioses to file a $7,500 cost bond, as required by section 13.01(b) of the Medical Liability and Insurance Improvement Act. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(b) (authorizing a trial court to order a plaintiff to file a $7,500 cost bond for each defendant physician or health-care provider if the plaintiff has not complied with the expert-report or $5,000 cost-bond requirement in section 13.01(a)); *id.* § 13.01(a) (requiring the plaintiff to file either an expert report or a $5,000 cost bond for each defendant physician or health-care provider within ninety days of filing suit). The trial court granted the motion, and the Palacioses filed a cost bond for each

defendant.

After 180 days passed from the date the Palacioses filed suit, American Transitional moved to dismiss the case against it because the Palacioses did not file an expert report and curriculum vitae, or nonsuit the claims against American Transitional, as section 13.01(d) of the Act requires. *Id.* § 13.01(d), (e). The Palacioses moved for an extension of time to file the report, which the trial court granted. *See id.* § 13.01(f), (g). The Palacioses then filed a report prepared by Dr. Catherine F. Bontke, who treated Palacios at the first rehabilitation hospital. American Transitional again moved to dismiss under section 13.01(e), claiming that the report did not satisfy the statutory requirements. *See id.* § 13.01(*l*), (r)(6). The trial court granted the motion, dismissed with prejudice the claims against American Transitional, and severed those claims to make the judgment against American Transitional final. *See id.* § 13.01(e).

The Palacioses appealed, and with one justice dissenting, the court of appeals reversed and remanded after using summary-judgment review standards to evaluate the sufficiency of the expert report. 4 S.W.3d at 860. After indulging every reasonable inference in the Palacioses' favor and eliminating any deference to the trial court's decision, the court of appeals concluded that the trial court erred in dismissing the case because the Palacioses made a good-faith effort to provide a report that met the requirements of section 13.01(r)(6). *Id.* at 862–63. American Transitional petitioned for review challenging both the standard of review applied by the court of appeals and the sufficiency of the Palacioses' report.

[1] Texas courts have long recognized the necessity of expert testimony in medical-malpractice cases. *E.g., Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1965); *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949). "There can be no other guide [than expert testimony], and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

proper to be submitted to the jury." *Hart, 399 S.W.2d at 792.* Because expert testimony is crucial to a medical-malpractice case, **\*877** knowing what specific conduct the plaintiff's experts have called into question is critical to both the defendant's ability to prepare for trial and the trial court's ability to evaluate the viability of the plaintiff's claims. This makes eliciting an expert's opinions early in the litigation an obvious place to start in attempting to reduce frivolous lawsuits. *See* HOUSE COMM. ON CIV. PRAC., BILL ANALYSIS, Tex. H.B. 971, 74th Leg., R.S. (1995).

Accordingly, in section 13.01, the Legislature requires medical-malpractice plaintiffs, within 180 days of filing suit, either to provide each defendant physician and health-care provider with an expert report and the expert's curriculum vitae, or to nonsuit the claims. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(d). If the plaintiff fails within the time allowed either to provide the expert reports and curriculum vitae, or to nonsuit the case, the trial court must sanction the plaintiff by dismissing the case with prejudice, awarding costs and attorney's fees to the defendant, and ordering the forfeiture of any applicable cost bond necessary to pay that award. *Id.* § 13.01(e). If the plaintiff does timely file a report, the defendant may move to challenge the adequacy of the report, and the trial court must grant the motion if "it appears to the court ... that the report does not represent a good faith effort to comply with the definition of an expert report." *Id.* § 13.01(*l*). The statute defines an expert report as "a written report by an expert that provides a fair summary of the expert's opinions ... regarding applicable standards of care, the manner in which the care rendered ... failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 13.01(r)(6). If a trial court determines that an expert report does not meet these statutory requirements and the time for filing a report has passed, it must then dismiss with prejudice the claims against the defendant who has challenged the report. *Id.* § 13.01(e).

American Transitional contends that a trial court's determination about the adequacy of an expert report should be reviewed under an abuse-of-discretion standard. The Palacioses respond that whether a report meets the requirements of subsections 13.01(*l*) and (r)(6) is a question of law. They suggest that a trial court's decision on the adequacy of a report should be reviewed as a court would review a summary-judgment decision: that is, by indulging every reasonable inference and resolving any doubts in the nonmovant's favor, and eliminating any deference to the trial court's decision. We agree with American Transitional.

[2][3] The plain language of section 13.01 leads to the conclusion that abuse of discretion is the proper standard. First, the statute directs the trial court to grant a motion challenging the adequacy of an expert report if it "appears to the court" that the plaintiffs did not make a good-faith effort to meet the statutory requirements. *Id.* § 13.01(*l*). This language plainly vests the trial court with discretion. *See* TEX. GOV'T CODE § 312.002. ("[W]ords shall be given their ordinary meaning."). Second, the statute states that dismissal under section 13.01(e) is a sanction: If the requirements of section 13.01(d) are not met, the court must "enter an order as sanctions" dismissing the case and granting the defendant its costs and attorneys' fees. TEX.REV.CIV. STAT. ANN .. art. 4590i, § 13.01(e). Sanctions are generally reviewed under an abuse-of-discretion standard. *Koslow's v. Mackie,* 796 S.W.2d 700, 704 (Tex.1990). And we presume the Legislature was aware of the standard of review ordinarily applied in sanctions cases when it explicitly identified a court's dismissal under section 13.01(e) as a sanction. **\*878** *See McBride v. Clayton,* 140 Tex. 71, 166 S.W.2d 125, 128 (1943) ( "All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it.").

Nevertheless, the court of appeals concluded that the usual standard of review for sanctions should not apply here. The court reasoned that the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

provisions of article 4590i at issue here were intended to discourage frivolous lawsuits, while sanctions, in contrast, are a response to litigation misconduct. We disagree with this distinction.

Filing a frivolous lawsuit can be litigation misconduct subject to sanction. *See* TEX.R. CIV. P. 13 (imposing sanctions for filing groundless motions, pleadings, or other papers in bad faith or for the purposes of harassment). And one purpose of the expert-report requirement is to deter frivolous claims. HOUSE COMM. ON CIV. PRAC., BILL ANALYSIS, Tex. H.B. 971, 74th Leg., R.S. (1995). The Legislature has determined that failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that the claim is either frivolous, or at best has been brought prematurely. *See id.* This is exactly the type of conduct for which sanctions are appropriate. *See TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 918 (Tex.1991) (holding that "death-penalty" sanctions are appropriate when a party's discovery abuse justifies a presumption that its claims lack merit). For these reasons, we hold that an abuse-of-discretion standard of review applies to a trial court's decision to dismiss a case under section 13.01(e).

[4] We next consider whether the trial court abused its discretion in dismissing the Palacioses' claims against American Transitional. The parties disagree about how to determine a report's adequacy under section 13.01(*l* ). American Transitional argues that the trial court must engage in a two-step process: (1) the trial court must determine whether the report constitutes a fair summary of the expert's opinions, TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(6); and (2) if the trial court concludes that the report is not a fair summary, it must then look outside the report at the plaintiff's conduct to determine whether the plaintiff made a good-faith effort to meet the statutory requirements, *id.* § 13.01(*l* ). The Palacioses, on the other hand, argue that the statute requires only one in-

quiry—whether the report evidences a good-faith effort to provide a fair summary of the expert's opinions. According to the Palacioses, the trial court does not have to make any factual determinations because the only relevant information is in the report itself. We agree with the Palacioses that a trial court should look no further than the report in conducting a section 13.01(*l* ) inquiry.

The issue for the trial court is whether "the report" represents a good-faith effort to comply with the statutory definition of an expert report. *Id.* § 13.01(*l* ). That definition requires, as to each defendant, a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the claimed injury. *Id.* § 13.01(r)(6). Because the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document.

[5][6] Under subsections 13.01(*l* ) and (r)(6), the expert report must represent only a good-faith effort to provide a fair summary of the expert's opinions. A report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. *See* **\*879***Hart v. Wright,* 16 S.W.3d 872, 877 (Tex.App.—Fort Worth 2000, pet. denied). In setting out the expert's opinions on each of those elements, the report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit. *See* 4 S.W.3d at 865 (Taft, J. dissenting); *Wood v. Tice,* 988 S.W.2d 829, 830 (Tex.App.—San Antonio 1999, pet. denied) (noting that one of the purposes of article 4590i is to deter frivolous claims).

[7][8][9][10] A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two pur-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

46 S.W.3d 873, 44 Tex. Sup. Ct. J. 720
**(Cite as: 46 S.W.3d 873)**

poses. Nor can a report meet these purposes and thus constitute a good-faith effort if it omits any of the statutory requirements. *See, e.g.,* [*Hart,* 16 S.W.3d at 877](holding that a report was inadequate because it stated that the patient had a heart attack and the doctor breached the standard of care, without describing the standard of care); [*Wood,* 988 S.W.2d at 831–32](holding that an expert report did not meet the statutory requirements because it did not name the defendants, state how the defendants breached the standard of care, demonstrate causation and damages, or include a curriculum vitae). However, to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. *See, e.g.,* [TEX.R. CIV. P. 166(f)](setting out the requirements for the form and content of affidavits offered as summary-judgment proof); TEX.R. [EVID. 802](stating that most hearsay is inadmissible).

[11] American Transitional contends that Dr. Bontke's report does not meet the statutory requirements because it does not represent a good-faith effort to provide a fair summary of her opinion on the standard of care and how American Transitional breached that standard. The Palacioses respond that the following parts of Dr. Bontke's report establish these elements:

Based on the available documentation I was able to conclude that: Mr. Palacios fell from his bed on 5/14/94 while trying to get out of it on his own. The nursing notes document that he was observed by nursing on the hour for two hours prior to the fall. In addition, ten minutes before the fall, the nursing notes documents [sic] the his wrist/vest restraints were on. Yet, at the time of his fall he was found on the floor with his vest/ [wrist restraints](link) on but not tied to the bed. It is unclear how he could untie all four of the restraints from the bedframe in under ten minutes. Obviously, Mr. Palacios had a habit of trying to undo

his restraints and precautions to prevent his fall were not properly utilized.

....

All in all, Mr. Palacios sustained a second [brain injury](link) with a left [subdural hematoma](link) while he was an inpatient at [the Hospital].... [I]n my opinion, the medical care rendered to Mr. Palacios at the time of his second [brain injury](link) was below the accepted and expected standard of care which he could expect to receive. Moreover, this [sic] below the accepted standard of care extends to both the cause of the second injury as well as the subsequent treatment....

The Palacioses rely mostly on one sentence in the report to establish the standard of care: "Mr. Palacios had a habit of **\*880** trying to undo his restraints and precautions to prevent his fall were not properly utilized." They argue that the inference can be made from that sentence, along with the statement that "[i]t is unclear how he could untie all four of the restraints from the bed frame in under ten minutes," that Dr. Bontke believes American Transitional's staff should have tied the restraints to the bed more securely.

[12] The standard of care for a hospital is what an ordinarily prudent hospital would do under the same or similar circumstances. *See [Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 366 (Tex.1987)](link). Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. "While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given." [4 S.W.3d at 865](link) (Taft, J. dissenting). The statement the Palacioses rely upon—that precautions to prevent Palacios' fall were not properly used—is not a statement of a standard of care. Neither the trial court nor American Transitional would be able to determine from

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

46 S.W.3d 873, 44 Tex. Sup. Ct. J. 720
**(Cite as: 46 S.W.3d 873)**

this conclusory statement if Dr. Bontke believes that the standard of care required American Transitional to have monitored Palacios more closely, restrained him more securely, or done something else entirely. "It is not sufficient for an expert to simply state that he or she knows the standard of care and concludes it was [or was not] met." *See Chopra v. Hawryluk,* 892 S.W.2d 229, 233 (Tex.App.—El Paso 1995, writ denied). Knowing only that the expert believes that American Transitional did not take precautions to prevent the fall might be useful if American Transitional had an absolute duty to prevent falls from its hospital beds. But as a general rule, res ipsa loquitur does not apply in medical-malpractice cases. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 7.01 (limiting res ipsa loquitur in medical malpractice to the limited classes of cases to which it applied as of August 29, 1977); *Haddock v. Arnspiger,* 793 S.W.2d 948, 951 (Tex.1990).

When the expert report's conclusory statements do not put the defendant or the trial court on notice of the conduct complained of, section 13.01(*l* ) affords the trial court no discretion but to conclude, as the trial court did here, that the report does not represent a good-faith effort to provide a fair summary of the standard of care and how it was breached, as section 13.01(r)(6) requires. And because the statutory 180 day time period had passed when the trial court here made that determination, section 13.01(e) required the court to dismiss with prejudice the Palacioses' claims against American Transitional. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(e). Accordingly, we reverse the court of appeals' judgment and dismiss with prejudice the Palacioses' claims.

Tex.,2001.
American Transitional Care Centers of Texas, Inc. v. Palacios
46 S.W.3d 873, 44 Tex. Sup. Ct. J. 720

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

228 S.W.3d 252
**(Cite as: 228 S.W.3d 252)**



Court of Appeals of Texas,
Austin.
Barbara APODACA, Individually and on behalf of
the Estate of Claudia J. McAulay, Appellant,
v.
Dr. Penni RUSSO, Appellee.

No. 03–06–00258–CV.
May 2, 2007.

**Background:** Estate of patient, who died from pulmonary embolism, brought action against doctor, alleging that doctor negligently failed to timely implement precautions against pulmonary emboli and anti-coagulant therapy. The District Court, Travis County, 200th Judicial District, Darlene Byrne, J., granted doctor's motion to dismiss, and estate appealed.

**Holding:** The Court of Appeals, Jan P. Patterson, J., held that expert report filed by patient's estate did not constitute a good faith effort to comply with requirements of medical liability statute and, therefore, constituted "no report" as to doctor.

Affirmed.

West Headnotes

**[1] Appeal and Error 30 ⚖➘960(1)**

30 Appeal and Error
   30XVI Review
      30XVI(H) Discretion of Lower Court
         30k960 Rulings on Motions Relating to Pleadings
            30k960(1) k. In general. Most Cited Cases
   (Formerly 198Hk809)

Appellate courts review a trial court's ruling on a motion to dismiss medical malpractice action for failure to file expert report for an abuse of discretion. V.T.C.A., Civil Practice & Remedies Code § 74.351(b).

**[2] Appeal and Error 30 ⚖➘946**

30 Appeal and Error
   30XVI Review
      30XVI(H) Discretion of Lower Court
         30k944 Power to Review
            30k946 k. Abuse of discretion. Most Cited Cases

A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules and principles.

**[3] Health 198H ⚖➘804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Expert report need not marshal all of the medical malpractice plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[4] Health 198H ⚖➘804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

For expert's report to constitute a good-faith effort under medical liability statute, the report must inform the defendant of the specific conduct called into question and provide a basis for the trial court to determine that the claims have merit, and report does not fulfill these purposes if it fails to address the standard of care, breach of the standard, and causation, or if it only states the expert's conclusions regarding these elements. V.T.C.A., Civil

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

228 S.W.3d 252
**(Cite as: 228 S.W.3d 252)**

Practice & Remedies Code § 74.351(r)(6).

**[5] Health 198H** ⚷804

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Expert report in medical malpractice action can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[6] Health 198H** ⚷804

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

In medical malpractice action, expert report is not required to prove the defendant's liability, but rather to provide notice of what conduct forms the basis for the plaintiff's complaints. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[7] Appeal and Error 30** ⚷840(4)

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in General
           30k838 Questions Considered
           30k840 Review of Specific Questions and Particular Decisions
               30k840(4) k. Review of questions of pleading and practice. Most Cited Cases
(Formerly 198Hk809)

**Health 198H** ⚷804

198H Health

198HV Malpractice, Negligence, or Breach of Duty
    198HV(G) Actions and Proceedings
        198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
(Formerly 198Hk809)

The only information relevant to whether an expert report represents a good faith effort to comply with the requirements in medical liability statute is the report itself, and therefore, appellate courts must consider whether the information within the four corners of the expert report demonstrates a good faith effort to comply with the statutory requirements. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[8] Health 198H** ⚷804

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Expert report filed by patient's estate did not constitute a good faith effort to comply with requirements of medical liability statute and, therefore, constituted "no report" as to doctor; although estate sued only doctor, other health-care providers were implicated by the facts set forth in the expert report, the report failed to mention doctor at all, and the report did not inform doctor of the specific conduct she allegedly performed that formed the basis of the action. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[9] Health 198H** ⚷804

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

If expert report fails to address the defendant physician, it constitutes no report as to that defend-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

228 S.W.3d 252
**(Cite as: 228 S.W.3d 252)**

ant under medical liability statute, and the trial court may not grant a 30–day extension. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**\*253** Thomas C. Hall, Law Office of Thomas C. Hall, P.C., San Antonio, for appellant.

Emily J. Davenport, Robert L. Hargett, Davis & Wilkerson, P.C., Austin, for appellee.

Before Justices PATTERSON, PEMBERTON and WALDROP.

## OPINION

JAN P. PATTERSON, Justice.

This interlocutory appeal arises from a healthcare liability claim filed by appellant Barbara Apodaca, individually and on behalf of the estate of Claudia J. McAulay, against Penni Russo, M.D. The issue is whether Apodaca's expert report sufficiently meets the requirements of section 74.351 of the civil practice and remedies code so as to allow her to receive an extension of time. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a)-(c) (West Supp.2006). Apodaca contends that the district court erred by granting Dr. Russo's motion to dismiss the lawsuit without first granting Apodaca an extension of time to cure her expert report's deficiencies. *See id.* § 74.351(c). Because the district court did not abuse its discretion in granting Dr. Russo's motion to dismiss and denying an extension of time to file an additional report, we affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

After she was involved in a serious automobile accident on October 22, 2003, in which she sustained trauma to her head and multiple orthopedic injuries, Claudia McAulay was admitted to Brackenridge Hospital. From October 24 to October 27, she was under the care of Dr. Thomas Coopwood, an internal medicine physician, and others. During the course of her treatment, according to her expert's report,**\*254** Ms. McAulay was transferred from Brackenridge Hospital Emergency Department to Healthsouth Rehabilitation Hospital, and then transferred back to Brackenridge Hospital for an evaluation of her altered mental state and a urinary tract infection.

Dr. Penni Russo is a licensed physician who specializes in general surgery. At some point, Russo evaluated Ms. McAulay for an inferior vena cava (IVC) filter, which allows intravenous access to prevent a blood clot from causing a pulmonary embolism or stroke. No IVC filter was inserted. On October 29, Ms. McAulay had a cardiopulmonary arrest, and health care providers were unable to resuscitate her. The certificate of death showed that the cause of death was pulmonary embolism.

As a representative of the estate, appellant filed suit on October 31, 2005, alleging that Dr. Russo negligently failed to timely implement precautions against "pulmonary emboli, and anti-coagulant therapy."[FN1] On February 17, 2006, appellant filed the expert report and curriculum vitae of Dr. Leslie S. Zun pursuant to section 74.351 of the civil practice and remedies code. *See id.* § 74.351(a). Appellant provided no other report[FN2] before the expiration of the expert report deadline.[FN3] Dr. Russo filed a motion to dismiss under section 74.351(b), asserting that appellant had failed to file an expert report addressing the care and treatment provided by Dr. Russo. *See id.* § 74.351(b). The district court granted the motion to dismiss, finding that appellant had failed to provide a proper expert report and further that she was not entitled to an extension of time to cure the report's inadequacies. *See id.* § 74.351(c). This interlocutory appeal followed.

> FN1. At the hearing, Dr. Russo's attorney argued that Dr. Russo's "sole involvement with this patient was on the 28th when she got called by a nurse to come and evaluate the patient for an IVC filter."
>
> FN2. Although Dr. Zun provided a second report dated March 22, 2006, which is in-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

cluded in the appendix to appellant's brief, the report was not before the trial court at the time of the hearing, the trial court did not grant leave for appellant to file the second report, and it is not a part of the record on appeal. *See* Tex.R.App. P. 34.

FN3. Section 74.351(a) required Apodaca to file expert reports within 120 days of filing her original petition. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (West Supp.2006). Thus, Apodaca's deadline to file expert reports was February 28, 2006.

### ANALYSIS

In her single issue on appeal, Apodaca argues that dismissal was improper and that she is entitled to an extension of time to file an expert report. Appellant urges that the district court erred in not granting an extension of time to file an expert report to cure any deficiency in her expert's first report. Dr. Russo responds that because the report fails to mention her name or address any care she provided to the patient, the report is "no report" as to her and appellant is not entitled to an extension.

[1][2] We review a trial court's ruling on a motion to dismiss under section 74.351(b) for an abuse of discretion. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877–78 (Tex.2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. **\*255** *Walker v. Gutierrez,* 111 S.W.3d 56, 63 (Tex.2003).

### *The expert report requirement*

[3][4] In a health-care liability claim, the claimant must provide each defendant with one or more expert reports, including a curriculum vitae for each expert, within 120 days of filing the original petition. Tex. Civ. Prac. & Rem.Code Ann. §

74.351(a). An "expert report" is:

a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). Failure to serve an adequate expert report mandates dismissal with prejudice. *Id.* § 74.351(b). A report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. *Palacios,* 46 S.W.3d at 878. To constitute a good faith effort, the report must inform the defendant of the specific conduct called into question and provide a basis for the trial court to determine that the claims have merit. *Id.* at 879. A report does not fulfill these purposes if it fails to address the standard of care, breach of the standard, and causation, or if it only states the expert's conclusions regarding these elements. *Id.*

[5][6] The supreme court has stated that "to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* The expert report is not required to prove the defendant's liability, but rather to provide notice of what conduct forms the basis for the plaintiff's complaints. *Longino v. Crosswhite ex rel. Crosswhite,* 183 S.W.3d 913, 916 (Tex.App.-Texarkana 2006, no pet.).

### *Dr. Zun's report*

To comply with the expert report requirement, appellant served Dr. Russo with a two-page report from Dr. Zun setting forth the medical care Ms. McAulay received. It does not mention Russo's name; it identifies another physician and otherwise

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

228 S.W.3d 252
**(Cite as: 228 S.W.3d 252)**

fails to specify the identity of any other health care provider involved in Ms. McAulay's treatment. After recounting the patient's initial treatment by Dr. Thomas Coopwood and her return to Brackenridge Hospital on October 28 for evaluation, the report observed:

The physician order sheet of 10/28/03 at 1350 states to stop the lovenox. In the same order sheet dated 10/28/03, an order to place a temporary IVC filter was to be placed today. Patient was noted to be restless and agitated the night of 10/28/03. On 10/28/03, the internal medicine consultant assessment stated, "the patient much less responsive that records report and there was a concern about delirium from alcoholism, head trauma". His evaluation included STAT CT scan of the head, holding narcotics and monitoring for worsening symptoms. In this same report, the internal medicine consultant recommended that stopping the heparin was not a good option. It was recommended that the patient receive an immediate IVC filter. The medication administration record for 10/29/03 at 9am did not document any medication for DVT prophylaxis. On 10/29/03 at 9:30am, the patient had a cardiopulmonary arrest. Resuscitation **\*256** was attempted but the patient did not survive.

Deep venous thrombosis (DVT) prophylaxis as per Dr. Coopwood's note was aspirin and plexipulse foot pump. The medication administration report from Brackenridge Hospital did not note any heparin or lovenox being given to the patient from 10/23–10/27. The patient was discharged to Healthsouth Rehabilitation hospital on lovenox.

After noting that the lovenox was discontinued on October 28 and the medication administration report stated that stopping the heparin was "not a good option for DVT prophylaxis and recommended that the patient get an IVC filter," Dr. Zun's report observed that "[a] note in the chart stated that an IVC filter was to be placed and an order to hold the IVC filter was noted on 10/28/03."

The report then specified "the deviations from the standard of care":

(1) Lack of treatment for DVT prophylaxis

Deep venous thrombosis prevention was not properly addressed. It is essential that prophylaxis for DVTs be given to patients in order to prevent pulmonary embolism and death. Heparin or low molecular weight heparins are indication for prevention of DVT. Based on the medical record, it is unclear whether the patient received heparin or lovenox during all of the days of all the hospital stays to prevent DVT. Asprin [sic] is not considered adequate prophylaxis for DVT. If there was a concern about heparin induced thrombocytopenia, lepirudin (Refludan) is the drug of choice for these patients. There was no finding that this medication was ever considered or given by the physicians carrying [sic] for the patient.

(2) Lack of IVC filter insertion

The other option for DVT prophylaxis is the insertion of an IVC filter. Until IVC filters are placed some other form of DVT prophylaxis needs to be initiated. In this case, the IVC filter was not placed in a timely fashion nor was the patient given DVT prophylaxis until the filter was placed. It is uncertain why the IVC filter was ordered and then cancelled.

(3) Inadequate evaluation of the patient's altered mental status

The patient's altered mental status was not properly addressed. One of the likely causes for altered mental status and agitation is pulmonary embolism. Evaluation of altered mental status in this patient focused around medications and head trauma. The appropriate evaluation would have included assessment of the respiratory status including pulse oximetry, blood gas analysis, and chest radiograph. If the patient's altered mental status was properly evaluated, the pulmonary embolism would have been discovered prior to car-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

diac arrest. Appropriate treatment for pulmonary embolism could have started prior to the fatal embolism and thereby prevented the patient's demise.

(4) The patient's respiratory status was not adequately monitored

The patient's pulmonary status was not properly addressed. Pulse determinations are one means to determine whether a patient has pulmonary problems. Low pulse oxygenation readings in a post surgical, post trauma patient would necessitate that the patient be evaluated for pulmonary embolism. Identification of pulmonary problem from pulmonary embolisms would have prompted immediate treatment that would have saved her life.

Zun concluded that "[e]ach of these four deviations from the standard of care, alone **\*257** or in combination, could have prevented the death of Ms. McAuley's."

[7] In considering whether an expert report represents an objective good faith effort, the supreme court has established that a trial court is limited to a review of the report itself:

The issue for the trial court is whether "the report" represents a good-faith effort to comply with the statutory definition of an expert report. [former Tex.Rev.Civ. Stat. Ann. art. 4590i] § 13.01(*l* ). That definition requires, as to each defendant, a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the claimed injury. *Id.* § 13.01(r)(6). Because the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document.

*Palacios,* 46 S.W.3d at 878; *see also Horizon/ CMS Healthcare Corp. v. Fischer,* 111 S.W.3d 67, 68 (Tex.2003). The only information, then, relevant

to whether a report represents a good faith effort to comply with the statutory requirements is the report itself. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002). We must, therefore, consider whether the information within the four corners of the expert report demonstrates a good faith effort to comply with the statutory requirements.

Section 74.351(r)(6) requires that an expert report explain how the care *rendered by the physician* failed to meet the applicable standard of care and the causal relationship between that failure and the injury suffered by the claimant. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6); *Palacios,* 46 S.W.3d at 878.

[8] Although appellant has sued only Dr. Russo, other doctors and health-care providers are implicated by the facts set forth in the report. The report references other providers as well as their conduct and refers to another doctor by name, but fails to mention Dr. Russo at all. The report does not discuss how the care rendered by Dr. Russo failed to meet the applicable standard of care or how Dr. Russo's failure caused Ms. McAulay to suffer injury, harm or damages. Thus, the report did not inform Dr. Russo of the specific conduct she allegedly performed that forms the basis of the petition.

[9] If a report fails to address the defendant physician, it constitutes no report as to that defendant, and the trial court may not grant a 30–day extension. *Garcia v. Marichalar,* 185 S.W.3d 70, 74 (Tex.App.-San Antonio 2005, no pet.). The question is whether the trial court abused its discretion in determining that the report failed to provide Dr. Russo a proper expert report and that it constituted "no report" so as to preclude an extension of time to cure any deficiency. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a)-(c).

In support of her contention that Apodaca's report did not satisfy the statutory requirements so as to allow an extension of time to cure any deficiency, Dr. Russo relies upon *Garcia,* 185 S.W.3d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

228 S.W.3d 252
**(Cite as: 228 S.W.3d 252)**

70. In *Garcia,* the plaintiff filed suit against three doctors, two nurses, and a hospital. *Garcia v. Marichalar,* 198 S.W.3d 250, 252 (Tex.App.-San Antonio 2006, no pet.) (later proceeding). The plaintiff served two expert reports, but neither report mentioned Dr. Garcia. *Id.* The court concluded that the trial court had no authority to grant an extension because the report was not merely deficient, but constituted no report as to Dr. Garcia. *Garcia,* 185 S.W.3d at 74. The court further held that "neither report informed Dr. Garcia of the specific conduct he allegedly performed that [the **\*258** plaintiff] had called into question," and, thus, the expert reports did not constitute a good faith effort to comply with the statutory requirements. *Garcia,* 198 S.W.3d at 255.

As in *Garcia,* in this case, the report refers to the conduct and care provided by several providers. But unlike *Garcia,* in this case, appellant has filed a lawsuit complaining of the actions of only one doctor, Dr. Russo. Appellant seeks to distinguish *Garcia* because she has sued only Dr. Russo. In *Garcia,* the plaintiffs made a similar argument, claiming that the report applied to Dr. Garcia because he was involved in the single incident made the basis of that suit. *Id.* at 254–55. The court concluded that the report must identify the physician's specific conduct, as well as the causal relationship to represent a good faith effort to comply with section 74.351. *See id.* The report does not satisfy section 74.351(a) for a specific defendant merely because he or she is a defendant; the report must specifically identify the defendant and apply the statutory elements to that defendant. *See Jernigan v. Langley,* 195 S.W.3d 91, 93–94 (Tex.2006) (affirming a dismissal under the prior statute, Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.03, because although the report made passing mention of Dr. Jernigan, it failed to state how he breached the standard of care or how his alleged breach caused injury); *Longino,* 183 S.W.3d at 917–18 (finding that the expert report did not represent a good faith effort because it failed to differentiate between Dr. Longino and another physician, and reversing the trial court's denial of Dr. Longino's motion to dismiss).

After reviewing the report in its entirety, we cannot conclude that the trial court abused its discretion in determining that the report fails to represent a good faith effort to address the conduct of Dr. Russo and constitutes no report as to Dr. Russo.

**CONCLUSION**

Because we conclude that the district court did not abuse its discretion in finding that the report did not constitute a good faith effort to comply with the statutory requirements and therefore constitutes "no report" as to Dr. Russo, we affirm the district court's order.

Tex.App.–Austin,2007.
Apodaca v. Russo
228 S.W.3d 252

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

340 S.W.3d 529
**(Cite as: 340 S.W.3d 529)**



Court of Appeals of Texas,
Fort Worth.
BAYLOR ALL SAINTS MEDICAL CENTER, Appellant,
v.
Pamela MARTIN and John Martin, Appellees.

No. 02–10–00402–CV.
April 14, 2011.

**Background:** Patient sued hospital for negligence based on alleged sexual assault on patient in her hospital room. Hospital objected to sufficiency of patient's expert report, moved to dismiss, and requested attorney fees. Following a hearing, the 17th District Court, Tarrant County, Melody Wilkinson, J., overruled hospital's objections and denied motion and request for attorney fees. Hospital appealed.

**Holding:** The Court of Appeals, Bob McCoy, J., held that patient's expert report was deficient in establishing appropriate standard of care for the hospital and the breach of that standard.

Reversed and remanded.

West Headnotes

**[1] Appeal and Error 30 🔑941**

30 Appeal and Error
  30XVI Review
    30XVI(H) Discretion of Lower Court
      30k940 Nature and Extent of Discretionary Power
        30k941 k. In general. Most Cited Cases

**Appeal and Error 30 🔑946**

30 Appeal and Error
  30XVI Review
    30XVI(H) Discretion of Lower Court
      30k944 Power to Review
        30k946 k. Abuse of discretion. Most Cited Cases

A trial court has no discretion in determining what the law is, or in applying the law to the facts, and thus a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion.

**[2] Health 198H 🔑804**

198H Health
  198HV Malpractice, Negligence, or Breach of Duty
    198HV(G) Actions and Proceedings
      198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

The purpose of the expert report requirement in health care liability claims is to inform the defendant of the specific conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[3] Health 198H 🔑804**

198H Health
  198HV Malpractice, Negligence, or Breach of Duty
    198HV(G) Actions and Proceedings
      198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Because the statute governing sufficiency of an expert report in a health care liability claim focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[4] Health 198H 🔑804**

198H Health
  198HV Malpractice, Negligence, or Breach of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

340 S.W.3d 529
**(Cite as: 340 S.W.3d 529)**

Duty

  198HV(G) Actions and Proceedings

  198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Alleged sexual assault on patient in her hospital room following surgery was covered, in negligence action against hospital, by the expert report requirement for health care liability claims. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[5] Health 198H ☞804**

198H Health

 198HV Malpractice, Negligence, or Breach of Duty

  198HV(G) Actions and Proceedings

  198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

An expert report served by plaintiff in a health care liability action need not marshal all the plaintiff's proof. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[6] Health 198H ☞804**

198H Health

 198HV Malpractice, Negligence, or Breach of Duty

  198HV(G) Actions and Proceedings

  198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

While plaintiff's expert report in a health care liability action must do more than simply state the expert's conclusions about the standard of care, breach, and causation, to avoid dismissal a plaintiff need not present evidence in the report as if it were actually litigating the merits, and report can be informal in that information in report does not have to meet same requirements as the evidence offered in a summary judgment proceeding or at trial. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[7] Health 198H ☞656**

198H Health

 198HV Malpractice, Negligence, or Breach of Duty

  198HV(C) Particular Procedures

  198Hk655 Hospitals in General

   198Hk656 k. In general. Most Cited Cases

The standard of care for a hospital on a health care liability claim is what an ordinarily prudent hospital would do under the same or similar circumstances.

**[8] Health 198H ☞804**

198H Health

 198HV Malpractice, Negligence, or Breach of Duty

  198HV(G) Actions and Proceedings

  198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Identifying the standard of care is critical in an expert report served by plaintiff in a health care liability action is critical: whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[9] Health 198H ☞804**

198H Health

 198HV Malpractice, Negligence, or Breach of Duty

  198HV(G) Actions and Proceedings

  198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

While a fair summary of expert's opinions, as required in an expert report served by plaintiff in a health care liability action, is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[10] Health 198H ☞804**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

340 S.W.3d 529
**(Cite as: 340 S.W.3d 529)**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Patient's expert report was deficient in negligence action against hospital arising from an alleged sexual assault on patient in her hospital room following surgery, in establishing appropriate standard of care for the hospital and the breach of that standard; while report opined that there must be policies in place to safeguard patients from assault and that hospital must employ sufficient security personnel, it did not state what specific policies and safeguards should have been in place, state the number of security personnel required, or establish the training that hospital staff should have received in identifying persons not authorized to enter patients' rooms. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[11] Health 198H ⚷804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Mere conclusions about the standard of care in a plaintiff's expert report are insufficient in a health care liability action. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[12] Pretrial Procedure 307A ⚷39**

307A Pretrial Procedure
    307AII Depositions and Discovery
        307AII(A) Discovery in General
            307Ak36 Particular Subjects of Disclosure
            307Ak39 k. Facts known and opinions held by experts. Most Cited Cases

Statutory provision that stayed discovery in a health care liability claim until service of plaintiff's expert report, except for discovery of information related to plaintiff's health care, did not limit discovery by patient of information relating to alleged sexual assault on her in her hospital room following surgery; provision only stated that information related to a plaintiff's health care "included" medical and billing records. V.T.C.A., Civil Practice & Remedies Code § 74.351(s).

**\*531** Cantey Hanger LLP, Stephen L. Tatum, Carol J. Traylor and David Speed, Fort Worth, TX, for Appellant.

King Law Office, P.C. and Russell W. King, Stephenville, TX, for Appellee.

PANEL: LIVINGSTON, C.J.; McCOY and GABRIEL, JJ.

### OPINION

BOB McCOY, Justice.

#### I. Introduction

In one issue, Appellant Baylor All Saints Medical Center asserts that the trial court erred when it determined that the expert report filed by the Appellees Pamela and John Martin met the requirements of section 74.351 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (Vernon 2011). We reverse and remand.

#### II. Factual and Procedural History

The Martins sued Baylor for negligence, alleging that Pamela was sexually assaulted in her hospital room as she recovered from surgery. In support of their claim, the Martins served Baylor with Dr. John C. Shershow, M.D.'s expert report and curriculum vitae. Baylor objected to the report's sufficiency, moved to dismiss the Martins' claim, and requested attorney's fees. The trial court overruled Baylor's objections after a hearing and denied Baylor's motion to dismiss and request for attorney's fees. This appeal followed.

#### III. Expert Report

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Baylor appeals the trial court's order overruling its objections that the Martins' expert witness report does not comply with section 74.351, arguing that the report failed to adequately set forth the standard of care applicable to Baylor and how that standard was breached.

## A. Standard of Review

[1] We review a trial court's denial of a motion to dismiss for an abuse of discretion. *Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); **\*532***Maris v. Hendricks,* 262 S.W.3d 379, 383 (Tex.App.-Fort Worth 2008, pet. denied); *Ctr. for Neurological Disorders, P.A. v. George,* 261 S.W.3d 285, 290–91 (Tex.App.-Fort Worth 2008, pet. denied). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.* However, a trial court has no discretion in determining what the law is, or in applying the law to the facts, and thus "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig. proceeding); *Ehrlich v. Miles,* 144 S.W.3d 620, 624 (Tex.App.-Fort Worth 2004, pet. denied).

## B. Applicable Law

Section 74.351 of the civil practice and remedies code, entitled "Expert Report," provides,

(a) In a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports, ...

....

(c) If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30–day extension to the claimant in order to cure the deficiency....

....

(*l* ) A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).

....

(r) In this section:....

(6) "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

(s) Until a claimant has served the expert report and curriculum vitae as required by Subsection (a), all discovery in a health care liability claim is stayed except for the acquisition by the claimant of information, including medical or hospital records or other documents or tangible things, related to the patient's health care[.]

Tex. Civ. Prac. & Rem.Code Ann. § 74.351.

[2][3] The purpose of the expert report requirement is to inform the defendant of the specific conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001)). When a defendant

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

moves to dismiss a plaintiff's claims for failure to provide the required expert report,

> The issue for the trial court is whether "the report" represents a good-faith effort to comply with the statutory definition of an expert report. That definition **\*533** requires, as to each defendant, a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the claimed injury. Because the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document.

> *Palacios,* 46 S.W.3d at 878 (citations omitted).

[4][5][6][7][8][9] An expert report "need not marshal all the plaintiff's proof." *Id.* at 878–79. While the report must do more than simply state the expert's conclusions about the standard of care, breach, and causation, to avoid dismissal "a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* at 879.

> [t]he standard of care for a hospital is what an ordinarily prudent hospital would do under the same or similar circumstances. Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. "While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given."

*Id.* at 880 (citations omitted). Assaults of the type alleged by the Martins are covered by section 74.351. *See, e.g., Diversicare Gen. Partner, Inc. v.*

*Rubio,* 185 S.W.3d 842, 853, 855 (Tex.2005) (holding that a patient's claim against a nursing home for negligence in failing to provide sufficient staff and supervision to prevent her sexual assault by another patient is a health care liability claim).

## C. Analysis

[10] Baylor argues that Dr. Shershow's report fails to adequately identify the standard of care and that he does not include specific information about what Baylor should have done differently. Dr. Shershow's report presents the following as Baylor's standard of care under the facts of this case:

> *Standard of Care*

> A hospital such as Baylor All Saints Medical [C]enter is expected to adhere to specific standards of care in regard to all of its patients. A bedrock principal [sic] in providing care to its patients is the understanding that all of a hospital's patients by nature of their disease or injury are potentially vulnerable and necessarily need to receive treatment in a safe and secure environment. The Joint Commission on Accreditation of Health Care Organizations (JCAHO) has established in its Hospital Standards that all healthcare organizations must have in place policies which safeguard patients from assault by hospital staff and by strangers that enter the hospital. The JCAHO requires that hospitals adequately implement these standards, and monitor this implementation. The JCAHO patient security and safety expectations would require at a minimum that hospitals should employ a sufficient number of security personal [sic] to insure that no unauthorized persons enter patients ['] rooms and physically assault their patients. Additionally, the JCAHO standards would expect that all hospital staff should be trained to identify persons that are not authorized to enter patients['] rooms and should monitor and prevent unauthorized persons from **\*534** having access to patients receiving treatment at the hospital.

The Martins reply that the trial court did not

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

abuse its discretion by denying Baylor's motion to dismiss, claiming that Dr. Shershow's report was adequate. They alternatively argue that the medical records that section 74.351(s) allows them to discover do not contain adequate information to establish the appropriate standard of care and breach thereof, and hence, further discovery should be allowed.

We observe that the Martins were well aware, as set out in their petition, of the alleged facts of the assault. Hence, it was incumbent upon their expert to articulate the standard of care applicable to the hospital to prevent such an assault, which does not require a factual inquiry into the measures taken by the hospital to meet this standard of care.

Dr. Shershow's report opines (1) that Baylor is expected to adhere to "specific standards of care" for its patients, (2) that there must be policies in place to safeguard patients from assault, including employing "a sufficient number of security personal [sic] to insure that no unauthorized persons assault patients and training staff to identify persons not authorized to enter patients['] rooms and prevent them from doing so," and (3) that these standards must be adequately implemented. These opinions do not establish what specific policies and safeguards should have been in place. For example, the "policies in place to safeguard patients" are not identified; neither are the number of security personnel required nor the training the staff should have received regarding identifying unauthorized persons. *See Wright,* 79 S.W.3d at 52 (stating that the expert must explain the basis of his statements to link his conclusions to the facts).

[11] Keeping in mind that mere conclusions about the standard of care are insufficient, that the standard is "what an ordinary prudent hospital would do under the same or similar circumstances," and that "even a fair summary must set out what care was expected," *see Palacios,* 46 S.W.3d at 880, we cannot agree that Dr. Shershow's report fulfills the required specificity.

[12] And although the Martins specifically complain that section 74.351(s) only allows discovery of medical records and billing records, which do not contain the circumstances surrounding the assault and hence provide no discovery as to whether security standards were met, this is a misreading of the discovery allowed under section 74.351(s). Section 74.351(s) allows discovery "of information, *including* medical or hospital records *or other documents or tangible things,* related to the patient's health care." *See Tex. Civ. Prac. & Rem.Code Ann. § 74.351(s)* (emphasis added). Furthermore, as assaults of the type here are covered by section 74.351, *see Rubio,* 185 S.W.3d at 851, logically, discovery of the hospital's policies and procedures regarding the protection of patients from assault must be covered by section 74.351(s). *See Tex. Civ. Prac. & Rem.Code Ann. § 74.351(s)* (stating that all discovery is stayed except for acquisition by the claimant of information related to the patient's health care); *see also Bogar v. Esparza,* 257 S.W.3d 354, 371–72 (Tex.App.-Austin 2008, no pet.) (op. on reh'g) (noting that the plaintiff has the burden to establish that section 74.351's discovery limitations have in fact prevented her from satisfying the statute's expert report requirements and pursuing her claim). *But cf. Simmons v. Texoma Med. Ctr.,* 329 S.W.3d 163, 174 (Tex.App.-El Paso 2010, no pet. h.)* (interpreting section 74.351(s) to preclude "[d]iscovery of issues such as financial information, insurance and indemnity agreements, corporate organization, **\*535** and even bylaws, policies, and procedures" until an expert report is served).

Therefore, we hold that with respect to the establishment of the appropriate standard of care for Baylor and the breach of that standard, the Martins' expert report was deficient, and the trial court abused its discretion by finding otherwise. We sustain Baylor's sole issue.[FN1]

> FN1. Based on our resolution, we do not reach Baylor's other arguments. *See* Tex.R.App. P. 47.1.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

340 S.W.3d 529
**(Cite as: 340 S.W.3d 529)**

## IV. Conclusion

Having sustained Baylor's sole issue, we reverse the trial court's order and remand this case to the trial court to consider whether to grant a thirty-day extension to cure the deficiency. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c); *Leland v. Brandal,* 257 S.W.3d 204, 207 (Tex.2008); *Foster v. Richardson,* 303 S.W.3d 833, 845–46 (Tex.App.-Fort Worth 2009, no pet.).

Tex.App.–Fort Worth,2011.
Baylor All Saints Medical Center v. Martin
340 S.W.3d 529

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



392 S.W.3d 625, 56 Tex. Sup. Ct. J. 298
**(Cite as: 392 S.W.3d 625)**

Supreme Court of Texas.
CERTIFIED EMS, INC. d/b/a CPNS Staffing, Petitioner,
v.
Cherie POTTS, Respondent.

No. 11–0517.
Argued Oct. 17, 2012.
Delivered Feb. 15, 2013.
Rehearing Denied March 29, 2013.

**Background:** Patient brought vicarious liability and direct liability action against nurse staffing agency that employed contract nurse who assaulted patient while she was in hospital. The 270th District Court, Harris County, Brent C. Gamble, J., denied nurse staffing agency's motion to dismiss, and nurse staffing agency filed interlocutory appeal. The Court of Appeals, 355 S.W.3d 683, affirmed. Staffing agency petitioned for review.

**Holding:** Upon grant of review, the Supreme Court, Jefferson, C.J., held that as long as patient's health care liability claim contained at least one viable liability theory, as evidenced by an expert report meeting the statutory requirements, the entire case was allowed to move forward, disapproving *MSHC the Waterton at Cowhorn Creek, LLC v. Miller,* 391 S.W.3d 551, *Fung v. Fischer,* 365 S.W.3d 507, *Hendrick Med. Ctr. v. Miller*, 2012 WL 314062, *River Oaks Endoscopy Ctrs., L.L.P. v. Serrano*, 2011 WL 303795, *Beaumont Bone & Joint, P.A. v. Slaughter*, 2010 WL 730152, and *Azle Manor, Inc. v. Vaden*, 2008 WL 4831408.

Affirmed.

West Headnotes

**[1] Courts 106 247(1)**

106 Courts
   106VI Courts of Appellate Jurisdiction

      106VI(B) Courts of Particular States
        106k247 Texas
          106k247(1) k. Appellate jurisdiction of Supreme Court in general. Most Cited Cases
Conflicts between appellate courts over the extent to which an expert report must examine every liability theory alleged in a case brought under the Texas Medical Liability Act provided Supreme Court with jurisdiction over interlocutory appeal brought by nurse staffing agency following denial of agency's motion to dismiss patient's action. V.T.C.A., Civil Practice & Remedies Code § 74.351; V.T.C.A., Government Code § 22.225(c).

**[2] Health 198H 805**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
        198Hk805 k. Sanctions for failing to file affidavits; dismissal with or without prejudice. Most Cited Cases
Dismissal of patient's claim against nurse staffing agency under the Medical Liability Act, which alleged both vicarious liability and direct liability, was not warranted, even though expert reports submitted by patient only supported her vicarious liability claims; as long as patient's health care liability claim contained at least one viable liability theory, as evidenced by an expert report meeting the statutory requirements, the entire case was allowed to move forward; disapproving *MSHC the Waterton at Cowhorn Creek, LLC v. Miller,* 391 S.W.3d 551, *Fung v. Fischer,* 365 S.W.3d 507, *Hendrick Med. Ctr. v. Miller*, 2012 WL 314062, *River Oaks Endoscopy Ctrs., L.L.P. v. Serrano*, 2011 WL 303795, *Beaumont Bone & Joint, P.A. v. Slaughter*, 2010 WL 730152, and *Azle Manor, Inc. v. Vaden*, 2008 WL 4831408. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[3] Health 198H 804**

392 S.W.3d 625, 56 Tex. Sup. Ct. J. 298
**(Cite as: 392 S.W.3d 625)**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

An expert report that satisfies the statutory requirements under the Medical Liability Act, even if as to only one theory of liability, entitles the claimant to proceed with a suit against the physician or health care provider. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[4] Health 198H ⟳804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

An expert report filed pursuant to the Medical Liability Act must inform the defendant of the specific conduct the plaintiff has called into question and must provide a basis for the trial court to conclude that the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[5] Health 198H ⟳804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

**Health 198H ⟳805**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk805 k. Sanctions for failing to file affidavits; dismissal with or without prejudice. Most Cited Cases

Under the Medical Liability Act, an expert report that adequately addresses at least one pleaded liability theory satisfies the statutory requirements, and the trial court must not dismiss in such a case. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[6] Health 198H ⟳804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

When a health care liability claim involves a vicarious liability theory, either alone or in combination with other theories, an expert report that meets the statutory standards as to the employee is sufficient to implicate the employer's conduct under the vicarious theory, and if any liability theory has been adequately covered, the entire case may proceed. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**\*626** Debra Ibarra Mayfield, Harris County Civil Courts at Law # 1, Harris County Civil Courthouse, Houston, TX, Laura Denise Wilson Slay and Nathan Montgomery Rymer, Rymer Moore Jackson & Echols, P.C., Houston, TX, for Certified EMS, Inc.

Clinton E. Wells Jr., John T. McDowell, McDowell Wells LLP, Houston, TX, Vincent L. Marable III, Paul Webb PC, Wharton, TX, for Cherie Potts.

Chief Justice JEFFERSON delivered the opinion of the Court.

A patient alleged that a hospital nurse, who was temporarily placed with the hospital by a staffing service, assaulted her. The patient sued under the Texas Medical Liability Act, asserting that the staffing service was directly and vicariously liable for the nurse's conduct. The staffing service sought dismissal because the patient's expert reports did not specify how the service was directly negligent.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

392 S.W.3d 625, 56 Tex. Sup. Ct. J. 298
**(Cite as: 392 S.W.3d 625)**

The service has not challenged, in this Court, the reports' adequacy concerning its vicarious liability.

The trial court denied the motion to dismiss, and the court of appeals affirmed. It held that because the reports support a theory of vicarious liability against the staffing service, the lack of a description supporting direct liability is not fatal to the claimant's maintaining her cause of action. We agree with the court of appeals, but for different reasons. Accordingly, we affirm the court of appeals' judgment.

**I. Background**

Cherie Potts was admitted to Christus St. Catherine's Hospital for treatment of a kidney infection. One of the nurses assigned to her care, Les Hardin, was referred to the hospital by a staffing service owned by Certified EMS. Potts claims that Hardin assaulted her sexually and verbally during her hospital stay. Potts alleges that the assaults caused her anxiety and physical pain. She sued the hospital, Hardin, and Certified EMS.[FN1]

> FN1. Christus St. Catherine's Hospital and Les Hardin are not parties to this interlocutory appeal.

Potts claimed that Certified EMS was directly liable for Hardin's conduct because it failed to properly train and oversee its staff, enforce applicable standards of care, and employ protocols to ensure quality patient care and adequate staff supervision. Potts also alleged that Certified**\*627** EMS was vicariously liable under the theory of *respondeat superior.*

Because Potts sued under the Texas Medical Liability Act, she was required to serve each defendant with an expert report that met certain statutory requirements. *See* TEX. CIV. PRAC. & REM.CODE § 74.351 (outlining requirements and guidelines for expert reports in health care liability claims). Potts timely served reports from Nurse S. Francis Scholl Foster and Dr. Kit Harrison, Ph.D. Certified EMS challenged the reports, and the trial

court gave Potts thirty days to cure the alleged deficiencies. *See id.* § 74.351(c). In response, Potts supplemented Nurse Foster's original report and provided a new one from Dr. Milton Altschuler, M.D.

The relevant portions of Nurse Foster's supplemented report outline the appropriate standard of care for nurses and nursing agencies, describe the steps that should have been taken by Hardin and Certified EMS to prevent the assaults, and conclude that Hardin's and Certified EMS's failures caused Potts's injuries. Dr. Altschuler's report states that Hardin engaged in sexually inappropriate and intrusive conduct, causing the injuries that Potts has alleged.

Certified EMS objected to the newly submitted reports and moved to dismiss on numerous grounds, among them that the reports omitted any explicit reference to Certified EMS's direct liability for Hardin's conduct.

The trial court denied the motion, and Certified EMS appealed. *See* TEX. CIV. PRAC. & REM.CODE § 51.014(a)(9) (allowing interlocutory appeal of an order denying relief sought by motion under section 74.351(b) in certain circumstances). The court of appeals affirmed, holding (as relevant here) that "if the claimant timely serves an expert report that adequately addresses at least one liability theory against a defendant health care provider, the suit can proceed, including discovery, without the need for every liability theory to be addressed in the report." 355 S.W.3d 683, 693.[FN2] We granted Certified EMS's petition for review, which raises a single issue: Must a claimant in a health care liability suit provide an expert report for each pleaded liability theory? 55 Tex. Sup. Ct. J. 461 (Mar. 30, 2012).

> FN2. The court of appeals also determined that the expert reports that Potts provided to Certified EMS sufficiently addressed her vicarious liability theory, but failed to address her direct liability theories. 355

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

S.W.3d at 686. Neither party has challenged those conclusions.

## II. Conflict Among the Courts of Appeals

[1] Numerous appellate decisions have discussed the extent to which an expert report must examine every liability theory alleged. The cases reach varied results. Several courts of appeals, like the court of appeals in this case, have determined that a claimant's expert report(s) need address only a single theory for the entire suit to proceed.[FN3] Some of those decisions rely on **\*628** *Potts*, either indirectly or explicitly.[FN4] The *Potts* court focused on the Act's plain language, specifically on the requirement that an expert report be served "[i]n a health care liability claim," which the statute further defines as a "cause of action." *See* 355 S.W.3d at 690–92; *see also* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13) ( " 'Health care liability claim' means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract."). Relying on our discussion of "cause of action" in *In re Jorden,* 249 S.W.3d 416 (Tex.2008), the *Potts* court reasoned that the Act requires an expert report only for each set of operative facts that give rise to one or more bases for suing. 355 S.W.3d at 691. Thus, if an expert report adequately addresses a single liability theory within a cause of action, the entire case may proceed. *Id.*

> FN3. *See Laurel Ridge Treatment Ctr. v. Garcia,* No. 04–12–00098–CV, 2012 WL 3731748, at *1 (Tex.App.-San Antonio Aug. 29, 2012, pet. filed) (mem.op.) (holding that the trial court did not abuse its discretion when it denied defendant's motion to dismiss because an "expert report is required to be adequate with regard to only one liability theory within a cause

of action in order for the claimant to proceed with the entire cause of action against the defendant"); *Nexion Health at Duncanville, Inc. v. Ross,* 374 S.W.3d 619, 626 (Tex.App.-Dallas 2012, pet. denied) (holding that an expert report need "not address each 'specific act of negligence' pleaded by a plaintiff ... [to] satisfy the two intended purposes of the expert report requirement"); *Univ. of Tex. Med. Branch at Galveston v. Qi,* 370 S.W.3d 406, 415–16 (Tex.App.-Houston [14th Dist.] 2012, no pet.) (referencing the *Potts* court's reasoning when it held that an expert report need not address "every act or omission mentioned in the pleadings, so long as at least one liability theory within each cause of action is sufficiently addressed"); *Clear Lake Rehab. Hosp., L.L.C. v. Karber,* No. 01–09–00883–CV, 2010 WL 987758, at *5 n. 7 (Tex.App.-Houston [1st Dist.] Mar. 18, 2010, no pet.) (mem.op.) (suggesting that a report that is adequate as to one theory of liability can move an entire cause of action past the expert report stage).

> FN4. *See, e.g., Laurel Ridge Treatment Ctr.,* 2012 WL 3731748, at *1; *Nexion Health,* 374 S.W.3d at 626–27.

Other courts insist that an expert report must specifically address each liability theory.[FN5] Unsupported theories must be dismissed. Those courts also look to the statute's language. Some interpret "health care liability claim" to mean a single**\*629** theory of liability.[FN6] Thus, when the statute requires that a "liability claim" be supported by an expert report, these courts reason that the report must address each liability theory. Other courts of appeals interpret "health care liability claim" to mean a cause of action, or set of operative facts, like the *Potts* court did. But unlike the *Potts* court, they reason that different theories of liability must be based on different sets of operative facts and each, therefore, requires its own expert report. In

that respect, several cases have held that direct and vicarious liability theories involve different sets of operative facts because "the facts required to establish the defendant's vicarious liability, i.e., the acts of [the agent and his relationship] to [the principal], differ from the facts required to establish the ... defendant's direct liability, i.e., [its] provision of particular policies and procedures." *Fung v. Fischer,* 365 S.W.3d 507, 522 (Tex.App.-Austin 2012, no pet.); *see also MSHC the Waterton at Cowhorn Creek, LLC v. Miller,* 391 S.W.3d 551, 560 (Tex.App.-Texarkana, no pet.) ("The facts required to establish direct liability here are qualitatively different from the facts necessary to establish ... vicarious liability....").

> FN5. *See MSHC the Waterton at Cowhorn Creek, LLC v. Miller,* 391 S.W.3d 551, 560 (Tex.App.-Texarkana, no pet.) (holding that the claimant's expert reports must address vicarious and direct liability claims separately because the theories were based on two different sets of operative facts, which were "qualitatively different from the facts necessary to establish [the employer's] vicarious liability for the acts or omissions of its staff"); *Fung v. Fischer,* 365 S.W.3d 507 (Tex.App.-Austin 2012, no pet.) (finding that because the claimant's theories of liability were both vicarious and direct and thus based on different sets of operative facts, the expert report that only addressed the employee's conduct was not sufficient to impose direct liability on the employer); *Hendrick Med. Ctr. v. Miller,* No. 11–11–00141–CV, 2012 WL 314062, at *3 (Tex.App.-Eastland Jan. 26, 2012, no pet.) (mem. op.) (holding that direct and vicarious liability claims must be evaluated separately to determine whether each claim was sufficiently supported by an expert report); *River Oaks Endoscopy Ctrs., L.L.P. v. Serrano,* No. 09–10–00201–CV, 2011 WL 303795, at *2 (Tex.App.-Beaumont Jan. 27, 2011, no

pet.) (mem. op.) (holding that a claimant alleging theories of direct and vicarious liability must provide an expert report that addresses all theories so that the defendant can be made aware of the specific conduct being called into question); *Beaumont Bone & Joint, P.A. v. Slaughter,* No. 09–09–00316–CV, 2010 WL 730152, at *3–4 (Tex.App.-Beaumont Mar. 4, 2010, pet. denied) (mem.op.) (holding that although vicarious liability claims were sufficiently addressed in an expert report, direct liability claims were not, and should have been dismissed); *Azle Manor, Inc. v. Vaden,* No. 2–08–115–CV, 2008 WL 4831408, at *10 (Tex.App.-Fort Worth Nov. 6, 2008, no pet.) (mem.op.) (holding that although vicarious liability claims against two doctors were sufficiently addressed in two expert reports, the direct liability claims were not, and thus the trial court abused its discretion when it denied the defendant doctors' motion to dismiss the direct liability claims).

> FN6. *See, e.g., Hendrick Med. Ctr.,* 2012 WL 314062, at *3.

Still other courts have addressed questions that vary slightly from the one before us today. These courts have engaged in analyses that demonstrate the need to definitively resolve the question of how expert reports treat multiple theories of liability. FN7

> FN7. *See Marino v. Wilkins,* No. 01–11–00835–CV, 2012 WL 749997, at *8–10 (Tex.App.-Houston [1st Dist.] Mar. 8, 2012, pet. denied) (holding, under the *Potts* reasoning, that a health care liability suit may proceed under one liability theory if the defendant does not move to dismiss all theories of liability in his challenge to the expert reports); *Petty v. Churner,* 310 S.W.3d 131, 138 (Tex.App.-Dallas 2010, no pet.) (concluding that the trial court

392 S.W.3d 625, 56 Tex. Sup. Ct. J. 298
**(Cite as: 392 S.W.3d 625)**

properly dismissed direct liability claims because the vicarious and direct liability theories were based on two different standards of care, and an expert report that only addressed the vicarious theory did not meet the statutory requirements); *Obstetrical and Gynecological Assocs., P.A. v. McCoy,* 283 S.W.3d 96, 105–06 (Tex.App.-Houston [14th Dist.] 2009, pet. denied) (deciding that a claimant need not provide an expert report addressing an employer's conduct if the claimant only seeks to hold the employer liable under a vicarious liability theory, noting that there is a distinction between allegations of liability made against the employer based on the conduct of employees versus allegations of direct liability based on the conduct of the employer entity itself); *Methodist Charlton Med. Ctr. v. Steele,* 274 S.W.3d 47, 50–51 (Tex.App.-Dallas 2008, pet. denied) (holding that because the claimant failed to timely serve expert reports related to the direct liability claims against defendants that were added in an amended petition, those particular claims should have been dismissed; but, the vicarious liability claims, based on the conduct of a nurse employee, were addressed in a timely report and could move forward).

These conflicts give us jurisdiction over this interlocutory appeal. TEX. GOV'T CODE § 22.225(c).[FN8]

FN8. *See also* TEX. GOV'T CODE § 22.225(e) (noting that "one court holds differently from another when there is inconsistency in their respective decisions that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants").

### III. Addressing Theories of Liability

[2] Certified EMS contends that if a claimant's report does not adequately address each asserted theory, the trial court must dismiss those theories that are unsupported by a report. Thus, if a plaintiff's allegations include both direct and vicarious liability claims, the report is deficient if it does not cover both. We are not persuaded.

**\*630** Several courts of appeals rely on the statute's use of the term "cause of action" to decide this issue. When we discussed the phrase in *In re Jorden,* we noted that it "generally applies to facts, not filings." *Jorden,* 249 S.W.3d at 421. We also looked to Black's Law Dictionary, which "defines 'cause of action' as [a] group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person." *Id.* (quoting BLACK'S LAW DICTIONARY 235 (8th ed.2004)). From this, several appellate courts have relied on "operative facts" to reach opposing results—either that an expert report must address every pleaded liability theory,[FN9] or that it need not.[FN10] The competing conclusions demonstrate the pitfalls of this approach.

FN9. *See, e.g., MSHC the Waterton,* 391 S.W.3d at 558–59.

FN10. *See, e.g., Qi,* 370 S.W.3d at 415–16.

The focus on operative facts raises more questions than it answers. Are the "operative facts" underlying alleged liability for failure to train different from the underlying allegations of vicarious liability for medical malpractice? The court of appeals here said no,[FN11] but others would say yes.[FN12] Would each of *Potts* 's direct liability theories against Certified EMS—for failing to train its employees, failing to enforce accepted standards of care, and failing to employ protocols to ensure quality care for patients—require its own expert report, because the facts underlying each allegation may differ? Will, as the cases suggest, the relevant operative facts be disputed in every case, leading to additional time, expense, and interlocutory appeals?

FN11. 355 S.W.3d at 690–92.

392 S.W.3d 625, 56 Tex. Sup. Ct. J. 298
**(Cite as: 392 S.W.3d 625)**

FN12. *See, e.g., MSHC the Waterton,* 391 S.W.3d at 558–59; *Fung,* 365 S.W.3d at 522.

[3] We appreciate the courts of appeals' reasoning, but decline to follow that approach. No provision of the Act requires an expert report to address each alleged liability theory. The Act requires a claimant to file an expert report "[i]n a health care liability claim." TEX. CIV. PRAC. & REM.CODE § 74.351(a). Once an expert report is timely served and properly challenged, the trial court:

shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report.

*Id.* § 74.351(*l* ); *see also Loaisiga v. Cerda,* 379 S.W.3d 248, 260 (Tex.2012) (same). A valid expert report has three elements: it must fairly summarize the applicable standard of care; it must explain how a physician or health care provider failed to meet that standard; and it must establish the causal relationship between the failure and the harm alleged. TEX. CIV. PRAC. & REM.CODE § 74.351(r)(6); *see Scoresby v. Santillan,* 346 S.W.3d 546, 556 (Tex.2011). A report that satisfies these requirements, even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider.

[4] The report serves two functions. "First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001).

A report need not cover every alleged liability theory to make the defendant aware of the conduct that is at issue. *Palacios* recognized that an expert report **\*631** does not require litigation-ready evid-

ence. Rather, "to avoid dismissal ... [t]he report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* For the particular liability theory addressed, the report must sufficiently describe the defendant's alleged conduct. Such a report both informs a defendant of the behavior in question and allows the trial court to determine if the allegations have merit. If the trial court decides that a liability theory is supported, then the claim is not frivolous, and the suit may proceed.

**IV. Legislative Intent**

This approach is consistent with the Legislature's intent. *See Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex.2011) ("Our primary objective in construing statutes is to give effect to the Legislature's intent."). In amending the Act, the Legislature sought to reduce "the excessive frequency and severity of ... claims," but to "do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis." Act of June 11, 2003, 78th Leg., R.S., ch. 204, § 10.11(b)(1), (3), 2003 Tex. Gen. Laws 847, 884. In accordance with this goal, we have opined that one purpose of the report requirement is "to expeditiously weed out claims that have no merit." *Loaisiga,* 379 S.W.3d at 263. We have also stated that the purpose of evaluating expert reports is "to deter frivolous claims, not to dispose of claims regardless of their merits." *Scoresby,* 346 S.W.3d at 554; *see also Loaisiga,* 379 S.W.3d at 258 (recognizing that the expert report "requirements are meant to identify frivolous claims and reduce the expense and time to dispose of any that are filed"); *In re Jorden,* 249 S.W.3d at 421.

Our holding today satisfies these purposes. If a health care liability claim contains at least one viable liability theory, as evidenced by an expert report meeting the statutory requirements, the claim cannot be frivolous. The Legislature's goal was to deter baseless claims, not to block earnest ones. *Potts* demonstrated to the trial court that at least

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

one of her alleged theories—vicarious liability—had expert support. She cleared the first hurdle, and the appeals court correctly recognized her right to have the entire case move forward. 355 S.W.3d at 693.

### V. Efficient and Practical Litigation

Certified EMS argues that this holding will prolong litigation by forcing defendants to defend meritless claims. For two reasons, we disagree. First, if there is at least one valid theory, the defendant will be engaged in further litigation regardless of the merits of the remaining theories. Defending those theories would not be unduly burdensome. The converse is not true. To require an expert report for each and every theory would entangle the courts and the parties in collateral fights about intricacies of pleadings rather than the merits of a cause of action, creating additional expense and delay as trial and appellate courts parse theories that could be disposed of more simply through other means as the case progresses. *Cf. Scoresby,* 346 S.W.3d at 549 (applying a "lenient standard" to a plaintiff's right to cure a deficient report, noting that approach "avoids the expense and delay of multiple interlocutory appeals and assures a claimant a fair opportunity to demonstrate that his claim is not frivolous").

This leads to our second point. The expert report requirement is a threshold mechanism to dispose of claims lacking merit, but reports are not the only means to address weak subsets of those claims. **\*632** The original and amended petitions inform a defendant of the claims against it and limit what a plaintiff may argue at trial. Discovery allows a claimant to refine her pleadings to abandon untenable theories and pursue supported ones. Summary judgment motions permit trial courts to dispose of claims that lack evidentiary support. But while a full development of all liability theories may be required for pretrial motions or to convince a judge or jury during trial, there is no such requirement at the expert report stage. *See Palacios,* 46 S.W.3d at 879.

It may be difficult or impossible for a claimant to know every viable liability theory within 120 days of filing suit, and the Act reflects this reality. It strictly limits discovery until expert reports have been provided, and we have held that the statute's plain language prohibits presuit depositions authorized under Rule 202 of the Texas Rules of Civil Procedure. *See* TEX. CIV. PRAC. & REM.CODE § 74.351(s); TEX.R. CIV. P. 202; *In re Jorden,* 249 S.W.3d at 418. The Act requires the expert report to summarize the expert's opinions "as of the date of the report," recognizing that those opinions are subject to further refinement. *Id.* § 74.351(r)(6). Discovery can reveal facts supporting additional liability theories, and the Act does not prohibit a claimant from amending her petition accordingly. Under Certified EMS's reasoning, a claimant would have to serve an expert report each time a new theory is discovered. Not only would that be impractical, it would prohibit altogether those theories asserted more than 120 days after the original petition was filed—effectively eliminating a claimant's ability to add newly discovered theories. *See id.* § 74.351(a) (requiring that expert report be filed "not later than the 120th day after the date the original petition was filed"). We see no indication that the Legislature intended such a result.

[5] In sum, an expert report that adequately addresses at least one pleaded liability theory satisfies the statutory requirements, and the trial court must not dismiss in such a case. To the extent other cases hold differently, we disapprove of them.

### VI. *Gardner v. U.S. Imaging, Inc.,* 274 S.W.3d 669 (Tex. 2008) (per curiam)

Finally, we address Certified EMS's argument that *Gardner,* precludes the result we reach today. In *Gardner,* we stated that "[w]hen a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient." *Gardner v. U.S. Imaging, Inc.,* 274 S.W.3d 669, 671–72 (Tex.2008) *(per curiam).* Certified EMS argues that because Potts's theories are not *purely* vicarious, *Gardner*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

392 S.W.3d 625, 56 Tex. Sup. Ct. J. 298
**(Cite as: 392 S.W.3d 625)**

implies that each must be addressed in an expert report.

[6] We disagree that *Gardner* compels such a conclusion. Our statement distinguished between expert reports required for vicarious liability claims, in which merely implicating the agent's conduct is sufficient, and those required for direct ones, in which the employer's conduct must be implicated. But we did not address the effect of such a report in a claim involving both vicarious and direct liability. To clarify, when a health care liability claim involves a vicarious liability theory, either alone or in combination with other theories, an expert report that meets the statutory standards as to the employee is sufficient to implicate the employer's conduct under the vicarious theory. And if any liability theory has been adequately covered, the entire case may proceed.

**VII. Conclusion**

Because Potts's reports sufficiently addressed one liability theory, the trial court **\*633** correctly denied the motion to dismiss. We affirm the court of appeals' judgment. TEX.R.APP. P. 60.2(a).

Tex.,2013.
Certified EMS, Inc. v. Potts
392 S.W.3d 625, 56 Tex. Sup. Ct. J. 298

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2014 WL 538815 (Tex.App.-Austin)
**(Cite as: 2014 WL 538815 (Tex.App.-Austin))**



Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

*MEMORANDUM OPINION*

Court of Appeals of Texas,
Austin.
Anurekha CHADHA, M.D. and Austin Regional
Clinic, P.A., Appellants
v.
Sharon ROTHERT and Fred Rothert, Appellees.

No. 03–13–00153–CV.
Feb. 5, 2014.

From the District Court of Travis County, 201st Judicial District, No. D–1–Gn–12–001752, Honorable Lora J. Livingston, Judge Presiding.
Michelle M. Cheng, William O. Whitehurst, Eugene W. Brees, II, Whitehurst, Harkness, Brees & Cheng, P.C., Austin, TX, for appellee.

Beth Harkins Miller, Ballard & Simmons, LLP, Austin, TX, for appellant.

Before Justices PURYEAR, ROSE, and GOODWIN.

*MEMORANDUM OPINION*
DAVID PURYEAR, Justice.

**\*1** Sharon and Fred Rothert filed a health-care-liability claim against Anurekha Chadha, M.D., and Austin Regional Clinic, P.A. (cumulatively Austin Regional). In June 2010, Sharon went to see Dr. Chadha regarding pain in her hands, hips, and neck. In the course of treatment, Dr. Chadha ordered an erythrocyte sedimentation rate test for inflammation. The test revealed that Sharon had an elevated sedimentation rate. Sharon returned to Dr. Chadha one month later, and

Dr. Chadha told her to take prednisone to treat the symptoms that she was experiencing in her hands, hips, and neck. Dr. Chadha also mentioned the elevated sedimentation rate. At the end of the consultation, Dr. Chadha asked Sharon to call him and let him know how she was responding to the medication. Sharon did not call. Approximately one year later, Sharon went to the emergency room because she was experiencing vision loss. During her treatment, Sharon was diagnosed with temporal arteritis. As a result of her condition, Sharon is now legally blind.

Subsequent to Sharon receiving her diagnosis, the Rotherts filed suit against Austin Regional. After the Rotherts filed an expert report, *see* Tex. Civ. Prac. & Rem.Code § 74.351 (requiring claimant in health care claim to file expert report), Austin Regional asserted that the report was deficient and not a good faith effort to comply with the governing statutory framework, *id.* § 74.351(c) (explaining that report may be challenged if elements of report are deficient). Accordingly, Austin Regional asked the district court to dismiss the case. *Id.* § 74.351(b) (stating that if expert report has not been timely served, trial court must dismiss claim if defendant files motion seeking dismissal), ( *l* ) (allowing court to grant motion challenging adequacy of report if "report does not represent good faith effort to comply with the definition of an expert report"). After considering Austin Regional's motion and the responses by the Rotherts, the district court overruled Austin Regional's objections to the report and denied its motion to dismiss. Austin Regional appeals the order of the district court. *See id.* § 51.014(a)(9) (authorizing interlocutory appeal of denial of motion to dismiss for failure to file expert report); *Ogletree v. Matthews,* 262 S.W.3d 316, 320–21 (Tex.2007) (discussing statutory provisions governing appeals of rulings challenging expert reports).

In its appeal, Austin Regional challenges the district court's ruling regarding its objections to the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2014 WL 538815 (Tex.App.-Austin)
**(Cite as: 2014 WL 538815 (Tex.App.-Austin))**

adequacy of the expert report and its accompanying motion to dismiss. We review a trial court's ruling regarding the adequacy of an expert report for an abuse of discretion. *TTHR Ltd. P'ship v. Moreno,* 401 S.W.3d 41, 44 (Tex.2013); *see also Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (describing abuse-of-discretion standard).

An expert report serves two purposes: it informs the defendant about the specific conduct that the claimant believes to be improper, and it provides " 'a basis for the trial court to conclude that the claims have merit.' " *Certified EMS, Inc. v. Potts,* 392 S.W.3d 625, 630 (Tex.2013) (quoting *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001)). Under the governing statute, an expert report is "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem.Code § 74.351(r)(6). If a report satisfies these requirements, "even if as to one theory only," the claimant may proceed with his "suit against the physician or health care provider." *Potts,* 392 S.W.3d at 630. In determining whether the report is sufficient, courts "look no further than the report itself." *HEB Grocery Co., L.L.P. v. Farenik,* 243 S.W.3d 171, 174 (Tex.App.-San Antonio 2007, no pet.). Moreover, the report may be informal, meaning "that the information in the report does not have to meet the same requirement as the evidence offered in a summary judgment proceeding," *id.,* and the report need not "rule out every possible cause of the injury, harm, or damages claimed," *Baylor Med. Ctr. v. Wallace,* 278 S.W.3d 552, 562 (Tex.App.-Dallas 2009, no pet.).

**\*2** In this case, Austin Regional does not challenge the qualification of the expert preparing the report, Dr. Life Rushing, and does not challenge the standard of care. Instead, Austin Regional limits its challenge to the causation element.

In his report, Dr. Rushing stated that the standard of care in these circumstances "required that Dr. Chadha follow-up with the patient regarding the elevated sedimentation rate in 2010." Specifically, the report opined that Dr. Chadha "should have called [Sharon] and had her return for a follow-up" because "Dr. Chadha knew or should have known that a sedimentation rate of 52 mm in one hour is a major abnormality and requires a comprehensive evaluation to try to find the cause." In fact, Dr. Rushing related that Dr. Chadha should have performed "a comprehensive workup to determine the cause of the elevated sedimentation rate, including an examination of the temporal arteries; a thorough inquiry of [Sharon] regarding the presence of other symptoms signaling temporal arteritis"; and a temporal artery biopsy "if necessary and if [Sharon]'s sedimentation rate continued to stay elevated." Furthermore, Dr. Rushing explained that temporal arteritis can be present for months and that the disease and symptoms can evolve over time. Accordingly, Dr. Rushing stated that the elevated sedimentation rate was, in his opinion, an early symptom of temporal arteritis. In light of the above, Dr. Rushing related that it "was more likely than not" that a thorough "workup ... would have revealed that the cause of the elevated sedimentation rate was temporal arteritis," that a follow up would have lead to a diagnosis of and treatment for temporal arteritis, and that it was "more likely than not" that early treatment would have prevented Sharon from suffering any visual loss. Finally, Dr. Rushing stated that Dr. Chadha's actions "proximately caused" Sharon to suffer visual loss.

Given the language of the report, we cannot conclude that the district court abused its discretion by determining that the report provided the requisite causal relationship. *See Farenik,* 243 S.W.3d at 174 (explaining that report must explain basis of expert's statements "to link his conclusions to the facts"). For that reason, we also cannot conclude

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2014 WL 538815 (Tex.App.-Austin)
**(Cite as: 2014 WL 538815 (Tex.App.-Austin))**

that the district court abused its discretion by overruling Austin Regional's objections to the expert report or by denying Austin Regional's motion to dismiss. Accordingly, we overrule Austin Regional's issue on appeal and affirm the district court's order.

Tex.App.-Austin,2014.
Chadha v. Rothert
Not Reported in S.W.3d, 2014 WL 538815 (Tex.App.-Austin)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

328 S.W.3d 637
**(Cite as: 328 S.W.3d 637)**



Court of Appeals of Texas,
Dallas.
CHRISTIAN CARE CENTERS, INC., Appellant,
v.
Jane GOLENKO, Jean Miller, and Judy Miller, Individually and on Behalf of The Estate of Nell Connally, Deceased, Appellees.

No. 05–09–01521–CV.
Nov. 4, 2010.
Rehearing Overruled Jan. 6, 2011.

**Background:** Estate of deceased nursing home resident, who died after hitting her head when pushed to the floor by another resident who had Alzheimer's disease, brought health care liability action against nursing home. The 192nd Judicial District Court, Dallas County, Craig Smith, J., denied nursing home's motion to dismiss. Nursing home filed interlocutory appeal.

**Holdings:** The Court of Appeals, Fillmore, J., held that:

(1) doctor was qualified to testify as an expert regarding assessment and care of individuals with Alzheimer's disease;

(2) nurse was qualified to testify as an expert regarding standard of care for nursing home staff;

(3) nursing home administrator was qualified to testify as an expert regarding standard of care for admission of a patient with Alzheimer's disease;

(4) doctor was qualified to testify to causation; and

(5) expert reports constituted good faith efforts to comply with requirements for expert reports in health care liability actions.

Affirmed.

West Headnotes

**[1] Appeal and Error 30 ⚷960(1)**

30 Appeal and Error

30XVI Review
30XVI(H) Discretion of Lower Court
30k960 Rulings on Motions Relating to Pleadings
30k960(1) k. In general. Most Cited Cases

Appellate court reviews a trial court's order on a motion to dismiss a health care liability claim for an abuse of discretion.

**[2] Appeal and Error 30 ⚷946**

30 Appeal and Error
30XVI Review
30XVI(H) Discretion of Lower Court
30k944 Power to Review
30k946 k. Abuse of discretion. Most Cited Cases

A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles.

**[3] Appeal and Error 30 ⚷946**

30 Appeal and Error
30XVI Review
30XVI(H) Discretion of Lower Court
30k944 Power to Review
30k946 k. Abuse of discretion. Most Cited Cases

A trial court abuses its discretion when it clearly fails to analyze and determine the law correctly or applies the law incorrectly to the facts.

**[4] Health 198H ⚷804**

198H Health
198HV Malpractice, Negligence, or Breach of Duty
198HV(G) Actions and Proceedings
198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

In determining sufficiency of expert's report in health care liability action, the court may not look beyond the report itself because all information rel-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

evant to the inquiry should be contained with the document's four corners. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[5] Appeal and Error 30 ⬉714(5)**

30 Appeal and Error
   30X Record
      30X(N) Matters Not Apparent of Record
        30k714 Matters Appearing Otherwise Than by Record
          30k714(5) k. Briefs. Most Cited Cases

Appellate court cannot consider documents attached to a brief if they are not formally included in the record on appeal.

**[6] Evidence 157 ⬉538**

157 Evidence
   157XII Opinion Evidence
      157XII(C) Competency of Experts
        157k538 k. Due care and proper conduct in general. Most Cited Cases

Doctor licensed to practice medicine in the state and board certified in internal medicine, rheumatology, and geriatrics was qualified to testify as an expert regarding assessment and care of individuals with Alzheimer's disease in health care liability action brought against nursing home by estate of nursing home patient who died after hitting her head when pushed to the floor by another resident who had Alzheimer's disease; doctor had treated patients with similar conditions and had been involved in the assessment of such patients for transfer and admission to various facilities, and doctor had also supervised nurses in the care and assessment of such patients. V.T.C.A., Civil Practice & Remedies Code § 74.402(b).

**[7] Evidence 157 ⬉538**

157 Evidence
   157XII Opinion Evidence
      157XII(C) Competency of Experts
        157k538 k. Due care and proper conduct in general. Most Cited Cases

Not every licensed doctor is automatically qualified to testify on every medical question in a health care liability action. V.T.C.A., Civil Practice & Remedies Code § 74.402(b).

**[8] Evidence 157 ⬉538**

157 Evidence
   157XII Opinion Evidence
      157XII(C) Competency of Experts
        157k538 k. Due care and proper conduct in general. Most Cited Cases

Expert qualifications should not be too narrowly drawn in health care liability litigation; rather, the trial court should determine whether the proffered expert has knowledge, skill, experience, training, or education regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject. V.T.C.A., Civil Practice & Remedies Code § 74.402(b).

**[9] Evidence 157 ⬉538**

157 Evidence
   157XII Opinion Evidence
      157XII(C) Competency of Experts
        157k538 k. Due care and proper conduct in general. Most Cited Cases

In determining qualifications to testify as an expert in health care liability litigation, the focus is on whether the expert's expertise goes to the very matter on which he is to give an opinion. V.T.C.A., Civil Practice & Remedies Code § 74.402(b).

**[10] Evidence 157 ⬉538**

157 Evidence
   157XII Opinion Evidence
      157XII(C) Competency of Experts
        157k538 k. Due care and proper conduct in general. Most Cited Cases

Nurse certified in gerontological care and wound care was qualified to testify as an expert regarding the standard of care applicable to nursing staff at nursing home in health care liability action

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

brought against nursing home by estate of nursing home patient who died after hitting her head when pushed to the floor by another resident who had Alzheimer's disease; although nurse had never been a full-time employee of a nursing home, nurse had worked as a nurse and nursing supervisor and educated students about caring for Alzheimer's patients, administering medication, transcribing orders, supervising residents, and notifying physicians of resident behaviors.

**[11] Evidence 157 ⚷538**

157 Evidence
   157XII Opinion Evidence
      157XII(C) Competency of Experts
         157k538 k. Due care and proper conduct in general. Most Cited Cases

Certified nursing home administrator was qualified to testify as an expert regarding the standard of care for the admission of a patient with Alzheimer's disease to a nursing facility in health care liability action brought against nursing home by estate of nursing home patient who died after hitting her head when pushed to the floor by another resident who had Alzheimer's disease; although administrator was not a licensed health care provider and did not practice health care, administrator was licensed in nursing home administration and managed a nursing home for eight years, administrator had knowledge of rules and regulations applicable to nursing facilities, and administrator taught and performed consulting work in the field of long-term care. V.T.C.A., Civil Practice & Remedies Code § 74.402.

**[12] Evidence 157 ⚷544**

157 Evidence
   157XII Opinion Evidence
      157XII(C) Competency of Experts
         157k544 k. Cause and effect. Most Cited Cases

Nurse and nursing home administrator who were not physicians were not qualified to render an opinion about causation in health care liability ac-

tion brought against nursing home by estate of nursing home patient who died after hitting her head when pushed to the floor by another resident who had Alzheimer's disease. V.T.C.A., Civil Practice & Remedies Code §§ 74.351(r)(5)(C), 74.403(a).

**[13] Evidence 157 ⚷544**

157 Evidence
   157XII Opinion Evidence
      157XII(C) Competency of Experts
         157k544 k. Cause and effect. Most Cited Cases

Doctor licensed to practice medicine in the state and board certified in internal medicine, rheumatology, and geriatrics was qualified to testify regarding causation in health care liability action brought against nursing home by estate of nursing home patient who died after hitting her head when pushed to the floor by another resident who had Alzheimer's disease; doctor regularly engaged in the diagnosis and treatment of patients with Alzheimer's disease, doctor had had patients with violent behavior who represented a threat to others as well as themselves, and doctor had knowledge of the admission assessment process and the care needed for these patients. V.T.C.A., Civil Practice & Remedies Code §§ 74.351(r)(5)(C), 74.403(a); Rules of Evid., Rule 702.

**[14] Health 198H ⚷804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

To constitute a good faith effort to comply with the statutory requirements for expert reports in health care liability actions, an expert report must inform the defendant of the specific conduct called into question and provide a basis for the trial court to determine that the claims have merit; it does not need to marshal all of the plaintiff's proof, but it

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

328 S.W.3d 637
**(Cite as: 328 S.W.3d 637)**

must include a fair summary of the expert's opinion on each of the elements identified in the statute, i.e., the applicable standard of care, the breach or deviation from the standard of care, and the causal relationship between the breach and the injury. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[15] Health 198H ⊸804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Expert filing expert report in health care liability action must explain the basis of his statements to link his conclusions to the facts. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[16] Health 198H ⊸804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Expert reports filed by estate of nursing home resident, in action against nursing home when resident died after hitting her head when pushed to the floor by another resident who had Alzheimer's disease, adequately informed nursing home of the specific conduct called into question and provided a basis for trial court to determine that the claims had merit; experts identified nursing home's failure to properly assess condition of other resident and to properly assess, supervise, medicate, and care for such patient, and doctor testified that nursing home's failure to properly care for resident with Alzheimer's disease presented a danger to and caused death of deceased resident. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[17] Health 198H ⊸804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Doctor's expert report's opinion on causation was not improperly conclusory in health care liability action brought against nursing home by estate of nursing home patient who died after hitting her head when pushed to the floor by another resident who had Alzheimer's disease; report stated that other resident was allegedly aggressive prior to and after being admitted to nursing home, standard of care required nursing home to properly assess and report other resident's condition and properly supervise him, despite foreseeable risk, nursing home admitted other resident and failed to supervise him, and while other resident was unsupervised, he injured decedent and caused her death. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**\*640** Delta Sue Best, Allison L. Spruill, Best & Spruill, P.C., Austin, TX, Appellant.

Michael Tate Barkley, Sugar Land, TX, Susan Cassidy Cooley, Schell, Mitchell & Cooley LLP, Addison, TX, Roger Arash Farahmand, Farahmand Law Firm, P.C., Dallas, TX, R. Alan York, Goodwin Pappas Langley Ronquillo, LLP, Houston, TX, for Appellees.

Before Justices FITZGERALD, MURPHY, and FILLMORE.

### OPINION

Opinion By Justice FILLMORE.

This interlocutory appeal follows the trial court's refusal to dismiss the health care liability claims of appellees Jane Golenko, Jean Miller, and Judy Miller, Individually and on behalf of the Estate of Nell Connally, against Christian Care Centers, Inc. Christian Care complains the trial court erred by denying its motion to dismiss because ap-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

328 S.W.3d 637
**(Cite as: 328 S.W.3d 637)**

pellees' experts are not qualified to render opinions contained in their reports and the reports do not constitute good faith efforts to comply with chapter 74 of the civil practice and remedies code. We affirm the trial court's order.

## Background

Jay Haberman suffered from early-onset Alzheimer's disease. After having a seizure at home, Haberman was admitted to Centennial Medical Center. While he was hospitalized, Haberman allegedly exhibited aggressive and combative behavior that required restraints and supervision by a personal attendant. Haberman was subsequently transferred to Christian Care's Alzheimer's Unit. Haberman allegedly continued to exhibit aggressive behavior at **\*641** Christian Care. Appellees assert that the day following his admission to Christian Care, Haberman was unsupervised in the dining room of the facility. Nell Connally, a resident of Christian Care, was also in the dining room using her "merry walker," which is a walker that includes a seat for the user. Haberman allegedly grabbed the walker and turned it over, causing Connally to hit her head on the floor. Connally later died from a subdural hematoma caused by the fall.

Appellees brought a wrongful death action against Haberman. In their second amended petition, appellees also asserted health care liability claims against Christian Care. Appellees alleged Christian Care was negligent in its care of Connally by failing to properly evaluate Haberman prior to admitting him to Christian Care, failing to manage, restrain, and evaluate Haberman following his admission, and failing to protect Connally from Haberman. Appellees timely served Christian Care with expert reports by Dr. Lige Rushing, a physician who is board certified in internal medicine, rheumatology, and geriatrics, Suzanne Frederick, a registered nurse, and Sid Gerber, a licensed nursing home administrator.

Christian Care objected to the expert reports and moved to dismiss appellees' claims on the grounds that appellees' experts are not qualified to render opinions concerning the applicable standard of care and causation and the expert reports do not constitute good faith efforts to meet the requirements of section 74.351 of the civil practice and remedies code. The trial court denied the motion to dismiss, and Christian Care brought this interlocutory appeal.

## Standard of Review

[1][2][3] We review a trial court's order on a motion to dismiss a health care liability claim for an abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (per curiam). A trial court abuses its discretion when it clearly fails to analyze and determine the law correctly or applies the law incorrectly to the facts. *Petty v. Churner,* 310 S.W.3d 131, 134 (Tex.App.-Dallas 2010, no pet.)

## Analysis

[4] Within 120 days of filing a health care liability claim, a plaintiff must serve an expert report with the expert's curriculum vitae on each defendant against whom a liability claim is asserted. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (West Supp. 2010). An "expert report" is a:

> written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). The trial court is required to grant a motion challenging the adequacy of a report only if the report does not constitute an objective good faith effort to comply with the statutory requirements. *Id.* § 74.351(b)(2), (*l* ). In determining a report's sufficiency, the court may not look beyond the report itself because all information relev-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ant to the inquiry should be contained with the document's four corners. *Palacios,* 46 S.W.3d at 878.

### *642 *Standard of Care*

Christian Care first argues that appellees' experts are not qualified to render an opinion as to the standard of care applicable to Christian Care. An expert is qualified to render an opinion regarding whether a health care provider departed from the accepted standards of care if the expert:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b) (West 2005). To assist the court in making a determination as to whether the expert is qualified on the basis of training or experience, the trial court must consider whether, at the time the claim arose or at the time the testimony is given, the witness: (1) is certified by a licensing agency or a professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and (2) is actively practicing health care in rendering health care services relevant to the claim. *Id.* § 74.402(c).

### *Dr. Rushing*

Christian Care contends Dr. Rushing is not qualified to testify about the applicable standard of care because he is not actively practicing health care in an area relevant to the claim. Christian Care asserts that, although Dr. Rushing is board certified in internal medicine and geriatrics, he does not have the "nursing home experience" to testify as to the standard of care applicable to nurses and nurses aides employed in nursing facilities. Finally, Christian Care contends Dr. Rushing has never worked for a nursing home screening patients for admission to a certified Alzheimer's unit and, therefore, is not qualified to opine about Christian Care's decision to admit Haberman.

[5] Christian Care asserts we should consider deposition testimony given by Dr. Rushing in another case to "disqualify" him from opining about issues relating to nursing care in a certified Alzheimer's unit. We question whether a defendant can rely on evidence not contained within the expert's reports to attack the expert's qualifications. *See Mem'l Hermann Healthcare Sys. v. Burrell,* 230 S.W.3d 755, 758 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (declining to consider excerpts from expert's deposition in other cases, affidavit of another doctor, and standards promulgated by Infectious Diseases Society of America because "analysis of the qualifications of an expert under section 74.351 is limited to the four corners of the expert's report and curriculum vitae"); *In re Windisch,* 138 S.W.3d 507, 511 (Tex.App.-Amarillo 2004, orig. proceeding) (declining to consider expert's testimony given at hearing on motion to dismiss because determination of expert's "qualifications to provide an expert report must be made on the basis of the contents of the report and curriculum vitae"); *see also Mosely v. Mundine,* 249 S.W.3d 775, 779 (Tex.App.-Dallas 2008, no pet.) (analysis of expert's qualifications limited to expert's report and curriculum vitae). However, we need not reach the issue because the testimony relied*643 upon by Christian Care, while attached to its brief, is not in the record. We cannot consider documents attached to a brief "if they are not formally included in the record on appeal." *Cantu v. Horany,* 195 S.W.3d 867, 870 (Tex.App.-Dallas 2006, no pet.).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

[6] We, therefore, turn to whether Dr. Rushing's report and curriculum vitae demonstrate he is qualified to opine about the applicable standard of care. Dr. Rushing is licensed to practice medicine in Texas and is board certified in internal medicine, rheumatology, and geriatrics. He is actively engaged in the practice of these three specialties and is an attending physician at Presbyterian Hospital in Dallas. He has "served as a primary care physician for more than 10,000 patients in hospitals, nursing homes, assisted living facilities, and patients who had Alzheimer's disease." He regularly engages in the diagnosis and treatment of patients with Alzheimer's disease. He has had patients with violent behavior similar to Haberman's behavior who represented a threat to others as well as themselves and patients who required geriatric psychiatric care. He has "worked closely with and written orders for, and supervised the execution of these orders for the care and treatment of [his] patients and supervised the nurses (registered nurses, licensed vocational nurses, and [certified nursing assistants] ), who have been assigned to provide nursing care, including assessment for transfer and admission assessments for [his] patients under similar circumstances" as Haberman. As a result, he is "intimately familiar with the specific standards of care that are required of the facilities and caregivers and the physicians who provide care and treatment for patients" such as Haberman.

According to Dr. Rushing, the standard of care required Christian Care and its staff to "properly assess Mr. Haberman's needs prior to his admission to be certain that they indeed could meet his needs." Dr. Rushing specifically questions Christian Care's "failure to properly assess Mr. Haberman prior to accepting him for transfer" and opines that if "a proper assessment had been done, it would have been obvious that the Christian Care Center could not meet Mr. Haberman's needs i.e. one-on-one supervision, restraints, and intensive psychiatric care and treatment that Mr. Haberman required." Further, after Haberman's transfer, the nursing staff had the opportunity to review Haberman's medical records and assess his condition. Dr. Rushing questions the nursing staffs' failure to provide one-on-one supervision of Haberman, including the failure to adequately supervise Haberman in the dining room at the time he turned over Connally's walker, and failure to report Haberman's clinical status and behavior to the director of nurses or the administrator of the facility.

[7][8][9] Not every licensed doctor is automatically qualified to testify on every medical question. *Broders v. Heise,* 924 S.W.2d 148, 152 (Tex.1996). However, "expert qualifications should not be too narrowly drawn." *Larson v. Downing,* 197 S.W.3d 303, 305 (Tex.2006) (per curiam). Rather, the trial court should determine whether the proffered expert has "knowledge, skill, experience, training, or education regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Broders,* 924 S.W.2d at 153–54; *see Chester v. El–Ashram,* 228 S.W.3d 909, 912 (Tex.App.-Dallas 2007, no pet.). The focus is on whether the expert's expertise goes to the very matter on which he is to give an opinion. *Broders,* 924 S.W.2d at 153.

**\*644** The essential claim in this case involves the standard of care applicable to the assessment and care of individuals with Alzheimer's disease. Thus, the relevant question is not the narrow issue of whether Dr. Rushing has worked in a nursing home or served on a committee evaluating potential patients for admission to a nursing home. Rather, it is the broader issue of whether Christian Care and its staff should have recognized Haberman's condition was such that Christian Care could not provide the care Haberman needed or could not protect its other residents from Haberman. Dr. Rushing's report and curriculum vitae show he is certified in geriatrics and internal medicine. He has treated patients with conditions similar to Haberman's condition and has been involved in the assessment of these patients for transfer and admission to various facilities. He has also supervised nurses in the care and assessment of his patients. The trial court did

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

328 S.W.3d 637
**(Cite as: 328 S.W.3d 637)**

not abuse it discretion by finding Dr. Rushing is qualified to testify about the standard of care applicable to assessing a patient with a condition similar to Haberman's for admission into a particular facility and the needs of the patient once admitted. *See Baylor Med. Ctr. at Waxahachie v. Wallace,* 278 S.W.3d 552, 558 (Tex.App.-Dallas 2009, no pet.) (physician who stated he was familiar with standard of care for nurses and for prevention and treatment of injury involved in claim qualified to opine about standard of care for nurses); *IHS Acquisition No. 140 Inc. v. Travis,* No. 13–07–00481–CV, 2008 WL 1822780, at *5 (Tex.App.-Corpus Christi 2008, pet. denied) (mem. op.) (doctor specializing in geriatrics qualified to opine about standard of care applicable to nursing home).

### Suzanne Frederick

[10] Christian Care next argues Frederick is not qualified to testify about the applicable standard of care because she has never been a full-time employee of a nursing home, never held a job that entailed admitting patients into a nursing home, and does not actively practice health care in a nursing home. Frederick is a board certified gerontological nurse and a certified wound care nurse. She has a master of science degree in nursing administration. She teaches nursing students at McLennan Community College and educates nursing students in nursing home and hospital settings, including caring for Alzheimer's patients, administering medication, transcribing orders, supervising residents, and notifying physicians of residents' behaviors. From 2003 through 2005, she taught a nursing administration class at the University of Texas at Arlington. She has worked as a nursing supervisor and a staff nurse at a hospital and served as the Subacute Program Director/Staff RN at a nursing home for seven years.

Frederick opined on the standard of care applicable to Christian Care for the admission of Haberman to Christian Care and the care of Haberman by the Christian Care nursing staff following his admission. Because Dr. Rushing and Gerber are qualified to opine about the standard of care applicable to Christian Care in deciding to admit Haberman into the facility, we need not decide whether Frederick was also qualified to do so. *See* TEX.R.APP. P. 47.1. Turning to the nursing staff, Frederick opined that the standard of care required the nurses at Christian Care to accurately transcribe Haberman's medications onto the physician's orders, have a verification system to ensure the accuracy of the orders and the medication administration record, administer only the medications prescribed by the physician, contact the physician to verify the orders as written on the medication profile report, **\*645** notify the physician of Haberman's behavior, and adequately assess and supervise Haberman.

Issues relating to administering medication, assessing a patient's condition, and contacting a physician about a patient's medication and condition are not unique to the care of residents in a nursing home. Frederick's curriculum vitae demonstrates she has worked as a nurse and nursing supervisor and educated students about caring for Alzheimer's patients, administering medication, transcribing orders, supervising residents, and notifying physicians of resident behaviors. We conclude the trial court did not abuse its discretion in finding Frederick was qualified to testify about the standard of care applicable to the nursing staff at Christian Care.

### Sidney Gerber

[11] Christian Care contends Gerber, a licensed nursing home administrator, is not qualified to opine about the standard of care applicable to Christian Care because he is not a licensed health care provider and does not practice health care in an area relevant to appellees' claims. In determining whether an expert is qualified on the basis of training and experience to render an opinion about the standard of care, a trial court must consider whether, at the time the claim arose or at the time the expert gave his opinion, that person (1) is certified by a licensing agency or a professional certifying

agency, or has other substantial training or experience, in the area of health care relevant to the claim; and (2) is actively practicing health care in rendering health care services relevant to the claim. TEX. CIV. PRAC. & REM.CODE § 74.402(c). However, the factors in section 74.402(c) are not mandatory elements that must be proved before a witness is qualified as an expert. *Heritage Gardens Healthcare Ctr. v. Pearson,* No. 05–07–00772–CV, 2008 WL 3984053, at *5 (Tex.App.-Dallas 2008, no pet.) (mem. op.). Whether Gerber is certified by a licensing agency or a professional certifying agency or is actively practicing health care are only two factors to be considered in determining whether Gerber is qualified on the basis of training and experience to offer the opinions contained in his report. *Id.*

Further, for purposes of determining whether an expert witness is qualified to opine about the standard of care applicable to a health care provider, "practicing health care" includes:

(1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or

(2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(a). "Health care" includes any act "performed or furnished, or that should have been performed or furnished" by the health care provider for, to, or on behalf of the patient. *Id.* § 74.001(a)(10). A "health care liability claim" includes a cause of action against the health care provider for a departure from the standard of care for "safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant." *Id.* § 74.001(a)(13). Christian Care's provision of safety, professional, or administrative services to Connally constitutes health care. Gerber is "practicing health care" if he (1) is educating health care providers in

safety, professional, or administrative services provided by nursing facilities at an accredited education institution, (2) is serving as a consultant in safety, professional, or administrative services relevant to nursing facilities, or (3) is licensed, certified, or **\*646** registered relating to the provision of safety, professional, or administrative services by nursing facilities. *See id.* § 74.402(a).

Appellees claim Christian Care failed to properly assess Haberman's condition prior to admitting him into Christian Care's facility. Gerber is licensed as a nursing facility administrator in Texas and has eight years of experience managing and operating nursing home facilities. He has knowledge of the state and federal regulations governing nursing home facilities. As a nursing home administrator, he worked closely with nursing home management and staff. He is currently a consultant in the field of long-term care management and provides quality assurance monitoring and inspection of facilities on behalf of the facilities' management. He also assists families of nursing home residents with long-term care planning and management support, including the verification of care compliance, care coordination, and review of care with physicians and long-term care facilities. He teaches classes in long-term care management and administration to nursing home administrator candidates at the University of Texas Health Science Center and San Jacinto College.

In Gerber's opinion, the standard of care for a nursing facility includes an assessment of the prospective resident at the hospital prior to admission. The purpose of this assessment is for a nursing facility professional to thoroughly and accurately assess a prospective resident's medical or mental conditions to determine whether the placement is appropriate, the nursing facility's capabilities to provide the necessary care, and the safety risks to both the resident and other residents. The standard of care requires the facility to admit "only residents who it can assure that it has the abilities to provide adequate and sufficient care by competent staff,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

owners, operators, and administration based on the care needs of the individual resident and in compliance with all standards that regulate the nursing facility."

Gerber opined that Christian Care failed to comply with the applicable standards of care by not adequately assessing Haberman prior to admission. In Gerber's opinion, if Christian Care had sent a nurse to evaluate Haberman prior to admission, it would have "had a much greater understanding of the significant risk of admitting Mr. Haberman into the general population with other residents at the facility, would have been prepared to manage his aggression and violent behavior, would have taken steps to protect other residents from potential harm inflicted by Mr. Haberman, could have refused his admission and acceptance to the nursing facility, and ultimately could have prevented Ms. Connally's death." Finally, in Gerber's opinion, Christian Care failed to adhere to its own policies and procedure for evaluating Haberman for placement and, if it had done so, Haberman would not have been deemed appropriate for admission under Christian Care's criteria.

Gerber is licensed in nursing home administration and managed a nursing home for eight years. He has knowledge of rules and regulations applicable to nursing facilities. He teaches and performs consulting work in the field of long-term care. The trial court did not abuse its discretion by finding Gerber is qualified to opine about the standard of care for the admission of a patient with Alzheimer's disease to a nursing facility.

### Causation

[12] Christian Care next argues that appellees' experts are not qualified to address causation because Gerber and Frederick are not licensed physicians and Dr. Rushing is not qualified on the very matter **647** at issue in this case. "[A] person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a

physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence." TEX. CIV. PRAC. & REM.CODE §§ 74.351(r)(5)(C); 74.403(a) (West 2005). Neither Frederick nor Gerber is a physician and, therefore, neither is qualified to render an opinion about causation. *See Petty,* 310 S.W.3d at 135.

[13] Christian Care argues Dr. Rushing is not qualified to opine about causation "for the same reasons" he is not qualified to opine about the standard of care. Under rule of evidence 702, the expert must have knowledge, skill, experience, training, or education regarding the specific issue before the court. *See* TEX.R. EVID. 702. As set out above, Dr. Rushing is licensed to practice medicine in Texas. He is board certified in internal medicine and geriatrics and is actively engaged in the practice of these specialties. He regularly engages in the diagnosis and treatment of patients with Alzheimer's disease. He has had patients with violent behavior like Haberman's behavior and who represented a threat to others as well as themselves. He has knowledge of the admission assessment process and the care needed for these patients. In his opinion, it was reasonably foreseeable that Christian Care could not meet Haberman's needs and that Haberman's behavior would likely result in injury to himself or others. We conclude the trial court did not err by concluding Dr. Rushing was qualified to opine about causation.

### Good Faith Effort

Christian Care finally argues the trial court erred by denying the motion to dismiss because appellees' expert reports do not constitute good faith efforts to comply with chapter 74. Specifically, Christian Care asserts all three reports pertain only to its care of Haberman, not its care of Connally, and that Dr. Rushing's opinions about causation are conclusory.

[14][15] To constitute a good faith effort to comply with the statutory requirements, an expert report must inform the defendant of the specific

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

conduct called into question and provide a basis for the trial court to determine that the claims have merit. *Palacios,* 46 S.W.3d at 879. It does not need to marshal all of the plaintiff's proof, but it must include a fair summary of the expert's opinion on each of the elements identified in the statute: the applicable standard of care, the breach or deviation from the standard of care, and the causal relationship between the breach and the injury. *Id.* at 878. The report cannot merely state the expert's conclusions about these elements. *Id.; Petty,* 310 S.W.3d at 134. The expert must explain the basis of his statements to link his conclusions to the facts. *Bowie Mem'l Hosp.,* 79 S.W.3d at 52; *Petty,* 310 S.W.3d at 134.

[16] Contrary to Christian Care's argument, its alleged failure to properly care for Haberman is relevant to whether it breached the standard of care owed to Connally. *See Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 850 (Tex.2005) (nursing home as a heath care provider had duty to protect resident and patient population from harming themselves and each other). Dr. Rushing, Frederick, and Gerber identified the conduct of Christian Care that was called into question—the failure to properly assess Haberman's condition and needs prior to his admission, to correctly administer medication to Haberman after admission, and to properly assess, supervise, and care for **\*648** Haberman after admission. In Dr. Rushing's opinion, Christian Care's failure to properly care for Haberman presented a danger to Connally and caused her death. The trial court did not abuse its discretion by finding appellees' expert reports informed Christian Care of the specific conduct called into question and provided a basis for the trial court to determine that the claims have merit.

[17] Christian Care also asserts Dr. Rushing's report does not constitute a good faith effort to comply with section 74.351 because his opinions about causation are conclusory. In claiming the report is deficient as to causation, Christian Care focuses on Dr. Rushing's statement that, "In summary, the care and treatment rendered to Jay Haberman by Centennial Medical Center and its staff, the Christian Care Center and its staff, and Dr. Swathi Bayya fell below the accepted standard of care for the reasons described in this report and proximately caused the death of Nell D. Connally." Christian Care claims this statement shows a lack of differentiation between the health care providers and does not address viable treatment options for Connally.

The issue is whether Dr. Rushing's report, not the one statement relied upon by Christian Care, articulated a causal relationship between Christian Care's alleged failure to meet the applicable standards of care and Connally's death. *See* TEX.CIV.PRAC. & REM.CODE 74.351(r)(6). This required Dr. Rushing to link Christian Care's alleged negligence with appellees' alleged harm—the assault on Connally by Haberman. *See UHS of Timberlawn, Inc. v. S.B.,* 281 S.W.3d 207, 213–14 (Tex.App.-Dallas 2009, pet. denied) (expert report sufficiently linked health care provider's negligence to sexual assault of complainant by another patient). Haberman was allegedly aggressive and combative prior to being admitted to Christian Care and required physical restraints and supervision by a personal attendant. His aggressive behavior allegedly continued at Christian Care. According to Dr. Rushing, the standard of care required Christian Care to properly assess Haberman's condition prior to admitting him to Christian Care and required the nursing staff at Christian Care to report Haberman's condition following his admission and to properly supervise Haberman. Dr. Rushing opined that, even though it was reasonably foreseeable that Haberman was a danger to himself or others, he was admitted to the Christian Care facility and was not properly cared for or supervised. While Haberman was unsupervised in the dining room at Christian Care, he injured Connally by turning over her walker, leading to her death. We conclude the trial court did not abuse its discretion by finding Dr. Rushing's report articulated the required causal relationship.

We overrule Christian Care's sole issue and af-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

328 S.W.3d 637
**(Cite as: 328 S.W.3d 637)**

firm the trial court's order.

Tex.App.–Dallas,2010.
Christian Care Centers, Inc. v. Golenko
328 S.W.3d 637

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.




Court of Appeals of Texas,
Corpus Christi–Edinburg.
CHRISTUS SPOHN HEALTH SYSTEM COR-
PORATION d/b/a Christus Spohn Hospital Corpus
Christi–Shoreline, Appellant,
v.
Sandra SANCHEZ and Omar Aleman, Appellees.
Edwin DeJesus and Alain Njoh, Appellants,
v.
Sandra Sanchez and Omar Aleman, Appellees.

Nos. 13–09–00055–CV, 13–09–00092–CV.
Oct. 29, 2009.

**Background:** Patient brought action against hospit-
al, alleging negligent hiring, supervision, training,
and retention of employees, as well as vicarious li-
ability for employees' conduct, and against employ-
ees in their individual capacities for assault and in-
tentional infliction of emotional distress. The
County Court at Law, Nueces County, Jon Martinez
, J., denied motion to dismiss for failure to file an
adequate expert report, and hospital and employees
appealed.

**Holdings:** The Court of Appeals, Rodriguez, held
that:
(1) claims based on conduct of hospital employees
towards patient was not a "health care liability
claim" which required expert report;
(2) claim against hospital based on negligence in
hiring, training, supervising and retaining employ-
ees was a "health care liability claim;"
(3) underlying nature of patient's common law vi-
carious liability claim was a "health care liability
claim;"
(4) nurse's expert report adequately set forth hospit-
al's standard of care or safety and its breach as re-
quired; and
(5) expert physician's report on hospital's duty of
care, its breach, and resulting damages adequately
established causation element.

Affirmed.

West Headnotes

**[1] Appeal and Error 30 893(1)**

30 Appeal and Error
 30XVI Review
  30XVI(F) Trial De Novo
   30k892 Trial De Novo
    30k893 Cases Triable in Appellate
Court
     30k893(1) k. In general. Most Cited
Cases
 Whether a claim is a health care liability claim
within meaning of statute requiring plaintiff to
provide an expert's report is a question of law and
is reviewed de novo. V.T.C.A., Civil Practice &
Remedies Code § 74.351.

**[2] Health 198H 800**

198H Health
 198HV Malpractice, Negligence, or Breach of
Duty
  198HV(G) Actions and Proceedings
   198Hk800 k. In general. Most Cited Cases
 A cause of action alleges a departure from ac-
cepted standards of medical care or health care, and
requires submission of expert report, if act or omis-
sion complained of is an inseparable part of rendi-
tion of medical services. V.T.C.A., Civil Practice &
Remedies Code § 74.001(a)(13).

**[3] Health 198H 800**

198H Health
 198HV Malpractice, Negligence, or Breach of
Duty
  198HV(G) Actions and Proceedings
   198Hk800 k. In general. Most Cited Cases
 Standards of safety directly related to health
care implicate claimants' exposure to unreasonably
dangerous or defective conditions or things in the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

299 S.W.3d 868
**(Cite as: 299 S.W.3d 868)**

course of their care, for purposes of determining whether claim is a health liability claim requiring an expert report. V.T.C.A., Civil Practice & Remedies Code § 74.001(a)(13).

**[4] Health 198H ⟁804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
          198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Necessity of expert testimony to establish relevant standard of care and whether it was deviated from is an important factor in determining whether a plaintiff's claim against a health care provider is inseparable from rendition of health care, and thus, a "health care liability claim" subject to statutory requirement of an expert report. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(13), 74.351(a).

**[5] Health 198H ⟁800**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
          198Hk800 k. In general. Most Cited Cases

In determining whether claims against a health care provider are indeed health care liability claims which require submission of expert report, courts focus on gravamen, or underlying nature, of claim. V.T.C.A., Civil Practice & Remedies Code § 74.001(a)(13).

**[6] Health 198H ⟁804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
          198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

In determining whether claims against a health

care provider are indeed health care liability claims which require submission of expert report, court is not bound by form of pleading, and nature of claim is not determined simply by status of defendant or place of injury. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(13), 74.351.

**[7] Assault and Battery 37 ⟁19**

37 Assault and Battery
    37I Civil Liability
        37I(B) Actions
          37k19 k. Grounds and conditions precedent. Most Cited Cases

**Health 198H ⟁804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
          198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Conduct of registered nurse and certified nurse's assistant toward patient was not related to health care being provided to patient nor did it involve their professional judgment; thus, patient action against those hospital employees for assault and intentional infliction of emotional distress was not a "health care liability claim" which required an expert report on standard of care, failure to meet it, and resulting damages, where their alleged conduct consisted of making comments and unwanted sexual advances while they were undressing her, trying to lie down with her, and writing personal messages on the white board in her room. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(13), 74.351.

**[8] Assault and Battery 37 ⟁19**

37 Assault and Battery
    37I Civil Liability
        37I(B) Actions
          37k19 k. Grounds and conditions precedent. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

299 S.W.3d 868
**(Cite as: 299 S.W.3d 868)**

**Health 198H** ☞**804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
          198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

When a claim is based on injurious actions of an individual unrelated to provision of health care, that individual cannot hide behind procedural safeguards of statute requiring an expert report when there is a health liability claim merely because he or she was also a health care provider at time of assault or other harmful conduct. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(13), 74.351.

**[9] Health 198H** ☞**804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
          198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Patient's claims against hospital for alleged negligence in hiring, training, supervising and retaining two employees who allegedly assaulted her was essentially a claim that hospital did not care for her within accepted standards of care and safety by protecting her from alleged unwanted sexual advances and was thus a "health care liability claim" which required patient to provide an expert report. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(13), 74.351.

**[10] Health 198H** ☞**800**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
          198Hk800 k. In general. Most Cited Cases

Decisions regarding protection of patients and supervision and monitoring of staff involve professional judgment; it follows that proper staffing for care and protection of patients is related to and part of rendition of health care, for purposes of determining whether a claim regarding the decisions is a health care liability claim which requires an expert report. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(13), 74.351.

**[11] Health 198H** ☞**800**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
          198Hk800 k. In general. Most Cited Cases

Determining appropriate number, training, and certifications of medical professionals necessary to care for and protect patients in weakened conditions requires health care expertise, which is but another indicator that staffing decisions are inseparable from provision of health care; thus, when a patient is injured because of an alleged lapse in this professional decision-making, the lawsuit complaining of that injury is a "health care liability claim" which requires an expert report. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(13), 74.351.

**[12] Health 198H** ☞**804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
          198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Underlying nature of patient's common law vicarious liability claim against hospital, arising from alleged sexual assault on her by a registered nurse and a certified nurse's assistant, was that through lapses in professional judgment and treatment hospital negligently breached standards of care and safety owed patient by failing to protect her from alleged assault, was actually a "health care liability claim" and, as such, was subject to statutory requirement that patient furnish an expert report on standard of care, failure to meet it, and resulting

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

299 S.W.3d 868
**(Cite as: 299 S.W.3d 868)**

damages. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(13), 74.351.

**[13] Health 198H ⟳804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

In its review of expert report on medical provider's standard of care, failure to meet it, and resulting damages, courts are limited to four corners of report in determining whether report manifests a good-faith effort to comply with statutory definition of an expert report. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(13), 74.351.

**[14] Health 198H ⟳804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Statutorily required expert reports in health care liability actions, detailing medical provider's standard of care, failure to meet it, and resulting damages, need not marshal all of patient's proof; if expert report puts medical provider on notice of specific conduct complained of and provides trial court a basis on which to conclude claims have merit, report represents a good-faith effort to comply with statute. V.T.C.A., Civil Practice & Remedies Code § 74.351(i).

**[15] Health 198H ⟳804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Nurse's expert report adequately set forth a hospital's standard of care or safety and its breach as required in patient's action against hospital, a registered nurse and a certified nurse's assistant, arising out of alleging unwanted sexual advances by the nurse and assistant; report stated that standard of care required hospital and nursing staff to provide adequate supervision to certified nursing assistants and licensed nursing personnel, that hospital and nursing staff were to protect patients from sexual harassment and abuse, and that they failed to do so by their specific actions. V.T.C.A., Civil Practice & Remedies Code § 74.351(i).

**[16] Health 198H ⟳804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Expert physician's report on hospital's duty of care, its breach, and resulting damages adequately established causation element required in connection with a "health care liability claim" as asserted by patient in action against hospital arising out of alleged unwanted sexual advances by hospital employees; report opined at length about alleged conduct of employees and described psychological symptoms patient suffered following her stay at hospital, and observed that patient was unable to protect herself, and felt vulnerable and harassed by people who were supposed to be caring for her, which linked report to other expert's report on hospital's duty to provide a safe recovery environment. V.T.C.A., Civil Practice & Remedies Code § 74.351(i).

**\*871** David R. Iler, Erin L. Leeser, Warren Szutse Huang, Fulbright & Jaworski, Houston, for Appellant in No. 13-09-00055-CV.

Stephen J. Chapman, F. Edward Barker, The Chapman Law Firm, Corpus Christi, for appellants in No. 13-09-00092-CV.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

299 S.W.3d 868
(Cite as: 299 S.W.3d 868)

Kevin W. Grillo, Robert C. Hilliard, Hilliard Munoz Guerra, L.L.P., Corpus Christi, for Appellees.

Before Chief Justice VALDEZ and Justices RODRIGUEZ and GARZA.

## OPINION

Opinion by Justice RODRIGUEZ.

This consolidated appeal involves the alleged sexual assault of a patient by nursing staff in a hospital intensive care unit (ICU).[FN1] Appellants Christus Spohn Health System Corporation d/b/a Christus Spohn Hospital Corpus Christi–Shoreline **\*872** (Spohn–Shoreline), Edwin DeJesus, and Alain Njoh challenge the trial court's denial of their motions to dismiss a lawsuit filed by appellees Sandra Sanchez and Omar Aleman for failure to serve an adequate expert report as required by section 74.351. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a)-(b) (Vernon Supp. 2009). By three issues on appeal, appellants argue that: (1) appellees' claims are health care liability claims; (2) appellees' expert reports did not constitute a good-faith effort to comply with the statute and were fatally deficient; and (3) section 74.351's expert report requirement is constitutional under the United States and Texas Constitutions. We affirm.

> FN1. This opinion consolidates the Court's analysis of both appeals. *See* TEX.R.APP. P. 47.1.

## I. BACKGROUND

In October 2007, Sanchez underwent spinal fusion surgery at Spohn–Shoreline. She was recovering in the ICU when she alleges that Njoh and DeJesus, a registered nurse and a certified nurse's assistant, entered her room and made unwanted sexual advances toward her. Sanchez alleges that one of the men undressed her and exposed her body for the other to see. She claims that they turned her over using their hands instead of a turning pad and, while they were moving her from the bed to a chair in her room, they danced with her. Sanchez alleges that during these physical contacts, Njoh and DeJesus were making sexual overtures and comments and that the improper conduct continued until she was discharged from the hospital a few days later.

In February 2008, appellees sued Spohn–Shoreline for negligent hiring, supervision, training, and retention of its employees and vicarious liability for the conduct of Njoh and DeJesus. Appellees timely served the expert report and curriculum vitae of Laura Burchell–Henson, a registered nurse.[FN2] TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a). Spohn–Shoreline filed objections to the report and a motion to dismiss appellees' lawsuit on the basis that their expert report did not constitute a good-faith effort to comply with the requirements of the statute. Appellees responded to the motion, arguing that their claims were not health care liability claims subject to section 74.351 and that the expert report requirement was unconstitutional under the United States and Texas Constitutions. In August 2008, appellees amended their petition to add causes of action against DeJesus and Njoh, in their individual capacities, for assault and intentional infliction of emotional distress. After the trial court granted appellees an extension of time to amend their expert report, appellees filed a report by George S. Glass, M.D. Spohn–Shoreline filed objections to the second report and all appellants filed motions to dismiss the suit for failure to file an adequate expert report. The trial court denied both motions to dismiss, and these appeals ensued. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (Vernon 2008) (authorizing an interlocutory appeal of the denial of a motion to dismiss filed under section 74.351(b)).

> FN2. Appellees maintain that their claims are not health care liability claims and that they served an expert report in an "abundance of caution" to preserve their rights to proceed with the lawsuit.

## II. DISCUSSION
### A. Health Care Liability Claims

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

299 S.W.3d 868
**(Cite as: 299 S.W.3d 868)**

By the first issue, appellants assert that appellees' claims are health care liability claims governed by chapter 74 of the civil practice and remedies code. Specifically, appellants argue that the underlying nature of appellees' claims is that appellants **\*873** breached the standards of care and safety owed to Sanchez. With regard to appellees' claims against Spohn–Shoreline, we agree. However, we cannot so conclude with respect to appellees' claims against Njoh and DeJesus in their individual capacities.

**1. Standard of Review and Applicable Law**

[1][2][3][4] "[W]hether a claim is a health care liability claim pursuant to section 74.351 is a question of law and is reviewed de novo." *Valley Baptist Med. Ctr. v. Stradley,* 210 S.W.3d 770, 773 (Tex.App.-Corpus Christi 2006, pet. denied). A health care liability claim is defined as:

[A] cause of action against a health care provider ... for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(13) (Vernon 2005).<sup></sup>FN3 "A cause of action alleges a departure from accepted standards of medical care or health care if the act or omission complained of is an inseparable part of the rendition of medical services." *Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 848 (Tex.2005). Standards of safety implicate claimants' "exposure to unreasonably dangerous or defective conditions or things" in the course of their care. *Marks v. St. Luke's Episcopal Hosp.,* No. 07–0783, 2009 WL 2667801, at \*8 (Tex. Aug. 28, 2009). The necessity of expert testimony is an important factor in determining whether the plaintiff's claim is inseparable from the rendition of health care. *Diversicare,* 185 S.W.3d at 848.

FN3. The statute's definition of health care provider includes hospitals, registered nurses, and employees acting in the course and scope of their employment with the health care provider. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.001 (a)(11)(G), (12)(A)(i), (12)(B)(ii) (Vernon 2005).

[5][6] In determining whether appellees' claims are indeed health care liability claims, we focus on the "gravamen," or underlying nature, of the claim. *Id.* "[W]e are not bound by the form of the pleading," and the nature of the claim is not determined simply by the status of the defendant or the place of injury. *Id.; see Marks,* 2009 WL 2667801, at \*8. Instead, "it is the cause of the injury and its relationship to medical or professional judgment that determines" the nature of the claim and the applicability of the health care liability statute. *Marks,* 2009 WL 2667801, at \*8.

**2. Claims against Njoh and DeJesus**

Njoh and DeJesus argue that appellees' claims against them for assault and intentional infliction of emotional distress actually center on their rendering of health care services to Sanchez. They contend that Sanchez's allegations—that they undressed her so they could view her naked body, moved her with their hands instead of a turning pad, and danced with her while they were moving her from the bed to a chair—are all subjective interpretations of what, in reality, were specific tasks routinely performed by nursing staff, i.e. changing her clothes in preparation for the doctor, turning her over in her bed, and helping her to the chair in her room. Njoh and DeJesus argue that Sanchez's differing perception of the conduct does not take her claims outside the confines of the health care liability statute. We disagree.

**\*874** [7] Although we acknowledge that the previously described tasks may be part and parcel of the care given to hospital patients by nursing staff, we do not view the conduct challenged by appellees in isolation from the surrounding circum-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

stances, as do Njoh and DeJesus. Because in addition to describing the undressing, turning over, and moving of Sanchez, appellees also allege that Njoh and DeJesus made sexual overtures toward Sanchez in the process of performing these tasks. Appellees claim that Njoh and DeJesus commented to Sanchez about her body while they were undressing her and allegedly danced with her and, at one point, even tried to climb in the bed with her. Appellees further allege that one of the two wrote "I love you" on the white board in Sanchez's room. We would be remiss to conclude that such conduct was related to the health care being provided to Sanchez or somehow involved the professional judgment of Njoh and DeJesus. *See Jones v. Khorsandi,* 148 S.W.3d 201, 206 (Tex.App.-Eastland 2004, pet. denied) (holding that allegations of sexual assault against a doctor did not involve "a breach of the applicable standards of care for health care providers").

[8] Appellees' amended petition alleges causes of action against Njoh and DeJesus for assault and intentional infliction of emotion distress, and we conclude that the underlying nature of appellees' claims, indeed, rests squarely in these intentional actions that had "nothing to do with a health care provider's lapse in professional judgment or failure to protect a patient due to an absence of supervision or monitoring." *Holguin v. Laredo Reg'l Med. Ctr., L.P.,* 256 S.W.3d 349, 354 (Tex.App.-San Antonio 2008, no pet.); *see Jones,* 148 S.W.3d at 206. "It would defy logic to suggest that a sexual assault 'is an inseparable part of the rendition of medical care' or a departure from accepted standards of care." *Holguin,* 256 S.W.3d at 353 (citing *Diversicare,* 185 S.W.3d at 848). When a claim is based on the injurious actions of an individual unrelated to the provision of health care, that individual cannot hide behind the procedural safeguards of chapter 74 merely because he or she was also a health care provider at the time of the assault or other harmful conduct. *See id.* (reasoning that the plaintiff's claim that his doctor sexually assaulted him was not a health care liability claim because the allegation was not that the doctor had negligently allowed the assault to occur, but rather, that the doctor injured the plaintiff "by his own actions"). Appellees' claims against Njoh and DeJesus in their individual capacities are, therefore, not health care liability claims, and we overrule the first issue as it applies to Njoh and DeJesus.[FN4]

> **FN4.** Having decided that appellees' claims against Njoh and DeJesus are not health care liability claims, we need not reach Njoh and DeJesus's contentions regarding the adequacy of appellees' expert reports or concerning the constitutionality of the expert report requirement. *See* TEX.R.APP. P. 47.1.

### 3. Claims against Spohn–Shoreline

[9] Similarly, Spohn–Shoreline contends that the underlying nature of appellees' claims is that it did not care for Sanchez within the accepted standards of care and safety. However, unlike appellees' claims against Njoh and DeJesus, appellees' claims against Spohn–Shoreline are based on negligence, implicate the standards of care and safety contemplated by chapter 74, and directly relate to its rendering of health care to Sanchez. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(13); *see also Stradley,* 210 S.W.3d at 775. In their amended petition, appellees allege that Spohn–Shoreline **\*875** owed a duty to Sanchez "to provide a reasonably safe recovery environment free from offensive contact" and that Spohn–Shoreline "breached this duty by failing to properly hire, supervise, train, and retain its employees." In other words, appellees' claims are that Spohn–Shoreline failed to protect her from the alleged unwanted sexual advances made by Njoh and DeJesus.

[10][11] Decisions regarding the protection of patients and the supervision and monitoring of staff involve professional judgment, *see Diversicare,* 185 S.W.3d at 851, and "[i]t follows that proper staffing for the care and protection of patients is related to and part of the rendition of health care." *Holguin,* 256 S.W.3d at 356. Moreover, determining "the appropriate number, training, and certifica-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

299 S.W.3d 868
**(Cite as: 299 S.W.3d 868)**

tions of medical professionals necessary to care for and protect patients in weakened conditions" requires health care expertise, which is but another indicator that staffing decisions are inseparable from the provision of health care. *Diversicare,* 185 S.W.3d at 848, 851. Thus, as here, when a patient is injured because of an alleged lapse in this professional decision-making, the lawsuit complaining of that injury is a health care liability claim. *See id.* at 851.

[12] Appellees respond that their claim against Spohn–Shoreline for vicarious liability, in particular, is not a health care liability claim subject to the expert report requirement. However, Texas courts have clearly held that a plaintiff cannot circumvent the expert report requirement by artfully pleading her health care liability claim based upon the negligence of the health care provider as some other cause of action, such as vicarious liability. *See Garland Cmty. Hosp. v. Rose,* 156 S.W.3d 541, 543 (Tex.2004); *NCED Mental Health, Inc. v. Kidd,* 214 S.W.3d 28, 34–35 (Tex.App.-El Paso 2006, no pet.); *Oak Park, Inc. v. Harrison,* 206 S.W.3d 133, 140–41 (Tex.App.-Eastland 2006, no pet.). Appellees' claim is not that Spohn–Shoreline, through its employees, committed the sexual assault. Instead, despite the recasting of their claim as common law vicarious liability, the underlying nature of appellees' claim is, nonetheless, that "through lapses in professional judgment and treatment [Spohn–Shoreline] negligently allowed the sexual assault to occur." *Diversicare,* 185 S.W.3d at 851; *see Harrison,* 206 S.W.3d at 141. We are, therefore, unpersuaded by appellees' vicarious liability argument.

We conclude that the "gravamen" of appellees' claims is that Spohn–Shoreline breached the standards of care and safety owed to Sanchez by failing to protect her from the allegedly assaultive conduct of its nursing staff. *See Marks,* 2009 WL 2667801, at *8. The complained-of conduct was an inseparable part of the care provided to Sanchez as a patient at Spohn–Shoreline, and appellees' claims

against Spohn–Shoreline therefore constituted health care liability claims subject to the expert report requirement of section 74.351. *See id.; see also* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (a). We sustain the first issue as it applies to Spohn–Shoreline.

**B. Expert Reports**

In the second issue, Spohn–Shoreline argues that appellees' expert reports were fatally deficient. FN5

> FN5. By a sub-issue, Spohn–Shoreline complains that the trial court erred in granting appellees' request for a thirty-day extension to amend the report of Nurse Burchell–Henson. Spohn–Shoreline argues that because the only expert report served by appellees within the 120–day deadline was authored by a nurse who, under the express terms of the statute, cannot offer an opinion regarding causation, appellees effectively failed to serve any expert report on Spohn–Shoreline within the time frame required by section 74.351. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c) ("If an expert report has not been served within the period specified ... because elements of the report are found deficient, the court may grant one thirty-day extension to the claimant in order to cure the deficiency."). In other words, Spohn–Shoreline argues that the report by Nurse Burchell–Henson was not merely deficient but, rather, no report at all and that, even if they were entitled to a thirty-day extension, appellees could use the extension only to amend the Burchell–Henson report, not to file a new report by a separate expert. However, the Texas Supreme Court has held that objections to a nurse's qualifications to act as an expert in a health care liability claim go to the sufficiency of the report and not to its existence. *Ogletree v. Matthews,* 262 S.W.3d 316, 322

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Tex.2007). Moreover, appellees were well within their rights to supplement Nurse Burchell–Henson's report with a report on causation by Dr. Glass, because deficiencies in an expert report can be cured during the thirty-day extension period by serving a report by a separate expert. *Lewis v. Funderburk,* 253 S.W.3d 204, 208 (Tex.2008). As such, we are unpersuaded by Spohn–Shoreline's argument and overrule the second issue to the extent that it challenges the trial court's decision to grant appellees a thirty-day extension.

**\*876 1. Standard of Review and Applicable Law**

We review a trial court's decision on a motion to dismiss under section 74.351 of the civil practice and remedies code for abuse of discretion. *Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). The trial court abuses its discretion if it acts unreasonably or arbitrarily or without reference to any guiding rules or principles. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003). The trial court's ruling is arbitrary and unreasonable only if "the appellant establishes that the trial court could reasonably have reached only one decision." *Taylor v. Christus Spohn Health Sys. Corp.,* 169 S.W.3d 241, 244 (Tex.App.-Corpus Christi 2004, no pet.).

Under section 74.351 of the Texas Civil Practice and Remedies Code, a claimant must "serve on each party or the party's attorney" an expert report and curriculum vitae "not later than the 120th day after the date the original petition was filed." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (a). An expert report is "a written report by an expert that provides a fair summary of the expert's opinions ... regarding applicable standards of care, the manner in which the care rendered ... failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6).

[13][14] In our review of the expert report, we are limited to the four corners of the report in determining whether the report manifests a good-faith effort to comply with the statutory definition of an expert report. *Palacios,* 46 S.W.3d at 878; *see* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l* ) (requiring that the trial court "grant a motion challenging the adequacy of the expert report only if appears to the court, after hearing, that the report does not represent an objective good faith effort to comply" with the statutory definition). "Nothing in [section 74.351] should be construed to mean that a single expert report must address all liability and causation issues...." TEX. CIV. PRAC. & REM.CODE. ANN. § 74.351(i). Moreover, the reports "need not marshal all the plaintiff's proof." *Palacios,* 46 S.W.3d at 878; *see Jernigan,* 195 S.W.3d at 93. If the expert report puts the defendant on notice of the specific conduct complained of and provides the trial court a basis on which to conclude the claims have merit, the report represents a **\*877** good-faith effort to comply with the statute. *Palacios,* 46 S.W.3d at 879.

**2. Analysis**

[15] Spohn–Shoreline first argues that Nurse Burchell–Henson's report did not adequately set forth the standard of care and/or safety and breach because the report is conclusory, speculative, and does not differentiate between the standards of care applicable to Spohn–Shoreline as opposed to the individual defendants. *See Taylor,* 169 S.W.3d at 244 ("An expert report may not assert that multiple defendants are all negligent for failing to meet the standard of care without providing an explanation of how each defendant specifically breached the standard...."). Spohn–Shoreline further argues that the report does not provide specific information about what it should have done differently. *See Palacios,* 46 S.W.3d at 880 (holding that a "fair summary" of the applicable standard of care and breach identifies the type of care expected but not rendered). We disagree.

Nurse Burchell–Henson's report states that the "standard of care requires that the hospital and its

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

nursing staff provide adequate supervision to their certified nursing assistants and licensed nursing personnel." The report further states that the "standard of care requires that the hospital and its nursing staff protect their patients from sexual harassment and abuse." It is clear to this Court that, although she references the "nursing staff" in these articulated standards of care, Nurse Burchell–Henson is describing the duties owed by Spohn–Shoreline to its patients. *See Univ. of Tex. Sw. Med. Ctr. v. Dale,* 188 S.W.3d 877, 879 (Tex.App.-Dallas 2006, no pet.) (holding that an expert report need not explicitly refer to the hospital employer by name where a plaintiff is asserting vicarious, and not direct, liability, and where it is clear that the conduct of the hospital employer is implicated). By specifying that the hospital is to adequately supervise its "certified nursing assistants and licensed nursing personnel," Nurse Burchell–Henson effectively differentiates between Spohn–Shoreline and the individual defendants.

Moreover, we conclude that Nurse Burchell–Henson identified the care that was expected but not rendered under the applicable standard of care. She states that Spohn–Shoreline "[f]ailed to provide adequate supervision to the CNA [DeJesus] and the RN [Njoh]," "[f]ailed to protect Ms. Sanchez from sexual harassment and sexual abuse," and "[f]ailed to provide safety to Ms. Sanchez in her immediate post operative [sic] when the CNA lifted Ms. Sanchez up and began dancing with her." She explains the specific tasks and responsibilities required of Spohn–Shoreline and notes that it failed to perform as such. In short, the report put Spohn–Shoreline on notice of the specific complained-of conduct, and we cannot say that the trial court abused its discretion in finding that the report sufficiently set forth the standard of care and breach. *See Palacios,* 46 S.W.3d at 879.

[16] Spohn–Shoreline next complains that the report of Dr. Glass did not establish the causation element required under the statute. *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (holding that an expert report "cannot merely state the expert's conclusions" regarding causation; rather, the basis of the expert's statements must link his conclusions to the facts). Specifically, Spohn–Shoreline contends that Dr. Glass's report is conclusory, does not show that Spohn–Shoreline's conduct caused the events upon which appellees' claims are based, and does not differentiate**\*878** between the conduct of Spohn–Shoreline, versus that of Njoh and DeJesus, as the cause of injury. Again, we disagree.

In his report, Dr. Glass opines at length about the alleged conduct of Njoh and DeJesus and describes the depression, severe anxiety, panic, nightmares, and social isolation that Sanchez suffered following her stay at Spohn–Shoreline. Dr. Glass observes that Sanchez was "unable to care [sic] and protect herself [sic] felt vulnerable, harassed by the people who were supposed to be caring for her in the hospital ICU." He then concludes that: "The fact that [Sanchez] was vulnerable, unable to protect herself, and felt as if her person was violated has caused her to now have symptoms of Major Depression and Post Traumatic Stress Disorder."

Dr. Glass's emphasis on Sanchez's vulnerable condition, in particular, puts Spohn–Shoreline on notice of the conditions called into question by appellees' claims. *See Palacios,* 46 S.W.3d at 879; *Wright,* 79 S.W.3d at 53 (agreeing that plaintiffs are not required to use any sort of magic words to meet the section 74.351 expert report obligation). Read in combination with Nurse Burchell–Henson's report on the standard of care, which provided that Spohn–Shoreline had a duty to provide a safe recovery environment for its vulnerable post-operative patients, we conclude that Dr. Glass sufficiently linked Sanchez's assault to Spohn–Shoreline's failure to protect her from the assaultive conduct of Njoh and DeJesus. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(i) (allowing standard of care and causation to be established in separate reports); *see also Wright,* 79 S.W.3d at 52. The trial court did not abuse its dis-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

299 S.W.3d 868
**(Cite as: 299 S.W.3d 868)**

cretion in finding the report sufficient as to causation. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6).

Based on the foregoing, we conclude that the expert reports of Nurse Burchell–Henson and Dr. Glass adequately set forth the standard of care, identified how Spohn–Shoreline breached the standard, and explained how the breach caused the injuries claimed by appellees. *See Palacios,* 46 S.W.3d at 878. The reports constituted a good faith effort to comply with the statute because they put Spohn–Shoreline on notice of the specific conduct complained of and provided the trial court with a basis on which to conclude appellees' claims have merit. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l* ); *Palacios,* 46 S.W.3d at 879. We overrule the second issue.[FN6]

> FN6. Having concluded that appellees' expert reports met the requirements of section 74.351 and that the trial court did not err in denying Spohn–Shoreline's motion to dismiss, we need not reach its third issue regarding appellees' argument that the expert report requirement is unconstitutional. *See* TEX.R.APP. P. 47.1.

### III. CONCLUSION

The orders of the trial court denying appellants' motions to dismiss are affirmed.

Tex.App.–Corpus Christi,2009.
Christus Spohn Health System Corp. v. Sanchez
299 S.W.3d 868

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


701 S.W.2d 238
**(Cite as: 701 S.W.2d 238)**

▷

Supreme Court of Texas.
Ida E. DOWNER, Petitioner,
v.
AQUAMARINE OPERATORS, INC., Respondent.

No. C–4141.
Dec. 4, 1985.
Rehearing Denied Jan. 15, 1986.

Wife of deceased seaman brought action for damages against shipowner. Trial court struck shipowner's answer as discovery abuse sanction and signed interlocutory default judgment as to liability. Jury trial on issue of damages was had in the 334th District Court, Harris County, Ken Harrison, J. Shipowner appealed. The Court of Appeals, 689 S.W.2d 472, reversed judgment of trial court. Wife appealed. The Supreme Court, Wallace, J., held that: (1) trial court had authority under rule regarding failure of party to appear at oral deposition to strike answer of shipowner; (2) trial court correctly imposed discovery sanction of striking shipowner's answer; and (3) trial court correctly refused to admit evidence of contributory negligence.

Judgment of Court of Appeals reversed and judgment of trial court affirmed.

West Headnotes

**[1] Pretrial Procedure 307A ⬢101**

307A Pretrial Procedure
    307AII Depositions and Discovery
        307AII(C) Discovery Depositions
            307AII(C)1 In General
                307Ak96 Persons Who May Be Examined
                    307Ak101 k. Corporate officers, agents, and employees. Most Cited Cases
    President of company which was party to action was a "party" within meaning of Rule 215a(c) regarding failure of party to appear at oral depos-

ition, where president testified he was in complete charge of all operations of the company. Vernon's Ann.Texas Rules Civ.Proc., Rule 215a(c) (Repealed).

**[2] Pretrial Procedure 307A ⬢748**

307A Pretrial Procedure
    307AV Pretrial Conference
        307Ak747 Order and Record or Report
            307Ak748 k. Amendment or modification. Most Cited Cases
    Trial court's plenary jurisdiction gives it not only authority but responsibility to review any pretrial order upon proper motion, and in doing so, it is presumed that court is familiar with entire record of case up to and including motion to be considered.

**[3] Pretrial Procedure 307A ⬢225**

307A Pretrial Procedure
    307AII Depositions and Discovery
        307AII(C) Discovery Depositions
            307AII(C)6 Failure to Appear or Testify; Sanctions
                307Ak225 k. Striking pleadings. Most Cited Cases

**Pretrial Procedure 307A ⬢226**

307A Pretrial Procedure
    307AII Depositions and Discovery
        307AII(C) Discovery Depositions
            307AII(C)6 Failure to Appear or Testify; Sanctions
                307Ak226 k. Dismissal or default judgment. Most Cited Cases
    In refusing to grant new trial and reinstate party's answer which had been struck at prior hearing on Motion for Sanctions as discovery sanction, trial court could consider evidence introduced subsequent to original sanctions hearing. Vernon's Ann.Texas Rules Civ.Proc., Rule 215a(c) (Repealed).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 S.W.2d 238
**(Cite as: 701 S.W.2d 238)**

**[4] Appeal and Error 30 ⚷946**

30 Appeal and Error
   30XVI Review
      30XVI(H) Discretion of Lower Court
         30k944 Power to Review
            30k946 k. Abuse of discretion. Most Cited Cases

Test for whether trial court abused its discretion is whether court acted without reference to any guiding rules and principles, i.e., whether the act was arbitrary or unreasonable, and mere fact that trial judge may decide matter within his discretionary authority in different manner than appellate judge in similar circumstance does not demonstrate that an abuse of discretion has occurred.

**[5] Pretrial Procedure 307A ⚷225**

307A Pretrial Procedure
   307AII Depositions and Discovery
      307AII(C) Discovery Depositions
         307AII(C)6 Failure to Appear or Testify; Sanctions
            307Ak225 k. Striking pleadings. Most Cited Cases

**Pretrial Procedure 307A ⚷226**

307A Pretrial Procedure
   307AII Depositions and Discovery
      307AII(C) Discovery Depositions
         307AII(C)6 Failure to Appear or Testify; Sanctions
            307Ak226 k. Dismissal or default judgment. Most Cited Cases

Trial court correctly imposed discovery sanction of striking defendant's answer and signing interlocutory default judgment as to liability under Rule 215a(c)(Repealed) regarding failure of party to appear at oral deposition, where shipowner voluntarily sent crew to sea rather than producing them for depositions as agreed on two occasions, attorney for wife of deceased seaman stated shipowner's attorney waited until one hour past deposition time to advise wife's attorney that wife's attorney would have to fly to another city to take depositions on following day, and shipowner failed to produce president of shipowner and immediate supervisor of captain for deposition and did not explain this failure. Vernon's Ann.Texas Rules Civ.Proc., Rule 215a(c) (Repealed).

**[6] Appeal and Error 30 ⚷1045(2)**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error
         30XVI(J)6 Interlocutory and Preliminary Proceedings
            30k1045 Selection and Impaneling of Jurors
            30k1045(2) k. Sustaining challenge or excusing juror. Most Cited Cases

Alleged error of trial court in refusing to strike a juror for cause did not result in harm, where challenged juror was a spare.

**[7] Damages 115 ⚷203**

115 Damages
   115X Proceedings for Assessment
      115k193 Inquest on Default or Interlocutory Judgment
         115k203 k. Scope of issues and questions considered. Most Cited Cases

Trial court correctly refused to admit evidence of contributory negligence in trial to determine damages, where defendant's answer had been struck and default judgment rendered as to liability and defendant had no pleading to support contributory negligence.

**[8] Appeal and Error 30 ⚷221**

30 Appeal and Error
   30V Presentation and Reservation in Lower Court of Grounds of Review
      30V(B) Objections and Motions, and Rulings Thereon
         30k221 k. Amount of recovery or extent of relief. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Alleged error of trial court in awarding prejudgment interest was not presented to trial court and was thus waived on appeal.

**\*239** John O'Quinn, Frank M. Staggs, Jr., O'Quinn & Hagans, Houston, for petitioner.

Terry P. Ayre and Thomas A. Brown, Brown, Sims, Wise & White, Houston, for respondent.

WALLACE, Justice.

This is an appeal from a judgment for damages in a suit brought under the Jones Act and under admiralty law. The trial dealt only with damages because the trial court struck the defendant's answer as a discovery abuse sanction and signed an interlocutory default judgment as to liability. The court of appeals reversed the trial court judgment, holding that the action of **\*240** that court was an error of law and an abuse of discretion. 689 S.W.2d 472. We reverse the judgment of the court of appeals and affirm the judgment of the trial court.

The issues before us are whether TEX.R.CIV.P. 215a(c), as it existed prior to the amendment effective August 1, 1984, authorized the trial court to strike defendant's answer, and, if so, whether the exercise of that authority constituted an abuse of discretion.

Edward P. Downer was a seaman aboard the vessel Four Point IV. He drowned while attempting to free a line that had fouled the vessel's propeller. Ida E. Downer, his widow, brought this action against Aquamarine Operators, Inc., the owner and operator of the vessel. The case was filed in the 151st District Court of Harris County. Both Downer and Aquamarine are residents of Harris County, Texas.

Downer filed Notice of Intent to Take the Depositions of All Members of The Crew on June 1. The notice identified each crew member, including the captain, Chester P. Dalfrey, by name only. Downer also requested depositions of the immediate supervisor of Chester Dalfrey and the custodian of Edward Downer's personnel file. On June 1, Aquamarine notified Downer that the crew was at sea and would not appear. Aquamarine at that time agreed to produce the requested persons on June 22. On June 21, Aquamarine again notified Downer that the crew was at sea and would not appear. It agreed to produce them on July 5.

Downer filed written Notice of Intent to Take Depositions of the same individuals for July 5. On that date, the requested deponents did not appear, whereupon Downer filed a Motion for Sanctions. A hearing on the Motion for Sanctions was set for August 22. Aquamarine made no appearance at the hearing; the trial court granted the Motion for Sanctions and signed an Order Striking Aquamarine's Answer.

Downer filed a Motion for Interlocutory Default Judgment to which Aquamarine responded. The response contained Aquamarine's reasons for not producing the requested individuals for depositions and its failure to appear at the sanctions hearing.

The reason offered for the first two occasions was that work for the FOUR POINT IV was scarce and, when work was available, it was necessary to send the vessel and crew to sea rather than produce them for depositions. On the third occasion, the vessel was in port at New Iberia, Louisiana, but Coast Guard regulations required a skeleton crew to be kept aboard at all times. Aquamarine's attorney stated that he notified Downer's attorney on July 1 of the necessity to take the depositions in New Iberia. Downer's attorney stated that he first learned that the individuals would not appear as noticed when Aquamarine's attorney called him an hour after the depositions were scheduled to commence. Both agreed that Aquamarine requested that the depositions be taken in New Iberia on July 6. However, Downer's attorney stated that he could not do so because he was preferentially set for trial in Houston starting at 9:00 a.m. on July 6.

The reason given by Aquamarine for not ap-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 S.W.2d 238
**(Cite as: 701 S.W.2d 238)**

pearing at the sanctions hearing was that Hurricane Alicia had struck La Porte, the residence of Mr. Ayres, Aquamarine's lead counsel, four days previously. Mr. Ayres was involved in cleaning up after the hurricane and mitigating the damages to his home. Also, he had a hearing set in federal court in Beaumont on the following day and was directing all of his available attention to that matter.

To his Motion to Reconsider the Sanctions, Mr. Ayres attached an affidavit from his secretary, which stated that she had called the clerk of the court on July 7, and had advised her that Mr. Ayres had to make a docket call in Angleton on August 22. She understood the clerk to say that the sanctions hearing would be reset for September 6. In response to this motion, Downer's attorney advised the court by letter of his version of the circumstances leading up to the non-appearance on July 5, and the time when he was first advised **\*241** that the named individuals would not appear. Attached to this letter to the court was a copy of a letter dated July 28, written by Mr. Bales, an associate of Mr. Ayres, which confirmed that the sanctions hearing was set for August 22.

With the above information before it, the trial court overruled Aquamarine's Motion to Reconsider the Sanctions and to reinstate its answer. The court signed an order granting an interlocutory default judgment as to liability. Aquamarine filed a Motion to Set Aside the Default Judgment. The motion contained practically the same information as the Motion to Reconsider Sanctions set out above. The trial court considered this motion and overruled it. On April 16, 1984, the case was preferentially set for trial for June 4, and the trial court refused to consider Aquamarine's Second Motion to Set Aside the Interlocutory Default Judgment and Reinstate Defendant's Pleadings.

A jury trial was had in a different court, the 334th District, on the issue of damages. At the trial, Chester Dalfrey testified that he was captain of the FOUR POINT IV and as such he was in complete charge of the vessel with authority over all of its

operations. Mr. Clark Ivans testified that he was president of Aquamarine at all times pertinent to this case, and that as such, he was the immediate supervisor of Chester Dalfrey.

[1] We now address the issue of whether the trial court had authority under Rule 215a(c) to strike Aquamarine's answer. That rule stated in pertinent part:

If a party or an officer or managing agent of a party, except for good cause shown, fails to appear before the officer who is to take his oral deposition ... the court in which the action is pending on motion and notice may strike out all or any part of the pleading of that party or dismiss the action or proceeding or any part thereof....

As noted above, Ivans testified that as president of Aquamarine he was in complete charge of all operations of the company. Thus he was a party as contemplated by Rule 215a(c).

[2][3] The next question is whether the trial court, in refusing to grant a new trial and reinstate Aquamarine's answer, could consider the evidence introduced subsequent to the original sanctions hearing. Aquamarine contends that the trial court, in imposing sanctions, could consider only the evidence before it at the time of the sanctions hearing, and not any evidence subsequently produced. A trial court's plenary jurisdiction gives it not only the authority but the responsibility to review any pre-trial order upon proper motion. In doing so, it is presumed that the court is familiar with the entire record of the case up to and including the motion to be considered. The plenary jurisdiction of the trial court in this case continued through the final judgment and overruling of Aquamarine's motion for new trial. When considering the motion for new trial, the court had before it the reasons advanced by Aquamarine for not appearing for depositions or the sanctions hearing; Downer's response to Aquamarine's motions; and the evidence produced at the trial on damages. Thus, the court of appeals erred in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 S.W.2d 238
**(Cite as: 701 S.W.2d 238)**

holding that the trial court did not have authority under Rule 215a(c) to strike Aquamarine's answer.

We now turn to the court of appeals holding that the trial court abused its discretion in striking Aquamarine's answer. The court of appeals concluded its review of the abuse of discretion issue by stating: "The facts of the case simply do not, in our opinion, show this to be an appropriate case to impose the ultimate sanctions of striking the pleadings and entering default judgment." We interpret that statement to mean that the court of appeals disagreed with the decision of the two trial judges who reviewed the matter.

[4] The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action. Rather, it is a question of whether the court acted without reference to any guiding rules and **\*242** principles. *Craddock v. Sunshine Bus Lines,* 134 Tex. 388, 133 S.W.2d 124, 126 (Tex.Comm.App.—1939, opinion adopted). Another way of stating the test is whether the act was arbitrary or unreasonable. *Smithson v. Cessna Aircraft Co.,* 665 S.W.2d 439, 443 (Tex.1984); *Landry v. Travelers Insurance Co.,* 458 S.W.2d 649, 651 (Tex.1970). The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Southwestern Bell Telephone Co. v. Johnson,* 389 S.W.2d 645, 648 (Tex.1965); *Jones v. Strayhorn,* 159 Tex. 421, 321 S.W.2d 290, 295 (Tex.1959).

To determine the trial judge's guiding rules and principles in imposing sanctions for discovery abuse, we must look to the Texas Rules of Civil Procedure as promulgated and amended by this Court as well as the decisions of appellate courts of this State and of the United States. The Texas Rules of Civil Procedure pertaining to discovery and sanctions for noncompliance have been amended several times, culminating in Rule 215a as it existed at the time of this case, and now embodied in Rule 215. The use of sanctions by trial courts to prevent discovery abuse has developed steadily over the past several years. These changes reflect the continuing pattern both to broaden the discovery process and to encourage sanctions for failure to comply.

The United States Supreme Court in *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) approved the use of sanctions not only to assure compliance with the discovery process but also to deter those who might be tempted to abuse discovery in the absence of a deterrent.

This court and various courts of appeals have also followed this progression. *See, e.g., Dyson v. Olin Corp.,* 692 S.W.2d 456 (Tex.1985), (Kilgarlin, J., concurring) (unnamed witness not permitted to testify); *Jarrett v. Warhola,* 695 S.W.2d 8 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd), (plaintiff's cause of action dismissed); *City of Houston v. Arney,* 680 S.W.2d 867 (Tex.App.—Houston [1st Dist.] 1984, no writ) (defendant's answer struck for failure to answer interrogatories); *Southern Pacific Transportation v. Evans,* 590 S.W.2d 515 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) (defendant's answer struck and interlocutory default judgment rendered as to liability), *cert. denied,* 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (1980).

In various speeches and law review articles, different members of this court have encouraged trial judges to use sanctions to the degree necessary to assure compliance with discovery procedures and deter abuse of the process. Barrow and Henderson, *1984 Amendments to the Texas Rules of Civil Procedure Affecting Discovery,* 15 ST. MARY'S L.J. 713 (1984) (presented to the Texas College of the Judiciary Nov. 29, 1984); Kilgarlin and Jackson, *Sanctions for Discovery Abuse Under New Rule 215,* 15 ST. MARY'S L.J. 767 (1984); Pope and McConnico, *Practicing Law With the 1981 Texas Rules,* 32 BAYLOR L.REV. 457 (1981); Spears, *The Rules of Civil Procedure: 1981 Changes In*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 S.W.2d 238
**(Cite as: 701 S.W.2d 238)**

*Pretrial Discovery,* 12 ST. MARY'S L.J. 633 (1981).

The trial court in this case was free to examine the factors before it to determine whether to levy sanctions. Among these were the following: (1) whether voluntarily sending the crew to sea rather than producing them for depositions as agreed on two occasions was in conscious disregard of this court's rules; (2) whether the contradictory statements of both attorneys indicated that Aquamarine's attorney did in fact wait until one hour past the scheduled time for depositions on July 5, to advise Downer's attorney that he would have to fly to New Iberia and take depositions on the following day; (3) whether Aquamarine's attorney consciously disregarded the sanctions hearing in preference to his personal needs and the federal court case set the following day; (4) whether the information contained in the secretary's affidavit as to the date of the sanctions hearing conflicted with the letter from an attorney **\*243** in that law firm confirming that the hearing was set on August 22; and (5) the unexplained failure of Aquamarine to produce for depositions on any of the occasions in question Clark Ivans, the immediate supervisor of Chester Dalfrey and the president of Aquamarine.

[5] The record contains no indication that the trial court was capricious, arbitrary, or unreasonable. Thus, the court of appeals erred in holding that the trial court abused its discretion.

In determining whether to reverse and render this cause or to remand it to the court of appeals, we must look to the four points of error raised by Aquamarine before the court of appeals but not addressed by that court. If those points raise questions of law, as opposed to questions of fact, they can be addressed by this court.

The first point was that Downer's First Amended Original Petition was insufficient to support the judgment. The contention is that the facts supporting the cause of action were not pleaded. TEX.R.CIV.P. 47 requires that a petition contain a short statement of the cause of action sufficient to give fair notice of the claim involved. Our rules do not require pleadings to contain evidence or factual detail. That point is overruled.

[6] The second point was that the trial court improperly refused to strike a juror for cause. After the court had ruled on challenges for cause, there were 26 names left on the jury list. Each party was given six jury strikes, so, after making those strikes, 14 names remained on the list. The challenged juror was Number 14 and was thus a spare. There was no harm in refusing to dismiss him for cause.

[7] The third point was that the trial court improperly refused to admit evidence of Downer's contributory negligence. Contributory negligence is an affirmative defense which must be pleaded. Aquamarine's answer had been struck and default judgment rendered as to liability. Thus, defendant had no pleading to support contributory negligence, so the court did not err in refusing to admit the requested evidence.

[8] Aquamarine's remaining point before the court of appeals was that the trial court erred in awarding prejudgment interest in a Jones Act case tried to a jury. This point was not presented to the trial court and was thus waived.

Aquamarine's points of error presented to the court of appeals but not considered by that court concerned questions of law over which we have jurisdiction. There is no merit to these points so it is not necessary for this cause to be remanded to the court of appeals.

The judgment of the court of appeals is reversed and the judgment of the trial court is affirmed.

Tex.,1985.
Downer v. Aquamarine Operators, Inc.
701 S.W.2d 238

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Supreme Court of Texas.
George FLORES, Relator,
v.
The FOURTH COURT OF APPEALS, Respondent.

No. C–7815.
June 28, 1989.
Rehearing Denied Oct. 11, 1989.

Claimant brought writ of mandamus to compel vacation of order of Court of Appeals, 751 S.W.2d 551, directing trial court to vacate order requiring city to produce accident report in workers' compensation suit. The Supreme Court, Mauzy, J., held that: (1) report was not protected by party communications privilege, and (2) trial court was within its authority in ordering discovery of report.

Writ issued with conditions.

Gonzales, J., dissented and filed opinion in which Phillips, C.J., and Cook, J., joined.

West Headnotes

**[1] Administrative Law and Procedure 15A 466**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(D) Hearings and Adjudications
            15Ak466 k. Discovery. Most Cited Cases

**Workers' Compensation 413 1703.5**

413 Workers' Compensation
    413XVI Proceedings to Secure Compensation
        413XVI(P) Hearing or Trial
            413XVI(P)2 Production and Reception of Evidence and Examination of Witnesses
                413k1703.5 k. Privileges. Most Cited Cases

(Formerly 413k1167)

Term "litigation," as used in rule governing party communications privilege, refers only to court proceedings and does not encompass proceedings before Industrial Accident Board. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 3, par. d.

**[2] Pretrial Procedure 307A 35**

307A Pretrial Procedure
    307AII Depositions and Discovery
        307AII(A) Discovery in General
            307Ak35 k. Work-Product Privilege. Most Cited Cases

(Formerly 307Ak33)

Determination of whether there is good cause to believe suit will be filed, so that investigation is done in anticipation of litigation for purposes of party communication privilege, requires consideration of outward manifestations which indicate litigation is imminent, and consideration of whether party opposing discovery had a good-faith belief that litigation would ensue. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 3, par. d.

**[3] Administrative Law and Procedure 15A 466**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(D) Hearings and Adjudications
            15Ak466 k. Discovery. Most Cited Cases

**Workers' Compensation 413 1703.5**

413 Workers' Compensation
    413XVI Proceedings to Secure Compensation
        413XVI(P) Hearing or Trial
            413XVI(P)2 Production and Reception of Evidence and Examination of Witnesses
                413k1703.5 k. Privileges. Most Cited Cases

(Formerly 413k1167)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

777 S.W.2d 38
**(Cite as: 777 S.W.2d 38)**

Report relating to workers' compensation claim, of kind prepared in every case set for prehearing conference before Industrial Accident Board, was prepared in usual and customary course of business and not in preparation of litigation, and therefore was not protected by party communications privilege. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 3, par. d.

**[4] Workers' Compensation 413 ☞1167**

413 Workers' Compensation
    413XVI Proceedings to Secure Compensation
        413XVI(A) In General
            413k1167 k. Proceedings Before Boards, Commissions, or Arbitrators. Most Cited Cases
District court was within its authority in ordering production of investigative report prepared after notice of injury was filed with Industrial Accident Board but before appeal to a district court. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 3, par. d.

**\*38** Roy D. Quillian, III, Susan Stone, San Antonio, for relator.

Charles S. Frigerio, Hector X. Saenz, San Antonio, for respondent.

MAUZY, Justice.
At issue in this mandamus proceeding is whether the trial court in the underlying workers' compensation case abused its discretion by ordering the production of an investigative report prepared after notice of injury was filed with the Industrial Accident Board but before an appeal to a district court. The Court of Appeals for the Fourth District of Texas held that the trial court abused its discretion and that the information obtained in the post-accident investigation was privileged under rule 166b(3)(d) of the Texas Rules of Civil Procedure. The court of appeals directed the trial court to vacate its order. 751 S.W.2d 551. Relator George Flores seeks mandamus from this court directing the court of appeals to vacate its order. Because we

hold that the trial court did not abuse its discretion, we conditionally grant the writ of mandamus.

**\*39** In the underlying action, Flores filed a workers' compensation suit against the City of San Antonio, which is selfinsured. As part of his pretrial discovery, he propounded a set of interrogatories and requests for production of documents to the City. The City objected to two interrogatories and a request for production that sought discovery of any investigations conducted by or on behalf of the City after Flores' injury. The City asserted that such investigations were privileged under rule 166b(3)(d). Flores filed a motion to compel answers to the interrogatories and request for production, and the City responded by filing a motion for protective order.

The judge of the 73rd District Court of Bexar County conducted a hearing on both motions which included an in camera inspection of the documents and testimony from George Vasill, a claims supervisor employed by an independent adjusting firm hired by the City. Vasill had become involved in the case after Flores filed his claim for compensation with the Industrial Accident Board. After investigating Flores' claim, he filed a prehearing report.

The trial judge granted Flores' motion to compel and ordered that the prehearing report prepared by Vasill be produced. The City petitioned the Fourth Court of Appeals for a writ of mandamus which was conditionally granted. Flores now seeks a writ of mandamus in this court contending that the court of appeals abused its discretion by granting the City's writ and ordering the trial court to vacate its order.

Rule 166b(3)(d) sets out the party communications privilege.[FN1] At the heart of the controversy is the language in the rule which states that a communication is privileged if it is prepared "in anticipation of the prosecution or defense of the claims made a part of the pending litigation." Tex.R.Civ.P. 166b(3)(d). The City claims that the report prepared

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

by Vasill is privileged because it was prepared in anticipation of litigation.

> FN1. Rule 166b(3)(d) states:
>
> 3. Exemptions. The following matters are protected from disclosure by privilege:
>
> ....
>
> d. Party Communications. With the exception of discoverable communications prepared by or for experts, and other discoverable communications, between agents or representatives or the employees of a party to the action or communications between a party and that party's agents, representatives or employees, when made subsequent to the occurrence or transaction upon which the suit is based, and in anticipation of the prosecution or defense of the claims made a part of the pending litigation. For the purpose of this paragraph, a photograph is not a communication.
>
> Tex.R.Civ.P. 166b(3)(d).

The City, as the party resisting discovery, has the burden of producing evidence to establish the privilege. *McKinney v. National Union Fire Ins. Co.,* 772 S.W.2d 72 (Tex.1989); *Turbodyne Corp. v. Heard,* 720 S.W.2d 802, 804 (Tex.1986); *Giffin v. Smith,* 688 S.W.2d 112, 114 (Tex.1985). The City can only invoke the privilege if Vasill prepared the report after there was good cause to believe suit would be filed or after the institution of a lawsuit. *Stringer v. Eleventh Court of Appeals,* 720 S.W.2d 801, 802 (Tex.1986); *Allen v. Humphreys,* 559 S.W.2d 798, 802 (Tex.1977).

The first inquiry is whether filing a notice of claim for workers' compensation commences litigation. The City contends that when a worker files a claim for compensation with the Industrial Accident Board litigation has commenced. The court of

appeals agreed, and accordingly held that litigation commenced when Flores filed his claim for compensation, and that the report subsequently prepared was privileged. 751 S.W.2d at 554.

[1] The court of appeals also held that the terms "litigation," "suit," and "lawsuit," as used in rule 166b(3)(d), encompassed proceedings before the Industrial Accident Board and thus extended the definition of litigation to include proceedings before an administrative agency having quasi-judicial powers and employing quasi-judicial procedures. FN2 *Id.* We cannot sanction**\*40** this expansive definition. Therefore, we hold that the term "litigation" refers only to court proceedings, which in this case commenced when Flores filed suit in the district court. FN3 Other states have recognized that a proceeding before workers' compensation agencies does not constitute litigation. *Bearns v. Department of Indus., Labor & Human Relations,* 102 Wis.2d 70, 306 N.W.2d 22 (1981) (litigation refers only to proceedings after the filing of a petition in district court); *Kochinsky v. Independent Pier Co.,* 157 Pa.Super. 15, 41 A.2d 409 (1945) (proceedings before the workers' compensation agency are not litigation).

> FN2. As support for its definition of litigation, the court of appeals cites to G. & C. Merriam Co., *Webster's Third New International Dictionary* 1322 (1961) which defines "litigation" as "a controversy involving adverse parties before an executive governmental agency having quasi-judicial powers and employing quasi-judicial procedures." However, *Black's Law Dictionary* 814 (5th ed. 1979) defines litigation as "[a] lawsuit. Legal action, including all proceedings therein. Contest in a court of law for the purpose of enforcing a right or seeking a remedy. A judicial contest, a judicial controversy, a suit at law."
>
> FN3. Rule 166b(3)(e) states:
>
> 3. Exemptions. The following matters

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

777 S.W.2d 38
**(Cite as: 777 S.W.2d 38)**

are protected from disclosure by privilege:

....

e. Other Privileged Information. Any matter protected from disclosure by any other privilege.

Upon a showing that the party seeking discovery has substantial need of the materials and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means, a party may obtain discovery of the materials otherwise exempted from discovery by subparagraphs c and d of this paragraph 3. Nothing in this paragraph 3 shall be construed to render non-discoverable the identity and location of any potential party, any person having knowledge of relevant facts, any expert who is expected to be called as a witness in the action, or of any consulting expert whose opinions or impressions have been reviewed by a testifying expert.

Tex.R.Civ.P. 166b(3)(e).

Based upon the theory that in *State v. Thomas, 766 S.W.2d 217 (Tex.1989)*, we elevated a "contested case" before a utility rate agency to the level of an action "in the courts," the dissent concludes that proceedings before the Industrial Accident Board constitute litigation. This analysis is severely flawed. Unlike the Public Utility Commission, the Industrial Accident Board is not an agency which determines "contested cases" within the meaning of the Administrative Procedure and Texas Register Act. Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 3(1) (Vernon Supp.1989).

Our holding, that proceedings before the Industrial Accident Board do not constitute litigation, does not conflict with our holding in *Thomas. Thomas* did not address discovery or when litiga-

tion commences, but concerned the issue of whether the attorney general could intervene in utility rate cases before the Public Utility Commission.

Judicial review of a workers' compensation case is vastly different from a utility rate case. A workers' compensation claim differs from other matters considered by administrative agencies because the Industrial Accident Board is a "way station" a party must pass through to reach the trial court. Either party, including the City as a self-insured entity, can appeal the board's award and demand a trial by jury.

A party or intervenor appealing from an adverse decision of the Public Utility Commission is *only* entitled to a review under the substantial evidence rule. It may *not* remake the record at the trial court level and cannot contest issues of fact found by the Commission. Tex.Rev.Civ.Stat.Ann. art. 1446c, § 69 (Vernon Supp.1989); Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19 (Vernon Supp.1989); *see Railroad Comm'n v. Entex, Inc., 599 S.W.2d 292 (Tex.1980)*. In contrast, a party appealing an Industrial Accident Board award is not bound by the record made at the agency level and can make a new record at the trial court level, where the jury determines contested issues of fact. Tex.Rev.Civ.Stat.Ann. art. 8307, § 5 (Vernon Supp.1989).

[2] Since we have concluded that litigation did not commence when Flores' filed his notice of claim, the next inquiry is whether the report was prepared in anticipation of litigation. Determining whether there is good cause to believe a suit will be filed, so that an investigation is done in anticipation of litigation, requires a two-prong analysis. The first prong requires **\*41** an objective examination of the facts surrounding the investigation. Consideration should be given to outward manifestations which indicate litigation is imminent. The second prong utilizes a subjective approach. Did the party opposing discovery have a good faith belief that litigation would ensue? There cannot be good cause to believe a suit will be filed unless elements of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

both prongs are present. Looking at the totality of the circumstances surrounding the investigation, the trial court must then determine if the investigation was done in anticipation of litigation. Unless there is an abuse of discretion, the trial court's ruling should not be disturbed.

[3] In the present case, the report was printed on a standard form and contained the following information: (1) whether there was a question of coverage, claimant's employment, compensable injury, whether the injury occurred in the course and scope of employment; (2) the average weekly wage on the date of the accident; (3) amount of temporary total disability paid claimant; (4) any advance payments; (5) whether the claim had been previously heard at a prehearing conference; (6) summary of medical findings; (7) whether claimant had returned to work; (8) calculations of the claimant's injuries; (9) current indemnity reserves; (10) attorney for the claimant; and (11) claims examiner.

During the hearing on the City's motion for protective order, Vasill testified that it was usual and customary to prepare such a report and that this was done in every case that was set for a prehearing conference. Other than his own conclusion that litigation would ensue, he observed no outward manifestation of litigation until he received the notice of intention to appeal. Flores' counsel stated he sought only statements that dealt with the facts of the case and that he was not interested in any evaluations made by Vasill or the indemnity reserves. The City made no specific attempt to protect the indemnity reserves from disclosure.

From the circumstances surrounding its preparation, this report was clearly prepared in the usual and customary course of business. Vasill's subjective conclusion that Flores would file suit was unsupported by any objective indications that litigation was imminent; in fact, Vasill himself testified there were no outward manifestations of litigation.

We have previously recognized that "[t]he discretion exercised by a trial court when ruling on an interlocutory matter is ordinarily quite broad, whereas the discretion exercised by an appellate court possessing mandamus power is much more confined." *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985). A writ of mandamus is only issued to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no adequate remedy by appeal. *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984). The court of appeals abuses its discretion when it grants relief absent these circumstances. *Johnson,* 700 S.W.2d at 917.

By contrast, a trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable that it results in a clear and prejudical error of law. The relator must establish that the law and the facts of the case only allow the trial court to reach one decision, since mandamus will not issue to control the action of a trial court in a matter involving discretion. *Johnson,* 700 S.W.2d at 917.

[4] To determine whether the court of appeals abused its discretion we must make an independent inquiry as to whether the trial court's order was so arbitrary and unreasonable that it resulted in a clear and prejudical error of law. If determination of the matter lies within the discretion of the trial court, its ruling will not be disturbed unless there has been a clear abuse of discretion. *Johnson,* 700 S.W.2d at 917.

The scope of discovery and the admission of evidence is principally within the discretion of the trial court. *Ginsberg v. Fifth Court of Appeals,* 686 S.W.2d 105, 108 (Tex.1985). In the present case, the trial judge held a hearing on the City's motion for protective order and an in camera inspection pursuant to rule 166b(4) of the Texas Rules of Civil Procedure. Tex.R.Civ.P. 166b(4); *see* **\*42***Peeples v. Honorable Fourth Supreme Judicial Dist.,* 701 S.W.2d 635 (Tex.1985). Our review of the record reveals that the trial court did not reach a decision "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Johnson,* 700 S.W.2d at 917. The trial court was properly within

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

777 S.W.2d 38
**(Cite as: 777 S.W.2d 38)**

its discretion when it deemed the investigative report discoverable. Accordingly, we hold that the trial court did not abuse its discretion by granting Flores' motion to compel and ordering the prehearing report be produced.

Besides an absence of abuse of discretion, we have another reason to uphold the trial court's ruling. In 1988 rule 166b(3)(e) was amended; a sentence was added to allow one seeking information that was otherwise privileged under rule 166b(3)(d), to obtain such discovery by showing that party's substantial need for materials and inability without undue hardship to obtain the substantial equivalent of the materials by other means. Although not addressed by the parties and often overlooked by those seeking discovery of privileged materials, section (3)(e) is the proper vehicle to alleviate much of the bench's and bar's struggle over what investigations will be deemed in anticipation of litigation.

Similarly, under rule 26(b)(3) of the Federal Rules of Civil Procedure, [FN4] a party may obtain discovery of documents and tangible things prepared in anticipation of litigation upon a showing of both substantial need and an inability absent undue hardship to obtain the substantial equivalent from other means. This rule also directs the court to "protect against disclosure of mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party." The utilization of this rule in the federal courts has greatly furthered the purpose of discovery—to prevent trial by ambush. In Texas, the bar could be similarly well-served by utilizing section (3)(e) during discovery.

FN4. Rule 26(b)(3) states:

(b) Discovery Scope and Limits. Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

....

(3) Trial Preparation: Materials. Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

A party may obtain without the required showing a statement concerning the action or its subject matter previously made by that party. Upon request, a person not a party may obtain without the required showing a statement concerning the action or its subject matter previously made by that person. If the request is refused, the person may move for a court order. The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion. For purposes of this paragraph, a statement previously made is (A) a written statement signed or otherwise adopted or approved by the person making it, or (B) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement by the person

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

making it and contemporaneously recorded.

Fed.R.Civ.P. 26(b)(3).

For the above reasons, we hold that the trial court's ruling should not have been disturbed and that the court of appeals abused its discretion by granting the City's writ and ordering the trial court to vacate its order. We conditionally grant Flores' petition for writ of mandamus. The writ will issue only if the court of appeals refuses to rescind its order.

GONZALEZ, J., files a dissenting opinion in which PHILLIPS, C.J., and COOK, J., join.

GONZALEZ, Justice, dissenting.

Ordinarily, I would agree with any decision of this court according greater deference to trial courts in pre-trial matters. *See e.g., Loftin v. Martin,* 776 S.W.2d 145 (Tex.1989) (Hecht, J., dissenting). However,**\*43** under the peculiar facts of this case, the court should not hide behind a false deference to judicial discretion, but should announce a simple rule which most parties can understand and follow. By failing to propound such a rule, the court has left both the bench and the bar adrift. In order to reduce the hemorrhaging of delay, uncertainty, and expense in this muddled area of the law, I would adopt a bright line rule in cases where an agency determination must precede litigation and hold that the filing of a claim with the agency constitutes commencement of litigation. Because I agree with the court of appeals that litigation commenced when Flores filed his workers' compensation claim, I would deny the writ of mandamus.

George Flores appealed the Industrial Accident Board's (IAB) ruling of his workers' compensation claim in district court. He served his employer, the City of San Antonio, with interrogatories and a request for production seeking discovery of any investigations conducted by or on behalf of the City subsequent to Flores' injury. The trial court granted a motion for a protective order filed by the City re-garding documents the City claimed were privileged, with the exception of one document entitled, "Pre–Hearing Conference Preliminary Report." The pre-hearing report had been prepared by a claims supervisor *after* Flores filed his workers' compensation claim to the IAB and it contained, among other things, information regarding the indemnity reserves.

The City successfully sought a writ of mandamus to the court of appeals to compel the trial court to vacate part of the order compelling discovery of the pre-hearing report. For the following reasons, I agree that the report was privileged information and therefore warranted the shield of a protective order.

The party communications privilege is embodied in Tex.R.Civ.P. 166b(3)(d), which provides:

3. Exemptions. The following matters are protected from disclosure by privilege:

d. *Party Communications*. With the exception of discoverable communications prepared by or for experts, and other discoverable communications, between agents or representatives or the employees of a party to the action or communications between a party and that party's agents, representatives or employees, when made subsequent to the occurrence or transaction upon which the suit is based, and in anticipation of the prosecution or defense of the claims made a part of the pending litigation. For the purpose of this paragraph, a photograph is not a communication.

It is undisputed that the report is a communication between representatives of the City and was prepared subsequent to Flores' injury which gave rise to this suit. However, there is a dispute as to whether the report was prepared in anticipation of litigation. This privilege protects "[o]nly information obtained by a party after there is good cause to believe a suit will be filed or after the institution of a lawsuit." *Stringer v. Eleventh Court of Appeals,* 720 S.W.2d 801, 802 (Tex.1986); *see also Turbodyne Corp. v. Heard,* 720 S.W.2d 802, 804

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

777 S.W.2d 38
**(Cite as: 777 S.W.2d 38)**

(Tex.1986).FN1

> FN1. This is not the first time this court has had difficulty in determining when a communication is made in connection with anticipation of litigation. We have been criticized, and rightfully so, that when there is a collision between two freight trains of different railroads resulting in serious injury or death, any "fool" would know that a suit would be filed. *Stringer* and *Turbodyne,* were per curiam opinions, and up to now, our court has not allowed dissents in per curiam opinions.

Flores contends that the report is not privileged because it was made prior to his filing suit in district court, and therefore, was not in anticipation of litigation. The report was made after the workers' compensation claim was filed. Although the IAB is not a court, it nonetheless entertains formal adjudicative proceedings in which it performs quasi-judicial functions. *Vestal v. Texas Employers' Ins. Ass'n,* 285 S.W. 1041, 1044 (Tex. Comm'n App.1926, judgm't adopted); *Moore v. Means,* 549 S.W.2d 417, 418 (Tex.Civ.App.—Beaumont 1977, writ ref'd n.r.e.). The IAB may order **\*44** claimants to submit to physical examinations, subpoena witnesses, administer oaths, inquire into matters of fact and punish for contempt in the same manner and to the same degree as a district court. Tex.Rev.Civ.Stat.Ann. art. 8307, § 4 (Vernon Supp.1988). Therefore, in light of these functions, I agree with the court of appeals that the term "litigation" contemplated by Rule 166b(3)(d) should be read to encompass proceedings before the IAB. This conclusion is consistent with this court's recent holding in *State v. Thomas,* 766 S.W.2d 217, 219 (Tex.1989), wherein the court equated a "contested case" to being the same as an action "in the courts," thereby allowing the Attorney General to intervene under its constitutional authority to take action "in the courts." Thus, I would hold that the filing of a claim with the IAB constitutes the commencement of a lawsuit. Therefore, the pre-hearing report was privileged and it was not within the discretion of the trial court to order its production.

Also, the two-prong analysis suggested by the court is unworkable. How can a party establish or a trial court decide whether an investigation made prior to an IAB award was made "with good cause to believe" that the claim would later proceed to litigation? It is no longer enough for a party to establish this in his or her own state of mind with regards to another party's conduct, which was difficult enough. To succeed, a party must now not only demonstrate that it possessed clairvoyant knowledge of the IAB's future reaction to the claim and the parties response to that reaction (subjective approach), but it must also demonstrate how others in the same or similar circumstances would react to the claim (objective approach). I submit that today's decision requires litigants and judges to accomplish the impossible.

For the above reasons, I dissent.

PHILLIPS, C.J. and COOK, J., join in this dissenting opinion.

Tex.,1989.
Flores v. Fourth Court of Appeals
777 S.W.2d 38

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

395 S.W.3d 884
**(Cite as: 395 S.W.3d 884)**



Court of Appeals of Texas,
Austin.
Richard HEBERT and Janet Hebert, Appellants
v.
Timothy E. HOPKINS, M.D., and Shannon Clinic,
Appellees.

No. 03–11–00419–CV.
March 1, 2013.

**Background:** Patient filed health care liability claim (HCLC) against neurosurgeon and clinic in connection with spinal-fracture surgery that purportedly rendered patient a quadriparetic. The District Court, Tom Green County, 391st Judicial District, Thomas J. Gossett, J., dismissed claim after concluding patient had failed to serve an expert report meeting statutory requirements. Patient appealed.

**Holdings:** The Court of Appeals, Bob Pemberton, J., held that:
(1) trial court did not abuse its discretion in concluding that patient's expert report did not adequately describe standard of care or alleged breach thereof;
(2) statutory requirements applicable to expert reports in support of HCLCs were rationally related to legitimate state purpose and therefore did not violate equal protection based on disparate treatment of health care liability claimants and other litigants;
(3) those requirements did not violate separation-of-powers principles; and
(4) patient failed to demonstrate that those requirements, as applied to him, violated open-courts provision of Texas constitution.

Affirmed.

J. Woodfin Jones, C.J., filed a dissenting opinion

West Headnotes

**[1] Health 198H ⚷804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
    To constitute a "good faith effort" to comply with statutory definition of the expert report required for a health care liability claim (HCLC), the report must include the expert's opinion on each of the three main elements, i.e., standard of care, breach, and causation, and must provide enough information to fulfill two purposes with respect to each element: (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351(*l*), (r)(6).

**[2] Health 198H ⚷804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
    Although statutory provisions relating to the adequacy of an expert report served in support of health care liability claim (HCLC) do not require a plaintiff to marshal all of his or her proof or to present expert testimony in a form that would be admissible at trial, they do necessitate that the expert must explain the basis for his statements to link his conclusions to the facts and not merely state conclusions. V.T.C.A., Civil Practice & Remedies Code § 74.351(*l*), (r)(6).

**[3] Appeal and Error 30 ⚷1024.1**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

30 Appeal and Error

    30XVI Review

        30XVI(I) Questions of Fact, Verdicts, and Findings

           30XVI(I)6 Questions of Fact on Motions or Other Interlocutory or Special Proceedings

                30k1024.1 k. In general. Most Cited Cases

**Health 198H ☞804**

198H Health

    198HV Malpractice, Negligence, or Breach of Duty

        198HV(G) Actions and Proceedings

        198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

The only information relevant to determining whether an expert report served in support of a health care liability claim (HCLC) complies with statutory requirements as to adequacy is that contained within "the four corners" of the report itself, and, consequently, neither the trial court nor the appellate court may infer additional opinions or underlying facts to fill in gaps that the report itself leaves open. V.T.C.A., Civil Practice & Remedies Code § 74.351(*l*), (r)(6).

**[4] Appeal and Error 30 ☞960(1)**

30 Appeal and Error

    30XVI Review

        30XVI(H) Discretion of Lower Court

        30k960 Rulings on Motions Relating to Pleadings

           30k960(1) k. In general. Most Cited Cases

The Court of Appeals reviews for abuse of discretion a trial court's determination as to whether an expert report served in support of a health care liability claim (HCLC) meets statutory requirements for adequacy. V.T.C.A., Civil Practice & Remedies Code § 74.351(*l*), (r)(6).

**[5] Health 198H ☞804**

198H Health

    198HV Malpractice, Negligence, or Breach of Duty

        198HV(G) Actions and Proceedings

        198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Trial court did not abuse its discretion, when dismissing health care liability claim (HCLC) against neurosurgeon for spinal-fracture surgery that purportedly rendered patient a quadriparetic, in concluding that patient's expert report did not adequately describe standard of care or alleged breach thereof; while report suggested anterior-only plate/screw fixation was inconsistent with standard of care, it also stated there could be "clinical situations" in which anterior-only fixation and supplemental protection such as external braces or activity limits would meet standard of care, and it did not address whether neurosurgeon met the standard through use of such supplemental protection. V.T.C.A., Civil Practice & Remedies Code § 74.351(*l*), (r)(6).

**[6] Appeal and Error 30 ☞333**

30 Appeal and Error

    30VI Parties

        30k331 Death

        30k333 k. Pending appeal or writ of error. Most Cited Cases

Appellate court would address argument, asserted by patient and his wife on appeal from dismissal of their health care liability claim (HCLC) for failure to serve adequate expert report, that statutory requirements relating to expert reports in support of an HCLC violated state constitution's open-courts provision as applied to patient, though his death during pendency of claim may have terminated his open-courts claim, as substance of open-courts argument implicated due-process and due-course-of-law concerns also raised on appeal. U.S.C.A. Const.Amend. 14; Vernon's Ann.Texas Const. Art. 1, §§ 13, 19; V.T.C.A., Civil Practice & Remedies Code § 74.351(*l*), (r)(6).

**[7] Constitutional Law 92 ☞2314**

395 S.W.3d 884
**(Cite as: 395 S.W.3d 884)**

92 Constitutional Law
    92XIX Rights to Open Courts, Remedies, and Justice
        92k2313 Conditions, Limitations, and Other Restrictions on Access and Remedies
            92k2314 k. In general. Most Cited Cases

Wrongful-death and survival claimants cannot establish an open-courts violation because they have no common law right to bring either claim. Vernon's Ann.Texas Const. Art. 1, § 13.

**[8] Constitutional Law 92 ☞3847**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(A) In General
            92k3847 k. Relationship to other constitutions. Most Cited Cases

While the Texas constitution is textually different from federal constitution in that it refers to "due course" rather than "due process," Texas courts regard those terms as without substantive distinction unless and until a party demonstrates otherwise. U.S.C.A. Const.Amend. 14; Vernon's Ann.Texas Const. Art. 1, § 19.

**[9] Constitutional Law 92 ☞3754**

92 Constitutional Law
    92XXVI Equal Protection
        92XXVI(E) Particular Issues and Applications
            92XXVI(E)17 Tort or Financial Liabilities
                92k3750 Personal Injuries
                    92k3754 k. Medical malpractice. Most Cited Cases

**Constitutional Law 92 ☞4422**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)19 Tort or Financial Liabilities

92k4418 Torts and Personal Injuries
    92k4422 k. Professional malpractice. Most Cited Cases

Statutory requirements for expert reports in support of health care liability claims (HCLCs), as challenged on due process and equal protection grounds, would be evaluated to determine whether those requirements bore a rational relationship to a legitimate state interest and whether legislature had a rational basis in differentiating between health care liability claimants and other litigants; requirements did not impinge on a fundamental or important right, and they were facially neutral and applied to any party asserting an HCLC. U.S.C.A. Const.Amend. 14; Vernon's Ann.Texas Const. Art. 1, § 19; V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[10] Constitutional Law 92 ☞3877**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and Deprivations Prohibited in General
            92k3877 k. Reasonableness, rationality, and relationship to object. Most Cited Cases

Under federal and state guarantees of due process, legislation that does not affect a fundamental right or interest is valid if it bears a rational relationship to a legitimate state interest. U.S.C.A. Const.Amend. 14; Vernon's Ann.Texas Const. Art. 1, § 19.

**[11] Constitutional Law 92 ☞3053**

92 Constitutional Law
    92XXVI Equal Protection
        92XXVI(A) In General
            92XXVI(A)6 Levels of Scrutiny
                92k3052 Rational Basis Standard; Reasonableness
                    92k3053 k. In general. Most Cited Cases

Constitutional guarantee of equal protection requires only that disparate treatment of different classifications be rationally related to a legitimate

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

395 S.W.3d 884
**(Cite as: 395 S.W.3d 884)**

state purpose, unless the classification impinges on the exercise of a fundamental right or distinguishes between people on a "suspect" basis, such as race or national origin. U.S.C.A. Const.Amend. 14.

**[12] Constitutional Law 92 ☞3062**

92 Constitutional Law
   92XXVI Equal Protection
     92XXVI(A) In General
       92XXVI(A)6 Levels of Scrutiny
        92k3059 Heightened Levels of Scrutiny
         92k3062 k. Strict scrutiny and compelling interest in general. Most Cited Cases

Classifications that impinge upon the exercise of a fundamental right or distinguish between people on a suspect basis, i.e., race, national origin, and alienage, are subject to strict scrutiny on an equal protection challenge and will be sustained only if they are suitably tailored to serve a compelling state interest. U.S.C.A. Const.Amend. 14.

**[13] Constitutional Law 92 ☞3061**

92 Constitutional Law
   92XXVI Equal Protection
     92XXVI(A) In General
       92XXVI(A)6 Levels of Scrutiny
        92k3059 Heightened Levels of Scrutiny
         92k3061 k. Intermediate scrutiny in general. Most Cited Cases

When a statute burdens a sensitive class or impinges on an important right, the statute is subject on an equal protection challenge to an intermediate level of scrutiny, which requires a showing that the statute is substantially related to an important state interest. U.S.C.A. Const.Amend. 14.

**[14] Constitutional Law 92 ☞3754**

92 Constitutional Law
   92XXVI Equal Protection
     92XXVI(E) Particular Issues and Applications
       92XXVI(E)17 Tort or Financial Liabilities
        92k3750 Personal Injuries
         92k3754 k. Medical malpractice. Most Cited Cases

**Health 198H ☞604**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
     198HV(A) In General
       198Hk601 Constitutional and Statutory Provisions
        198Hk604 k. Validity. Most Cited Cases

Statutory requirements applicable to expert reports in support of health care liability claims (HCLCs) were rationally related to legitimate state purpose of ensuring that medical practitioners were not being placed in the situation of defending frivolous claims at a high cost to the health care system and therefore did not violate equal protection based on disparate treatment of health care liability claimants and other litigants. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[15] Constitutional Law 92 ☞3057**

92 Constitutional Law
   92XXVI Equal Protection
     92XXVI(A) In General
       92XXVI(A)6 Levels of Scrutiny
        92k3052 Rational Basis Standard; Reasonableness
         92k3057 k. Statutes and other written regulations and rules. Most Cited Cases

**Constitutional Law 92 ☞3877**

92 Constitutional Law
   92XXVII Due Process
     92XXVII(B) Protections Provided and Deprivations Prohibited in General
       92k3877 k. Reasonableness, rationality,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

395 S.W.3d 884
**(Cite as: 395 S.W.3d 884)**

and relationship to object. Most Cited Cases

It is not a court's place to question the legislature's policy decisions when conducting a rational basis review of a statute challenged on due process or equal protection grounds. U.S.C.A. Const.Amend. 14; Vernon's Ann.Texas Const. Art. 1, § 19.

**[16] Constitutional Law 92 ⚷2357**

92 Constitutional Law
    92XX Separation of Powers
        92XX(B) Legislative Powers and Functions
            92XX(B)2 Encroachment on Judiciary
                92k2357 k. Remedies and procedure in general. Most Cited Cases

**Constitutional Law 92 ⚷2380**

92 Constitutional Law
    92XX Separation of Powers
        92XX(B) Legislative Powers and Functions
            92XX(B)2 Encroachment on Judiciary
            92k2377 Costs and Fees
                92k2380 k. Attorney fees. Most Cited Cases

**Costs 102 ⚷194.48**

102 Costs
    102VIII Attorney Fees
        102k194.48 k. On dismissal, nonsuit, default, or settlement. Most Cited Cases

**Health 198H ⚷604**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(A) In General
            198Hk601 Constitutional and Statutory Provisions
                198Hk604 k. Validity. Most Cited Cases

Statutory requirements concerning adequacy and timely service of expert reports in support of health care liability claims (HCLCs), and requiring an award of attorney fees upon dismissal for non-compliance, did not violate separation-of-powers principles; they imposed a threshold procedural requirement aimed at filtering out meritless or premature lawsuits from proceeding until a claimant made a good-faith effort to demonstrate that at least one expert believes that a breach of applicable standard of care caused claimed injury, and courts retained judicial power to determine whether a timely served report was adequate in that regard and to render a decision accordingly. Vernon's Ann.Texas Const. Art. 2, § 1, Art. 5, § 1; V.T.C.A., Civil Practice & Remedies Code § 74.351(a-c), (*l*), (r)(6).

**[17] Constitutional Law 92 ⚷2350**

92 Constitutional Law
    92XX Separation of Powers
        92XX(B) Legislative Powers and Functions
            92XX(B)2 Encroachment on Judiciary
                92k2350 k. In general. Most Cited Cases

**Constitutional Law 92 ⚷2623**

92 Constitutional Law
    92XX Separation of Powers
        92XX(D) Executive Powers and Functions
            92k2622 Encroachment on Judiciary
                92k2623 k. In general. Most Cited Cases

Only when the executive or legislative branch interferes with the functioning of the judicial process in a field constitutionally committed to the control of the courts does a constitutional separation-of-powers problem arise. Vernon's Ann.Texas Const. Art. 2, § 1, Art. 5, § 1.

**[18] Constitutional Law 92 ⚷2314**

92 Constitutional Law
    92XIX Rights to Open Courts, Remedies, and Justice
        92k2313 Conditions, Limitations, and Other Restrictions on Access and Remedies
            92k2314 k. In general. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

395 S.W.3d 884
**(Cite as: 395 S.W.3d 884)**

**Health 198H ⛝604**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(A) In General
            198Hk601 Constitutional and Statutory Provisions
                198Hk604 k. Validity. Most Cited Cases

Patient whose health care liability claim (HCLC) against neurosurgeon was dismissed for noncompliance with statutory requirements governing expert reports failed to demonstrate that those requirements, as applied to him, violated open-courts provision of Texas constitution; patient did not prove how the statutory provisions, as opposed to his own failure to provide an adequate report, prevented him from pursuing his claims, or show that expert-report requirement was unreasonable or arbitrary when balanced with purpose of ensuring that medical practitioners were not being placed in the situation of defending frivolous claims at a high cost to the health care system. Vernon's Ann.Texas Const. Art. 1, § 13; V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[19] Constitutional Law 92 ⛝2315**

92 Constitutional Law
    92XIX Rights to Open Courts, Remedies, and Justice
        92k2313 Conditions, Limitations, and Other Restrictions on Access and Remedies
            92k2315 k. Time for proceedings. Most Cited Cases

Open-courts provision of Texas constitution protects a person from having his or her right to sue cut off by a legislative act before the individual has been afforded a reasonable opportunity to discover the wrong and bring suit. Vernon's Ann.Texas Const. Art. 1, § 13.

**[20] Constitutional Law 92 ⛝2314**

92 Constitutional Law

    92XIX Rights to Open Courts, Remedies, and Justice
        92k2313 Conditions, Limitations, and Other Restrictions on Access and Remedies
            92k2314 k. In general. Most Cited Cases

Open-courts provision of Texas constitution is premised on the rationale that the legislature has no power to make a remedy by due course of law contingent upon an impossible condition. Vernon's Ann.Texas Const. Art. 1, § 13.

**[21] Constitutional Law 92 ⛝2314**

92 Constitutional Law
    92XIX Rights to Open Courts, Remedies, and Justice
        92k2313 Conditions, Limitations, and Other Restrictions on Access and Remedies
            92k2314 k. In general. Most Cited Cases

To prove that a statute violates the open-courts provision of Texas constitution, the claimant must show that: (1) a cognizable common law cause of action is being restricted, and (2) the restriction is unreasonable or arbitrary when balanced with the statute's purpose and basis. Vernon's Ann.Texas Const. Art. 1, § 13.

**[22] Constitutional Law 92 ⛝2314**

92 Constitutional Law
    92XIX Rights to Open Courts, Remedies, and Justice
        92k2313 Conditions, Limitations, and Other Restrictions on Access and Remedies
            92k2314 k. In general. Most Cited Cases

A claimant bringing an as-applied open-courts challenge to statutory requirements governing expert reports in support of health care liability claims (HCLCs) must show that the requirements actually prevented him from bringing his claims. Vernon's Ann.Texas Const. Art. 1, § 13; V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[23] Constitutional Law 92 ⛝2315**

92 Constitutional Law

395 S.W.3d 884
**(Cite as: 395 S.W.3d 884)**

92XIX Rights to Open Courts, Remedies, and Justice

92k2313 Conditions, Limitations, and Other Restrictions on Access and Remedies

92k2315 k. Time for proceedings. Most Cited Cases

**Health 198H 604**

198H Health

198HV Malpractice, Negligence, or Breach of Duty

198HV(A) In General

198Hk601 Constitutional and Statutory Provisions

198Hk604 k. Validity. Most Cited Cases

The statutory expert-report requirement for a health care liability claim (HCLC) does not violate the open-courts provision of Texas Constitution by requiring an expert report sooner rather than later in the litigation. Vernon's Ann.Texas Const. Art. 1, § 13; V.T.C.A., Civil Practice & Remedies Code § 74.351(a, c).

**[24] Courts 106 85(1)**

106 Courts

106II Establishment, Organization, and Procedure

106II(F) Rules of Court and Conduct of Business

106k85 Operation and Effect of Rules

106k85(1) k. In general. Most Cited Cases

When a rule of procedure conflicts with a statute, the statute prevails unless the rule has been passed subsequent to the statute and repeals the statute.

**[25] Jury 230 9**

230 Jury

230II Right to Trial by Jury

230k9 k. Nature and scope in general. Most Cited Cases

The right to a jury trial is not an absolute right in civil cases, but is subject to certain procedural rules.

**[26] Jury 230 31.2(1)**

230 Jury

230II Right to Trial by Jury

230k30 Denial or Infringement of Right

230k31.2 Rights of Action and Procedure in Civil Cases

230k31.2(1) k. In general. Most Cited Cases

Dismissal of a health care liability claim (HCLC) for failing to serve an adequate expert report as required by statute does not violate an asserted right to jury trial on the merits; such a dismissal is not based on the merits, but merely operates to dismiss the case on a procedural requirement which is directly related to statute's purpose of limiting the number of frivolous suits. V.T.C.A., Civil Practice & Remedies Code § 74.351(*l* ), (r)(6).

**\*888** Dana D. Banks, Smith Rose Finley, P.C., San Angelo, TX, for appellee.

William E. Zook, Jr., David W. Townend, Ted B. Lyon & Associates, P.C., Mesquite, TX, for appellant.

Before Chief Justice JONES, Justices PEMBERTON and ROSE.

*OPINION*

BOB PEMBERTON, Justice.

Richard Hebert and his wife, Janet Hebert, appeal from a district court judgment dismissing, for failure to serve the expert report required by chapter 74 of the civil practice and remedies code, a health care liability claim they asserted against Timothy Hopkins, M.D., and Shannon Clinic.[FN1] The Heberts bring two issues, urging respectively that (1) the district court abused its discretion in concluding that they failed to serve an expert report complying with chapter 74; and (2) chapter 74's ex-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

pert-report requirement violates various constitutional protections. We will overrule these contentions and affirm the district court's judgment.

> FN1. The parties have advised us that Richard Hebert died shortly after the Heberts perfected their appeal. As contemplated by rule 7.1 of the rules of appellate procedure, the parties have proceeded on appeal as if all parties are alive, and so have we. *See* Tex.R.App. P. 7.1(a)(1).

### BACKGROUND

The Heberts filed the underlying suit alleging that Dr. Hopkins, a neurosurgeon, committed professional negligence in performing spinal surgery on Richard Hebert at Shannon in September 2008 after Richard broke his neck in a fall. Specifically, they pled that Richard had presented with a fracture of the cervical 6(C6) vertebra that was "very unstable" due to a preexisting condition known as ankylosing spondylitis that had self-fused his spinal vertebrae on either side of the fracture; that the standard of care in such circumstances had required Hopkins to perform "an anterior and posterior fusion surgery" to ensure stability; that Hopkins had performed "an anterior fusion with plates and screws at C4–C7 but took no appropriate surgical measures to stabilize the fusion posteriorly;" and that the anterior-only fusion had subsequently "failed as one or more of the screws had pulled out causing the vertebral segments to move and compress the spinal cord at C4–C7," rendering Richard a quadriparetic (i.e., paralyzed in all four limbs). The Heberts asserted that Shannon was vicariously liable for Hopkins's negligence by virtue of Hopkins's status as a "partner or member" of the clinic.

Within 120 days thereafter, in an attempt to comply with chapter 74's expert-report requirement, the Heberts served a report from P. Merrill White, M.D., along with Dr. White's curriculum vitae. FN2 Hopkins**889** and Shannon timely objected to the sufficiency of Dr. White's report, asserting that the report had failed to adequately set forth, and was "conclusory" with respect to the underlying factual

bases of, opinions regarding the applicable standard of care for Hebert in light of his underlying medical conditions, the manner in which Hopkins's care had failed to meet that standard, or a causal linkage to the fusion failure and Richard's injuries. FN3 By now, the 120–day period for serving an "expert report" had expired, so appellees also moved to dismiss the Heberts' suit with prejudice and sought a mandatory award of attorney's fees. FN4 Both sides submitted briefing on the merits of appellees' objections. Following a hearing at which the parties presented argument, the district court sustained appellees' objections but granted the Heberts a thirty-day extension to cure any deficiencies. FN5

> FN2. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (West 2011) ("In a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted.").
>
> In the absence of material intervening substantive changes, we have cited the current version of chapter 74 for convenience.
>
> FN3. *See id.* ("Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived.").
>
> FN4. *See id.* § 74.351(b) ("If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall ... enter an order that: (1) awards to the affected

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and (2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim."); *see also id.* § 74.351(c) (recognizing that "an expert report has not been served within the period specified by Subsection (a)" when "elements of the report are found deficient").

FN5. *See id.* § 74.351(c).

Within the extension period, the Heberts served a supplemental report from White. Contending that White's supplemental report had failed to cure the deficiencies in his original report, appellees again moved to dismiss the Heberts' suit with prejudice. FN6 The Heberts filed a response joining issue regarding the sufficiency of the two reports and also asserting that chapter 74's expert-report requirement violates various protections of the U.S. or Texas constitutions. Following a hearing, the district court granted appellees' motion to dismiss. Subsequently, after hearing evidence, the district court awarded appellees attorney's fees as required by chapter 74, FN7 and this order also served to make the court's prior dismissal order final. The Heberts then timely perfected this appeal.

FN6. *See id.* § 74.351(b), (c).

FN7. *See id.* § 74.351(b)(1).

**ANALYSIS**
**Sufficiency of expert reports**

In their first issue, the Heberts urge that the district court abused its discretion in holding that Dr. White's report, either in its original form or as supplemented, did not represent an objective good faith effort to comply with the statutory definition of an expert report.

[1][2] The standards governing the contents of the expert report or reports required by chapter 74 are well established. Chapter 74 defines an "expert report" as "a fair summary of the expert's opinion as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to **\*890** meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." FN8 "A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply" with this definition of "expert report." FN9 To constitute a "good faith effort," as the Texas Supreme Court has explained, the report must include the expert's opinion on "each of the three main elements: standard of care, breach, and causation," and must provide enough information to fulfill two purposes with respect to each element: (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. *See Jelinek v. Casas,* 328 S.W.3d 526, 538–40 & n. 9 (Tex.2010); *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (per curiam); *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878–79 (Tex.2001). Although these requirements do not require a plaintiff to marshal all of his or her proof or to present expert testimony in a form that would be admissible at trial, *see Jelinek,* 328 S.W.3d at 539–40 & n. 9, they do necessitate that "the expert must explain the basis for his statements to link his conclusions to the facts" and not merely state conclusions. *Id.* (quoting *Wright,* 79 S.W.3d at 52 (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999))); *see also id.* at 539–40 (observing, with respect to the causation element, "the expert must ... explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented"). This is so, in the supreme court's view, because " '[a] report that merely states the expert's conclusions about the standard or care, breach, and causation' does not fulfill the two purposes of a good-faith effort." *Id.* at 539 (quoting *Palacios,* 46 S.W.3d at 879); *see*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*also id.* at 540 (expert "must include sufficient detail" regarding how breach caused plaintiff's injuries "to allow the trial court to determine if the claim has merit").

> FN8. *See id.* § 74.351(r)(6). Chapter 74 also imposes requirements regarding the qualifications of the "expert" who may prepare an "expert report," *see id.* § 74.351(r)(5), but appellees have not disputed that White meets those standards here.

> FN9. *Id.* § 74.351(*l* ).

[3] Importantly, the only information relevant to determining whether an expert report complies with these requirements is that contained within "the four corners" of the report itself. *Palacios,* 46 S.W.3d at 878. Consequently, neither the trial court nor this Court may infer additional opinions or underlying facts to fill in gaps that the report itself leaves open. *See Wright,* 79 S.W.3d at 53; *see also Austin Heart, P.A. v. Webb,* 228 S.W.3d 276, 279 (Tex.App.-Austin 2007, no pet.) (this requirement "precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended" (citing *Wright,* 79 S.W.3d at 53)).

[4] Our standard of review is likewise limited. Chapter 74 imposes a mandatory duty on a trial court to grant a motion challenging the adequacy of an expert report "if it appears to the court" that the report does not meet the above-described requirements. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(*l* ) ("A court *shall* grant a motion challenging the adequacy of an expert report only if it appears to the court ... that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).") (emphasis added). **\*891** Conversely, the trial court is prohibited from granting such a motion unless such noncompliance "appears to the court." *Id.* ("A court shall grant a motion challenging the adequacy of an expert report *only* if it appears to

the court ....") (emphasis added). But the linchpin determination that controls which of these two alternative sets of mandatory duties applies—whether "it appears to the court" that the report does not comply with the requirements—has been committed to the trial court's sound discretion by the Legislature. *See Palacios,* 46 S.W.3d at 877–78. Consequently, we review the trial court's determination for abuse of that discretion. *See Wright,* 79 S.W.3d at 52 (citing *Palacios,* 46 S.W.3d at 878).

A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *See id.* (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985)). "When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for the trial court's judgment." *Id.* (citing *Flores v. Fourth Court of Appeals,* 777 S.W.2d 38, 41 (Tex.1989)). We do not, in other words, examine the contents of Dr. White's reports and make our own de novo determination as to whether he has provided sufficient information, with respect to his opinions regarding standard of care, breach, and causation, to (1) inform appellees of the specific conduct the Heberts have called into question; and (2) provide a basis for the district court to conclude that the claims have merit. *See Jelinek,* 328 S.W.3d at 538–40 & n. 9; *Wright,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878–79. Instead, we determine only whether the district court acted arbitrarily, unreasonably, and without reference to guiding rules and principles in determining that the reports failed to provide that information. *See Wright,* 79 S.W.3d at 52; *see also Jelinek,* 328 S.W.3d at 542 (Jefferson, C.J., dissenting) ("The dividing line between a sufficient and an inadequate report is impossible to draw precisely. We have said, therefore, that the determination must be made in the first instance by the trial court, and review of that decision asks not how an appellate court would have resolved that issue, but instead whether the trial court abused its discretion.") (citing *Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); *Walker v. Gutier-*

*rez,* 111 S.W.3d 56, 63 (Tex.2003)).

[5] Applying this deferential abuse-of-discretion standard of review, we cannot conclude that the district court acted arbitrarily, unreasonably, and without guiding rules and principles in determining that Dr. White's reports did not supply it sufficient information regarding his opinions concerning standard of care and breach, as they relate to the underlying facts, to enable it to determine whether the Heberts' claims had merit.

In his initial report, White summarized medical records reflecting that Richard Hebert sought treatment at Shannon in the early morning hours of September 7, 2008, following a fall in which he injured his neck, and that Richard was placed under Hopkins's care. According to White, CT scans and other evaluations revealed that Richard had suffered "a trace traumatic subarachnoid hemorrhage" (i.e., bleeding on the brain) and a "fracture through the superior vertebral body of C6 with a fracture extending through the posterior elements of C5–6." The injury "was initially managed in a cervical collar which was changed to a Philadelphia collar and spinal precautions were ordered" within about five hours. That same evening, White indicated, Hopkins performed a surgical procedure in which the neurosurgeon **\*892** fused Richard's C5–C6 vertebrae and implanted "C4 through C7 anterior instrumentation"—a plate over or along the front of Richard's spine, attached by screws to his bone—to provide stability and support while the fracture healed. On the following day, White continued, the medical records indicated that Richard had showed signs of recovery progress and that "[c]ervical collar is discontinued per Dr. Hopkins'[s] order." But four days later, during the afternoon of September 12, Richard had a decline in neurological function and subsequent CT scans "confirm[ed] failure of implant fixation at C6 and C7" and injury to the spinal cord. Although another neurosurgeon, Dr. Duarte, operated on Richard thereafter to remove the failed anterior instrumentation and implement a different type of fixation

method, Richard ended up with "increased neurological deficit (quadriparesis)."

The medical records, as summarized by White, additionally reflected that Richard had a history of "coronary artery disease treated with cardiac stints, Plavix, and aspirin; cerebrovascular accident [ (i.e., a stroke) ] on two occasions with residual left hand paraesthesia [ (tingling or prickling sensations) ] treated with Plavix and aspirin; and hypertension," as well as "ankylosing spondylitis," a degenerative condition of the spine that causes both brittleness of bones and self-fusion of vertebrae.

Although he did not indicate whether or how Richard's other medical conditions impacted the standard of care, White emphasized his opinion that a patient with ankylosing spondylitis warranted special precautions when performing surgery to address spinal fracture:

In the surgical treatment of cervical spine fractures complicating ankylosing spondylitis, the prudent spine surgeon must recognize the unstable nature of these fractures. The instability is contributed to by the long level arms cranial and caudal to the fracture site resulting from the multilevel autofusion and poor bone quality associated with ankylosing spondylitis. These two factors result in increased susceptibility to spine fractures as a result of relatively minor trauma, greater instability, and a greater likelihood of neurologic deficit resulting from a cervical fracture than found in patients with cervical spine fractures and otherwise normal spinal anatomy.

The prudent spine surgeon should design a surgical plan of care allowing decompression of the spinal cord, reduction of the traumatic deformity, and immediate stabilization of the spinal column to protect the spinal cord and to facilitate mobilization and nursing care to the patient in the short term and healing of the spinal fusion in the longer term.

As for the standard of care regarding the spe-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

cific means by which these objectives should be achieved, White initially suggested that anterior-only internal instrumentation was inconsistent with the standard of care and that some form of posterior internal instrumentation, either additionally or as an alternative to anterior instrumentation, would instead be preferable:

> Over the recent years, the debate of the spinal community has been in which circumstances fusion with posterior only fixation or fusion with anterior and posterior fixation is appropriate. Anterior instrumentation only is predictably inadequate in a fracture pattern with gross anterior and posterior column instability such as Mr. Hebert's. Adequate treatment of Mr. Herbert's [sic] fracture requires anterior and posterior instrumentation in order to meet the standard of care.

> In Mr. Herbert's [sic] situation, the standard of care requires fixation stable **\*893** enough to allow mobilization of the patient without loss of fixation resulting in increased neurological deficits. This goal is more likely to be achieved by multilevel posterior internal fixation in addition to at least single level anterior internal fixation with fusion at appropriate levels.

However, in the next sentence, within the same paragraph, White acknowledged that "clinical situations" could arise in which anterior-only instrumentation, coupled with "supplemental protection" other than posterior implementation, would be consistent with the standard of care:

> If the clinical situation in which the surgeon finds himself and the patient allows only inadequate internal fixation, the surgeon is obligated to protect the patient supplementing the internal fixation with external bracing and/or activity limitations. The supplemental protection should continue until the patient can be returned to the operating room for additional internal fixation or the fracture becomes stable through healing.

Following these statements regarding standard of care, White turned to whether or how Hopkins breached an applicable standard. Consistent with the first portion of his explanation of the standard of care, White began by asserting that Hopkins breached the standard by utilizing "anterior only plate/screw fixation":

> Dr. Timothy Hopkins'[s] choice of anterior only plate/screw fixation fails to meet the applicable standard of care. Constrained anterior cervical plates function as tension band devices and require relative stability of the posterior elements. In extension these devices resist distraction of the anterior column. These devices do not effectively resist flexion forces and require stable posterior elements to limit deformity resulting from flexion forces. In the absence of adequate posterior stability, anterior plate/screw constructs typically fail in flexion by plate breakage or, as in this case, by screw pullout. Mr. Herbert's [sic] fracture resulted in significant instability of both the anterior and posterior elements at the C5–6 level. Anterior only plate/screw fixation, in this setting, is predictably doomed to failure.

But in the next sentence, White seemed to allude to his previously expressed view that a surgeon could act within the standard of care by "supplementing" otherwise "inadequate internal fixation" with some form of "external bracing and/or activity limitations" as an alternative to posterior surgical fixation:

> The prudent spine surgeon must recognize the limitations of the various internal fixation constructs available and if necessary must compensate for the predictable weaknesses by adequate external bracing and/or activity limitation.

Then White ended his discussion of breach with the following conclusion:

> The standard of care for the surgical treatment of this fracture requires a multilevel posterior fixation and a fusion in conjunction with anterior fixation and fusion with or without supplemental external fixation as was ultimately performed by Dr. Duarte on September 12, 2008.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

White then offered the following opinions as to causation, now referencing perceived inadequacies in internal *and* external fixation without elaborating as to the nature or identity of any of the latter category:

> The failure to choose the internal and external fixation construct capable of providing stability to allow mobilization of the patient, prevent spinal displacement, and protect the spinal cord is the proximate cause of Mr. Herbert's [sic] **\*894** increased neurologic deficit (quadriparesis). This occurred as a result of the constrained anterior plate/screw construct's predictable inability to neutralize flexion forces resulting in screw pullout at C6 and C7 levels followed by displacement of the spinal column through the C5–6 fracture/allograft site with subsequent spinal cord injury and deterioration of neurologic function.

Among their objections to the sufficiency of White's initial report, appellees urged that the report did not represent an objective good faith attempt to comply with chapter 74's requirements—i.e., that it discussed the standard of care, breach, and causation with sufficient specificity to (1) inform them of the conduct called into question and (2) provide a basis for the district court to determine that the claims have merit—because it was internally inconsistent as to the standard of care that applied and did not address whether or not Hopkins complied with the standard of care through the use of the "external bracing and/or activity limitation" White had contemplated. And these asserted deficiencies, appellees further suggested, in turn undermined any factual bases underlying White's assertions that the standard of care either required Hopkins's use of anterior-only internal fixation or was breached by his choice not to use posterior interior fixation.

In arguing that the district court abused its discretion in sustaining appellees' objections, the Heberts emphasize the portions of White's initial report focusing on the relative merits of anterior versus posterior internal fixation. But the district court was within its discretion also to consider White's recognition of an apparent exception, qualification, or limitation to his broader criticisms of anterior fixation: "the clinical situation in which the surgeon finds himself and the patient" may "allow[ ] only inadequate internal fixation," in which case the standard of care could be met by "supplementing the internal fixation with external bracing and/or activity limitations." Along with White's recognition of this aspect of the standard of care, the court also could have reasonably considered that White never elaborated on the nature or type of "clinical situation" that would "allow [ ] only inadequate internal fixation" or whether such a situation did or did not exist in regard to Richard, a patient who, as White acknowledged in his report, had a history of coronary artery disease, two strokes, and hypertension, not to mention bleeding on the brain from his fall. The court likewise could reasonably have viewed White's references to "external bracing" or "activity limitations" as an alternative to further internal fixation as begging the question as to whether the unspecified "spinal precautions" Hopkins had ordered, the cervical collar Richard wore following surgery, or other "external bracing" or "activity limitations" Hopkins imposed had or had not satisfied the standard of care.

In short, we cannot conclude that the district court acted arbitrarily, unreasonably, or without regard to guiding principles in determining that White's initial report fell short of describing the applicable standard or care or breach thereof, as applicable to the underlying facts, with sufficient specificity to provide the court a basis to determine that White's claims have merit. *See Jelinek,* 328 S.W.3d at 538–40 & n. 9; *Wright,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878–79. And in the face of such deficiencies regarding standard of care and breach, the district court would have acted within its discretion in determining that any assertions by White to the effect that anterior-only internal fixation breaches the standard of care or that only posterior internal fixation can suffice lack an underlying factual basis—**\*895** i.e., are "conclusory"—and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

fail to satisfy chapter 74. *See Wright,* 79 S.W.3d at 52 ("the expert must explain the basis of his statements to link his conclusions to the facts" (quoting *Earle,* 998 S.W.2d at 890)).

The Heberts urge us to indulge a "fair reading" that White's opinions regarding unspecified "clinical situations" refers to a surgeon who is attempting to perform a combined anterior and posterior procedure but gets interrupted by "surgical complications such as delays or blood loss," and that no such complications arose here. The dissent similarly relies on inferences or implications that such "extraordinary circumstances" were not present. But the problem with these arguments is that White never actually says any of this in his initial report, and the established rule is that the report must stand or fall on the contents within its "four corners." *Palacios,* 46 S.W.3d at 878. This requirement, again, "precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." *Austin Heart, P.A.,* 228 S.W.3d at 279 (citing *Wright,* 79 S.W.3d at 53).

Nor did the district court abuse its discretion in holding that such deficiencies were not cured by White's supplemental report. In his supplement, although White reiterates and emphasizes at length his conclusions and assertions regarding anterior versus posterior fixation generally, nowhere does he address the deficiencies concerning the standard of care and breach that the district court could have perceived in his initial report.

We overrule the Heberts' first issue.

**Constitutional claims**

[6][7] In their second issue, the Heberts bring forward constitutional challenges to chapter 74's expert-report requirement. While not appearing to quarrel with the general concept that the Legislature can validly impose some form of threshold report requirement for asserting health care liability claims or other types of civil claims, the Heberts complain about three basic features of chapter 74's

expert-report requirement: (1) the fixed deadline of 120 days to serve an expert report, subject to a single 30–day extension; (2) the requirements focusing judicial analysis of a report's sufficiency solely on the "four corners" of the report and prohibiting courts from considering extrinsic evidence of a claim's merits; and (3) the mandatory requirement that courts dismiss health care liability claims with prejudice for failing to serve an adequate expert report and also award attorney's fees. The Heberts contend that these mechanisms unfairly "single out" health care liability claimants for unconstitutional "disparate treatment," deprive courts of judicial discretion in violation of the separation-of-powers protections of the Texas Constitution, and deprive claimants of access to the courts in violation of due-process or open-courts protections. FN10

> FN10. The Heberts acknowledge that Richard's death during the pendency of this appeal may have terminated his open-courts claim. "[W]rongful-death and survival claimants cannot establish an open-courts violation because they 'have no common law right to bring either.' " *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 903 (Tex.2000) (quoting *Bala v. Maxwell,* 909 S.W.2d 889, 893 (Tex.1995)). The Texas Supreme Court also has declined to rule on an open-courts argument in a similar situation when the claimant died during the pendency of the appeal. *Kallam v. Boyd,* 232 S.W.3d 774, 776 (Tex.2007) (per curiam). While we have similar reservations, we will address the Heberts' open-courts argument to the extent its substance implicates due-process and due-course-of-law protections they have also raised. *See, e.g., Bogar v. Esparza,* 257 S.W.3d 354, 370 n. 6 (Tex.App.-Austin 2008, no pet.) (noting open-court protections not directly implicated in statutory wrongful-death and survivor action before conducting similar due-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

395 S.W.3d 884
**(Cite as: 395 S.W.3d 884)**

process analysis).

**\*896** When reviewing the constitutionality of a statute, we begin with a presumption that it is constitutional. *Herrera v. Seton Nw. Hosp.,* 212 S.W.3d 452, 460–61 (Tex.App.-Austin 2006, no pet.) (citing *Walker,* 111 S.W.3d at 66); *see also* Tex. Gov't Code Ann. § 311.021(1) (West 2005). The wisdom or expediency of the law is the Legislature's prerogative, not ours. *Smith v. Davis,* 426 S.W.2d 827, 831 (Tex.1968). We presume that the Legislature has not acted unreasonably or arbitrarily. *Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983) (quoting *Davis,* 426 S.W.2d at 831). The party challenging a statute's constitutionality has the burden of proving that the statute fails to meet constitutional requirements. *Walker,* 111 S.W.3d at 66. A party must show that a statute is unconstitutional either on its face or as applied to that party. *Texas Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 518 n. 16 (Tex.1995); *see also City of Corpus Christi v. Public Util. Comm'n,* 51 S.W.3d 231, 240–41 (Tex.2001) (per curiam) (Owen, J., concurring). To sustain a facial challenge, the party must show that the statute, by its terms, always operates unconstitutionally. *Garcia,* 893 S.W.2d at 528 n. 16. To sustain an as-applied challenge, the party must show that the statute is unconstitutional when applied to that particular person or set of facts. *Id.*

We note at the outset that the Heberts face an uphill battle because every court that has considered similar challenges to chapter 74's expert-report requirement, including this Court, has rejected them. *See, e.g., Stockton v. Offenbach,* 336 S.W.3d 610, 618 (Tex.2011) (denying open-courts challenge); *Hightower v. Baylor Univ. Med. Ctr.,* 348 S.W.3d 512, 521–22 (Tex.App.-Dallas 2011, pet. denied) (rejecting special-law, vagueness, due-course-of-law, and separation-of-powers challenges); *Broxterman v. Carson,* 309 S.W.3d 154, 159 (Tex.App.-Dallas 2010, pet. denied) (rejecting due-process challenge); *Gulf Coast Med. Ctr., LLC v. Temple,* No. 13–09–00350–CV, 2010 WL

196972, at \*6 (Tex.App.-Corpus Christi Jan.21, 2010, no pet.) (mem. op.) (rejecting due-process and due-course-of-law challenges); *Bogar v. Esparza,* 257 S.W.3d 354, 372–73 (Tex.App.-Austin 2008, no pet.) (same); *Wilson–Everett v. Christus St. Joseph,* 242 S.W.3d 799, 802–04 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (rejecting separation-of-powers challenge); *Ledesma v. Shashoua,* No. 03–05–00454–CV, 2007 WL 2214650, at \*9 (Tex.App.-Austin Aug. 3, 2007, pet. denied) (mem. op.) (rejecting due-process and open-courts challenges); *Thoyakulathu v. Brennan,* 192 S.W.3d 849, 855–56 (Tex.App.-Texarkana 2006, no pet.) (due process does not require "exceptions [to the expert-report requirement] that would encompass any conceivable complication in order to pass constitutional muster"); *Herrera,* 212 S.W.3d at 461–62 (rejecting equal-protection, due-process, due-course-of-law, and open-courts challenges). Texas courts also uniformly rejected constitutional challenges to an expert-report requirement under chapter 74's predecessor statute, article 4590i. *See, e.g., Strom v. Memorial Hermann Hosp. Sys.,* 110 S.W.3d 216, 227 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (rejecting due-process, equal-protection, and jury-trial challenges); *Villa v. Hargrove,* 110 S.W.3d 74, 81 (Tex.App.-San Antonio 2003, pet. denied) (rejecting due-process and equal-protection challenges); *Walker,* 111 S.W.3d at 66 (rejecting due-process challenge); **\*897***Perry v. Stanley,* 83 S.W.3d 819, 825 (Tex.App.-Texarkana 2002, no pet.) (rejecting open-courts challenge); *Mocega v. Urquhart,* 79 S.W.3d 61, 64 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) (same); *Gill v. Russo,* 39 S.W.3d 717, 718–19 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) (same); *Knie v. Piskun,* 23 S.W.3d 455, 467 (Tex.App.-Amarillo 2000, pet. denied) (rejecting equal-protection, due-process, open-courts and free-speech challenges); *Schorp v. Baptist Mem'l Health Sys.,* 5 S.W.3d 727, 736–38 (Tex.App.-San Antonio 1999, no pet.) (rejecting due-process, open-courts, and jury-trial challenges). FN11

FN11. In their reply brief, the Heberts attempt to distinguish some of these cases on the basis that they involved "a complete failure to file an expert report," instead of "addressing the legislature's restriction placed on the courts in deciding the issue" of a report's sufficiency. However, Texas courts, including this Court, have rejected constitutional challenges where, as here, an expert report was served, but found deficient. *See, e.g., Hightower v. Baylor Univ. Med. Ctr.,* 348 S.W.3d 512, 520 (Tex. App.-Dallas 2011, pet. denied) (upholding dismissal of deficient reports); *Ledesma v. Shashoua,* No. 03–05–00454–CV, 2007 WL 2214650, at *7–8 (Tex.App.-Austin Aug. 3, 2007, pet. denied) (mem. op.) (same).

The Heberts acknowledge the constitutional validity of the expert-requirement in chapter 74's predecessor statute, article 4590i, but attempt to distinguish it as "less draconian." *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, sec. 13.01, 1995 Tex. Gen. Laws 985, 985–88, *repealed and recodified as amended* by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, sec. 74.351, 2003 Tex. Gen. Laws 847, 875–77 (amended 2005) (current version at Tex. Civ. Prac. & Rem.Code Ann. § 74.351). They emphasize differences in the deadlines article 4590i imposed for serving expert reports and the extent of discretion vested in trial courts to extend deadlines. Specifically, article 4590i allowed claimants to either serve an expert report within 90 days of filing suit or file a cost bond. *See* former art. 4590i, § 13.01(a). An expert report was required within 180 days of suit, though the court could grant a 30–day extension if the failure to serve was not intentional or the result of conscious indifference, but was the result of an accident or mistake. *Id.* § 13.01(d), (g).

The Heberts also assert that "4590i did not mandate what had to be included in the contents of the report," and that "there was no requirements or

authorization for the court to summarily dismiss the case based on the deficiencies in the language of the report." They also contend that parties opposing an article 4590i expert report had to "satisfy summary judgment procedures to secure a dismissal with prejudice." To the contrary, a court considering the sufficiency of an expert report under article 4590i, as under chapter 74, was limited to the "four corners" of the report. *See Palacios,* 46 S.W.3d at 878. Likewise, if a claimant failed to serve a report, or served a report that the trial court concluded did not represent a good faith effort to comply with the statutory definition of expert report, the trial court was required to dismiss the case with prejudice and award costs and attorney's fees to the opposing party. *See* former art. 4590i, § 13.01(e), (*l* ), (r)(6); *see also Palacios,* 46 S.W.3d at 877.

"*Disparate treatment* "

[8] The Heberts contend that chapter 74 irrationally singles them out for disparate treatment in violation of their rights to due process and equal protection. The due-course-of-law guarantee of the Texas Constitution provides: "No citizen of this State shall be deprived of liberty, property, privileges or immunities, or in any manner disenfranchised, except by due course of the law of the land." Tex. Const. art. I, § 19. Similarly, the federal due-**\*898** process clause provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law;...." U.S. Const. amend. XIV, § 1. While the Texas Constitution is textually different in that it refers to "due course" rather than "due process," Texas courts regard these terms as without substantive distinction unless and until a party demonstrates otherwise, and the Heberts suggest no reason to construe them differently here. *See University of Tex. Med. Sch. at Houston v. Than,* 901 S.W.2d 926, 929 (Tex.1995) (citing *Mellinger v. City of Houston,* 68 Tex. 37, 3 S.W. 249, 252–53 (1887)).

[9][10][11][12][13] Under federal and state

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

guarantees of due process, legislation that does not affect a fundamental right or interest is valid if it bears a rational relationship to a legitimate state interest. *Rylander v. B & A Mktg. Co. ex rel. Atl. Richfield Co.,* 997 S.W.2d 326, 333–34 (Tex.App.-Austin 1999, no pet.) (citing *Williamson v. Lee Optical,* 348 U.S. 483, 491, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Garcia,* 893 S.W.2d at 525). Similarly, the constitutional guarantee of equal protection requires only that disparate treatment of different classifications be rationally related to a legitimate state purpose, unless the classification impinges on the exercise of a fundamental right or distinguishes between people on a "suspect" basis, such as race or national origin.[FN12] The Heberts have not demonstrated that chapter 74 impinges on a fundamental or important right or a suspect class. By its terms, chapter 74 is facially neutral and applies to any party asserting a health care liability claim. Consequently, in addressing the Heberts' due-process and equal-protection claims, we must determine whether chapter 74 bears a rational relationship to a legitimate state interest and whether the Legislature had a rational basis in differentiating between health care liability claimants and other litigants. "In so doing, we must uphold the law if we can conceive of any rational basis for the Legislature's action." *Owens Corning v. Carter,* 997 S.W.2d 560, 581 (Tex.1999).

> FN12. Classifications that impinge upon the exercise of a fundamental right or distinguish between people on a suspect basis (i.e., race, national origin, and alienage) "are subject[ ] to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne v. Cleburne Living Ctr. Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (plurality opinion). When a statute burdens a sensitive class or impinges on an important right, the statute is subject to an intermediate level of scrutiny, which requires a showing that the statute is substantially related to an import-

ant state interest. *Id.* at 440–41, 105 S.Ct. 3249.

In enacting chapter 74, the Legislature made a number of findings about the state of the health care system in Texas. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11, 2003 Tex. Gen. Laws 847, 884–85. Specifically, it found the frequency of claims and the amounts paid out by insurers in judgments and settlements had risen inordinately since 1995, which created a public problem in the availability and affordability of adequate medical professional liability insurance. *Id.* § 10.11(a)(1), (3), (4). This "crisis" increased costs to physicians, hospitals, patients, and the public. *Id.* § 10.11(a)(5), (7). As a result, the Legislature concluded the "adoption of certain modifications in the medical, insurance and legal systems" would "have a positive effect on the rates charged by insurers for medical professional liability insurance." *Id.* § 10.11(a)(12). In enacting various measures, including chapter 74, the Legislature intended to reduce the frequency and severity of health care liability claims, decrease costs of claims, and ensure**\*899** that awards were rationally related to costs, but "do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis." *Id.* § 10.11(b)(1), (2), (3).

In *Smalling v. Gardner,* the Fourteenth Court of Appeals recognized that the "legislature has broad authority to create classifications for legislative purposes, so long as they have a reasonable basis and operate equally on all persons within the class." 203 S.W.3d 354, 371 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (addressing special-law challenge to constitutionality of article 4590i).[FN13] The expert report is required only for claims against healthcare providers for departures from accepted standards of medical or health care or safety. *Id.* Accordingly, the expert-report requirement applies equally to all physicians and health care providers and rationally relates to the interests of the State "in ensuring that medical practitioners were not 'being placed in the situation of defending

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

395 S.W.3d 884
**(Cite as: 395 S.W.3d 884)**

frivolous claims at a high cost' to the health care system." *Id.* (quoting *Schorp,* 5 S.W.3d at 737). Recently, the Dallas Court of Appeals adopted the *Smalling* analysis and applied it to chapter 74. *See Hightower,* 348 S.W.3d at 521.

> FN13. Though the Heberts did not explicitly claim chapter 74 was an unconstitutional special law prohibited by the Texas Constitution, many of their complaints track arguments raised by parties who have raised such claims. Accordingly, we find cases addressing special-law challenges instructive.

While *Smalling* and *Hightower* dealt with special-law challenges, we previously rejected an equal-protection challenge to chapter 74's predecessor for similar reasons. *Fields v. Metroplex Hosp. Found.,* No. 03–04–00516–CV, 2006 WL 2089171, at *4 (Tex.App.-Austin July 28, 2006, no pet.) (mem. op.) ("[T]he legislature determined that medical liability plaintiffs should be treated differently because of the negative effects of the numbers and cost of their lawsuits had on the provision of health care."). In that case, the claimant failed to show article 4590i's expert-report requirement was not rationally or substantially related to the government's interest in reducing the aggregate costs of defending against frivolous costs and reducing the costs of insurance and medical care to all. *Id.; see also Bogar,* 257 S.W.3d at 373 (in addressing due-process challenge to chapter 74: "We disagree that it is irrational, in light of the legislature's goal of curtailing frivolous health care liability claims, for it to require that appellees serve an expert report explaining why or how this outcome was actually caused by the conduct of [the defendant], as opposed to some other person or health care provider.").

The Heberts challenge the Legislature's rationale as "pre-textual, not supported by empirical data and refuted by surveys showing there aren't excessive frivolous medical malpractice suits." They reason that because the Legislature had previously

acted to curb frivolous medical malpractice claims by enacting article 4590i, its subsequent enactment of chapter 74 reflects intent to "single out medical malpractice claimants for special and harsh treatment by making it so onerous to file and prosecute [a claim] that they or their counsel will not take the case, or once it is filed, to make it so difficult to prosecute the case that they or their counsel will just give up." The Heberts likewise complain that chapter 74 strips them "of all the rights accorded to other litigants in the Texas Rules of Civil Procedure," but does not place similar restrictions on "major corporations like insurance companies and banks suing for breach of contract, or on individual or corporate clients suing attorneys,**\*900** accountants, bankers and brokers." According to the Heberts, no compelling state interest or rational basis supports this "arbitrary" classification.

[14][15] We find no merit in the Heberts' argument that the Legislature, evaluating the impact of 4590i, could not have rationally concluded that a problem had nonetheless persisted in the cost and availability of health care due to the prevalence of medical-malpractice suits. To the extent the Heberts challenge the underlying policies of chapter 74, it is not our place to question the Legislature's policy decisions when conducting a rational basis review. *See Bell v. Low Income Women of Tex.,* 95 S.W.3d 253, 264 (Tex.2002) ("The restriction clearly serves [the act's] purposes, and it is not for us to second-guess the Legislature's policy choices."). The Heberts fail to demonstrate that the Legislature lacked any rational basis in differentiating between health care liability claimants and other litigants. Accordingly, we reject the Heberts' "disparate treatment" constitutional challenges.

### Separation of powers

[16][17] For similar reasons, the Heberts' other constitutional challenges fail. They claim the Legislature has impermissibly interfered with the judicial branch through chapter 74. The Texas Constitution vests the judicial power of the State in the courts. Tex. Const. art. V, § 1. The separation-of-powers

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

requirement prohibits one branch of government from exercising a power inherently belonging to another branch. *Id.* art. II, § 1; *Wilson–Everett,* 242 S.W.3d at 802 (citing *General Servs. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 600 (Tex.2001)). Only when the executive or legislative branch interferes with the functioning of the judicial process in a field constitutionally committed to the control of the courts does a constitutional problem arise. *Wilson–Everett,* 242 S.W.3d at 802.

Chapter 74's expert report imposes a threshold procedural requirement aimed at filtering out meritless or premature lawsuits from proceeding until a claimant makes a good-faith effort to demonstrate that at least one expert believes that a breach of the applicable standard of care caused the claimed injury. *Id.* at 802–04 (rejecting argument that chapter 74 "interefere[d] with the judiciary's constitutional power to decide when and how to render judgments" (citing *Murphy v. Russell,* 167 S.W.3d 835, 838 (Tex.2005) (per curiam); *Walker,* 111 S.W.3d at 66). Though the Heberts contend chapter 74 "prohibits the courts from using the rules of procedure and directs the courts in every respect," in actuality, the courts retain the judicial power to determine whether a timely served report is adequate in this regard and to render a decision accordingly. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(*l* ), (r)(6); *see also Carrick v. Summers,* 294 S.W.3d 886, 891 (Tex.App.-Beaumont 2009, no pet.) ("[I]mposing a strict, non-discretionary time limit on serving the expert report does not restrict the trial court's power to hear evidence, determine the facts of a case and the rights of the parties, apply the law to the facts and to enter a judgment appropriate to the case, any more than a statute of limitations does."). The same is true of chapter 74's requirement that courts award attorney's fees upon dismissal. *Hightower,* 348 S.W.3d at 522 (rejecting separation-of-powers challenge based on attorneys' fees provision because "court still retains its constitutional authority to determine the reasonable fees based on the law and the evidence presented by the parties"). The Heberts offer no persuasive authority

to the contrary. Accordingly, we reject the **\*901** Heberts' separation-of-powers constitutional challenge.

### *Right of access*

[18][19][20][21] Finally, the Heberts argue chapter 74 violates their right of access to the courts and due course of law. The open-courts provision of the Texas Constitution guarantees litigants the right to redress their grievances. Tex. Const. art. I, § 13; *LeCroy v. Hanlon,* 713 S.W.2d 335, 341 (Tex.1986). It protects a person from having his or her right to sue cut off by a legislative act before the individual has been afforded a reasonable opportunity to discover the wrong and bring suit. *Shah v. Moss,* 67 S.W.3d 836, 842 (Tex.2001). It is premised on the rationale that the Legislature has no power to make a remedy by due course of law contingent upon an impossible condition. *Hightower,* 348 S.W.3d at 522 (citing *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 355 (Tex.1990)); *see also Stockton,* 336 S.W.3d at 618 (rejecting open-courts challenge based on chapter 74's 120–day deadline). To prove that the statute violates the open-courts provision, the Heberts must show that: (1) a cognizable common law cause of action is being restricted, and (2) the restriction is unreasonable or arbitrary when balanced with the statute's purpose and basis. *Sax,* 648 S.W.2d at 666.

[22] A claimant bringing an as-applied open-courts challenge to chapter 74 must show that the expert-report requirements actually prevented him from bringing his claims. *Herrera,* 212 S.W.3d at 461; *McGlothlin v. Cullington,* 989 S.W.2d 449, 453 (Tex.App.-Austin 1999, pet. denied). The Heberts failed to prove how the provisions of chapter 74, as opposed to their own failure to provide an adequate report, prevented them from pursuing their claims. *See Ledesma,* 2007 WL 2214650, at \*9 (rejecting open-courts challenge when plaintiff failed to serve sufficient reports); *see also Stockton,* 336 S.W.3d at 618–19 (rejecting as-applied open-courts challenge when plaintiff failed to exercise due diligence in serving expert report on

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendant physician).

[23][24] As discussed above, the Heberts have also failed to show chapter 74 is unreasonable or arbitrary when balanced with the statute's purpose and basis. Health care liability claims require expert testimony at trial. *See Smalling,* 203 S.W.3d at 371. The expert-report requirement " 'does not violate the open-courts provision by requiring an expert report sooner rather than later in the litigation.' " *Id.* (addressing article 4590i (quoting *Mocega,* 79 S.W.3d at 64)); *see also Gill,* 39 S.W.3d at 718–19 (article 4590i expert-report requirement did not violate open-courts provision because plaintiff raising medical negligence claim required to prove claim by competent expert testimony to avoid summary judgment and/or prevail at trial); *Bankhead v. Spence,* 314 S.W.3d 464, 466 (Tex.App.-Waco 2010, pet. denied) ("This Court and others have determined that the expert-report requirement itself does not violate the open-courts guarantee because it 'is rationally related to the purpose of the statute to discourage frivolous malpractice suits.' " (quoting *Powell v. Clements,* 220 S.W.3d 138, 140 (Tex.App.-Waco 2007, pet. denied))); *Fields,* 2006 WL 2089171, at *4 (holding report requirement not so onerous that it "effectively deprived the litigant of access to the court").[FN14]

> FN14. The Heberts also argue that chapter 74 "effectively revives the general demurrer practice which permitted judges to dismiss cases on the pleadings." They argue that summary judgment is the preferred method for defendants to obtain a dismissal on the merits. Our rules of procedure prohibit the use of general demurrers. Tex.R. Civ. P. 90. However, "[w]hen a rule of procedure conflicts with a statute, the statute prevails unless the rule has been passed subsequent to the statute and repeals the statute...." *Johnstone v. State,* 22 S.W.3d 408, 409 (Tex.2000) (per curiam). The current version of chapter 74 was passed in 2003 and amended in 2005; rule 90 was approved in 1940 and amended in 1980. Thus, to the extent chapter 74 and rule 90 conflict, chapter 74 controls. *See Mitchell v. Berry,* No. 05–06–01328–CV, 2007 WL 4111923, at *4 (Tex.App.-Dallas Nov. 20, 2007, pet. denied) (mem. op.) (rejecting argument Tex. Civ. Prac. & Rem.Code Ann. § 13.001 allowing for dismissal in inability-to-pay cases was a general demurrer in contravention of Rule 90); *see also Smalling v. Gardner,* 203 S.W.3d 354, 367 n. 8 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (distinguishing dismissal under general demurrer from dismissal for failure to serve expert report).

***902** [25][26] The Heberts have failed to demonstrate a constitutional defect in chapter 74's expert-report requirement.[FN15] Accordingly, we overrule their second issue.[FN16]

> FN15. The Heberts make passing reference to infringement of their right to trial by jury, but provide no authority or argument in support of any challenge based on that provision that is distinct from their other arguments. To the extent the Heberts intended to advance a distinct challenge based on their right to jury trial, it too would fail. The right to a jury trial is not an absolute right in civil cases, but is subject to certain procedural rules. *Schorp v. Baptist Mem'l Health Sys.,* 5 S.W.3d 727, 738 (Tex.App.-San Antonio 1999, no pet.) (citing *Wooten v. Dallas Hunting & Fishing Club, Inc.,* 427 S.W.2d 344, 346 (Tex.Civ.App.-Dallas 1968, no writ)). "Imposing the requirement to file an expert report and the failure to meet that requirement allows the trial court to dismiss the case. This dismissal is not based on the merits, but merely operates to dismiss the case on a procedural requirement which is directly related to the statute's purpose of limiting the number of frivolous suits." *Id.*

(addressing article 4590i (citing *Buckholts Indep. Sch. Dist. v. Glaser,* 632 S.W.2d 146, 149 (Tex.1982)* (holding that failure of plaintiff to fulfill bonding requirement for challenging school board election did not deny taxpayer right to jury trial on merits))).

FN16. The Heberts point to decisions from other jurisdictions that, in their view, struck down expert-report requirements similar to chapter 74 based on constitutional provisions analogous to the protections on which they rely here. *See, e.g., Putman v. Wenatchee Valley Med. Ctr.,* 166 Wash.2d 974, 216 P.3d 374, 378–79 (2009)* (law requiring certificate of merit from expert at time of filing violated separation of powers and right of access as it cut off rights of discovery and abrogated pleading requirements in rules of procedure); *Wimley v. Reid,* 991 So.2d 135, 138 (Miss.2008)* (law requiring certificate of merit violated separation of powers); *Summerville v. Thrower,* 369 Ark. 231, 253 S.W.3d 415, 421 (2007)* (law requiring expert affidavit within 30 days of suit violated separation of powers); *Zeier v. Zimmer, Inc.* 152 P.3d 861, 873 (Okla.2006)* (law requiring affidavit of merit with petition barred right of access). They also acknowledge that courts in at least two jurisdictions upheld laws similar to chapter 74. *See McAlister v. Schick,* 147 Ill.2d 84, 167 Ill.Dec. 1021, 588 N.E.2d 1151, 1157–58 (1992); *Mahoney v. Doerhoff Surgical Servs. Inc.,* 807 S.W.2d 503, 512–13 (Mo.1991)*. Additionally, they favorably cite cases from other jurisdictions that upheld similar laws "so long as the Legislature [does] not direct[ ] the Courts how to decide the legitimacy of the case." Texas decisions regarding chapter 74 are consistent with that reasoning. *See, e.g., Wilson–Everett v. Christus St. Joseph,* 242 S.W.3d 799, 803 (Tex.App.-Houston [1st Dist.] 2007, pet. denied)* (rejecting argument that chapter 74 "interfere[d] with the judiciary's constitutional power to decide when and how to render judgments"). In any event, cases from other jurisdictions have no precedential value for this Court. Instead, we are bound to follow the Supreme Court of Texas and our own precedent, as well as the persuasive cases of our sister courts. Texas authorities have consistently rejected constitutional challenges similar to those advanced by the Heberts.

**CONCLUSION**

Having overruled the Heberts' issues on appeal, we affirm the district court's judgment.

**\*903** Jones, C.J., dissent.

J. WOODFIN JONES, Chief Justice, dissenting.

Because I believe the expert report in this case represents a good-faith effort to comply with the statutory definition of an expert report, I respectfully dissent.

The three significant Texas Supreme Court opinions that address the issue of determining the adequacy of an expert report are *American Transitional Care Centers of Texas, Inc. v. Palacios,* 46 S.W.3d 873 (Tex.2001); *Bowie Memorial Hospital v. Wright,* 79 S.W.3d 48 (Tex.2002); and *Jelinek v. Casas,* 328 S.W.3d 526 (Tex.2010)*. Together, those three cases describe and clarify the standards by which courts are to evaluate an expert report. Because those standards are appropriately set forth in the majority opinion, I will not repeat them all. But it is crucial to remember that all that is necessary to avoid dismissal is that the report represent a "good faith effort" to comply with the statutory definition of an expert report, which in turn requires only that the report provide "a fair summary of the expert's opinions" regarding standard of care, breach, and causation. Most important, the supreme court has defined "good faith effort" as "one that provides information sufficient to (1) 'inform the defendant of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

395 S.W.3d 884
**(Cite as: 395 S.W.3d 884)**

the specific conduct the plaintiff has called into question,' and (2) 'provide a basis for the trial court to conclude that the claims have merit.' " *Jelinek,* 328 S.W.3d at 539 (quoting *Wright,* 79 S.W.3d at 52). I believe the report in the present case easily meets that test.

The first prong of the good-faith test is that the report must "inform the defendant of the specific conduct the plaintiff has called into question." In this regard, the expert report in this case could not be clearer: the standard of care requires that a spinal fracture complicated by pre-existing ankylosing spondylitis must be treated by posterior internal fixation, either alone or in combination with anterior internal fixation, ***not*** by anterior fixation alone, as was done by the defendant physician here. By my count, the medical expert's report contains no less than nine separate statements and/or explanations of this requirement, four in his original report and five more in his supplemental report.

• "Anterior instrumentation only is predictably inadequate in a fracture pattern with gross anterior and posterior column instability such as Mr. Hebert's. Adequate treatment of Mr. Herbert's fracture requires anterior and posterior instrumentation in order to meet the standard of care."

• "Dr. Timothy Hopkins' choice of anterior only plate/screw fixation fails to meet the applicable standard of care."

• "In the absence of adequate posterior stability, anterior plate/screw constructs typically fail in flexion by plate breakage or, as in this case, by screw pullout.... Anterior only plate/screw fixation, in this setting, is predictably doomed to failure."

• "The standard of care for the surgical treatment of this fracture requires a multilevel posterior fixation and a fusion in conjunction with anterior fixation and fusion with or without supplemental external fixation...."

• "Dr. Hopkins performed an anterior (front) only plate and screw fixation.... The standards of care governing a prudent surgeon require that he not perform anterior only fixation with plate and screws...."

• "The standards of care governing a prudent surgeon require that he perform a multilevel posterior instrumented fusion alone or in conjunction with an anterior instrumented fusion...."

**\*904** • "My opinion is that Dr. Hopkins breached the standard of care by performing a multi-level anterior only fusion and fixation with plate/screws without also performing a multi-level posterior fusion and fixation with instrumentation."

• "The factual basis for this opinion is that a prudent surgeon following the standards of care would not have performed an anterior only fusion with instrumentation to attempt to stabilize this very unstable fracture but would have performed an anterior instrumented fusion with plates/screws and a multilevel posterior instrumented fusion or a multilevel posterior instrumented fusion alone."

• "[P]erforming an anterior only fusion with instrumentation without also performing the posterior fusion and fixation was a breach of the standard of care because the standards of care require performing both procedures to adequately stabilize the very unstable fracture and anterior only surgery was doomed to fail...."

There can be no doubt what conduct is being called into question.

The second prong of the supreme court's good-faith definition is that the report must "provide a basis for the trial court to conclude that the claims have merit." Here, the expert report goes into great detail in explaining the standard of care, why the actions of the defendant physician constituted a breach of the standard, and "how and why the breach caused the injury based on the facts presen-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ted." *Jelinek,* 328 S.W.3d at 539–40. The report does not contain mere conclusions of the expert. Quite the contrary. As to causation, for example, the report explains at length the process by which the breach of the standard of care resulted in the plaintiff's paralysis:

> My opinion is that performing an anterior only fusion with instrumentation without also performing a multilevel posterior instrumented fusion caused permanent and irreversible spinal cord injury when the screw predictably pulled out in the post perioperative period.... When the screw pulled out of the vertebral segments of C–6 and C–7, the C–5 vertebral body was allowed to move on C–6 resulting in cord compression. The screw predictably failed because the anterior only approach was insufficient in the absence of inherent or surgically created posterior element stability, to stabilize the fracture and resist deformation due to flexion forces. When the screws failed, the vertebral segments moved resulting in cord compression. As a result, Mr. Hebert is now a quadraparetic, meaning he is nearly completely paralyzed from the chest down. If, instead of the anterior only surgery, Dr. Hopkins had performed an anterior and posterior instrumented fusion, like Dr. Duarte did on 9/12/08, it is highly probable the anterior implants would not have failed as they did, the resulting cord compression would have been avoided and Mr. Hebert would not have sustained his spinal cord injury and paralysis.

In the face of the expert report's highly detailed explanation of all of the elements required by *Palacios, Wright,* and *Jelinek,* the majority holds that a single sentence from the original report was so "internally inconsistent" as to the applicable standard of care that all of the report's detailed explanations and opinions were vitiated:

> If the clinical situation in which the surgeon finds himself and the patient allows only inadequate internal fixation, the surgeon is obligated to protect the patient supplementing the internal fixation

**\*905** with external bracing and/or activity limitations.

There are several things to note about this sentence. First, it does not say that anterior only internal fixation could *ever* meet the standard of care in treating a patient with the conditions existing here. Indeed, the sentence does not explicitly reference anterior internal fixation at all. It is simply a general reference to a hypothetical situation in which "inadequate internal fixation" is, temporarily, the only available option under some presumably extraordinary circumstances. Second, whatever the general references to "clinical situation" and "inadequate internal fixation" mean, the report goes on to specify that the defendant breached the standard of care in *this case,* as to *this patient.* This is an implicit statement that, to the best of the expert's knowledge, there were no extraordinary circumstances in this case. Third, and perhaps most important, the possible existence of extraordinary circumstances that might—or might not—justify the defendant physician's temporary use of anterior only internal fixation is a matter to be fleshed out during discovery and possibly trial, not as part of a gatekeeper effort to deter frivolous lawsuits. This is especially true in light of the fact that the medical records available to the expert in preparing his report may not have reflected whether any such extraordinary circumstances existed at the time of the surgery.[FN1] To require a report to negate possible defenses at this stage of the litigation creates an extra-statutory burden and is unfair to both the plaintiff and the medical expert.

> FN1. Medical issues, like legal ones, are seldom black and white. One can imagine a hypothetical conversation between a plaintiff's attorney and the plaintiff's medical expert, in which the expert says something like, "In the overwhelming majority of cases like this, the standard of care is X. But I have to be candid: in a very small percentage of such cases, extraordinary circumstances may call for a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

different treatment approach. Nothing in the medical records I have seen indicates that such extraordinary circumstances existed in this case, but I would not be completely honest if I did not at least mention that possibility."

I believe the expert report in this case constituted a good-faith effort to comply with the definition of an expert report, as required by the applicable statutes and supreme court precedent. Accordingly, I respectfully dissent.

Tex.App.–Austin,2013.
Hebert v. Hopkins
395 S.W.3d 884

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



328 S.W.3d 526, 54 Tex. Sup. Ct. J. 272
**(Cite as: 328 S.W.3d 526)**



Supreme Court of Texas.
Michael T. JELINEK, M.D. and Columbia Rio Grande Healthcare, L.P. d/b/a Rio Grande Regional Hospital, Petitioners,
v.
Francisco CASAS and Alfredo DeLeon, Jr., as Personal Representatives of the Estate of Eloisa Casas, Deceased, Respondents.

No. 08–1066.
Argued Feb. 18, 2010.
Decided Dec. 3, 2010.

**Background:** Patient's surviving family members brought medical malpractice action against hospital and physician, arising out of treatment of patient at hospital. Following non-suiting of physician, and following jury trial, the 275th District Court, Hidalgo County, Juan R. Partida, J., entered judgment for family members. Hospital and physician appealed. The Corpus Christi Court of Appeals, 2008 WL 2894889, affirmed. Hospital and physician petitioned for review.

**Holdings:** The Supreme Court, Guzman, J., held that:
(1) lay testimony of family members did not present some evidence in support of finding that hospital's alleged negligence caused patient's additional pain and suffering;
(2) expert testimony did not present some evidence in support of finding that hospital's alleged negligence caused patient's additional pain and suffering; and
(3) expert report was conclusory with regard to causation and, thus, was deficient.

Reversed and rendered in part; reversed and remanded in part.

Jefferson, C.J., dissented in part, and filed opinion in which Green and Lehrmann, JJ., joined.

Lehrmann, J., filed opinion dissenting in part.

West Headnotes

**[1] Health 198H ⟲631**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(B) Duties and Liabilities in General
         198Hk630 Proximate Cause
            198Hk631 k. In general. Most Cited Cases

At a trial concerning a medical malpractice claim, the plaintiff must establish two causal nexuses in order to be entitled to recovery: (1) a causal nexus between the defendant's conduct and the event sued upon; and (2) a causal nexus between the event sued upon and the plaintiff's injuries.

**[2] Appeal and Error 30 ⟲1001(3)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)2 Verdicts
            30k1001 Sufficiency of Evidence in Support
               30k1001(3) k. Total failure of proof. Most Cited Cases

In a legal sufficiency review, when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.

**[3] Appeal and Error 30 ⟲1001(3)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)2 Verdicts

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

328 S.W.3d 526, 54 Tex. Sup. Ct. J. 272
**(Cite as: 328 S.W.3d 526)**

30k1001 Sufficiency of Evidence in Support

30k1001(3) k. Total failure of proof. Most Cited Cases

In a legal sufficiency review, when the circumstances are equally consistent with either of two facts, neither fact may be inferred.

**[4] Appeal and Error 30 ☞1002**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)2 Verdicts
            30k1002 k. On conflicting evidence. Most Cited Cases

In a legal sufficiency review, when the evidence equally supports two alternatives, the Supreme Court must view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances, and must consider not just favorable but all the circumstantial evidence, and competing inferences as well.

**[5] Health 198H ☞822(3)**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk815 Evidence
            198Hk822 Weight and Sufficiency in General
               198Hk822(3) k. Proximate cause. Most Cited Cases

To meet the legal sufficiency standard in medical malpractice cases, plaintiffs are required to adduce evidence of a reasonable medical probability, or reasonable probability, that their injuries were caused by the negligence of one or more defendants, meaning simply that it is more likely than not that the ultimate harm or condition resulted from such negligence.

**[6] Health 198H ☞823(8)**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk815 Evidence
            198Hk823 Weight and Sufficiency, Particular Cases
               198Hk823(8) k. Diagnosis and treatment of cancer. Most Cited Cases

Lay testimony of patient's surviving husband and son regarding patient's discomfort while obtaining treatment for cancer in hospital did not present some evidence in support of finding that hospital's alleged negligence caused patient's additional pain and suffering, in their medical malpractice action against hospital; testimony of husband and son raised no more than mere suspicion of causation, inasmuch as they were unable to assert whether it was cancer, surgery, other infections, or lapse in medication that caused such discomfort.

**[7] Health 198H ☞821(3)**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk815 Evidence
            198Hk821 Necessity of Expert Testimony
               198Hk821(3) k. Proximate cause. Most Cited Cases

**Health 198H ☞821(4)**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk815 Evidence
            198Hk821 Necessity of Expert Testimony
               198Hk821(4) k. Gross or obvious negligence and matters of common knowledge. Most Cited Cases

Lay testimony may be used as evidence of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

328 S.W.3d 526, 54 Tex. Sup. Ct. J. 272
**(Cite as: 328 S.W.3d 526)**

causation in certain circumstances in medical malpractice actions, but when expert testimony is required, lay evidence supporting liability is legally insufficient.

**[8] Health 198H ⟊821(3)**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk815 Evidence
               198Hk821 Necessity of Expert Testimony
                   198Hk821(3) k. Proximate cause.
Most Cited Cases

A general rule in medical malpractice actions is that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors.

**[9] Health 198H ⟊631**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(B) Duties and Liabilities in General
           198Hk630 Proximate Cause
               198Hk631 k. In general. Most Cited Cases

Correlation does not necessarily imply causation, for purposes of a medical malpractice action; evidence of an event followed closely by manifestation of or treatment for conditions which did not appear before the event raises suspicion that the event at issue caused the conditions, but suspicion has not been and is not legally sufficient to support a finding of legal causation.

**[10] Health 198H ⟊821(4)**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk815 Evidence
               198Hk821 Necessity of Expert Testimony
                   198Hk821(4) k. Gross or obvious negligence and matters of common knowledge. Most Cited Cases

Non-expert evidence alone is sufficient in a medical malpractice action to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence.

**[11] Evidence 157 ⟊571(9)**

157 Evidence
    157XII Opinion Evidence
        157XII(F) Effect of Opinion Evidence
           157k569 Testimony of Experts
               157k571 Nature of Subject
                   157k571(9) k. Cause and effect.
Most Cited Cases

**Evidence 157 ⟊574**

157 Evidence
    157XII Opinion Evidence
        157XII(F) Effect of Opinion Evidence
           157k574 k. Conflict with other evidence.
Most Cited Cases

**Health 198H ⟊823(6)**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk815 Evidence
               198Hk823 Weight and Sufficiency, Particular Cases
                   198Hk823(6) k. Infections and infectious diseases. Most Cited Cases

Expert testimony did not present some evidence in support of finding that hospital's alleged negligence through lapse in medication caused pa-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tient's additional pain and suffering, in medical malpractice action by patient's surviving family members against hospital; competing explanations existed for presence of negligence-induced infection, and expert did not explain why presence of such infection was medically more probable than competing explanations.

**[12] Evidence 157 ⚷555.10**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.10 k. Medical testimony.
Most Cited Cases

**Trial 388 ⚷105(3)**

388 Trial
    388IV Reception of Evidence
        388IV(C) Objections, Motions to Strike Out, and Exceptions
            388k105 Effect of Failure to Object or Except
                388k105(3) k. Expert and other opinion evidence. Most Cited Cases

If no basis for the expert opinion in a medical malpractice action is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection; a claim will not stand or fall on the mere ipse dixit of a credentialed witness.

**[13] Evidence 157 ⚷555.10**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.10 k. Medical testimony.
Most Cited Cases

When the only evidence of a vital fact is circumstantial, an expert witness in a medical malpractice action cannot merely draw possible infer-

ences from the evidence and state that "in medical probability" the injury was caused by the defendant's negligence; rather, the expert must explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts, and thus, when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion.

**[14] Health 198H ⚷822(3)**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk815 Evidence
                198Hk822 Weight and Sufficiency in General
                    198Hk822(3) k. Proximate cause.
Most Cited Cases

The proof in a medical malpractice action must establish causal connection beyond the point of conjecture; it must show more than a possibility.

**[15] Health 198H ⚷822(2)**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk815 Evidence
                198Hk822 Weight and Sufficiency in General
                    198Hk822(2) k. Degree of proof.
Most Cited Cases

Verdicts in a medical malpractice action must rest upon reasonable certainty of proof.

**[16] Appeal and Error 30 ⚷1001(1)**

30 Appeal and Error
    30XVI Review

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

30XVI(I) Questions of Fact, Verdicts, and Findings

30XVI(I)2 Verdicts

30k1001 Sufficiency of Evidence in Support

30k1001(1) k. In general. Most Cited Cases

**Trial 388 ☞140(1)**

388 Trial

388VI Taking Case or Question from Jury

388VI(A) Questions of Law or of Fact in General

388k140 Credibility of Witnesses

388k140(1) k. In general. Most Cited Cases

Courts should not usurp the jury's role as fact finder, nor should they question the jury's right to believe one witness over another; but when reviewing a verdict for sufficiency of the evidence, courts need not, indeed, must not, defer to the jury's findings when those findings are not supported by credible evidence.

**[17] Appeal and Error 30 ☞1001(3)**

30 Appeal and Error

30XVI Review

30XVI(I) Questions of Fact, Verdicts, and Findings

30XVI(I)2 Verdicts

30k1001 Sufficiency of Evidence in Support

30k1001(3) k. Total failure of proof. Most Cited Cases

When the evidence compels the jury to guess if a vital fact exists, a reviewing court does not undermine the jury's role by sustaining a no-evidence challenge.

**[18] Costs 102 ☞2**

102 Costs

102I Nature, Grounds, and Extent of Right in General

102k1 Nature and Grounds of Right

102k2 k. In general. Most Cited Cases

**Health 198H ☞804**

198H Health

198HV Malpractice, Negligence, or Breach of Duty

198HV(G) Actions and Proceedings

198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Expert report was conclusory with regard to causation, and thus, was deficient, in medical malpractice action by patient's surviving family members against physician arising out of treatment of patient, so as to entitle physician to award of attorney fees and costs in action; report offered no more than bare assertion that physician's alleged breach resulted in increased pain and suffering as well as prolonged hospital stay, but did not offer explanation of how breach caused injury. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(e) (Repealed).

**[19] Health 198H ☞804**

198H Health

198HV Malpractice, Negligence, or Breach of Duty

198HV(G) Actions and Proceedings

198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

If a plaintiff in a medical malpractice action timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion only if it appears to the court, after a hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in the governing statute. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l* ), (r)(6) (Repealed).

**[20] Health 198H ☞804**

198H Health

198HV Malpractice, Negligence, or Breach of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

328 S.W.3d 526, 54 Tex. Sup. Ct. J. 272
**(Cite as: 328 S.W.3d 526)**

Duty

198HV(G) Actions and Proceedings

198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

All information needed for an inquiry into whether a good-faith effort was made to comply with expert report requirements in the governing statute is found within the four corners of the expert report, which need not marshal all the plaintiff's proof, but must include the expert's opinion on each of the three main elements: standard of care, breach, and causation. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6) (Repealed).

**[21] Health 198H ⟜804**

198H Health

198HV Malpractice, Negligence, or Breach of Duty

198HV(G) Actions and Proceedings

198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

An expert report in a medical malpractice action cannot merely state the expert's conclusions about the elements of standard of care, breach, and causation, but must explain the basis of the statements to link the conclusions to the facts; a report that merely states the expert's conclusions about the elements does not fulfill the purposes of a good-faith effort in complying with the expert report requirements in the governing statute. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6) (Repealed).

**[22] Appeal and Error 30 ⟜960(1)**

30 Appeal and Error

30XVI Review

30XVI(H) Discretion of Lower Court

30k960 Rulings on Motions Relating to Pleadings

30k960(1) k. In general. Most Cited Cases

The Supreme Court reviews the trial court's grant or denial of a motion for sanctions and dismissal of a medical malpractice action on the ground of a deficient expert report under the abuse-of-discretion standard. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(e) (Repealed).

**[23] Appeal and Error 30 ⟜946**

30 Appeal and Error

30XVI Review

30XVI(H) Discretion of Lower Court

30k944 Power to Review

30k946 k. Abuse of discretion. Most Cited Cases

A district court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles.

**\*529** Ronald G. Hole, Ida Cecilia Garza, Hole & Alvarez, L.L.P., McAllen, for Michael T. Jelinek, M.D.

John N. Mastin, San Antonio, Francisco J. Rodriguez, Rodriguez Tovar & Lopez, LLP, McAllen, for Francisco Casas.

Mike A. Hatchell, Sarah B. Duncan, Elissa Gail Underwood, Locke Lord Bissell & Liddell, LLP, Austin, Raul Javier Guerra, Green, DuBois & Guerra, San Antonio, Susan A. Kidwell, Locke Lord Bissell & Liddell, LLP, Austin, for Columbia Rio Grande Healthcare, L.P.

Justice GUZMAN delivered the opinion of the Court, in which Justice HECHT, Justice WAINWRIGHT, Justice MEDINA, Justice JOHNSON, and Justice WILLETT joined, and in which Chief Justice JEFFERSON, Justice GREEN, and Justice LEHRMANN joined as to Parts I and II.A.

When circumstantial evidence is consistent with several possible medical conclusions, only one of which establishes that the defendant's negligence caused the plaintiff's injury, an expert witness must explain why, based on the particular facts of the case, that conclusion is medically superior to the others. If the expert fails to give any reason beyond an unsupported opinion, the expert's testimony is legally insufficient evidence of causation. In this

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

328 S.W.3d 526, 54 Tex. Sup. Ct. J. 272
**(Cite as: 328 S.W.3d 526)**

case, we determine whether legally sufficient evidence supports the jury's verdict in favor of the estate of Eloisa Casas [FN1] against Rio Grande Regional Hospital (the Hospital).[FN2] Following her admission to the Hospital with abdominal pain, doctors placed Casas on antibiotics used to treat and prevent certain intra-abdominal infections. Two days later she underwent major abdominal surgery and continued on the antibiotics for another five days, but the Hospital allowed the prescriptions to lapse for four-and-a-half days. The Hospital admits it should have continued the antibiotics but denies that the lapse caused Casas any additional pain. We hold that the Casases failed to present legally sufficient evidence that Casas suffered from an infection the omitted antibiotics would have treated. Accordingly, we reverse the court of appeals' judgment and render judgment that the Casases take nothing. [FN3]

> FN1. Francisco Casas and Alfredo DeLeon Jr., Casas's husband and son, respectively, serve as personal representatives of her estate. We refer to them collectively as "the Casases."

> FN2. Columbia Rio Grande Regional Healthcare, L.P., d/b/a/ Rio Grande Regional Hospital.

> FN3. Because we conclude legally insufficient evidence supports the jury's verdict, we do not reach the Hospital's second issue—whether the Hospital preserved error regarding its proposed unavoidable accident instruction.

In a separate petition, Dr. Michael Jelinek, one of Casas's treating physicians sued by the Casases, argues that the trial court should have granted his motion for sanctions and dismissal because the Casases' expert report was deficient. We agree and hold that an award of attorney's fees is proper. Therefore, we reverse and remand to the trial court for an award of attorney's fees and costs.

**\*530 I. Background**

In 2000, Eloisa Casas was diagnosed with colon cancer and underwent surgery, radiation, and chemotherapy. A year later, doctors told her that the cancer appeared to be in remission, and she thought she was cured. But on July 10, 2001, she was admitted to the Hospital with abdominal pains; she also had a fever and a mildly elevated white-blood-cell count, potentially indicating an infection. To treat this possible infection, her surgeon and primary physician, Dr. Carlos Garcia–Cantu, consulted with an infectious disease specialist at the Hospital, Dr. Michael Jelinek, who on July 11 prescribed two medications, Maxipime (a broad-spectrum antibiotic), and Flagyl (an antibiotic used to treat anaerobic bacteria).

The Hospital performed several diagnostic tests, which revealed abnormal collections of fluid in Casas's abdomen. On July 13, she underwent major abdominal surgery during which Dr. Garcia–Cantu discovered that "fairly extensive" metastatic cancer had perforated Casas's colon and allowed material to leak into her abdominal cavity, causing an intra-abdominal abscess. Dr. Garcia–Cantu drained the abscess, repaired Casas's colon, and inserted a Jackson–Pratt drain to prevent further problems. Following the surgery, Dr. Garcia–Cantu continued the Maxipime and Flagyl prescriptions, and a culture of the removed abscess revealed an E. coli infection, which is effectively treated with Maxipime. Casas received Maxipime and Flagyl for another five days, but hospital staff inadvertently failed to place a prescription renewal form on Casas's chart, resulting in a four-and-a-half-day period between July 18 and 23 during which Casas did not receive either medication. Even so, Casas never tested positive for E. coli again and a culture of the incision site on July 18 instead grew Candida (a fungus) for which Diflucan (an antifungal) was prescribed. Then, on July 21, a second culture from a blood sample grew coagulase-negative staph, for which Vancomycin was prescribed.[FN4] Neither Maxipime nor Flagyl would have treated the Candida or coagulase-negat-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ive staph infection.

> FN4. There was a several-day lag between taking the culture and ordering the prescription, presumably to allow the culture to grow and to transmit the results to the treating physicians. Thus, the Diflucan was prescribed on July 21 and the Vancomycin on July 23.

On July 23, Dr. Garcia–Cantu noted an abscess in the wound, which he drained by removing the staples and opening the wound. The next day, records indicate that a foul smell was emanating from the wound site, and hospital staff brought fans into the room to dissipate the odor. When Dr. Jelinek learned of the lapsed prescription on July 23, he informed Casas and then prescribed different antibiotics, Levaquin and Vancomycin. On July 25, after a CAT scan showed no abscess, Dr. Garcia–Cantu removed the drain. Casas left the Hospital on August 23, but she returned in early September and died two months later.

In May 2003, several members of Casas's family, including her husband and son, filed suit against the Hospital, Dr. Garcia–Cantu, and Dr. Jelinek. The plaintiffs claimed that the defendants' negligence caused Eloisa Casas to "suffer grievous embarrassment and humiliation, as well as excruciating pain the remainder of her life which she would not have suffered to such degree or extent if properly diagnosed, treated and cared for." The plaintiffs sought to recover damages for Casas's injuries and mental anguish. They twice amended their petition, ultimately leaving the Casases as the sole plaintiffs.

**\*531** As required by former article 4590i § 13.01 of the Medical Liability and Insurance Improvement Act, *see* TEX.REV.CIV. STAT. art. 4590i § 13.01, [FN5] the Casases filed an expert report within 180 days of filing the original petition. In the report, Dr. John Daller opined that Dr. Garcia–Cantu and Dr. Jelinek were negligent in failing to discover that the antibiotics were not being given

to Casas and that within "reasonable medical probability" this negligence resulted in a prolonged hospital stay and increased pain and suffering. Dr. Jelinek later filed a motion for sanctions and dismissal under article 4590i § 13.01(e), alleging that the expert report was deficient because, among other things, it failed to explain any causal connection between the negligence and the purported injury. The trial court denied the motion. Before trial began, however, the Casases nonsuited Dr. Jelinek and Dr. Garcia–Cantu.

> FN5. *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986, *amending* the Medical Liability and Insurance Improvement Act of Texas, Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. Former article 4590i § 13.01 was replaced by Texas Civil Practice and Remedies Code § 74.351, as amended.

At trial, Dr. Daller testified as the Casases' medical expert. During direct examination, he analyzed the Hospital's daily patient notes regarding Casas and identified the significant events. He noted changes in Casas's vital signs on July 21 and 22, such as increased heart rate and temperature, inflammation, and tenderness of the surgery site. Dr. Daller stated that "in medical probability" there was an infection in the abdomen, but on cross-examination he admitted that "there was no objective evidence present to demonstrate that intra-abdominal infection." When reviewing the patient notes for July 24, which noted the presence of a foul smell, he suggested that the smell was consistent with an anaerobic infection that would be difficult to culture because anaerobic bacteria die when exposed to air. Dr. Carl Berkowitz, the Hospital's expert, offered several other explanations for the smell, such as the Candida infection or dying tissue.

The Casases also called Casas's relatives to testify about her condition. Consistent with Dr.

328 S.W.3d 526, 54 Tex. Sup. Ct. J. 272
**(Cite as: 328 S.W.3d 526)**

Daller's testimony, Casas's son linked the smell with the opening of the wound to drain the abscess: "The odor that I noticed was after they had taken out the staples on her incision, and one day that I went to see her as soon as they opened the door the whiff of this putrid smell just engulfed me." He also testified that Casas was upset upon learning that she had not received the antibiotics but was even more upset when the incision had to be opened and drained: "Well, after she was told and I was told that she wasn't getting antibiotics, like I said, she was upset. What really upset her more was when they had to—they had to take out the staples out of her incision, and they had to open her incision up again." Casas's husband testified that, while she was upset and did not trust the nurses or doctors after learning of the lapsed prescription, "she was still fighting. She ... wanted to beat this cancer she had." The son testified that Casas did not lose hope until she witnessed the events of September 11, 2001, following her re-admission to the Hospital: "That's why I remember that day so vividly in my mind because that was the turning point in my mom. She seemed to just give up, not fight, not want to fight anymore like she used to. And that was a very, very sad day."

**\*532** The jury found that the negligence of the Hospital, Dr. Jelinek, and Dr. Garcia–Cantu proximately caused Casas's injury. The jury apportioned ninety percent of the negligence to the Hospital, five percent to Dr. Jelinek, and five percent to Dr. Garcia–Cantu. It awarded $250,000 in damages to the Casases as compensation for Casas's pain and mental anguish.

The Hospital appealed, arguing that the evidence was legally and factually insufficient to prove causation or damages for mental anguish. Dr. Jelinek also appealed, challenging the trial court's denial of his motion for sanctions and dismissal. The court of appeals affirmed on all issues. —— S.W.3d ——.

## II. Analysis

We address in turn the two issues raised in this appeal: the legal sufficiency of the causation evidence and the sufficiency of the Casases' expert report.

### A. Sufficiency of the Evidence

[1] The facts of this case are unfortunate: a woman with advanced colon cancer underwent surgery to repair her cancer-perforated and infected colon, and in the course of treatment for her many symptoms the Hospital failed to renew her antibiotic prescriptions for a four-and-a-half-day period. The Hospital admits it should have continued the antibiotics. Even so, the plaintiff bears the burden to prove that the negligence caused an injury: "[A]t trial the plaintiff must establish two causal nexuses in order to be entitled to recovery: (a) a causal nexus between the defendant's conduct and the event sued upon; and (b) a causal nexus between the event sued upon and the plaintiff's injuries." *Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 731 (Tex.1984). Only the second nexus is at issue here.

[2][3][4] In *City of Keller v. Wilson,* we considered at length the parameters of legal sufficiency review, quoting with approval Chief Justice Calvert's seminal article on the topic:

"No evidence" points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.

168 S.W.3d 802, 810 (Tex.2005) (quoting Robert W. Calvert, *" No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960)). "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). The same is true when the evidence equally supports two alternatives: " 'When the circumstances are equally consistent with either of two facts, neither fact may be inferred.' " *City of Keller,* 168 S.W.3d at 813 (quoting *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.,* 819 S.W.2d 801, 805 (Tex.1991)). When considering such cases, "we must 'view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances,' " *id.* at 813–14 (quoting *Lozano v. Lozano,* 52 S.W.3d 141, 167 (Tex.2001) (per curiam)), and we "must consider not just favorable but all the circumstantial evidence, and competing inferences as well." *Id.* at 814.

[5] To meet the legal sufficiency standard in medical malpractice cases "plaintiffs are required to adduce evidence of a **\*533** 'reasonable medical probability' or 'reasonable probability' that their injuries were caused by the negligence of one or more defendants, meaning simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 399–400 (Tex.1993) (citations omitted). Thus, we examine the record to determine if the Casases presented legally sufficient evidence that "in reasonable medical probability" the Hospital's negligence caused Casas additional pain and suffering.

When distilled to its essence, the Casases' claim is predicated on the presence of an infection—treatable by the lapsed antibiotics—that caused Casas pain and mental anguish above and beyond that caused by the cancer, the surgery, and the other known infections. The absence of an infection treatable by Maxipime and Flagyl would undermine the Casases' claim, for then the prescription lapse would amount to an unfortunate, but harmless, occurrence. The Hospital argues that the Casases presented no evidence that the Hospital's negligence caused such an infection. The Casases' expert admitted there is no direct evidence of an anaerobic infection, leaving the jury to consider the circumstantial evidence and make proper inferences from it. In reviewing the record, we initially decide if jurors can determine causation under these facts unaided by expert testimony—that is, whether lay testimony regarding causation is legally sufficient.

### 1. Lay Testimony of Causation

[6][7][8][9] Lay testimony may be used as evidence of causation in certain circumstances, but "[w]hen expert testimony is required, lay evidence supporting liability is legally insufficient." *City of Keller,* 168 S.W.3d at 812. In medical malpractice cases, expert testimony regarding causation is the norm: "The general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Guevara v. Ferrer,* 247 S.W.3d 662, 665 (Tex.2007); *see also Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949) ("It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries."). We have allowed lay evidence to establish causation "in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition." *Morgan,* 675 S.W.2d at 733 (citing *Lenger v. Physician's Gen. Hosp., Inc.,* 455 S.W.2d 703, 706 (Tex.1970)). Care must be taken to avoid the *post hoc ergo propter hoc* fallacy, that is, finding an earlier event caused a later event merely because it occurred first. Stated simply, correlation does not necessarily imply causation. As we noted in *Guevara,* "[e]vidence of an event followed closely by manifestation of or treatment for conditions which did not appear before the event raises suspicion that the event at issue caused the conditions. But suspicion has not been and is not legally sufficient to support a finding of legal causation." 247 S.W.3d at 668.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

[10] When lay testimony is credited as evidence of causation, it usually highlights a connection between two events that is apparent to a casual observer. In *Morgan,* for example, a previously healthy employee, upon exposure to leaking chemicals, suffered watering of the eyes, blurred **\*534** vision, headaches, and swelling of the breathing passages. 675 S.W.2d at 733. In such a circumstance, lay testimony sufficed to connect the specific injury to the negligence with no evidence of causation beyond the leaking chemicals. *Id.* Likewise in *Guevara,* we stated that determining causation of "certain types of pain, bone fractures, and similar basic conditions" following an automobile accident was within the competence of lay jurors. 247 S.W.3d at 668. But we held that expert testimony was required to prove that a patient's medical expenses resulted from the accident, noting that "[p]atients in hospitals are often treated for more than one condition brought on by causes independent of each other." *Id.* at 669. These cases illustrate this basic premise: "[N]on-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence." *Id.* at 668.

The present case does not fall within this rule. Unlike in *Morgan,* an otherwise healthy person did not suddenly experience health difficulties following the defendant's negligent conduct when the plaintiff's symptoms were reasonably attributable to the negligence and to nothing else. Rather, a patient with terminal colon cancer did not receive antibiotics for four-and-a-half days following major abdominal surgery and after having received the medications for eight days. There is no direct evidence that she suffered from an infection treatable by the omitted antibiotics, but there is evidence that she had two other infections that accounted for all of her symptoms during that time. Given Casas's medical condition, expert testimony was crucial to link

the prescription lapse to an infection causing additional pain and suffering beyond what she would otherwise have experienced. *See Kaster v. Woodson,* 123 S.W.2d 981, 983 (Tex.Civ.App.-Austin 1938, writ ref'd) ("What is an infection and from whence did it come are matters determinable only by medical experts."); *see also Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1966) ("In determining negligence in a case such as this, which concerns the highly specialized art of treating disease, the court and jury must be dependent on expert testimony. There can be no other guide, and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury.").

The Casases point to testimony by Casas's husband and son to support their argument that she deteriorated rapidly after discovering she did not receive the antibiotics. But this characterization overstates the evidence. While Casas's husband testified she was upset and did not trust her doctors following the discovery, she was still determined to fight her cancer. The son also observed Casas's anger and lack of trust but testified that the opening of her wound, which occurred the same day she learned of the lapse, upset her even more. As Dr. Daller admitted, Candida likely caused the abscess that required Dr. Garcia–Cantu to drain the wound. Further, based on his experience at Casas's bedside, her son pinpointed the tragic events of September 11, 2001, and their effect on his mother as the turning point in her mental state. The latter event was some seven weeks after discovery of the lapsed prescriptions and after Casas's discharge from and readmission to the Hospital. This evidence does not bear out the Casases' claim of a marked shift in Casas's mental resilience following the omission of the medications.

**\*535** More importantly, Casas's husband and son were unable to precisely identify the cause of her suffering. While they could accurately describe her discomfort, they were unable to say if it was the cancer, the surgery, the other infections, or the

lapse that caused it. Even testimony that Casas suffered after learning of the omission raises no more than a mere suspicion of causation, and that is not enough, *see Guevara,* 247 S.W.3d at 668, particularly in light of the evidence that Casas thought she was cured of cancer before the surgery and then learned that not only was it "back with a vengeance," it was terminal. The testimony of Casas's husband and son is evidence of her suffering, but not of its cause. Thus, we hold that the lay testimony presented by the Casases is legally insufficient to establish that the Hospital's negligence caused Casas additional pain and suffering.

### 2. Expert Testimony

[11] The Casases also presented expert testimony regarding causation. The Casases' expert, Dr. Daller, testified that the Hospital's negligence "in medical probability" caused Casas additional pain and suffering. He based this opinion on the presence of an intra-abdominal infection that could have been treated using Maxipime and Flagyl. Admitting that no direct evidence indicated such an infection, Dr. Daller pointed to various circumstantial indicators that suggested an infection. These indicators were primarily Casas's changed vital signs, such as fever and increased heart rate: "Well, given the fact that two to three days after the antibiotics had been mistakingly [sic] stopped her fever curve went up and her heart rate went up, to me that suggests the presence of on going [sic] infection."[FN6] But on cross-examination, he conceded these data were equally consistent with two other infections cultured from Casas's incision and blood—Candida and coagulase—negative staph—neither of which is treatable by Maxipime or Flagyl:

> FN6. When asked if the lapsed prescriptions affected Casas's hospital stay, Dr. Daller equivocated:
>
> A. I think that it certainly did impact it. However, I cannot quantitate that because there are multiple variables that are present in a clinical condition. Whether it lengthened her stay by one

day, two days, three days, I cannot say that. What I would say from a scientific standpoint is that for four and a half days she did not receive appropriate therapy. Had she received the appropriate therapy then *you would expect* her length of stay to be shortened somewhat. To quantitate that, I could not do that.

....

A. Obviously, not receiving antibiotics is not going to shorten your stay. Therefore, *if it impacted the stay* it must have lengthened it. (emphases added).

Q. Now, Candida, infection of a wound like this, they can cause high temperatures. Correct?

A. Fungal infections can cause a high temperature, yes.

Q. It can cause increased heart rate?

A. That is correct.

Q. And inflammation?

A. That is correct.

Q. Pain?

A. That is correct.

Q. How about an abscess?

A. It caused or is part of the abscess in that wound that was present, that wound infection that needed to be opened.

Q. So when Doctor Garcia went in on 7/23 ... and drained that wound at bedside that abscess was within a reasonable degree of medical probability caused by the Candida?

**\*536** A. That was one of the organisms that was there. It was the organism that was cultured. That is correct.

....

Q. ... This coagulase negative staph causes fever?

A. Correct.

Q. Increased heart rate?

A. The fever will cause increased heart rate.

....

Q. It can cause pain?

A. Depending upon the site. Correct.

Q. Okay. All of these things can be caused by coagulase negative staph and Candida, which we know were present 7/18 through 7/23, the time period she did not get antibiotics?

A. That's correct.

Q. Neither one would have been killed by Maxipime or Flagyl?

A. That's correct.

[12][13] It is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury. The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury. We have rejected expert opinions not grounded in a sound evidentiary basis: "[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection. '[A] claim will not stand or fall on the mere *ipse dixit* of a credentialed witness.' " *City of San Antonio v. Pollock,* 284 S.W.3d 809, 818 (Tex.2009) (quoting *Burrow v. Arce,* 997 S.W.2d 229, 235 (Tex.1999)); *see also Whirlpool Corp. v. Camacho,* 298 S.W.3d 631, 637 (Tex.2009) ( "Conclusory or speculative opinion testimony is not relevant evidence because it does not tend to make the existence of material facts

more probable or less probable."). When the only evidence of a vital fact is circumstantial, the expert cannot merely draw possible inferences from the evidence and state that "in medical probability" the injury was caused by the defendant's negligence. The expert must explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts. Thus, when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion. *See Lenger,* 455 S.W.2d at 707 ("[E]xpert testimony that the event is a possible cause of the condition cannot ordinarily be treated as evidence of reasonable medical probability except when, in the absence of other reasonable causal explanations, it becomes more likely than not that the condition did result from the event."); *Hart,* 399 S.W.2d at 792 ("The burden of proof is on the plaintiff to show that the injury was negligently caused by the defendant and it is not enough to show the injury together with the expert opinion that it might have occurred from the doctor's negligence and from other causes not the fault of the doctor. Such evidence has no tendency to show that negligence did cause the injury.").

By conceding that Casas's symptoms were consistent with infections not treatable by Maxipime or Flagyl, Dr. Daller undermined his conclusion that an undetected infection was also present. While it is possible that Casas did have such an infection, its presence can only be inferred from facts that are equally consistent with the Candida and coagulase-negative staph infections. " 'When the circumstances are **\*537** equally consistent with either of two facts, neither fact may be inferred.' " *City of Keller,* 168 S.W.3d at 813 (quoting *Tubelite,* 819 S.W.2d at 805). Here, objective data—the cultures—support the Candida and staph infections but not the supposed anaerobic infection.[FN7]

> FN7. Admittedly, anaerobic bacteria are hard to culture because they are averse to oxygen.

[14][15] Based on the record evidence, an anaerobic infection cannot be proved or disproved. It is equally plausible that Casas had such an infection or that she did not. Dr. Daller opined that she did, but he did not explain why that opinion was superior to the opposite view. Such evidence raises no more than a possibility of causation, which is insufficient. As we said in *Bowles v. Bourdon,* " '[t]he proof must establish causal connection beyond the point of conjecture. It must show more than a possibility. Verdicts must rest upon reasonable certainty of proof. Where the proof discloses that a given result may have occurred by reason of more than one proximate cause, and the jury can do no more than guess or speculate as to which was, in fact, the efficient cause, the submission of such choice to the jury has been consistently condemned by this court and by other courts.' " 219 S.W.2d at 785 (quoting *Ramberg v. Morgan,* 209 Iowa 474, 218 N.W. 492, 498–99 (1928)).

The Casases argue that the foul smell, which is consistent with an anaerobic infection, is strong evidence of such an infection. Looking at the patient notes for July 24, Dr. Daller commented on the smell:

> A. The text says something about drainage to the abdomen with moderate amount of drainage. And it says that it is foul smelling.
>
> ....
>
> Q. The [previous notes] that I remember that we have gone over didn't say anything about foul smelling?
>
> A. That's correct. They were just described as I recall as being purulent and looking like puss [sic].
>
> Q. What does that mean when it says "foul smelling"?

> A. When you have foul smelling, it suggests that the organism is an anaerobe. In other words, one of those bacteria that didn't need oxygen in order to grow that, for example, Flagyl would treat.
>
> Q. Okay. Does that give you clinical evidence that had she been continued on Maxipime and Flagyl that they would have had some effect with regards to the condition as we see it on the 24th?
>
> A. Well, like I said, most anaerobes are sensitive or susceptible to Flagyl. And she had previously been on Flagyl and at this time she is not. So I would have expected that that would be an appropriate antibiotic that would have covered the organism that's causing that foul smell.

Dr. Berkowitz, the Hospital's expert, offered several other explanations for the smell, including necrotic tissue, dead cancer tissue, and the Candida infection.[FN8] As **\*538** noted, Casas's son noticed the smell after the incision was opened to drain the abscess, which Dr. Daller admitted was likely caused by Candida.

> FN8. Dr. Berkowitz testified:
>
> > I think that there are a number of things that can cause things smelling bad besides just infection. Tissue that dies doesn't smell good. There's bacteria and products released by the dead tissue that don't smell good.
> >
> > And we know based on the pathology report of the cancer that they took out of her abdomen, that this had grown enough that it was dying. In other words, it was probably outgrowing it's [sic] blood supply and was starting to die. That in and of itself can smell bad. Then you have a wound that is infected; although Candida itself does not typically smell bad, not like something dead. It smells funky and people don't like the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

way it smells. The wound itself when it wasn't healing was probably having some necrotic tissue, as well, or dead tissue that is in the wound. I'm sure that smelled bad, as well. And they were never able to completely get rid of all that dead cancer tissue that was in her abdomen.

I think there's a number of reasons why she would have had a bad smell, none of which can be explained by four or five days of not getting Flagyl [or] Maxipime.

[16][17] Here again, there are competing explanations for the smell, which amounts to no more than circumstantial evidence of some kind of infection or possibly dying tissue. Because there is no direct evidence of the infection and the circumstantial evidence is meager, we "must consider not just favorable but all the circumstantial evidence, and competing inferences as well." *City of Keller,* 168 S.W.3d at 814. Courts should not usurp the jury's role as fact finder, nor should they question the jury's right to believe one witness over another. But when reviewing a verdict for sufficiency of the evidence, courts need not—indeed, must not—defer to the jury's findings when those findings are not supported by credible evidence. When the evidence compels the jury to guess if a vital fact exists, a reviewing court does not undermine the jury's role by sustaining a no-evidence challenge. The evidence in this case—being consistent with an anaerobic infection that was treatable by Flagyl, a fungal infection that was not, or even with dying tissue, cancerous or otherwise—did not provide the jury a reasoned basis from which to infer the presence of a negligence—induced infection. Because the jury could not reasonably infer an infection caused by the Hospital's negligence, we agree with the Hospital that no evidence supports the jury's verdict.

We understand the Casas family's predicament and frustration at the Hospital's conduct, and we recognize the difficulty of proving that the lapsed prescriptions caused a painful infection. But the Casases shouldered that burden and must prove the causal link with reasonable certainty. In that quest, the Casases offered the testimony of Dr. Daller, but he did not explain why an undetected, anaerobic infection is medically more probable than one based on the known infections and the dying tissue, leaving the jury to guess if the lapsed prescriptions caused additional pain and suffering. Without probative medical testimony that the lapse caused—by means of an infection treatable by Maxipime and Flagyl—more pain than the cancer, the surgery, and the other infections already inflicted, there is no legally sufficient evidence of causation. Dr. Daller did not provide that causal link; accordingly, we hold that his testimony is legally insufficient to support the jury's verdict. Because the Casases failed to prove causation, we reverse the judgment of the court of appeals and render judgment that the Casases take nothing.

**B. Adequacy of the Expert Report**

[18][19] In his petition, Dr. Jelinek raises a single issue: whether the trial court abused its discretion by denying his motion for sanctions and dismissal because the Casases' expert report was deficient under former article 4590i § 13.01, the statute in effect at the time. *See* TEX.REV.CIV. STAT. art. 4590i § 13.01. Article 4590i required the report to provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that **\*539** failure and the injury, harm, or damages claimed." *Id.* § 13.01(r)(6). "If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion '*only if* it appears to the court, after hearing, that the report does not represent a *good faith effort* to comply with the definition of an expert report in Subsection (r)(6) of this section.' " *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 51–52 (Tex.2002) (per curiam) (quoting § 13.01(*l* )). Dismissal for failure

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

to serve an adequate expert report also carried mandatory sanctions, requiring an award to the defendant of his costs and attorney's fees against the plaintiff or the plaintiff's attorney. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001) (citing § 13.01(e)).

[20][21] We have defined a "good-faith effort" as one that provides information sufficient to (1) "inform the defendant of the specific conduct the plaintiff has called into question," and (2) "provide a basis for the trial court to conclude that the claims have merit." *Wright,* 79 S.W.3d at 52 (citing *Palacios,* 46 S.W.3d at 879). All information needed for this inquiry is found within the four corners of the expert report, which need not "marshal all the plaintiff's proof" but must include the expert's opinion on each of the three main elements: standard of care, breach, and causation. *Id.* Importantly for this case, the "report cannot merely state the expert's conclusions about these elements," but " 'the expert must explain the basis of his statements to link his conclusions to the facts.' " *Id.* (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). "A report that merely states the expert's conclusions about the standard of care, breach, and causation" does not fulfill the two purposes of a good-faith effort. *Palacios,* 46 S.W.3d at 879.

[22][23] We review the trial court's grant or denial of a motion for sanctions and dismissal under the abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 877–78. A district court "abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Wright,* 79 S.W.3d at 52 (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985)).

Dr. Jelinek argues that the Casases' report is deficient in two ways, failing (1) to state the applicable standard of care, and (2) to provide more than conclusory statements of causation. We focus on the latter. Dr. Daller's report concluded that Dr. Jelinek's breach of the appropriate standard of care in "reasonable medical probability, resulted in a prolonged hospital course and increased pain and suffering being experienced by Ms. Casas." Aside from repeating essentially the same phrase twice more, the report says nothing more regarding causation. The Casases argue this statement is sufficient to meet the good-faith requirement. We disagree.

An expert cannot simply opine that the breach caused the injury. Stated so briefly, the report fails the second *Palacios* element—it does not give the trial court any reasonable basis for concluding that the lawsuit has merit. *See* 46 S.W.3d at 879. An expert's conclusion that "in medical probability" one event caused another differs little, without an explanation tying the conclusion to the facts, from an *ipse dixit,* which we have consistently criticized. *See Pollock,* 284 S.W.3d at 818 (citing *Burrow,* 997 S.W.2d at 235); *Earle,* 998 S.W.2d at 890 ("An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts."). Instead, the expert must go further and explain, to a reasonable degree,**\*540** how and why the breach caused the injury based on the facts presented. While we have said that no "magical words" need be used to meet the good-faith requirement, mere invocation of the phrase "medical probability" is likewise no guarantee that the report will be found adequate. *See Wright,* 79 S.W.3d at 53.

Under these standards, the Casases' report is conclusory on causation. It offers no more than a bare assertion that Dr. Jelinek's breach resulted in increased pain and suffering and a prolonged hospital stay. Beyond that statement, the report offers no explanation of how the breach caused the injury. Again, the plaintiff need not marshal all of his proof in the report, but he must include sufficient detail to allow the trial court to determine if the claim has merit. Because the Casases' report lacks any explanation linking the expert's conclusion to the relevant facts, we hold that the trial court abused its discretion by denying Dr. Jelinek's motion and the court of appeals erred by affirming that ruling.[FN9] *See id.* at 52. Accordingly, we remand the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

case to the trial court for an award of attorney's fees and costs [FN10] under former article 4590i § 13.01(e) against the Casases and their counsel. [FN11]

FN9. In his dissent, CHIEF JUSTICE JEFFERSON argues that an expert report need not meet the legal sufficiency requirements necessary to support a judgment and suggests that we hold it must. We agree that an expert report need not "meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios,* 46 S.W.3d at 879. But, as we stated earlier, the report must provide more than conclusory statements concerning applicable standards of care, breach of those standards, and causation. *See id.* An expert report must instead, within its four corners, provide some explanation as to each of these elements. TEX.REV.CIV. STAT. art. 4590i § 13.01(r)(6); *Wright,* 79 S.W.3d at 52. The report here offered only a conclusory statement concerning causation with no explanation as to how the lapse in antibiotic treatment resulted in longer hospitalization, increased pain and suffering, or ultimately Casas's death.

FN10. In her dissent, JUSTICE LEHRMANN indicates that (1) she would remand the case to allow the Casases an opportunity to show that their failure to present an adequate report was not intentional or the result of conscious indifference, and (2) Dr. Jelinek should not be entitled to attorney's fees and costs if the Casases can make this showing and submit an adequate report. We note that the Casases did not request a remand of this nature, nor brief the attorney's fees issue. *See State v. Brown,* 262 S.W.3d 365, 370 (Tex.2008) (observing that "[a] party generally is not entitled to relief it does not seek" and refusing to sua sponte grant re-

lief that was not sought); *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 410 (Tex.1997) (noting that ordinarily, failure to brief an argument waives error on appeal); TEX.R.APP. P. 38.1(h).

FN11. We briefly note that under former article 4590i a trial court's order denying a motion to dismiss premised on an inadequate expert report was not immediately appealable, as it now is under Texas Civil Practice and Remedies Code §§ 51.014 and 74.351. Nor did we definitively say that mandamus review was appropriate for such orders until almost four years after the trial court denied Dr. Jelinek's motion for dismissal and sanctions. *See In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 461–62 (Tex.2008). Thus, we do not fault Dr. Jelinek for waiting until final judgment to seek review of the trial court's order. *See Hernandez v. Ebrom,* 289 S.W.3d 316, 318 (Tex.2009) ("Generally, appeals may only be taken from final judgments....").

We mention this point because we have since cautioned that a defendant—having foregone the interlocutory appeal now available—risks losing the right to appeal following final judgment if, after a trial on the merits, the jury finds the defendant liable. *See id.* at 321. Even if the present statute applied here, this caution would not bar Dr. Jelinek's appeal because he was not a party at trial, having been nonsuited earlier. We will not bar a nonsuited defendant's appeal after final judgment because the jury finds him liable at a former codefendant's trial. Such a defendant did not call or cross-examine witnesses, present evidence, or otherwise participate at trial and should not be bound by what happens there.

**\*541 III. Conclusion**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

For the foregoing reasons, we reverse the court of appeals' judgment, render judgment that the Casases take nothing, and remand to the trial court for an award of Dr. Jelinek's attorney's fees and costs consistent with this opinion.

Chief Justice JEFFERSON filed an opinion, dissenting in part, in which Justice GREEN and Justice LEHRMANN joined.
Justice LEHRMANN filed an opinion, dissenting in part.

Chief Justice JEFFERSON, joined by Justice GREEN and Justice LEHRMANN, dissenting in part.

We must decide whether an expert report gave a "fair summary" of the expert's opinions regarding standard of care, failure to meet the standard, and the link between that failure and the patient's damages. We must consider the expert's opinions "as of the date of the report." TEX.REV.CIV. STAT. art. 4590i § 13.01(r)(6) (repealed 2003). To do so, we must disregard today's holding that, at trial, there was no evidence linking the discontinuation of antibiotics to increased suffering by Casas. The expert report submitted in this case gave fair notice of a meritorious claim—that the doctor failed to ensure that his patient received antibiotics, thereby increasing her pain and suffering. I would affirm the court of appeals' judgment with respect to the doctor.

### I. Background

Eloisa Casas, a patient recently diagnosed with colon cancer, was admitted to Rio Grande Hospital for abdominal pain. The cancer had perforated her colon, the contents of which leaked into her abdominal cavity, causing an abscess. After the doctor drained and surgically removed the abscess, he discovered that Casas had an E. coli infection, for which the doctor prescribed two antibiotics. Although those prescriptions were supposed to have been renewed five days later, they lapsed. Casas contends this mistake occurred because the doctor failed to ensure that hospital staff complied with his renewal order. During the four days after the pre-

scriptions expired, Casas's surgical incision began to emit a putrid odor. She developed several infections in addition to E. coli, exacerbating her pain and extending her stay in the hospital. Casas died two months after she was discharged.

Casas's estate sued the Hospital and two of the treating doctors, Dr. Garcia–Cantu and Dr. Jelinek, for negligently causing Mrs. Casas "grievous embarrassment and humiliation, as well as excruciating pain the remainder of her life which she would not have suffered to such degree if properly diagnosed, treated and cared for...." The trial court denied Dr. Jelinek's motion to dismiss the case against him. Nevertheless, the estate nonsuited both doctors more than a year before Casas's claim against the Hospital was tried to a jury. At that trial, the jury found the hospital 90% negligent, and each doctor 5% negligent. The trial court rendered judgment against the hospital, and the court's order nonsuiting Dr. Jelinek "with prejudice" merged into that final judgment.

Dr. Jelinek and the hospital appealed the trial court's judgment. The hospital complained that the evidence was legally insufficient to support the verdict. Dr. Jelinek complained that the trial court improperly denied him attorney's fees, as the expert report was not a good faith effort to comply with statutory requirements. The court of appeals affirmed, 2008 WL 2894889, *9–*10, 2008 Tex.App. LEXIS 5647, *28–*29 (Tex.App.-Corpus Christi July 29, 2008), and the appellants below are now petitioners here. I fully join the **\*542** Court's rendition of judgment for the hospital. I disagree with the Court's holding as to the doctor.

### II. Good faith effort; fair summary

Former article 4590i provided that "[a] court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in [the statute]." TEX.REV.CIV. STAT. art. 4590i § 13.01(*l* ). "That definition requires, as to each defendant, a fair summary of the expert's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the claimed injury." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001) (citing TEX.REV.CIV. STAT. art. 4590i § 13.01(r)(6)). Because an expert report is filed long before discovery is complete, we cannot judge it according to what subsequent discovery reveals or how the evidence develops at trial. The question is whether the report fairly summarizes the malpractice elements before the case is tested in a full adversary process. For that reason, "to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* at 879.

The report must also give the defendant notice of the conduct the plaintiff challenges, and the trial court must have a basis to determine whether the claim has merit. *Id.* The dividing line between a sufficient and an inadequate report is impossible to draw precisely. We have said, therefore, that the determination must be made in the first instance by the trial court, and review of that decision asks not how an appellate court would have resolved the issue, but instead whether the trial court abused its discretion. *See, e.g., Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); *Walker v. Gutierrez,* 111 S.W.3d 56, 63 (Tex.2003).

### III. Dr. Daller's report

Dr. Daller is a physician and an expert on intra-abdominal abscesses and infection. His report states that a doctor treating a patient like Casas must ensure that the antibiotics he prescribes are actually administered. Despite that standard, Dr. Daller states that antibiotics prescribed for Ms. Casas were not administered from July 17 through July 23, even though "[t]here [wa]s no order to discontinue the antibiotic therapy." He concluded that Dr. Jelinek breached the standard of care by his "failure

to recognize that the antibiotics were not being administered as ordered." Dr. Daller concludes that "[t]his breach in the standard of care ..., within reasonable medical probability, resulted in a prolonged hospital course and increased pain and suffering...."

### IV. Dr. Daller gave a "fair summary" of the required standard of care and how the allegedly inadequate care fell below that standard.

The Court concludes that Dr. Daller's report lacks the detail necessary to conclude that the estate's lawsuit has merit. But the cases it cites as support involve situations in which a hindsight view is entirely appropriate. *Earle v. Ratliff,* for example, is a summary judgment case; it presents the higher evidentiary standard that *Palacios* rejected for expert reports. *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999) ("Summary judgment can be granted on the affidavit of an interested expert **\*543** witness, ... but the affidavit must not be conclusory.... [R]ather, the expert must explain the basis of his statements to link his conclusions to the facts."). Similarly, the standard employed in *City of San Antonio v. Pollock,* 284 S.W.3d 809, 817–18 (Tex.2009), also cited by the Court, is inapplicable here, since it examined an expert report under the "no evidence" standard of review. *See* —— S.W.3d at ——.

In *Palacios* we held that an expert report that failed to articulate a standard of care or explain how the defendant hospital breached that standard was not a good faith effort to comply with the statutory requirements. *Palacios,* 46 S.W.3d at 880. The expert in that case blamed the hospital for taking no action to prevent a patient from falling out of his bed, even though the patient "had a habit of trying to undo his restraints." *Id.* at 879–880. The report, as such, was not a fair summary of the evidence because it neglected to articulate what actions the hospital *should* have taken that it did not. *Id.* at 880. Thus, the trial court did not abuse its discretion by dismissing the plaintiff's claim for lack of a good faith effort to summarize the expert's opin-

ions.

Subsequently, in *Bowie Memorial Hospital v. Wright,* we held that the trial court did not abuse its discretion in concluding that an expert report failed to comply with the statute, as the report did not "establish how any act or omission of employees of Bowie Memorial Hospital caused or contributed to [the patient's] injuries." *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 51–53 (Tex.2002) (quoting the expert in that case as speculating, "I do believe that it is reasonable to believe that if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then [the plaintiff] would have had the possibility of a better outcome."). We observed that a report must satisfy *Palacios*'s two-part test. *Id.* at 52. Because the report "lack[ed] information linking the expert's conclusion (that [the plaintiff] might have had a better outcome) to [the defendant's] alleged breach (that it did not correctly read and act upon the x-rays), the trial court could have reasonably determined that the report was conclusory." *Id.* at 53.

In each of those cases, the trial court could not have evaluated the claim's merit without speculating about actions the defendant could have taken to prevent injury. No such speculation is required here. Dr. Daller states that had the antibiotics been administered from July 17 through July 23, Eloisa Casas would have suffered less. Dr. Daller could have stated that conclusion in greater detail, of course, but "[a] report need not marshal all the plaintiff's proof." *Palacios,* 46 S.W.3d at 878. Daller's report includes his opinions on (1) the applicable standard of care (to maintain vigilance over a patient's treatment), (2) the manner in which the care failed to meet that standard (failing to ensure the treatment he ordered was actually administered), and (3) the causal connection between the failure and the claimed injury (without the antibiotics, the patient's pain and suffering increased and she required additional hospitalization).

A "good faith effort" does not require that the report "meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial"; therefore, an expert report does not fail the good faith effort test merely because it may not later prove legally sufficient to support a judgment. *Id.* at 879. So, here, whether the Casas estate ultimately amassed sufficient proof in an adversarial trial is beside the point; the claim itself was far from frivolous. *See id.* at 878 (noting that "one purpose of the expert-report requirement is to deter frivolous **\*544** claims"). The law imposes a penalty for filing a frivolous suit. Only by today's decree does it also punish a claimant for failing to win an arguably meritorious case. *Cf. TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 918 (1991) (holding that "sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the ... process justifies a presumption that its claims or defenses lack merit.").

I agree with the Court that the Estate failed to prove causation at trial; I disagree that, as to Dr. Jelinek, the expert report was not a good faith attempt to comply with the statute. I respectfully dissent in part from the Court's judgment.

Justice LEHRMANN, dissenting in part.

I fully join Chief Justice Jefferson's dissent. I write separately, however, to highlight the incongruity inherent in the Court's decision to remand the case for an award of attorney's fees and costs under former article 4590i § 13.01(e), given this case's circumstances. *See* TEX.REV.CIV. STAT. art. 4590i § 13.01(e) (repealed 2003) [FN1]. The Court presumes that Dr. Michael Jelinek is entitled to attorney's fees because the expert report filed by Eloisa Casas's estate [FN2] was, on appeal, determined to be insufficient. But, after a pre-trial hearing was held on the defendant's motion to dismiss the lawsuit, the trial court rejected Dr. Jelinek's contention that the report was inadequate; consequently, the Casases had no opportunity to rectify any deficiencies as the statute and our precedent would have allowed.

FN1. *See* Act of May 5, 1995, 74th Leg.,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986, *amending* the Medical Liability and Insurance Improvement Act of Texas, Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. For ease of reference, I will refer to the relevant provisions as they were identified in article 4590i.

FN2. I refer to the estate, which was represented by Casas's husband and son, as "the Casases."

Section 13.01(e) of article 4590i provided for an order awarding attorney's fees and costs if a health care claimant failed to supply an expert report within the time required under subsection (d)—180 days. But the statute provided several avenues for health care claimants to obtain an extension of the 180–day deadline, including section 13.01(g). That provision required the trial court to grant a thirty-day extension of the statutory deadline if a claimant's failure to provide an expert report was not intentional or the result of conscious indifference. And we have expressly held that "a party who files a timely but inadequate expert report may seek relief under the grace period provisions of section 13.01(g)." *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003). Thus, health care claimants could receive an opportunity to rectify deficiencies in a report if they could show that they did not intentionally, or with conscious indifference, submit an inadequate report.

Here, the Casases never had the chance to request an opportunity to cure any deficiencies in their report because the trial court determined that the report adequately complied with section 13.01(d). In *Gutierrez,* we were guided by our recognition that it would be "perverse" to allow a claimant who filed no report a second chance to comply with the statute's expert report requirement, while "punishing those who attempt to comply with the statute but fail." *Id.* In this case, perversely, the

Casases may have been in a better position **\*545** than they are now if the trial court had found that the report was inadequate; they might have had an opportunity to eliminate any deficiencies.

I agree fully with Chief Justice Jefferson that the report represents a good-faith effort to comply with section 13.01. Even if it did not, however, I would remand the case to allow the Casases an opportunity to show that their failure to present an adequate report was not intentional or the result of conscious indifference. *See City of DeSoto v. White,* 288 S.W.3d 389, 401 (Tex.2009) (remanding in the interest of justice *sua sponte* to allow police officer "to make an appellate election with full knowledge of his appellate rights and with knowledge of" the guidance provided in Court's opinion). In my view, the Casases should not be assessed attorney's fees and costs if they can make the showing section 13.01(g) requires and then submit a report complying with the statute. For these reasons, as well as those expressed by Chief Justice Jefferson, I respectfully dissent in part.

Tex.,2010.
Jelinek v. Casas
328 S.W.3d 526, 54 Tex. Sup. Ct. J. 272

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


362 S.W.3d 740
**(Cite as: 362 S.W.3d 740)**

▷

Court of Appeals of Texas,
Houston (14th Dist.).
KINGWOOD PINES HOSPITAL, LLC, Horizon
Health Corporation, Psychiatric Solutions, Inc. and
Yolanda Bassett, Appellants,
v.
R. GOMEZ, Individually and a/n/f of V.G., Appellee.

No. 14–11–00050–CV.
Nov. 22, 2011.

**Background:** Mother, individually and as next friend of her daughter, brought negligence, aiding and abetting assault, assisting or encouraging assault and medical malpractice action against physician, counselor and hospital, where daughter was being evaluated for a psychiatric condition following a history of sexual abuse, after daughter was molested by another patient. The 127th District Court, Harris County, R.K. Sandill, J., denied defendants' motion to dismiss based on an inadequate expert report. Defendants filed interlocutory appeal.

**Holdings:** The Court of Appeals, Martha Hill Jamison, J., held that:
(1) trial court did not abuse its discretion by finding that mother's expert was qualified to give an opinion; but
(2) expert report did not adequately set forth the standards of care and how those standards were breached;
(3) expert report did not adequately describe the causal relationship between defendants' failure to meet the standards of care and daughter's injury; and
(4) doctrine of res ipsa loquitur did not apply.

Reversed and remanded.

West Headnotes

**[1] Appeal and Error 30 ⚷960(1)**

30 Appeal and Error
   30XVI Review
      30XVI(H) Discretion of Lower Court
         30k960 Rulings on Motions Relating to Pleadings
            30k960(1) k. In general. Most Cited Cases
A trial court's denial of a motion to dismiss in a health care liability action under the expert report statute is reviewed for abuse of discretion. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[2] Appeal and Error 30 ⚷971(2)**

30 Appeal and Error
   30XVI Review
      30XVI(H) Discretion of Lower Court
         30k971 Examination of Witnesses
            30k971(2) k. Competency of witness. Most Cited Cases
A trial court's determination of whether a physician is qualified to opine in a health care liability case is reviewed for an abuse of discretion standard. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[3] Health 198H ⚷804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
A trial court in a health care liability case should err on the side of granting an extension to cure an expert report and must grant it if the deficiencies are curable. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[4] Health 198H ⚷804**

198H Health
   198HV Malpractice, Negligence, or Breach of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Duty

198HV(G) Actions and Proceedings

198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

When determining if a good faith effort has been made to comply with the expert report statute in a health care liability case, a trial court is limited to the four corners of the report and cannot consider extrinsic evidence. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[5] Health 198H ⚖804**

198H Health

198HV Malpractice, Negligence, or Breach of Duty

198HV(G) Actions and Proceedings

198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

**Health 198H ⚖817**

198H Health

198HV Malpractice, Negligence, or Breach of Duty

198HV(G) Actions and Proceedings

198Hk815 Evidence

198Hk817 k. Presumptions. Most Cited Cases

In a health care liability case, qualifications must appear in the expert report and cannot be inferred. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[6] Health 198H ⚖804**

198H Health

198HV Malpractice, Negligence, or Breach of Duty

198HV(G) Actions and Proceedings

198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

An expert report in a health care liability case must provide a fair summary of the expert's opinions regarding: (1) the applicable standard of care; (2) the manner in which the care provided failed to meet that standard; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[7] Health 198H ⚖804**

198H Health

198HV Malpractice, Negligence, or Breach of Duty

198HV(G) Actions and Proceedings

198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

An expert report in a health care liability case must incorporate sufficient information to inform the defendant of the specific conduct the plaintiff has called into question and provide a basis for the trial court to conclude the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[8] Health 198H ⚖804**

198H Health

198HV Malpractice, Negligence, or Breach of Duty

198HV(G) Actions and Proceedings

198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

An expert report in a health care liability case does not comply with the expert report statute by merely containing the expert's conclusions about the standard of care, breach and causation. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[9] Health 198H ⚖804**

198H Health

198HV Malpractice, Negligence, or Breach of Duty

198HV(G) Actions and Proceedings

198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

An expert in an export report in a health care liability case must explain the basis for his state-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 S.W.3d 740
**(Cite as: 362 S.W.3d 740)**

ments and must link his conclusions to the facts. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[10] Health 198H 804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
          198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

A plaintiff need not present all the evidence necessary to litigate the merits of his case, in an export report for a health care liability case. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[11] Health 198H 804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
          198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

An expert report in a health care liability case may be informal in that the information need not fulfill the same requirements as the evidence offered in a summary judgment proceeding or at trial. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[12] Health 198H 804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
          198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Trial court did not abuse its discretion, in health care liability action that mother brought against physician, counselor and hospital, which had been evaluating her daughter who had a history of sexual molestation for a psychiatric condition, after her daughter was sexually abused by a patient, by finding that mother's expert was qualified to render an opinion on the standard of care; expert had practiced psychiatry for almost 35 years, was a clinical professor in the Department of Psychiatry of a university for almost 35 years, was board certified in child and adolescent psychiatry and general psychiatry, maintained a private practice, had been the clinical director of a psychiatric hospital, and examined child psychiatrists for certification by the American Board of Psychiatry and Neurology for over ten years. V.T.C.A., Civil Practice & Remedies Code § 74.402.

**[13] Health 198H 804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
          198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Expert report submitted by mother, in health care liability action that mother brought against physician, counselor and hospital, which had been evaluating her daughter who had a history of sexual molestation for a psychiatric condition, after her daughter was sexually abused by a patient, did not adequately set forth the applicable standards of care and how the standards were breached, as required by expert report statute; expert's articulation of the standards of care was conclusory in that expert did not specify how providing a safe and secure environment could be accomplished, and expert's articulation of how the standards were breached was similarly conclusory in that the expert did not provide specific information about what the defendants should have done differently. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[14] Health 198H 618**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(B) Duties and Liabilities in General
          198Hk617 Standard of Care

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 S.W.3d 740
**(Cite as: 362 S.W.3d 740)**

198Hk618 k. In general. Most Cited Cases

Standard of care in a health care liability case is defined by what an ordinarily prudent health care provider or physician would have done under the same or similar circumstances. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[15] Health 198H ⟜804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Identifying the standard of care in an expert report for a health care liability case is critical; whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[16] Health 198H ⟜804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

While a fair summary required by the expert report statute in a health care liability case is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[17] Health 198H ⟜804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings

198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

When a plaintiff sues more than one defendant in a health care liability case, the expert report must set forth the standard of care for each defendant and explain the causal relationship between each defendant's individual acts and the injury. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[18] Health 198H ⟜804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

While it is possible that a single standard of care may apply to several defendants in a health care liability case, generic statements in an expert report that the same standard of care attaches to each defendant without further explanation are conclusory. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[19] Evidence 157 ⟜555.4(3)**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.4 Sources of Data
               157k555.4(3) k. Hearsay or evidence otherwise incompetent. Most Cited Cases

An expert may rely on a statement that otherwise would not be admissible in evidence in formulating his opinions.

**[20] Health 198H ⟜804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 S.W.3d 740
**(Cite as: 362 S.W.3d 740)**

Expert report submitted by mother, in health care liability action that mother brought against physician, counselor and hospital, which had been evaluating her daughter who had a history of sexual molestation for a psychiatric condition, after her daughter was sexually abused by a patient, did not adequately describe the causal relationship between defendants' failure to meet the standards of care and daughter's injury, as required by expert report statute; expert did not explain how and why the failures to meet the standards of care resulted in daughter's molestation. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[21] Negligence 272 ⟨⟩1610**

272 Negligence
  272XVIII Actions
    272XVIII(C) Evidence
      272XVIII(C)3 Res Ipsa Loquitur
        272k1610 k. In general. Most Cited Cases

**Negligence 272 ⟨⟩1620**

272 Negligence
  272XVIII Actions
    272XVIII(C) Evidence
      272XVIII(C)3 Res Ipsa Loquitur
        272k1618 Operation and Effect of Doctrine
          272k1620 k. Creation of inference or presumption. Most Cited Cases

Res ipsa loquitur is not a cause of action separate from negligence; rather, it is a rule of evidence by which the jury may infer negligence.

**[22] Negligence 272 ⟨⟩1613**

272 Negligence
  272XVIII Actions
    272XVIII(C) Evidence
      272XVIII(C)3 Res Ipsa Loquitur
        272k1611 Elements or Conditions of Application
          272k1613 k. Nature and character

of accident or injury. Most Cited Cases

**Negligence 272 ⟨⟩1614**

272 Negligence
  272XVIII Actions
    272XVIII(C) Evidence
      272XVIII(C)3 Res Ipsa Loquitur
        272k1611 Elements or Conditions of Application
          272k1614 k. Control or management of instrumentality. Most Cited Cases

Res ipsa loquitur applies to situations in which two factors are present: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence, and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant.

**[23] Health 198H ⟨⟩818**

198H Health
  198HV Malpractice, Negligence, or Breach of Duty
    198HV(G) Actions and Proceedings
      198Hk815 Evidence
        198Hk818 k. Res ipsa loquitur. Most Cited Cases

Res ipsa loquitur applies in a health care liability case only when the nature of the alleged malpractice and injuries are plainly within the common knowledge of laypersons, requiring no expert testimony.

**[24] Health 198H ⟨⟩818**

198H Health
  198HV Malpractice, Negligence, or Breach of Duty
    198HV(G) Actions and Proceedings
      198Hk815 Evidence
        198Hk818 k. Res ipsa loquitur. Most Cited Cases

The three recognized areas in which res ipsa loquitur applies to health care claims are negligence in the use of mechanical instruments, operating on

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 S.W.3d 740
**(Cite as: 362 S.W.3d 740)**

the wrong body part, and leaving surgical instruments or sponges inside the body. V.T.C.A., Civil Practice & Remedies Code § 74.201.

**[25] Health 198H** ⚷➣**818**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk815 Evidence
               198Hk818 k. Res ipsa loquitur. Most Cited Cases

Doctrine of res ipsa loquitur was not applicable in health care liability case that mother brought against psychiatric hospital, physician and counselor after daughter, who was being evaluated for a psychiatric condition after a history of sexual molestation, was sexually abused by a patient; though mother's claims, that defendants placed daughter in a room with a known sexual abuser, might fall within the common knowledge of laypersons, res ipsa loquitur could only be applied in health care liability cases involving the negligent use of mechanical instruments, operating on the wrong body part, or leaving surgical instruments or sponges inside the body. V.T.C.A., Civil Practice & Remedies Code §§ 74.201, 74.351.

**[26] Appeal and Error 30** ⚷➣**1178(1)**

30 Appeal and Error
    30XVII Determination and Disposition of Cause
        30XVII(D) Reversal
           30k1178 Ordering New Trial, and Directing Further Proceedings in Lower Court
               30k1178(1) k. In general. Most Cited Cases

Health care liability case that mother brought against hospital, physician and counselor, after daughter was sexually abused by a patient, would be remanded for the trial court to consider mother's motion for an extension to cure deficiencies in her expert report, when the Court of Appeals reversed the trial court and found that the report deficient; mother had requested an extension if the trial court

found the report deficient, and trial court had not ruled on the request for an extension. V.T.C.A., Civil Practice & Remedies Code § 74.351.

***743** Ryan Lee Clement, Houston, for appellants.

David K. Mestemaker, Norman Louis Straub, Jonathan Brian Zumwalt, Houston, for appellee.

Panel consists of Justices FROST, SEYMORE, and JAMISON.

**OPINION**

MARTHA HILL JAMISON, Justice.

This is a health care liability case governed by the Medical Liability Act.[FN1] Appellants bring an interlocutory appeal from the trial court's order denying appellants' motions to dismiss based on the asserted inadequacy of an expert report served by appellee R. Gomez, individually and as next friend of her daughter V.G. We reverse the trial court's order denying the motions to dismiss and remand this cause to the trial court to consider whether a 30–day extension of the deadline for serving the report to allow Gomez to address deficiencies is appropriate.

> FN1. Tex. Civ. Prac. & Rem.Code §§ 74.001–.507. All references to the Act are to these provisions.

*Background*

V.G., a minor, was admitted into Kingwood Pines Hospital for evaluation of a psychiatric condition relating to her past history of being raped and subjected to sexual molestation in two separate incidents. As alleged, while in the care of Kingwood Pines Hospital, V.G. was molested by another female patient.[FN2] According to Gomez's expert, Dr. Mark Blotcky, Gomez asserted in an affidavit that hospital staff knew the other patient was aggressive, had been sexually abused, and had sexually molested others, but allowed the two patients to share a room and, accordingly,***744** did not prevent the other patient from having physical access

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

to V.G.[FN3]

> **FN2.** The other patient, also a minor, allegedly got into bed with V.G., "made out with her," touched her private parts, left visual marks (hickeys) on her, and threatened to beat her up if she told anyone.

> **FN3.** The affidavit is not in the record, but the expert reported prepared by Dr. Mark Blotcky describes the affidavit and states that Blotcky relied on the affidavit in reaching his conclusions.

Gomez filed suit on February 24, 2010, against appellants and others,[FN4] alleging that they failed to provide a reasonably safe environment for V.G. and the other patient by allowing them to share a room. Gomez asserted claims against appellants for negligence, aiding and abetting assault, assisting or encouraging assault, and medical malpractice. She seeks actual and special damages.

> **FN4.** Gomez sued Kingwood Pines Hospital, LLC; Horizon Health Corporation; Psychiatric Solutions, Inc.; Psychiatric Solutions, P.C.; Fernando Guillermo Torres, M.D. and Yolanda Bassett. Gomez alleged that Kingwood Pines Hospital is owned by the other corporate defendants. Only Kingwood Pines Hospital, Horizon Health Corporation, Psychiatric Solutions, Inc., and Bassett filed this appeal.

On May 28, 2010, Gomez served an expert report and curriculum vitae prepared by Dr. Mark Blotcky, a board certified psychiatrist, in support of her claims. After appellants objected to the adequacy of the report, Gomez served a supplemental expert report.[FN5] Appellants objected to the adequacy of the supplemental report on the same grounds as their former objections and moved to dismiss the claims with prejudice pursuant to the Act.[FN6] *See* Tex. Civ. Prac. & Rem.Code § 74.351(b). Appellants contended that the initial re-

port was inadequate because Blotcky (1) did not establish his qualifications to opine regarding the standards of care for the admission, treatment, and care of patients in a psychiatric facility; (2) failed to articulate a fair summary of his opinions regarding the applicable standards of care, the manner in which those standards were breached by appellants, and the causal relationship between any breach and the injury and damages claimed; and (3) attempted to apply a single standard of care to multiple health care providers. After considering appellants' challenges to the expert report and supplemental report and hearing arguments of the parties, the trial court entered an order denying appellants' motions to dismiss.

> **FN5.** The supplemental report was served on June 24, 2010, the 120th day after Gomez filed suit, so both reports were timely under the Act. *See* Tex. Civ. Prac. & Rem.Code § 74.351(a).

> **FN6.** Kingwood Pines Hospital, Horizon Health Corporation, and Psychiatric Solutions, Inc. jointly filed their objections and motion to dismiss, and Bassett filed her objections and motion to dismiss separately. All of appellants' objections were based on the same grounds.

### *Discussion*

In two issues, appellants contend the trial court abused its discretion in denying appellants' motions to dismiss because the expert and supplemental reports neither establish Blotcky's qualifications to render an opinion regarding licensed professional counselors, nursing staff, and hospital personnel nor include a fair summary of Blotcky's opinions in connection with the statutory elements required by section 74.351—the applicable standards of care, the manner in which the care rendered failed to meet those standards, and the causal relationship between the failure and the injury, harm, or damages claimed. *See id.* Gomez contends the reports meet the standards required by section 74.351, but even if they do not, an expert report was not re-

362 S.W.3d 740
**(Cite as: 362 S.W.3d 740)**

quired because the doctrine of *res ipsa loquitur* applies.

**\*745 A.** *Standard of Review and Applicable Law*

[1][2] The Act entitles a defendant to dismissal of a health care liability claim if he is not served with an expert report showing that the claim has merit within 120 days of the date suit was filed. Tex. Civ. Prac. & Rem.Code § 74.351(b); *Scoresby v. Santillan,* 346 S.W.3d 546, 549 (Tex.2011). The trial court's refusal to dismiss may be immediately appealed. Tex. Civ. Prac. & Rem.Code § 51.014(a)(9); *Scoresby,* 346 S.W.3d at 549. We review a trial court's denial of a motion to dismiss under section 74.351 for abuse of discretion. *Jelinek v. Casas,* 328 S.W.3d 526, 539 (Tex.2010); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875, 878 (Tex.2001); *Group v. Vicento,* 164 S.W.3d 724, 727 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). Similarly, we review a trial court's determination of whether a physician is qualified to opine in a health care liability case under an abuse of discretion standard. *Larson v. Downing,* 197 S.W.3d 303, 304–05 (Tex.2006) (per curiam); *Mem'l Hermann Healthcare Sys. v. Burrell,* 230 S.W.3d 755, 757 (Tex.App.-Houston [14th Dist.] 2007, no pet.). A trial court abuses its discretion if it acts in an unreasonable or arbitrary manner or without reference to any guiding rules or principles. *Larson,* 197 S.W.3d at 304–05; *see also Jelinek,* 328 S.W.3d at 539.

[3][4] The Act specifies requirements for an adequate report and mandates "an objective good faith effort to comply" with the requirements. Tex. Civ. Prac. & Rem.Code § 74.351(*l* ), (r)(6); *Scoresby,* 346 S.W.3d at 549. It also authorizes a trial court to give a plaintiff who meets the 120–day deadline an additional 30 days to cure any deficiencies in the report. Tex. Civ. Prac. & Rem.Code § 74.351(c); *Scoresby,* 346 S.W.3d at 549. The trial court should err on the side of granting the extension and must grant it if the deficiencies are curable. *Scoresby,* 346 S.W.3d at 549. When determining if a good faith effort has been made, the trial court is limited to the four corners of the report and cannot consider extrinsic evidence. *See Jelinek,* 328 S.W.3d at 539; *Palacios,* 46 S.W.3d at 878.

[5][6][7][8][9][10][11] An expert must establish that he is qualified to provide an acceptable report. Tex. Civ. Prac. & Rem.Code § 74.351(r)(5)(B). Qualifications must appear in the expert report and cannot be inferred. *Baylor Coll. of Med. v. Pokluda,* 283 S.W.3d 110, 117 (Tex.App.-Houston [14th Dist.] 2009, no pet.). Additionally, an expert report must provide a fair summary of the expert's opinions regarding (1) the applicable standard of care; (2) the manner in which the care provided failed to meet that standard; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See* Tex. Civ. Prac. & Rem.Code § 74.351(r)(6); *Palacios,* 46 S.W.3d at 879. In compliance with these standards, the expert report must incorporate sufficient information to inform the defendant of the specific conduct the plaintiff has called into question and provide a basis for the trial court to conclude the claims have merit. *Patel v. Williams,* 237 S.W.3d 901, 904 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (citing *Palacios,* 46 S.W.3d at 879). A report may not merely contain the expert's conclusions about these elements. *Jelinek,* 328 S.W.3d at 539; *Palacios,* 46 S.W.3d at 879. The expert must explain the basis for his statements and must link his conclusions to the facts. *Jelinek,* 328 S.W.3d at 539. However, a plaintiff need not present all the evidence necessary to litigate the merits of his case. *Palacios,* 46 S.W.3d at 879; *Patel,* 237 S.W.3d at 904. The report may be informal in that the information need not **\*746** fulfill the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Palacios,* 46 S.W.3d at 879; *Patel,* 237 S.W.3d at 904.

**B.** *Dr. Blotcky's Qualifications*

Within their second issue, appellants argue that the expert and supplemental reports do not establish that Blotcky was qualified to render an opinion re-

garding a licensed professional counselor [FN7] or nursing staff and hospital personnel.

> FN7. Bassett is a licensed professional counselor.

To be qualified to provide opinion testimony regarding whether a health care provider departed from the accepted standard of health care, an expert must satisfy section 74.402. *See* Tex. Civ. Prac. & Rem.Code § 74.351(r)(5)(B). Section 74.402 lists three specific qualifications an expert witness must possess to provide opinion testimony on how a health care provider departed from accepted standards of health care. The expert must:

> (1) [be] *practicing health care* in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
>
> (2) [have] knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) [be] *qualified on the basis of training or experience* to offer an expert opinion regarding those accepted standards of health care.

> *Id.* § 74.402(b) (emphases added).

The above emphasized terms are specifically defined in subsections (a) and (c) of section 74.402. "Practicing health care" includes:

> (1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or
>
> (2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.

*Id.* § 74.402(a). To determine whether an expert is "qualified on the basis of training or experience," a court must consider whether the expert:
> (1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and
>
> (2) is actively practicing health care in rendering health care services relevant to the claim.

> *Id.* § 74.402(c).

[12] Blotcky has been a licensed physician for 40 years and has practiced psychiatry for almost 35 years. He also has been a clinical professor in the Department of Psychiatry of The University of Texas Southwestern Medical Center at Dallas for almost 35 years. He is board certified in child and adolescent psychiatry and general psychiatry. When the expert report was served, he maintained a private practice, and approximately 66% of his patients were children and adolescents.[FN8] He previously served on the managing board of directors of a psychiatric hospital, was director of the hospital's Child and Adolescent Psychiatry Residency Program, and clinical director of the hospital. He examined**747** child psychiatrists for certification by the American Board of Psychiatry and Neurology for over ten years and served as Chair of the Committee for Certification of Child and Adolescent Psychiatry for that board.

> FN8. We assume this is still the case, but the record reflects only Blotcky's qualifications when the report was served.

Based on Blotcky's education, training, and experience in treating patients similarly situated to V.G.—an adolescent who was seeking treatment for her psychiatric conditions—and in working in a hospital setting, the trial court acted within its discretion in concluding that Blotcky is qualified to render an opinion on the standard of care at issue in this case. *See Pokluda,* 283 S.W.3d at 120. Simil-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

arly, Blotcky's hospital experience qualifies him to opine on the standards of care required for nursing staff and hospital personnel. *See* Tex. Civ. Prac. & Rem.Code § 74.402(c)(2); *see also Pokluda,* 283 S.W.3d at 118–19 ("The test is whether the report and curriculum vitae establish the witness's knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject.").

We hold that the trial court acted within its discretion by denying appellants' motions to dismiss as to Blotcky's qualifications, and we overrule that portion of appellants' second issue attacking the expert and supplemental reports on that basis.

### C. *Standard of Care and Breach*

[13] In both issues, appellants contend that the expert and supplemental reports do not adequately address each element required by subsection 74.351(r)(6) (standards of care, breach, causation and damages) because the reports are conclusory as to each element and do not represent an objective good faith effort to comply with the statutory definition of an expert report. We first address whether the reports set forth the applicable standards of care and how appellants breached these standards. We conclude that they do not.

As set forth above, the two-fold purpose of an expert report under section 74.351 is to inform the defendants of the specific conduct the plaintiff has called into question and to provide the trial court with a basis to determine whether or not the plaintiff's claims have merit. *Kelly v. Rendon,* 255 S.W.3d 665, 679 (Tex.App.-Houston [14th Dist.] 2008, no pet.). A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes. *Palacios,* 46 S.W.3d at 879. Rather, the expert must explain the basis of his statements to link his conclusions to the facts. *Jelinek,* 328 S.W.3d at 539; *see also Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999) ("An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must

explain the basis of his statements to link his conclusions to the facts."); *Davis v. Spring Branch Med. Ctr.,* 171 S.W.3d 400, 406 (Tex.App.-Houston [14th Dist.] 2005, no pet.) ("[T]he expert report has to set out, in nonconclusory language, the expert's opinion about [the] three [statutorily required] elements of the claim.").

[14][15][16][17][18] Standard of care is defined by what an ordinarily prudent health care provider or physician would have done under the same or similar circumstances. *Palacios,* 46 S.W.3d at 880; *Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216, 222 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). Identifying the standard of care is critical: whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Palacios,* 46 S.W.3d at 880. While a "fair summary" is something less than a full statement of the applicable standard of care and how it was ***748** breached, even a fair summary must set out what care was expected, but not given. *Id.* When a plaintiff sues more than one defendant, the expert report must set forth the standard of care for each defendant and explain the causal relationship between each defendant's individual acts and the injury. *CHCA Mainland L.P. v. Burkhalter,* 227 S.W.3d 221, 227 (Tex.App.-Houston [1st Dist.] 2007, no pet.). While it is possible that a single standard of care may apply to several defendants, generic statements that the same standard of care attaches to each defendant without further explanation are conclusory. *See Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 859 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *see also Tenet Hosps. Ltd. v. Love,* 347 S.W.3d 743, 753 (Tex.App.-El Paso 2011, no pet.) ("If the standard of care is the same for each defendant, then the report must state so.").

[19] Blotcky's expert report addresses standards of care and breach as follows:

• Kingwood Pines Hospital was required to "supervise[ ] closely and house [ ] safely" any "aggressive [or] sexually aggressive 14 year old

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

girl with a history of being both sexually molested and perpetrating sexual molestation herself so she could not harm another patient" [FN9] and provide treatment of patients such as V.G. "in a safe environment." The hospital staff "breached both these standards of care—effective, careful supervision of a predator and careful, effective protection of a molestation victim."

> FN9. We note that Blotcky bases his opinion on Gomez's affidavit stating that the patient who allegedly molested V.G. "was known by the hospital staff to be aggressive, to have been sexually abused and to be a sexual molester." We assume without deciding the accuracy of this allegation because we are confined to the four corners of the expert report in our consideration of its adequacy. *See Palacios,* 46 S.W.3d at 878. While an expert may rely on a statement that otherwise would not be admissible in evidence in formulating his opinions, *see Gannon v. Wyche,* 321 S.W.3d 881, 890–91 (Tex.App.-Houston [14th Dist.] 2010, pet. denied),* it is unclear how Gomez obtained this information. *Cf. id.* at 892 ("[A]ll that is required is that [the] expert report informs the defendants of the specific conduct the plaintiffs have called into question and provides a basis for the trial court to conclude that the claims have merit.").

• Dr. Torres [FN10] and Bassett were required "to ensure that there were appropriately trained and adequate staffing and milieu structure" so that a "young" patient "would not be sexually molested." They breached "their duties to [V.G.]" by failing to do so.

> FN10. As set forth above, Torres is a defendant in the underlying case, but not an appellant.

The supplemental report further addresses these issues as follows:

• While they "may each have different standards of care in some areas," Kingwood Pines Hospital, Torres, and Bassett "share the most rudimentary responsibility for the safety and security of their patients ... in whatever therapeutic milieu their patient is being treated. The safety and security of any patient is always a most basic element in the standard of care." The "treating team" must "provide additional supervision" to patients with histories "of hurting themselves and being vulnerable to being hurt by others." Kingwood Pines Hospital, Torres, and Bassett breached this standard of care, as "[V.G.] was not afforded the most basic supervision under their care."

• Kingwood Pines Hospital must not "allow any harm to occur to any of its patients." The standard of care for the hospital "is to supervise the behavior **\*749** of each and every patient." "Based on the facts contained in the medical records," the hospital breached its standard of care by failing to provide "a safe and secure environment" and "allowing" V.G. "to be molested by another patient."

• Bassett was required to "do anything necessary" to "insure that any patient she treats in [the] hospital ... has been admitted to a safe and secure milieu" by "be[ing] aware of the treatment milieu, patient population, and the structure and safety measures" in place. She breached the standard of care by failing to "insur[e] her patient's basic safety using any number of measures available."

Appellants complain that Blotcky's articulation of the applicable standards of care is deficient in two regards, first, that Blotcky improperly applies a single standard of care to multiple health care providers and second, that his articulation of the standard is conclusory.

***Single Standard of Care Applied to Multiple Health Care Providers.*** In the expert report,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 S.W.3d 740
**(Cite as: 362 S.W.3d 740)**

Blotcky applies a standard of care to Kingwood Pines Hospital separate from the standard he applies to Bassett and Torres. He states that the hospital was required to supervise known sexually aggressive patients and protect molestation victims from aggressive patients. By contrast, he applies a single standard of care to Torres and Bassett—to insure that the hospital had properly trained and adequate staffing so that a patient would not be molested. In the supplemental report, Blotcky clarifies that, although "they may have different standards of care in some areas," the hospital, Torres, and Bassett all shared the same responsibility for the safety and security of their patients. He further articulates the standard as to each party. The hospital was required to supervise every patient. Torres was required to "admit patients only to ... facilit[ies] that provide[ ] a safe and secure environment," "work with the treatment team to understand his patient's treatment and other needs," "consult with ... staff to insure ... his orders are understood and followed" and "know the inpatient program and how it implements a safe structure for patients who have been either victims or perpetrators of sexual assault." Similarly, Bassett was required to insure her patients are being treated in a safe and secure environment by being aware of the environment, patient population, and safety measures taken by the hospital.

We conclude that Blotcky articulates a standard of care for each appellant, although conclusorily, as set forth below. In the supplemental report, he adequately explains why the standards of care overlap as to the parties, which cures any deficiencies with regard to his applying the same standard to Torres and Bassett in the expert report. *See Tenet,* 347 S.W.3d at 753. We thus find without merit appellants' argument that Blotcky improperly applies the same standard of care to multiple health care providers.

***Conclusory Articulation of Standard of Care.***
Other than containing conclusory statements regarding the provision of a secure environment, the supervision of patients, and the prevention of harm to patients, the reports do not indicate what an ordinarily prudent health care provider would do under the same or similar circumstances. *See Palacios,* 46 S.W.3d at 880. They merely include Blotcky's conclusion that appellants did not provide a safe and secure environment for V.G., but do not specify how this should have been accomplished. They are thus deficient in this regard. *See id.*

**\*750** ***Breach of the Standard of Care.***
Blotcky's statements regarding breach of the standard of care, such as Bassett's "failing to ensure that there were appropriately trained and adequate staffing and milieu structure such that a young girl (about whom they were forewarned was vulnerable) would not be sexually molested" and "breach[ing] the standard of care by not insuring her patient's safety using *any of the number of measures available* " and appellants' failing to "provide additional supervision" and "not afford[ing] [V.G.] ... *the most basic supervision* " are similarly conclusory. (Emphases added.) Whether a defendant breached the standard of care cannot be determined without "specific information about what the defendant should have done differently." *Id.* For example, the reports do not provide information about how Bassett was to insure that hospital staff were appropriately trained and adequately staffed or what "measures" were available to her to insure her patient's safety. Nor do the reports indicate what kind of supervision by the hospital or Bassett was necessary or "basic" to provide a secure environment for V.G.[FN11] Blotcky, moreover, states that the hospital breached its standard of care "[b]ased on the facts contained in the medical records," but does not indicate on what "facts" he relies to reach that conclusion.

FN11. Gomez argues that this case is akin to *Russ v. Titus Hospital District,* 128 S.W.3d 332 (Tex.App.-Texarkana 2004, pet. denied), which held that an expert report was sufficient relating to a claim filed by a mentally ill patient who was allowed

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 S.W.3d 740
**(Cite as: 362 S.W.3d 740)**

access to an unsecured window out of which she fell. *Id.* at 344. But the expert report in that case specifically outlined that the standard of care required a suicidal patient not to be placed in a room with unlocked windows and what steps the hospital, doctors, and nurses should have taken to secure the windows, *id.* at 342, whereas the reports in this case merely state that V.G. should have been placed in a secure environment where patients were supervised, without specifying how this should have been accomplished.

We conclude that Blotcky's reports are deficient because they do not adequately describe applicable standards of care or breaches of those standards by each appellant.

### D. *Causation*

[20] Conclusory statements also plague Blotcky's efforts to satisfy the statutory element of causation. In the expert report, he simply states, "In medical probability, V.G. would be expected to suffer significant psychological damage especially from sexual molestation occurring to her in a treatment setting. The proximate cause of this was the hospital's failure as well as that of ... Ms. Bassett to meet the standard of care." Likewise, he states in the supplemental report that appellants' breaches of the standards of care caused V.G.'s damages and "[h]ad [V.G.] and the other patients been properly supervised, [V.G.] would not have been assaulted."

These reports do not adequately describe the causal relationship between appellants' failures to meet the standards of care and V.G.'s injury: Blotcky provided no explanation regarding how and why these failures resulted in the alleged molestation. Rather, he provided bare assertions that appellants' failure to "properly supervise" the patients resulted in V.G.'s damages. He did not attempt to explain what constitutes proper supervision. Because the reports do not contain this required information, they are deficient. *See Jelinek,* 328 S.W.3d at 539–40; *Palacios,* 46 S.W.3d at 879

(holding reports that merely state expert's conclusions about causation are deficient).

### E. *Res Ipsa Loquitur*

Gomez also contends she was not required to serve expert reports because the **\*751** negligence alleged in this case rises to the level of *res ipsa loquitur.*

[21][22][23] *Res ipsa loquitur* is not a cause of action separate from negligence; rather, it is a rule of evidence by which the jury may infer negligence. *Losier v. Ravi,* 362 S.W.3d 639, 642–43 (Tex.App.-Houston [14th Dist.] 2009, no pet.). It applies to situations in which two factors are present: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence, and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant. *Id.* Further, the doctrine applies only when the nature of the alleged malpractice and injuries are plainly within the common knowledge of laypersons, requiring no expert testimony. *Id.*

[24] The legislature limited the applicability of *res ipsa loquitur* in health care claims only to those instances in which the doctrine had been applied by Texas appellate courts as of August 29, 1977. *See* Tex. Civ. Prac. & Rem.Code § 74.201. The three recognized areas in which *res ipsa loquitur* applies to health care claims are negligence in the use of mechanical instruments, operating on the wrong body part, and leaving surgical instruments or sponges inside the body. *Losier,* 362 S.W.3d at 642–43 (citing *Haddock v. Arnspiger,* 793 S.W.2d 948, 951 (Tex.1990)); *Hector v. Christus Health Gulf Coast,* 175 S.W.3d 832, 837 (Tex.App.-Houston [14th Dist.] 2005, pet. denied).

[25] While the nature of Gomez's claims of malpractice and V.G.'s alleged injuries may be plainly within the common knowledge of laypersons, Gomez would still have to show that her claim fell within one of the pre–1977 categories of cases in order for *res ipsa loquitur* to apply. *See Lo-*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 S.W.3d 740
**(Cite as: 362 S.W.3d 740)**

*sier,* 362 S.W.3d at 642–43; *Hector,* 175 S.W.3d at 837. Because it does not, we find without merit Gomez's argument that she was not required to serve an expert report.

We hold that the trial court abused its discretion by denying the motions to dismiss because they do not adequately describe the elements required by subsection 74.351(r)(6). We thus sustain that portion of appellants' issues attacking the adequacy of the expert and supplemental reports because they are deficient.

**F.** *Opportunity to Cure*

[26] In their second issue, appellants assert that because of the reports' deficiencies, no "expert report" has been timely served and this case should be dismissed. As discussed above, Gomez's reports are deficient. But even with these deficiencies, the trial court still has discretion to grant Gomez a thirty-day extension under section 74.351(c). *See* Tex. Civ. Prac. & Rem.Code § 74.351(c); *Scoresby,* 346 S.W.3d at 554. Gomez requested such an extension in the trial court, and the trial court has not ruled on this request. The appellants have not shown that Gomez is not entitled to a ruling on her request for a thirty-day extension under section 74.351(c). [FN12] *See* Tex. Civ. Prac. & Rem.Code § 74.351(c); *Scoresby,* 346 S.W.3d at 554. Therefore, while we agree with appellants that the reports are deficient, we conclude that this case should be remanded for the trial court to consider granting a 30–day extension to cure the reports' deficiencies under **\*752**section 74.351(c). Accordingly, we overrule appellants' second issue.

> FN12. Even if appellants had argued that Gomez's reports amount to no report at all and even if it were appropriate to address that argument at this juncture, we would still conclude that the reports satisfy the minimal standard in *Scoresby. See Scoresby,* 346 S.W.3d at 557.

### Conclusion

We reverse the trial court's order denying the motions to dismiss filed by appellants and remand this cause to the trial court to consider whether a 30–day extension to allow Gomez to address the deficiencies in the reports is appropriate.

Tex.App.–Houston [14 Dist.],2011.
Kingwood Pines Hosp., LLC v. Gomez
362 S.W.3d 740

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.)))**



Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**

Court of Appeals of Texas,
Houston (1st Dist.).
Steven Philip KLOERIS, M.D. and Rajeswari Thisgara Rajan, M.D., Appellants
v.
Charles and Jamie STOCKDALE, Individually and as Representatives of the Estate of Charles William Stockdale III, and James and Toren Dukes, as Legal Guardians Of Minor Children, Allyson Lenora Stockdale and Charles William Stockdale, IV, Appellees.

No. 01–09–00711–CV.
April 1, 2010.

West KeySummary**Health 198H** 🔑**804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
    Expert report regarding a witness for the estate of decedent did not represent an objective good-faith effort to provide a fair summary of the standard of care applicable to a doctor who allegedly committed malpractice. The report did not state what the standard of care specifically required the doctor to do to determine that her patient's husband, who was not her patient, was currently abusing prescription medication, and that the doctor should not have prescribed those drugs to her patient who went by a different last name in most of her medical records and who first presented to the doctor as an assault victim. Report did not specify what the doctor should have done to learn of the husband's prescrip-

tion drug abuse, to learn of the patient's drug seeking behavior, to learn that the patient was married to the husband, or how the doctor should have treated the patient for her complaints in those circumstances. V.T.C.A., Civil Practice & Remedies Code § 74.351(l).

On Appeal from the 133rd District Court, Harris County, Texas, Trial Court Cause No.2008–10581.
T. Marc Calvert, for Steven Philip Kloeris and Rajeswari Thisgara Rajan.

Charles Alfred Sturm, for Charles and Jamie Stockdale, Individually and as Representatives of the Estate of Charles William Stockdale III, and James and Toren Dukes, as Legal Guardians Of Minor Children, Allyson Lenora Stockdale and Charles William Stockdale, IV.

Panel consists of Justices JENNINGS, HANKS, and BLAND.

**MEMORANDUM OPINION**

JANE BLAND, Justice.

**\*1** Charles (Chuck) and Jamie Stockdale, individually and as representatives of the estate of Charles Stockdale III, and James and Toren Dukes, as legal guardians of Allyson and Charles Stockdale IV (collectively, the Stockdales), sued Dr. Steven Kloeris and Dr. Rajeswari Rajan for medical malpractice arising out of Charles's death from a prescription drug overdose. The trial court overruled Dr. Kloeris and Dr. Rajan's objections to the sufficiency of the expert report and denied their motions to dismiss the Stockdales' claims. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l* ) (Vernon Supp.2009). In this interlocutory appeal, Dr. Kloeris and Dr. Rajan contend that the trial court abused its discretion by denying their motions to dismiss because the expert report served by the Stockdales does not represent a good faith effort to comply with the statutory expert report requirements. *See id.* § 74.351(r)(6). We hold that the expert report

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.)))**

provides a fair summary of the standard of care applicable to Dr. Kloeris, how he breached that standard, and how his breach caused Charles Stockdale's death. We also hold that the expert report does not present a fair summary of the standard of care applicable to Dr. Rajan and how she breached the standard of care, and we therefore remand the case to the trial court to determine whether to grant the Stockdales one thirty-day extension to cure the deficiencies of the report regarding Dr. Rajan's conduct.

### Background

Dr. Kloeris and Dr. Rajan both practice as part of the Texas Gulf Coast Medical Group. On November 29, 2005, Charles Stockdale first visited Dr. Kloeris, complaining of severe anxiety and panic attacks. Charles informed Dr. Kloeris that he was currently taking 25 milligrams (mg) of atenolol once per day, vicoprofen, as needed, for headaches, and 2 mg of alprazolam (Xanax) twice per day. Dr. Kloeris diagnosed Charles with generalized anxiety disorder, panic disorder, and migraines, and prescribed ninety tablets of alprazolam (2 mg) and twenty-eight tablets of hydrocodone (Vicodin, 7.5 mg). Charles returned to Dr. Kloeris on December 15, 2005, sixteen days later, to receive prescription refills and treatment for a staph infection. On this occasion, Dr. Kloeris prescribed an additional ninety tablets of alprazolam and sixty tablets of hydrocodone (10 mg).

Charles' wife, Kristen, had been a patient of the Gulf Coast Medical Group for at least the previous year and a half. Her chart included a statement that, on January 24, 2005, she "confided to the nurse [at Clear Lake Regional Medical Center] that she regularly visits emergency rooms complaining of different areas of pain in order to get Vicodin [hydrocodone] prescriptions for her husband." Most of Kristen's medical records refer to her by her maiden name, Arsement; however, the records do occasionally contain references to her as "Kristen Stockdale" and also mention her husband, Charles Stockdale. During December 2005, Kristen received prescriptions from Dr. Kloeris and Dr. Rajan for hydrocodone, lorazepam, alprazolam, and Soma. On December 16, 2005, one day after Charles's second visit to Dr. Kloeris, he died of a prescription drug overdose. The Harris County Medical Examiner listed Charles's official cause of death as "the toxic effects of Hydrocodone, Alprazolam, and Diazepam [Valium]."

**\*2** Charles and Jamie Stockdale, Charles's parents, and James and Toren Dukes, the legal guardians of Charles's children, sued Dr. Kloeris and Dr. Rajan for negligence, gross negligence, and wrongful death. Within 120 days of filing suit, the Stockdales served an expert report by Dr. Hugh Poindexter pursuant to Section 74.351 of the Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp.2009). Dr. Poindexter stated that he is board certified by the American Board of Family Medicine, he has been in private practice since 1977, first in Huntsville until 1989, and then at the Kelsey–Sebold clinic in The Woodlands, where he has been the managing physician since 1991, and he has treated "many patients with the same or similar diagnosis as Mr. Stockdale[, and is] familiar with and [has] prescribed the same medications prescribed to Mr. Stockdale by Dr. Kloeris, and to his wife Kristen by Dr. Rajan." Dr. Poindexter reviewed Charles's autopsy report, the Texas Gulf Coast Medical Group's medical records for both Charles and Kristen, pharmacy records from six different pharmacies for both Charles and Kristen, a prescription summary report, an affidavit from plaintiff Chuck Stockdale, and the plaintiffs' original petition.

Dr. Poindexter described Charles's two visits to Dr. Kloeris and stated that Dr. Kloeris prescribed a total of 180 tablets of alprazolam and eighty-eight tablets of hydrocodone in a sixteen-day time period. Regarding Kristen, Dr. Poindexter noted that her medical records included a statement from her that she routinely visited emergency rooms to obtain hydrocodone for her husband, and although both Dr.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.)))**

Kloeris and Dr. Rajan were aware or should have been aware of this statement in their own records, they still prescribed excessive amounts of medication to Kristen during November and December of 2005, including hydrocodone and alprazolam. Dr. Poindexter opined that, based on all the records he reviewed, "Mr. Stockdale died as a result of the toxic effects of hydrocodone, alprazolam and diazepam prescribed by Dr. Kloeris and Dr. Rajan."

According to Dr. Poindexter, "[b]ased on the frequent and excessive prescriptions for hydrocodone and alprazolam to Kristen and Charles" and Kristen's admission that she procures prescription medication for her husband, Dr. Kloeris "knew or should have known that Charles Stockdale was abusing prescription drugs." The standard of care "required Dr. Kloeris to recognize this addiction and treat it" by either referring Charles to a substance abuse facility or lowering the amounts of drugs prescribed. Dr. Poindexter then generally described the characteristics and effects of alprazolam and hydrocodone, mentioning that both medications were potentially dangerous and that "[t]he quantity of pills prescribed in such a short period of time shows that caution was not used." Specifically, Dr. Kloeris prescribed more than the recommended daily dose of alprazolam. Charles only visited the practice twice; however, "he was prescribed an excessive amount of medication over a very short time span." Dr. Poindexter concluded by opining that "[i]f Dr. Kloeris had not prescribed excessive quantities and dosages of these drugs to Charles, or if he had referred him for drug abuse treatment, then, to a reasonable degree of medical certainty, Mr. Stockdale would not have died."

**\*3** Regarding Dr. Rajan, Dr. Poindexter stated that, based on the "frequent and excessive prescriptions for hydrocodone and alprazolam" to Kristen by both doctors, and Kristen's admission that she obtained prescription drugs for her husband's use, Dr. Rajan "knew or should have known that Charles was abusing these drugs and that Kristen was attempting to get them for her husband's ab-use." Dr. Rajan should have recognized Charles's abuse and should not have prescribed hydrocodone and alprazolam to Kristen. According to Dr. Poindexter, "[h]ad Dr. Rajan not prescribed these drugs to Kristen, then, to a reasonable degree of medical certainty, Mr. Stockdale would not have died."

Within twenty-one days of the filing of the expert report, Dr. Kloeris and Dr. Rajan both objected to the sufficiency of the report, arguing that Dr. Poindexter made conclusory assumptions, failed to establish a causal link between the doctors' conduct and Charles's death, and did not specify the standard of care applicable to Dr. Rajan and how she breached that standard. The doctors then moved to dismiss the case with prejudice due to the insufficiency of the report. The trial court overruled the doctors' objections to the report and denied their motions to dismiss. Dr. Kloeris and Dr. Rajan then filed this interlocutory appeal. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (Vernon 2008) (allowing interlocutory appeal when trial court "denies all or part of the relief sought by a motion under Section 74.351(b)").

### Discussion

*Standard of Review*

We review the trial court's decision on a section 74.351 motion to dismiss for abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). The trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003). When we review matters within the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (per curiam). The trial court does not abuse its discretion merely because it decides a discretionary matter differently than we would in similar circumstances. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985).

*Sufficiency of Expert Reports*

Dr. Kloeris and Dr. Rajan contend that the trial

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in S.W.3d, 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.)))**

court abused its discretion by denying their motions to dismiss because Dr. Poindexter's report is vague, conclusory, and does not represent a good faith effort to comply with the expert report requirements of section 74.351(r)(6). When a plaintiff brings a healthcare liability claim, section 74.351 of the Civil Practice and Remedies Code requires the plaintiff to serve each health care provider defendant with an expert report within 120 days after the original petition is filed. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp.2009); *Harris County Hosp. Dist. v. Garrett,* 232 S.W.3d 170, 176 (Tex.App.-Houston [1st Dist.] 2007, no pet.). Section 74.351(r)(6) defines an "expert report" as a "written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). A defendant must file and serve any objections to the sufficiency of the report not later than the twenty-first day after the date the report was served, failing which all objections are waived. *Id.* § 74.351(a). The trial court shall grant a defendant's motion to dismiss only if, after a hearing, it appears to the court that the expert report does not represent an objective good-faith effort to comply with the definition of an expert report. *Id.* § 74.351(*l* ).

**\*4** In determining whether the expert report represents an "objective good-faith effort" to comply with the statute, we look only to the four corners of the report. *Palacios,* 46 S.W.3d at 878. The expert report must fulfill two purposes to meet the "good-faith effort" requirement: (1) The report must inform the defendant of the specific conduct that the plaintiff calls into question; and (2) The report must provide a basis for the trial court to conclude that the claims have merit. *See id.* The report does not fulfill these purposes if it merely states the expert's conclusions about the standard of care,

breach, and causation. *See id.* Instead, the expert must give, for each defendant, a "fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the claimed injury." *Id.* The report must explain the basis of the expert's statements to link his conclusions to the facts. *Wright,* 79 S.W.3d at 52 (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). Although the report must include the expert's opinion on each of the elements enumerated in section 74.351(r)(6), the expert report does not have to marshal all of the plaintiff's proof. *Palacios,* 46 S.W.3d at 878. The plaintiff also does not have to present evidence in the report as if he were actually litigating the merits of the claim, and thus the report can be informal and the information does not have to meet the same requirements as evidence offered in a summary judgment proceeding or a trial. *Id.* at 879.

*A. Sufficiency of Report Regarding Dr. Kloeris's Conduct*

Dr. Kloeris contends that Dr. Poindexter's report fails to articulate how Dr. Kloeris breached the standard of care. The expert report must state the applicable standard of care as well as the manner in which the health care provider failed to meet that standard of care. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). Whether a defendant breached the standard of care cannot be determined "absent specific information about what the defendant should have done differently." *Palacios,* 46 S.W.3d at 880. The expert is not required to give a full statement of the standard of care and how it was breached, but he must "set out what care was expected, but not given." *Id.* With respect to Dr. Kloeris, Dr. Poindexter's report stated the following:

> Based on the frequent and excessive prescriptions for hydrocodone and alprazolam to Kristen and Charles by Dr. Kloeris and Dr. Rajan, and the admission by Kristen that she frequented doctors to get hydrocodone for her husband, Dr. Kloeris

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

knew or should have known that Charles Stockdale was abusing prescription drugs. The medical standard of care required Dr. Kloeris to recognize this addiction and treat it, either by referring Charles to an abuse facility, or prescribing smaller quantities and doses of hydrocodone and alprazolam solely to prevent complications from the sudden withdrawal of these drugs.... The quantity of pills prescribed in such a short period of time shows that caution was not used. The amount of alprazolam prescribed exceeds the recommended daily dose. Mr. Stockdale had only had two visits for medical care to their clinic. However, he was prescribed an excessive amount of medication over a very short time span.... If Dr. Kloeris had not prescribed excessive quantities and dosages of these drugs to Charles, or if he had referred him for drug abuse treatment, then, to a reasonable degree of medical certainty, Mr. Stockdale would not have died.

**\*5** Dr. Poindexter specifically stated that the standard of care required Dr. Kloeris to recognize Charles' addiction to prescription medication and treat it, by either referring him to a treatment facility or lowering the quantities of drugs prescribed to avoid sudden withdrawal. He also stated that Dr. Kloeris prescribed an "excessive amount of medication over a very short time span," more than the recommended daily dose of alprazolam, and Dr. Kloeris did not refer Charles to a substance abuse facility. "Magic words" are not necessary to provide a fair summary of the standard of care, breach of that standard, and causation. *See Wright,* 79 S.W.3d at 53. In determining whether the expert complied with the statute, we consider the "substance of the opinions, not the technical words used." *Moore v. Sutherland,* 107 S.W.3d 786, 790 (Tex.App.-Texarkana 2003, pet. denied). Dr. Poindexter's report gives fair notice to Dr. Kloeris that he breached the standard of care by prescribing excessive amounts of hydrocodone and alprazolam in a short period of time and by failing to refer Charles to a substance abuse facility.

Dr. Kloeris further contends that Dr. Poindexter's report makes conclusory assumptions and fails to establish a causal link between his conduct and Charles's death. An expert report must include a fair summary of the causal relationship between the defendant's failure to meet the appropriate standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM.CODE ANN. § 74 .351(r)(6). An expert cannot merely state his conclusions or "provide insight" about the plaintiffs' claims, but must instead "explain the basis of his statements to link his conclusions to the facts." *Wright,* 79 S.W.3d at 52. Dr. Kloeris relies on *Wright* for the contention that Dr. Poindexter's conclusion is based on speculation and conjecture. After Wright was in a car accident, a physician's assistant at the hospital x-rayed Wright's foot and knee and diagnosed her with a fractured knee, but did not discover that Wright also fractured her foot. *Id.* at 50. Another physician discovered this injury approximately one month later, after surgeons already operated on Wright's knee. *Id.* Wright needed two additional surgeries to correct her foot injury. *Id.* The expert report stated only that "if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then Wright would have had the possibility of a better outcome." *Id.* at 52–53. The Texas Supreme Court upheld the trial court's dismissal of Wright's claim, holding that the "report simply opines that [Wright] might have had 'the possibility of a better outcome' without explaining how [the hospital's] conduct caused injury to [Wright]." *Id.* at 54. The expert report lacked information that linked the conclusion—that Wright might have had a better outcome—to the breach-the hospital's failure to correctly read and act on the x-rays. *Id.*

**\*6** Here, Dr. Poindexter specifically stated that the standard of care required Dr. Kloeris to recognize and treat Charles's prescription drug addiction, and that Dr. Kloeris breached the standard of care by not referring Charles to a substance abuse facility and by prescribing excessive amounts of hydrocodone and alprazolam in a very short period of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in S.W.3d, 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.)))**

time. Specifically, Dr. Kloeris prescribed a total of 180 tablets of alprazolam and eighty-eight tablets of hydrocodone in a sixteen-day period. Dr. Poindexter concluded by stating that, "[i]f Dr. Kloeris had not prescribed excessive quantities and dosages of these drugs to Charles, or if he had referred him for drug abuse treatment, then, to a reasonable degree of medical certainty, Mr. Stockdale would not have died." In contrast to Wright's expert, who did not explain how the hospital's failure to meet the standard of care caused Wright's injury, Dr. Poindexter sufficiently links his conclusion, that Charles would not have died from a prescription drug overdose, to Dr. Kloeris's alleged breach, his failure to refer Charles to a substance abuse facility and his excessive prescription of hydrocodone and alprazolam. *See Wright,* 79 S.W.3d at 53. Dr. Poindexter's statement of causation "is not a conclusion or a statement of mere possibility, as in the *Wright* case, but is a positive statement of fact." *Moore,* 107 S.W.3d at 791. We hold that the trial court could have reasonably determined that Dr. Poindexter's report gave a fair summary of how Dr. Kloeris caused Charles's death and thus the trial court did not abuse its discretion in denying Dr. Kloeris's motion to dismiss.

According to Dr. Kloeris, although Dr. Poindexter stated that he reviewed medical and pharmacy records, he "clearly ignores" the records' indication that numerous other doctors prescribed similar medication to Charles and Kristen during the same time period. In determining whether an expert report constitutes a "good-faith effort" to comply with the requirements of section 74.351(r)(6), we look only to the four corners of the report. *Palacios,* 46 S.W.3d at 878. Dr. Kloeris cites the Beaumont Court of Appeals' unpublished decision in *Reddy v. Seale* for the proposition that we may look beyond the four corners of the expert report when the health care provider can show that the expert's opinion is based on an inaccurate or incomplete reading of medical records. *See* No. 09–07–00372–CV, 2008 Tex.App. LEXIS 2000, at *9 n. 1 (Tex.App.-Beaumont Mar. 20, 2008, no

pet.) (mem.op.) ("Both Dr. Lutz and Dr. Korn state in their respective reports that they reviewed Melody's medical records; thus, in determining whether their records represent a fair summary, the records that they referred to are within our purview."). In deciding that a review of the medical records is permissible, the Beaumont Court observed that although courts cannot look outside an expert's report to supply statutorily required information, the challenge to the report in *Reddy* addressed "whether the opinions in the expert reports are supported by the medical records that the experts represented they reviewed." *Id.* The Beaumont Court affirmed the trial court's denial of the doctors' motion to dismiss, stating that even when it considered the medical records, it could not "conclude that the medical records necessarily preclude the opinions that were reached by Dr. Lutz and Dr. Korn." *Id.* Similarly, the medical and pharmacy records relied upon by Dr. Poindexter do not preclude the opinions that he reached.

**\*7** Dr. Kloeris notes that Dr. Poindexter's report does not mention prescriptions written by other doctors or the effects of these drugs on Charles, nor does Dr. Poindexter indicate how he arrived at the conclusion that only Dr. Kloeris and Dr. Rajan's prescriptions caused Charles's death. A review of Charles and Kristen's pharmacy records demonstrates that from the beginning of October 2005 to Charles's death on December 16, 2005, the Stockdales filled prescriptions for fifteen different prescription drugs from twenty-one different doctors. In the month preceding Charles's death, Charles received a total of 118 tablets of Hydrocodone: 30 (5 mg) from a Dr. Mougouris on December 14, 28 (5 mg) from Dr. Kloeris on November 29, and 60 (10 mg) from Dr. Kloeris on December 15. During this same time period, Kristen received a total of 125 tablets of Hydrocodone: 23 total from Doctors Totz, Kung, and Le on November 19, 27, and 28, respectively; 21 from Dr. Rajan on December 2; 21 from Dr. Rajan on December 8; and 60 from Dr. Kloeris on December 12. Dr. Kloeris also prescribed 90 tablets of Alprazolam to Charles on

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in S.W.3d, 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.)))**

November 29, 60 tablets to Kristen on December 12, and 90 more to Charles on December 15. Charles died on December 16 from the "toxic effects of hydrocodone, alprazolam and diazepam." Even though the medical and pharmacy records reflect that Charles and Kristen received large quantities of prescription drugs from multiple doctors, the records also reflect that Dr. Kloeris prescribed the majority of the hydrocodone and alprazolam that Charles received in the month prior to his death. Specifically, in the sixteen days leading up to Charles's death, Dr. Kloeris prescribed eighty-eight tablets of hydrocodone and 180 tablets of alprazolam to Charles. We conclude that the pharmacy records of Charles and Kristen do not preclude Dr. Poindexter's opinion that Dr. Kloeris's excessive prescription of hydrocodone and alprazolam caused Charles's death.

Dr. Kloeris further contends that Dr. Poindexter's expert report is speculative, conclusory, and insufficient as a matter of law because he states that Charles died due to the "toxic effects of hydrocodone, alprazolam, and diazepam prescribed by Dr. Kloeris and Dr. Rajan," but neither of these doctors prescribed diazepam to Charles or Kristen. Whether an expert's opinions are correct is an issue for summary judgment, not a Chapter 74 motion to dismiss. *Methodist Hosp. v. Shepherd–Sherman,* 296 S.W.3d 193, 199 n. 2 (Tex.App.-Houston [14th Dist.] 2009, no pet.). As the San Antonio Court of Appeals noted, "[a] motion to dismiss seeks to demonstrate that a plaintiff has not satisfied the *procedural* requirements of Chapter 74, while a motion for summary judgment seeks to demonstrate that the *substance* of the claim lacks merit." *Wissa v. Voosen,* 243 S.W.3d 165, 169 (Tex.App.-San Antonio 2007, no pet.). An issue such as the fact that neither Dr. Kloeris nor Dr. Rajan prescribed diazepam to Charles or Kristen but the Harris County Medical Examiner found that diazepam contributed to Charles's death is a substantive issue affecting the merits of the Stockdales' claim. Our focus at this stage of the proceedings is whether Dr. Poindexter's expert report provided a fair summary

of the standard of care applicable to Dr. Kloeris, how Dr. Kloeris breached that standard, and how Dr. Kloeris's breach caused Charles' death, not whether Dr. Poindexter is ultimately correct in his opinions and assertions. *See id.* at 169–70; *see also Apodaca v. Russo,* 228 S.W.3d 252, 255 (Tex.App.-Austin 2007, no pet.) ("The expert report is not required to prove the defendant's liability, but rather to provide notice of what conduct forms the basis for the plaintiff's complaints.").

**\*8** Even though Dr. Poindexter did not address the prescriptions written by other doctors or the fact that Dr. Kloeris did not prescribe diazepam, in the "History" section of his report, he detailed the amount of hydrocodone and alprazolam prescribed to Charles by Dr. Kloeris, as well as the short time period in which Dr. Kloeris prescribed that medication. Thus, this report linked Dr. Poindexter's conclusions on causation to the specific facts of this case. *See Wright,* 79 S.W.3d at 52. This report fulfilled the twin purposes that *Palacios* requires to constitute an "objective good-faith effort" to comply with Chapter 74:(1) it informed Dr. Kloeris of the specific conduct the Stockdales called into question; and (2) it provided a basis for the trial court to conclude that the claim has merit. *Palacios,* 46 S.W.3d at 879. The trial judge could have reasonably determined that this report gave a fair summary of each of the statutory requirements, and therefore did not abuse its discretion by denying Dr. Kloeris's motion to dismiss.

*B. Sufficiency of Report Regarding Dr. Rajan's Conduct*

Dr. Rajan contends that Dr. Poindexter's report does not articulate a specific standard of care applicable to her and contains a speculative conclusion regarding causation without any supporting evidence. Dr. Poindexter's report states the following relating to Dr. Rajan:

> Based on the frequent and excessive prescriptions for hydrocodone and alprazolam to Kristen by Dr. Kloeris and Dr. Rajan, and the admission by Kristen that she frequented doctors to get hydro-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in S.W.3d, 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.)))**

codone for her husband, Dr. Rajan knew or should have known that Charles was abusing these drugs and that Kristen was attempting to get them for her husband's abuse. Dr. Rajan should have recognized this abuse and not prescribed Kristen hydrocodone and alprazolam. Had Dr. Rajan not prescribed these drugs to Kristen, then, to a reasonable degree of medical certainty, Mr. Stockdale would not have died.

The standard of care for a physician is what a physician of ordinary prudence would do in the same or similar circumstance. *Moore,* 107 S.W.3d at 789. We cannot determine whether a defendant breached her duty to a patient "absent specific information about what the defendant should have done differently." *Palacios,* 46 S.W.3d at 880. We do not require a full statement of the standard of care and how the defendant breached that standard, but the "fair summary" must state what "care was expected, but not given." *Id.*

Dr. Poindexter opines that Dr. Rajan "knew or should have known" that Charles was abusing prescription drugs and that Kristen was obtaining these drugs for her husband's use, and therefore Dr. Rajan should not have prescribed hydrocodone and alprazolam to Kristen. Dr. Poindexter does not, however, state what the standard of care specifically required Dr. Rajan to do to determine that Charles Stockdale, who was not her patient, was currently abusing prescription medication, and that she should not prescribe these drugs to Kristen, who went by a different last name in most of her medical records and who first presented to Dr. Rajan as an assault victim. The report does not, for example, specify what Dr. Rajan should have done to learn of Charles's prescription drug abuse, what she should have done to learn of Kristen's drug-seeking behavior, what she should have done to learn that Charles and Kristen were currently married, or how she should have treated Kristen, her patient, for her complaints in these circumstances. Without specific information of this nature, Dr. Poindexter's report does not provide a fair summary of the applicable

standard of care and how she breached that standard sufficient to give Dr. Rajan notice of the specific conduct complained of by the Stockdales. *See Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 859–60 (Tex.App.-Houston [1st Dist.] 2006, no pet.).* In this case, the trial court had no discretion but to conclude that the expert report does not represent an "objective good-faith effort" to provide a fair summary of the standard of care applicable to Dr. Rajan and how she breached that standard as required by section 74.351(r)(6). *See Palacios,* 46 S.W.3d at 880.

**\*9** Dr. Rajan requests that we reverse and render judgment that the trial court dismiss the Stockdales' claims against her with prejudice. The Civil Practice and Remedies Code provides, however, that "[i]f an expert report has not been served within [120 days of the plaintiff filing suit] because elements of the report are found deficient, the court may grant one 30–day extension to the claimant in order to cure the deficiency." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c). According to the Texas Supreme Court, the plain language of this section "permits one thirty-day extension when the court of appeals finds deficient a report that the trial court considered adequate." *Leland v. Brandal,* 257 S.W.3d 204, 207 (Tex.2008). We have discretion to remand consideration of the extension issue to the trial court. *See id.* at 208. We therefore remand the case to the trial court to determine whether to grant the Stockdales one thirty-day extension to cure the deficiencies of the report regarding Dr. Rajan's conduct.

*Sanctions for Frivolous Appeal*
The Stockdales request that we sanction Dr. Kloeris for filing a frivolous appeal pursuant to Rule 45 of the Texas Rules of Appellate Procedure. *See* TEX.R.APP. P. 45 ("If the court of appeals determines that an appeal is frivolous, it may ... award each prevailing party just damages."). The Stockdales contend that Dr. Kloeris's appeal is "patently frivolous," since Dr. Kloeris agreed to be sanctioned by the Texas Medical Board (TMB) for,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.)))**

among other things, his treatment of Charles Stockdale. An agreed order from the TMB is considered a settlement agreement under Rule 408 of the Texas Rules of Evidence. TEX. OCC.CODE ANN. § 164.002(d) (Vernon Supp.2009). Settlement agreements are not admissible to prove liability or invalidity of the claim or amount, but may be admissible when "offered for another purpose." TEX.R. EVID. 408. Determining whether an appeal regarding the sufficiency of an expert report is frivolous when the doctor has agreed to be sanctioned for the conduct at issue does not relate to liability or validity of the claim or amount, and is therefore a permissible purpose for which a settlement agreement can be considered.

When determining whether an appeal is frivolous, we "look at the record from the viewpoint of the advocate and decide whether he had reasonable grounds to believe the case could be reversed." *Smith v. Brown, P.C.,* 51 S.W.3d 376, 381 (Tex.App.-Houston [1st Dist.] 2001, pet. denied); *see also Goss v. Houston Cmty. Newspapers,* 252 S.W.3d 652, 657 (Tex.App.-Houston [14th Dist.] 2008, no pet.) ("If an appellant's argument on appeal fails to convince us but has a reasonable basis in law and constitutes an informed, good-faith challenge to the trial court's judgment, sanctions are not appropriate."). Dr. Kloeris's contention that Dr. Poindexter's report is insufficient centers around the fact that the report does not address records upon which Dr. Poindexter stated he relied but undermine his conclusion regarding causation. Although we hold that the medical and pharmacy records from other doctors, relied upon but not mentioned by Dr. Poindexter in his report, do not preclude his conclusions on causation, Dr. Kloeris asserted reasonable grounds for an appeal. *See Reddy,* 2008 Tex.App. LEXIS 2000, at *9 n. 1 (stating that appellate courts can consider additional records to determine whether the expert's opinions are supported by the records he reviewed). We decline to conclude that Dr. Kloeris's appeal is frivolous.

### Conclusion

**\*10** We hold that Dr. Poindexter's expert report provides a fair summary of the standard of care applicable to Dr. Kloeris, how Dr. Kloeris breached that standard, and how Dr. Kloeris's breach caused Charles Stockdale's death. We therefore affirm the order of the trial court denying Dr. Kloeris's motion to dismiss. We further hold that Dr. Poindexter's report does not provide a fair summary of the standard of care applicable to Dr. Rajan and how her conduct breached that standard with respect to Charles Stockdale, who was not her patient. We therefore remand the case to the trial court to determine whether to grant the Stockdales a thirty-day extension to cure the deficiencies in the expert report regarding Dr. Rajan's conduct.

Tex.App.-Houston [1 Dist.],2010.
Kloeris v. Stockdale
Not Reported in S.W.3d, 2010 WL 1241305 (Tex.App.-Hous. (1 Dist.))

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

*MEMORANDUM OPINION*

Court of Appeals of Texas,
Austin.
Kristen KOCUREK, M.D., and Texas MedClinic,
Appellants
v.
Anthony D. COLBY, Appellee.

No. 03–13–00057–CV.
Aug. 22, 2014.

From the District Court of Travis County, 419th Judicial District No. D–1–GN–12–000186, Tim Sulak, Judge Presiding.
Anthony D. Colby, Austin, TX, pro se appellee.

Laura A. Macom, George F. Evans Jr., Brett B. Rowe, Evans & Rowe, PC, San Antonio, TX, for appellant.

Before Chief Justice JONES, Justices GOODWIN and FIELD.

*MEMORANDUM OPINION*
SCOTT K. FIELD, Justice.

**\*1** Appellants Kristen Kocurek, M.D., and Texas MedClinic appeal from the trial court's denial of their motion to dismiss appellee Anthony D. Colby's [FN1] suit for medical malpractice based on Colby's alleged failure to provide an adequate expert report as required by chapter 74 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem.Code § 74.351. We will reverse the trial court's judgment and remand for dismissal and a determination of attorneys' fees.

FN1. Colby represents himself in this ap-

peal as he did in the trial court proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND**

Colby was under Kocurek's care for approximately two months after sustaining injuries on the job; his primary medical complaints were numbness and pain in his left hip and tingling in his right hand. According to Colby, Kocurek performed no physical examination on him and instead had only oral conferences with him. Further, Kocurek indicated to him orally that she would refer him to a specialist, but never did.

After receiving treatment from Kocurek, Colby moved out of state and transferred his care to an orthopedic specialist there. Shortly thereafter, however, Colby returned to see Kocurek, claiming new symptoms. According to Colby's petition, at that visit Kocurek again failed to examine him physically, ignored his symptoms, and displayed an inappropriate demeanor toward him.

Colby filed suit against Kocurek and Texas MedClinic,[FN2] alleging departures from accepted standards of medical care that proximately resulted in injuries to him. Colby alleged that Kocurek failed to meet the applicable standards of care in failing to (1) perform a thorough examination of him; (2) secure appropriate treatment for him; (3) properly diagnose and treat him; (4) refer him to or consult with a specialist; and (5) monitor his condition. Colby also made a claim for fraudulent misrepresentation/common-law fraud relating to Kocurek's documentation of his injuries and treatment. In addition, Colby claimed that Kocurek's actions caused (1) a pinched nerve in his right hand to become entrapped, (2) his left hip to develop bursitis and soft-tissue nerve damage, (3) limited range of motion in his hip, as well as constant pain and nerve damage that will worsen with age, and (4) a need for surgery in his right hand due to numbness, tingling, and serious pain.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

> FN2. Colby's claims against Texas Med-Clinic were solely for vicarious liability arising from Kocurek's actions.

After filing suit, Colby served appellants with the expert report of Dr. Ronald Devere, a neurologist, to comply with the expert-report requirement of section 74.351 of the Texas Civil Practice and Remedies Code. *See id.* Appellants then filed a motion to dismiss the suit, claiming that Devere's expert report failed to satisfy the statutory elements under section 74.351. After a hearing, the trial court agreed with appellants that Devere's expert report was deficient, but granted Colby a 30–day extension to cure the deficiencies. In response to the trial court's ruling, Colby served appellants with an amended report from Devere. Appellants again filed a motion to dismiss, contending that Devere's amended report remained deficient. After a hearing, the trial court denied appellants' motion to dismiss.[FN3] Appellants then filed this interlocutory appeal. *See id.* § 51.014(a)(9).

> FN3. The trial judge who denied appellants' motion to dismiss Devere's amended expert report was not the same trial judge who ruled that Devere's expert report was deficient in the context of appellants' first motion to dismiss.

### ANALYSIS

**Jurisdiction**

**\*2** In response to appellants' appeal, Colby contends that this Court lacks jurisdiction over the appeal. Colby appears to argue that once a trial court grants a 30–day extension for a plaintiff to file an amended report and the plaintiff files an amended report, no appeal may be taken with regard to the trial court's ruling on the adequacy of the amended report. Colby argues that, in any event, a party may not appeal the denial of a motion to dismiss relating to the *adequacy* of the expert report. In support of his argument, Colby relies on this Court's opinion in *Academy of Oriental Med., L.L.C. v. Andra,* 173 S.W.3d 184 (Tex.App.-Austin 2005, no pet.). Our opinion in *Andra,* however,

does not support Colby's position. In *Andra,* the defendant filed an interlocutory appeal of a denial of a motion to strike an expert report, not a motion to dismiss as in this case. *Id.* at 186. Because of the unique procedural posture in the *Andra* case, we concluded that the motion for relief was a motion under section 74.351(*l* ), for which there is no provision for an interlocutory appeal when denied. *Id.* at 189; *see* Tex. Civ. Prac. & Rem.Code § 51.014(a)(10) (allowing interlocutory appeal of order granting relief under section 74.351(*l* )). That is not the type of motion appellants filed in this case.

Appellants filed a motion to dismiss and request for attorneys' fees under section 74.351(b). *See* Tex. Civ. Prac. & Rem.Code § 74.351(b) (providing that physician provider may move to dismiss when sufficient expert report not served and 120–day deadline has expired). The denial of a motion to dismiss and request for attorneys' fees under section 74.351(b) is subject to interlocutory appeal under section 51.014(a)(9) of the Texas Civil Practice and Remedies Code. *Lewis v. Funderburk,* 253 S.W.3d 204, 208 (Tex.2008). Colby's jurisdictional complaint is overruled, and we now turn to the merits of this appeal.

**Sufficiency of Expert Report**

In a health-care-liability claim, a claimant must provide each defendant with an expert report and curriculum vitae for each expert within 120 days of filing suit. Tex. Civ. Prac. & Rem.Code § 74.351(a). The expert report must summarize the expert's opinions "regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). After an expert report is filed, the defendant may object to the sufficiency of the report and move to dismiss the plaintiff's claims. *See id.* § 74.351(a), (b). In two appellate issues, appellants contend that the trial court abused its discretion in denying their motion to dismiss because (1) Devere is not a qualified expert to provide a re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

port in this case, and (2) Devere's report is conclusory with regard to the element of causation. We will begin with analysis of whether Devere's report adequately demonstrates causation.

**\*3** When a party challenges the adequacy of an expert report, the trial court should sustain the objection only if it determines that the report does not represent an "objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(*l* ). To constitute a good-faith effort, the report must inform the defendant of the specific conduct called into question and provide a basis for the trial court to determine whether the claims have merit. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001). A report does not fulfill these purposes if it fails to address the standard of care, breach of the standard of care, and causation, or if it merely states the expert's conclusions regarding these elements. *Id.* The expert must link his conclusions to the facts of the case. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). We review a trial court's denial of a motion to dismiss under section 74.351 under an abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 878. However, "if an expert report contains only conclusions about the statutory elements, the trial court has 'no discretion but to conclude ... that the report does not represent a good-faith effort' to satisfy the statute." *Smith v. Wilson,* 368 S.W.3d 574, 577 (Tex.App.-Austin 2012, no pet.) (quoting *Palacios,* 46 S.W.3d at 877, 880). To perform its review, the trial court must look only to the four corners of the report itself. *Palacios,* 46 S.W.3d at 878.

Devere's eight-page report contains a paragraph on his qualifications, lists the issues he is reviewing and the materials used in that review, and states the background facts. The report then turns to a discussion of the standards of care for Kocurek's treatment of Colby and a discussion applying those standards of care to the facts presented. Finally, it contains a conclusion section. The report contains some detail of Colby's complaints, the standards of

care applicable to those complaints, and an opinion as to whether Kocurek breached the applicable standards of care. Devere's report, however, contains nearly no discussion of causation to link Colby's alleged harm to Kocurek's actions.

Looking only to the four corners of the report, the following are the only statements from Devere's report that could potentially be considered as touching on causation:

• "Based on Dr. Kocurek's failure to act, secure treatment and properly execute a referral for Mr. Colby, his condition has worsened and he has suffered tremendously and unnecessarily." (from Background Facts section of report)

• "By not making this referral [to a specialist], Defendant, Dr. Kocurek, deceived Mr. Colby, created anxiety in Mr. Colby by making him think that a referral to a specialist was coming when it was not and resulted in a delay in Mr. Colby receiving any needed care, treatment or therapy that might have been recommended by a specialist, if that referral had been made." (from Application of Standard of Care section)

**\*4** • "In my expert opinion, the Defendant violated the applicable standard of care for physician's [sic] operating in the State of Texas based on the reasons mentioned above. Based on her actions or failures to act, Mr. Colby suffered and her actions or failures to act were a direct cause of worsening pain and numbness to Mr. Colby. Her violations of the standard of care resulted in a delay of Mr. Colby receiving appropriate care for his injuries, and the worsening of his symptoms." (from the Conclusion section)

• "Based on these worsening injuries, Mr. Colby has endured and will continue to endure significant pain, numbness and incapacity until he can receive the appropriate treatment to correct these conditions." (from the Conclusion section)

The issue is whether these statements, which

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

appear to be the only attempts made at establishing causation in Devere's report, are sufficient to meet the requirements of section 74.351. We conclude they are not.

The problem with Devere's report is that it fails to show, within its four corners, what specific actions Kocurek did or did not take, or could have taken, that would have prevented Colby's symptoms or injuries. *See* Tex. Civ. Prac. & Rem.Code § 74.351(r)(5) (expert report must include "fair summary" or expert's opinion as to "causal relationship" between medical defendant's failure to meet standard of care and injury). Nowhere in the report does Devere actually state what specific violation of which standard of care led to a particular health problem of Colby's. The report lists five standards of care that Kocurek allegedly violated in her treatment of Colby and the specific ways Devere believes Kocurek violated those standards of care. Devere, however, did not provide facts that would explain a causal link between any of those alleged breaches of the standards of care to any one of Colby's injuries.

An expert report must explain, to a reasonable degree, how and why the alleged breach caused the injury based on the facts presented. *See Jelinek v. Casas,* 328 S.W.3d 526, 539–40 (Tex.2010). The closest Devere's report comes to providing a causal link is in his statement that "[b]ased on [Kocurek's] actions or failures to act, Mr. Colby suffered and [Kocurek's] actions or failures to act were a direct cause of worsening pain and numbness to Mr. Colby. Her violations of the standard of care resulted in a delay of Mr. Colby receiving appropriate care for his injuries, and the worsening of his symptoms." This statement, however, never identifies which breach of which standard of care by Kocurek led to a worsening of Colby's pain and numbness. Further, the statement fails to identify how any specific injury sustained by Colby would have been prevented or lessened had he received "appropriate care" sooner. Devere's statement that referring Colby to a specialist might have made a difference

in Colby's condition—"treatment or therapy that might have been recommended by a specialist, if that referral had been made"—amounts to nothing more than speculation. *See id.* at 539 (concluding that statement in expert report that breach of standard of care "in reasonable medical probability resulted in [injury]" was insufficient). The report does not explain what treatment or therapy a specialist would have provided had Colby been referred earlier or how such treatment or therapy would have prevented Colby's injuries. As a result, the statements in Devere's report regarding causation amount to "no more than a bare assertion that [Kocurek's] breach resulted in increased pain and suffering." *See id.* at 540.

**\*5** This Court has consistently required more than what Devere has provided in terms of expert testimony on causation in the context of section 74.351. *See Smith,* 368 S.W.3d at 577–78 (holding that expert report failed to show how doctor's alleged breach of standard of care caused patient to commit suicide); *Constancio v. Bray,* 266 S.W.3d 149, 157–58 (Tex.App.-Austin 2008, no pet.) (holding that expert report that alleged that breach of standard of care by doctor caused patient's death is insufficient when report did not explain how increased monitoring of patient, detection of hypoxemia, and other actions would have prevented patient's death); *Perez v. Daughters of Charity Health Servs. of Austin,* No. 03–08–00200–CV, 2008 WL 4531558, at \*4 (Tex.App.-Austin Oct. 10, 2008, no pet.) (mem.op.) (concluding expert report insufficient on causation because it did not link hospital's actions to patient's death or any cause of death and did not identify any specific injury that would have been prevented had hospital complied with standard of care). To find Devere's report sufficient on causation, we would have to make inferences from beyond the four corners of his report; this we are not allowed to do.

Based on the record before us and the four corners of the expert report, we are left with no choice but to conclude that the report does not

provide an adequate causal link between Kocurek's alleged shortcomings and Colby's symptoms or injuries. Because the report is insufficient as to Kocurek, it is also insufficient as to Texas MedClinic, which Colby sued solely on the basis of its alleged vicarious liability for Kocurek's actions. *See Smith, 368 S.W.3d at 579*. Accordingly, we sustain the appellants' second issue on appeal. [FN4]

> FN4. Because appellants' second issue is dispositive of this appeal, we need not reach appellants' first appellate issue challenging the trial court's conclusion that the expert report adequately demonstrated Devere's qualifications as an expert.

### CONCLUSION

We reverse the trial court's order denying appellants' motion to dismiss. We remand the cause to the trial court for a determination of attorneys' fees, *see* Tex. Civ. Prac. & Rem.Code § 74.351(b), and for entry of a final order dismissing Colby's claims against appellants.

Tex.App.-Austin,2014.
Kocurek v. Colby
Not Reported in S.W.3d, 2014 WL 4179454 (Tex.App.-Austin)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


296 S.W.3d 193
**(Cite as: 296 S.W.3d 193)**

H

Court of Appeals of Texas,
Houston (14th Dist.).
The METHODIST HOSPITAL, Appellant
v.
Beverley SHEPHERD–SHERMAN, Appellee.

No. 14–08–01090–CV.
Aug. 20, 2009.

**Background:** Marfan syndrome patient brought negligence action against hospital arising from heart surgery by surgeons who were not patient's normal surgeon who was a Marfan syndrome specialist, alleging that stent was misplaced and that hospital's doctors and employees did not honor her request to have her surgeon treat her. The 113th District Court, Harris County, 2008 WL 6654897, Patricia Ann Hancock, J., denied the hospital's motion to dismiss based on patient's alleged failure to meet the expert report requirement. Hospital appealed.

**Holdings:** The Court of Appeals, Leslie B. Yates, J., held that:
(1) expert was qualified to render standard of care opinion regarding hospital admissions procedures for patients requesting a specific doctor;
(2) expert report was sufficient as to the standard of care and breach;
(3) expert report was sufficient as to causation; and
(4) hospital was not subject to sanction for frivolous appeal.

Affirmed.

West Headnotes

**[1] Health 198H ⟜804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

In providing the required expert report for a health care liability claim, the claimant need not marshal his evidence or present sufficient evidence to avoid summary judgment. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[2] Health 198H ⟜804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

The required expert report for a health care liability claim must provide enough information to fulfill two purposes: (1) to inform the defendant of the specific conduct the plaintiff has called into question, and (2) to provide a basis for the trial court to conclude the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[3] Appeal and Error 30 ⟜960(1)**

30 Appeal and Error
    30XVI Review
        30XVI(H) Discretion of Lower Court
            30k960 Rulings on Motions Relating to Pleadings
                30k960(1) k. In general. Most Cited Cases

The appellate court reviews for an abuse of discretion a trial court's ruling on the adequacy of an expert report and a motion to dismiss based on a failure to meet the expert report requirement in a health care liability case. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[4] Health 198H ⟜804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty

296 S.W.3d 193
**(Cite as: 296 S.W.3d 193)**

198HV(G) Actions and Proceedings
198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

In determining the qualifications of an expert to provide an expert report in a health care liability case, the court must analyze the expert's training and experience regarding the specific issue before the court to ensure the expert is qualified to give an opinion on that issue. V.T.C.A., Civil Practice & Remedies Code § 74.402(b)(3), (c)(1).

**[5] Health 198H ⚷804**

198H Health
198HV Malpractice, Negligence, or Breach of Duty
198HV(G) Actions and Proceedings
198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Physician was qualified to render standard of care opinion regarding hospital admissions procedures for patients requesting a specific doctor in patient's negligence action against hospital arising from surgery performed by surgeons other than one requested by patient, where physician had experience with all aspects of the admissions process, having been involved in numerous admissions where either a patient had requested him as a doctor or a patient he was involved with requested another doctor. V.T.C.A., Civil Practice & Remedies Code § 74.402(b)(3), (c)(1).

**[6] Health 198H ⚷804**

198H Health
198HV Malpractice, Negligence, or Breach of Duty
198HV(G) Actions and Proceedings
198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

A doctor serving as an expert in a health care liability case is not automatically disqualified from giving opinions regarding other types of health care providers, even though the standard of care may be different for those providers; if doctor is familiar with the standard of care for other health care pro-

viders based on experience working with or supervising them, then he can be qualified to render an opinion in the form of the required expert report. V.T.C.A., Civil Practice & Remedies Code § 74.402(b)(3), (c)(1).

**[7] Health 198H ⚷804**

198H Health
198HV Malpractice, Negligence, or Breach of Duty
198HV(G) Actions and Proceedings
198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Physician's expert report was sufficient as to standard of care and breach even if report did not identify the specific conduct called into question by each type of hospital employee involved, namely doctors, nurses, or admissions staff, in patient's negligence action against hospital arising from heart surgery performed by surgeons other than the Marfan syndrome specialist requested by patient; report explained that the standard of care was the same for doctors and hospital staff when a patient requested a specific doctor and report opined that the doctors and hospital staff all breached that standard. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[8] Health 198H ⚷804**

198H Health
198HV Malpractice, Negligence, or Breach of Duty
198HV(G) Actions and Proceedings
198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Expert report in health care liability case may not state a global standard of care without explaining how that standard of care applies to the health care providers at issue and how they breached it. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[9] Pretrial Procedure 307A ⚷680**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

307A Pretrial Procedure
  307AIII Dismissal
    307AIII(B) Involuntary Dismissal
      307AIII(B)6 Proceedings and Effect
        307Ak680 k. Fact questions. Most Cited Cases

Whether an expert's opinions in the required expert report in a health care liability case are correct is an issue for summary judgment, not a motion to dismiss. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[10] Health 198H** ⚷804

198H Health
  198HV Malpractice, Negligence, or Breach of Duty
    198HV(G) Actions and Proceedings
      198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Physician's expert report was sufficient as to causation in patient's negligence action against hospital arising from heart surgery performed by surgeons other than the Marfan syndrome specialist requested by patient, even though chain of events leading from hospital's actions to patient's injuries had many links; report described Marfan syndrome and explained why the use of a stent was contradicted for Marfan syndrome patients, report opined that stent should not have been used on patient, and report repeatedly stated that no reasonable doctor, which presumably included the Marfan syndrome expert, would have performed stent surgery under such circumstances. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[11] Health 198H** ⚷804

198H Health
  198HV Malpractice, Negligence, or Breach of Duty
    198HV(G) Actions and Proceedings
      198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

An expert report in a health care liability case cannot be based on mere conclusions or specula-

tion; rather, the expert must explain the basis for his statements and link his conclusions to the facts. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[12] Health 198H** ⚷804

198H Health
  198HV Malpractice, Negligence, or Breach of Duty
    198HV(G) Actions and Proceedings
      198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Expert report in health care liability case must provide supported opinions that are sufficient to give the trial court assurance that the claim has merit. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[13] Costs 102** ⚷260(1)

102 Costs
  102X On Appeal or Error
    102k259 Damages and Penalties for Frivolous Appeal and Delay
      102k260 Right and Grounds
        102k260(1) k. In general. Most Cited Cases

**Costs 102** ⚷261

102 Costs
  102X On Appeal or Error
    102k259 Damages and Penalties for Frivolous Appeal and Delay
      102k261 k. Discretion of court. Most Cited Cases

Whether to grant sanctions for a frivolous appeal is a matter of discretion that the appellate court exercises with prudence and caution and only after careful deliberation in truly egregious circumstances. Rules App.Proc., Rule 45.

**[14] Costs 102** ⚷260(4)

102 Costs
  102X On Appeal or Error

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

296 S.W.3d 193
**(Cite as: 296 S.W.3d 193)**

102k259 Damages and Penalties for Frivolous Appeal and Delay

102k260 Right and Grounds

102k260(4) k. What constitutes frivolous appeal or delay. Most Cited Cases

If an appellant's argument on appeal fails to convince the appellate court but has a reasonable basis in law and constitutes an informed, good-faith challenge to the trial court's judgment, sanctions for a frivolous appeal are not appropriate. Rules App.Proc., Rule 45.

**[15] Costs 102 ☞260(5)**

102 Costs

102X On Appeal or Error

102k259 Damages and Penalties for Frivolous Appeal and Delay

102k260 Right and Grounds

102k260(5) k. Nature and form of judgment, action, or proceedings for review. Most Cited Cases

Hospital's interlocutory appeal of denial of its motion to dismiss patient's health care liability claims based on her alleged failure to meet expert report requirements was not frivolous, and therefore sanctions were not warranted, even though the appeal lacked merit. Rules App.Proc., Rule 45.

**\*195** Dwight Willis Scott Jr., Stephanie Laird Tolson, Houston, TX, Michael H. Rubin, Baton Rouge, LA, for appellants.

Jimmy Williamson, Oscar Luis Delarosa, Kenneth E. Broughton, Thomas P. Sartwelle, James R. Boston, Cindy M. Rusnak, Houston, TX, for appellees.

Panel consists of Chief Justice HEDGES and Justices YATES and FROST.

**OPINION**

LESLIE B. YATES, Justice.

This is an interlocutory appeal of the trial court's order denying appellant The Methodist Hospital's motion to dismiss the health care liability claims of appellee Beverley Shepherd–Sherman ("Sherman") based on her failure to meet the expert **\*196** report requirements of chapter 74 of the Texas Civil Practice and Remedies Code. Methodist claims in four issues that the motion to dismiss should have been granted because Sherman's expert was not qualified and because the report was insufficient regarding the standard of care, breach of the standard of care, and causation. We conclude that the trial court did not abuse its discretion in denying Methodists's motion to dismiss, and thus we affirm.

**BACKGROUND**

Sherman suffers from Marfan syndrome, which is a condition that damages connective tissue in the body and can affect many bodily systems, including the cardiovascular system. Sherman was a long-term patient of Dr. Neal Kleiman, and he told her that if she ever had chest pains, she should call him and go to an emergency room. Dr. Kleiman would then ensure that she was treated by Dr. Joseph Coselli, a surgeon and Marfan syndrome specialist. In 2001, this scenario happened—Sherman experienced chest pains and called Dr. Kleiman on the way to the Methodist emergency room, and Dr. Kleiman contacted Dr. Coselli, who met her at the hospital and performed heart surgery.

In February 2006, Sherman again experienced chest pains and called Dr. Kleiman on her way to the Methodist emergency room. According to Sherman, this time Dr. Kleiman refused to call Dr. Coselli, despite her repeated requests. Dr. Kleiman contacted Dr. Alan Lumsden instead. Sherman continued to insist to various doctors and hospital employees that Dr. Coselli was her doctor and that she wanted him to be contacted, but she was told that Dr. Coselli no longer worked for Methodist and that Dr. Lumsden had taken his place. Two days after being admitted to Methodist, Dr. Lumsden and Dr. Michael Reardon performed aortic stent graft surgery on Sherman. After the surgery, Sherman tracked down Dr. Coselli, who transferred her to another hospital and removed the stent. Sherman

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

suffered complications from the stent surgery, which required many subsequent surgeries and left her unable to work or care for herself alone.

Sherman sued Methodist and Drs. Kleiman, Lumsden, and Reardon. She alleged, inter alia, that the doctors were negligent because they misplaced the stent and because a stent is contraindicated for a Marfan syndrome patient. Sherman alleged that Methodist is liable because its doctors and employees did not honor her requests to have Dr. Coselli treat her and Dr. Coselli would not have inserted a stent, thereby preventing all of her subsequent problems.

Pursuant to chapter 74 of the Civil Practice and Remedies Code, Sherman filed the expert report and curriculum vitae of Dr. Phillip Adams. The defendants all objected, and Sherman was given an opportunity to file a supplemental report. The defendants again objected to Sherman's supplemental report and filed a motion to dismiss, which the trial court denied. Methodist is the only defendant appealing the trial court's ruling. We consider the initial and supplemental reports together in assessing Sherman's compliance with chapter 74.

### ANALYSIS
#### A. Legal Framework

[1][2] Section 74.351 of the Civil Practice and Remedies Code requires a health care liability claimant to provide the defendant with an expert report within 120 days after filing the petition. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp. 2008). A defendant may then file a motion challenging the adequacy of the expert's **\*197** report, and the trial court "shall grant" the motion if it appears that the report does not represent a good faith effort to comply with the statutory requirements. *Id.* § 74.351(a), (*l* ). A sufficient expert report must provide a fair summary of the expert's opinions regarding the applicable standard of care, the manner in which the care provided failed to meet that standard, and the causal relationship between that breach and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6); *Am. Transitional*

*Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878–79 (Tex.2001). In providing the expert's opinions on these elements, the claimant need not marshal his evidence or present sufficient evidence to avoid summary judgment. *Palacios,* 46 S.W.3d at 878; *Patel v. Williams,* 237 S.W.3d 901, 904 (Tex.App.-Houston [14th Dist.] 2007, no pet.). Rather, the report must provide enough information to fulfill two purposes: (1) to inform the defendant of the specific conduct the plaintiff has called into question and (2) to provide a basis for the trial court to conclude the claims have merit. *Palacios,* 46 S.W.3d at 879; *Patel,* 237 S.W.3d at 904.

[3] We review a trial court's ruling on the adequacy of an expert report and a motion to dismiss based on a failure to meet the expert report requirement for an abuse of discretion. *Palacios,* 46 S.W.3d at 877; *San Jacinto Methodist Hosp. v. Bennett,* 256 S.W.3d 806, 811 (Tex.App.-Houston [14th Dist.] 2008, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). Though we may not substitute our judgment for that of the trial court, the trial court has no discretion in determining what the law is or applying the law to the facts. *Id.; Sanjar v. Turner,* 252 S.W.3d 460, 463 (Tex.App.-Houston [14th Dist.] 2008, no pet.).

#### B. Qualifications

[4] In its first issue, Methodist challenges Dr. Adams's qualifications to render an opinion as to the allegations against it. To be qualified to provide an expert report under chapter 74, an expert must, among other things, be "qualified on the basis of training or experience" to offer an opinion in the relevant area of health care. TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b)(3), (c)(1) (Vernon 2005). We must analyze the expert's training and experience regarding the "specific issue" before the court to ensure the expert is qualified to give an opinion on that issue. *Thomas v. Alford,* 230 S.W.3d 853, 857 (Tex.App.-Houston [14th Dist.]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

296 S.W.3d 193
**(Cite as: 296 S.W.3d 193)**

2007, no pet.); *see also In re Windisch,* 138 S.W.3d 507, 512–13 (Tex.App.-Amarillo 2004, no pet.).

[5] Unlike her claims against the defendant doctors, Sherman's claims against Methodist are not based on the surgery itself but on Methodist's employees denying her access to her doctor of choice. Thus, the specific issue before the court involves hospital admissions procedures when a patient requests a specific doctor. Methodist argues that although Dr. Adams may be qualified to give opinions regarding Sherman's medical treatment, that does not establish his qualifications regarding the standard of care for hospital admissions procedures and the conduct of non-physician hospital personnel when a patient requests a specific doctor.

[6] According to Dr. Adams's report, he has experience with all aspects of the admissions process, having been involved in numerous admissions where either a patient has requested him as a doctor or a patient he was involved with requested another doctor. He further states that he is familiar with the standard of care for **\*198** hospital personnel based on his work with admissions personnel and other hospital staff responsible for following hospital policy. Methodist contends that this experience does not qualify Dr. Adams to opine on the standard of care applicable to non-physicians because his experience is based on his perspective as a doctor, not, for example, as a nurse or admissions clerk. We disagree. A doctor is not automatically disqualified from giving opinions regarding other types of health care providers, even though the standard of care may be different for those providers. *See Baylor Med. Ctr. at Waxahachie v. Wallace,* 278 S.W.3d 552, 558 (Tex.App.-Dallas 2009, no pet.); *Bennett,* 256 S.W.3d at 814; *Manor Care Health Servs., Inc. v. Ragan,* 187 S.W.3d 556, 562 (Tex.App.-Houston [14th Dist.] 2006, pet. granted, judgm't vacated, remanded by agr.). If the doctor is familiar with the standard of care for other health care providers based on experience working with or supervising them, then he can be qualified to render an opinion. *See Wallace,* 278 S.W.3d at 558–59;

*Bennett,* 256 S.W.3d at 813–14; *Ragan,* 187 S.W.3d at 563. Based on Dr. Adams's experience in hospital admissions and working with hospital personnel in carrying out patient requests for specific doctors, we conclude Dr. Adams is qualified to render opinions regarding the claims against Methodist.[FN1] *See Wallace,* 278 S.W.3d at 558–59 (concluding doctor qualified to provide standard of care for medical center based on work with nurses, nurse practitioners, physician's assistants, and other doctors); *Bennett,* 256 S.W.3d at 814 (finding doctor qualified to state standard of care for professional nurse in preventing bed sores based on previous work with nurses in such situations); *Ragan,* 187 S.W.3d at 564 (stating that doctor was qualified to provide standard of care for nurses based on experience working with nursing staff on the exact situation at issue in the case). Accordingly, we determine the trial court did not abuse its discretion in denying Methodist's motion to dismiss based on Dr. Adams's purported lack of qualifications, and we overrule its first issue.

> FN1. It is this fact that distinguishes this case from Methodist's authority, in which the doctor either never stated the standard of care for the non-physician health care providers at issue or did not explain the basis for any such knowledge. *See, e.g., Christus Health SE Tex. v. Broussard,* 267 S.W.3d 531, 535–36 (Tex.App.-Beaumont 2008, no pet.); *Simonson v. Keppard,* 225 S.W.3d 868, 872–73 (Tex.App.-Dallas 2007, no pet.); *Methodist Health Care Sys. of San Antonio, Ltd. v. Rangel,* No. 04–05–00500–CV, 2005 WL 3445994, at \*2–3 (Tex.App.-San Antonio Dec. 14, 2005, pet. denied) (mem. op.); *cf. Bennett,* 256 S.W.3d at 814 (distinguishing *Simonson* ).

**C. Standard of Care and Breach**

[7] In its second and third issues, Methodist argues that Sherman's expert report does not adequately identify and apply the standard of care and

breach of the standard of care as to Methodist. Dr. Adams states repeatedly in his report that when a patient requests a specific doctor, the standard of care requires doctors and hospital employees to locate and contact that doctor and request his instructions for the care and treatment of that patient. According to Dr. Adams, Methodist's employees breached the standard of care because, despite Sherman's repeated requests, no one attempted to locate or contact Dr. Coselli and request his instructions for her care.

[8][9] Methodist contends that the report is inadequate as to the standard of care and breach because it does not identify the specific conduct called into question by each type of hospital employee involved, such as doctors, nurses, or admissions staff. Methodist argues that a global standard **\*199** of care and assertion of breach for all actors is insufficient as a matter of law. Methodist is correct that an expert report may not state a global standard of care without explaining how that standard of care applies to the health care providers at issue and how they breached it. *See, e.g., Haddad v. Marroquin,* No. 13–07–014–CV, 2007 WL 2429183, at *4 (Tex.App.-Corpus Christi Aug. 29, 2007, pets. denied) (mem. op.); *Doades v. Syed,* 94 S.W.3d 664, 671–72 (Tex.App.-San Antonio 2002, no pet.). However, that is not what Dr. Adams's report does. Rather, in his report, Dr. Adams explains that in the context of this specific area of practice—that is, when a patient requests a specific doctor—the standard of care is the same for doctors and hospital staff. He then opines that the doctors and hospital staff in this case all breached the standard of care by failing to attempt to locate and contact Dr. Coselli in response to Sherman's requests. There is nothing inherently impermissible about concluding that different health care providers owed the same standard of care to Sherman and breached that duty in the same way.[FN2] *See Bennett,* 256 S.W.3d at 817 ("Although [the expert]'s opinion for each defendant is identical, he unquestionably provided an opinion for each hospital. That he held each defendant to the same standard of care, found the same

type of breach, and analyzed causation in the same way does not render his opinion inadequate."); *Sanjar,* 252 S.W.3d at 466–67 (affirming trial court's refusal to dismiss based on expert report that applied same standard of care to multiple defendants). We conclude that Dr. Adams's report sufficiently explained why the standard of care and breach elements were the same as to all the relevant health care providers. Therefore, the trial court did not abuse its discretion in denying Methodist's motion to dismiss on this basis, and we overrule Methodist's second and third issues.

> FN2. Dr. Adams may be, as Methodist suggests, incorrect in this conclusion, but whether an expert's opinions are correct is an issue for summary judgment, not a motion to dismiss under chapter 74. *See, e.g., Sanjar,* 252 S.W.3d at 467 n. 6 (concluding that doctor's arguments that he did not owe duty to patient as described in expert report was an issue for summary judgment rather than a motion to dismiss); *Wissa v. Voosen,* 243 S.W.3d 165, 169–70 (Tex.App.-San Antonio 2007, pet. denied) (same).

**D. Causation**

[10] In its fourth issue, Methodist argues that Sherman's expert report is also insufficient as to causation. Dr. Adams opines that the stent is the ultimate cause of all Sherman's injuries and that Dr. Coselli would not have performed stent surgery. Thus, if Methodist had followed the standard of care and contacted Dr. Coselli, Sherman would never have received a stent, thereby avoiding her injuries. Methodist asserts that this opinion is speculative and conclusory because there is no basis for concluding what Dr. Coselli would have actually done and that, at most, any negligence by Methodist merely created a condition that allowed another's negligence to cause an injury. Methodist stresses that its actions were administrative rather than treatment-oriented and that it was the allegedly defective treatment that caused Sherman's injuries.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

[11][12] An expert report cannot be based on mere conclusions or speculation. *See Bowie, 79 S.W.3d at 52; Mosely v. Mundine, 249 S.W.3d 775, 781 (Tex.App.-Dallas 2008, no pet.).* Rather, the expert must explain the basis for his statements and link his conclusions to the facts. *Bowie, 79 S.W.3d at 52; Sanjar, 252 S.W.3d at 465, 467–68.* Dr. Adams does just that. He describes Marfan syndrome and explains why the use of a stent is contraindicated for Marfan syndrome patients and **\*200** should not have been used on Sherman. Dr. Adams repeatedly states that no reasonable doctor, which presumably includes Dr. Coselli, would have performed stent surgery under such circumstances. That the chain of events leading from Methodist's actions to Sherman's injuries has many links does not render Dr. Adams's opinion insufficient because he explains and supports each step. *See Patel, 237 S.W.3d at 905–06; Farishta v. Tenet Healthsystem Hosps. Dallas, Inc., 224 S.W.3d 448, 454–55 (Tex.App.-Fort Worth 2007, no pet.).* Methodist complains that Dr. Adams's opinion is not based on evidence, such as an affidavit or deposition from Dr. Coselli, stating exactly what *he* would have done had he been called when Sherman was admitted. Methodist cites no authority that discovery from a fact witness is required to support an initial expert report under chapter 74.[FN3] The report must provide supported opinions that are sufficient to give the trial court assurance that the claim has merit. *See Palacios, 46 S.W.3d at 879; Patel, 237 S.W.3d at 904.* Dr. Adams's well-supported conclusions about how a reasonably prudent doctor would have acted under the circumstances are sufficient to have given the trial court such assurances at this stage in the case. That discovery could later prove Dr. Adams wrong is not a basis for holding that his report is insufficient under chapter 74. *See Sanjar, 252 S.W.3d at 467 n. 6; Wissa v. Voosen, 243 S.W.3d 165, 169–70 (Tex.App.-San Antonio 2007, pet. denied).* We overrule Methodist's fourth issue.

> FN3. Indeed, discovery is severely limited before the chapter 74 expert report requirement is met. *See* TEX. CIV. PRAC. &

REM.CODE ANN. § 74.351(s), (u) (Vernon Supp. 2008); *In re Jorden,* 249 S.W.3d 416, 418, 420–24 (Tex.2008) (orig. proceeding); *In re Lumsden,* 291 S.W.3d 456, 461 (Tex.App.-Houston [14th Dist.] 2009, orig. proceeding); *In re Huag,* 175 S.W.3d 449, 456 (Tex.App.-Houston [1st Dist.] 2005, no pet.).

**E. Sanctions**

[13][14][15] In her cross-issue, Sherman requests this court to sanction Methodist for a frivolous appeal under Texas Rule of Appellate Procedure 45. Whether to grant sanctions for a frivolous appeal is a matter of discretion that this court exercises with prudence and caution and only after careful deliberation in truly egregious circumstances. *See Goss v. Houston Cmty. Newspapers,* 252 S.W.3d 652, 657 (Tex.App.-Houston [14th Dist.] 2008, no pet.). If an appellant's argument on appeal fails to convince us but has a reasonable basis in law and constitutes an informed, good-faith challenge to the trial court's judgment, sanctions are not appropriate. *Id.* Although Methodist's appeal lacks merit, we conclude that it is not frivolous, and we overrule Sherman's cross-issue.

**CONCLUSION**

The trial court did not abuse its discretion in denying Methodist's motion to dismiss based on its objections to Sherman's expert's qualifications and report. Having overruled all of Methodist's issues, we affirm the trial court's judgment.

Tex.App.–Houston [14 Dist.],2009.
Methodist Hosp. v. Shepherd-Sherman
296 S.W.3d 193

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

MEMORANDUM OPINION

Court of Appeals of Texas,
Dallas.
Nexion Health at Garland, Inc. d/b/a Pleasant Valley Healthcare and Rehabilitation Center, Appellant
v.
Temperance Treybig, Appellee

No. 05–14–00498–CV
Opinion Filed December 31, 2014

On Appeal from the 14th Judicial District Court, Dallas County, Texas, Trial Court Cause No. dc–13–12286. Eric Moye, Judge.
Jason A. Burris, J. Edward Johnson III, Weston M. Davis, Gregory N. Ziegler, Dallas, TX, for Appellant.

Dawn M. Smith, Rachel Shackelford, Curtis Clinesmith, Dallas, TX, for Appellee.

Before Justices Bridges, Lang, and Evans

**MEMORANDUM OPINION**
Opinion by Justice Lang
**\*1** This interlocutory appeal involves a medical malpractice action brought by the appellee, Temperance Treybig ("Treybig"), as Representative of the Estate of William Treybig ("Mr.Treybig"), against Nexion Health at Garland d/b/a Pleasant Valley Healthcare and Rehabilitation Center ("Nexion") and Reliant Pro Rehab, LLC ("Reliant"). Nexion, the appellant, filed a motion to dismiss pursuant to section 74.351(b) of the Texas Civil Practices and Remedies Code, alleging Treybig failed to comply with the medical expert report requirement of the Texas Medical Liability Act ("TMLA"). *See* TEX. CIV. PRAC. & REM. CODE ANNN. § 74.351(b) (West 2011). Now, Nexion appeals from the trial court's denial of that motion to dismiss. Reliant is not a party to this appeal.

In four issues, Nexion argues the trial court abused its discretion when it denied the motion to dismiss. Specifically, Nexion contends the trial court erred because (1) the expert report "does not identify the standard of care applicable to Nexion or the actions that Nexion should have taken," (2) the expert report "failed to establish a causal relationship between Nexion's alleged negligence and Mr. Treybig's injury," (3) Treybig failed to serve Nexion with a report from a "qualified expert," and (4) the trial court failed to award Nexion its attorney's fees and costs. We decide Nexion's third issue in its favor. The expert report and curriculum vitae supplied by Treybig do not provide sufficient information regarding the knowledge and experience of the medical expert, as indicated below. Accordingly, we reverse the order of the trial court and remand the case for a determination of whether to grant Treybig a thirty-day extension to cure the deficiencies in the report. TEX. CIV. PRAC. & REM. CODE ANN.. § 74.351(c).

**I. FACTUAL AND PROCEDURAL BACKGROUND**
From March 1, 2010, through January 14, 2013, Mr. Treybig, Treybig's father, was a resident at Pleasant Valley Healthcare and Rehabilitation Center ("Pleasant Valley"), which is a nursing home owned by Nexion. According to Treybig, "Nexion provided what [she] believed and understood was skilled nursing care and ongoing assessments of Mr. Treybig," whose medical history included, among other things, double below the knee amputations and two bilateral hip replacements. Treybig alleges Nexion "engaged, contracted with, and/or hired" Reliant, a physical therapy provider, "to provide medical care and/or therapy to Mr. Treybig while [he was] a resident at the facility." Treybig's factual theory is that during a therapy ses-

sion at Nexion's facility on October 4, 2011, two of Reliant's therapists stretched Mr. Treybig and leaned their combined weight on him while ignoring his cries of pain. On or about October 11, 2011, Mr. Treybig "was diagnosed as having a compression fracture to his L4 vertebrae."

On October 11, 2013, Treybig filed a medical malpractice lawsuit against Nexion and later amended her petition to include Reliant as a defendant. Treybig alleged that the back fracture injury, "among others, was caused by [Nexion and Reliant's] failure to design and/or implement care plans that adequately addressed Mr. Treybig's conditions and failure to provide the care he required." On March 7, 2014, Treybig served Nexion and Reliant with the expert report and curriculum vitae of Dr. Lige B. Rushing ("Dr.Rushing"). Nexion and Reliant each filed a motion to dismiss under the TMLA challenging the adequacy of Dr. Rushing's expert report. After a hearing, the trial court denied both motions, and Nexion filed this appeal.

## II. MEDICAL EXPERT'S REPORT
### A. Standard of Review

**\*2** "Generally, an appellate court reviews a trial judge's decision on a motion to dismiss a claim under section 74.351 of the Texas Civil Practice and Remedies Code for an abuse of discretion." *Baylor Med. Ctr. at Waxahachie v. Wallace,* 278 S.W.3d 552, 555 (Tex.App.–Dallas 2009, no pet.). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles." *Id.* "When reviewing matters committed to the trial court's discretion, an appellate court may not substitute its judgment for that of the trial court." *Cayton v. Moore,* 224 S.W.3d 440, 444 (Tex.App.–Dallas 2007, no pet.). "A trial court has no discretion when determining what the law is or in applying the law to the facts. A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Wallace,* 278 S.W.3d at 555–56 (internal citations omitted).

### B. Standard of Care and Breach

### 1. Applicable Law

"A valid expert report has three elements: it must fairly summarize the applicable standard of care; it must explain how a physician or health care provider failed to meet that standard; and it must establish the causal relationship between the failure and the harm alleged." *Certified EMS, Inc. v. Potts,* 392 S.W.3d 625, 630 (Tex.2013) (citing TEX. CIV. PRAC. & REM. CODEE § 74.351(r)(6) (West 2011)). "A report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001) (decided under section 13.01 of the predecessor statute, the Medical Liability and Insurance Improvement Act, previously codified at article 4590i of the Texas Revised Civil Statutes); *see Loaisiga v. Cerda,* 379 S.W.3d 248, 257–58 (Tex.2012) (applying *Palacios* 's expert report analysis to the TMLA). "The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* at 879. "In determining a report's sufficiency, the court may not look beyond the report itself because all information relevant to the inquiry should be contained [within] the document's four corners." *Christian Care Ctrs., Inc. v. Golenko,* 328 S.W.3d 637, 641 (Tex.App.–Dallas 2010, pet. denied) (citing *Palacios,* 46 S.W.3d at 878).

"The report serves two functions. 'First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit.' " *Potts,* 392 S.W.3d at 630 (quoting *Palacios,* 46 S.W.3d at 879). "A report need not cover every alleged liability theory to make the defendant aware of the conduct that is at issue." *Id.* "The expert report requirement is a threshold mechanism to dispose of claims lacking merit," and "[i]f a health care liability claim contains at least one viable liability theory, as evidenced by an expert report meeting the statutory requirements, the claim

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2014 WL 7499373 (Tex.App.-Dallas)
**(Cite as: 2014 WL 7499373 (Tex.App.-Dallas))**

cannot be frivolous." *Id.* at 631.

"When, as here, a plaintiff sues more than one defendant, the expert report must set forth the standard of care for each defendant. If the standard of care is the same for each defendant, then the report must state so." *Tenet Hosps. Ltd. v. Love,* 347 S.W.3d 743, 753 (Tex.App.–El Paso 2011, no pet.) (internal citations omitted). "While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given." *Palacios,* 46 S.W.3d at 880. "In other words, one must be able to determine from the report what the standard of care required to be done. This requires 'specific information about what the defendant should have done differently.' " *Russ v. Titus Hosp. Dist.,* 128 S.W.3d 332, 342 (Tex.App.–Texarkana 2004, pet. denied) (quoting *id.*).

### 2. Application of Law to Facts

**\*3** As to issue one, where Nexion claims the expert report "does not identify the standard of care applicable to Nexion or the actions that Nexion should have taken," Nexion contends Dr. Rushing's reference to "Defendants," apparently meaning both Nexion and Reliant, renders his expert report deficient. Specifically, Nexion argues Dr. Rushing's "collective referral to Nexion and Reliant prevents the report from (A) adequately stating the standard of care as applied to Nexion and (B) identifying Nexion's allegedly negligent actions in violation of that standard." Treybig responds that the report "does not need to identify separate standards of care when one standard applies to both [Nexion and Reliant] through [Treybig's] vicarious liability and direct liability claims." Treybig contends Dr. Rushing's report provides "a fair summarization of the standard of care" and "makes Nexion 'aware of the conduct that is at issue.' "

Treybig's health care liability claim arises out of the care received by Mr. Treybig while he was a resident at Pleasant Valley, particularly, the physical therapy and other related care that allegedly res-

ulted in Mr. Treybig's back fracture. Dr. Rushing identifies the standard of care applicable to Nexion as follows:

"In order to meet the standard of care, the facility must provide a safe environment for its patients. This standard encompasses a range of duties relating to the patient's stay with the nursing home, which the facility owes to the patient, such as securing qualified personnel to administer the services provided, adequately supervising any therapy sessions, providing proper equipment and facilities for all treatments necessary to meet the patient's needs, and following up with the patient to verify the success of all procedures and treatments.... The standard of care is not met when a nursing home fails to properly investigate, treat and document the patient's pain complaints over the course of time. The most obvious and egregious instance of Defendant's failure to investigate and treat the patient's back pain was during the therapy session when the therapists ignored Mr. Treybig's cries of pain and requests to stop the session, continuing to push and pull using their combined bodyweight.... Reasonable investigation, documentation and treatment would have signified the danger in forceful hamstring stretches on a double below the knee amputee, and prevented fracture.

Dr. Rushing sets forth what care was expected from Nexion and how Nexion failed to provide it. The quoted statements provide a "fair summary" of the standard of care applicable to Nexion. *See Palacios,* ("[A] fair summary must set out what care was expected, but not given."); *Columbia N. Hills Hosp. Subsidiary, L.P. v. Bowen,* No. 02–13–00286–CV, 2014 WL 345658, at \*4–5 (Tex.App.–Fort Worth Jan. 30, 2014, pet. denied) (mem.op.) (concluding an expert report that stated various duties owed by a hospital and detailed how the hospital failed to properly perform those duties "fairly summarized the applicable standard of care for Hospital and explained how Hospital failed to meet that standard"); *Russ,* 128 S.W.3d at 342

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(concluding that statements in an expert report that a hospital "deviated from the standard of care," which required the hospital to lock windows or secure them with metal screens, by "placing patient with potential suicidal ideation and recent suicidal behavior in a fourth floor room with unlocked windows" constituted a "specific allegation which provide[d] the Hospital with notice of the conduct complained of by [the plaintiff]").

Although other statements in Dr. Rushing's report describe the duties and failings of "the Defendants," referring to both Nexion and Reliant, the particular statements identified above, which are contained within the four corners of the report, are specific to Nexion and are sufficient to inform Nexion of its conduct that Treybig calls into question. *See Presbyterian Cmty. Hosp. of Denton v. Smith,* 314 S.W.3d 508, 514 (Tex.App.–Fort Worth 2010, no pet.) (citing TEX. CIV. PRAC. & REM. CODE ANN.. § 74.351(r)(6) (defining "expert report")) (rejecting a hospital's argument that "several individual statements in [the expert's] report [were] insufficient" because the "report, as a whole, provide[d] a 'fair summary' of [the expert's] opinions"). It is clear from his report that in Dr. Rushing's opinion, Nexion's compliance with the standard of care, by conducting "[r]easonable investigation, documentation and treatment" of Mr. Treybig's pain complaints, "would have signified the danger in forceful hamstring stretches on a double below the knee amputee, and prevented fracture." *Cf. Texarkana Nursing & Healthcare Ctr., LLC v. Lyle,* 388 S.W.3d 314, 320 (Tex.App.–Texarkana 2012, no pet.) (concluding an expert report, which indicated that a nursing home breached the standard of care by "allowing the documented assault of [the patient] by one of its own employees," did not sufficiently articulate the standard of care and breach because the report did not "advise [the nursing home] of what should have been done in order to prevent its employee from assaulting [the patient]"). We conclude the substance of Dr. Rushing's report "gives fair notice" to Nexion of its negligent conduct on which Treybig relies and

"provides a sufficient basis for the trial court to conclude that the claims have merit." *See Russ,* 128 S.W.3d at 342. The trial court did not abuse its discretion in denying the motion to dismiss on grounds that the report failed to summarize the standard of care and explain how Nexion breached that standard. *See Bowen,* 2014 WL 345658, at \*5; *id.* Accordingly, we decide Nexion's first issue against it.

### C. Causation

**\*4** In issue two, Nexion contends Dr. Rushing's report "fails to adequately address causation for the same reason that it fails to address Nexion's standard of care—the report's collective description of the events and defendants prevents it from adequately addressing Nexion's conduct." Treybig responds that the report "properly sets forth Dr. Rushing's opinions on causation as to Nexion" because "both Reliant and Nexion owed Mr. Treybig the same duty to properly supervise," and the report is "a good faith effort to articulate the causal relationship between Nexion's failure to supervise and the harm to Mr. Treybig." As discussed above, Dr. Rushing's report does adequately identify Nexion's allegedly negligent conduct, despite "the report's collective description of the events and defendants." *See Fortner v. Hosp. of the Sw., LLP,* 399 S.W.3d 373, 383–84 (Tex.App.–Dallas 2013, no pet.) (concluding expert reports "represent[ed] a good faith effort to provide a fair summary of the experts' opinions about ... the causal relationship between the failure and the claimed injury" because the reports "identif[ied] each physician and health care provider against which direct liability claims [were] asserted, including [the appellant, a hospital], and discuss[ed] how the provider breached the applicable standard of care and caused or contributed to causation of [the patient's] injury"); *Christus Spohn Health Sys. Corp. v. Sanchez,* 299 S.W.3d 868, 877–78 (Tex.App.–Corpus Christi 2009, pet. denied) (concluding expert reports "sufficiently linked [the patient's] assault to [the hospital's] failure to protect her from the assaultive conduct of [its employees]" when the reports stated the hospital "had duty to provide a safe recovery

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

environment," described the alleged conduct of the employees, and concluded "[t]he fact that [the patient] was vulnerable, unable to protect herself, and felt as if her person was violated has caused her to now have symptoms of Major Depression and Post Traumatic Stress Disorder"). So, for the same reasons discussed above, we decide Nexion's second issue against it.

*D. Medical Expert's Qualifications*

In issue three, Nexion contends Dr. Rushing is not a "qualified expert" because his report and curriculum vitae (1) "do not show that he is actively practicing in nursing home health care" and (2) do not "demonstrate that he has knowledge of the standard of care for nurses or physical therapists working in nursing homes like Nexion."

1. Applicable Law

For purposes of the expert report, "a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care" must be qualified to testify. TEX. CIV. PRAC. & REM. CODEE § 74.351(r)(5)(B). Section 74.402(b) provides that a person is qualified to testify only if the person:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

*Id.* § 74.402(b).

"Section 74.402(b) makes it clear that different standards of care apply to physicians and health care providers." *Wallace,* 278 S.W.3d at 558 (citing *Simonson v. Keppard,* 225 S.W.3d 868, 872 (Tex.App.–Dallas 2007, no pet.)).

When a physician fails to state in his expert report or affidavit that he has knowledge of the standard of care applicable to the specific types of health care providers involved in the claim, or that he has ever worked with or supervised the specific types of health care providers involved in the claim, the physician is not qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers.

*Id.* " '[E]xpert qualifications should not be too narrowly drawn.' " *Golenko,* 328 S.W.3d at 643 (quoting *Larson v. Downing,* 197 S.W.3d 303, 305 (Tex.2006) (per curiam)). "Rather, the trial court should determine whether the proffered expert has 'knowledge, skill, experience, training, or education regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject.' " *Id.* (quoting *Broders v. Heise,* 924 S.W.2d 148, 153–54 (Tex.1996)). "The focus is on whether the expert's expertise goes to the very matter on which he is to give an opinion." *Id.* "Therefore, a medical expert from one specialty may be qualified to testify if he has practical knowledge of what is customarily done by practitioners of a different specialty under circumstances similar to those at issue in the case." *Tenet Hosps. Ltd. v. Love,* 347 S.W.3d 743, 750 (Tex.App.–El Paso 2011, no pet.); *see also Broders,* 924 S.W.2d at 153 ("Our holding does not mean that only a neurosurgeon can testify about the cause in fact of death from an injury to the brain, or even that an emergency room physician could never so testify. What is required is that the offering party establish that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject."). However, "it is not enough to summarily state such

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

'knowledge' when the reports and curricula vitae fail to demonstrate how the experts gained the requisite experience or training," and "the proffered medical expert's expertise must be evident from the four corners of his report and curriculum vitae." *Id.*

### 2. Application of Law to Facts

**\*5** As to its third issue, Nexion's first contention is that Dr. Rushing is not qualified to render an opinion on the applicable standard of care because "he is not actively practicing health care in a nursing home." Treybig responds that "Dr. Rushing need not be employed at a nursing home to offer opinions on a fracture to the spine of an elderly patient."

The "essential claim" in this case involves the standard of care that should be applied in a nursing home when it contracts with another healthcare provider to provide a resident with physical therapy and other care on the premises of the nursing home. *See Golenko,* 328 S.W.3d at 644 (concluding that the "essential claim" against a nursing home involved the assessment and care of individuals with Alzheimer's disease, so a doctor, who was board certified in geriatrics and internal medicine, had treated patients with similar conditions, was involved in the assessment of those patients, and had supervised nurses in the care and assessment of those patients, was qualified to testify to the applicable standard of care, despite his lack of "nursing home experience"). So, the relevant question is not the narrow issue of whether Dr. Rushing has worked in a nursing home. Rather, it is the broader issue of whether Dr. Rushing is knowledgeable about the standard of care applicable to the treatment of patients like Mr. Treybig and the relevant care provided by Nexion. *See id* ; *IHS Acquisition No. 140, Inc. v. Travis,* No. 13–07–481–CV, 2008 WL 1822780, at \*5 (Tex.App.–Corpus Christi Apr. 24, 2008, pet. denied) (mem.op.) (concluding a doctor, who was board certified in geriatrics and "knowledgeable about the types of people who reside in nursing homes, their afflictions, and most importantly, the relevant treatment and standard of care for such patients," was qualified to testify to the standard of care applicable in a claim against a nursing home for failure to monitor a resident's eye injury). Accordingly, we disagree with Nexion to the extent that it argues Dr. Rushing is not qualified merely because he does not work in a nursing home. *Golenko,* 328 S.W.3d at 644; *IHS Acquisition,* 2008 WL 1822780, at \*4 ("The statute, reasonably construed, does not require that the expert be involved in the exact same field as the health-care-provider defendant.") (citing *Roberts v. Williamson,* 111 S.W.3d 113, 121 (Tex.2003)).

Second, Nexion contends Dr. Rushing is not qualified because "[n]either Dr. Rushing's report nor his [curriculum vitae] demonstrate that he has knowledge of the standard of care for nurses or physical therapists working in nursing homes like Nexion." In response, Treybig argues that Dr. Rushing has "ample experience treating patients with spinal injuries, including writing orders to treat and care for spinal injuries and supervising the execution of the orders."

According to the record, Dr. Rushing is licensed to practice medicine in Texas and is board certified in internal medicine, rheumatology, and geriatrics. He is actively engaged in the practice of these three specialties and is an attending physician at Presbyterian Hospital of Dallas, Texas. In his expert report, Dr. Rushing more specifically identifies his qualifications regarding this case as follows:

In the regular course of my medical practice I have occasion to diagnose and treat patients with conditions similar to or identical with Mr. Treybig. [D]uring the course of my career I have provided primary medical care to more than 10,000 patients in hospitals, nursing homes and assisted living facilities. I have provided care to patients who, like Mr. Treybig, were suffering from diabetes, hip replacement therapy, complications from infections, amputations, and spinal injuries. I have written orders for the care and treatment of these patients and have supervised the execution of these orders by RNs LVN's and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

CNA's who were assigned to provide the hands-on care to my patients. These orders included orders for the treatment for hip pain as well as the treatment of spinal injuries. I am therefore intimately familiar with the standards of care for the facilities involved in this claim as well as the RNs, LVN's and CNA's who provid[ed] care to Mr. Treybig.

**\*6** While Dr. Rushing states that he is "intimately familiar with the standards of care for the facilities involved as well as the RNs, LVN's and CNA's who provid[ed] care to Mr. Treybig," he does not state that he is familiar with the standards of care that would be applicable to Nexion's supervision of Reliant's physical therapists who provided the relevant care or treatment to Mr. Treybig at Pleasant Valley, nor does his report and curriculum vitae identify any experience supervising, managing, or overseeing physical therapists or physical therapy treatment. *Compare Golenko,* 328 S.W.3d at 644 (concluding a doctor was qualified to testify to the standard of care applicable to the assessment of a patient with Alzheimer's disease for admission to a nursing home when the doctor was certified in geriatrics and internal medicine, treated patients with Alzheimer's disease, and supervised nurses in the care and assessment of those patients), *with Simonson,* 225 S.W.3d at 872–73 (holding an expert report inadequate because the expert, a doctor, did not "state that he either ha[d] knowledge of the standard of care applicable to nurse practitioners or that he ha[d] ever worked with or supervised nurse practitioners"). Further, Dr. Rushing's report and curriculum vitae "fail to demonstrate how [he] gained the requisite experience or training" to offer an opinion on the standard of care applicable in a nursing home when it contracts with another healthcare provider to provide a resident with physical therapy care on the premises of the nursing home. *See Love,* 347 S.W.3d at 750 ("[I]t is not enough to summarily state [the expert's] 'knowledge' when the reports and curricula vitae fail to demonstrate how the experts gained the requisite experience or training."). The statement that Dr. Rushing has

"provided primary medical care" to patients in nursing homes with "conditions similar or identical with Mr. Treybig" does not adequately establish how Dr. Rushing is "intimately familiar" with the standard of care owed by a nursing home under these circumstances. *See id.*; *Simonson,* 225 S.W.3d at 872–73 ("Section 74.402(b)(2) requires that the expert have knowledge of *the accepted standard of care for health care providers, i.e. nurse practitioners, for the diagnosis* involved in the claim." (emphasis in original)). Because the four corners of Dr. Rushing's report and curriculum vitae do not adequately articulate how Dr. Rushing is qualified to opine on the standard of care applicable to a nursing home when it contracts with another healthcare provider to provide a resident with physical therapy care or treatment, we conclude the trial court abused its discretion in denying the motion to dismiss on this basis. We decide in favor of Nexion on its third issue. *See Love,* 347 S.W.3d at 750–51.

*E. Thirty-day Extension to Cure Deficiencies*

In its fourth issue, Nexion contends the trial court abused its discretion when it denied Nexion's motion to dismiss and failed to award Nexion its attorney's fees and costs. Treybig responds that if Dr. Rushing's report is "inadequate, the case should be remanded to receive a 30–day extension to cure the deficiencies." In response, Nexion argues Treybig is not entitled to "a chance to get a thirty-day extension" because Dr. Rushing's report "did not implicate Nexion's conduct," and Dr. Rushing "was not qualified to offer the report."

1. Applicable Law

When an expert report is timely served and properly challenged, the trial court "shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." TEX. CIV. PRAC. & REM. CODE ANN.. § 74.351(l); *Potts,* 392 S.W.3d at 630. The TMLA "also authorizes the trial court to give a plaintiff who meets the 120–day

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

deadline an additional thirty days in which to cure a 'deficiency' in the elements of the report." *Scoresby v. Santillan,* 346 S.W.3d 546, 549 (Tex.2011) (citing TEX. CIV. PRAC. & REM. CODE ANN.. § 74.351(c)). "The trial court should err on the side of granting the additional time and must grant it if the deficiencies are curable." *Id.* (internal citations omitted). "The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits." *Leland v. Brandal,* 257 S.W.3d 204, 554 (Tex.2008) (citing *Palacios,* 46 S.W.3d at 878). "A court may not provide opportunities to cure, however, when an expert report is 'absent' as opposed to deficient," such as when a report "fails to address all required elements of a claim." *Hollingsworth v. Springs,* 353 S.W.3d 506, 524 (Tex.App.–Dallas 2011, no pet.) (denying a health care liability claimant an opportunity to cure when the expert report "omitted any discussion of the element of causation," so the "report could not qualify as a good faith effort to meet Chapter 74's requirements").

"[A] thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated." *Scoresby,* 346 S.W.3d at 557. The Supreme Court has "recognize[d] that this is a minimal standard." *Id.* "An individual's lack of relevant qualifications and an opinion's inadequacies are deficiencies the plaintiff should be given an opportunity to cure if it is possible to do so." *Id.* at 549. When a court of appeals finds an expert report to be deficient after the trial court concluded it was adequate, the court of appeals "has the discretion to remand the case for consideration of a thirty-day extension to cure the deficiency." *Leland,* 257 S.W.3d at 208.

2. Application of Law to Facts

**\*7** We now address whether Dr. Rushing's report meets the standard identified in *Scoresby,* in-

dicating that the trial court may grant Treybig an opportunity to cure the deficiencies. *See Scoresby,* 346 S.W.3d at 557. Dr. Rushing's report was served by the statutory deadline, and it "implicates" Nexion's conduct, stating "[r]easonable investigation, documentation and treatment [of Mr. Treybig's pain complaints] would have ... prevented fracture" and "the events and failures set forth in [the] report proximately caused Mr. Treybig's injuries." *See id.* While we have concluded that Dr. Rushing's report and curriculum vitae did not adequately articulate how Dr. Rushing is qualified to opine on the applicable standard of care in this case, it does not necessarily follow that Dr. Rushing is not "an individual with expertise," such that the report was " 'absent' as opposed to deficient." *See Hollingsworth,* 353 S.W.3d at 524. Dr. Rushing's expertise, as a licensed medical doctor, who is board certified in internal medicine, rheumatology, and geriatrics, "is relevant in explaining the connection between" the physical therapists' alleged use of "excessive force" and the back fracture Mr. Treybig suffered. *See Scoresby,* 346 S.W.3d at 557 ("The Act requires that [the expert's] knowledge, training or experience, and practice be 'relevant' to [the plaintiff's] claim."). We agree with Treybig's contention that this case should be remanded to the trial court for consideration of a thirty-day extension to cure the deficiencies. *See Leland,* 257 S.W.3d at 208. Accordingly, we decide against Nexion on its fourth issue.

### III. CONCLUSION

The trial court abused its discretion in denying the motion to dismiss because Dr. Rushing's expert report and curriculum vitae do not adequately articulate how Dr. Rushing is qualified to opine on the standard of care applicable in a nursing home when it contracts with another healthcare provider to provide a resident with physical therapy care on the premises of the nursing home. Accordingly, we reverse the trial court's order denying the motion to dismiss and remand the cause to the trial court to consider whether to grant Treybig a thirty-day extension to cure the deficiencies in Dr. Rushing's re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

port.

Tex.App.-Dallas, 2014
Nexion Health at Garland, Inc. v. Treybig
Not Reported in S.W.3d, 2014 WL 7499373
(Tex.App.-Dallas)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 S.W.3d 508
**(Cite as: 314 S.W.3d 508)**



Court of Appeals of Texas,
Fort Worth.
PRESBYTERIAN COMMUNITY HOSPITAL OF
DENTON d/b/a Presbyterian Hospital of Denton
and Chad Hammonds, R.N., Appellants,
v.
Connie SMITH, Individually and as Personal Representative of the Estate of Thomas Edward Smith, Deceased, and as Next Friend for Thomas Anthony Smith, a Minor, and Douglas Smith and Stephanie Smith, Appellees.

No. 2–09–288–CV.
May 20, 2010.

**Background:** Survivors of deceased patient filed negligence suit against hospital, based on postoperative care provided by three employee-nurses. Hospital filed motion to dismiss based on alleged insufficiency of survivors' expert reports. The 393rd District Court, Denton County, Douglas M. Robison, J., denied motions. Hospital appealed.

**Holdings:** The Court of Appeals, Anne Gardner, J., held that:

(1) reports sufficiently described the standard of care applicable to hospital's nurse-employees and how they allegedly breached the standard of care, and

(2) second report sufficiently linked causation opinions to facts and adequately described chain of events allegedly leading to patient's death.

Affirmed.

West Headnotes

**[1] Appeal and Error 30 ⚷960(1)**

30 Appeal and Error
  30XVI Review
    30XVI(H) Discretion of Lower Court
      30k960 Rulings on Motions Relating to

Pleadings
        30k960(1) k. In general. Most Cited Cases
A trial court's ruling concerning an expert report under the Medical Liability and Insurance Act is reviewable under the abuse of discretion standard. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[2] Health 198H ⚷804**

198H Health
  198HV Malpractice, Negligence, or Breach of Duty
    198HV(G) Actions and Proceedings
      198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
To constitute a good faith effort to comply with the definition of an expert report under the Medical Liability and Insurance Act the report must discuss the standards of care, breach, and causation with sufficient specificity (1) to inform the defendant of the conduct the plaintiff has called into question and (2) to provide the trial court with a basis to conclude that the claims have merit; a report does not fulfill this requirement if it merely states the expert's conclusions or if it omits any of the statutory requirements. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[3] Health 198H ⚷804**

198H Health
  198HV Malpractice, Negligence, or Breach of Duty
    198HV(G) Actions and Proceedings
      198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
When reviewing the adequacy of a expert medical report, the only information relevant to the inquiry of whether it complies with the definition of an expert report under the Medical Liability and Insurance Act is the information contained within the four corners of the document; this requirement pre-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 S.W.3d 508
**(Cite as: 314 S.W.3d 508)**

cludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended, but does not prohibit experts, as opposed to courts, from making inferences based on medical history. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[4] Health 198H** 804

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

In negligence suit against hospital, based on acts of employee-nurse, medical doctor's expert report sufficiently described the standard of care applicable to hospital's nurse-employee and how nurse allegedly breached the standard of care, as required by Medical Liability and Insurance Act; report stated that nurse had a duty to assist doctor with patient's post-operative anticoagulation therapy, should have known incidence of thrombus following mechanical valve replacement surgery, should have monitored patient's anticoagulant therapy, should have known doctor made incorrect assessment, failed to report doctor's incorrect assessment, and failed to recognize or report patient's excessive anticoagulation blood condition to doctors. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[5] Health 198H** 804

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

In negligence suit against hospital, based on acts of employee-nurse, nurse's expert report sufficiently described the standard of care applicable to hospital's nurse-employee and how nurse allegedly breached the standard of care, as required by Med-

ical Liability and Insurance Act; report provided that nurse had a duty to monitor patient's post-operative mental and physical conditions, a duty to either question or clarify doctor's order before administering both morphine and hydrocodone to patient but failed to do either, and failed to assess or appreciate patient's altered level of consciousness, restrain patient, provide sufficient observation of patient, and recognize that patient's catheter had been removed from his jugular vein. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[6] Health 198H** 804

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

In negligence suit against hospital, based on acts of employee-nurse, nurse's expert report sufficiently described the standard of care applicable to second nurse-employee of hospital and how that nurse allegedly breached the standard of care, as required by Medical Liability and Insurance Act; report provided that nurse had a duty to monitor patient's post-operative mental and physical conditions, but failed to assess or appreciate patient's altered level of consciousness, failed to restrain patient, failed to provide sufficient surveillance of patient, failed to timely discover patient's removal of catheter from jugular vein, and failed to monitor and document physiologic monitoring system with appropriate alarm limits. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**[7] Health 198H** 804

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

In negligence suit against hospital, based on

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

acts of employee-nurses, medical doctor's expert report sufficiently linked causation opinions to the facts and adequately described the chain of events allegedly leading to patient's death by nurse-employees' alleged breaches of standard of care, as required by Medical Liability and Insurance Act; report stated that nurses' failures to properly and adequately monitor patient's activities and conditions resulted in their failures to timely and properly recognize patient's removal of catheter that had been sutured in his internal jugular vein, and bleeding from catheter site before patient experienced hemorrhagic cardiopulmonary arrest, which probably led to his death. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**\*510** Jones Carr McGoldrick, LLP and Jeffrey F. Wood, James J. McGoldrick and Heather J. Forgey, Dallas, for appellants.

Keith Law Firm, PC and Darrell L. Keith, Fort Worth, for appellees.

PANEL: LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

### OPINION
ANNE GARDNER, Justice.
#### I. Introduction
In this interlocutory appeal, Appellants Presbyterian Hospital of Denton d/b/a Presbyterian Hospital of Denton and Chad Hammonds, R.N. (collectively, the Hospital) argue that the trial court abused its discretion by denying the Hospital's motion to dismiss. We affirm the trial court's order.

#### II. Procedural Background
Appellees Connie Smith, Individually, and as Personal Representative of the Estate of Thomas Edward Smith, Deceased, and as Next Friend for Thomas Anthony Smith, a Minor, and Douglas and Stephanie Smith (collectively, the Smiths) sued the Hospital on September 2, 2008. The Smiths asserted that the Hospital, by and through its nurse-employees, acted negligently in its care and treat-

ment of Thomas Edward Smith. On December 31, 2008, the Smiths served the Hospital with expert reports by Dr. Michael E. Halkos, a cardiothoracic surgeon, and Dean W. Hayman, R.N., a registered nurse specializing in cardiac and critical care nursing. The Hospital filed a motion to dismiss and argued Dr. Halkos's and Nurse Hayman's expert reports do not meet the statutory requirements because they do not constitute "an objective good faith effort to provide a fair summary of the alleged experts' opinions on the standard of care, alleged breach thereof, and how any alleged breach by [the Hospital] caused [the Smiths'] damages."

After a hearing, the trial court denied the Hospital's motion as to Dr. Halkos's report. The trial court partially denied and partially granted the Hospital's motion as to Nurse Hayman's report and granted the Smiths an extension to supplement Nurse Hayman's report if they chose to do so.[FN1] The Smiths then served the Hospital **\*511** with a supplemental report from Nurse Hayman, and the Hospital again objected. After a hearing, the trial court overruled the Hospital's objections to the supplemental report. This interlocutory appeal followed. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(9) (Vernon 2008); *Lewis v. Funderburk,* 253 S.W.3d 204, 208 (Tex.2008) (authorizing appeal from trial court order determining that expert report was adequate and denying motion to dismiss).

> FN1. The trial court stated, "While [Nurse Hayman's report] was deficient in part, I find that the Halkos report was sufficient to create a basis for asserting a claim that fairly put the Hospital on notice of the type of claims that are being asserted against it by and through the nurses." The trial court also stated that its partial grant of the Hospital's objection to Nurse Hayman's report is "kind of irrelevant because I find that it's [otherwise] sufficient."

#### III. Factual Background
The Smiths' fourth amended petition, their live

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 S.W.3d 508
**(Cite as: 314 S.W.3d 508)**

pleading at the time of the second hearing on the Hospital's motion to dismiss, contains the following allegations relevant to their claims against the Hospital.

On June 21, 2006, Mr. Smith presented to the emergency department at the Hospital with intermittent headaches, feverishness, increasing malaise and shortness of breath, minimal cough, shoulder and back pain, and leg swelling. He was admitted to the Hospital for further evaluation and treatment. Tests revealed "the presence of bilateral pneumonia and moderate renal compromise" and "severe tricuspid regurgitation with vegetations present." Mr. Smith's blood cultures were also positive for methicillin-sensitive Staphylococcus aureus, and he was treated with intravenous antibiotics.

Because of his diagnosis of tricuspid valve endocarditis, Mr. Smith "underwent a tricuspid valve debridement and excision with tricuspid valve replacement" on June 30, 2006. A transesophageal echocardiogram at the end of the operative procedure "revealed good seating of the valve with no evidence of perivalvular leak, good function of the valve leaflets and ... no evidence of an atrial-ventricular block." Mr. Smith then returned to the intensive care unit (the ICU) for further treatment and recovery.

On July 4, 2006, Mr. Smith had a Quinton catheter sutured into place in his left internal jugular vein. He tolerated the procedure well, and all catheters in his body were "noted to be free of redness [sic] or edema." However, Nurse Hammonds entered Mr. Smith's room on July 5, 2006, and found that Mr. Smith "was experiencing agonal respirations," that "the Quintan [sic] catheter was no longer in its proper place," and that Mr. Smith "was and had been experiencing significant bleeding." The medical staff successfully resuscitated Mr. Smith, and he remained in the ICU. Later that day, however, Mr. Smith "was medically assessed that he was not able to follow simple commands, except to open his eyes when his name was called."

Over the next few days, Mr. Smith continued receiving blood pressure medications and received a new Quinton catheter. He received dialysis therapy, but by July 8, 2006, his "blood pressure continued to drop despite increasing ... his blood pressure medications" and other treatments. Mr. Smith also had "continuous oozing of blood from his mouth, nose, hemodialysis catheter, and scrotal area." On July 9, 2006, Dr. Mario Ruiz informed Mr. Smith's wife, Connie, that Mr. Smith was "slowly dying." On July 10, 2006, "a medical decision was made to withdraw life support measures from Mr. Smith due to his severely [sic] brain damaged [sic] and other conditions, such life support measures were withdrawn from Mr. Smith, and he was pronounced dead" on the evening **\*512** of July 10, 2006. An autopsy by Dr. Juan Zamora "revealed pathological findings of a status post recent tricuspid valve prosthesis implant showing no complications, hypertrophy of the heart (500g) with organizing fibrinoid percarditis, bilateral granulomata of the lungs, edema of the brain with acute hepatitis, and other findings."

### IV. Standard of Review

[1] A trial court's ruling concerning an expert report under section 74.351 (formerly article 4590i, section 13.01) of the Medical Liability and Insurance Act is reviewable under the abuse of discretion standard. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351; *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Cire v. Cummings,* 134 S.W.3d 835, 838–39 (Tex.2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *Bowie Mem'l,* 79 S.W.3d at 52; *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 S.W.3d 508
**(Cite as: 314 S.W.3d 508)**

### V. Statutory Requirements

A health care liability claimant must serve an expert report on each defendant no later than the 120th day after the claim is filed. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). A defendant may challenge the adequacy of a report by filing a motion to dismiss, and the trial court must grant the motion to dismiss if it finds, after a hearing, that "the report does not represent an objective good faith effort to comply with the definition of an expert report" in the statute. *Id.* § 74.351(*l* ). While the expert report "need not marshal all of the plaintiff's proof," it must provide a fair summary of the expert's opinions as to the "applicable standard of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6); *Palacios,* 46 S.W.3d at 878 (construing former article 4590i, § 13.01).

[2] To constitute a good faith effort, the report must discuss the standards of care, breach, and causation with sufficient specificity (1) to inform the defendant of the conduct the plaintiff has called into question and (2) to provide the trial court with a basis to conclude that the claims have merit. *See Bowie Mem'l,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 879. A report does not fulfill this requirement if it merely states the expert's conclusions or if it omits any of the statutory requirements. *Bowie Mem'l,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 879. But the information in the report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios,* 46 S.W.3d at 879.

[3] When reviewing the adequacy of a report, the only information relevant to the inquiry is the information contained within the four corners of the document. *Bowie Mem'l,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878. This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *See Austin Heart, P.A. v. Webb,* 228 S.W.3d 276, 279 (Tex.App.-Austin 2007, no pet.). However, section 74.351 does not prohibit experts, as opposed to courts, from making inferences based on medical history. **\*513***Marvin v. Fithian,* No. 14–07– 00996–CV, 2008 WL 2579824, at \*4 (Tex.App.-Houston [14th Dist.] July 1, 2008, no pet.) (mem. op.); *see also* Tex.R. Evid. 703 (providing that an expert may draw inferences from the facts or data in a particular case); Tex.R. Evid. 705 (providing that expert may testify in terms of opinions and inferences).

### VI. Analysis

The Hospital argues in its sole issue that the expert reports by Dr. Halkos and Nurse Hayman are insufficient and that the trial court abused its discretion by denying the Hospital's motion to dismiss. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(*l* ). Dr. Halkos's and Nurse Hayman's expert reports discuss the acts and omissions of three of the Hospital's nurse-employees: Donna L. McElravy, R.N.; Chad Hammonds, R.N.; and Garland Gill, R.N. We address the allegations against each of these nurse-employees in turn.

### A. Duty and Alleged Breach by Nurse McElravy

The Hospital contends Dr. Halkos's report is insufficient because it does not adequately describe the standard of care applicable to Nurse McElravy or how Nurse McElravy allegedly breached the standard of care.

Relevant portions of Dr. Halkos's report provide:

> McElravy was responsible for assisting Dr. Bolton in managing the post-operative anticoagulation therapy of Mr. Smith to prevent thrombus formation as a result of the mechanical valve replacement surgery performed on the patient. At that time, the incidence of thrombus (blood clot) complications of following mechanical valve replacement surgery was or should have been a matter of common knowledge to reasonably prudent registered nurses specializing in cardiovascular and thoracic surgery.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

McElravy should have properly monitored anti-coagulant therapy for Mr. Smith in a manner that would maintain an INR (International Normalized Ratio) of 2.5 to 3.5; or a PTT (Partial Thromboplastin Time) of 1.5 to 2.5 times the control.... On the morning of July 4, 2006, at about 9:00 a.m., Dr. Bolton noted an INR greater than 3 in Mr. Smith, and recorded in the progress notes that Mr. Smith's INR was greater than 3 and noted to hold the administration of coumadin that night. [The Hospital] laboratory reported critically abnormal results of Mr. Smith's PT (protime) at about 9:34 a.m., as being greater than 120 seconds[,] and the laboratory was unable to calculate the INR. The protime greater than 120 seconds value reflected an excessive and potentially dangerous state of anticoagulation in Mr. Smith's blood.

When the critically abnormal PT results and lack of a calculable INR were reported, McElravy should have become aware of this information, and reported such values to Dr. Bolton, Dr. Russell, or PA Dizney and cause repeat testing of a new blood specimen from Mr. Smith to verify the previously noted and reported critical results.... Therefore, when McElravy discovered or should have discovered that Dr. Bolton improperly recorded Mr. Smith's INR as greater than 3, she failed to meet the applicable standard of reasonable and prudent nursing care in that she failed to bring to Dr. Bolton or PA Dizney's attention Dr. Bolton's improper assessment of Mr. Smith's INR on the morning of July 4, 2006[;] she also failed to meet the standard of reasonable nursing care in failing to recognize Mr. Smith's excessive anticoagulation blood condition, report such condition to Dr. Bolton, Dr. Russell **514 or PA Dizney and bring about appropriate intervention to correct this dangerous condition for Mr. Smith.

[4] Dr. Halkos's report adequately describes Nurse McElravy's duties and alleged breaches of those duties. The report states that McElravy: (1) had a duty to assist Dr. Bolton with Mr. Smith's

post-operative anticoagulation therapy; (2) should have known the incidence of thrombus following mechanical valve replacement surgery; (3) should have monitored Mr. Smith's anticoagulant therapy so as to maintain an INR of 2.5 to 3.5 or a PTT of 1.5 to 2.5 times the control; (4) should have known Dr. Bolton incorrectly recorded the INR as greater than 3; (5) failed to report Dr. Bolton's incorrect assessment of Mr. Smith's INR; and (6) failed to recognize or report Mr. Smith's excessive anticoagulation blood condition to Dr. Bolton, Dr. Russell, or PA Dizney. These statements, all contained within the four corners of Dr. Halkos's report, are sufficient to inform the Hospital of the specific conduct by Nurse McElravy that the Smiths have called into question and provide a basis for the trial court to conclude that the Smiths' claim has merit. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 879.

The Hospital also argues that several individual statements in Dr. Halkos's report are insufficient.[FN2] We do not address these specific arguments by the Hospital, however, because Dr. Halkos's report, as a whole, provides a "fair summary" of his opinions; it (1) sufficiently informs the Hospital of the conduct the Smiths question and (2) provides the trial court with a basis to conclude the Smiths' claim has merit. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6); *Bowie Mem'l,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 879; *Benavides v. Garcia,* 278 S.W.3d 794, 799 (Tex.App.-San Antonio 2009, pet. denied) (stating that opinion in expert report, read in isolation, appeared conclusory, but holding that opinion was sufficiently described in context of entire report). The trial court did not abuse its discretion by finding that Dr. Halkos's report adequately address Nurse McElravy's alleged duties and breaches of those duties.

> FN2. For example, the Hospital argues Dr. Halkos's report states that Nurse McElravy "should have properly monitored anticoagulant therapy for Mr. Smith" but does not explain how Nurse McElravy improp-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

erly monitored anticoagulant therapy or how Nurse McElravy should have monitored it and does not state how McElravy was negligent in not having information about "critically abnormal PT ... results and lack of calculable INR" as alleged in the report.

**B. Duty and Alleged Breach by Nurse Hammonds**

The Hospital also contends Nurse Hayman's report and supplemental report are insufficient because they do not adequately describe the standard of care applicable to Nurse Hammonds or how Nurse Hammonds allegedly breached the standard of care.

Relevant portions of Nurse Hayman's report provide:

Nurse Hammonds was responsible for providing reasonable and prudent nursing diagnosis, assessment, care and treatment for Mr. Smith's post-operative conditions and well-being in the [Hospital] ICU, and this responsibility included careful and frequent monitoring of his physical and mental conditions, the plan of care from multiple consultants, and the delivery of ongoing intensive nursing care in the ICU and interventions as prescribed by attending and consulting physicians as well as reasonable nursing practices.

**\*515** Nurse Hammonds administered 4 mg of morphine sulfate by IV and 15 mg of hydrocodone by mouth at 2000 (8:00 PM) on 7/04/06. Nurse Hammonds failed to properly administer the PRN (as necessary) pain control orders because he should have known that both medications should not have been administered to Mr. Smith in one dose. If Nurse Hammonds believed such orders allowed the choice to administer both medications at one time, then Hammonds failed to question or clarify Dr. Bolton's orders. It was a violation of the reasonable and prudent standards of nursing care for a critical care nurse to administer the medications in that manner or not to call Dr. Bolton and question the orders.

Nurse Hammonds failed to perform sufficient surveillance to discover the removal of the IJ catheter in time to prevent Mr. Smith's hemorrhagic arrest. A reasonably prudent critical care nurse ... should have known that continuous bleeding for approximately 30—45 minutes would lead to hemorrhagic cardiac arrest. Therefore, it is reasonable to conclude, in reasonable nursing probability, that Defendant Hammonds failed to see and assess Mr. Smith for at least 30 minutes prior to his arrest. According to the hospital records, Hammonds recorded Mr. Smith's vital signs at a time prior to his arrest when the Quinton catheter must have been out and therefore significant bleeding would and should have been obvious to a critical care nurse, including Hammonds, performing duties according to the standards for reasonable and prudent nurses in ICU settings. The hospital ICU records indicate that Hammonds either failed to properly observe Mr. Smith, or he did not accurately and completely record his nursing actions in the hospital record, and both such failures would be a violation of the applicable standard of nursing care for Hammonds.

Nurse Hammonds failed to set alarm limits on the physiologic monitors that reflected the patient's baseline vital signs and thereby failed to discover when various parameters were in alarm condition.... Hammonds either failed to transduce the IJ catheter to the alarm system or he failed to respond to the alarm condition caused by the removal of the device. In either situation, Hammonds failed to meet the applicable standard of nursing care for Mr. Smith.... In violation of the standards for reasonable and prudent critical care nursing, Nurse Hammonds failed to document alarm conditions, rhythm strips, oxygen desaturation or his nursing responses to any of the abnormalities that occurred before Mr. Smith exsanguinated (bled out) into arrest.

The hospital code record reflects that ECG mon-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

itoring and pulse oximetry were in progress at the time of the arrest event. Defendant Hammonds either failed to establish that monitoring or he ignored the alarm conditions that would have occurred in the setting of "agonal breathing." Mr. Smith's agonal breathing would have caused alarm conditions in the rate of respirations and oxygen saturation on the alarm system.... Defendant Hammonds failed to recognize, intervene in, or document and report any such alarm conditions for Mr. Smith at that time. Further, Hammonds had an obligation to be in audible or visual proximity to promptly and adequately respond to any such clinical or physiological alarm conditions.

Using the physiologic monitoring system, Nurse Hammonds should have established and monitored clinical alarms/limits based on [Mr. Smith's] condition.... All central venous lines or **\*516** catheters, like the left internal jugular catheter, should have been transduced to the physiological monitoring system such that the monitoring system would alarm when a central line became disconnected.

Defendant Hammonds failed to perform sufficient surveillance to discover the removal of the IJ catheter in time to prevent Mr. Smith's hemorrhagic arrest. A reasonably prudent critical care nurse, would have known that continuous bleeding for approximately 30—45 minutes would lead to hemorrhagic cardiac arrest. Therefore, in reasonable medical probability, Hammonds failed to observe Mr. Smith for 30—45 minutes prior to the arrest event.

In addition, Nurse Hayman's supplemental report provides that the standard of care applicable to Nurse Hammonds requires him to have basic knowledge of all medications he administers to a patient, including the potential side effect of the medications to assess, from a nursing perspective, "decreased levels of consciousness, disorientation, and/or sedation in patients" similar to Mr. Smith, and to "utilize wrist restraints in the care of pa-

tients, including Mr. Smith, who demonstrate a decreased level of consciousness, disorientation, and/or sedation in order to prevent the patient from causing injury to himself." Nurse Hayman's supplemental report states that Nurse Hammonds failed to appreciate the potential side effects of simultaneous doses of morphine sulphate and hydrocodone, failed to assess, from a nursing perspective, Mr. Smith's resulting neurological impairment and decreased levels of consciousness, disorientation, and/or sedation, and failed to utilize wrist restraints to prevent Mr. Smith from causing injury to himself.

[5] Nurse Hayman's report and supplemental report provide that Nurse Hammonds: (1) had a duty to monitor Mr. Smith's post-operative mental and physical conditions; (2) had a duty to either question or clarify Dr. Bolton's order before administering both morphine and hydrocodone to Mr. Smith but failed to do either; (3) failed to assess, from a nursing perspective, or appreciate Mr. Smith's altered level of consciousness; (4) failed to use bilateral soft wrist restraints or obtain orders from Dr. Bolton or Dr. Russell for wrist restraints; (5) failed to provide sufficient observations and surveillance of Mr. Smith; (6) failed to recognize that Mr. Smith's Quinton catheter had been removed while recording Mr. Smith's vital signs; (7) failed to timely discover the removal of Mr. Smith's Quinton catheter; and (8) either failed to establish a physiologic monitoring system and set the appropriate alarm limits on the monitoring system or failed to monitor and document the alarms from the monitoring system. These statements, all contained within the four corners of Nurse Hayman's report, are sufficient to inform the Hospital of the specific conduct by Nurse Hammonds that the Smiths have called into question and provide a basis for the trial court to conclude that the claim has merit. *See Bowie Mem'l,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 879. The trial court did not abuse its discretion in finding that Nurse Hayman's report and supplemental report sufficiently address duty and alleged breach of duty as to Nurse Hammonds.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 S.W.3d 508
**(Cite as: 314 S.W.3d 508)**

**C. Duty and Alleged Breach by Nurse Gill**

[6] The Hospital next contends Nurse Hayman's report and supplemental report are insufficient because they do not adequately describe the standard of care applicable to Nurse Gill or how Nurse Gill allegedly breached the standard of care.

**\*517** Relevant portions of Nurse Hayman's report provide:

Nurse Gill was responsible for providing reasonable and prudent nursing diagnosis, assessment, care and treatment for Mr. Smith's post-operative conditions and well-being in the [Hospital] ICU, and this responsibility included careful and frequent monitoring of his physical and mental conditions, the plan of care from multiple consultants, and the delivery of ongoing intensive nursing care in the ICU and interventions as prescribed by attending and consulting physicians as well as reasonable nursing practices.

Nurse Gill failed to perform sufficient surveillance to discover the removal of the IJ catheter in time to prevent Mr. Smith's hemorrhagic arrest. A reasonably prudent critical care nurse, should have known that continuous bleeding for approximately 30—45 minutes would lead to hemorrhagic cardiac arrest. Therefore, it is reasonable to conclude, in reasonable nursing probability, that Defendant Gill failed to see and assess Mr. Smith for at least 30 minutes prior to his arrest. The hospital ICU records indicate that Gill either failed to properly observe Mr. Smith, or he did not accurately and completely record his nursing actions in the hospital record, and both such failures would be a violation of the applicable standard of nursing care for Gill.

Defendant Gill failed to recognize, intervene in, or document and report any such alarm conditions for Mr. Smith at that time. Further, Gill had an obligation to be in audible or visual proximity to promptly and adequately respond to any such clinical or physiological alarm conditions.

Using the physiologic monitoring system, Nurse Gill should have established and monitored clinical alarms/limits based on [Mr. Smith's] condition.... All central venous lines or catheters, like the left internal jugular catheter, should have been transduced to the physiological monitoring system such that the monitoring system would alarm when a central line became disconnected.

Furthermore, Nurse Hayman's supplemental report states that the standard of care applicable to Nurse Gill requires him to have basic knowledge of all medications he administers to a patient, including the potential side effect of the medications to assess, from a nursing perspective, "decreased levels of consciousness, disorientation, and/or sedation in patients" similar to Mr. Smith, and to "utilize wrist restraints in the care of patients, including Mr. Smith, who demonstrate a decreased level of consciousness, disorientation, and/or sedation in order to prevent the patient from causing injury to him [self]." Nurse Hayman's supplemental report states that Nurse Gill failed to appreciate the potential side effects of simultaneous doses of morphine sulphate and hydrocodone, failed to assess, from a nursing perspective, Mr. Smith's resulting neurological impairment and decreased levels of consciousness, disorientation, and/or sedation, and failed to utilize wrist restraints to prevent Mr. Smith from causing injury to himself.

Nurse Hayman's report and supplemental report adequately describe Nurse Gill's duties and alleged breaches of those duties. The report and supplemental report provide that Nurse Gill: (1) had a duty to monitor Mr. Smith's post-operative mental and physical conditions; (2) failed to, from a nursing perspective, assess or appreciate Mr. Smith's altered level of consciousness; (3) failed to use bilateral soft wrist restraints or obtain orders from Dr. Bolton or Dr. Russell for wrist restraints; (4) failed to provide sufficient surveillance of Mr. Smith; (5) failed to timely discover **\*518** the removal of Mr. Smith's Quinton catheter; and (6) failed to establish or monitor and document a physiologic monitoring

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

system with the appropriate alarm limits. These statements, all contained within the four corners of Nurse Hayman's reports, are sufficient to inform the Hospital of the specific conduct by Nurse Gill that the Smiths have called into question and provide a basis for the trial court to conclude that the Smiths' claim has merit. *See Bowie Mem'l,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 879. The trial court acted within its discretion in finding that Nurse Hayman's report and supplemental report sufficiently address duty and alleged breach of duty as to Nurse Gill.

### D. Causation

[7] Finally, the Hospital argues the Smiths' expert reports are insufficient because they do not sufficiently describe how the alleged breaches of the standard of care by the Hospital's three nurse-employees caused any harm to Mr. Smith.

Relevant portions of Dr. Halkos's report provide:

It is my opinion that each of the above-described failures of Dr. Bolton, Dr. Russell, Dr. Suominen, PA Dizney, Nurse McElravy, Nurse Hammonds, and Nurse Gill to meet the reasonable, prudent, and accepted standards of medical, nursing and health care in the diagnosis, assessment, care and treatment of [Mr.] Smith's post-operative and clinical conditions, separately and collectively, probably caused Mr. Smith to experience a worsening of his physical and mental conditions leading to his pulling out the Quinton catheter resulting in significant and severe bleeding that led to his hemorrhagic cardiopulmonary arrest with pulseless electrical activity, resuscitation, additional deterioration, and his death....

Dr. Bolton and Dr. Russell's failures to be notified [by Nurse McElravy] of Mr. Smith's severe abnormal anticoagulation condition, as demonstrated by his incalculable and undetermined INR as of July 4, 2006, due to his abnormally high protime (greater than 120 seconds), allowed his excessive anticoagulation condition to continue unrecognized and uncorrected.

If Dr. Suominen, PA Dizney or Nurse McElravy had properly evaluated Mr. Smith's conditions and notified Dr. Bolton and Dr. Russell of such conditions, then in all probability, Mr. Smith's state of excessive anticoagulation would have been recognized and corrected because the applicable standards of medical care for Dr. Bolton and Dr. Russell would have required them to take such action under the circumstances. Unfortunately, Mr. Smith's state of excessive anticoagulation continued and the administration of large doses of narcotic pain medications administered by Nurse Hammonds to Mr. Smith on the evening of July 4, 2006, in all probability led to disorientation and neurological impairment in Mr. Smith such that he was able to self-remove the left internal jugular Quinton catheter causing massive hemorrhage leading to exsanguinating cardiopulmonary arrest. Although the sequence of events leading up to Mr. Smith's hemorrhagic arrest is not accurately or completely documented in the [Hospital] medical record, it is likely that Mr. Smith's neurological impairment, caused by the large doses of narcotic pain medications for the above-discussed reasons, allowed him to avoid suffering the significant pain of self-removal of the Quinton catheter from his neck and not be alarmed by the subsequent massive hemorrhage he experienced and summon the [Hospital] nursing staff for help.

**\*519** Dr. Suominen's failure to adequately secure the Quinton catheter to Mr. Smith's neck and Nurse McElravy's failure to cause to be ordered[ ] soft wrist restraints in the setting of Mr. Smith's altered level of consciousness allowed this series of events to occur where Mr. Smith was able to pull out the Quinton catheter and experience massive bleeding. If Dr. Suominen had adequately secured the Quinton catheter in Mr. Smith's neck and if Nurse McElravy had caused to be ordered[ ] soft wrist restraints in the setting of Mr. Smith's altered level of consciousness this series of events where Mr. Smith was able to pull out the Quinton catheter and experience massive

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

bleeding in all lilklihood [sic] would not have oc-curred and would not have progressed to cardiop-ulmonary arrest.

Nurses Hammonds['] and Gill's failures to prop-erly and adequately monitor Mr. Smith's above-described activities and conditions resulted in their failures to timely and properly recognize his removal of the Quinton catheter and the bleeding from the catheter site before he experienced hem-orrhagic cardiopulmonary arrest.... Nurses Ham-monds and Gill failed to closely monitor Mr. Smith's conditions for a period of at least 30 to 45 minutes before Hammonds['s] discovery of Mr. Smith's hemorrhagic arrest. If Nurses Hammonds and Gill had timely discovered Mr. Smith's self-removal of the Quinton catheter within 30 to 45 minutes before arrest, and implemented proper interventional procedures, it is likely that Mr. Smith's significant bleeding condition could have been stopped and would not have progressed to cardiopulmonary arrest. Although Mr. Smith's clinical condition had a mortality of about twenty percent prior to the arrest, the above-discussed failures of Dr. Bolton, Dr. Russell, Dr. Suominen, PA Dizney, McElravy, Hammonds, and Gill probably led to the arrest and the sequelae that probably ensued and in reasonable probability led to his progressive weakness, increasing renal dys-function, and multi-system organ failure and his death.

These statements, all contained within the four corners of Dr. Halkos's report, sufficiently link Dr. Halkos's causation opinions to the facts and ad-equately describe the chain of events allegedly leading to Mr. Smith's death. *See Patel v. Williams, 237 S.W.3d 901, 905–06 (Tex.App.-Houston [14th Dist.] 2007, no pet.)* (holding expert report suffi-ciently set forth causation when it presented a chain of events beginning with a contraindicated prescrip-tion and ending with the patient's death). The trial court acted within its discretion in finding that Dr. Halkos's report sufficiently address the element of causation.[FN3]

FN3. The Hospital also argues that Nurse Hayman is not qualified to render causa-tion opinions. We need not address this ar-gument, however, because Dr. Halkos's re-port, without reference to Nurse Hayman's report, sufficiently addresses the causation element in the Smiths' claim against the Hospital. *See* Tex.R.App. P. 47.1.

We overrule the Hospital's sole issue.

### VII. Conclusion

Having overruled the Hospital's sole issue, we affirm the trial court's order.

Tex.App.–Fort Worth,2010.
Presbyterian Community Hosp. of Denton v. Smith
314 S.W.3d 508

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in S.W.3d, 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.)))**

▷

Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**

Court of Appeals of Texas,
Houston (1st Dist.).
Vasudev SHENOY and Dario Zuniga, Appellant
v.
Penny JEAN, Individually, and as Wrongful Death Beneficiary of Willie Ann Jean, Deceased, and on Behalf of the Estate of Willie Ann Jean, Deceased, and on Behalf of all Wrongful Death Beneficiaries of Willie Ann Jean, Deceased, Appellee.

No. 01–10–01116–CV.
Dec. 29, 2011.

On Appeal from the 151st District Court, Harris County, Texas, Trial Court Case No.2010–28302.
John G. Myers, Dee L. Dawson, Myers Doyle, Houston, for Appellant Vasudev Shenoy.

Robert G. Smith, David O. Cluck, Scott B. Novak, Lorance & Thompson, P.C., Houston, for Appellant Dario Zuniga.

Monica C. Vaughan, for Penny Jean, Individually, and as Wrongful Death Beneficiary of Willie Ann Jean, Deceased, and on Behalf of the Estate of Willie Ann Jean, Deceased, and on Behalf of all Wrongful Death Beneficiaries of Willie Ann Jean, Deceased.

Panel consists of Chief Justice RADACK and Justices SHARP and BROWN.

**MEMORANDUM OPINION**
HARVEY BROWN, Justice.
**\*1** In this interlocutory appeal,[FN1] Dr. Shenoy and Dr. Zuniga appeal the trial court's orders deny-ing their motion to dismiss Penny Jean's healthcare liability claim for failure to serve an adequate expert report. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (West 2011). Penny's mother, Willie Ann Jean, died approximately three weeks after gallbladder surgery as a result of hypoxic encephalopathy. Dr. Zuniga performed the surgery. Dr. Shenoy, a cardiologist, cleared Jean for the surgery.

> FN1. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (West 2011).

In two issues, Shenoy contends that the trial court abused its discretion in denying his motion to dismiss because Jean's expert, Dr. Mazzei, an anesthesiologist, is not qualified to opine on the applicable standard of care for a cardiologist, breach of that standard or causation, and his report does not adequately address standard of care, breach, or causation. In his sole issue, Zuniga contends that the trial court abused its discretion because (1) Mazzei is not qualified to offer an opinion on the applicable standard of care for a surgeon, (2) the report does not address how Zuniga caused Willie Ann's death beyond mere conclusions, and (3) it is "impermissibly cumulative"—that is, it does not adequately identify the particular breaches of the standard of care or causation with respect to each separate defendant. We reverse and render an order dismissing the claims against Shenoy and Zuniga.

**Background**
Mazzei's expert report provides the background facts in this case. The medical records are not before us, and we accept the factual statements for the limited purpose of this appeal.[FN2]

> FN2. *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002) (review of Chapter 74 report is limited to four corners of report).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.)))**

Willie Ann Jean, age 57, was taken by ambulance to the emergency room of Doctor's Hospital on February 15, 2008, complaining of abdominal pain, vomiting, chest pain of three hours' duration, and difficulty breathing. As part of her admission, Willie Ann gave an extensive medical history that included diabetes, hypertension, angina, surgery for a brain aneurysm, coronary artery disease, chronic obstructive pulmonary disease, hypercholesterolemia, and a prior myocardial infarction. Willie Ann reported she had experienced abdominal and chest pain for years without treatment. Based on a physical examination and ultrasound, the emergency room physician, Dr. Mireles, determined that she had polyps and diagnosed symptomatic gallstones in her gallbladder. He recommended that she undergo surgery to remove her gallbladder. He ordered a surgical consultation and a cardiology consultation.

Shenoy, a cardiologist, saw her that same day, and noted that Willie Ann had a two- to three-year history of epigastric and right upper quadrant abdominal pain as well as a history of a previous myocardial infarction and a cereberovascular accident (i.e., a stroke). Shenoy noted that Willie Ann had suffered chest pain, accompanied by shortness of breath and sweating for four to six hours earlier that day. Willie Ann also had an abnormal electrocardiogram (EKG). Shenoy's diagnosis was that Willie Ann had suffered an acute myocardial infarction, symptomatic gallstones, hypertension, and diabetes.

**\*2** Zuniga, a surgeon, performed the surgical consultation three days after her initial admission, on February 18, 2008. Zuniga confirmed the presence of gallstones, diagnosed inflammation of the gallbladder, and cleared Willie Ann for surgery to remove her gallbladder the next day, February 19, subject to a cardiology assessment. Dr. Shenoy saw Willie Ann again on February 18. A nuclear test was negative for ischemia. Shenoy also ordered an EKG, the results of which are included in Mazzei's report but the significance of which are not ex-plained. Shenoy cleared Willie Ann for the gallbladder surgery.

Dr. Amin–Sankar, an anesthesiologist, performed a preoperative anesthesia assessment on February 19. He noted Willie Ann's past medical history, including her acute myocardial infarction and abnormal EKG. Amin–Sankar cleared Willie Ann for surgery.

On February 19, 2008, Zuniga performed the surgery. The surgery was an "uneventful" procedure. After leaving the post-anesthesia careunit (PACU), Willie Ann was to be sent to the intensive care unit because she had fluctuating oxygen saturation levels, inadequate ventilation, and shallowness of breath. Shortly thereafter, she was transported back to the PACU and was placed on a ventilator. According to Mazzei's report, Amin–Sankar prematurely extubated Willie Ann ten minutes later. Within a few minutes, Willie Ann was in respiratory arrest. She received CPR and medications, and Amin–Sankar reintubated her.

Thirty minutes later, Willie Ann was returned to the ICU. According to Mazzei's report, Jean became "agitated" and had trouble with the ventilator. She extubated herself and suffered a second respiratory arrest. She was re-intubated and given medications. An EEG the following day showed possible hypoxic encephalopathy—brain damage caused by lack of oxygen. A follow-up EEG the next day also indicated hypoxic encephalopathy. Mazzei's report does not discuss whether the EEGs differentiate between any damage caused by the first extubation and arrest and the second extubation and arrest. Willie Ann was unresponsive to stimuli, including painful stimuli. On February 25, Willie Ann was transferred to another facility for long-term care. She died on March 5, 2008 due to the hypoxic encephalopathy.

Penny filed a wrongful death medical malpractice suit against Doctor's Hospital, Mireles, Amin–Sankar, Shenoy, and Zuniga.[FN3] Penny alleged that Shenoy and Zuniga were negligent in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in S.W.3d, 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.)))**

clearing her mother for surgery. Specifically, Penny alleged that there was no emergency or urgent reason to remove her mother's gallbladder and that her mother had experienced abdominal and chest pain for years without treatment. In addition, Willie Ann had suffered an acute myocardial infarction before the gallbladder surgery and had a history of numerous health problems. Although she was stable, her history created additional risks that made her a poor candidate for surgery, and therefore Shenoy and Zuniga negligently cleared Willie Ann for the surgery.

> FN3. Only Shenoy and Zuniga are parties to this appeal.

**\*3** Penny timely served an expert report from Mazzei, an anesthesiologist. [FN4] Mazzei's report focused primarily on the anesthesiologist, Amin–Sankar. Concerning Shenoy and Zuniga, Mazzei stated that if Willie Ann "had not undergone elective surgery on February 19, 2008, she would not have experienced the respiratory arrests that resulted from her extubation and she would have, in all probability, survived."

> FN4. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a).

Concerning Amin–Sankar, Mazzei's report states, "In reasonable medical probability, if Ms. Jean had not been prematurely extubated, she would not have had the increased demands placed on her body which caused her subsequent respiratory arrest, anoxic brain injury and death." He further explained in his general discussion of causation that the anesthesiologist should have been aware of the risks of premature extubation. A fair reading of Mazzei's report is that the premature extubation was the immediate cause of death:

> The time it takes for a patient's anesthesia effect to lessen enough for them to be able to breathe independently varies from patient to patient and is affected by a patient's physiology and underlying disease processes. For a patient like Ms. Jean

who had recently suffered a MI, it should have been expected that it would take her a significant period of time before she was capable of being extubated to breathe on her own. This was not taken into account nor was her clinical picture when she was untimely extubated [by the anesthesiologist]. This caused her to suffer a respiratory arrest which further stressed Ms. Jean's ability to recover from surgery and lead to another respiratory arrest with anoxic encephalopathy and death.... When Ms. Jean extubated herself, the failure to address her increasing respiratory distress resulted in a subsequent respiratory arrest causing the anoxic encephalopathy which lead to her death.

Shenoy and Zuniga moved to dismiss, asserting that the report was inadequate to them. The trial court granted Penny an opportunity to amend the report. After receiving the amended report, Shenoy and Zuniga again moved to dismiss due to inadequacies in the report. The trial court denied the motions to dismiss, and this interlocutory appeal followed.

### Standard of Review

We review a trial court's ruling on a motion to dismiss a healthcare liability lawsuit pursuant to Chapter 74 of the Texas Civil Practice and Remedies Code under an abuse of discretion standard. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001) (reviewing dismissal under predecessor statute, section 13(e) of article 4590i); *Runcie v. Foley,* 274 S.W.3d 232, 233 (Tex.App.-Houston [1st Dist.] 2008, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles or if it clearly fails to analyze or apply the law correctly. *Runcie,* 274 S.W.3d at 232. In reviewing whether an expert report complies with Chapter 74, we evaluate whether the report "represents a good-faith effort" to comply with the statute. *Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216, 221 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). In making this evaluation,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in S.W.3d, 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.)))**

we must look only at the information contained within the four corners of the report. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002).

### Adequacy of Dr. Mazzei's report

**\*4** In their respective appeals, Shenoy and Zuniga attack various aspects of the adequacy of Mazzei's report, asserting it fails to meet the requirements of section 74.351 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE § 74.351(a).

### I. Chapter 74 expert report requirements

Pursuant to section 74.351, medical-malpractice plaintiffs must provide each defendant physician and health care provider with an expert report or voluntarily nonsuit the action. *Id.* If a claimant timely furnishes an expert report, a defendant may file a motion challenging the report's adequacy. *Id.* The trial court shall grant the motion only if it appears, after hearing, that the report does not represent a good faith effort to comply with the statutory definition of an expert report. *See id.* § 74.351(*l* ). The statute defines an expert report as a written report by an expert that provides, as to each defendant, a fair summary of the expert's opinions, as of the date of the report, regarding: (1) the applicable standards of care; (2) the manner in which the care provided failed to meet the standards; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See id.* § 74.351(r)(6); *Gray v. CHCA Bayshore, L.P.,* 189 S.W.3d 855, 85859 (Tex.App.-Houston [1st Dist .] 2006, no pet.).

Although the report need not marshal all the plaintiff's proof, it must include the expert's opinions on the three statutory elements—standard of care, breach, and causation. *See Palacios,* 46 S.W.3d at 878; *Gray,* 189 S.W.3d at 859. In detailing these elements, the report must provide enough information to fulfill two purposes if it is to constitute a good faith effort: first, it must inform the defendant of the specific conduct the plaintiff has called into question, and, second, it must provide a basis for the trial court to conclude that the claims

have merit. *Scoresby v. Santillan,* 346 S.W.3d 546, 556 (Tex.2011) (citing *Palacios,* 46 S.W.3d at 879). A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these two purposes. *Id.* " '[T]he expert must explain the basis of his statements and link his conclusions to the facts.' " *Wright,* 79 S.W.3d at 52 (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). Furthermore, in assessing the report's sufficiency, the trial court may not draw any inferences, and instead must rely exclusively on the information contained within the report's four corners. *See Scoresby,* 346 S.W.3d at 556 (citing *Palacios,* 46 S.W.3d at 878).

### II. Adequacy of report concerning causation

Within his second issue, Shenoy contends that Mazzei's report does not adequately address causation of Jean's injuries as a result of any negligence by Shenoy. As part of his sole issue, Zuniga similarly argues that the report is inadequate in its statement of causation for his alleged malpractice.

**\*5** An expert report must include a fair summary of the causal relationship between the defendant's failure to meet the appropriate standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). An expert cannot merely state his conclusions or "provide insight" about the plaintiffs' claims, but must instead "explain the basis of his statements to link his conclusions to the facts." *Wright,* 79 S.W.3d at 52. In explaining causation, the report must explain how the physician's conduct caused the plaintiff's injuries. *Id.* at 53.

### A. Assertions in Mazzei's expert report regarding causation

Mazzei's report asserts that the applicable standard of care breached by Shenoy included the responsibility to consider all of Willie Ann's co-morbidities because these conditions placed Willie Ann "at an unacceptably high risk for complications from surgery and anesthesia." The report identifies two risks from the surgery and anesthesia : (1) the stresses placed upon the cardiovascular and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in S.W.3d, 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.)))**

respiratory system during surgery and anesthesia and (2) the depression of the central nervous system and the resulting risk of "experiencing cardiovascular and respiratory problems." It also generally states that a patient's medical history may increase these risks. It does not, however, quantify or otherwise describe the magnitude of risk for respiratory problems for a person undergoing this surgery with normal health or compare that risk to the risk for a person with pre-existing medical conditions like Willie Ann's. According to the report, these risks are addressed by intubating the patient "so the anesthesiologist can ventilate the patients while their central nervous system is depressed" and that intubation normally continues "until the patient is able to again breathe on [his] own." The report continues:

> .... Although complications arose as Ms. Jean was extubated following surgery, these complications occurred because of the medical conditions that should have lead Dr. Shenoy to conclude that Ms. Jean was not an appropriate surgical candidate. If Ms. Jean had not undergone elective surgery on February 19, 2008, she would not have experienced the respiratory arrests that resulted from her extubation and she would have, in all probability, survived.

In the "Causation" section, the report further states:

> Ms. Jean was a patient who was still recovering from her MI who never should have undergone elective surgery. By continuing to recommend the gallbladder removal surgery, clearing her for surgery and performing surgery, Ms. Jean's healthcare providers breached and violated the standards of care as set forth above and proximately caused her death.

Finally, Mazzei states for a patient like Willie Ann "it should have been expected that it would take her a significant period of time before she was capable of being extubated to breathe on her own ."

**B. Adequacy of the report concerning Shenoy**

**\*6** Mazzei's report states that the medical conditions that rendered Willie Ann unfit for surgery caused the complications that arose when she was extubated ("these complications occurred because of the medical conditions"). What he fails to do is provide a factual underpinning for that conclusion explaining why or how this occurred and whether it was all her medical conditions listed in his report or her myocardial infarction in particular that made the risk unacceptable and caused her respiratory arrest. These omissions make the report conclusory and deficient for purposes of section 74.351.

*1. Expert reports cannot be conclusory to satisfy section 74.351.*

An opinion on causation stated without the underlying facts is conclusory. *Jelinek v. Casas,* 328 S.W.3d 526, 536 (Tex.2010); *Arkoma Basin Exploration Co., Inc. v. FMF Assocs. 1990–A, Ltd.,* 249 S.W.3d 380, 389 n. 32 (Tex.2008). A conclusory opinion is not probative. *City of San Antonio v. Pollock,* 284 S.W.3d 809, 818 (Tex.2009); *see Zamecnik v. Indian Prairie Sch. Dist. No. 204,* 636 F.3d 874, 881 (7th Cir.2011) (stating that mere conclusions are useless to the court).

This rule is not a mere procedural hurdle. Juries—or in the case of expert reports, judges—are often confronted with conflicting expert testimony. One expert may testify that X caused the plaintiff's injuries while a different expert may testify that X did not cause the plaintiff's injuries. The factfinder typically lacks the expertise necessary to form an opinion without expert assistance—this is why expert testimony is admitted in the first place. *See* TEX.R. EVID. 702. It is the expert's explanation of "how" and "why" causation exists that allows the factfinder to weigh the credibility of the expert's opinion and, when expert opinions conflict, to decide which testimony to disregard. *Cf. In re Christus Spohn Hosp. Kleberg,* 222 S.W.3d 434, 440 (Tex.2007) (detailing reasons why it is essential that the jury have access to the facts and data underlying an expert's testimony in order "to accurately assess the testimony's worth."). With respect

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.)))**

to expert reports in healthcare liability claims, the expert's explanation is what allows the trial court to determine whether the claim has merit. *See Jelinek,* 328 S.W.3d at 539; *see also Scoresby,* 346 S.W.3d at 552 (observing that Legislature enacted expert report requirement to elicit expert opinions at an early stage of the litigation to allow the trial court to determine that a basis exists for concluding that the claims have merit). Expert testimony that merely states a final conclusion on an essential element of a cause of action—such as causation—without providing a factual basis for that conclusion does not aid the jury in its role as factfinder but, rather, supplants it. This, an expert may not do. *See Greenberg Traurig of N.Y., P.C.v. Moody,* 161 S.W.3d 56, 97 (Tex.App.-Houston [14th Dist.] 2004, no pet.) ("Expert testimony is admissible to aid the jury in its decision, but it may not supplant the jury's decision."). Similarly, an expert report that merely asserts that a defendant physician's breach caused the plaintiff's injury without providing a factual basis does not provide the trial court with the information necessary to evaluate the merits of the plaintiff's claim. *See Jelinek,* 328 S.W.3d at 529.

**\*7** The requirement that the expert's opinion must not be conclusory applies not only to trial testimony, but to expert reports required by section 74.351(a). *See Jelinek,* 328 S.W.3d at 539–40; *Wright,* 79 S.W.3d at 53.In *Jelinek,* the Texas Supreme Court found the trial court abused its discretion in denying a motion to dismiss because the expert's opinion on causation was conclusory. 328 S.W.3d at 539–40. The expert's report stated that "[the defendant's] breach of the appropriate standard of care in 'reasonable medical probability, resulted in a prolonged hospital course and increased pain and suffering being experienced by [the plaintiff].' " *Id. at 539.* The Court emphasized, "[T]he report says nothing more regarding causation." *Id.* The Court faulted the report for offering no explanation "tying the conclusion to the facts" or of "how and why the breach caused the injury based on the facts presented." *Id.* at 539–40. This is

precisely the information missing here: the how and the why.

In *Gray,* this court held that the expert report contained a conclusory statement concerning causation. 189 S.W.3d at 860. The report stated that "[t]he failure to monitor and detect the malpositioned left knee resulted in a dislocated left patella, severe pain and suffering, and subsequent medical treatment." *Id . at 858.* Like the Supreme Court in *Jelinek,* this court faulted the causation opinion for failing to "convincingly tie the alleged departure from the standard of care to specific facts of the case." *Id.* at 860.

*2. Mazzei's report was conclusory on the issue of causation*

Mazzei's causation opinion regarding Shenoy's decision to clear Willie Ann for surgery was conclusory. Although Mazzei's report states that anesthesia depresses the respiratory system and places stress on the heart, the report does not state that Willie Ann's history of heart problems or other conditions somehow made her more likely to suffer respiratory arrest after premature extubation than a person without those medical conditions. It does not state that her risks for the complications that she experienced—respiratory arrest—were enhanced because of her medical conditions. The report does generally discuss why Willie Ann's other conditions affected her suitability for surgery, but does not link her medical conditions to the complication she experienced, respiratory arrest. It recognizes that a depressed central nervous system and the resulting risk of respiratory problems are normal byproducts of anesthesia for even a person with normal health. In other words, Mazzei's report shows that the surgery itself created the risk and does not state how or why Willie Ann's pre-existing conditions changed those risks except in conclusory terms. The report also states that those risks can be addressed by leaving her intubated for "a significant period of time" before extubation. Mazzei's report makes it clear that he believes that the premature extubation was the immediate cause of her

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in S.W.3d, 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.)))**

death.

**\*8** A report may be sufficient if it states a chain of events that begin with a health care provider's negligence and end in a personal injury. *See Patel v. Williams,* 237 S.W.3d 901, 905 (Tex.App.-Houston [14th Dist.] 2007, no pet.); *see also Engh v. Reardon,* No. 01–09–00017–CV, 2010 WL 4484022, at \*8 (Tex.App.-Houston [1st Dist.] Nov. 10, 2010, no pet.) (mem.op.). But neither case involved an event as remote as that involved here.

In *Patel,* the Fourteenth Court of Appeals held that an expert report sufficiently set forth causation when it presented a chain of events beginning with an allegedly negligent prescription and ending with the patient's death. *Patel,* 237 S.W.3d at 905–06. Patel prescribed Williams an anti-dementia drug. *Id.* at 903. The report explained that the drug was not FDA-approved for patients with Williams's ailment and that known side-effects of the drug included restlessness or a need to keep moving. *Id.* Williams's family withdrew consent for the drug, but Patel continued to prescribe it. *Id.* Williams was being fed via feeding tube, and allegedly due to the restlessness from the drug, she removed the tube. *Id.* The report identified nurses' notes that described Williams as agitated and stated that she kept pulling at her feeding tube. *Id.* The nursing staff improperly re-inserted the tube, causing a small cut, which became infected because of the contents of the feeding tube entering the cut. *Id.* The cut developed into an abscess requiring multiple surgeries. *Id.* The report concluded that Williams's death was caused by the infection from the improperly re-inserted feeding tube. *Id.* at 904. The Fourteenth Court held that the trial court did not abuse its discretion in determining the report was not conclusory or speculative concerning causation. *Id.* at 905–06.

The report in this case is distinguishable. The report identifies the alleged breach—clearing Willie Ann for surgery with her medical history—as did the report in Patel—prescribing an unapproved drug without consent. *See id.* But there the similarities end. In *Patel,* the report explained that a known

side effect of the drug was restlessness, and the restlessness caused Williams to become agitated and remove her feeding tube. *Id* . Willie Ann likewise became agitated and removed her breathing tube. The report, however does not explain any connection between clearing Willie Ann for surgery or her medical history and her agitation. While the report in *Patel* explained each step on the path of causation, the report in this case does not.[FN5]

> FN5. The report in this case is similarly distinguishable from the report in *Engh.* In *Engh,* the report identified the alleged breach-placing a surgical clip on the ureter during surgery. 2010 WL 4484022 at \*6. The report also explained the consequences of a clipped ureter. Specifically, the report detailed how damage to and, eventually, loss of the kidney would result from clipped ureter. *Id.* Thus, this court found the report adequate, although Engh saw multiple other doctors and several months passed after his surgery and before he lost his kidney. *Id.* at \*10. The report explained how the alleged breach caused the loss of Engh's kidney, while the report here contains no explanation of how clearing a patient with a history like Willie Ann's causes premature extubation, self-extubation, or the eventual death of the patient.

There were "many links in the chain of events" that began with the pre-surgical clearance and ended with her death, but Mazzei failed to explain and support each link. While Mazzei explains how Willie Ann's premature extubation prevented her from "maintain[ing] the oxygenation in the blood," increasing her risk for respiratory arrest, he fails to explain what role her pre-existing medical conditions played in her respiratory arrest. It is here that we part company with the trial court and find that it abused its discretion. Mazzei does not link the alleged negligence—clearing Jean for surgery—with the premature extubation except that one occurred

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.)))**

before the other. That is not enough; it is only a statement of "but for" causation. If that is all that section 74.351 requires to demonstrate causation, almost any prior action taken by a health care provider could be said to cause the ultimate outcome. For example, the referral by the emergency room physician for the surgical consultation with Dr. Shenoy also was a cause of Willie Ann's death if all that is necessary is for an event to have preceded the injury.

**\*9** To establish cause in fact, Mazzei had to discuss why the act or omission was a substantial factor in causing the injury and without which the harm would not have occurred. *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 551 (Tex.2005); *see also Transcon. Ins. Co. v. Crump,* 330 S.W.3d 211, 214 (Tex.2010) (stating that plaintiff must prove "cause in fact (or substantial factor)"); *Ford Motor Co. v. Ledesma,* 242 S.W.3d 32, 46 (Tex.2007) (stating that producing cause requires that (1) the cause must be a substantial cause of the event in issue and (2) it must be a but-for cause, namely one without which the event would not have occurred). The report does not do so. Mazzei's report does not link facts from the alleged negligence in clearing her for surgery to Willie Ann's death. Willie Ann did not suffer a cardiac arrest during or after the surgery; she suffered respiratory arrest and only after a premature extubation. Mazzei does not state that Willie Ann suffered any unusual respiratory issue during the surgery itself; the surgical procedure was "uneventful." And based on Mazzei's report, it appears that any patient—healthy or with a history of medical conditions—who is prematurely extubated will not sufficiently "maintain the oxygenation in the blood" and therefore is at risk for respiratory arrest. The mere fact that Willie Ann was cleared for surgery before her death does not mean that the clearance for surgery caused her death. *Jelinek,* 328 S.W.3d at 533 (cautioning against the *post hoc ergo propter hoc* fallacy, that is, reasoning that an earlier event caused a later event simply because it occurred first).

A causal link can be too attenuated to satisfy the causation requirement for an expert report. *See Gonzalez v. Sebile,* No. 09–09–00363–CV, 2009 WL 4668892, at *4 (Tex.App.-Beaumont Dec. 10, 2009, pet. denied) (mem.op.). In *Gonzalez,* the physician was sued for clearing the patient for surgery without obtaining a cardiologist consultation despite an earlier open heart surgery. 2009 WL 4668892at *2. According to the plaintiffs, the defendant anesthesiologist fell below the standard of care by failing to disqualify the plaintiff as not fit for surgery in part because of the risks of general anesthesia. *Id.* The court held that the report's statement that the plaintiff would not have been injured if he had not undergone surgery in the first place was "too attenuated to set forth evidence of causation with sufficient specificity to inform" the physician of the alleged misconduct and to allow the trial court to conclude that the plaintiff's claims had merit. *Id* . at *3. Mazzei's report suffers from the same defect.

While Mazzei's report "provides insight" concerning the claims surrounding Jean's death, it does not link the facts of the decision to clear her for surgery to the conclusion that Shenoy's alleged breach of the standard of care caused Jean's death. It does not, therefore, provide a basis for the trial court to have concluded that causation was demonstrated for Shenoy's decision to clear Willie Ann for surgery. *See Palaciois,* 46 S.W.3d at 879 (report must provide basis for concluding that claims have merit). We conclude, therefore, that the report is conclusory and inadequate with respect to Shenoy. *See Gray,* 189 S.W.3d at 860; *see also Jelinek,* 328 S.W.3d at 539–40 (finding report inadequate concerning causation because it did not explain "how and why the breach caused the injury based on the facts presented").

**\*10** We sustain this portion of Shenoy's second issue.

**B. Adequacy of the report concerning Zuniga**
Penny has not alleged, and Mazzei's report does not assert, that Zuniga negligently performed

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

surgery; rather, the surgery is described as "uneventful." For the same reasons that the report is inadequate as to causation for Shenoy, we conclude that, with respect to Zuniga, the report fails to explain how and why Zuniga's clearing of Willie Ann for surgery caused her death, fails to demonstrate the causal link necessary to have a meritorious claim, and is conclusory and inadequate. *See Gray,* 189 S.W.3d at 860; *Jelinek,* 328 S.W.3d at 539–40.

We sustain this portion of Zuniga's sole issue. FN6

> FN6. Because we have sustained Shenoy's second issue in part and Zuniga's sole issue in part, we do not address the other arguments raised by the parties. *See* TEX.R.APP. P. 47.1.

### Conclusion

We reverse and render an order dismissing the claims against Shenoy and Zuniga.

SHARP, J., dissenting. Dissent to follow.

Tex.App.-Houston [1 Dist.],2011.
Shenoy v. Jean
Not Reported in S.W.3d, 2011 WL 6938538 (Tex.App.-Hous. (1 Dist.))

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Court of Appeals of Texas,
Austin.
Ted SMITH, D.O.; and Austin Regional Clinic,
P.A., Appellants,
v.
Janet Lynn WILSON, Appellee.

No. 03–10–00387–CV.
Jan. 11, 2012.
Rehearing Overruled May 7, 2012.

**Background:** Medical malpractice action was brought against physician and clinic, after patient who had been prescribed anti-depressant committed suicide. The 53rd Judicial District Court, Travis County, Suzanne Covington, J., denied defendants' motion to dismiss due to deficient expert report, and defendants appealed.

**Holding:** The Court of Appeals, David Puryear, J., held that expert's medical report was not good faith attempt to comply with medical expert report requirements.

Reversed and remanded.

West Headnotes

**[1] Health 198H ☞804**

198H Health
    198HV Malpractice, Negligence, or Breach of
Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
    Amended medical expert report stating that applicable standard of care for prescribing anti-depressant was to take full psychiatric history of mental health patient complaining of depression and stress, that patient was suicide-vulnerable, that there was connection between anti-depressant and suicide, and that, but for medication, patient would

not have committed suicide, was not good faith attempt to comply with medical expert report requirements in malpractice action against prescribing physician and clinic, where report did not indicate how failure to take complete history was cause of patient's suicide, and it did not include information that physician should have gleaned from patient's past or symptoms that would have stopped physician from prescribing anti-depressant. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[2] Health 198H ☞804**

198H Health
    198HV Malpractice, Negligence, or Breach of
Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
    In determining whether a proffered medical expert report represents a good faith effort to comply with the statutory requirements for the same, in a medical malpractice action, the trial court should confine its inquiry to the four corners of the report, which must include the expert's opinion on all three statutory elements and must explain the basis of the expert's statements to link his conclusions to the facts. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[3] Health 198H ☞804**

198H Health
    198HV Malpractice, Negligence, or Breach of
Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
    A medical expert report submitted in support of a medical malpractice claim need not marshal all the plaintiff's proof, but to be considered a good-faith effort to satisfy the expert report statute, it must do more than simply provide the expert's conclusions as to standard of care, breach, and causa-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

368 S.W.3d 574
**(Cite as: 368 S.W.3d 574)**

tion, and it must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351(*l* ), (r)(6).

**[4] Health 198H ⟳804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

If a medical expert report submitted in support of a medical malpractice suit contains only conclusions about the statutory elements, the trial court has "no discretion but to conclude that the report does not represent a good-faith effort" to satisfy the statute governing the expert report requirements. V.T.C.A., Civil Practice & Remedies Code § 74.351(*l* ), (r)(6).

**\*575** Diana L. Faust, R. Brent Cooper, Richard C. Harrist, Cooper & Scully, PC, Dallas, TX, for Appellant.

Dan Ballard, Stacey J. Simmons, Ballard & Simmons, LLP, Austin, TX.

Jay Harvey, Winckler & Harvey, LLP, Austin, TX, for Appellee.

Before Chief Justice JONES, Justices PURYEAR and PEMBERTON.

### *OPINION*
DAVID PURYEAR, Justice.

Appellants Ted Smith, D.O., and Austin Regional Clinic ("ARC") appeal from the denial of their motion to dismiss appellee Janet Lynn Wilson's suit for medical malpractice. We reverse the trial court's order and remand for dismissal and determination of attorney's fees.

### Factual and Procedural Background
On August 6, 2007, Wilson's son, Keith Michael Harris, went to see Dr. Smith, complaining of depression and stress. Harris was twenty-three years old and had recently broken up with his girlfriend. Smith prescribed fluoxetine [FN1] with twelve refills and did not schedule a follow-up visit. On September 5, 2007, Harris committed suicide.

> FN1. Fluoxetine is the generic name for Prozac, an anti-depressant. We will refer to the drug as fluoxetine except when quoting the record, in which the terms seem to be used interchangeably.

Wilson sued appellants, alleging that Smith was negligent in prescribing fluoxetine and in not scheduling a follow-up visit with Harris, that ARC was vicariously liable as Smith's employer, and that their negligence was a proximate cause of Harris's death. Wilson timely served an expert report by Dr. John T. Maltsberger. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (West 2011). In his report, Maltsberger stated that the accepted standard of care that should be employed when prescribing fluoxetine required a doctor to obtain a description of the patient's "anxious and depressive symptoms" and a full psychiatric history. He opined that Smith breached that standard of care because he did not "obtain and record" Harris's symptoms of anxiety and depression or his full psychiatric history. Maltsberger stated that there was a generally recognized relationship between fluoxetine and suicide in adolescents and young adults and that "adolescents with psychiatric disorders" had a greater risk of suicidal thoughts and behavior in "the first few months of treatment" when prescribed fluoxetine. Maltsberger**\*576** concluded by stating, "[I]t is my opinion that more likely than not, had Keith Harris not been prescribed fluoxetine, he would not have committed suicide."

Appellants objected to the report, asserting it

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

368 S.W.3d 574
**(Cite as: 368 S.W.3d 574)**

was deficient because it was conclusory with regard to causation. Appellants also noted that the report did not mention ARC at all, much less level any criticism against it, and argued that it therefore amounted to no expert report at all as to ARC. The trial court found that Maltsberger's report qualified as a report but was inadequate, denied appellants' motion to dismiss, and gave Wilson thirty days to remedy the report's deficiencies. Wilson filed an amended report providing essentially the same opinions, but adding more detail to the causation paragraph.[FN2] Maltsberger changed his statements about the relationship between fluoxetine and suicidal thinking and behavior to refer only to adolescents, removing his prior inclusion of "young adults."[FN3] Maltsberger concluded:

> FN2. The amended report is two and one-half pages long, and the actual summaries of the standard of care, breach, and causation are covered in slightly over one page.

> FN3. This is a noteworthy omission, since Harris, as a twenty-three-year-old man, was not what is generally considered an adolescent. *See Webster's Third New Int'l Dictionary* 28 (2002) (defining adolescence as "the period of life from puberty to maturity terminating legally at the age of majority"); *see also* medical-dictionary.thefreedictionary.com/adolescence (last visited January 5, 2012, citing *Mosby's Med. Dictionary* (2009), *Miller–Keane Encyclopedia & Dictionary of Med., Nursing, & Allied Health* (2003)) (defining adolescence as time between puberty and adulthood, usually running from between eleven and thirteen and between eighteen and twenty).

Based on the information provided to me to date, it is my opinion that Keith Harris was a suicide-vulnerable, depressed young man. As outlined in the studies described above, fluoxetine worsened his depression and agitated this patient, driving him beyond his capacity for endurance. It is my opinion that more likely than not, fluoxetine was a significant cause that worsened the emotional burden of Mr. Harris's illness and that without it he would not have committed suicide.

Appellants filed another motion to dismiss, asserting that the new report was deficient because Maltsberger "never connects the dots and says that based on the history or presentation that existed had Dr. Smith obtained an adequate history, he *should not* have prescribed Prozac." Appellants further asserted:

> [Maltsberger] never states that based on the information available to Dr. Smith at the time that he was treating Mr. Harris, Dr. Smith should have concluded that Mr. Harris was suicide-vulnerable. As an expert, he is supposed to analyze Dr. Smith's actions based on the information that was available to him at the time. His failure to do so renders his opinions conclusory, and therefore, not adequate.

Appellants also reasserted that because Maltsberger's report made no reference to or criticism of ARC, it did not qualify as an expert report on those claims. The trial court denied appellants' motion to dismiss, and appellants filed this appeal. *See id.* § 51.014(a)(9) (West 2008).

**Analysis**

[1] Within 120 days of the date a plaintiff files a health-care-liability claim, she must serve each physician or health care provider against whom claims are asserted ("medical defendant") with at least one expert report that summarizes the expert's opinions "regarding applicable standards **\*577** of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(a), (r)(6). After an expert report is filed, a medical defendant may file an objection to the report's sufficiency and a motion to dismiss the plaintiff's liability claims. *See id.* § 74.351(a), (b).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

368 S.W.3d 574
**(Cite as: 368 S.W.3d 574)**

[2] When the adequacy of a report is challenged, the trial court should only sustain the objections if it determines "that the report does not represent an objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(*l* ); *see American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). The trial court should confine its inquiry to the four corners of the report, which must include the expert's opinion on all three statutory elements and " 'must explain the basis of [the expert's] statements to link his conclusions to the facts.' " *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). If the trial court finds a report deficient, the plaintiff's claims against the medical defendant are subject to dismissal unless the court grants "one 30–day extension to the claimant in order to cure the deficiency." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c), (*l* ). If an expert report is not timely served, the trial court *must* dismiss the claims against the medical defendant if the defendant files a motion to dismiss. *Id.* § 74.351(b).

[3][4] "A report need not marshal all the plaintiff's proof," but to be considered a good-faith effort to satisfy the statute, it must do more than simply provide the expert's conclusions as to standard of care, breach, and causation. *Palacios,* 46 S.W.3d at 878–79. Instead, the report "must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Id.* at 875. We review a trial court's denial of a motion to dismiss under section 74.351 for an abuse of discretion, but if an expert report contains only conclusions about the statutory elements, the trial court has "no discretion but to conclude ... that the report does not represent a good-faith effort" to satisfy the statute. *Id.* at 877, 880.

After appellants objected to the sufficiency of Maltsberger's original report, the trial court gave Wilson the opportunity to provide an amended report. The new report, however, added very little to Maltsberger's statements related to Smith's alleged breach of the standard of care and causation, including only one additional paragraph that stated that Harris was "a suicide-vulnerable, depressed young man" and that fluoxetine worsened his depression and led to his suicide.[FN4] Wilson asserts that this report "provides, in its four corners, that but for prescribing the medication the patient would not have committed suicide." That may be true, but despite Maltsberger's opinion that fluoxetine worsened Harris's mental state and "without it he would not have committed suicide," the report does not explain how taking more complete medical records from Harris would have made Smith aware that fluoxetine would put Harris at risk for suicidal thoughts or action and **\*578** would have dissuaded Smith from prescribing fluoxetine. In other words, the report does not show how Smith's alleged breach of the standard of care caused the tragic result. *See Taylor v. Fossett,* 320 S.W.3d 570, 577–78 (Tex.App.-Dallas 2010, no pet.) (report did not provide a factual explanation of how doctor's delay in diagnosis or treatment caused complications); *Estorque v. Schafer,* 302 S.W.3d 19, 28–29 (Tex.App.-Fort Worth 2009, no pet.) (expert report left "gaps by not explaining how or why the physicians' failure to consult a urologist or gynecologist caused worsening or progression of Shirley's listed conditions" and did not explain how plaintiff would not have been injured had defendants obtained consults from specialists); *Johnson v. Willens,* 286 S.W.3d 560, 565 (Tex.App.-Beaumont 2009, pet. denied) (report did not explain what "normal dose" would have been, why prescribed dose was excessive, what patient complained of, or what proper treatment would have been); *see also Wright,* 79 S.W.3d at 53 (affirming trial court's determination that report was insufficient because it lacked "information linking the expert's conclusion ... to Bowie's alleged breach"); *Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 859–60 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (affirming trial court's finding that report was insufficient because it did

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

368 S.W.3d 574
**(Cite as: 368 S.W.3d 574)**

not provide any specific information about what defendants should have done or "convincingly tie the alleged departure from the standard of care to specific facts of the case").

> FN4. Although Wilson alleged in her petition that Smith breached the standard of care by not scheduling a follow-up visit with Harris, neither of Maltsberger's reports discusses follow-up visits or states whether a follow-up should have been scheduled, when such a visit would have been appropriate, or whether it would have made a difference in this case.

Maltsberger's report essentially states that (1) the applicable standard of care required Smith to obtain and record a description of Harris's symptoms and a complete psychiatric history, (2) Smith neglected to get a description of the symptoms or a complete psychiatric history in deciding to prescribe fluoxetine, and (3) fluoxetine worsened Harris's emotional state to the point where he committed suicide. Maltsberger does not, however, provide even the roughest summary of the information Smith should have gleaned from Harris's psychiatric past or symptoms that would have stopped Smith from prescribing fluoxetine or whether Harris's symptoms or history actually contained information that would have indicated that fluoxetine was not an appropriate prescription.[FN5] He does not provide facts to explain the causal link between Smith's alleged breach and Harris's suicide, one of the required statutory elements of an expert report. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6) (expert report must include "fair summary" of expert's opinion as to "causal relationship" between medical defendant's failure to meet standard of care and injury).

> FN5. Wilson cites to *Bakhtari v. Estate of Dumas,* 317 S.W.3d 486 (Tex.App.-Dallas 2010, no pet.), stating *Bakhtari* is a "strikingly similar case." The expert report in *Bakhtari,* however, provided substantially more information than the report presented here. The *Bakhtari* report explained that the medication in question should only have been prescribed for very short-term use, no refills should have been given, the patient should have been warned of possible side-effects, the doctor should have consulted with or referred the patient to a mental-health professional, and the doctor should have provided or arranged for "on-going assessment and monitoring" of the patient's condition. *Id.* at 496–97 nn. 9, 10. Maltsberger's cursory report bears very little similarity to the specificity and explanations provided in the *Bakhtari* report.

Further, Maltsberger states that studies have shown a relationship between fluoxetine and suicide in adolescents and that fluoxetine increases the risk of suicidal thoughts and behavior in adolescents with psychiatric disorders. He does not, however, state that fluoxetine should never be prescribed to adolescents, nor does he explain whether fluoxetine is always inappropriate**\*579** for all adolescents, whether some adolescents can safely take it, or, more importantly, whether the findings related to adolescents could even be applied to Harris, who at twenty-three was not an adolescent. Without more, Maltsberger's statement that a correlation exists between fluoxetine and suicide in adolescents does not supply a causal link between the prescribing of fluoxetine and Harris's suicide.

To be sure, Maltsberger was not required to provide an exhaustive, lengthy summary of how Smith's omissions caused Harris's suicide or what aspects of Harris's medical records led Maltsberger to conclude that fluoxetine was an inappropriate and dangerous prescription, but he provides literally no summary of such information. We are left with no choice but to conclude that the report does not provide a fair summary of the causal link between Smith's alleged shortcomings and Harris's death. *See Taylor,* 320 S.W.3d at 577–78; *Estorque,* 302 S.W.3d at 28–29; *Johnson,* 286 S.W.3d at 565.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

368 S.W.3d 574
**(Cite as: 368 S.W.3d 574)**

Because the report is insufficient as to Smith, it is also insufficient as to ARC, which Wilson sued solely for vicarious liability for Smith's conduct. *See Kettle v. Baylor Med. Ctr.,* 232 S.W.3d 832, 842–43 (Tex.App.-Dallas 2007, pet. denied) (affirming dismissal of suit against professional association due to deficiencies in report about doctor's conduct, stating that whether association was directly or vicariously liable, "liability still depends on conduct" of doctor).

We reverse the trial court's order denying appellants' motion to dismiss. We remand the cause to the trial court for the determination of attorney's fees, *see* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b), and for entry of a final order dismissing Wilson's claims against appellants.

Tex.App.–Austin,2012.
Smith v. Wilson
368 S.W.3d 574

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

388 S.W.3d 314
**(Cite as: 388 S.W.3d 314)**



Court of Appeals of Texas,
Texarkana.
TEXARKANA NURSING & HEALTHCARE
CENTER, LLC, Appellant
v.
Susan LYLE, Independent Guardian of Betty Ruth
Vest, Appellee.

No. 06–12–00067–CV.
Submitted: Nov. 20, 2012.
Decided: Dec. 14, 2012.

**Background:** Resident's daughter brought action against nursing home, alleging negligent hiring, supervision, and failure to provide a safe environment, as well as vicarious liability for assault of resident by home's employee. The 202nd Judicial District Court, Bowie County, Leon F. Pesek Jr., J., trial court denied nursing home's motion to dismiss. Nursing home appealed.

**Holdings:** The Court of Appeals, Carter, J., held that:
(1) expert report provided by daughter was deficient with respect to her direct liability claim;
(2) remand was required to allow trial court to consider whether to grant extension to allow expert to cure the deficiency;
(3) expert report was also deficient with respect to daughter's vicarious liability claims; and
(4) the deficiency with respect to the vicarious liability claims was not curable.

Remanded.

West Headnotes

**[1] Health 198H ☞804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings

198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

A motion to dismiss a health care liability claim is properly granted if it appears that the expert report does not represent a good-faith effort to comply with expert report requirements of the Medical Liability Act or is not sufficiently specific to provide a basis for the trial court to conclude that the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351(a, l, r).

**[2] Health 198H ☞804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

A report that merely states the expert's conclusions about the standard of care, breach, and causation does not constitute a good-faith effort under the Medical Liability Act; rather, the expert must explain the basis of his statements to link his conclusions to the facts. V.T.C.A., Civil Practice & Remedies Code § 74.351(a, r).

**[3] Health 198H ☞804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

A "good-faith effort" to comply with statutory definition of an expert report, pursuant to the Medical Liability Act, is one that (1) provides information sufficient to inform the defendant of the specific conduct called into question and (2) enables the trial court to conclude the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351(l ).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

388 S.W.3d 314
**(Cite as: 388 S.W.3d 314)**

**[4] Appeal and Error 30 ☞962**

30 Appeal and Error
   30XVI Review
      30XVI(H) Discretion of Lower Court
        30k962 k. Dismissal or nonsuit before trial. Most Cited Cases

    Trial court's ruling on a motion to dismiss is reviewed for an abuse of discretion.

**[5] Appeal and Error 30 ☞946**

30 Appeal and Error
   30XVI Review
      30XVI(H) Discretion of Lower Court
        30k944 Power to Review
          30k946 k. Abuse of discretion. Most Cited Cases

    A trial court abuses its discretion, as would warrant reversal, when it acts arbitrarily or unreasonably or without reference to any guiding rules or principles.

**[6] Health 198H ☞804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
        198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

    Medical expert's report did not adequately set forth the applicable standard of care and how the standards were breached, as required by expert report statute, in suit alleging that nursing home was directly negligent for assault of resident by home's employee; only direct negligence claim addressed in report was that of failing to provide resident with a safe and secure environment, but report failed to articulate what nursing home should have done differently to prevent the assault. V.T.C.A., Civil Practice & Remedies Code § 74.351(a, *l*, r).

**[7] Appeal and Error 30 ☞1177(6)**

30 Appeal and Error
   30XVII Determination and Disposition of Cause

      30XVII(D) Reversal
        30k1177 Necessity of New Trial
          30k1177(6) k. Issues not passed on below. Most Cited Cases

    The Court of Appeals would remand health care liability case against nursing home to trial court to consider whether to grant a 30-day extension to cure deficiencies in expert report to allow expert to address standard of care and how standard was breached when resident was assaulted by home's employee, where only direct negligence claim addressed in report was that home failed to provide resident with safe and secure environment; although report did not address plaintiff's claim that home had a duty to assist resident in maintaining highest practicable level of physical, mental, and psychosocial well being, implicit in such duty was provision of safe and secure environment, and at least three of plaintiff's direct liability claims necessarily related to provision of safe environment. V.T.C.A., Civil Practice & Remedies Code § 74.351(a, c, r).

**[8] Health 198H ☞804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
        198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

    When a defendant's alleged health care liability is purely vicarious, a medical expert report that adequately implicates the actions of that party's agents or employees is sufficient. V.T.C.A., Civil Practice & Remedies Code § 74.351(a).

**[9] Health 198H ☞804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
        198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

    Medical expert report, in health care liability

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

suit alleging that nursing home was vicariously liable for its employee's assault of resident, failed to demonstrate good-faith effort to provide fair summary of expert's opinions regarding standard of care applicable to home's employees, breach of standard of care, and causation, as required by Medical Liability Act; report stated that standard of care for home and its staff required the facility to provide level of care and treatment that a reasonable, prudent, similar facility would provide, but failed to identify the standard of care applicable to the staff, or address breach and causation. V.T.C.A., Civil Practice & Remedies Code § 74.351(a, *l*, r).

**[10] Health 198H ⚷804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
    Deficiencies in expert report, in health care liability suit alleging that nursing home was vicariously liable for its employee's assault of resident, were not curable, where report failed to identify the standard of care applicable to the nursing home's staff, and did not address breach and causation. V.T.C.A., Civil Practice & Remedies Code § 74.351(a, *l*, r).

**\*315** David W. Frost, Kent, Anderson & Bush, PC, Tyler, TX, for appellant.

J.T. Borah, Dawn W. Smith, Curtis E. Clinesmith, The Clinesmith Firm, Dallas, TX, for appellee.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

OPINION

Opinion by Justice CARTER.

**I. Background**

    Betty Ruth Vest was a resident of Texarkana Nursing & Healthcare Center, L.L.C. (Texarkana Nursing) from 2003 until September 2011, when she passed **\*316** away.[FN1] From the time of her admission, Vest was dependent on the nursing home staff for all of her care. It is alleged that on July 31, 2009, while under the care of the Texarkana Nursing staff and while receiving hospice care, Vest was assaulted by Mary Bean, an L.V.N. employed by Texarkana Nursing. The assault allegedly left scratches on Vest's forehead, cuts on her left leg, knots on the sides of her head, and caused bruising and swelling of her left eye. Vest recovered from the assault.[FN2] Bean was arrested and charged with assault.

> FN1. Lyle died in September 2011, after the petition was filed in July 2011.

> FN2. While Lyle does not claim Vest died as a result of the assault, the prayer for relief is phrased in terms of the "wrongful death beneficiaries of BETTY RUTH VEST."

    In July 2011, Susan Lyle, Vest's daughter and independent guardian, sued Texarkana Nursing[FN3] alleging Vest was assaulted by Bean in July 2009 and was injured as a result. Lyle pleads that the claims "by Plaintiff against Defendants fall within the scope of Chapter 74 of the Texas Civil Practice and Remedies Code." This assertion is incorporated into each theory of liability thereafter set forth in the petition. Lyle claims Texarkana Nursing is vicariously liable for the alleged negligence of its employees. Lyle further alleges Texarkana Nursing was directly responsible for the assault due to negligent supervision, negligent hiring, failure to hire and provide sufficient staff, and failure to allocate sufficient financial resources to the facility. The petition also alleges a direct negligence claim against Texarkana Nursing based on the failure to provide a safe environment for its residents.

> FN3. Ann Yeager Ellisor (the nursing home administrator) was also a named de-

fendant in the lawsuit. The claim against Ellisor was nonsuited.

Lyle provided an expert report from Milton D. Shaw, M.D., C.M.D.[FN4] In response, Texarkana Nursing filed a motion to dismiss for failure to provide an adequate expert report in accordance with Section 74.351(a) and (b) of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a), (b) (West 2011). The trial court denied the motion to dismiss. On appeal of this interlocutory order, Texarkana Nursing alleges that (1) the trial court erred in denying its motion to dismiss Lyle's direct liability claims, and (2) the trial court erred in denying its motion to dismiss Lyle's vicarious liability claims.

> FN4. Shaw is board certified in internal medicine and is certified by the American Medical Directors Association as a medical director. Shaw is the medical director of the geriatrics and extended care program at the Veterans Administration (VA) Hospital in Kerrville and is assistant clinical professor of medicine at the University of Texas Medical School at San Antonio. Shaw is the medical director of two private community nursing homes in Kerrville, separate from his VA practice.

## II. Applicable Law and Standard of Review

[1][2][3] Chapter 74 of the Texas Civil Practice and Remedies Code requires a health care liability claimant to serve on each party one or more expert reports, together with a curriculum vitae of each expert, no later than 120 days after the original petition is filed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a). An expert report is

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the **\*317** causal relationship between that failure and the injury, harm, or dam-

ages claimed.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) (West 2011). A motion to dismiss is properly granted if it appears that the report does not represent a good-faith effort to comply with subsection (r)(6) or is not sufficiently specific "to provide a basis for the trial court to conclude that the claims have merit." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001); *see* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). A report that merely states the expert's conclusions regarding the standard of care, breach, and causation is deficient. *See Palacios,* 46 S.W.3d at 879. "[T]he expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (per curiam). A motion challenging the adequacy of an expert report shall be granted if the report "does not represent an objective good faith effort to comply" with the statutory definition of an expert report. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l* ) (West 2011). A "good faith effort" is one that (1) provides information sufficient to inform the defendant of the specific conduct called into question and (2) enables the trial court to conclude the claims have merit. *Wright,* 79 S.W.3d at 52.

[4][5] We review a trial court's ruling on a motion to dismiss for an abuse of discretion. *Id.; Goforth v. Bradshaw,* 296 S.W.3d 849, 851 (Tex.App.-Texarkana 2009, no pet.). A trial court abuses its discretion when it acts arbitrarily or unreasonably or without reference to any guiding rules or principles. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003). A trial court has no discretion, however, in correctly analyzing and applying the law. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

## III. Analysis

## A. Shaw's Report is Deficient, but Not Silent, with Respect to Direct Liability Claims

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

388 S.W.3d 314
**(Cite as: 388 S.W.3d 314)**

Texarkana Nursing argues that Shaw's report is silent with respect to the pled claims of direct liability. Texarkana Nursing characterizes the categories of direct negligence listed in the petition as negligence in hiring, staffing levels, supervision of personnel, provision of financial resources, and failing to comply with the Code of Federal Regulations. FN5

FN5. The allegations fall variously under the categories listed in the petition as "Negligence," "Negligence Resulting in Health Care Liability Claims," "Negligence Per Se," and "Violation of Penal Code § 22.04." Pled claims include: the failure to allocate sufficient financial resources to Texarkana Nursing for residents' needs to be met, resulting in the mistreatment, abuse, and neglect of Vest; the failure to use reasonable care in treating residents with the degree of skill and learning ordinarily possessed and used by nursing home facilities in the same or similar locality; the failure to assist all residents, including Vest, in attaining and maintaining the highest practicable level of physical, mental, and psychosocial well-being; the failure to properly supervise nurses and aides; the failure to provide sufficient nurses and aides; the failure to ensure that Vest received timely and accurate care assessments and necessary supervision; various violations of the Code of Federal Regulations; and violation of Section 22.04 of the Texas Penal Code (injury to elderly individual). TEX. PENAL CODE ANN. § 22.04 (West Supp.2012).

Shaw's report states that Vest "was assaulted by Mary Ann Bean, an L.V.N. at the nursing facility, resulting in injuries to Mrs. Vest, including a 1 inch scratch to the forehead, bilateral contusions with swelling to the forehead, left periorbital ecchymosis,**318** and contusion with ecchymosis to the left lower leg." FN6

FN6. Ecchymosis is "[t]he passage of blood from ruptured blood vessels into subcutaneous tissue, marked by a purple discoloration of the skin." *Ecchymosis Definition,* TheFreeDictionary.com, http://www.thefreedictionary.com/ecchymosis (last visited Dec. 10, 2012).

The report includes one paragraph addressing the standard of care, as follows:

The standard of care for a long term care facility and its staff requires that the facility in question provide that level of care and treatment that a reasonable, prudent, similar facility would provide under the same or similar circumstances. The facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being possible. To do so also requires that the nursing facility provide a safe environment for its residents, insofar as it is possible.

Shaw further opines:
In the case of Ms. Vest, Texarkana Nursing and Healthcare Center clearly did not provide a safe and secure environment for its residents, allowing the documented assault of Ms. Vest by one of its own employees. In this regard, Texarkana Nursing and Healthcare Center breached its responsibility to Ms. Vest and her family, resulting in injury to the resident.

Shaw concludes that "Texarkana Nursing and Healthcare Center failed to provide a safe environment for Ms. Vest, resulting in her assault and injury at the hands of an employee of the facility."

**(1) Standard of Care and Breach**
Even though our analysis is confined to the four corners of the report, the report must be read in conjunction with the pleadings to determine if it provides a basis for Lyle's claims. *See Palacios,* 46 S.W.3d at 878. The report states that the applicable standard of care requires Texarkana Nursing to "provide the necessary care and services to attain or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

maintain the highest practicable physical, mental, and psychosocial wellbeing possible." This standard includes, insofar as it is possible, the duty to "provide a safe environment for ... residents." Shaw opines that Texarkana Nursing breached the standard of care by allowing the "documented assault on Ms. Vest by one of its own employees." The resulting injuries are listed in the report.

Texarkana Nursing initially takes issue with Shaw's opinion addressing the need to provide Vest with a "safe environment" because it is not a pled claim. Even though not pled in this precise language, the petition alleges a breach of the nondelegable duty to assist Vest in attaining and maintaining "the highest practicable level of physical, mental, and psychosocial well being." As Shaw opines, the provision of a safe environment is required in order to fulfill this duty. *See Harris Methodist Fort Worth v. Ollie,* 342 S.W.3d 525, 527 (Tex.2011) (per curiam) ("services a [health care provider] provides its patients necessarily include those services required to meet the patients' fundamental needs such as ... safety").

Texarkana Nursing further complains of the inadequacy of the stated standard of care, because it does not indicate what Texarkana Nursing should have done differently, citing *Russ v. Titus Hospital District,* 128 S.W.3d 332, 341–42 (Tex.App.-Texarkana 2004, pet. denied) ("[w]hether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently") (quoting *Palacios,* 46 S.W.3d at 880).[FN7] In other words, one must be able to determine from the report what was required by the standard of care. This requires "specific information about what the defendant should have done differently." *Palacios,* 46 S.W.3d at 880. Here, we have a generic statement that the nursing facility must provide a safe environment. Texarkana Nursing maintains this is insufficient.

> FN7. *Russ* involved an allegedly deficient report regarding a hospital's duty to keep a suicidal patient from injuring herself. In that case, the patient sustained injuries from a fall out of a hospital window. This Court held that the statement "that windows [must] either be secured with metal screens that only staff can open, or be locked" or, "[i]f the patient has access to the window, a special difficult to break glass or Plexiglass should be used" was sufficient to apprise the hospital of what it should have done differently in light of the fact that the hospital placed the patient in a fourth-floor room with unlocked windows. *Russ,* 128 S.W.3d at 342.

Conversely, Lyle contends that the report meets the criteria set out in Chapter 74. According to Lyle, the report sets forth the standard of care, requiring the facility to provide the level of care and services necessary for Vest to maintain and attain the highest level of well-being possible, thus necessitating the provision of an environment safe for residents. Lyle defends the breach and causation sections of the report in reliance on *UHS of Timberlawn, Inc. v. S.B. ex rel. A.B.,* 281 S.W.3d 207 (Tex.App.-Dallas 2009, pet. denied). In that case, a thirteen-year-old patient at Timberlawn's psychiatric treatment facility was placed in a ward with male patients, where one of them allegedly raped her. The patient claimed her injuries were proximately caused by the negligence of Timberlawn's employees and submitted an expert report in support of her claims. Timberlawn claimed the report was inadequate and conclusory on the issue of causation. This complaint was based on the premise that the expert did not opine that the patient was actually raped, and, thus, could not identify the alleged causal relationship between Timberlawn's alleged negligence and the patient's injury. In rejecting this premise, the court distinguished health care liability claims in which "the 'injury, harm, or damages claimed' flow from the existence of a medical condition that itself resulted from the breach of the applicable standard of care." *Id.* at 212. In such a case,

[I]dentifying the causal relationship between the alleged breach of the standard of care and the resulting harm involves not only an explanation as to how the standard of care was breached, but also how the breach gave rise to the new, deleterious medical condition. Similarly, other healthcare liability claims may allege that a breach of the applicable standard of care exacerbated a pre-existing medical condition, or hindered or prevented the effective treatment of such a condition. Identifying the "breach/injury" causal relationship in these cases may well require an expert to opine as to the existence, extent, and prognosis of the pre-existing medical condition, as well as how the alleged breach of the standard of care aggravated such a condition, impeded or prohibited its treatment, and otherwise affected the patient's prognosis.

However, S.B.'s claim is different. S.B. alleges that, as a result of Timberlawn's failure to meet the applicable standards of care relevant to its treatment of her, she was raped. Rape is not a medical condition. It is an assault. Moreover, rape may—or may not—be accompanied by medically ascertainable evidence of physical trauma, or even physical evidence that it occurred.

**\*320** *Id.* The court, therefore, declined to hold that the causation element of the report was required to include an opinion that the patient was in fact raped. *Id.*

This case is different from *Timberlawn* inasmuch as Texarkana Nursing is not claiming that the report fails to state that Vest was, in fact, assaulted. There is no dispute that Vest was assaulted; the assault was photographically documented.[FN8] Instead, Texarkana Nursing claims the mere statement that it failed to provide a safe environment is an insufficient statement of the breach of the standard of care, because it does not indicate what should have been done differently. In contrast, the *Timberlawn* report stated that housing the patient

FN8. Shaw's report indicates he reviewed

the following records in conjunction with issuing his report:

> 1) Nursing Home Records from Texarkana Nursing and Healthcare Center

> 2) Affidavit from the Texas Board of Nursing

> 3) Offense Report by Officer Steven G. Womack

> 4) Pictures of Mrs. Vest taken by her daughter

> 5) Arrest Report of Mary Elliott Bean.

in the male unit exposed [the patient] to harm which resulted in her self reported rape. Had [S.B.] been housed in a safe and appropriate manner, given her propensity for sexual victimization, she would not have been placed in a male unit. By being housed in a male unit it was foreseeable that [S.B.] would be exposed to and was at higher risk for the exact self reported harm which she suffered....
*Id.* at 214. The report made clear the specific conduct called into question and provided a sufficient basis for the trial court to conclude that the claim had merit. *Id.* at 215.

In this case, however, the report indicates that Texarkana Nursing failed to provide "a safe and secure environment for its residents, allowing the documented assault of Ms. Vest by one if its own employees." In other words, the assault itself is the breach of the standard of care, which requires the provision of a safe and secure environment for nursing home residents. This statement does not, however, advise Texarkana Nursing of what should have been done in order to prevent its employee from assaulting Vest.

The question boils down to one of how much detail is needed in order for an expert report to withstand Chapter 74 scrutiny when the harm alleged arises from assaultive conduct. Lyle points to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Christus Spohn Health System Corp. v. Sanchez,* 299 S.W.3d 868 (Tex.App.-Corpus Christi 2009, pet. denied),* in support of her contention that the report is sufficient. *Sanchez* involved an action against a hospital and hospital employees in their individual capacities for assault and intentional infliction of emotional distress. Sanchez was an I.C.U. patient when a registered nurse and a certified nurse's assistant allegedly entered her room and made unwanted sexual advances toward her. Sanchez alleged that one of the men undressed her and exposed her body for the other to see. She further claimed that they turned her over using their hands instead of a turning pad and, while they were moving her from the bed to a chair in her room, they danced with her. Sanchez alleged that during these physical contacts, the nurse and nurse's assistant made sexual overtures and comments and that the improper conduct continued until she was discharged from the hospital a few days later. *Id.* at 872.

**\*321** Sanchez sued the hospital for negligent hiring, supervision, training, and retention of its employees and vicarious liability for the conduct of its employees. Relevant to this case, Sanchez's expert report was attacked on the basis that it did not adequately set forth the standard of care and/or safety and breach because the report was alleged to be conclusive and speculative. *Id.* at 877. Spohn further argued that the report failed to provide specific information about what it should have done differently. The report stated, in relevant part, that the "standard of care requires that the hospital and its nursing staff provide adequate supervision to their certified nursing assistants and licensed nursing personnel." The report further stated that the "standard of care requires that the hospital and its nursing staff protect their patients from sexual harassment and abuse." *Id.*

The court concluded that the report identified the care that was expected, but not rendered under the applicable standard of care, because it states the hospital "[f]ailed to provide adequate supervision to the [certified nurse's assistant] and the [registered nurse]," "[f]ailed to protect Ms. Sanchez from sexual harassment and sexual abuse," and "[f]ailed to provide safety to Ms. Sanchez in her immediate post operative [sic] when the [certified nurse's assistant] lifted Ms. Sanchez up and began dancing with her." *Id.* The court found that this report put the hospital on notice of the specific, complained-of conduct. *Id.*

In this case, unlike *Sanchez,* the report simply states that Texarkana Nursing failed to provide a safe and secure environment for Vest. In *Sanchez,* however, the report stated that the hospital was required to provide adequate supervision of its certified nursing assistants and licensed nursing personnel, to protect its patient from sexual harassment and abuse, and to keep the patient safe. Granted, this is not much more detail than we have in this case, but *Sanchez* may be close to the line of what is permissible.

For example, *Baylor All Saints Medical Center v. Martin,* 340 S.W.3d 529 (Tex.App.-Fort Worth 2011, no pet.),* involved an alleged sexual assault on a patient in her hospital room.[FN9] The hospital objected to the sufficiency of the patient's expert report. The report in question articulates the standard of care as follows:

> FN9. The *Martin* opinion does not indicate whether the assault was committed by a hospital employee, another patient, or some other third party.

A hospital such as Baylor All Saints Medical [C]enter is expected to adhere to specific standards of care in regard to all of its patients. A bedrock principal [sic] in providing care to its patients is the understanding that all of a hospital's patients by nature of their disease or injury are potentially vulnerable and necessarily need to receive treatment in a safe and secure environment. The Joint Commission on Accreditation of Health Care Organizations (JCAHO) has established in its Hospital Standards that all healthcare organiz-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ations must have in place policies which safeguard patients from assault by hospital staff and by strangers that enter the hospital. The JCAHO requires that hospitals adequately implement these standards, and monitor this implementation. The JCAHO patient security and safety expectations would require at a minimum that hospitals should employ a sufficient number of security personal [sic] to insure that no unauthorized persons enter patients ['] rooms and physically assault their patients. Additionally, the JCAHO standards would expect that all hospital staff should be trained to identify **322** persons that are not authorized to enter patients['] rooms and should monitor and prevent unauthorized persons from having access to patients receiving treatment at the hospital.

*Id.* at 533–34. The court determined this to be an insufficient statement of the standard of care. For example, the report stated that there must be policies in place to safeguard patients from assault, including employing a sufficient number of security personnel. The court wrote that this statement failed to indicate what specific policies and safeguards should have been in place. Further, the " 'policies in place to safeguard patients' are not identified." *Id.* at 534. The number of security personnel needed and the training the staff should have received is not described. *Id.* This report failed in light of the required standard, i.e., "what an ordinary prudent hospital would do under the same or similar circumstances," and "even a fair summary must set out what care was expected." *Id.* (citing *Palacios,* 46 S.W.3d at 880).FN10

> FN10. The court also addressed Martin's claim that the report was all that could be done at the time in light of the fact that Section 74.351(s) only allows discovery of medical records and billing records, which do not contain the circumstances surrounding the assault and hence provide no discovery as to whether security standards were met. The court wrote that this was a

misreading of the discovery allowed under Section 74.351(s). Because assaults in health care settings are covered by Section 74.351, said the court (*Martin,* 340 S.W.3d at 534 (citing *Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 851 (Tex.2005))), logically, discovery of the hospital's policies and procedures regarding the protection of patients from assault must be covered by Section 74.351(s). *Martin,* 340 S.W.3d at 534.

*Kingwood Pines Hospital, LLC v. Gomez,* 362 S.W.3d 740 (Tex.App.-Houston [14th Dist.] 2011, no pet.), further illustrates the need for detail when an expert offers opinions regarding patient safety. In that case, a patient of Kingwood Pines Hospital was sexually assaulted by another patient. Gomez offered an expert report indicating a failure "to ensure that there were appropriately trained and adequate staffing and millieu structure such that a young girl ... would not be sexually molested." The report stated that the standard of care was breached when the physician failed to insure her patient's safety using "any of the number of measures available," by failing to "provide additional supervision" and not affording the patient "the most basic supervision." *Id.* at 750. The report further indicated that (the physician) was required "to insure her patients are being treated in a safe and secure environment by being aware of the environment, patient population, and safety measures taken by the hospital." *Id.* at 749. In concluding the report was conclusory, the court noted that it did not provide information about how the physician was to insure that the hospital was adequately staffed and that staff members were appropriately trained or what measures were available to insure the patient's safety. Further, the report did not indicate what kind of supervision by the hospital was sufficient to provide a secure environment for the patient. *Id.* at 750.

[6] In this case, the only direct negligence claim addressed in Shaw's report is that of failing to provide Vest with a safe and secure environment.

Because the report fails to articulate what Texarkana Nursing should have done differently to prevent the assault, it is deficient with respect to articulation of the standard of care and its breach.

### (2) Causation

Texarkana Nursing further contends that Shaw's report is deficient in that it **\*323** fails to set forth the causal relationship between Texarkana Nursing's alleged deviations from the standard of care and Vest's injuries. The report does, however, indicate that Texarkana Nursing breached its responsibility to Vest in allowing the documented assault of Vest by one of its own employees, resulting in injury to Vest. The resulting injuries are described. Lyle maintains that this is a sufficient statement of causation under *Timberlawn.* After all, assault is not a medical condition. Conversely, if the report is not sufficiently detailed in its statement of the standard of care and breach, and, thus, fails to advise Texarkana Nursing of what it should have done differently to provide a safe and secure environment for Vest, then it logically follows that causation should be described in terms of the specific shortcomings that created a situation in which assault could occur.

### B. Deficiencies Regarding Direct Liability Are Curable

[7] Texarkana Nursing contends that because the report does not address the pleaded cause of action, it does not constitute a good-faith effort to comply with the statutory requirements and should, therefore, be dismissed in reliance on *Windsor v. Maxwell,* 121 S.W.3d 42, 51 (Tex.App.-Fort Worth 2003, pet. denied) (to inform defendant of specific conduct plaintiff has called into question, report must support cause of action alleged by plaintiff in its pleadings). Here, as previously discussed, the report does address the claim that Texarkana Nursing had a duty to assist Vest in attaining and maintaining "the highest practicable level of physical, mental, and psychosocial well being." Implicit in this duty is the provision of a safe and secure environment. *See Harris Methodist Fort Worth,* 342

S.W.3d at 527. The report, albeit in a conclusory manner, addresses this claim.

Because the report is deficient with respect to Lyle's direct liability claim regarding the failure to provide a safe and secure environment for Vest, the trial court should be permitted the opportunity to consider whether to grant a thirty-day extension to cure the deficiencies. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c) (West 2011); [FN11] *Leland v. Brandal,* 257 S.W.3d 204, 207 (Tex.2008); *Longino v. Crosswhite,* 183 S.W.3d 913, 918 n. 2 (Tex.App.-Texarkana 2006, no pet.); *see also Scoresby v. Santillan,* 346 S.W.3d 546, 549 (Tex.2011) (trial court should err on side of granting additional time and must grant it if deficiencies are curable). [FN12] Because at least three of Lyle's direct liability claims necessarily relate to the provision of a safe environment, they are not completely unaddressed, and we decline to find that such claims should be dismissed. [FN13] *See* **\*324** *Querry v. Sanders,* No. 06–08–00099–CV, 2009 WL 1097904, at \*7 (Tex.App.-Texarkana Apr. 24, 2009, no pet.) (mem. op.) (report which wholly failed to address alleged negligence in failing to properly identify and isolate main bile duct before initiating main procedure not curable deficiency).

> FN11. Section 74.351 of the Texas Civil Practice and Remedies Code states, "If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the Court may grant one 30–day extension to the claimant in order to cure the deficiency." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c).

> FN12. *Scoresby* involved a letter report that failed to state the standard of care but implied that it was inconsistent with the physicians' conduct. Even so, the report contained the opinion of an individual with expertise that the claim had merit and implicated the defendants' conduct. This minimal standard is met here as well. The re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

388 S.W.3d 314
**(Cite as: 388 S.W.3d 314)**

port is written by an individual with expertise, implicates the conduct of Texarkana Nursing, and indicates that the claim has merit. *Scoresby,* 346 S.W.3d at 557.

> FN13. Lyle alleges that Texarkana Nursing was negligent in terms of hiring, staffing levels, supervision of personnel, provision of financial resources, and in failing to comply with the Code of Federal Regulations.

### C. Shaw's Report Fails to Address Vicarious Liability Claims

[8] Lyle's petition alleges that Texarkana Nursing has "vicarious liability for the acts and omissions of all persons or entities under their control, either directly or indirectly, including employees, agents, consultants, and independent contractors, whether in-house or outside entities, individuals, agencies, or pools causing or contributing to the injuries of BETTY RUTH VEST." "When a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient." *Gardner v. U.S. Imaging, Inc.,* 274 S.W.3d 669, 671–72 (Tex.2008) (per curiam). Thus, if the report identifies conduct by Texarkana Nursing's employee, Texarkana Nursing is implicated. As long as the report adequately addresses the standard of care applicable to the employee, how the employee breached the standard of care, and that the breach caused the plaintiff's injury, it is sufficient as against Texarkana Nursing to satisfy the expert report requirement for the vicarious liability claims. *See RGV Healthcare Assocs., Inc. v. Estevis,* 294 S.W.3d 264, 273 (Tex.App.-Corpus Christi 2009, pet. denied).

Lyle pled that the staff of Texarkana Nursing did not provide Vest with timely and accurate care assessments and necessary supervision; failed to use reasonable care in treating residents with the degree of skill and learning ordinarily possessed and used by nursing home facilities in the same or similar locality; failed to assist residents (including Vest) in attaining and maintaining the highest practicable level of physical, mental, and psychosocial well-being; failed to meet the applicable standards of care; violated their duty of care to Vest through mistreatment, abuse and neglect; and violated Section 22.04 of the Texas Penal Code (injury to elderly individual). Shaw's report is silent with respect to each of these claims, with the exception of assaultive conduct and mistreatment. The report identifies conduct by Texarkana Nursing's employee—the alleged assault on Vest. The report fails, however, to identify the standard of care, breach of the standard of care, or causation.

[9] The only statement regarding the standard of care in the entire report regarding the staff is: "The standard of care for a long term care facility *and its staff* requires that the facility in question provide that level of care and treatment that a reasonable, prudent, similar facility would provide under the same or similar circumstances." (Emphasis added.) The report says nothing regarding the breach of the standard of care by the staff or how that breach caused Vest's injuries. While the underlying nature of the vicarious liability claim rests in the intentional acts of Bean, which appear to be unrelated to the rendition of health care, Lyle's pleading alleges her claims fall within the purview of Chapter 74.FN14 We must, therefore, analyze **\*326** them as such. *See Giron v. Baylor Univ. Med. Ctr.,* No. 05–09–00825–CV, 2011 WL 149981, at \*2 (Tex.App.-Dallas Jan. 19, 2011, pet. denied) (mem. op.) (when Giron chose to proceed under Chapter 74 and plead her cause of action as health care liability claim, she bound herself to statutory requirements).

> FN14. Recently, the Texas Supreme Court decided *Loaisiga v. Cerda,* 379 S.W.3d 248 (Tex.2012). *Loaisiga* was not decided until after the appellant's brief was filed here and well after the hearing in the trial court. In *Loaisiga,* two female patients sued a medical doctor, the professional as-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

sociation bearing his name, and a clinic alleging the doctor assaulted them by groping their breasts while examining them for sinus and flu symptoms. *Id.* at 253. The patients served the doctor and professional association with reports from a physician who, based on the assumption that the allegations in the plaintiffs' pleadings were true, opined that the doctor's alleged actions did not fall within any appropriate standard of care. The defendants argued that the claims were health care liability claims and moved for dismissal on the basis that the reports were deficient. The trial court denied the motions. The court of appeals held that the claims were not health care liability claims and that expert reports were not required and affirmed the trial court's order without considering the report's adequacy. *Id.* at 254. The high court recognized a presumption:

> The breadth of the statute's text essentially creates a presumption that a claim is an HCLC if it is against a physician or health care provider and is based on facts implicating the defendant's conduct during the course of a patient's care, treatment, or confinement. *See [Marks v. St. Luke's Episcopal Hosp.,* 319 S.W.3d 658, 662 (Tex.2010) ]. But the presumption is necessarily rebuttable. In some instances the only possible relationship between the conduct underlying a claim and the rendition of medical services or healthcare will be the healthcare setting (i.e., the physical location of the conduct in a health care facility), the defendant's status as a doctor or health care provider, or both.

*Id.* at 256. Following a discussion of the statute's requirement that claimants in health care liability claims file expert reports, the high court wrote:

> [W]e fail to see how the Legislature could have intended the requirement of an expert report to apply under circumstances where the conduct of which a plaintiff complains is wholly and conclusively inconsistent with, and thus separable from, the rendition of "medical care, or health care, or safety or professional or administrative services directly related to health care" even though the conduct occurred in a health care context. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(13); *see also* TEX. GOV'T CODE ANN. § 311.021 ("In enacting a statute, it is presumed that ... a just and reasonable result is intended....").

*Id.* at 257.

The court then listed three factors that must be reflected in the record in order for an assault claim against a medical or health care provider *not* to be considered a health care liability claim:

> [A] claim against a medical or health care provider for assault is not an HCLC if the record conclusively shows that (1) there is no complaint about any act of the provider related to medical or health care services other than the alleged offensive contact, (2) the alleged offensive contact was not pursuant to actual or implied consent by the plaintiff, and (3) the only possible relationship between the alleged offensive contact and the rendition of medical services or healthcare was the setting in which the act took place.

*Id.*

In determining whether a claim is subject to the Texas Medical Liability Act's (TMLA) expert report requirements, the

trial court is not limited to the four corners of the expert report; instead, the trial court should consider the entire record, including pleadings, motions and responses, and relevant evidence properly admitted. *Id.* at 258. In *Loaisiga,* the court noted a lack of information to give context to the physician's actions during the examinations, such as medical records, reports, and other information regarding the plaintiffs' symptoms and complaints to the physician. This lack of information prevented the plaintiffs from conclusively showing that "the only relationship between the alleged touching of their breasts and Dr. Loaisiga's rendition of medical services was the physical location of the examination...." *Id.* at 259. The court went on to say that

because we are clarifying the standard for whether claims are subject to the TMLA's expert report requirements and the plaintiffs maintain that theirs are not, we conclude it is appropriate to remand the case to the trial court for further proceedings regarding that issue. *See Low v. Henry,* 221 S.W.3d 609, 621 (Tex.2007) (remanding "to allow the parties to present evidence responsive to our guidelines").

*Id.* at 260.

In light of *Loaisiga,* this Court questioned whether to remand the case to the trial court for a determination of whether or not Lyle's claim is, in fact, a health care liability claim. However, in *Loaisiga,* the plaintiffs maintained that their claims were not health care liability claims. Here, Lyle has represented to this Court that her claims are health care liability claims, and, in oral argument, Lyle's counsel stated it was not her wish to remand the case to the trial court for a

determination of whether her claims are subject to the TMLA's expert report requirements.

[10] The lone statement regarding the standard of care applicable to the staff of Texarkana Nursing fails to specify what is required of a reasonable and prudent staff under the same or similar circumstances. This statement is not a fair summary of Shaw's opinions regarding the standard of care for the Texarkana Nursing staff. The mere recitation of a legal standard, in the absence of specific facts applicable to this case, is not a good-faith effort to articulate the standard of care. *See Lira v. Cerna,* No. 08–01–00250–CV, 2002 WL 1767569, at *6 (Tex.App.-El Paso Aug. 1, 2002, no pet.) (not designated for publication) (The statement that "[t]he standard of care requires that a physician provide that level of care which a reasonable prudent physician would provide in the same or similar circumstances" does not demonstrate good-faith effort to provide fair summary of expert's opinions and does not identify standard of care.); *see also Hood v. Phillips,* 554 S.W.2d 160, 165 (Tex.1977) (holding that legal standard for medical profession is "reasonable and prudent" physician "under the same or similar circumstances"). Moreover, the report is silent regarding the breach of the standard of care and causation. Because the standard of care applicable to the staff is not identified, and because breach and causation are not addressed, these deficiencies are not curable. Lyle's vicarious liability claims should, therefore, have been dismissed by the trial court.

## IV. Conclusion

Because the report is deficient with respect to Lyle's direct liability claim regarding the failure to provide a safe and secure environment for Vest, we remand this claim to the trial court to consider whether to grant a thirty-day extension to cure these deficiencies.

Shaw's report is silent with respect to the standard of care, breach, and causation regarding her vicarious liability claims. Because these deficiencies

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

388 S.W.3d 314
**(Cite as: 388 S.W.3d 314)**

are not curable, Lyle's vicarious liability claims are dismissed.

Tex.App.–Texarkana,2012.
Texarkana Nursing & Healthcare Center, LLC v. Lyle
388 S.W.3d 314

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



371 S.W.3d 171, 55 Tex. Sup. Ct. J. 1033
**(Cite as: 371 S.W.3d 171)**

▷

Supreme Court of Texas.
TEXAS WEST OAKS HOSPITAL, LP and Texas Hospital Holdings, LLC, Petitioners,
v.
Frederick WILLIAMS, Respondent.

No. 10–0603.
Argued Nov. 8, 2011.
Decided June 29, 2012.

**Background:** Estate of psychiatric patient brought health care liability claim (HCLC) against hospital and hospital's employee who was involved in physical altercation with patient that resulted in patient's death and injuries to employee. Employee brought cross-claim of negligence against hospital, which was a nonsubscriber to workers' compensation scheme. The 234th District Court, Harris County, Reese Rondon, J., denied hospital's motion to dismiss employee's cross-claim as an HCLC subject to expert-report requirements. Hospital brought interlocutory appeal. The Court of Appeals, 322 S.W.3d 349,Leslie B. Yates, J., affirmed. Hospital filed petition for review.

**Holdings:** The Supreme Court, Wainwright, J., held that:
(1) employee was a "claimant" under the Texas Medical Liability Act (TMLA);
(2) negligence claim was based on alleged departures from accepted standards of health care and of safety and was therefore an HCLC;
(3) if expert medical or health care testimony is necessary to prove or refute the merits of claim against a physician or health care provider, claim is an HCLC;
(4) to qualify as an HCLC, a claim that is based on departures from accepted standards of safety need not be directly related to health care, abrogating *St. David's Healthcare P'ship, L.P. v. Esparza,* 315 S.W.3d 601; *Appell v. Muguerza,* 329 S.W.3d 104;
(5) interpreting hospital employee's action as an HCLC did not conflict with exclusive-remedy provisions of Texas Workers' Compensation Act (TWCA), as hospital

was a nonsubscriber to workers' compensation insurance; and
(6) aside from claims alleging negligent medical care or health care, a claim need not involve a patient-physician relationship for it to be an HCLC.

Judgment of Court of Appeals reversed; case remanded with instructions.

Lehrmann, J., filed a dissenting opinion, in which Medina and Willett, JJ., joined.

West Headnotes

**[1] Health 198H ⬚800**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk800 k. In general. Most Cited Cases
Causes of action that are health care liability claims (HCLCs) cannot be transmuted to avoid the strictures of the medical liability statute. V.T.C.A., Civil Practice & Remedies Code § 74.001 et seq.

**[2] Appeal and Error 30 ⬚893(1)**

30 Appeal and Error
    30XVI Review
        30XVI(F) Trial De Novo
            30k892 Trial De Novo
                30k893 Cases Triable in Appellate Court
                    30k893(1) k. In general. Most Cited Cases

**Health 198H ⬚800**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk800 k. In general. Most Cited Cases
The nature of health care liability claims (HCLCs) that the Legislature intended to include under the umbrella of the Texas Medical Liability Act (TMLA) is a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

371 S.W.3d 171, 55 Tex. Sup. Ct. J. 1033
**(Cite as: 371 S.W.3d 171)**

matter of statutory construction, a legal question that appellate court reviews de novo. V.T.C.A., Civil Practice & Remedies Code § 74.001(a)(13).

**[3] Statutes 361 ☞1072**

361 Statutes
  361III Construction
    361III(A) In General
      361k1071 Intent
        361k1072 k. In general. Most Cited Cases
(Formerly 361k181(1))

**Statutes 361 ☞1091**

361 Statutes
  361III Construction
    361III(B) Plain Language; Plain, Ordinary, or Common Meaning
      361k1091 k. In general. Most Cited Cases
(Formerly 361k188)

In construing a statute, court's aim is to determine and give effect to the legislature's intent, and court begins with the plain and common meaning of the statute's words.

**[4] Health 198H ☞804**

198H Health
  198HV Malpractice, Negligence, or Breach of Duty
    198HV(G) Actions and Proceedings
      198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

With the exception of medical care and health care claims, court's focus in determining whether claims are health care liability claims (HCLCs) falling under Texas Medical Liability Act (TMLA) and its expert-report requirements is not the status of the claimant, but the gravamen of the claim or claims against the health care provider. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(10, 13, 19), 74.351(a, b).

**[5] Health 198H ☞804**

198H Health
  198HV Malpractice, Negligence, or Breach of Duty
    198HV(G) Actions and Proceedings

      198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Though not a patient, psychiatric technician and professional caregiver who was employed at private mental health hospital was a "claimant" under Texas Medical Liability Act (TMLA) in context of determining whether negligence claim he asserted against hospital for injuries sustained in physical altercation with patient was a health care liability claim (HCLC) subject to TMLA's expert-report requirements. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(2, 13), 74.351(a, b).

**[6] Health 198H ☞800**

198H Health
  198HV Malpractice, Negligence, or Breach of Duty
    198HV(G) Actions and Proceedings
      198Hk800 k. In general. Most Cited Cases

A health care liability claim (HCLC) under the Texas Medical Liability Act (TMLA) contains three basic elements: (1) a physician or health care provider must be a defendant; (2) the claim or claims at issue must concern treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's act or omission complained of must proximately cause the injury to the claimant. V.T.C.A., Civil Practice & Remedies Code § 74.001(a)(13).

**[7] Health 198H ☞804**

198H Health
  198HV Malpractice, Negligence, or Breach of Duty
    198HV(G) Actions and Proceedings
      198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Negligence claim that was brought against private mental health hospital by its employee, a mental health professional, to recover for injuries from altercation with psychiatric patient was based on alleged departures from accepted standards of health care and, therefore, was a "health care liability claim" ("HCLC") subject to expert-report requirements of Texas Medical Liability Act (TMLA); employee alleged he was acting on pro-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

fessional judgments of a physician about patient's care and treatment, and that the physician's judgments and the hospital's additional professional judgments about safety protocols departed from accepted standards of care and caused employee's injury. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(13), 74.351(a, b).

**[8] Health 198H** ☞**804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
     198HV(G) Actions and Proceedings
       198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

In order for a claim based on departures from accepted standards of health care to constitute a health care liability claim (HCLC) subject to expert-report requirements of Texas Medical Liability Act (TMLA), there must a nexus between the standard departed from and the alleged injury. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(13), 74.351(a, b).

**[9] Health 198H** ☞**800**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
     198HV(G) Actions and Proceedings
       198Hk800 k. In general. Most Cited Cases

If expert medical or health care testimony is necessary to prove or refute the merits of claim against a physician or health care provider, the claim is a "health care liability claim" ("HCLC") under the Texas Medical Liability Act (TMLA). V.T.C.A., Civil Practice & Remedies Code § 74.001(a)(13).

**[10] Health 198H** ☞**800**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
     198HV(G) Actions and Proceedings
       198Hk800 k. In general. Most Cited Cases

**Health 198H** ☞**821(5)**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty

198HV(G) Actions and Proceedings
     198Hk815 Evidence
       198Hk821 Necessity of Expert Testimony
         198Hk821(5) k. Particular procedures. Most Cited Cases

Expert testimony was required to support negligence claim by hospital employee, a mental health professional, against hospital in connection with injuries sustained in altercation with psychiatric patient, thus making claim a "health care liability claim" ("HCLC") under the Texas Medical Liability Act (TMLA); at its core, caregiver's dispute with hospital was over the appropriate standards of care owed to employee in treating and supervising a psychiatric patient at the mental hospital, what services, protocols, supervision, monitoring and equipment were necessary to satisfy the standard, and whether such specialized standards were breached. V.T.C.A., Civil Practice & Remedies Code § 74.001(a)(13).

**[11] Health 198H** ☞**804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
     198HV(G) Actions and Proceedings
       198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

Negligence claim by hospital employee, a mental health professional, against hospital in connection with injuries sustained in altercation with psychiatric patient would not be considered a health care liability claim (HCLC) subject to expert-report requirements of Texas Medical Liability Act (TMLA) on bare basis that claim mirrored HCLC claims of patient's estate against hospital that stemmed from same fact pattern, though employee's claim qualified as an HCLC on other grounds; employee and patient's estate stood as separate claimants. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(2, 13), 74.351(a, b).

**[12] Health 198H** ☞**804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
     198HV(G) Actions and Proceedings
       198Hk804 k. Affidavits of merit or meritori-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ous defense; expert affidavits. Most Cited Cases

Negligence claim asserted by hospital employee, a mental health professional, against hospital in connection with injuries sustained in altercation with psychiatric patient implicated alleged departures from accepted standards of safety and therefore qualified as a health care liability claim (HCLC) subject to the expert-report requirements of the Texas Medical Liability Act (TMLA); claim was predicated on the monitoring and restraint of violent, schizophrenic patients. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(2, 13), 74.351(a, b).

**[13] Health 198H ☞804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

To qualify as a health care liability claim (HCLC) subject to expert-report requirements of Texas Medical Liability Act (TMLA), a claim that is based on departures from accepted standards of safety need not be directly related to health care; abrogating *St. David's Healthcare P'ship, L.P. v. Esparza,* 315 S.W.3d 601; *Appell v. Muguerza,* 329 S.W.3d 104. V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(13), 74.351(a, b).

**[14] Statutes 361 ☞1161**

361 Statutes
   361III Construction
      361III(E) Statute as a Whole; Relation of Parts to Whole and to One Another
         361k1161 k. Relative and qualifying terms and provisions, and their relation to antecedents. Most Cited Cases
   (Formerly 361k196)

Under the "last antecedent doctrine" of statutory interpretation, a qualifying phrase should be applied only to the portion of the sentence immediately preceding it.

**[15] Health 198H ☞804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

**Workers' Compensation 413 ☞2084**

413 Workers' Compensation
   413XX Effect of Act on Other Statutory or Common-Law Rights of Action and Defenses
      413XX(A) Between Employer and Employee
         413XX(A)1 Exclusiveness of Remedies Afforded by Acts
           413k2084 k. In general. Most Cited Cases

Interpreting hospital employee's negligence claim against hospital, brought to recover for on-the-job injuries sustained in altercation with psychiatric patient, as a health care liability claim (HCLC) subject to the expert-report requirements of the Texas Medical Liability Act (TMLA) did not conflict with exclusive-remedy provisions of Texas Workers' Compensation Act (TWCA), where hospital was a nonsubscriber to workers' compensation insurance. V.T.C.A., Labor Code §§ 406.002, 406.031(a), 406.033, 408.001(a); V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(13), 74.351(a, b).

**[16] Workers' Compensation 413 ☞11**

413 Workers' Compensation
   413I Nature and Grounds of Employer's Liability
      413k11 k. Purpose of legislation. Most Cited Cases

In providing the worker a form of prompt remuneration for loss of earning capacity, the statutory workers' compensation scheme is in lieu of common law liability based on negligence. V.T.C.A., Labor Code § 406.001 et seq.

**[17] Health 198H ☞804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Aside from claims alleging negligent medical care or health care, a claim need not involve a patient-physician relationship for it to be a health care liability claim (HCLC) subject to expert-report requirements of Texas Medical Liability Act (TMLA). V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(13), 74.351(a, b).

**[18] Health 198H ⟜807**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
     198HV(G) Actions and Proceedings
       198Hk807 k. Notice. Most Cited Cases

Purpose of the notice-of-suit and medical-records-release provisions of the Texas Medical Liability Act (TMLA) is to encourage the parties to negotiate and settle disputes prior to suit. V.T.C.A., Civil Practice & Remedies Code §§ 74.051(a, d), 74.052.

**\*174** Ryan Lee Clement, Wesson H. Tribble, Tribble, Ross & Wagner, Houston, TX, for Texas West Oaks Hospital, LP.

Charles M. Hessel, Marks Balette & Giessel, P.C., Robert Steven Kwok, William Wade Hoke, Robert Kwok & Associates, Leah Rush Easterby, Houston, TX, for Frederick Williams.

Justice WAINWRIGHT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice GREEN, Justice JOHNSON, and Justice GUZMAN joined.

At issue in this interlocutory appeal is whether the claims of an employee against his employer, both of whom are health care providers, alleging injuries arising out of inadequate training, supervision, risk-mitigation, and safety in a mental health facility, constitute health care liability claims (HCLCs) under the Texas Medical Liability Act (TMLA or Act). *See* TEX. CIV. PRAC. & REM.CODE ch. 74 *et seq.* We conclude that the TMLA does not require that the claimant be a patient of the health care provider for his claims to fall under the Act, so long as the Act's other requirements are met. We hold that the employee here is properly characterized as a "claimant" under the Act and his allegations against his nonsubscribing employer are health care and safety claims under the TMLA's definition of HCLCs, requiring an expert report to maintain his lawsuit. We further hold that the Act does not conflict with the Texas Workers' Compensation Act (TWCA). We therefore reverse the judgment of the court of appeals.

## I. Background

Texas West Oaks Hospital, LP and Texas Hospital Holdings, LLC operate Texas West Oaks Hospital (West Oaks), a state-licensed, private mental health hospital located in Houston, Texas. Frederick**\*175** Williams, a psychiatric technician and professional caregiver at West Oaks, was injured on the job while supervising a patient, Mario Vidaurre. Vidaurre was admitted to West Oaks on June 11, 2007. Due to his history of paranoid schizophrenia, including manic outbursts and violent behavior directed at family members and professional staff, Vidaurre was placed by his admitting physician on one-to-one observation, an elevated level of supervised care in the psychiatric unit. Vidaurre was also put on "unit restriction," meaning he could only be taken out of the psychiatric unit by direct order of a physician. A few days after Vidaurre's admission, while Williams was supervising him, Vidaurre became agitated. To calm him, Williams took Vidaurre to an outdoor enclosed smoking area, in violation of the unit-restriction policy. The door to the enclosure locked behind them and the unsupervised area contained no cameras, audio supervision, mirrors, or other monitoring apparatus. Although Williams previously had taken Vidaurre to the smoking area without incident, a physical altercation occurred on this occasion, resulting in Vidaurre's death and injuries to Williams.

Vidaurre's estate sued West Oaks, and later Williams, asserting HCLCs under the TMLA, codified in Chapter 74 of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM.CODE §§ 74.001 – 74.507. Williams later asserted cross claims of negligence against West Oaks pursuant to section 406.033 of the Texas Labor Code, a statutory provision governing employee common law claims against employers not subscribed to workers' compensation. *See* TEX.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

LAB.CODE § 406.033. West Oaks' status as a nonsubscriber to workers' compensation is uncontroverted, and therefore, Williams' claims against his employer are not barred by the Texas Workers' Compensation Act. *See id.; Port Elevator–Brownsville, L.L.C. v. Casados,* 358 S.W.3d 238, 241 (Tex.2012) (discussing the "exclusive remedy" doctrine).

Williams alleged that West Oaks was negligent in:

(a) Failing to properly train Williams to work at West Oaks' premises, including warning him of the inherent dangers of working with patients with the conditions and tendencies that Mario Vidaurre possessed; (b) Failing to adequately supervise West Oaks' employees, including Williams, while working with patients with conditions and tendencies that Mario Vidaurre possessed; (c) Failing to provide adequate protocol to avoid and/or decrease the severity of altercations between its employees, such as Williams, and patients; (d) Failing to provide its employees, including Williams, with adequate emergency notification devices to alert other employees of altercations in which assistance is needed; (e) Failing to warn Williams of the dangers that West Oaks knew or should have known were associated with working with patients such as Mr. Vidaurre; and (f) Failing to provide a safe workplace for its employees, including Williams.

West Oaks filed a motion to dismiss on the grounds that Williams' claims constituted HCLCs under the TMLA and that Williams had not served an expert report on West Oaks, as required under the Act. *See* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13) (defining health care liability claims), and § 74.351(a), (b) (requiring a trial court to dismiss a health care liability claim if an expert report is not served within 120 days of filing suit). [FN1] Williams **\*176** responded that his claims sound in ordinary negligence rather than health care liability. Following a hearing, the trial court denied West Oaks' motion. West Oaks then filed this interlocutory appeal. *See id.* § 51.014(a)(9).

> FN1. The HCLC definition was amended after Williams' cause of action accrued, and the prior

law is applicable to his claims. Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, *amended by* Act of July 19, 2011, 82nd Leg., 1st C.S., ch. 7, § 4.02, 2011 Tex. Gen. Laws 5445 (amending section 74.001(a), adding subsection (a)(12)(A)(viii) (including a health care collaborative as a "health care provider") and making nonsubstantive changes).

The court of appeals affirmed the trial court's order. 322 S.W.3d 349, 354. The court analyzed Williams' claims as breaches of West Oaks' duty of safety to its employee. *Id.* at 352. The court of appeals began its analysis from the premise that the phrase "directly related to health care" in section 74.001(a)(13) modifies not only "professional or administrative services," but also the term "safety." *Id.* It concluded that a safety claim "must be directly related to and inseparable from health care." *Id.* It is not disputed here that Vidaurre's claims against West Oaks are HCLCs, but Williams argues his claims against West Oaks are not. The court of appeals noted the related nature of the two parties' cases but concluded, based in part on our withdrawn opinion in *Marks v. St. Luke's Episcopal Hospital,* 52 Tex.Sup.Ct.J. 1184, *withdrawn and superseded on rehearing,* 319 S.W.3d 658 (Tex.2010), that Williams' claims against West Oaks are separable from health care and are not HCLCs. 322 S.W.3d at 353. Reasoning that the source of West Oaks' duty to Williams is the employer-employee relationship and that the nature of Vidaurre's relationship with West Oaks—patient to health care provider—is different from Williams', the court of appeals concluded that the safety claims "flow from the employment relationship" between Williams and West Oaks and are not "directly related" to health care, as required by the statute. 322 S.W.3d at 352–53; TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). West Oaks filed a petition for review in this Court.

## II. Discussion

[1] In seeking to distinguish ordinary negligence claims from HCLCs, the heart of these cases lies in the nature of the acts or omissions causing claimants' injuries and whether the events are within the ambit of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

371 S.W.3d 171, 55 Tex. Sup. Ct. J. 1033
**(Cite as: 371 S.W.3d 171)**

legislated scope of the TMLA. Causes of action that are HCLCs cannot be transmuted to avoid the strictures of the medical liability statute. *Omaha Healthcare Ctr., LLC v. Johnson,* 344 S.W.3d 392, 394 (Tex.2011); *Diversicare Gen. Ptr., Inc. v. Rubio,* 185 S.W.3d 842, 851 (Tex.2005). We recognize that the Legislature intended the Texas Medical Liability Insurance Improvement Act (TMLIIA), the TMLA's predecessor, to be broad, and it broadened that scope further in 2003 with its repeal and amendments resulting in the TMLA. Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(6), 1977 Tex. Gen. Laws 2039, 2040 (former TEX.REV.CIV. STAT. art. 4590i, § 1.02(6)), *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. After the 2003 amendments, the breadth of HCLCs include causes of action against physicians and health care providers for negligence in the provision of "medical care, or health care, or safety or professional or administrative services directly related to health care." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13).

West Oaks argues that Williams' claims, mirroring the same facts as Vidaurre's HCLCs, are HCLCs and therefore implicate the requirement to serve an expert report. Such a conclusion would mandate **\*177** a dismissal because Williams did not serve a report on West Oaks. TEX. CIV. PRAC. & REM.CODE § 74.351(a), (b). West Oaks also urges that Williams' status as a health care provider at the hospital—as opposed to a patient—does not remove Williams from the requirement that he pursue his allegations as HCLCs. On the other hand, Williams characterizes his allegations as ordinary negligence claims against a nonsubscriber to the workers' compensation scheme. Williams contends that the court of appeals was correct in concluding that his claims fall outside the HCLC definition and therefore an expert report is not required for his suit to proceed. *See* 322 S.W.3d 349, 353–54. Williams also echoes the court of appeals in asserting that West Oaks' alleged safety and security breaches do not require expert medical testimony and are interchangeable with safety and security issues arising in non-medical settings such as corrections facilities. *See id.* at 353 (opining that Williams' safety and security claims involve issues also

"aris[ing] in other settings, such as jails and prisons"). In essence, Williams argues that the hospital is the mere situs of his claims, that his role as psychiatric technician overseeing a mental patient has no bearing on the character of his claims, and the fact that his claims arose in a mental health facility has little or no bearing on their character.

**A. Standard of Review**

[2][3] West Oaks' and Williams' arguments both implicate the scope of claims reached by the TMLA. The nature of the claims the Legislature intended to include under the TMLA's umbrella is a matter of statutory construction, a legal question we review de novo. *Marks,* 319 S.W.3d at 663 (interpreting the TMLIIA); *see also MCI Sales & Serv., Inc. v. Hinton,* 329 S.W.3d 475, 500 (Tex.2010) (observing that questions of statutory construction are generally reviewed de novo). In construing a statute, our aim " 'is to determine and give effect to the Legislature's intent,' " and we begin with the " 'plain and common meaning of the statute's words.' " *McIntyre v. Ramirez,* 109 S.W.3d 741, 745 (Tex.2003) (quoting *Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 318 (Tex.2002); *State Dep't of Highways & Pub. Transp. v. Gonzalez,* 82 S.W.3d 322, 327 (Tex.2002) (further citations omitted)).

**B. Relationship Between the Parties Under the Act**

Williams argues that the lack of a patient-physician or patient-health-care-provider relationship between him and West Oaks is a clear barrier to inclusion of his claims within the Legislature's definition of HCLCs. He asserts that such a relationship is necessary to HCLCs. At one point in the past, Williams may have had a good argument. However, modifications over time to the TMLA and its predecessor indicate a different scope for HCLCs under current law.

The TMLIIA was enacted in 1977 to relieve a medical "crisis [having] a material adverse effect on the delivery of medical and health care in Texas." Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(6), 1977 Tex. Gen. Laws 2039, 2040 (repealed 2003). In 2003, facing another "medical malpractice insurance crisis" and a corresponding "inordinate[ ]" increase in the frequency of HCLCs filed since 1995, the Legislature repealed the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

TMLIIA, amending parts of the previous article 4590i and recodifying it as Chapter 74 of the Texas Civil Practice and Remedies Code. Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(a), 2003 Tex. Gen. Laws 847, 884.

The 2003 legislation featured a significant modification to the existing law; it changed the HCLC definition:

> **\*178** 'Health care liability claim' means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death *of a claimant,* whether the *claimant's claim or cause of action* sounds in tort or contract.

TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13) (emphases added). The Legislature replaced the term "patient" with "claimant" in the definition of an HCLC.[FN2] *Compare* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13), *with* TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4) (repealed 2003). The Legislature also defined the new term in the Act:

> FN2. The Legislature also broadened the subject-matter scope of the activities constituting HCLCs through the addition to the definition of "professional or administrative services directly related to health care." *Id.* § 74.001(a)(24).

> 'Claimant' means a person, including a decedent's estate, seeking or who has sought recovery of damages in a health care liability claim. All persons claiming to have sustained damages as the result of the bodily injury or death of a single person are considered a single claimant.

TEX. CIV. PRAC. & REM.CODE § 74.001(a)(2). "Person" is not defined in the TMLA and therefore must be given its common law meaning. *Id.* § 74.001(b). Changing the term "patient" to "claimant" and defining "claimant" as a "person" expands the breadth of HCLCs beyond the patient population. This in turn necessarily widened the reach of the expert report requirement, unless otherwise limited by other statutory provisions.

However, "health care" and "medical care" HCLCs are separately defined in the Act and reference treatment furnished "for, to, or on behalf of a patient." *Id.* § 74.001(a)(10), (a)(19).[FN3] As discussed more fully below, "medical care" and "health care" HCLCs require that the claimant be a patient. *See* Part II.D.1, *infra.*

> FN3. This conclusion is in harmony with the Legislature's stated intent to "reduce [the] excessive frequency ... of health care liability claims through reasonable improvements and modifications in the Texas insurance, tort, and medical malpractice systems...." Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(b)(1), 2003 Tex. Gen. Laws 847, 884.

[4] With the exception of medical care and health care claims, our focus in determining whether claims come under the TMLA is not the status of the claimant, but the gravamen of the claim or claims against the health care provider. *See Diversicare,* 185 S.W.3d at 854.

**C. Williams' Status as a "Claimant" Under the Act**

[5] We next examine whether Williams is a "claimant" under the TMLA. Only claimants are obligated to serve expert reports on physicians or health care providers. TEX. CIV. PRAC. & REM.CODE § 74.351(a), (b). West Oaks argues that the language and structure of the definition of "claimant" in the current statute, especially when compared to its predecessor, indicate that the term includes not only patients, but other persons as well. Williams asserts that he is not a "claimant" because his claims are not HCLCs, as they do not involve the exercise of professional medical judgment. Williams also argues that the Legislature's substitution of "patient" with "claimant" is meant only to include derivative claims by the relatives and representatives of deceased patients,**\*179** not employees of health care provider defendants.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

As observed above, a "claimant" is broadly defined as a "person," including the estate of a person, bringing an HCLC. TEX. CIV. PRAC. & REM.CODE § 74.001(a)(2). A claimant is a person seeking damages for an HCLC. *See id.* § 74.001(a)(2), (13). As noted above, the TMLIIA, by contrast, featured an HCLC definition predicated on injury to a "patient." TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4) (repealed 2003). Neither "person" nor "patient" is a defined term in the TMLA and therefore possesses such meaning as is consistent with the common law. TEX. CIV. PRAC. & REM.CODE § 74.001(b).

Although he likely would not have been a "patient" under the TMLIIA, Williams is a "claimant" and a "person" under the textual change to the definition of HCLCs in the TMLA. Not only is the term "patient" not included within the definition of "claimant," the Legislature used the term "including" to precede the reference to a decedent's estate. This renders any components of the definition nonexclusive. TEX. GOV'T CODE § 311.005(13); *Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 440–41 (Tex.2009) (noting that the term "including" is a term of enlargement and cautioning against "circumventing Legislative intent" by misapplying non-exhaustive lists in statutes); *see also In re Allcat Claims Serv., L.P.,* 356 S.W.3d 455, 468 (Tex.2011) (observing that the term "including" in that case was an explanatory term of enlargement).

The dissent argues that the 2003 amendment substituting "claimant" in lieu of "patient" in the HCLC definition merely clarifies that a patient's estate or others acting in a representative capacity may bring an HCLC. 371 S.W.3d at 194 (Lehrmann, J., dissenting). But further belying the contention that a "claimant" may be only a patient or her estate is the Act's definition of "representative." The term "representative," used in the Act's medical-records-disclosure provision, is defined as the "agent of the patient *or* claimant," indicating that patient and claimant do not necessarily refer to the same category of persons. TEX. CIV. PRAC. & REM.CODE § 74.001(a)(25) (emphasis added), 74.052; *Wilson N. Jones Mem'l Hosp. v. Ammons,* 266 S.W.3d 51, 61–62 (Tex.App.—Dallas 2008, pet. denied) (also drawing the

distinction). Neither the language of the TMLA nor the logic of the amendments can support a narrow reading of the term "claimant."

**D. Character of Williams' Claims**

In defining the types of claims against health care providers constituting HCLCs, the question we face is not whether it seems that a claimed injury really arose from treatment commonly understood to be some type of medical or health care; nor do we address whether the incident causing the injury would have been a common law negligence claim. Instead, the issue posed is whether the umbrella fashioned by the Legislature's promulgation of the TMLA includes the cause of action brought by a claimant against physicians or health care providers.

The foundations of our analysis are well established. As in *Diversicare* and *Marks,* we determine whether the relevant allegations are negligence claims or are properly characterized as HCLCs under the Act. *Marks,* 319 S.W.3d at 662 (construing the TMLIIA); *Diversicare,* 185 S.W.3d at 847.

[6] An HCLC contains three basic elements: [FN4] (1) a physician or health care **\*180** provider must be a defendant; (2) the claim or claims at issue must concern treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's act or omission complained of must proximately cause the injury to the claimant. *See* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13); *Marks,* 319 S.W.3d at 662 (construing the similar definition found in the TMLIIA).

> FN4. " 'Health care liability claim' means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract." TEX. CIV. PRAC. &

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

REM.CODE § 74.001(a)(13).

The second element is at issue in this case: whether Williams' claims alleging West Oaks' failure to properly train the facility's staff, warn of risks associated with violent psychiatric patients, provide adequate protocols and equipment to limit such risks, and provide a safe work environment under such circumstances implicate one or more of the standards listed in the HCLC definition. There are several types of HCLCs set out in the TMLA: in addition to claims involving treatment and lack of treatment, the Act contemplates claims for alleged "departure[s] from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). All of these categories of claims, except safety, are defined terms in the Act. *See, e.g., id.* § 74.001(a)(10), (a)(19), and (a)(24) (defining "health care," "medical care," and "professional or administrative services"). West Oaks asserts that Williams' claims allege departures from accepted standards of either "health care" or "safety." Williams argues that neither of these categories of claims applies to his allegations, removing him from the Act's reach.

**1. Claimed Departures from Accepted Standards of Health Care**

We examine whether Williams' complaints are "claimed departure[s] from accepted standards of ... health care." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). In *Diversicare,* we held that a claim alleges a departure from accepted standards of health care if the act or omission complained of is an inseparable or integral part of the rendition of health care. 185 S.W.3d at 848, 850. "[T]raining and staffing policies and supervision and protection of [patients] ... are integral components of a [health care facility's] rendition of health care services...." *Id.* at 850. Williams' claims are similar to the health care claims at issue in *Diversicare.* However, our analysis of health care claims in that case involved claims by a patient against a health care provider, not, as in this case, claims brought by a non-patient employee against his employer.

The definition for "health care" suggests that

claims brought under this prong of the HCLC definition must involve a patient-physician relationship. *See id.* § 74.001(a)(10). "Health care" is:

... *any act* or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a *patient* during the *patient's* medical care, treatment, or confinement.

*Id.* § 74.001(a)(10)(emphases added); *see also, e.g., Omaha Healthcare Ctr.,* 344 S.W.3d at 395 (pointing to the "any act" language in the "health care" definition as necessarily implicating more than acts of **\*181** physical care and medical diagnosis and treatment); *Diversicare,* 185 S.W.3d at 847 (noting the "broad[ ]" nature of the "health care" definition). While the "any act" language of the "health care" definition is certainly expansive, it is limited by the requirement that health care be rendered "for, to, or on behalf of a *patient* during the *patient's* medical care, treatment, or confinement." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10) (emphases added). Because a claim under the health care prong of section 74.001(a)(13) incorporates the definition of "health care," such a claim must involve a patient-physician relationship.

[7] The requirement that a claim arising under the health care prong of section 74.001(a)(13) involve a patient-physician relationship could be viewed as in tension with the term "claimant," defined in terms of a person. *See id.* § 74.001(a)(2). We consider all the relevant provisions of the TMLA together and follow the rule that specific statutory provisions prevail over more general provisions. *See Jackson v. State Office of Admin. Hearings,* 351 S.W.3d 290, 297 (Tex.2011) (reiterating the rule that "a specific statutory provision prevails as an exception over a conflicting general provision") (citing *Tex. Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 637 (Tex.2010)); *see also* TEX. GOV'T CODE § 311.026(b) (same). However, the specific wording of the "health care" definition, that health care be an act involving treatment rendered for, to or on behalf of a patient, acts as a limitation on the general provision that an HCLC need only be pursued by a "claimant." While other categories of HCLCs need

only be pursued by claimants, by specific statutory directive health care claims must involve a patient-physician relationship.

[8] Claims based on departures from accepted standards of health care therefore involve a nexus between the standard departed from and the alleged injury. Such a nexus exists in this case. Williams, a health care provider for Vidaurre, was assaulted by Vidaurre, who was a West Oaks patient. *See* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(12) (defining "health care provider" to include employees of facilities licensed to provide health care). Williams was acting on orders to provide one-on-one supervision for Vidaurre. That directive was made by a West Oaks physician exercising professional judgment about the schizophrenic patient's care and treatment, including, specifically, heightened supervision in light of recent aggressive and violent behavior. Additional professional judgments about the safety protocols for such patients were put in place by West Oaks to care for its mental patients. Williams alleges that these judgments, concerning his training and psychiatric institutional protocols, departed from accepted standards of care and caused his injury. We previously reasoned in *Diversicare* that the health care facility's "training and staffing policies and supervision and protection of [a patient] and other residents are integral components of [the facility's] rendition of health care services." 185 S.W.3d at 850. Williams' similar allegations constitute HCLCs based on claimed departures from accepted standards of health care.

Texas mental health statutes and regulations bolster this conclusion. West Oaks is a state-licensed, private mental health facility. The law requires that an inpatient mental health facility "provide adequate medical and psychiatric care and treatment to every patient in accordance with the highest standards accepted in *medical practice.*" TEXAS HEALTH AND SAFETY CODE § 576.022(a)(emphasis added). Mental health hospitals may not operate in Texas **\*182** unless licensed by the Texas Department of Health and operated in accordance with the rules and standards of the Texas Board of Mental Health and Mental Retardation to ensure the proper care and treatment of patients. *Id.* § 577.001(a),

577.005(b), 577.010(a).

[9] The necessity of expert testimony to support or refute the allegations at issue is a factor in assessing the nature of a claim against a health care provider or physician. *Diversicare,* 185 S.W.3d at 848. Here, the court of appeals considered the need for expert testimony in Williams' case and concluded that "even if medical expert testimony is necessary to establish Williams' claims, the need for expert testimony is not dispositive as to whether a claim is a health care liability claim." 322 S.W.3d at 353. We have indicated that even when expert medical testimony is not necessary, the claim may still be an HCLC. *Murphy v. Russell,* 167 S.W.3d 835, 838 (Tex.2005) ("The fact that in the final analysis, expert testimony may not be necessary to support a verdict does not mean the claim is not a health care liability claim."). We have not previously addressed the court of appeals' reasoning, and we now hold that if expert medical or health care testimony is necessary to prove or refute the merits of the claim against a physician or health care provider, the claim is a health care liability claim.

[10] Expert testimony in the health care field is necessary to support Williams' claims. Those claims require evidence on proper training, supervision, and protocols to prevent, control, and defuse aggressive behavior and altercations in a mental hospital between psychiatric patients and employed professional counselors who treat and supervise them. The provision of emergency notification devices, warning of dangers associated with psychiatric patients, providing a safe workplace, and properly training the caregiver at a psychiatric facility are integral to the patient's care and confinement. Acts or treatment that are integral to a "patient's medical care, treatment, or confinement" constitute "health care." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10). Claims for injuries arising from departures from proper "treatment performed or furnished, or that should have been performed or furnished" are health care claims. *Id.* § 74.001(a)(10). Contrary to Williams' argument, this dispute concerns more than simply determining whether a person should be protected from a known aggressive person. The dispute between Willi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ams and West Oaks is, at its core, over the appropriate standards of care owed to this mental health professional in treating and supervising a psychiatric patient at the mental hospital, what services, protocols, supervision, monitoring and equipment were necessary to satisfy the standard, and whether such specialized standards were breached. *See Diversicare,* 185 S.W.3d at 850. The allegedly missing or insufficient protocols and standards were for a mental patient in a mental hospital. It would blink reality to conclude that no professional mental health judgment is required to decide what those should be, and whether they were in place at the time of Williams' injury.[FN5]

> FN5. As we discussed in *Diversicare,* a number of other states also recognize that providing supervision and a safe environment at a health care facility are matters of professional health care judgment. 185 S.W.3d at 852–54 (citing *Dorris v. Detroit Osteopathic Hosp.,* 460 Mich. 26, 594 N.W.2d 455, 466 (1999) (concluding that claims for assault in a psychiatric hospital implicated medical or health care under Michigan's medical malpractice statute and noting that "[t]he ordinary layman does not know the type of supervision or monitoring that is required for psychiatric patients in a psychiatric ward."); *Smith v. Four Corners Mental Health Ctr.,* 70 P.3d 904, 914 (Utah 2003) (holding that an assaulted child's lawsuit against the outpatient mental health care provider was a health care malpractice claim because the plaintiff's "allegations arise out of the fact that [a health care provider] provided mental health services directly to him...."); *see also D.P. v. Wrangell Gen. Hosp.,* 5 P.3d 225, 229 n. 17 (Alaska 2000) ("[I]n so far as [plaintiff] intends to argue issues that involve specialized medical decisions—such as the appropriate level of physical restraints or medication—she can do so only through expert testimony."); *Bell v. Sharp Cabrillo Hosp.,* 212 Cal.App.3d 1034, 260 Cal.Rptr. 886, 896 (1989) ("[T]he competent selection and review of medical staff is precisely the type of profes-

sional service a hospital is licensed and expected to provide, for it is in the business of providing medical care to patients and protecting them from an unreasonable risk of harm while receiving medical treatment.... [T]he competent performance of this responsibility is 'inextricably interwoven' with delivering competent quality medical care to hospital patients.").

**\*183** Williams' argument that any security officer could have performed the oversight and supervision of a psychiatric patient at the mental health hospital is overly simplistic. Perhaps a security officer could have protected Williams, and Vidaurre himself, from harm, or lessened the severity of the injuries suffered, but security is only one aspect of the matter. Williams' position at West Oaks involved professional, health-care-related judgments different from the tasks typically associated with a law enforcement officer, security guard, or bouncer. Treatment of a mental patient subject to psychotic and aggressive outbursts requires health care, not simply protection from bodily harm, to control, defuse, or prevent mental processes leading to aggression, and professional techniques to do so. Patients at West Oaks are there not merely for shelter, but also for care and treatment. *See Charrin v. Methodist Hosp.,* 432 S.W.2d 572, 574 (Tex.Civ.App.—Houston [1st Dist.] 1968, no writ) (holding that the hospital-patient relationship is different from that of a landlord-tenant). Williams' self-described role at West Oaks was that of a "counselor" and "caregiver," not a security guard. One of Vidaurre's experts characterizes psychiatric technicians as a "valuable and indispensable part of psychiatric hospital care." Vidaurre's expert also notes that the role of psychiatric technician involves appropriately observing and evaluating potentially assaultive mentally ill patients and assessing the potential for violent eruptions. Thus, the very deficiencies in training and protocols Williams complains of underscore the health-related nature of his role.

[11] We do not conclude, as West Oaks would have us, that Williams' claims should be considered HCLCs on the bare basis that they mirror those of the patient

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

and stem from the same fact pattern. Williams and the patient stand as separate claimants. We analyze the applicability of the TMLA and its attendant procedural requirements on the gist of the claimant's allegations. *See Diversicare,* 185 S.W.3d at 847–48.

## 2. Claimed Departures from Accepted Standards of Safety

[12] We also examine whether Williams' claims may be characterized as HCLCs under the definition's "safety" prong. We have not decided whether safety claims must be "directly related to health care." The TMLA's HCLC definition includes, among the different types of covered claims, "claimed departure[s] from accepted standards of ... safety...." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13).

Williams was injured during an altercation with Vidaurre in a smoking area at the hospital, and he contends his injuries would have been avoided if West Oaks had instituted proper safety protocols and monitoring devices. Williams' claims, predicated upon the monitoring and restraint**\*184** of violent, schizophrenic patients, implicate the safety, as commonly understood, of employees and patients. Safety is not defined in the TMLA. This Court has construed the term, under principles of statutory construction, according to its commonly understood meaning as the condition of being "untouched by danger; not exposed to danger; secure from danger, harm or loss." *Diversicare,* 185 S.W.3d at 855 (quoting the definition of "safe" in Black's Law Dictionary (6th ed.1990) to construe the meaning of "safety" under predecessor statute). Logically, the inclusion of safety "expand[ed] the scope of the statute beyond what it would be if it only covered medical and health care" and included the claims in that case, and it was not necessary to define the precise boundaries of the safety prong. *Diversicare,* 185 S.W.3d at 855; *see also Marks,* 319 S.W.3d at 662–63.

[13] In 2003, the Legislature modified the definition of HCLCs. It changed "patient" to "claimant," and also added the italicized phrase to the relevant portion of the pre–2003 definition: HCLC means a cause of action for a "claimed departure from accepted standards of medical care, or health care, or safety *or professional or*

*administrative services directly related to health care,* which proximately results in injury to or death of a claimant...." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13)(emphasis added). The dissent argues that the 2003 amendment was intended to narrow the existing scope of the safety prong of HCLCs by requiring that safety be "directly related to health care." [FN6] *See id.* We disagree for several reasons.

> FN6. Texas appellate courts construing the TMLA have diverged on whether "directly related" applies to safety claims or only to other claims in the definition's list of departures from accepted standards. *Compare St. David's Healthcare P'ship, L.P. v. Esparza,* 315 S.W.3d 601, 604 (Tex.App.—Austin 2010), *rev'd on other grounds,* 348 S.W.3d 904 (Tex.2011) ("directly related to health care" modifies "safety"); *Appell v. Muguerza,* 329 S.W.3d 104, 115 (Tex.App.—Houston [14th Dist.] 2010, pet. filed) (same); *Dual D Healthcare Operations, Inc. v. Kenyon,* 291 S.W.3d 486, 489–90 (Tex.App.—Dallas 2009, no pet.) (same); *Omaha Healthcare Ctr., L.L.C. v. Johnson,* 246 S.W.3d 278, 284 (Tex.App.—Texarkana 2008), *rev'd on other grounds,* 344 S.W.3d 392 (Tex.2011) (same); *Harris Methodist Ft. Worth v. Ollie,* 270 S.W.3d 720, 723 (Tex.App.—Fort Worth 2008), *rev'd on other grounds,* 342 S.W.3d 525 (Tex.2011) (same); *Christus Health v. Beal,* 240 S.W.3d 282, 289 (Tex.App.—Houston [1st Dist.] 2007, no pet.) (same); *Valley Baptist Med. Ctr. v. Stradley,* 210 S.W.3d 770, 774–75 (Tex.App.—Corpus Christi 2006, pet. denied) (same), *with Holguin v. Laredo Reg'l Med. Ctr., L.P.,* 256 S.W.3d 349, 354–55 (Tex.App.—San Antonio 2008, no pet.) (safety claim need not be directly related to health care); *Emeritus Corp. v. Highsmith,* 211 S.W.3d 321, 328 (Tex.App.—San Antonio 2006, pet. denied) ("[A] claim may be a 'health care liability claim' under the safety definition even if it does not 'directly relate[ ] to health-care.' ").

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Safety was in the Act prior to the 2003 amendments and this Court construed it according to its common meaning as being secure from danger, harm or loss. *Diversicare,* 185 S.W.3d at 855. The phrase "directly related to health care" was added to the definition of HCLCs in 2003 to modify "professional or administrative services." *Compare* TEX.REV.CIV. STAT. art 4590i, § 1.03(a)(4) (repealed 2003), *with* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 865.

[14] Scrutinizing grammar in interpreting statutes, we are cognizant of the rule that "[m]odifiers should come, if possible, next to the words they modify." William Strunk, Jr. & E.B. White, THE ELEMENTS OF STYLE R. 30 (4th ed. 2000); *see also* Bryan A. Garner, GARNER'S MODERN AMERICAN USAGE 523 (2003) (noting that "[w]hen modifying words are separated **\*185** from the words they modify, readers have a hard time processing the information," and adding that "the true referent should generally be the closest appropriate word."). This rule is related to the last antecedent doctrine of statutory interpretation commonly applied to ambiguous legislative texts. 82 C.J.S. STATUTES § 443 (2011) (footnotes omitted). Under that tenet, a qualifying phrase should be applied only to the portion of the sentence "immediately preceding it." *City of Dallas v. Stewart,* 361 S.W.3d 562, 571 n. 14 (Tex.2012) (applying the doctrine); *Spradlin v. Jim Walter Homes, Inc.,* 34 S.W.3d 578, 580 (Tex.2000) (same). Accordingly, the phrase "directly related to health care" modifies the terms immediately before it—"professional or administrative services." Under the dissent's logic, the phrase "directly related to health care" should be applied to modify each term in the HCLC definition, including professional or administrative services, safety, health care, and medical care. This construction is nonsensical, as it would be entirely redundant as to health care and medical care, unsupported by the text in the attempted application to safety, and render safety largely repetitive of health care. *See Marks,* 319 S.W.3d at 673 (Johnson, J., concurring) (pointing out that safety and health care are separate). We explained in *Diversicare,* a patient-assault case also involving training and staffing policies and monitoring and protection of patients,

that "[p]rofessional supervision, monitoring, and protection of the patient population necessarily implicate the accepted standards of safety." *Diversicare,* 185 S.W.3d at 855. Williams' similar complaints here concerning his protection from danger at the hands of a mental patient also implicate safety.[FN7]

> FN7. We explained in *Diversicare* that the claimant's allegations of deficient monitoring and training are distinct from hypothetical claims for injuries arising out of an intruder assaulting a claimant due to an unlocked window or a claimant falling from a rickety staircase. 185 S.W.3d at 854. These examples, however, did not concern our analysis of HCLCs that were alleged departures from accepted standards of safety. They were instead provided as examples of claims that would be separable from health care under the health care prong of the HCLC definition. *Id.* (construing the TMLIIA). *Diversicare* 's only holding as to the scope of claims based on alleged departures from accepted standards of safety was that inclusion of the term safety in the HCLC definition expanded the reach of the statute and that it was broad enough to include the claimants' claim in that case. *Marks v. St. Luke's Episcopal Hosp.,* No. 07–0783, 52 Tex.Sup.Ct.J. 1184, 2009 WL 2667801, 2009 Lexis 636, at \*39 (Tex. August 28, 2009) (Wainwright, J., dissenting), *opinion withdrawn and substituted on rehearing,* 319 S.W.3d 658 (Tex.2010).

Moreover, a majority of the members of this Court have opined in written opinions or joined written opinions reasoning that safety is not constricted by the subsequent addition to the statute of the phrase "professional or administrative services directly related to health care." Concurring and dissenting in *Diversicare,* Chief Justice Jefferson wrote that safety, undefined in the statute, is commonly understood to mean protection from danger and that the "specific source of that danger ... is without limitation." 185 S.W.3d at 860–61 (Jefferson, C.J., concurring and dissenting) (also noting that "[i]n defining health care liability

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

claims as it did, the Legislature created a statute with a broad scope. Complaints about the breadth of [the TM-LIIA] should be directed to the Legislature, not to this Court, for the courts must 'take statutes as they find them.' " (citation omitted)). Concurring in *Marks,* Justice Johnson agreed with Chief Justice Jefferson's analysis of safety in his concurrence and dissent in *Diversicare.* Justice Johnson reasoned that making safety contingent on a direct connection between it **\*186** and health care would "effectively read [ ] safety out of the statute instead of properly giving it meaning as an additional category of claims." *Marks,* 319 S.W.3d at 673 (Johnson, J., concurring, joined by Justice Willett, Justice Hecht, and Justice Wainwright). FN8 Chief Justice Jefferson wrote again in *Marks,* quoting his concurrence and dissent in *Diversicare,* noting that a reasonable construction of "safety" is to give the term its "common meaning," which could therefore encompass premises liability claims. *Id.* at 674 (Jefferson, C.J., concurring and dissenting, joined by Justices Green, Guzman and Lehrmann).

> FN8. Justices Hecht and Wainwright joined Justice Johnson's concurrence in *Marks,* except for the discussion of "safety." 319 S.W.3d at 667.

We agree with West Oaks that Williams' claims are indeed for departures from accepted standards of safety. We conclude that the safety component of HCLCs need not be directly related to the provision of health care and that Williams' claims against West Oaks implicate this prong of HCLCs.

### E. Relationship with the Texas Workers' Compensation Act

[15] Williams also contends that interpreting the TMLA to encompass his claims will conflict with the procedural and substantive litigation rights granted to employee plaintiffs under the TWCA. *See* TEX. LAB.CODE § 406.001 *et seq.* He argues that his personal injury claims against his employer should not be characterized as HCLCs because the Legislature did not intend for employee claims against a health care provider employer to fall under the rubric of the Act. Williams also contends that an employee's personal injury

claim against his employer would not have constituted a medical malpractice claim prior to the enactment of the medical liability statutes in 1977.

We see no conflict between the TMLA and the TWCA, whether the claim at issue is asserted against an employer subscribing to workers' compensation insurance or, as here, against a nonsubscriber. The TWCA is unique in permitting private Texas employers to elect to subscribe to workers' compensation insurance. *Id.* § 406.002(a); *Lawrence v. CDB Servs., Inc.,* 44 S.W.3d 544, 552 (Tex.2001); *see also Casados,* 358 S.W.3d at 241. If they so elect, and their employees do not opt out of the workers' compensation coverage, then their employees are generally precluded from filing suit against them and must instead pursue their claims through an administrative agency against the employer's insurance carrier for benefits provided for in the TWCA. *See* TEX. LAB.CODE § 406.031(a) (noting that an employer's insurance carrier is liable for compensation of an employee's injury if the employee is subject to the Act and the injury arises out of the course and scope of the employment). But employees need not prove the employer's negligence for workers' compensation recovery, just that they were injured in the course and scope of employment. *See id.* ("An insurance carrier is liable for compensation for an employee's injury without regard to fault or negligence...."); *id.* § 406.002(b) (stating that a subscribing employer is subject to the TWCA). As part of the legislated policy trade-off underlying the workers' compensation system, employees are also limited in their recovery to indemnity and medical expenses, absent intentional conduct. *See id.* § 408.001(a) ("Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage...."); *but see id.* § 408.001(b) (allowing recovery of exemplary damages for **\*187** death caused by an intentional act or omission or the employer's gross negligence).

However, if an employer forgoes workers' compensation coverage, and is a nonsubscriber to the workers' compensation system, it is subject to suits at common law for damages. With the exception of certain employer defenses abrogated by the statute, a suit by an

employee of a nonsubscribing employer is largely outside the limitations imposed by the TWCA. *See id.* § 406.033(a), (d) (discussing limited defenses and employee burden of proof in establishing negligence). Employees of a nonsubscriber, injured on the job, must prove the elements of a common law negligence claim, absent intentional misconduct. *Id.* § 406.033(d). An employee may also elect to waive workers' compensation coverage and "retain the common-law right of action to recover damages for personal injuries or death" if certain notification requirements are met. *Id.* § 406.034(a), (b).

[16] Thus, the workers' compensation construct contemplates two systems, one in which covered employees may recover relatively quickly and without litigation from subscribing employers and the other in which nonsubscribing employers, or the employers of employees who have opted not to accept workers' compensation coverage, are subject to suit by injured employees to recover for their on-the-job injuries. "In providing the worker a form of prompt remuneration for loss of earning capacity, the statutory [workers' compensation] scheme is in lieu of common law liability based on negligence." *Paradissis v. Royal Indem. Co.,* 507 S.W.2d 526, 529 (Tex.1974); *see also Reed Tool Co. v. Copelin,* 689 S.W.2d 404, 407 (Tex.1985) ("The system balances the advantage to employers of immunity from negligence and potentially larger recovery in common law actions against the advantage to employees of relatively swift and certain compensation without proof of fault.").

Just as the workers' compensation system treats employees of subscribing versus nonsubscribing employees differently, the treatment of those two differently situated employees under the TMLA for on-the-job injuries is also distinct. The employee of a subscriber that is a health care provider must pursue an administrative remedy under the TWCA for on-the-job injuries. However, the employee of a nonsubscribing employer that is a health care provider must file suit against the nonsubscriber and follow the rules that govern that suit. In this case, the governing rules include the TMLA's requirements for a claimant suing a health care provider.

Other proceedings to recover against nonsubscribing employers would similarly be governed by applicable statutes and rules, e.g., proof of negligence and causation, notice requirements under the Texas Tort Claims Act, or the common pleading and service requirements in the Texas Rules of Civil Procedure for all lawsuits.

Williams invites us to read into the TMLA an exception for claimants happening to be employees of nonsubscriber health care provider employers who sue their employers for claims that come under the TMLA umbrella. Williams' case is against a nonsubscriber, outside of the workers' compensation system, yet he implores the Court to except him from the TMLA's requirements without any express statutory exception. He seeks a common law exemption from the TMLA's mandate that we are not willing to create.

As explained, the TWCA and the TMLA do not conflict in this case. But even if they did, the Legislature has already designated the victor—the TMLA would prevail. Section 74.002(a) of the TMLA states:

**\*188** In the event of a conflict between this chapter and another law, including a rule of procedure or evidence or court rule, this chapter controls to the extent of a conflict.

TEX. CIV. PRAC. & REM.CODE § 74.002(a). This provision was added as part of the 2003 amendments and replaced an earlier, more cabined conflicts provision. *See* TEX.REV.CIV. STAT. art. 4590i, § 11.05 (repealed) (entitled "Subchapter's Application Prevails Over Certain Other Laws" and stating that "[t]he provisions of this subchapter shall apply notwithstanding the provisions contained in Article 4671, Revised Civil Statutes of Texas, 1925, as amended, and the provisions of Article 5525, Revised Civil Statutes of Texas, 1925, as amended" (pertaining to injuries resulting in death and survival of cause of action, respectively)).[FN9]

> FN9. Articles 4671 and 5525 were both repealed prior to the 2003 amendments as part of the Legislature's 1985 adoption of the Texas Civil Practice and Remedies Code.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

TEX.REV.CIV. STAT. arts. 4671 and 5525, repealed by Act of June 16, 1985, 69th Leg., R.S., ch. 959, § 9(1), 1985 Tex. Gen. Laws 3242, 3322.

Here, Williams must establish the medical negligence of West Oaks to recover under the TMLA. The statute requires expert reports to support his claims.

### III. Response to Dissent

At base, the dissent's position is that, notwithstanding the Legislature's substitution of the term "claimant" for "patient" in the TMLA's HCLC definition, HCLCs are only those in which the defendant has a patient-physician or "patient-health-care-provider" relationship with the plaintiff. In spite of the Act's words, the dissent proffers that the Court strays from the language of the Act and undermines its purpose. *See* 371 S.W.3d at 199–200 (Lehrmann, J., dissenting). The chart below vividly illustrates the Legislature's broad intention and refutes the dissent's position.

| TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4) (repealed 2003) (emphases added) | TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13) (amended 2003) (emphases added) |
| --- | --- |
| "Health care liability claim" means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury to or death *of the patient*, whether the *patient's claim or cause of action* sounds in tort or contract. | "Health care liability claim" means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death *of a claimant*, whether the *claimant's claim or cause of action* sounds in tort or contract. |

As explained in Parts II.B and C above, in 2003 the Legislature modified the scope of HCLCs when it deleted "patient" and inserted the broader term "claimant" in the definition. *Compare* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13), *with* TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4) (repealed 2003). A claimant need not be the patient in all HCLCs.

As discussed above, two of the different types of HCLCs have specific definitions. The "medical care" and "health care" definitions both refer to services rendered for, to, or on behalf of a *patient* during the *patient's* care,[FN10] treatment, or confinement. **\*189** TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10), (a)(19); *see id.* at § 74.001(a)(13). Although HCLCs, as defined, include causes of action against health care providers brought by "claimants," the specific incorporation of the patient relationship for health care and medical care claims governs the HCLC for departures from accepted standards of medical care and health care. *See* *Jackson,* 351 S.W.3d at 297 (holding that specific statutory provisions override general provisions). However, that limitation does not apply to claims of safety, which is not defined with reference to a patient.[FN11] TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). Contending that only patients' claims may be considered HCLCs, the dissent argues, in essence, that the 2003 amendment is a nullity and seeks to have the Court rewrite section 74.001(a)(13). We decline to do so.

> FN10. There is a slight variance between the definitions for "health care" and "medical care." The "health care" definition features the word "medical" between the words "patient's" and "care." The "medical care" definition does not feature this word. TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10), (a)(19).

> FN11. The scope of claims for "professional or administrative services directly related to health care" in the HCLC definition is not at is-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

371 S.W.3d 171, 55 Tex. Sup. Ct. J. 1033
**(Cite as: 371 S.W.3d 171)**

sue in this case.

[17] This is a statutory construction case. Our role "is to determine and give effect to the Legislature's [expressed] intent." *McIntyre,* 109 S.W.3d at 745. Such cases may offer the temptation to shoehorn a desired legislative result. But the Legislature changed "patient" to "claimant," and "claimant" is broader than "patient." Aside from claims alleging negligent medical care or health care, a claim need not involve a patient-physician relationship for it to be an HCLC.

The dissent argues several other points which we address briefly. The dissent contends that other provisions of the TMLA should trump the definition of HCLCs.

[18] (1) *Notice of suit and medical records release provisions.* The dissent similarly notes that inclusion of non-patients as claimants would render the notice of suit to health care providers, and accompanying medical-records releases, to health care providers, questionable. 371 S.W.3d at 195 (Lehrmann, J., dissenting) (citing TEX. CIV. PRAC. & REM.CODE §§ 74.051, .052). The Act requires "any person" asserting an HCLC to provide notice to the defendant physician or health care provider. TEX. CIV. PRAC. & REM.CODE § 74.051(a). This notice must be accompanied by the medical-records release form detailed in section 74.052. *Id.* § 74.052; *Jose Carreras, M.D., P.A. v. Marroquin,* 339 S.W.3d 68, 73 (Tex.2011). Further, all parties are entitled to "complete and unaltered copies of the patient's medical records." TEX. CIV. PRAC. & REM.CODE § 74.051(d). The form of notice provides a release including the name of the "patient." *Id.* § 74.052(c)(A), (B). As the dissent correctly observes, the Legislature's purpose for the notice and disclosure requirements was to encourage the parties to negotiate and settle disputes prior to suit. 371 S.W.3d at 195 (Lehrmann, J., dissenting); *Carreras,* 339 S.W.3d at 73 (citing *Garcia v. Gomez,* 319 S.W.3d 638, 643 (Tex.2010)). However, nothing in the language of the notice and disclosure provisions or in their purpose of encouraging pre-suit negotiation and settlement indicates a legislative intent that in all cases a claimant must be a patient or her representative.

The dissent contends that the parties' right to medical records cannot be applied against a third-party patient, such as Vidaurre. Specifically, the dissent points out that medical-privacy laws may prevent the parties from compelling a person such as Vidaurre, who is not a party to this case **\*190** pursuing a claim under the TMLA, from supplying his medical records. 371 S.W.3d at 195 (Lehrmann, J., dissenting). JUSTICE LEHRMANN'S point is well taken, but not in this case. Williams is the claimant in this case and these requirements should be applied to him. For purposes of his own medical records, Williams would be the "patient" referenced in the authorization form. *See* TEX. CIV. PRAC. & REM.CODE § 74.052(c)(A). In alignment with the broadly defined "claimant," the notice provision makes clear at the outset that it applies to "any person" asserting an HCLC, as opposed to a "patient" or representative. *Id.* §§ 74.001(a)(2), .051(a). In turn, the disclosure requirements allow not only for the release of records of a patient-plaintiff, but also the pre- and post-injury records of non-patient plaintiffs seeking recovery for her post-injury damages. *See id.* § 74.052 (predicating the disclosure requirements on the applicability of section 74.051(a)). Such records would bear directly in assessing the extent of damages and would streamline settlement negotiations, regardless of whether the claimant was a patient of the health care provider being sued.

(2) *Expert report provisions.* The dissent similarly asserts that the Act's definition of "expert report" and discussion of expert qualifications means that HCLCs must be based on a patient-physician relationship because those provisions contain references to departures from accepted standards by physicians or health care providers and knowledge of accepted standards for diagnosing, caring, or treating the illness, injury, or condition at issue in the claim. 371 S.W.3d at 195–96 (Lehrmann, J., dissenting) (discussing TEX. CIV. PRAC. & REM.CODE §§ 74.351(r)(6), .401(a)(2), .402(a)(2)). The fact that experts submitting reports have knowledge of the alleged standards at issue does not logically lead to a conclusion that only a patient's suit against a health care provider can constitute an HCLC, especially when such a conclusion conflicts

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

with the Legislature's substitution of "claimant" for "patient" in the TMLA's definition of HCLCs. Similarly, the dissent's point that the "expert report" definition calls for a discussion of the manner in which the care rendered by the physician or health care provider failed to meet standards does not lead to the conclusion that only the patient at the receiving end of that care can be a "claimant" under the Act. *Id.* § 74.351(r)(6); *see also id.* § 74.001(a)(2). An expert report detailing the departure from standards would still be relevant in a case, such as this, where a non-patient alleges that the health care provider's deviations from accepted standards led to his injury. As explained, expert testimony is necessary to specify the departure from accepted standards leading to the injury. *Id.* § 74.351(r)(6). The Act's requirement that an expert be qualified to give an opinion on the standards at issue does not, as the dissent contends, indicate that the condition at issue must be sustained by a patient. The expert report requirement is intended to effectuate the TMLA's objective that only meritorious causes of action proceed, not define the scope of HCLCs. *See Samlowski v. Wooten,* 332 S.W.3d 404, 416 (Tex.2011) (Wainwright, J., dissenting in part).

(3) *Jury instructions.* The dissent observes that one of the jury instructions required by the Act in jury trials includes a caution that a finding of negligence may not be based solely on evidence of a "bad result" to the claimant, but a bad result may be considered in determining negligence. 371 S.W.3d at 196 (Lehrmann, J., dissenting) (citing TEX. CIV. PRAC. & REM.CODE § 74.303(e)(2)). Drifting again from the statutory text directly at issue, the dissent argues that this instruction "only **\*191** makes sense" in the context of a patient dissatisfied with medical or health care services delivered by a health care provider. We fail to see the logic in this argument. "Bad result" is not defined, making it difficult to limit its meaning exclusively to health care or medical care, as the dissent would do. The Act indicates that a "bad result" is merely a fact that may be considered in a negligence finding. To conclude from this provision that the Legislature intended to include only patients under the Act, when it expressly broadened the HCLC definition, is not logical and would render the re-

visions to the more relevant HCLC definition meaningless.

(4) *Re-interpretation of Diversicare.* Our opinion today is consistent with our earlier construction of the HCLC definition in *Diversicare,* 185 S.W.3d at 847 (noting that "we examine the underlying nature of the claim and are not bound by the form of the pleading"). The dissent contends that we stray from *Diversicare* and its progeny by centering our analysis on the nature of the claims at issue. 371 S.W.3d at 196–97 (Lehrmann, J., dissenting). The dissent erroneously argues that *Diversicare* requires courts to place equivalent emphasis on the relationship between the parties. Specifically, the dissent contends that in *Diversicare* we attached "equal" importance to the "claimant's status as a patient" at a health care facility. *Id.; see Diversicare,* 185 S.W.3d at 850. However, in *Diversicare* we discussed that relationship, not because it was determinative in the scope of HCLCs generally, but because those were the facts of the case we were deciding. *Diversicare,* 185 S.W.3d at 850. The standards for the conduct at issue, rather than the form of pleadings or identity of parties, are paramount in classifying HCLCs. *See Yamada v. Friend,* 335 S.W.3d 192, 196 (Tex.2010) ( "Artful pleading does not alter [the nature of the underlying claim]."); *Omaha Healthcare,* 344 S.W.3d at 394 (similar).

(5) *Importance of the 2003 amendments.* Incredibly, the dissent contends that the Court places "undue importance" on the Legislature's modification of the HCLC definition in 2003, substituting the broader term "claimant" for "patient" in identifying who may bring a claim. 371 S.W.3d at 193–94 (Lehrmann, J., dissenting); TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13) . The dissent would interpret that modification as referring to the estate or direct representatives of a patient-plaintiff, parties that have always been permitted to make a claim, even prior to the 2003 amendment. *See* 371 S.W.3d at 197 (Lehrmann, J., dissenting); *see also* TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(9), 4.01 (repealed 2003). First, focusing on the language of the statutory definition at the center of this case does not give it "undue importance." Second, the dissent's con-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

struction is contrary to established rules of statutory construction. As we note in Parts II. B and C, "claimant" is defined as "a person, including a decedent's estate, seeking or who has sought recovery of damages in a health care liability claim." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(2). Thus, aside from claims involving health care or medical care and claims based on treatment, a direct healthcare-provider-to-patient relationship is not required for claims to constitute HCLCs.

(6) *Construction of "safety."* The dissent argues that this issue has not been properly raised. 371 S.W.3d at 198 (Lehrmann, J., dissenting). However, West Oaks presents the safety-related nature of its claims in its briefing, and the court of appeals analyzed Williams' claims as safety claims. 322 S.W.3d 349, 352. Contrary to the dissent's assertions, our construction of "safety" is based not only on established canons of textual construction,**\*192** but also on our interpretation of safety based on its commonly understood meaning. *See Diversicare,* 185 S.W.3d at 855. Further, following principles of statutory construction, our construction of "safety" prevents the term from becoming meaningless surplusage, subsumed into claims based on departures from accepted standards of "health care." *See* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13).

(7) *Balance between the TMLA and TWCA.* Contending that our assessment of Williams' claims as HCLCs "forc[es]" them into the HCLC "mold" and "significantly disrupts the delicate balance between employee and employer interests" motivating the TWCA, the dissent argues that our reasoning alters the incentive structure in the TWCA intended to penalize nonsubscribing employers. 371 S.W.3d at 199 (Lehrmann, J., dissenting). However, contrary to the implication of the dissent, the TWCA does not create an especially punitive litigation regime for nonsubscribing employers. Rather, as noted above, nonsubscribing employers are divested of several common law defenses. *See* TEX. LAB.CODE § 406.033(a); *see also Kroger Co. v. Keng,* 23 S.W.3d 347, 349–50 (Tex.2000) (describing the limitation of defenses of nonsubscribers as a "penalty" meant as an incentive for employers to subscribe to

workers' compensation insurance). However, the plaintiff must prove the negligence of the nonsubscribing employer or the employer's agent. TEX. LAB.CODE § 406.033(d). As part of the negligence claim against a health care provider employer, an employee asserting a claim that is otherwise an HCLC must adhere to the expert report requirements of the TMLA. The dissent also argues that our reasoning will discourage small claims and implies that fewer employers will subscribe to workers' compensation insurance. 371 S.W.3d at 199 (Lehrmann, J., dissenting). However, because no information concerning workers' compensation policies is in the record before us, the dissent's concerns are speculative at best. As described above, while we see no conflict between the TMLA and TWCA, the Legislature signaled its intent that the TMLA should control over contradictory statutory provisions. *See* TEX. CIV. PRAC. & REM.CODE § 74.002(a).

(8) *Legislative purpose of the TMLA.* Noting that one of the stated purposes of the Act is to reduce the frequency and cost of medical malpractice claims, the dissent concludes that our holding will result in a larger number of total HCLC claims, contrary to the Legislature's purpose. 371 S.W.3d at 199–200 (Lehrmann, J., dissenting). Given the number of claims filed against health care providers, many will be HCLCs and some may not be. The dissent would shift the balance so that many more are not HCLCs, which is contrary to the Legislature's change of "patient" to "claimant." We refuse to trump explicit statutory language with the dissent's view of the TMLA's purpose.

Finally, our conclusion that the Act covers claims by non-patients against health care providers is not new territory. The Fifth Court of Appeals has concluded that a non-patient hospital visitor's personal injury claim resulting from an on-premises patient assault was an HCLC. *Ammons,* 266 S.W.3d at 64. The court, citing *Diversicare,* concluded that the supervision and restraint of patients was at issue and constituted health care under the facts of that case. *Id.* The *Ammons* court correctly reasoned that no language in the Act required that a "claimant" also necessarily be a "patient." *Id.* at 60–62.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

371 S.W.3d 171, 55 Tex. Sup. Ct. J. 1033
**(Cite as: 371 S.W.3d 171)**

### IV. Conclusion

Williams claims that West Oaks failed to properly train, warn and supervise him to **\*193** work with potentially violent psychiatric patients and, as a result, failed to provide a safe workplace. In 2003, the Legislature broadened the definition of health care liability claims under the Texas Medical Liability Act by adding new types of claims under the HCLC definition and expanding the scope of persons included within the Act's purview. *Compare* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13), *with* TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4) (repealed 2003). We conclude that Williams' claims against West Oaks are properly characterized as health care liability claims based on claimed departures from accepted standards of health care and safety. Williams failed to provide an expert report in accordance with section 74.351(a). TEX. CIV. PRAC. & REM.CODE § 74.351(a). We therefore reverse the judgment of the court of appeals affirming the trial court's order denying West Oaks' motion to dismiss all of Williams' claims. Because West Oaks requested its attorney's fees and costs in the trial court pursuant to Texas Civil Practice and Remedies Code section 74.35 1(b)(1), we remand to that court with instructions to dismiss Williams' claims against West Oaks and consider West Oaks' request for attorney's fees and costs.

Justice LEHRMANN filed a dissenting opinion, in which Justice MEDINA and Justice WILLETT joined.

Justice LEHRMANN, joined by Justice MEDINA and Justice WILLETT, dissenting.

"A whole new world [of health care liability claims], hinted by opinions in the last few years, is here." *In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 470 (Tex.2008) (Wainwright, J. dissenting). Interpreting a law designed to *reduce* the number of medical malpractice suits, the Court holds that an employee's claims against his employer for providing an unsafe workplace and inadequate training are health care liability claims. The Court's strained reading of the statute runs counter to express statutory language, the Legislature's stated purposes in enacting the current version of chapter 74, and common sense. Further, the Court's decision undermines the balance struck by the Legislature to encourage employers to become subscribers under the Workers Compensation Act. For these reasons, I am compelled to respectfully express my dissent.

### I. The Medical Liability Act Contemplates a Patient/ Physician Relationship Between the Parties
**A. The Act's plain language indicates that it applies to claims alleging a breach of a health care provider's duty to a patient.**

Our primary objective in construing a statute "is to ascertain and give effect to the Legislature's intent by first looking at the statute's plain and common meaning." *Tex. Natural Res. Conservation Comm'n v. Lakeshore Util. Co.,* 164 S.W.3d 368, 378 (Tex.2005). We divine that intent by reading the statute as a whole, and we interpret the legislation to give effect to the entire act. *Id.* (citing *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25 (Tex.2003)). Furthermore, we may look to the statutory context to determine a term's meaning. *City of Boerne,* 111 S.W.3d at 25. All of those tools lead to the conclusion that Williams's claims are not health care liability claims.

Under the Medical Liability Act, § 74.001 *et seq.,* a health care liability claim is

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional **\*194** or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). The Court concludes that Williams's suit against his employer for providing an unsafe workplace and inadequate training alleges health care liability claims, despite the lack of any physician-patient relationship between the health care provider and the claimant. 371 S.W.3d at 174. The Court first determines that Williams's claims are for a departure from health care standards because they "involve a patient-physician relationship." 371 S.W.3d at 181. Although that determination is more than enough to decide the case, the Court then

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

371 S.W.3d 171, 55 Tex. Sup. Ct. J. 1033
**(Cite as: 371 S.W.3d 171)**

reaches out to further expand the Act's scope by deciding that a claim under the "safety" prong of the health care liability claim definition need not be directly related to health care—even though Williams's claim *is,* in the Court's view—directly related to health care. Both conclusions are inconsistent with plain statutory language and sound statutory construction. The Act is replete with provisions indicating that a health care liability claim must be founded on a health care provider's alleged breach of a professional duty towards a patient. *See Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 851, 854 (Tex.2005). The Court's interpretation renders some of those provisions meaningless or nonsensical.

**1. Williams's claims are not "health care" claims, as the Court concludes.**

The Act defines "health care" as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider *for, to, or on behalf* of a patient *during the patient's medical care, treatment, or confinement.*" TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10) (emphasis added). Plainly, the Legislature contemplated that a health care liability claim based upon a departure from standards of health care would stem from medical treatment directed toward a particular patient—"the patient" whose care, treatment, or confinement is the subject of the lawsuit.

Based largely on the Legislature's use of the term "claimant" rather than "patient" in the health care liability claim definition, the Court determines that a claim falls under the health care prong of the definition even absent a physician-patient relationship so long as a physician-patient relationship is "involved." 371 S.W.3d at 189. As set out in section I.B. below, the Court's analysis of the significance of the Legislature's use of "claimant" in the definition flows from an erroneous premise and is deeply flawed; the Court's reliance on the change ignores the fact that the Legislature used the term throughout the Act's predecessor, including in its statement of legislative purpose. More importantly, the Legislature did not say that a health care claim must "involve" a patient. Indeed, the word is found nowhere in the definition of health care or health care liability

claim. Instead, health care claims arise from "act[s] or treatment furnished or that should have been furnished for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10) (emphasis added). Williams's claims allege that West Oaks failed to provide *him,* not the patient, adequate training and a safe work place.

Section 74.051 of the Act highlights the Court's error in concluding that the mere peripheral involvement of a patient transforms an ordinary negligence claim into a health care claim. That section requires health care liability claimants to provide **\*195** notice by certified mail to any health care provider against whom the claim is asserted sixty days before the claim is filed. TEX. CIV. PRAC. & REM.CODE § 74.051(a). The notice must be accompanied by a form authorizing the release of the medical records of "*the patient* " whose treatment is the subject of the claim. *Id.* §§ 74.051(d)( "All parties shall be entitled to obtain complete and unaltered copies of the patient's medical records...."); 74.052(c)A, B. Under the Court's reading of the statute, Williams would be required to authorize or obtain authorization for the release of Vidaurre's medical records to pursue his suit against his employer. Obviously, medical privacy laws prevent Williams from authorizing the release of Vidaurre's medical records. 45 C.F.R. § 164.502(f) (providing that Health Insurance Privacy and Portability Act restrictions apply to deceased individuals). While the Legislature sought to reduce frivolous claims against health care providers, it sought to do so without unduly restricting claims with merit. It is inconceivable that the Legislature intended to require health care claimants with meritorious claims to be blocked by the refusal of third parties (the patients "involved") to authorize release of their medical records.

Moreover, even if Williams were somehow able to obtain authorization from Vidaurre's estate, the records would not serve the purpose sections 74.051 and 74.052 were designed to serve: to " 'provide[ ] an opportunity for health care providers to investigate claims and possibly settle those with merit at an early stage.' " *Jose Carreras, M.D., P.A. v. Marroquin,* 339 S.W.3d 68, 73

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Tex.2011) (quoting *In re Collins,* 286 S.W.3d 911, 916–17 (Tex.2009)). Vidaurre's psychiatric diagnosis and violent tendencies are undisputed, and the records would have no bearing on the merits of Williams's claims against West Oaks for allegedly providing an unsafe workplace and inadequate training.

The Court discounts the import of these sections, finding no language to suggest that employee/employer disputes like this case are not health care liability claims. But section 74.052, which describes the statutory authorization form that must accompany the statutory notice provides:

(c) The medical authorization required by this section shall be in the following form[ ]:

(A) I, _____ (name of *patient* [*not* claimant] or authorized representative), hereby authorize _____ (name of physician or other health care provider to whom the notice of health care claim is directed) to obtain and disclose ... the protected health information described below....

Other provisions of the Act, which provide the relevant statutory context, *see City of Boerne,* 111 S.W.3d at 25, shore up the conclusion that health care liability claims arise from a health care provider's breach of a duty toward a particular patient. I examine several below.

**2. The Court's interpretation is inconsistent with provisions governing the expert reports and the qualifications of experts.**

The Court reverses the court of appeals' judgment and remands to the trial court, instructing it to dismiss because Williams failed to comply with the expert report requirement of section 74.351. But the very definition of "expert report" belies the Court's conclusion that Williams's allegations state claims for health care liability. An "expert report" is defined as

a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, **\*196** *the manner in which the care rendered by the physician*

*or health care provider failed to meet the standards,* and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM.CODE § 74.351(r)(6) (emphasis added). The emphasized language clearly contemplates that the defendant health care provider has delivered health care services to a patient, who has allegedly been injured by the provider's departure from applicable standards. The Court minimizes the definition's significance by noting that "[t]he fact that experts submitting reports have knowledge of the alleged standards deviated from does not logically lead to a conclusion that only a patient's suit against a health care provider can constitute an HCLC...." 371 S.W.3d at 190. That suggestion, however, overlooks the provision's reference to the health care provider's rendition of care.

The sections of the Act governing the qualifications of experts who may author reports similarly show that a health care liability claim arises only from a patient/health care provider relationship. Section 74.041 establishes the necessary qualifications for an expert in a suit against a physician. Among other qualifications, the expert must "ha[ve] knowledge of accepted standards of medical care for the *diagnosis, care, or treatment of the illness, injury, or condition involved in the claim.*" TEX. CIV. PRAC. & REM.CODE § 74.401(a)(2) (emphasis added). The definitions thus contemplates that the lawsuit will center on a physician's treatment of a patient's illness, injury, or condition, not on the adequacy of a workplace or the training provided to an employee.

**3. The jury instruction mandated by the Legislature contemplates that the claim arises from a health care provider's treatment of a patient.**

In section 74.303(e) of the Act, the Legislature mandated the inclusion of two express jury instructions "[i]n any action on a health care liability claim that is tried by a jury in any court in this state." The second of those is:

A finding of negligence may not be based solely on *evidence of a bad result* to the claimant in question, but *a bad result may be considered* by you, along

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

with other evidence, in determining the issue of negligence. You are the sole judges of the weight, if any, to be given to this kind of evidence.

*Id.* § 74.303(e)(2). This instruction reflects the long-recognized principle that a physician who exercises ordinary care, within his school or specialty, is not liable to a patient for a bad outcome. *See Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949). Clearly, the instruction only makes sense where a patient or the patient's proxy is dissatisfied by health care services delivered by a health care provider. In the context of the present case, in which the health care provider acted as an employer, the instruction becomes nonsensical.

**B. The Court's Interpretation Is Contrary to Our Prior Interpretations and Attaches Undue Importance to the Alteration of the Definition of "Health Care Liability Claim."**

Noting that "our focus ... is not the status of the claimant," 371 S.W.3d at 178, the Court rejects out of hand Williams's contention that the lack of a patient-physician relationship between him and West Oaks places his suit outside of the Act. It is true, as the Court asserts, that in *Diversicare* we placed great importance upon the essence of the claims, "the alleged wrongful conduct and the duties allegedly breached." 185 S.W.3d at 851. But in **\*197** rejecting Rubio's contention that her claim for a sexual assault by another patient should be treated as an ordinary premises liability claim, we attached equal importance to the claimant's status as a patient between the parties: "There is an important distinction in the relationship between premises owners and invitees on one hand and health care facilities and their patients on the other. The latter involves health care." *Id.* at 850. And we emphasized that, were we to agree with Rubio's position, "our decision would have the effect of lowering the standard from professional to ordinary care." *Id.* at 854. The presence of a doctor-patient relationship was undeniably important to our determination that Rubio's allegations amounted to health care liability claims.

The Court attaches much significance to the Legislature's alteration in 2003 of the definition of "health care liability claim." The Act's predecessor, the Medical Liability and Insurance Improvement Act, former article 4590i, defined the term as

a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury or death of the *patient,* whether the *patient's* claim or cause of action sounds in tort or contract.

Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.03(a)(4), 1997 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09 2003 Tex. Gen. Laws 847, 884 (emphasis added). In 2003, the Legislature replaced the word "patient" with the term "claimant." TEX. CIV. PRAC. & REM.CODE § 74.001(13). Without regard to the abundant indicia to the contrary throughout the Act, the Court concludes that this change contemplated health care liability claims that do not arise from the physician-patient relationship.

While claimant is a new term in the definition of health care liability claim, the word was used throughout the TMLIIA before the Legislature made that change. In fact, the Legislature used the term in describing the Act's very purpose: to alleviate a perceived health care crisis "in a manner that will not unduly restrict a *claimant's* rights any more than necessary to deal with the crisis." Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(13)(3), 1977 Tex. Gen. Laws 2039, 2040, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch 204, § 10.09 2003 Tex. Gen. Laws 847, 884 The term was also used and defined in section 13 of article 4590i. That section, the precursor of sections 74.351 and 74.352 of the current act, among other things, required a claimant in a health care liability claim to file an expert report within 180 days. Act of May 1, 1995, 74th Leg., R.S., ch. 971, § 1, sec. 13.01(d), (e), 1995 Tex. Gen. Laws 985, 985–986, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. "Claimant" was defined as

a party who files a pleading asserting a claim. All

plaintiffs claiming to have sustained damages as the result of the bodily injury or death of a single person are considered to be a single claimant.

Act of May 1, 1995, 74th Leg., R.S., ch. 971, § 1, sec. 13.01(d), (e), 1995 Tex. Gen Laws 985, 985–986, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch 204, § 10.09 2003 Tex. Gen. Laws 847, 884. Accordingly, even though "health care liability claim" referred to injury to or the death of a patient, the statute contemplated that others could pursue claims under article 4590i. And what parties could claim to have damages as the result of the injury or death of a patient but spouses or relatives with their own claims for loss of support or **\*198** consortium or mental anguish, or others acting in a representative capacity, such as an estate or next friend? In light of that history, it seems fairly obvious that the Legislature broadened the definition of "health care liability claim" in 2003 to harmonize the definition with its previous recognition that parties other than patients might suffer injuries as the result of a health care provider's departure from accepted standards in rendering health care services to a patient.[FN1]

> FN1. The Court also makes much of the Act's definition of "representative," a term used in the Act's medical records disclosure provision. TEX. CIV. PRAC. & REM.CODE §§ 74.001(a)(25), .052. "Representative" is defined as the "agent of the patient *or* claimant." The Court concludes this "indicat[es] that patient and claimant do not necessarily refer to the same category of persons." I agree, but my conclusion that "claimant" refers to parties with claims derived from a health care provider's breach of a duty toward a particular patient, such as guardians, executors, survivors, and next friends, is far more consistent with other provisions of the Act than the Court's.

## II. Safety Under the Act

Although its holding that Williams has asserted a claim for breach of a health care standard is dispositive, the Court reaches out to decide an issue that isn't even presented: whether a claim for safety under the Act must be directly related to health care. That issue isn't presented because, at least in the Court's view, Williams's claim *is* directly related to health care. West Oaks itself argued that Willams's claims "are inextricably interwoven with the rendition of health care services." Even if the question were properly before us, though, I would reach a different conclusion than the Court. I would hold that a claim for safety under the Health Care Liability Act must arise from a breach of a health care provider's duty to adequately ensure a patient's safety in providing health care services.

The Court's conclusion that a health care liability claim for breach of a safety standard depends entirely on the last antecedent doctrine, 371 S.W.3d at 182, or the notion that " '[m]odifiers should come, if possible, next to the words they modify.' " 371 S.W.3d at 184 (quoting William Strunk, Jr. & E.B. White, THE ELEMENTS OF STYLE R. 20 (4th ed. 2000)). In the Court's view, then, the Legislature would have had to frame the definition as "a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of ... safety *directly related to health care* or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract. Neither Strunk and White's instructions nor the last antecedent doctrine are so absolute as to require such redundancy. *See City of Dallas v. Stewart,* 361 S.W.3d 562, 571 n. 14 (Tex.2012). Instead, we should read the word in harmony with the other provisions I have discussed, and in conjunction with the words surrounding "safety," which all clearly implicate claims arising from a health care provider's delivery of medical care to a patient. *See City of Boerne,* 111 S.W.3d at 29 (citing *Cty. of Harris v. Eaton,* 573 S.W.2d 177, 179 (Tex.1978)).

The Court's reading of the term "safety"—"untouched by danger, not exposed to danger; secure from danger, harm or loss"—is so broad that almost any claim against a health care provider can now be deemed a health care liability claim. If a hospital cook leaves an unlit gas burner on and causes an ex-

plosion, claims for any resulting injuries might be health care liability**\*199** claims. If a nurse's deranged spouse arrives at a clinic and shoots her, her claim that the facility provided inadequate security will also fall under the statute. Surely the Legislature did not intend to make professional liability insurers responsible for such claims in order to solve an insurance availability crisis.

### III. The Court's Holding Undermines the Balance Struck by the Legislature in the Workers Compensation Act

I dissent also because, by forcing an employee's negligence suit against his employer for on-the-job injuries into the health-care-liability-claim mold, the Court significantly disrupts the delicate balance between employee and employer interests the Legislature sought to implement when it enacted the Texas Workers Compensation Act (TWCA). The TWCA permits an employee to bring a negligence action against a nonsubscriber like West Oaks. *See* TEX. LAB.CODE § 406.033. By making the common law defenses of assumption of the risk, negligence of a fellow employee, and contributory negligence unavailable to a nonsubscribing employer under the TWCA, *id.* at § 406.033(a), it is clear that the Legislature intended to "penalize[ ] nonsubscribers" and make it easier for their employees to recover. *Kroger Co. v. Keng,* 23 S.W.3d 347, 349, 352 (Tex.2000) (noting that "[t]o encourage employers to obtain workers' compensation insurance, [the TWCA] penalizes nonsubscribers by precluding them from asserting certain common-law defenses in their employees' personal injury actions" and that the "Legislature intended that an employee's fault would neither defeat nor diminish his or her recovery"). Under the Court's holding, employees of nonsubscribing healthcare providers will encounter procedural hurdles, such as the Act's notice and expert report requirements, that the TWCA does not contemplate. *See* TEX. CIV. PRAC. & REM.CODE §§ 74.051, 74.351. Failure to comply with these special requirements can result in harsh consequences, including dismissal of a claim with prejudice and assessment of attorneys fees against the plaintiff. *Id.* § 74.351(b). Rather than the health care provider being penalized for not subscribing to workers' compensa-

tion insurance, the Court's decision increases the burden and cost of pursuing negligence claims against nonsubscribers for employees of health care institutions. This will likely discourage healthcare workers from bringing smaller claims.

More importantly, the Act places strict limits on damages that may be recovered from health care providers. TEX. CIV. PRAC. & REM CODE §§ 74.301 –.303. By conferring the benefit of the Act's statutory damages cap on nonsubscribing health care providers, the Court gives health care provider nonsubscribers a benefit that is at odds with the measures the Legislature implemented to penalize employers who opt not to participate in the workers compensation system. "In enacting section 406.033 and its predecessors, the Legislature intended to delineate explicitly the structure of an employee's personal-injury action against his or her nonsubscribing employer." *Kroger v. Keng,* 23 S.W.3d at 350–351. Today's decision redraws that delineation.

### IV. The Court's Holding Undermines the Legislature's Stated Purposes

In enacting chapter 74, the Legislature found that "the number of health care liability claims [had] increased since 1995 inordinately[,] caus[ing] a serious public problem in availability and affordability of adequate medical professional liability insurance." Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(a)(1), (4), 2003 Tex. Gen. Laws 847, 884. It adopted the Act to reduce the frequency and decrease the **\*200** costs of those claims. *Id.* at § 10.11(b)(1), (2). By sweeping a whole new class of claims—negligence claims of employees of health care institutions—into chapter 74, the Court *increases* the number of health care liability claims and thwarts that purpose. Mystifyingly, the Court proclaims that its decision is "in harmony" with the Act's purposes because this new class of health care claimants will be required to file expert reports. 371 S.W.3d at 182–83, n. 5. To be sure, Williams's claim will be dismissed in the wake of today's decision—one claim will go away. But, in the future, employees in Williams's position will be forewarned that they must provide an expert report and undoubtedly will do so. The upshot of the Court's decision is that medical pro-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

371 S.W.3d 171, 55 Tex. Sup. Ct. J. 1033
**(Cite as: 371 S.W.3d 171)**

fessional liability insurers will be responsible for claims that normally would have fallen under a health care employer's workers compensation or comprehensive liability coverage.

The Court has previously declined to construe provisions of the Act in a way that would lead to absurd results. *Jose Carreras, M.D., P.A. v. Marroquin,* 339 S.W.3d 68, 72–73 (Tex.2011). It should do so here.

### V. Conclusion

The Court's conclusion that Williams's claim against his employer for providing inadequate training and an unsafe workplace is a health care liability claim is not only counterintuitive, it is inconsistent with the Act's express language and its underlying purposes. Furthermore, it alters the contours of employees' claims against nonsubscribing health care providers established in the Workers Compensation Act. For these reasons, I respectfully dissent.

Tex.,2012.
Texas West Oaks Hosp., LP v. Williams
371 S.W.3d 171, 55 Tex. Sup. Ct. J. 1033

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

401 S.W.3d 41, 56 Tex. Sup. Ct. J. 467
**(Cite as: 401 S.W.3d 41)**



Supreme Court of Texas.
TTHR LIMITED PARTNERSHIP d/b/a Presbyterian Hospital of Denton, Petitioner,
v.
Claudia MORENO, individually and as Next Friend of F.C., a Minor, Respondent.

No. 11–0630.
Argued Nov. 6, 2012.
Decided April 5, 2013.
Rehearing Denied June 7, 2013.

**Background:** Mother, individually and as next friend of child, sued hospital and two physicians for injuries to child during birth. The 362nd District Court, Denton County, Robert Bruce McFarling, J., denied hospital's motion to dismiss under Texas Medical Liability Act (TMLA). Hospital appealed. The Fort Worth Court of Appeals affirmed, 2011 WL 2651813. Hospital appealed.

**Holdings:** The Supreme Court, Johnson, J., held that:
(1) combined conclusions of three experts were adequate to satisfy expert report requirement of TMLA, and
(2) TMLA did not require an expert report as to each liability theory alleged against hospital.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Health 198H ☞804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
    Trial court did not abuse its discretion by de-termining pediatric nephrologist's, obstetrician's, and pediatric neurologist's reports were adequate to satisfy the expert report requirement of the Texas Medical Liability Act (TMLA) as to patient's claim that hospital was vicariously liable for the negligence of two physicians in connection with damage to patient's child's nervous system and kidneys during childbirth, where obstetrician stated a standard of care and opined that physicians breached the standard and thereby caused an extended labor and birthing process, and the other two experts opined that the extended birthing process caused the damage to the child's nervous system and kidneys. V.T.C.A., Civil Practice & Remedies Code § 74.351(a), (r)(6).

**[2] Health 198H ☞804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases
    Obstetrician/gynecologist's report was not improperly conclusory under the Texas Medical Liability Act (TMLA), in stating that the standard of care for a doctor caring for a patient presenting with conditions such as the mother in the present case was to immediately deliver the babies by cesarean section, that failing to do so was a breach of that standard, and that the physicians' failure to perform a cesarean section resulted in the extended labor and birthing process. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[3] Health 198H ☞804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of merit or meritorious defense; expert affidavits. Most Cited Cases

401 S.W.3d 41, 56 Tex. Sup. Ct. J. 467
**(Cite as: 401 S.W.3d 41)**

The Texas Medical Liability Act (TMLA) requires a claimant to timely file an adequate expert report as to each defendant in a health care liability claim, but it does not require an expert report as to each liability theory alleged against that defendant. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**\*42** J. Kevin Oncken, Roger A. Berger, Uzick Oncken, P.C., Houston, TX, for Petitioner.

Craig T. Enoch, Enoch Kever PLLC, Austin, TX, Lawrence R. Lassiter, Les Weisbrod, Max E. Freeman II, Miller Weisbrod LLP, Dallas, TX, for Respondent.

Justice JOHNSON delivered the opinion of the Court.

Plaintiffs suing on health care liability claims must serve each defendant with an expert report meeting the requirements of the Texas Medical Liability Act ("TMLA" or "the Act")[FN1] or face dismissal of their claims. We recently held that an expert report satisfying the requirements of the TMLA as to a defendant, even if it addresses only one theory of liability alleged against that defendant, is sufficient for the entire suit to proceed against the defendant. *Certified EMS, Inc. v. Potts,* 392 S.W.3d 625 (Tex.2013). In this case the plaintiff's expert reports satisfy the TMLA requirements as to her claim that a hospital is vicariously liable for the allegedly negligent actions of two doctors. Accordingly, the plaintiff's case against the hospital may proceed.

> FN1. TEX. CIV. PRAC. & REM.CODE §§ 74.001–.507.

We affirm the judgment of the court of appeals in part, reverse in part, and remand the cause to the trial court for further proceedings.

## I. Background

Claudia Moreno, pregnant with twins, was admitted to TTHR Ltd., d/b/a Presbyterian Hospital of Denton ("Presbyterian" or "the hospital") for diffi-

culties associated with the pregnancy. The hospital's nurses began having problems monitoring Moreno and the twins, so they paged the physician on call, Dr. Lorie Gore–Green. Dr. Gore–**\*43** Green and Moreno's regular doctor, Dr. Marc Wilson, attended to Moreno the next morning. Dr. Wilson induced labor and used forceps and vacuum extraction to deliver the second baby, F.C. At some point shortly before or during the birth process F.C. suffered blood loss and a hypoxic-ischemic insult. It was later determined that his nervous system and kidneys were damaged.

Moreno, individually and as next friend of F.C., sued the hospital, Dr. Wilson, and Dr. Gore–Green.[FN2] She alleged that the hospital was liable for the injuries to F.C. because of its own direct negligence as well as its vicarious liability for the negligence of its nurses and the two doctors.

> FN2. Neither Dr. Wilson nor Dr. Gore–Green are parties to this appeal. We will reference only the claims against the hospital.

Moreno timely served Presbyterian with a report by Dr. Samuel Tyuluman, an obstetrician and gynecologist. *See* TEX. CIV. PRAC. & REM.CODE § 74.351(a) (requiring service of an expert report not later than the 120th day after a health care liability claim is filed). The hospital objected to Dr. Tyuluman's report on the basis that he was not qualified to express opinions about the cause of F.C.'s neurological and kidney damage, and also because his opinions about the standards of care, breach of the standards, and causation were conclusory. In response to the objections, Moreno served a report by Dr. Billy Arant, a pediatric nephrologist.[FN3] *See id.* § 74.351(i) (authorizing fulfilling the expert report requirements by serving multiple reports). Presbyterian objected to Dr. Arant's report on various grounds.

> FN3. Nephrology involves the study of functions and treatment of the kidneys.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

401 S.W.3d 41, 56 Tex. Sup. Ct. J. 467
**(Cite as: 401 S.W.3d 41)**

The trial court sustained only Presbyterian's objection that the reports failed to show a causal relationship between the alleged failures of the hospital and its nurses to meet the applicable standards of care and F.C.'s neurological injury. The court granted Moreno a thirty-day extension to cure the reports. *See id.* § 74.351(c) (providing that if "elements of the report are found deficient, the court may grant one thirty-day extension to the claimant in order to cure the deficiency"). She then filed a report by Dr. John Seals, a pediatric neurologist. Presbyterian objected to Dr. Seals's report on the basis that it did not set out any acts of alleged negligence on the part of the hospital, nor did it set out a causal connection between any allegedly negligent act or omission of the hospital or its nurses and F.C.'s neurological injury. The trial court determined that when the reports of Drs. Tyuluman, Arant, and Seals were read in concert, Moreno had met the TMLA's requirements. It denied the hospital's motion to dismiss, and this interlocutory appeal followed. *See id.* § 51.014(a)(9).

The court of appeals affirmed as to the adequacy of the reports regarding Moreno's claim that Presbyterian is vicariously liable for the doctors' negligence. 401 S.W.3d 163. In doing so, it determined that Dr. Tyuluman's report specified several standards of care, how the defendant doctors breached them, and that Drs. Arant and Seals were qualified to and did opine on the causal connection between the breaches by the doctors and F.C.'s injuries. *Id.* at 169. The appeals court also determined that the reports adequately addressed a causal relationship between the events at delivery and F.C.'s neurological and kidney injuries. *Id.* at 170. But in addressing the direct liability claims, the court concluded that Dr. Tyuluman's report did not adequately address the applicable standards of care or how Presbyterian breached those standards, and neither **\*44** the report of Dr. Arant nor that of Dr. Seals addressed any standard or breach by the hospital. *Id.* at 167. As to the vicarious liability claims based on the nurses' actions, the court concluded that Dr. Tyuluman's report did not state how any of the nurses violated applicable standards of nursing care and the reports of Drs. Arant and Seals did not attempt to address either nursing standards of care or breaches of those standards. *Id.* at 170. The court remanded the case to the trial court and instructed it to consider granting Moreno a thirty-day extension to cure the deficiencies found on appeal. *Id.* at 170.

Presbyterian appeals, arguing that the court of appeals erred by concluding Moreno's reports were adequate as to causation, but even if the reports were adequate in that respect, the court erred by remanding the case for the trial court to consider granting another thirty-day extension to cure the other deficiencies.

After we heard oral argument in this case we held in *Certified EMS* that the TMLA does not require an expert report for each liability theory pleaded against a defendant. *Certified EMS, Inc.,* 392 S.W.3d at 632. Our decision in that case controls the outcome here because we conclude that Moreno's expert reports addressing the hospital's alleged liability for the actions of Drs. Wilson and Gore–Green are adequate. Given that determination, we do not address whether the court of appeals erred by remanding the case for the trial court to consider granting a second extension of time for Moreno to cure deficiencies in her reports.

## II. Vicarious Liability for the Doctors' Actions

[1] The court of appeals held that the trial court did not abuse its discretion by determining Moreno's reports were adequate as to her claim that the hospital is vicariously liable for the negligence of Drs. Wilson and Gore–Green. 401 S.W.3d at 166. Its review of the trial court's ruling was under the abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). So is ours, and we reach the same conclusion as did the court of appeals.

[2] A valid expert report under the TMLA must provide: (1) a fair summary of the applicable standards of care; (2) the manner in which the physician or health care provider failed to meet those stand-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ards; and (3) the causal relationship between that failure and the harm alleged. TEX. CIV. PRAC. & REM.CODE § 74.351(r)(6). Dr. Tyuluman's report set out applicable standards of care for doctors treating a patient with conditions similar to those with which Moreno presented. He opined that (1) the standard of care for a doctor caring for a patient presenting with conditions such as Moreno's was to immediately deliver the babies by cesarean section; (2) failing to do so was a breach of that standard; and (3) the doctors' failing to perform a cesarean section resulted in the extended labor and birthing process. We agree with the court of appeals that as to the foregoing standard of care and breach, Dr. Tyuluman's report was not conclusory. Dr. Arant's report explained that asphyxia during the birth process caused F.C.'s kidney injury, and Dr. Seals's report stated his opinion that the hypoxic-ischemic event during the labor and delivery process caused F.C.'s brain injury. Accordingly, we agree with the court of appeals that the trial court did not abuse its discretion by finding Moreno's reports adequate as to the claim that Presbyterian is vicariously liable for actions of the doctors.[FN4]

> FN4. Presbyterian does not concede that it can be held vicariously liable for the doctors' actions. But it acknowledges that whether it can be is not a question to be determined in this appeal.

**\*45 III. Direct Liability and Vicarious Liability for Nurses' Negligence**

[3] As we articulated in *Certified EMS,* the TMLA requires a claimant to timely file an adequate expert report as to each defendant in a health care liability claim, but it does not require an expert report as to each liability theory alleged against that defendant. *Certified EMS, Inc.,* 392 S.W.3d at 632. Here, because the trial court did not abuse its discretion in finding Moreno's reports adequate as to her theory that Presbyterian is vicariously liable for the doctors' actions, her suit against Presbyterian—including her claims that the hospital has direct liability and vicarious liability for actions of the

nurses—may proceed. *See id.* at 632.

**IV. Conclusion**

We affirm the court of appeals' judgment as to the adequacy of the reports regarding the claim that Presbyterian is vicariously liable for the doctors' actions. We need not and do not consider whether the TMLA authorized the court of appeals to remand the case to the trial court for it to consider granting a second extension of time for Moreno to cure her reports. We reverse that part of the court of appeals' judgment by which it did so, but affirm its judgment remanding the entire suit to the trial court.

The cause is remanded to the trial court for further proceedings consistent with this opinion.

Tex.,2013.
TTHR Ltd. Partnership v. Moreno
401 S.W.3d 41, 56 Tex. Sup. Ct. J. 467

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


281 S.W.3d 207
**(Cite as: 281 S.W.3d 207)**



Court of Appeals of Texas,
Dallas.
UHS OF TIMBERLAWN, INC., Appellant,
v.
S.B., a Minor, by and through her Next Friend,
A.B., Appellee.

No. 05–08–00222–CV.
Feb. 24, 2009.

**Background:** Former patient brought action against psychiatric treatment facility, alleging that she was placed in a ward with male patients and one of them raped her. The 160th Judicial District Court, Dallas County, Jim Jordan, J., denied facility's motion to dismiss, and facility appealed.

**Holdings:** The Court of Appeals, Moseley, J., held that:
(1) in order to identify the causal relationship between actions of treatment facility and patient's claimed injury, patient was not required, under health care liability statute, to proffer an expert report opining that she was in fact raped; and
(2) report of patient's expert contained adequate statements regarding causation so as to satisfy expert report requirement of health care liability statute.

Affirmed.

West Headnotes

**[1] Health 198H ⊂⇝804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited Cases
    Appellate courts consider only the expert's report and curriculum vitae in determining whether the witness is qualified as an expert under health care liability statute. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(5)(C).

**[2] Health 198H ⊂⇝804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited Cases
    Under health care liability statute, the expert report must represent a good-faith effort to provide a fair summary of the expert's opinions. V.T.C.A., Civil Practice & Remedies Code § 74.351(*l* ), (r)(6).

**[3] Health 198H ⊂⇝804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited Cases
    Health care liability statute's expert-report requirement serves two purposes: (1) to inform the defendant of the specific conduct the plaintiff has called into question; and (2) to provide a basis for the trial court to conclude the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[4] Health 198H ⊂⇝804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited

281 S.W.3d 207
**(Cite as: 281 S.W.3d 207)**

Cases

Expert report does not comply with health care liability statute if it fails to address the standard of care, breach of the standard, and causation, or if it only states the expert's conclusions regarding these elements. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[5] Health 198H ☜804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
        198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited Cases

Although the expert report need not marshal all of the plaintiff's proof, it must include the expert's opinion on each of the elements identified in the health care liability statute. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[6] Health 198H ☜804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
        198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited Cases

Under health care liability statute, expert's report must explain the basis of his or her statements to link those conclusions to the facts. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[7] Appeal and Error 30 ☜960(1)**

30 Appeal and Error
    30XVI Review
      30XVI(H) Discretion of Lower Court
        30k960 Rulings on Motions Relating to Pleadings
          30k960(1) k. In General. Most Cited Cases

Traditionally, appellate courts apply an abuse of discretion standard in reviewing the trial court's decision to deny a motion to dismiss based on failure to file an adequate expert report under health care liability statute. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[8] Appeal and Error 30 ☜946**

30 Appeal and Error
    30XVI Review
      30XVI(H) Discretion of Lower Court
        30k944 Power to Review
          30k946 k. Abuse of Discretion. Most Cited Cases

Trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles.

**[9] Appeal and Error 30 ☜946**

30 Appeal and Error
    30XVI Review
      30XVI(H) Discretion of Lower Court
        30k944 Power to Review
          30k946 k. Abuse of Discretion. Most Cited Cases

**Appeal and Error 30 ☜1008.1(3)**

30 Appeal and Error
    30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
        30XVI(I)3 Findings of Court
          30k1008 Conclusiveness in General
            30k1008.1 In General
              30k1008.1(3) k. Substituting Reviewing Court's Judgment. Most Cited Cases

Appellate court may not substitute its judgment for the trial court's judgment, or find that the trial court abused its discretion merely because appellate court would have decided the matter differently.

**[10] Health 198H ☜804**

198H Health

198HV Malpractice, Negligence, or Breach of Duty

198HV(G) Actions and Proceedings

198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited Cases

In order to identify the causal relationship between actions of psychiatric treatment facility and patient's claimed injury, patient was not required under health care liability statute to proffer an expert report opining that she was in fact raped; patient alleged that, as result of facility's failure to meet the applicable standards of care relevant to its treatment of her, she was raped, rape was not a medical condition, and instead, it was an assault, and medical evidence of an alleged sexual assault was not required even in criminal prosecutions. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[11] Health 198H ⟲631**

198H Health

198HV Malpractice, Negligence, or Breach of Duty

198HV(B) Duties and Liabilities in General

198Hk630 Proximate Cause

198Hk631 k. In General. Most Cited Cases

In some health care liability claims, the injury, harm, or damages claimed flow from existence of a medical condition that itself resulted from the breach of the applicable standard of care, and in such cases, identifying the causal relationship between the alleged breach of the standard of care and the resulting harm involves not only explanation as to how standard of care was breached, but also how the breach gave rise to the new, deleterious medical condition.

**[12] Health 198H ⟲821(3)**

198H Health

198HV Malpractice, Negligence, or Breach of Duty

198HV(G) Actions and Proceedings

198Hk815 Evidence

198Hk821 Necessity of Expert Testimony

198Hk821(3) k. Proximate Cause. Most Cited Cases

Some health care liability claims may allege that a breach of the applicable standard of care exacerbated a pre-existing medical condition, or hindered or prevented the effective treatment of such a condition, and identifying the "breach/injury" causal relationship in these cases may require an expert to opine as to the existence, extent, and prognosis of the pre-existing medical condition, as well as how the alleged breach of the standard of care aggravated such a condition, impeded or prohibited its treatment, and otherwise affected the patient's prognosis.

**[13] Rape 321 ⟲51(3)**

321 Rape

321II Prosecution

321II(B) Evidence

321k50 Weight and Sufficiency

321k51 In General

321k51(3) k. Carnal Knowledge. Most Cited Cases

Medical evidence of an alleged sexual assault is not required in criminal prosecutions; the rule in Texas is that penetration may be proven by circumstantial evidence.

**[14] Rape 321 ⟲54(1)**

321 Rape

321II Prosecution

321II(B) Evidence

321k50 Weight and Sufficiency

321k54 Corroboration of Female

321k54(1) k. Necessity. Most Cited Cases

The testimony of a sexual assault victim alone is sufficient evidence of penetration to support a criminal conviction, even if the victim is a child.

**[15] Health 198H ⟲804**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited Cases

Under health care liability statute, an expert report need not marshal the claimant's evidence, but it should explain the basis of the expert's opinions and link his conclusions to the facts. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[16] Health 198H ☞804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
           198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited Cases

Report of patient's expert contained adequate statements regarding causation so as to satisfy expert report requirement of health care liability statute with respect to patient's claim that, as result of psychiatric treatment facility's failure to meet the applicable standards of care relevant to its treatment of her, she was raped when she was placed in ward with male patients; expert's report stated that, because patient had a history of past sexual victimization and risk factors of a co-morbid developmental disability and a psychiatric disorder, the standard of care required facility to provide housing where patient could not be accessed by unsupervised males. V.T.C.A., Civil Practice & Remedies Code § 74.351.

**\*209** Sidney L. Murphy, Steed Flagg, L.L.P., Rockwell, Cathy F. Bailey, Steed Flagg, LLP, Dallas, for Appellant.

Vicki Kathleen McCarthy, Duncanville, Kirk L. Pittard, F. Leighton Durham, Cheyenne J. Robertson, Durham & Pittard, Dallas, for Appellee.

Before Justices MOSELEY, RICHTER, and FRANCIS.

## OPINION

Opinion by Justice MOSELEY.

Appellee S.B., acting through her next friend A.B., sued appellant UHS of Timberlawn, Inc. She alleges that while she was thirteen years old and a patient at Timberlawn's psychiatric treatment facility, she was placed in a ward with male patients, where one of them raped her. She claims her injuries were proximately caused by the negligence of Timberlawn's employees.

Timberlawn asserts, among other things, that the report of S.B.'s expert, Dr. Michael Jay Levine, is deficient because he did not opine as to whether S.B. was in fact raped; neither does the report indicate Levine was qualified to render such an opinion. We affirm the trial court's order denying Timberlawn's motion to dismiss.

### \*210 PROCEDURAL BACKGROUND

S.B. filed the curriculum vitae and report of Dr. Levine within 120 days of the filing of the petition. *See* TEX. CIV. P. & REM. C.. § 74.351 (Vernon Supp.2008). Timberlawn successfully disputed the adequacy of that report, and the trial court gave S.B. an additional thirty days to cure any deficiencies in Levine's report. *See id.* § 74.351(c). Thereafter, S.B. filed another report and curriculum vitae from Dr. Levine, entitled "Revised Expert Report." Timberlawn also objected to adequacy of this report, and filed a motion to dismiss. However, the trial court denied Timberlawn's motion. Timberlawn appealed. *See id.* §§ 51.014(a)(9); 74.351(b); *Lewis v. Funderburk,* 253 S.W.3d 204, 206–08 (Tex.2008); *Romero v. Lieberman,* 232 S.W.3d 385, 388 (Tex.App.-Dallas 2007, no pet.).

### APPLICABLE LAW

Within 120 days of filing suit, a plaintiff asserting a healthcare liability claim must serve expert reports for each physician or health care provider against whom such a claim is asserted. TEX.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

CIV. PRAC. & REM.CODE § 74.351(a). These reports must identify the "applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6).

[1] As pertinent to this appeal, an "expert" means "with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5)(C). To be so qualified under the Texas Rules of Evidence, an expert must have knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *Broders v. Heise,* 924 S.W.2d 148, 153 (Tex.1996) (citing rule of evidence 702). We consider only the expert's report and CV in determining whether the witness is qualified as an expert under section 74.351. *See Mem'l Hermann Healthcare Sys. v. Burrell,* 230 S.W.3d 755, 758 (Tex.App.-Houston [14th Dist.] 2007, no pet).

[2][3][4][5][6] Under subsections 74.351(*l* ) and (r)(6), the expert report or reports must represent a good-faith effort to provide a fair summary of the expert's opinions. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). The expert-report requirement serves two purposes: (1) to inform the defendant of the specific conduct the plaintiff has called into question; and (2) to provide a basis for the trial court to conclude the claims have merit. *Id.* at 879. A report does not fulfill these purposes if it fails to address the standard of care, breach of the standard, and causation, or if it only states the expert's conclusions regarding these elements. *Id.* at 879. Although the report need not marshal all of the plaintiff's

proof, it must include the expert's opinion on each of the elements identified in the statute. *See id.* at 878. Moreover, the expert's report must explain the basis of his or her statements to link those conclusions to the facts. *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999); *Mosely v. Mundine,* 249 S.W.3d 775, 780 (Tex.App.-Dallas 2008, no pet.).

## STANDARD OF REVIEW

[7][8][9] Traditionally we apply an abuse of discretion standard in reviewing the trial court's decision to deny a motion to **\*211** dismiss based on failure to file an adequate expert report. *See Walker v. Gutierrez,* 111 S.W.3d 56, 63 (Tex.2003) (discussing predecessor statute to § 74.351(c)).[FN1] The trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (per curiam); *Mosely,* 249 S.W.3d at 778. We may not substitute our judgment for the trial court's judgment, or find that the trial court abused its discretion merely because we would have decided the matter differently. *Id.* If, however, the trial court clearly failed to analyze and determine the law correctly or applied the law incorrectly to the facts, then it abused its discretion. *Id.*

> FN1. Timberlawn recognizes this; nevertheless, citing discussions (but not rulings) in two court of appeals' opinions, it contends we should apply a de novo standard. Those two opinions are *Kendrick v. Garcia,* 171 S.W.3d 698, 702 (Tex.App.-Eastland 2005, pet. denied), and *Quint v. Alexander,* No. 03–04–00819–CV, 2005 WL 2805576 (Tex.App.-Austin 2005, pet denied.). However, Timberlawn provides no additional briefing, or any analysis or discussion as to how the two standards might differ in the context of this appeal. Thus we decline Timberlawn's invitation.

## ANALYSIS

On appeal Timberlawn asserts several com-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

281 S.W.3d 207
**(Cite as: 281 S.W.3d 207)**

plaints about the revised expert report.

## A. "New" Report

In its fourth issue Timberlawn argues the revised report contains new opinions with regard to the breach of the standard of care and causation, and thus constitutes a "new report" that: (1) was improperly filed after the time limitations provided by section 74.351; and (2) "exceeds the scope of § 74.351(c)." It argues the statute "does not allow a plaintiff to obtain and serve a new report." As sole support for its argument, Timberlawn cites the court of appeals's opinion in *Danos v. Rittger,* 253 S.W.3d 294 (Tex.App.-Houston [1st Dist.] 2007), *rev'd* 253 S.W.3d 215 (Tex.2008). As the Texas Supreme Court reversed the court of appeals on that point, we overrule Timberlawn's fourth issue. *See Danos v. Rittger,* 253 S.W.3d 215 (Tex.2008) (citing *Lewis v. Funderburk,* 253 S.W.3d 204 (Tex.2008)).

## B. Causation-related Complaints

[10] In its remaining issues, Timberlawn asserts Levine's revised report and curriculum vitae do not establish he is qualified to render an opinion as to causation, and the revised report is inadequate and conclusory as to that issue. These arguments all flow from Timberlawn's position disputing whether S.B. was, in fact, raped.

Timberlawn contends that, absent a statement in Levine's revised report (presumably based on all reasonable medical probability) that S.B. was in fact raped, Levine's revised report fails to identify the "causal relationship between [Timberlawn's actions] and the injury, harm, or damages claimed." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). Timberlawn argues Levine did not opine, nor did he show he was qualified to opine, as to whether S.B. had been raped. Timberlawn's arguments are best summarized in the conclusion and prayer set forth in its brief:

[Levine] did not and/or could not express an opinion, based on his education, training or experience, that [S.B.] was sexually assaulted or

raped. [S.B.'s] expert did not nor could not articulate facts to support any opinion that [Timberlawn's] alleged breaches in the standard **\*212** of care proximately caused [S.B.'s] alleged sexual assault or rape. [S.B.'s] expert has not shown himself to be qualified to render an opinion that [S.B.] was sexually assaulted or raped or that the alleged breaches in the standard of care proximately caused [S.B.'s] sexual assault or rape.[FN2]

> FN2. Timberlawn's brief continues:
>
> > Accordingly, this case has no merit, and there is no basis to continue to take up the time and resources of the Trial Court, to expend the time, energy, and resources of the litigants, or even to put [S.B.] through what will undoubtedly be a traumatic experience of discovery, deposition, and trial testimony, reliving her past medical, psychiatric, and educational history, not to mention her 'past history of sexual victimization', and the matters alleged in this lawsuit. This case is the very type of case that Chapter 74 was designed to require the Court to dismiss at an early stage

Thus, the premise of Timberlawn's arguments is that unless S.B. can present the report of a qualified expert opining that S.B. was actually raped, her expert report(s) cannot identify the alleged causal relationship between Timberlawn's actions or omissions and S.B.'s alleged injuries, as required by section 74.351(r)(6). We reject this premise.

[11][12] In some healthcare liability claims, the "injury, harm, or damages claimed" flow from the existence of a medical condition that itself resulted from the breach of the applicable standard of care. In such cases, identifying the causal relationship between the alleged breach of the standard of care and the resulting harm involves not only an explanation as to how the standard of care was breached,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

281 S.W.3d 207
**(Cite as: 281 S.W.3d 207)**

but also how the breach gave rise to the new, deleterious medical condition. Similarly, other healthcare liability claims may allege that a breach of the applicable standard of care exacerbated a pre-existing medical condition, or hindered or prevented the effective treatment of such a condition. Identifying the "breach/injury" causal relationship in these cases may well require an expert to opine as to the existence, extent, and prognosis of the pre-existing medical condition, as well as how the alleged breach of the standard of care aggravated such a condition, impeded or prohibited its treatment, and otherwise affected the patient's prognosis.

However, S.B.'s claim is different. S.B. alleges that, as a result of Timberlawn's failure to meet the applicable standards of care relevant to its treatment of her, she was raped. Rape is not a medical condition. It is an assault. Moreover, rape may—or may not—be accompanied by medically ascertainable evidence of physical trauma, or even physical evidence that it occurred.

[13][14] Medical evidence of an alleged sexual assault is not required even in criminal prosecutions; the rule in Texas is that "penetration may be proven by circumstantial evidence." *See Villalon v. State,* 791 S.W.2d 130, 133 (Tex.Crim.App.1990). Moreover, the testimony of a sexual assault victim alone is sufficient evidence of penetration to support a criminal conviction, even if the victim is a child. *Karnes v. State,* 873 S.W.2d 92, 96 (Tex.App.-Dallas 1994, no pet.) (citing *Garcia v. State,* 563 S.W.2d 925, 928 (Tex.Crim.App. [Panel Op.] 1978)).

We decline to hold that in order to identify the causal relationship between Timberlawn's actions and S.B.'s claimed injury, *see* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6), she was required to proffer an expert report opining that she was in fact raped. Thus we reject Timberlawn's arguments that the trial court erred in not dismissing S.B.'s claim because: (1) Levine's**213** report did not show him to be qualified to render an opinion on

whether S.B. was in fact raped; and (2) because Levine's report did not render an opinion on that issue.

1. Levine's Qualifications

The standard of care relevant to S.B.'s claim is the assessment, treatment, and housing of an adolescent mental patient in a mental health facility. Timberlawn does not dispute Levine's qualifications to opine as to that standard or as to the breach of that standard. We agree the record shows the trial court could have concluded S.B. met her burden to show Levine had the knowledge, skill, experience, training, or education necessary to opine whether Timberlawn's conduct breached the applicable standard of care and caused her injury.[FN3] *See Broders,* 924 S.W.2d at 153; *Mosely,* 249 S.W.3d at 779. We conclude the trial court did not abuse its discretion in overruling Timberlawn's objection to Levine's qualifications as an expert pursuant to section 74.351(r)(5). We overrule Timberlawn's issue based on Levine's qualifications.

> FN3. Levine is a licensed medical doctor and a clinical associate professor at the Department of Psychiatry and Behavioral Sciences at the University of Texas–Houston Medical School. He has worked at hospitals in Texas and other states since completing his residency in 1972 in positions involving child and adolescent neurodevelopmental diagnosis and treatment. He trains and supervises medical students, psychiatry residents, child psychiatry fellows, and psychology interns and externs. Levine's curriculum vitae shows he has extensive training and experience with the assessment, evaluation, and treatment of children and adolescents in a mental health facility or hospital. *See Mosely,* 249 S.W.3d at 779–80 (emergency room physician qualified to opine about causation regarding emergency room physician's ability to interpret routine chest x-rays and identify abnormality in patient later dia-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

281 S.W.3d 207
**(Cite as: 281 S.W.3d 207)**

gnosed with cancer); *Palafox v. Silvey,* 247 S.W.3d 310, 316 (Tex.App.-El Paso 2007, no pet.) (physician with training and experience working with elderly patients and knowledge of "swallowing mechanism" qualified to offer opinion on cause of patient's aspiration and death after defendant placed her on non-pureed diet).

2. Adequacy of Report Regarding Causation

[15][16] An expert report need not marshal the claimant's evidence, but it should explain the basis of the expert's opinions and link his conclusions to the facts. *Bowie Mem'l Hosp.,* 79 S.W.3d at 52. Thus, Levine's report should link Timberlawn's alleged negligence with S.B.'s alleged harm or injuries-her sexual assault by a male patient. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 52; *Costello v. Christus Santa Rosa Health Care Corp.,* 141 S.W.3d 245, 249 (Tex.App.-San Antonio 2004, no pet.) ("[C]ausation is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and without which the harm would not have occurred.").

Levine's report states the applicable standard of care required Timberlawn to "provide individualized assessment, and adequate medical treatment in the least restrictive environment and access to advocacy services." Specifically, because S.B. had a history of past sexual victimization and "the risk factors of a co-morbid developmental disability and a psychiatric disorder, the standard of care required Timberlawn to provide[ ] housing where [S.B.] could not be accessed by unsupervised males." The report also states: "If [S.B.] needed to be housed on a unit where males would be located, the standard of care would require Timberlawn to provide a room which could not be accessed by an unsupervised male."

Levine stated Timberlawn breached the standard of care by failing to provide S.B. with individualized assessment, adequate **\*214** medical treatment in the least restrictive environment, and an environment and housing where she would be kept safe.

Levine's report states in part that S.B.

was actually housed on the male side of the treatment unit. Once housed on the male unit [S.B.] should have been provided a room which could not be accessed by unsupervised male patients. Instead her room was accessed by an unsupervised male, who, she reported, sexually assaulted her. It is my best professional medical opinion from the available reviewed materials that Timberlawn failed to provide individualized assessment, and failed to provide particularly adequate protection from harm such as sexual victimization. Specifically, that Timberlawn breached its duty by housing [S.B.] in such a manner that a male patient was able to obtain access to her for sexual victimization.

According to Levine, if Timberlawn had followed the standard of care, S.B. would have been housed on the girls side of the treatment unit "where she would not have been exposed to harm and/or victimization from male patients." The report also indicates that housing S.B. in a male unit "exposed her to harm which resulted in her self reported rape. Had [S.B.] been housed in a safe and appropriate manner, given her propensity for sexual victimization, she would not have been placed in a male unit."

The report also addresses how the breach of the standard of care caused S.B.'s injury. Specifically, the report states housing S.B.

in the male unit exposed her to harm which resulted in her self reported rape. Had [S.B.] been housed in a safe and appropriate manner, given her propensity for sexual victimization, she would not have been placed in a male unit. By being housed in a male unit it was foreseeable that [S.B.] would be exposed to and was at higher risk for the exact self reported harm which she suffered which was the assault she reported by a 16 year old male patient. [FN4]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN4. Levine's report also states in part:

Had Timberlawn followed the applicable standard of care discussed above, and not breached the standard of care, as discussed above, [S.B.] would have been properly evaluated, and properly housed on the girls side of the treatment Unit she would have been in the least restrictive environment, where she would not have been exposed to harm and/or victimization from male patients. Had Timberlawn carefully reviewed [S.B.'s] past medical, psychiatric and educational database and made an adequate current evaluation, they would have identified the past history of sexual victimization and the risk factors of a co-morbid developmental disability and psychiatric disorder which made [S.B.] more susceptible to sexual victimization and which required an enhanced specific treatment and protection....

The Sexual Assault reported by [S.B.] resulted in a termination of her stay at Timberlawn, rape crises intervention, fear of pregnancy and due to deterioration of her mental state the eventual readmittance to another facility. As a direct and proximate cause of the improper housing and security provided, [S.B.] reported a sexual assault which stopped her treatment at Timberlawn and required her to be sent to Parkland Hospital for a rape exam. At the age of 13 she was prescribed and took the morning after pill to prevent a pregnancy. The records show that she developed a fear of getting pregnant or catching a disease. She was unable to complete her therapy program at Timberlawn and went home. She continued to miss school and the home therapist reported that she continued to be upset and had suicidal thoughts. After being at home less than two [w]eeks she was readmitted to another facility, Green Oaks where she had to restart with a new therapy program.

We conclude Levine's report identified the specific conduct of Timberlawn called **\*215** into question by S.B. and provided a sufficient basis for the trial court to conclude the claim has merit. *See Palacios,* 46 S.W.3d at 879. Therefore, the trial court did not abuse its discretion in denying the motion to dismiss. We overrule Timberlawn's issues concerning the adequacy of the expert report.

### CONCLUSION

Having rejected all of Timberlawn's issues, we affirm the trial court's order.

Tex.App.–Dallas,2009.
UHS of Timberlawn, Inc. v. S.B. ex rel. A.B.
281 S.W.3d 207

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Court of Appeals of Texas,
San Antonio.
Michael Fawzy WISSA, M.D., Appellant,
v.
Mark VOOSEN, Karen Voosen, and Mary Elizabeth ("Emmy") Voosen, Appellees.

No. 04–07–00386–CV.
Sept. 26, 2007.

**Background:** Patient brought action against doctors and anesthesiologist for medical negligence, alleging failure to properly diagnose and treat her wound infection resulting in unnecessary surgeries, chronic infection, pain and suffering and impairment to her ankle. The 45th Judicial District Court, Bexar County, Janet P. Littlejohn, J., denied anesthesiologist's motion to dismiss, and he appealed.

**Holding:** The Court of Appeals, Phylis J. Speedlin, J., held that doctor's expert report was adequate under Medical Liability and Insurance Improvement Act.

Affirmed.

West Headnotes

**[1] Health 198H ⟞804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited Cases

In order to comply with statutory requirements, expert report in medical malpractice action must both inform the defendant of the specific conduct the plaintiff has called into question, and provide a basis for the trial court to conclude that the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351(a), (r)(6).

**[2] Health 198H ⟞804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited Cases

In determining whether the expert report constitutes a good faith attempt to comply with Medical Liability and Insurance Improvement Act, courts look no further than the report itself, and while the report need not marshal all of the plaintiff's proof, it must include the expert's opinion on each of the elements identified in the Act: standard of care, breach, and causation. V.T.C.A., Civil Practice & Remedies Code § 74.351(l).

**[3] Health 198H ⟞804**

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(G) Actions and Proceedings
            198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited Cases

Expert report under Medical Liability and Insurance Improvement Act need not present evidence as if the plaintiff were actually litigating the merits, but it must do more than merely state the expert's conclusions about the statutory requirements. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[4] Appeal and Error 30 ⟞960(1)**

30 Appeal and Error
  30XVI Review
    30XVI(H) Discretion of Lower Court
        30k960 Rulings on Motions Relating to Pleadings

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

243 S.W.3d 165
**(Cite as: 243 S.W.3d 165)**

30k960(1) k. In General. Most Cited Cases

Appellate courts review a trial court's determination about the adequacy of an expert report under Medical Liability and Insurance Improvement Act for abuse of discretion. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[5] Health 198H ☞804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited Cases

**Judgment 228 ☞181(33)**

228 Judgment
  228V On Motion or Summary Proceeding
    228k181 Grounds for Summary Judgment
      228k181(15) Particular Cases
        228k181(33) k. Tort Cases in General. Most Cited Cases

A motion to dismiss seeks to demonstrate that a plaintiff has not satisfied the procedural requirements with respect to expert report under Medical Liability and Insurance Improvement Act, while a motion for summary judgment seeks to demonstrate that the substance of the claim lacks merit. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**[6] Health 198H ☞804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited Cases

While anesthesiologist's challenge to the scope of his legal duty to patient might indeed be a proper

inquiry at trial, or during a summary judgment proceeding, it was simply not a determination contemplated or required with respect to anesthesiologist's motion to dismiss, challenging the adequacy of expert report. V.T.C.A., Civil Practice & Remedies Code § 74.351(l).

**[7] Health 198H ☞804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited Cases

Under Medical Liability and Insurance Improvement Act, a qualified expert in a similar field may testify as to the accepted standards of care if he can demonstrate within the expert report that he possesses knowledge about the care or treatment delivered by the defendant and the diagnosis, care or treatment of the condition involved in the claim.' V.T.C.A., Civil Practice & Remedies Code § 74.402(b).

**[8] Health 198H ☞804**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk804 k. Affidavits of Merit or Meritorious Defense; Expert Affidavits. Most Cited Cases

Doctor's expert report established that he was practicing health care in field of practice that involved the same type of care or treatment as provided by anesthesiologist to patient, and further established the necessary experience and knowledge to render expert opinion, and thus, the expert report was adequate under Medical Liability and Insurance Improvement Act; expert report set forth applicable standards of care required of a licensed physician, such as anesthesiologist, when completing a history and physical examination on pre-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

operative patient and when serving as supervising physician for podiatrist conducting a surgical procedure. V.T.C.A., Civil Practice & Remedies Code § 74.351(*l*), (r)(6).

**\*166** Diana L. Faust, R. Brent Cooper, Michelle E. Robberson, Cooper & Scully, P.C., Dallas, TX, Karen R. Roberts, Rosemary L. Hollan, Hollan Law Firm, P.C., San Antonio, TX, for Appellant.

Jon T. Powell, The Powell Law Firm, Brant S. Mittler, M.D., J.D., San Antonio, TX, for Appellees.

**\*167** Sitting: CATHERINE STONE, Justice, PHYLIS J. SPEEDLIN, Justice, STEVEN C. HILBIG, Justice.

## OPINION

Opinion by PHYLIS J. SPEEDLIN, Justice.

In this interlocutory appeal, we are asked to determine if the trial court abused its discretion when it denied Dr. Michael Wissa's motion to dismiss the underlying medical malpractice suit against him. Finding no error, we affirm the trial court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts relevant to this appeal are essentially undisputed. Mary Elizabeth Voosen ("Emmy"), a 16 year old high school student, athlete, and cheerleader sought medical evaluation and treatment for chronic right ankle pain. Initially, Marque Allen, D.P.M., a podiatrist employed by Sports Medicine Associates of San Antonio, evaluated Emmy and determined that her ankle was unstable due to a ligament injury. To correct the problem, Dr. Allen performed a surgical procedure on Emmy's right ankle on October 29, 2004. Subsequently, on November 29, 2004, Dr. Allen saw Emmy in follow up and scheduled a second surgery on Emmy's ankle for the next day. Immediately prior to her second surgery, Emmy met with the anesthesiologist for the procedure, Dr. Michael Wissa. Dr. Wissa performed a pre-anesthesia evaluation prior to administering anesthesia and also documented the patient's required history and physical examination. The history and physical form that Dr. Wissa completed listed him as "Examining M.D. for Podiatry."[FN1] Dr. Wissa did not treat Emmy again after her second surgery.

> FN1. A podiatrist is licensed to practice podiatry. TEX. OCC.CODE ANN. § 202.001(3)(A) (Vernon 2004). "Podiatry" means the treatment of or offer to treat any disease, disorder, physical injury, deformity, or ailment of the human foot by any system or method. *Id.* § 202.001(a)(4) (Vernon 2004).

Emmy developed complications at the surgical site. She and her parents ultimately sued five defendants, including Dr. Wissa, for medical negligence, alleging failure to properly diagnose and treat her wound infection resulting in unnecessary surgeries, chronic infection, pain and suffering and impairment to her ankle. The Voosens timely served the expert report of Marvin Brown, M.D. Dr. Wissa objected to Dr. Brown's report as it pertained to him and filed a motion to dismiss under section 74.351(b) of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b) (Vernon Supp.2006). The trial court denied Dr. Wissa's motion and this interlocutory appeal was perfected.

In one issue, Dr. Wissa maintains the trial court abused its discretion in denying his motion to dismiss the medical malpractice suit against him. Dr. Wissa first argues the trial court failed to determine as a matter of law that Dr. Wissa owed no legal duty to Emmy as a podiatrist or surgeon.[FN2] Specifically, Dr. Wissa maintains the standard of care set forth in Dr. Brown's report does not apply to him in his limited role as an anesthesiologist. In a related argument, Dr. Wissa also maintains Dr. Brown's expert report fails to establish that he is qualified to render an opinion about the standards of care applicable to Dr. Wissa in his role as an anesthesiologist.**\*168** In response, the Voosens contend Dr. Brown's report meets the statutory require-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

243 S.W.3d 165
**(Cite as: 243 S.W.3d 165)**

ments necessary for an expert report under section 74.351(b) of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b).

> FN2. Dr. Wissa also argues that "the trial court erroneously relied on expert testimony about duty to impliedly find Dr. Wissa owed the duties of a podiatrist or surgeon even though Dr. Wissa only formed a physician-patient relationship for the purposes of administering anesthesia to Emmy...."

### APPLICABLE LAW AND STANDARD OF REVIEW

[1] In a medical malpractice lawsuit such as the one before us, a claimant must timely provide each defendant health care provider an expert report with the expert's curriculum vitae. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp.2006). The Chapter 74 expert report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) (Vernon Supp.2006). In order to comply with the statutory requirements, the report must both inform the defendant of the specific conduct the plaintiff has called into question, and provide a basis for the trial court to conclude that the claims have merit. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001); *Tovar v. Methodist Healthcare Sys. of San Antonio, Ltd., L.L.P.,* 185 S.W.3d 65, 67–68 (Tex.App.-San Antonio 2005, pet. denied).

[2][3][4] If the affected physician or health care provider challenges the report's adequacy by a motion to dismiss, the trial court must grant the motion "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an ex-

pert report in Subsection (r)(6)." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l* ) (Vernon Supp.2006). In determining whether the expert report constitutes a good faith attempt to comply with the statute, we look no further than the report itself. *See Palacios,* 46 S.W.3d at 878 (the only information relevant to the inquiry is within "the four corners" of the report). While the report need not marshal all of the plaintiff's proof, it must include the expert's opinion on each of the elements identified in the statute: standard of care, breach, and causation. *Id.* at 878–79; *Tovar,* 185 S.W.3d at 68. The report need not present evidence as if the plaintiff were actually litigating the merits, but it must do more than merely state the expert's conclusions about the statutory requirements. *Palacios,* 46 S.W.3d at 879. In addition to expressing a fair summary of the expert's opinions on the three elements of an expert report, the report must be rendered by an expert qualified to testify under section 74.401. TEX. CIV. PRAC. & REM.CODE ANN. § 74.401 (Vernon 2005). We review a trial court's determination about the adequacy of an expert report under an abuse of discretion standard. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Id.*

### DISCUSSION

[5] Dr. Wissa first argues the trial court erred in failing to properly analyze and apply the law regarding legal duty. He maintains his duty to Emmy was limited because he was only engaged to provide anesthesiology services; therefore, the trial court should have made a threshold determination that Dr. Wissa owed no legal duty to Emmy as a podiatrist or surgeon. Dr. Wissa cites several cases for the legal proposition that the existence of duty in a medical negligence case is a **\*169** question of law the trial court must make before it considers the applicable standard of care. *See, e.g., Praesel v. Johnson,* 967 S.W.2d 391, 394 (Tex.1998) (threshold question for court is whether treating physicians have legal duty to third parties to warn

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

epileptic patients not to drive); *St. John v. Pope, 901 S.W.2d 420, 423 (Tex.1995)* (duty of on-call physician consulted over telephone must be decided before issue of standard of care). None of the cases cited by Dr. Wissa, however, involve a Chapter 74 expert report. Instead, each case cited by Dr. Wissa arises in the context of a summary judgment proceeding, which we find readily distinguishable from a motion to dismiss filed under section 74.351. *Compare* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) (expert report must address each element identified in the statute-applicable standard of care, breach and causal relationship) *with* TEX.R. CIV. P. 166a(c) (summary judgment is proper where no genuine issue exists as to any material fact). While the purposes of a motion to dismiss under section 74.351 and a motion for summary judgment are similar in some respects, their scope is clearly different. *See Farishta v. Tenet Healthsystem Hospitals Dallas, Inc.,* 224 S.W.3d 448, 453 (Tex.App.-Fort Worth 2007, no pet.) (noting that both seek to eliminate frivolous claims). A motion to dismiss seeks to demonstrate that a plaintiff has not satisfied the *procedural* requirements of Chapter 74, while a motion for summary judgment seeks to demonstrate that the *substance* of the claim lacks merit. *See Smalling v. Gardner,* 203 S.W.3d 354, 367 (Tex.App.-Houston [14th Dist.] 2005, pet. denied); *see also Apodaca v. Russo,* 228 S.W.3d 252, 255 (Tex.App.-Austin 2007, no pet.) (expert report is not required to prove defendant's liability, but rather to provide notice of what conduct forms the basis for plaintiff's complaints); *see also Palacios,* 46 S.W.3d at 879 ("[t]o avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial").

[6] Furthermore, Dr. Wissa does not dispute that he had a physician-patient relationship with Emmy, and therefore, owed some duty to Emmy. He admits he physically examined her prior to her surgery, filled out her history and physical form, and provided the anesthesia for her surgery. Instead, Dr. Wissa disputes that his duty to Emmy extended beyond his role in providing anesthesia, or that by completing a history and physical form prior to the procedure he assumed "full responsibility for Dr. Allen's conduct and all aspects of Emmy's care before, during and after the procedure." He argues that the trial court should have determined, as a matter of law, that he did not have a duty to Emmy outside the administration of anesthesia, and, accordingly, should have ignored Dr. Brown's report and criticisms to the contrary. As noted by the Supreme Court in *Praesel,* in deciding whether a legal duty exists, among other factors, the court "weigh[s] the risk, foreseeability and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury and the consequences of placing that burden on the defendant." *Praesel,* 967 S.W.2d at 397; *Graff v. Beard,* 858 S.W.2d 918, 920 (Tex.1993) (decision to impose common law duty involves complex considerations of public policy and their application to the particular facts of case). While Dr. Wissa's challenge to the scope of his legal duty to Emmy may indeed be a proper inquiry at trial, or during a summary judgment proceeding, it **\*170** is simply not a determination contemplated or required under the statutory language of Chapter 74. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l* ) ("[a] court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report....").

[7] Dr. Wissa also challenges Dr. Brown's qualifications to render an opinion on the standards of care applicable to Dr. Wissa in his role as the anesthesiologist for Emmy's surgery. Dr. Wissa points out that Dr. Brown does not recite any education, training or experience in the administration of anesthesia during a podiatric surgical procedure for debridement and wound closure. We respectfully disagree that only an expert in the same specialty

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

field of practice can qualify as an expert for purposes of a Chapter 74 report. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b) (Vernon 2005). According to the statute, in order to testify about the accepted standards of care, a person must: (1) be practicing in "a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider;" (2) possess "knowledge of accepted standards of care ... for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim;" and (3) be "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care." *Id.* Accordingly, a qualified expert in a similar field may testify as to the accepted standards of care if he can demonstrate within the report that he possesses knowledge about the "care or treatment ... delivered by the defendant" and "the diagnosis, care or treatment of the ... condition involved in the claim." *Id.*

[8] Turning to the report, it is undisputed that Dr. Brown's report does not criticize Dr. Wissa's actual administration of anesthesia, but instead, sets forth the applicable standards of care required of a licensed physician such as Dr. Wissa when completing a history and physical examination on a pre-operative patient like Emmy and when serving as a supervising physician for a podiatrist conducting a surgical procedure like the procedure done on Emmy. Additionally, it is undisputed that the report adequately sets forth Dr. Brown's credentials and vast experience as a board certified orthopedic surgeon and his familiarity with lower leg, foot and ankle problems, including wound infection.[FN3] Dr. Brown's report states that he knows the accepted standard of care required of Dr. Wissa and details the manner in which he is familiar with the accepted standards of care for completing pre-operative history and physical examinations and serving as a supervising physician for a podiatrist. For example, Dr. Brown affirmatively states:

> FN3. Dr. Brown's report dated February 19, 2007 is directed at both Dr. David R. Schmidt and Dr. Michael F. Wissa and is over eighteen pages in length. It details Dr. Brown's credentials, documents reviewed, and the patient's history, and devotes over five pages to Dr. Wissa's care of Emmy.

[I] am fully qualified to render opinions about the standard of care, breaches of the standard of care, and causation with respect to the damages caused by those breaches to Ms. Voosen by virtue of the fact that the process of pre-operative evaluation as 'Examining M.D. for Podiatry' is the same for orthopedic surgeons and any other medical doctor of any specialty who takes on that responsibility or who fails to take on that responsibility. The specific skills to perform a competent History and Physical **\*171** Examination and Assessment and Plan are taught to all medical students in all specialty areas and contain common elements for all specialties, whether orthopedic surgery or anesthesiology.

The report further details ten standards of care "for Dr. Michael Wissa in treating patients with conditions like or similar to those experienced by Emmy Vossen" and the manner in which the care provided by Dr. Wissa failed to meet the enumerated standards. For example, Dr. Brown opines that when he performed a physical examination for purposes of filling out the history and physical form, Dr. Wissa was expected, as a medical doctor, to diagnose a wound infection and to recognize that it required hospitalization and "urgent consultation with other specialists."

Based on the record before us, Dr. Brown's report establishes that he is practicing health care in a field of practice that involves the same type of care or treatment as provided by Dr. Wissa to Emmy, and further establishes the necessary experience and knowledge to render an expert opinion. Accordingly, the trial court did not abuse its discretion when it denied Dr. Wissa's motion to dismiss. We affirm the trial court's order.

Tex.App.–San Antonio,2007.
Wissa v. Voosen

243 S.W.3d 165
**(Cite as: 243 S.W.3d 165)**

243 S.W.3d 165

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.